UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO. 2:10-CR-334-FTM-29SPC

---

PATRICK HURLEY,

          Plaintiff,

vs.                                          Fort Myers, Florida
                                             April 9, 2012
KENT OF NAPLES, INC., a Florida              9:00 A.M.
Corporation, KENT SECURITY OF PALM
BEACH, INC., a Florida Corporation,
and KENT SECURITY SERVICES, INC., a
Florida Corporation,

          Defendants.

---

TRANSCRIPT OF EXCERPT JURY TRIAL DAY 1
(Excluding Jury Selection)

BEFORE THE HONORABLE LAWRENCE PIERSOL
UNITED STATES DISTRICT JUDGE

FOR THE PLAINTIFF:          Morgan & Morgan, P.A.
                            6824 Griffin Road
                            Davie, Florida  33314
                            954/243-4295
                            BY:  RICHARD CELLAR
                                 ANGELI MURTHY

FOR THE DEFENDANTS:         Blue Rock Legal, P.A.
                            10800 Biscayne Boulevard, Suite 410
                            Miami, Florida  33161
                            305/981-4300
                            BY:  FRANK H. HENRY

REPORTED BY:                R. JOY STANCEL, RMR-CRR
                            Federal Official Court Reporter
                            2110 First Street
                            Fort Myers, Florida  33901
                            239/461-2064

```
 1                    I N D E X
 2   Plaintiff Opening                        Page  41
 3   Defense Opening                          Page  63
 4
 5   WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS
 6   Carlos Paisan             78     104     113
 7   Frederick Stuart         116     161
 8
 9
10              E X H I B I T   I N D E X
11   NUMBER                                        PAGE
12   Plaintiff 54   Medical Records                 82
13   Plaintiff 55   Dauer Treatment Record          90
14   Plaintiff 56   Dauer Medical Record            91
15   Plaintiff 57   Stuart Treatment Notes         127
16   Plaintiff 58   Medical Chart 12/21/07          93
17   Plaintiff 59   Clinical Social History        193
18   Plaintiff 60   Discharge Summary              141
19   Plaintiff 61   Carter Progress Notes          150
20   Plaintiff 62   Family Practice Note 1/21/08    95
21   Plaintiff 64   Family Practice Note 5/9/08     97
22   Plaintiff 65   FMLA Form                      100
23   Plaintiff 66   Stuart Summary Letter          143
24
25   Defense R-3    Vacation Photos 2005-2008      169
```

```
 1              (Call to Order of the Court)
 2              THE COURT:  Good morning.
 3              MR. HENRY:  Good morning, Your Honor.
 4              MR. CELLAR:  Good morning.
 5              THE COURT:  Appearances, first for the plaintiff.
 6              MR. CELLAR:  May it please the Court, Your Honor,
 7    Richard Cellar and Angeli Murthy from the law firm of
 8    Morgan & Morgan on behalf of our client, Patrick Hurley.
 9              THE COURT:  For the defense?
10              MR. HENRY:  Your Honor, I'm Frank Henry for all
11    defendants, and I have with me Gil Neuman and Defendant Orly
12    Alexander.
13              THE COURT:  Well, we're new to each other, so this
14    is a chance for us to get organized a little bit before we
15    start and I don't think I have too many peculiarities with
16    regard to conducting a trial, but of course every judge
17    thinks that, and I'll go through a couple things.  One, some
18    lawyers have gotten in the habit, because they can get away
19    with it in some places, of making long, narrative
20    objections, and that isn't the rule, nor is it the way that
21    I'll conduct a trial.  If you have an objection, if it's
22    hearsay, say hearsay.  If it's foundation, say foundation.
23    The problem with a long, narrative, somewhat argumentative
24    objection is that it kind of encourages the Court to not
25    just rule on it, because that sounds kind of hollow, but
```

1  rather it encourages the Court to give kind of a long

2  explanation if overruling the objection as to why it isn't a

3  very good objection at all and so that's why I just want the

4  objection, you know, foundation, hearsay, whatever it is,

5  and I'll rule on it.

6        If I don't understand in my own mind why the

7  objection is or I've got a real problem with it and I think

8  it's important, I'll call you up to the bench and I'll ask

9  you.  We're not going to argue in front of the jury, in

10  terms of back and forth that they can hear.

11        Also, I believe that the rules of evidence are

12  rules of inclusion, not exclusion but inclusion of

13  trustworthy evidence.  Trustworthy is a big word but with

14  that in mind, I trust that lawyers on both sides are

15  experienced trial lawyers, but nonetheless, once in a while

16  you get a in a situation where you're trying to put in a

17  piece of evidence and you think it should come in and it's

18  just not coming in.  Objections are getting sustained,

19  getting sustained.  Well, if that's the case and you really

20  don't understand why you're not getting it in, you can ask

21  to approach the bench.  I'll tell you why.  And then you

22  might not be able to overcome whatever the problem is, but

23  I'll tell you what the problem is, although normally you

24  will have figured it out.

25        That doesn't mean I want everybody running up to

1    the bench every time an objection gets sustained but it does

2    mean, you know, on something where you're really just not

3    getting something in, you thought it was -- your foundation

4    was good and it seemed like it was relevant and it's not

5    coming in, you can do that.  I have had situations where

6    lawyers start bringing up to the bench on every sustaining

7    of an objection and that isn't what I'm talking about.

8              Then is there any issue with regard to once the

9    evidence starts being presented with regard to witnesses in

10   the courtroom?  In other words, do you have any

11   understanding with regard to the exclusion of the witnesses

12   or does anybody wish to make a motion in that regard?

13             MR. CELLAR:  Your Honor, I'd like to invoke the

14   rule until a witness testifies and once they testify, I have

15   no objection to allowing them to remain in the courtroom.

16             THE COURT:  Very well.  What's defense position?

17             MR. HENRY:  We have no -- we would agree with the

18   exclusionary rule, but with the caveat that any witness that

19   I may call in my case in chief after the plaintiff has

20   rested, we would ask to be excused for the remainder of the

21   trial until I've recalled them.  There may be witnesses that

22   testify in Mr. Cellar's case in chief, and based on what he

23   just said, once that witness testifies, that witness would

24   be able to stay in the courtroom for the remainder of trial.

25   But in fact, there may be witnesses that I might recall

```
 1   during my case in chief.  I would prefer that those
 2   witnesses be excluded from the courtroom until they've
 3   testified in my case in chief.
 4           MR. CELLAR:  I can tell Your Honor directly, the
 5   only one would be Mr. Hurley's wife, who's going to testify
 6   today, and then she would just want to be present to support
 7   her husband during the trial.
 8           THE COURT:  You're going to have to -- by the way,
 9   I have a high frequency hearing loss so just so you know,
10   you're going to have to speak into the microphone so I'll
11   hear you.
12           MR. CELLAR:  Is it easier, Your Honor, may I sit
13   as I speak?  Is that okay?
14           THE COURT:  Yes.
15           MR. CELLAR:  The only witness that we would ask be
16   allowed to remain is Patrick Hurley's wife, who will be
17   testifying today and would like to remain in the trial for
18   support of her husband.
19           THE COURT:  Well, I mean, in support of her
20   husband doesn't make any difference with regard to the rule
21   for exclusion.  I think that the request is reasonable.
22   She'll be excluded because I take it she is being called by
23   the defense; is that right?
24           MR. HENRY:  We'll be calling her as a witness in
25   the defense.
```

| | |
|---|---|
| 1 | THE COURT:  She's going to be excluded. |
| 2 | MR. CELLAR:  Okay, Your Honor. |
| 3 | THE COURT:  And the rule for exclusion is, and |
| 4 | motion by both sides is granted.  Is there a separate issue |
| 5 | with regard to any expert witnesses? |
| 6 | MR. CELLAR:  We intend on calling an expert |
| 7 | economist to establish Mr. Hurley's back damages.  Now, the |
| 8 | prior judge in the case ruled that the expert would not |
| 9 | testify to the jury with regard to a potential front pay |
| 10 | award. |
| 11 | THE COURT:  All right.  It's no different with |
| 12 | regard to me. |
| 13 | MR. CELLAR:  Correct.  My only question, Your |
| 14 | Honor, is the expert, Dr. Pettingill, will be here to |
| 15 | testify.  Does it make sense from a logistics standpoint, |
| 16 | are you interested in hearing his testimony outside the |
| 17 | presence of the jury on the calculation of front pay? |
| 18 | THE COURT:  No. |
| 19 | MR. CELLAR:  So then he'll just be here to testify |
| 20 | regarding back pay. |
| 21 | THE COURT:  What I was getting at with my question |
| 22 | was sometimes, and I don't know -- you know, I was aware of |
| 23 | that issue with regard to your economic expert -- but |
| 24 | sometimes a party wants to have an expert in to listen to |
| 25 | testimony.  I didn't think that this was one of those cases. |

1          MR. HENRY:  That's correct, Your Honor.
2    Dr. Pettingill testified at his deposition that his only
3    expertise is the ability to reduce a front pay award to its
4    present value, you know.  When he's teed up to testify and
5    he's qualifying as an expert, we're going to be challenging
6    his ability to testify as to a back pay award because he
7    testified at his deposition that he has no experience, no
8    expertise in doing that.  We would respectfully request the
9    Court exclude him as a witness even in the preliminary
10   stages of the trial because it's anything but clear that
11   he's going to testify and there are serious problems with
12   his report that we don't necessarily want him to correct
13   based upon what he hears during the trial.
14         THE COURT:  We're not going to have a Daubert
15   hearing right now.  I mean, you're going to challenge him, I
16   think, on cross examination?
17         MR. HENRY:  Correct.
18         THE COURT:  All right.  Well, but he can be in
19   here, if he is around, until the evidence starts being
20   presented.
21         MR. HENRY:  I have no objection to that.
22         THE COURT:  All right.  I told both sides that you
23   could have 20 minutes for voir dire after the Court has
24   conducted its own voir dire.  And then let me ask, how much
25   time does plaintiff anticipate for opening statement?  And

```
 1    I'm going to ask the same thing of the defense.
 2              MR. CELLAR:  Approximately 45 minutes, Your Honor.
 3              THE COURT:  What's the defense time.
 4              MR. HENRY:  We think 15 to 20 minutes.
 5              THE COURT:  45 minutes is too long, because the
 6    problem is that, you know, this doesn't appear to be that
 7    complicated of a case and the opening statement, the longer
 8    it gets, the more likely it is it's going to turn into at
 9    some point argument rather than recitation of what you
10    expect the evidence to be.  So half an hour is the limit on
11    opening.
12              All right, you have the preliminary jury
13    instructions that I'm going to give in the case, and is
14    there anything that the plaintiff wants to bring out before
15    we bring the jury in?
16              MR. CELLAR:  There are three preliminary matters,
17    Your Honor, that I did want to address with you.  One of
18    them deals with, I believe the defendants intend to call
19    Mr. Hurley's former attorney to testify regarding
20    communications that they had, that Mr. Hurley is not waiving
21    his privilege on.  The dispute, and it's the second part of
22    the issue I want to raise, centers on an EEOC charge that
23    was filed on Mr. Hurley's behalf that he never signed.  The
24    testimony is going to be that Mr. Hurley did not see the
25    EEOC charge and didn't sign it.
```

```
 1              To bring in Mr. Hurley's former lawyer would
 2     eviscerate the attorney-client privilege and if they just
 3     want to simply ask whether the attorney sent it to
 4     Mr. Hurley and whether Mr. Hurley agreed to it, I don't
 5     necessarily have an objection to that testimony, but to get
 6     into the specifics of what he and his attorney discussed
 7     regarding this litigation would be incredibly prejudicial to
 8     Mr. Hurley and would also violate the attorney-client
 9     privilege.
10              Do you want me to address the second issue which
11     is related, as well?
12              THE COURT:  What's that?
13              MR. CELLAR:  Well, the defendant intends to
14     introduce a finding from the EEOC, essentially a no cause
15     letter, and as Your Honor's aware under the FMLA, there is
16     no administrative prerequisite to filing a Family Medical
17     Leave Act claim.  You don't have to go to the EEOC and the
18     defendant's intention in offering a no cause finding on
19     other claims that were filed is intended to bolster their
20     support that the FMLA claim is not appropriate.  So the
21     courts are consistent on not allowing the findings of the
22     EEOC to be presented to a jury because the danger of that is
23     that the jury may substitute the EEOC's decision-making for
24     their own.
25              So if they want to bring up that he filed an EEOC,
```

1   he'll dispute that he saw it or signed it, but the actual

2   finding is entirely irrelevant to his FMLA claim,

3   considering as I mentioned earlier there is no prerequisite

4   in filing an FMLA claim.  So whether the jury found cause

5   under Title VII or the ADEA has no relevance to the FMLA.

6          THE COURT:  Let me hear from the defense on that.

7          MR. HENRY:  Your Honor, this issue has been the

8   subject of several motions already.

9          THE COURT:  I saw that.

10         MR. HENRY:  Judge Steele --

11         THE COURT:  A lot of it had to do with whether or

12  not her deposition would be taken, which ultimately the

13  Court said no.

14         MR. HENRY:  Ultimately, the Court said no.  Judge

15  Steele, in an order before that, ruled on the admissibility

16  of the EEOC charges, and as you probably read in that order

17  and the supporting motions, the EEOC charges are chock full

18  of admissions that are relevant to this case, such as the

19  fact that Mr. Hurley said in those charges that Mr. Neuman

20  was motivated against him to force him out of the company

21  for years before he was actually terminated.  That goes to

22  the issue of whether or not the reason for his discharge was

23  this vacation request that he submitted in April of 2008.

24  And there are others.  But Judge Steele said that those

25  charges are admissible.  It gave us the opportunity to

1    depose Geralyn Noonan in order to authenticate the charges

2    because Mr. Hurley said I'm not sure I ever saw these

3    charges before, self-servingly. so Judge Steele said go

4    ahead and take Ms. Noonan's deposition and he said, by the

5    way, the conversations that they had together are not

6    subject to the privilege and those cases are cited in the

7    order.  Judge Steele said that it was not privileged when

8    Mr. Hurley told his lawyer information that was intended to

9    go into that EEOC charge to be filed with the Government.

10    That's the scope of the waiver of the privilege, whatever

11    Mr. Hurley told her that was going to go into the EEOC

12    charge.

13         So we intend to call Geralyn Noonan to

14    authenticate those charges because her signature is on them,

15    and I'm going to ask her where she got the information

16    that's in the charges.  There's four charges that she filed

17    and there's also an unemployment claim.  There's no issue

18    that she did so in her representative capacity.  She was his

19    attorney at the time.  As you know, things that lawyers

20    write in their representative capacity are admissions on

21    behalf of the party that hired the attorney and so we intend

22    to call Ms. Noonan to authenticate the charge and tell us,

23    tell the jury where she got that information.

24              MR. CELLAR:  May I respond briefly, Your Honor?

25              THE COURT:  You may.

1          MR. CELLAR:  To allow a jury --

2          THE COURT:  Don't put your hand in front of your

3    mouth when you talk.

4          MR. CELLAR:  I'm sorry, I'm sorry.  To allow a

5    jury to see an attorney cross examined regarding what their

6    client said to them during a attorney-client confidential

7    communication would eviscerate the public's interest in the

8    confidences communicated to a lawyer in anticipation of

9    litigation.  Mr. Henry's argument related to the charges.

10   The first portion of what I raised this mornings was the

11   findings of the EEOC.  He made no argument regarding whether

12   or why the findings would be relevant or admissible on an

13   FMLA claim.

14          With regard to the charges, themselves, he can ask

15   Mr. Hurley during cross examination, didn't you submit this

16   information to your lawyer.  But it's undisputed that

17   Mr. Hurley's signature is not on these EEOC charges.  It's

18   undisputed.  He never signed one of them.  So there is a

19   dispute whether he approved the charges before they were

20   filed.  And I understand, to the extent they want to ask

21   Mr. Hurley about that, that's fair game.  But to then get

22   into the attorney-client privilege, I think the

23   attorney-client privilege outweighs, and the case law is

24   fairly clear on this, any potential need to use the evidence

25   in this type of manner.

```
1          MR. HENRY:  There's a --

2          THE COURT:  Go ahead.

3          MR. HENRY:  There's a problem, Your Honor, with

4   the authentication of the document.  Mr. Hurley is not

5   willing to authenticate the documents.  If Mr. Cellar is

6   willing to stipulate to their authenticity, I'm not sure

7   that Ms. Noonan is a critical witness because Mr. Hurley can

8   read those charges into the record and as long as he's

9   willing to admit that they're authentic, that's fine with

10  me.  But in the absence of his agreement as to their

11  authenticity, if he sits on the witness stand and he says

12  I've never seen these things before --

13         THE COURT:  What are you talking about,

14  specifically?  These things, documents, you're talking

15  plural.  I don't know -- I need specifics.

16         MR. HENRY:  There are four charges of

17  discrimination that were filed with the federal and state

18  government and they're basically the same allegations.  When

19  I show those four charges, I showed one of them to

20  Mr. Hurley at his deposition, he initially recognized it, he

21  talked about it in his deposition.  And then at some point,

22  he realized that the signature at the bottom was of his

23  lawyer and not Mr. Hurley and at that point, he said well

24  I'm not sure I ever saw this before.  And at that point, we

25  decided to take Ms. Noonan's deposition and that's how all
```

```
1    of this started.  Judge Steele said you can go ahead and
2    take her deposition, she can authenticate the charges, and
3    Ms. Noonan was filing a motion with the Court to excuse
4    herself from the deposition.  The judge -- on the grounds of
5    the attorney-client privilege, and Judge Steele said no, not
6    as to things that you talked about that were intended to go
7    into the charge, intended to be provided to the federal
8    government.  There's no privilege to where she got that
9    information.
10           And so we don't -- I don't intend to explore with
11   Ms. Noonan, you know, every conversation that she had with
12   Mr. Hurley, but what I would propose to do is to read a
13   sentence -- for instance, one of the charges says, "I was
14   fired on the basis of my age."  I would like to ask
15   Ms. Noonan who told you that.  Mr. Hurley says that he
16   didn't.  Ms. Noonan may have a different answer.
17           THE COURT:  I've looked at this and I was
18   preparing for this, but the document, again, I want to look
19   at Judge Steele's order again.
20           MR. CELLAR:  Your Honor, we will find that, but as
21   far as the stipulation, we are willing to stipulate that
22   those charges were filed with the EEOC.  We'll stipulate to
23   that.  They were filed on Mr. Hurley's behalf with the EEOC.
24   I think that solves the defendant's concern.
25           THE COURT:  Well, you're talking about one charge
```

1    with EEOC.  The defense is talking about four different

2    proceedings.  I don't -- we have to narrow this down as to

3    what we're talking about.

4              MR. CELLAR:  I think there were multiple charges

5    filed on Mr. Hurley's behalf with the EEOC.  I think they

6    were a little bit different with regard to the words that

7    were being used.  Regardless of that, we're willing to

8    stipulate that all of the charges that were filed were filed

9    on Mr. Hurley's behalf with the EEOC.

10             THE COURT:  All right, just a minute.  I want

11   to -- Document 74, the order, and I want to review it again,

12   since we're in the middle of it.  Just a moment.

13             MR. HENRY:  Thank you, Judge.

14             (Pause in place)

15             MR. HENRY:  Judge, what was the date on that

16   order?

17             THE COURT:  74.

18             MR. HENRY:  The date?

19             THE COURT:  The date is July 22, 2011.

20             MR. HENRY:  Thank you.

21             THE COURT:  That's the filing date.  And also the

22   date it was signed.

23             (Pause in place)

24             MR. HENRY:  Judge, the order denying Geralyn

25   Noonan's motion to quash the subpoena for her deposition is

```
1    docket entry 80, and that's the order in which the -- Judge

2    Steele discussed the attorney-client privilege issue.

3              THE COURT:  All right.  Just a moment.

4              (Pause in place)

5              THE COURT:  All right, well, with what the

6    plaintiff has now offered, that takes care of the foundation

7    problem that Judge Steele identified, but then so do we have

8    any other issues with regard to whether or not, then,

9    Ms. Noonan should testify?

10             MR. HENRY:  If there's a situation where

11   Mr. Hurley is on the witness stand and I ask him a question,

12   there's a very important matter raised in the charges and

13   that is whether Gil Neuman was attempting to constructively

14   discharge Mr. Hurley for three years prior to his actual

15   termination.  Mr. Hurley has disavowed that.  He said that

16   it didn't happen.  He was trying to be constructively

17   discharged, it was earlier in his career.

18             Geralyn Noonan is a rebuttal witness to that

19   testimony.  The only thing that I would ask Ms. Noonan was

20   the specific allegation that's in that charge, if she could

21   tell me whether that information was given to her by Patrick

22   Hurley or whether she made it up.

23             THE COURT:  Under Judge Steele's ruling, that

24   would be admissible.

25             MR. CELLAR:  However, Your Honor, in order for me
```

```
 1    to then cross examine Ms. Noonan effectively, I would have
 2    to get into further communication with Ms. Noonan regarding
 3    her representation of Mr. Hurley.  It's a very slippery
 4    slope that we're going down in the sense that she's
 5    necessarily going to have to divulge further attorney-client
 6    privilege in the very matter that's before the jury.
 7              THE COURT:  Like what?
 8              MR. CELLAR:  What Mr. Hurley discussed, the
 9    circumstances of why he felt that way, what his theories
10    were on why that might be applicable.  To allow a defendant
11    to cross examine a plaintiff on what they communicated with
12    with their counsel under the sanctity of the attorney-client
13    privilege, there's been no showing why that should be
14    eviscerated.  The burden is substantial.  I recognize Judge
15    Steele's ruling but --
16              THE COURT:  Well, are we re-arguing his ruling
17    now?  Is that it?
18              MR. CELLAR:  Well, in light of the stipulation, I
19    think that she's no longer necessary to testify.
20              THE COURT:  The stipulation just provides
21    foundation.
22              MR. CELLAR:  Your Honor, it provides foundation
23    that the documents were filed on Mr. Hurley's behalf.
24              THE COURT:  Uh-huh.
25              MR. CELLAR:  What he discussed with her on having
```

```
1    those documents filed on his behalf are irrelevant to the
2    proceedings.  They're arguing that those statements signed
3    by his attorney are assigned to him, that it's him.
4             THE COURT:  Well, is he saying -- is he going to
5    say then that I never saw that and if I'd seen it, I'd said
6    that isn't right.
7             MR. HENRY:  That's what he said at his deposition.
8             MR. CELLAR:  Yes, that's going to be his
9    testimony, but I don't think that overcomes the privilege,
10   Your Honor.
11            THE COURT:  Well, under Judge Steele's ruling, it
12   sure does.
13            MR. CELLAR:  Respectfully, Your Honor, I
14   understand Judge Steele's prior ruling, but the case, with
15   all due respect, is no longer before Judge Steele and the
16   Court's function is making sure that we don't commit
17   reversible error in allowing those things in.
18            THE COURT:  I know what the function of the Court
19   is.
20            MR. CELLAR:  So in preserving my client's
21   confidences conveyed to his attorney, I feel it's
22   appropriate to re-argue the motion.
23            THE COURT:  Well, you can't have it both ways.  He
24   says, you know, if he's disavowing what his lawyer says in
25   the pleading that was filed, he disavows that, says either
```

1    that's wrong or I never saw it, then it's going to be fair

2    game to then ask the lawyer, because even though there's

3    technically an admission, the jurors really don't understand

4    that, the, you know, your lawyer filed this now he's

5    disavowing.  So as a practical matter, the jury's going,

6    wow, he never signed that, the lawyer did.  So if that's his

7    testimony, then they're going to be able, on whatever

8    limited question that he disavows, the defense is going to

9    be able to ask his former lawyer, is that information that

10   is right here, did you get that from your then client.  Or

11   that --

12            MR. CELLAR:  Well the Court -- am I going to need

13   to object after every question, Your Honor, or will the

14   Court exercise its discretion in limiting the testimony

15   before the jury?

16            THE COURT:  Well you see, the trouble is, we're at

17   a situation where there's going to be some things that are

18   probably objectionable from your point of view, some that

19   aren't.  So I don't want a blanket.  I'm going to have to

20   rule on every objection because -- because you know, this is

21   kind of a mess because of her deposition not being taken.

22   Normally in a situation like this, I get a deposition and

23   I'd be able to see exactly what we're talking about and the

24   questioning then would track what the Court already ruled in

25   advance, you know.  Here, we're kind of winging it.  So

```
 1    you're going to have to object every time that you think
 2    something is a violation of attorney-client privilege and
 3    I'm going to have to rule on it each time.
 4           MR. CELLAR:  Would the Court consider a proffer
 5    from Ms. Noonan outside the presence of the jury before she
 6    testifies so that we don't interrupt the trial with an
 7    objection after every question?
 8           THE COURT:  Well, the trouble is, you know, are we
 9    going to talk about a proffer or am I giving a bunch of
10    advisory opinions?  Because at this point, I don't know.  It
11    may be that the question to her is going to be very limited.
12    I don't know.  In part, it's going to depend, the plaintiff
13    is going to have already testified before she's called and
14    it may be that it really narrows things down.  So I might
15    take a proffer, I might not.  I'm going to have to wait and
16    see what it looks like.
17           MR. CELLAR:  Understood, Your Honor.
18           MR. HENRY:  Thank you, Your Honor.
19           THE COURT:  All right.  Anything else from
20    plaintiff?
21           MR. CELLAR:  One final issue, and I think it can
22    be disposed of fairly briefly, is we believe the defendants
23    are going to attempt to argue what's referred to as "me,
24    too" evidence in the sense of they're going to get up here
25    and say we never discriminate against anybody else under the
```

```
 1    Family Medical Leave Act, and the case law is fairly clear
 2    that that testimony is simply intended to bolster their
 3    position.  The relevant inquiry in this case is --
 4              THE COURT:  I don't remember seeing a motion in
 5    limine about that, but go ahead.
 6              MR. CELLAR:  It's an issue that as we've gotten
 7    closer to trial we identify the defendants may try to argue,
 8    but simply put, the information in this case is whether
 9    Mr. Hurley was discriminated against or retaliated against,
10    not whether defendants treated other employees improperly
11    under the Family Medical Leave Act.  So we believe any
12    attempt to argue that would be improper bolstering and under
13    the Second Circuit's decision in Brown versus Henderson, 255
14    F.3d 246, So.2d, 2001, the Court found that whether an
15    employer discriminates against only a subset of the
16    protected class or discriminates inconsistently, the laws
17    protect any individual, so long as that individual is
18    mistreated.  So our position is the relevant inquiry here is
19    Mr. Hurley, not what defendants have done in the past with
20    other employees.
21              THE COURT:  That's 255 F.3d 776?
22              MR. CELLAR:  257 F.3d 446.
23              THE COURT:  257 F.3d 246?
24              MR. CELLAR:  Yes, Your Honor.  And also --
25              THE COURT:  Have you got a copy of the case for
```

```
 1   everybody?
 2            MR. CELLAR:  I do not, Your Honor.  And I'm not
 3   actually citing it for authority.  I'm just citing it.  I
 4   found a brief in a prior case against defendants where we
 5   argued this matter as well.  So I can get one for the Court
 6   and counsel.
 7            THE COURT:  We'll print one off but generally
 8   speaking, when you're citing something, if possible, it
 9   would be good to have a copy for everybody.  But I'll get my
10   own.
11            Okay, anything else from the plaintiff?
12            MR. CELLAR:  No, Your Honor.
13            THE COURT:  Defense?
14            MR. HENRY:  This is a Family Medical Leave Act
15   case, Judge, and so we have our human resources professional
16   that's going to testify that the company has a family
17   medical leave policy and that the company has a procedure
18   for certifying family medical leaves and that the company
19   has routinely done that in the past.  "Me, too" evidence, we
20   don't intend to put on the names or circumstances of any
21   particular employee that's ever requested or received family
22   medical leave, but the -- the nature of the claim that
23   plaintiff has tabled for us requires that we show that we
24   have a policy for addressing FMLA claims.
25            Mr. Cellar is going to be arguing that Mr. Neuman
```

1    should have treated this -- there was a request for vacation

2    leave that was submitted at midnight one night and the

3    plaintiff is claiming in this case that that was actually a

4    family medical leave and his -- in his deposition has asked

5    Mr. Neuman, you know, why didn't you send a certification

6    form, why didn't you ask for more information, and he's

7    going to say it's because it wasn't a family medical leave.

8    We're going to be putting on evidence that we have a policy,

9    that the policy has been applied to other employees, and

10   then our substantive evidence goes to our reasons for

11   treating this particular vacation request as something other

12   than a family medical leave.

13           THE COURT:  That's about three different things.

14   One, the testify -- have somebody testify from the company

15   that you have a policy.  That's one thing; no problem with

16   that.  Secondly, then, as to the fact that you have other

17   Family Medical Leave Act claims that were handled by the

18   company, that's a separate issue.  Then thirdly, what you

19   did with this particular one, that's another matter.

20           At this point, you know, because this has just

21   come up and the Court hasn't had a chance to look at the

22   case that plaintiff apparently just found this morning in

23   another brief, so seems to me, I've got 15 minutes before

24   the jury comes out.  Obviously, the first point, the fact

25   that you have a policy, that's admissible and nobody

```
 1    disagrees with that, I would trust.
 2              MR. CELLAR:  No, Your Honor.
 3              THE COURT:  All right.  The second one, though,
 4    with regard to other people, my initial impression is I
 5    don't want to be trying a bunch of sub cases --
 6              MR. HENRY:  No.
 7              THE COURT:  -- of, you know, somebody else, what
 8    were the merits of their claim and how was that handled.  I
 9    think that that tends, on my first look at this, to be more
10    confusing, distracting to the jury than probative.  So my
11    inclination at this point in opening statement, you won't go
12    into, you know, we have other claims and we handled them,
13    other claims and so on, because then that would invite going
14    into the other claims, which we're not going to do.  Unless
15    you come up with some authority that shows me we should.
16              Then of course with how this, the plaintiff's
17    claim was handled, that's what the case involves.  Anything
18    else from the defense?
19              MR. HENRY:  Nothing from the defense.
20              MR. CELLAR:  Your Honor, there was no ruling, I
21    believe, on whether they can get into the findings of the
22    EEOC, which is one of the issues that we had raised.
23              THE COURT:  As I recall, Judge Steele left that
24    one open.  Isn't that right?
25              MR. HENRY:  He did, Judge, and I may be able to
```

```
 1    resolve the issue.  We don't intend -- I don't have on my
 2    exhibit list the EEOC's no cause determination.  The most
 3    that the witness would be expected to say about the EEOC
 4    processing those charges is that they were ultimately
 5    dismissed, which is true.
 6              MR. CELLAR:  I think the word dismissal, Your
 7    Honor, has a negative connotation.
 8              MR. HENRY:  We have to have some way to describe
 9    how they were resolved.  They were dismissed with no
10    findings by the EEOC.
11              THE COURT:  No findings one way or the other or a
12    no cause?
13              MR. HENRY:  Well, the way the process works, the
14    EEOC doesn't give no cause determinations anymore because
15    the issue has been so hotly litigated.  What the EEOC does
16    is issue dismissal and notice of rights and that dismissal
17    and notice of rights says right on it, we don't make any
18    findings, this is your notice, you have 90 days to file a
19    lawsuit.  And so we all call that now a dismissal.
20              That's what was issued by the EEOC.  It's
21    noncommittal.  It doesn't mean that the EEOC found us guilty
22    or innocent.  They found no -- it's what used to be a no
23    cause determination.  No question that the jury is going to
24    ask themselves what happened to the age discrimination
25    claim.
```

```
 1          MR. CELLAR:  Which is exactly what we're concerned

 2   about, Your Honor, which is, we believe, a red herring, not

 3   relevant to the FMLA claims.

 4          THE COURT:  Well jurors, in my experience -- I've

 5   been a trial judge 19 years and I was a trial lawyer for 28

 6   years before that.  Jurors like to hear the story and if

 7   they don't hear a complete story, they'll complete it in

 8   their minds.  So we're going to have to deal with that in

 9   some way, because the EEOC filing is clearly going to come

10   into evidence.  I mean, everybody agrees it's going to, and

11   somehow, we have to deal with that in a way.

12          MR. CELLAR:  It would be the equivalent, Your

13   Honor, of us saying that the EEOC claims have been resolved.

14   That would infer or suggest to the jury that perhaps there

15   was a settlement in very much the same way a dismissal would

16   suggest it was dismissed for a negative reason.

17          MR. HENRY:  The claims were not settled.  The EEOC

18   dismissed them.

19          MR. CELLAR:  Right, but the point I'm making is,

20   you know, what about saying that the EEOC allowed Mr. Hurley

21   the right to proceed further in court on those claims.

22          THE COURT:  Then I have to give a curative saying

23   this isn't it and then they're going to think, well okay,

24   does he get another shot then?  I'm searching around, we

25   have to deal with this somehow.
```

1          MR. HENRY:  The real truth is that the EEOC issued

2     a Dismissal and Notice of Right to Sue.  That's what the

3     document is called, and that's what was issued.  There were

4     no findings, but the document that the government sent to

5     Mr. Hurley and to Kent is called a Dismissal and Notice of

6     Rights.

7          THE COURT:  I know that.  But then I'm just

8     thinking out loud --

9          MR. HENRY:  So am I.

10         THE COURT:  -- with this issue, and if we tell

11    them that and then I tell them, well, and this lawsuit isn't

12    the lawsuit brought by the plaintiff as a result of that 90

13    day permission within which you can bring a lawsuit, but

14    then we face the issue of them thinking, okay, if we zero

15    him out on this one, does he get another shot, in other

16    words, bringing that lawsuit.  Which we all know he can't

17    because the 90 days has long passed, so I'm just thinking

18    about how we properly treat that issue.  Just a minute, I

19    want to think about it.  You think about it for a minute,

20    too.

21         (Pause in place)

22         THE COURT:  I think that if I give the jury a

23    curative instruction that says the following:  You're not to

24    speculate with regard to any outcome of any EEOC

25    proceedings.

1              That just tells them that's a blank.  Is that

2      agreeable to plaintiff?

3              MR. CELLAR:  Would that be, Your Honor, in lieu of

4      the defendant even referencing any sort of dismissal during

5      their opening or testimony?

6              THE COURT:  It would be.

7              MR. CELLAR:  Then we have no objection, Your

8      Honor.

9              MR. HENRY:  I'm just picturing myself on a jury

10     and I'm wondering if I would sit there wondering, you're

11     telling me that I'm not supposed to speculate, which

12     inspires me to speculate as to what happened with the age

13     discrimination claim.  Could I suggest as an alternative as

14     part of the curative to -- curative instruction that the

15     Court instruct the jury that the EEOC processed the charge

16     in its normal course, the charge was concluded, and you're

17     not to speculate as to what the outcome was.  Is that fair?

18             MR. CELLAR:  I would defer to Your Honor on that,

19     if you're okay with that language.

20             THE COURT:  I beg your pardon?

21             MR. CELLAR:  I would defer to Your Honor on

22     whether that inclusion is fine.

23             THE COURT:  I'm sorry, I couldn't hear you.

24             MR. CELLAR:  I'm sorry, Your Honor.  I would defer

25     to the Court on whether that accomplishes the purpose of the

```
 1    curative instruction.  I don't necessarily have an objection
 2    to it.
 3             THE COURT:  Just a minute, I want to change what
 4    I've written.
 5             (Pause in place)
 6             THE COURT:  Okay, I would tell the jury, "You are
 7    advised that the EEOC charge was concluded but you're not to
 8    speculate about any outcome of any EEOC proceedings."  Is
 9    that agreeable to the plaintiff?
10             MR. CELLAR:  Yes, Your Honor.
11             THE COURT:  To the defendants?
12             MR. HENRY:  Yes, Your Honor.
13             THE COURT:  Okay, that's how we'll handle it.
14    Thank you both for helping us address that issue.
15             MR. CELLAR:  Nothing else, Your Honor.
16             THE COURT:  Anything else from the defense?
17             MR. HENRY:  Mechanical issues, Judge.  Never tried
18    a case in front of you.  You like us to stand at the podium?
19             THE COURT:  Say it again?
20             MR. HENRY:  You like us to stand at the podium
21    when we're addressing a witness?
22             THE COURT:  No, what I do is you can approach the
23    witness, but if you start to -- and you don't have to ask
24    permission to approach the witness, but if you start to lean
25    in to a witness, so to speak -- because I've tried a lot of
```

1   cases as a trial lawyer, too, and sometimes a lawyer will

2   try and exert a little influence over a witness, then I'll

3   put you back to the podium.  So you can approach the witness

4   to hand them something.  You don't have to ask permission to

5   do it.

6          I don't know what the acoustics are in this

7   courtroom, but you probably, so that I'm sure I'm hearing

8   you, you're probably going to have to stick pretty close to

9   the microphone.  Sometimes you're going to be over at ELMO,

10  or whatever this audiovisual is, and you don't want to have

11  to dance back and forth, but if you're over there, make sure

12  you're enunciating, okay?  So you don't have to be welded to

13  the podium, but you have to make sure that I hear you

14  because if I'm not, you can bet there's one out of 12 of

15  those jurors that isn't hearing you either.  Does that give

16  you enough instruction?

17          MR. HENRY:  It does.  Thank you.

18          THE COURT:  We'll take a five minute recess, then,

19  before we bring in the jurors.

20          (Proceedings took place, to include jury

21  selection, that are not included in this excerpt, after

22  which, proceedings continued as follows:)

23          THE COURT:  Bring in the jury, please.

24          COURT SECURITY OFFICER:  Yes, sir.

25          (Jury in)

1          COURT SECURITY OFFICER:  Ms. Libby, they seem to
2     be messed up on their numbers.
3          THE COURT:  Please be seated.  If you'd stand, the
4     courtroom deputy will administer the oath as you actually
5     serving as jurors.
6          DEPUTY CLERK:  I did, Your Honor, before we went
7     to lunch.
8          THE COURT:  Oh, you did before you went to lunch.
9     It's been done; I didn't realize that.  All right, you may
10    be seated.
11          Ladies and gentlemen, you've now been sworn as the
12    jury to try the case.  By your verdict, you will decide the
13    disputed issues of fact.  I will decide all questions of law
14    and procedure that arise during the trial.  And before you
15    retire to the jury room at the end of the trial to
16    deliberate upon your verdict and decide the case, I will
17    explain to you the rules of law which you must follow and
18    apply in making your decision.
19          The evidence presented to you during the trial
20    will primarily consist of the testimony of witnesses and
21    tangible items including papers or documents called
22    exhibits.
23          Preliminary Instruction Number 2.  This is a civil
24    case brought by the plaintiff, Patrick Hurley.  In this
25    case, the plaintiff, Patrick Hurley, brings a claim under

1    the Family Medical Leave Act to recover damages for alleged

2    interference with and retaliation for plaintiff asserting

3    his rights under the Family Medical Leave Act.  Plaintiff

4    alleges defendants fired him because he requested time off

5    under the Family Medical Leave Act.

6              The defendants, Kent of Naples, Kent Security of

7    Palm Beach, Inc., Kent Security Services, Inc., Gil Neuman,

8    and Orly Alexander deny plaintiff's allegations and assert

9    that plaintiff's employment was terminated for other

10   reasons.  Defendants also contend that plaintiff was not

11   damaged to the extent he claims and that the plaintiff

12   failed to mitigate his alleged damages.

13             It will be your duty to decide from the evidence

14   whether the plaintiff is entitled to a verdict against the

15   defendants.  From the evidence, you will decide what the

16   facts are.  You're entitled to consider that evidence in the

17   light of your own observations and experiences in the

18   affairs of life.  You will then apply those facts to the law

19   which I give you in the case and my other instructions, and

20   in that way, reach a verdict.

21             You're the sole judges of the facts but you must

22   follow the law as stated in my instructions, whether you

23   agree with it or not.

24             Preliminary Instruction Number 3.  You should pay

25   close attention to the testimony because it will be

```
 1    necessary for you to rely upon your memories concerning what
 2    the testimony was.  Although, as you can see, the court
 3    reporter is making a stenographic record of everything that
 4    is said, typewritten transcripts will not be prepared in
 5    sufficient time or appropriate form for you -- for your use
 6    during your deliberations and you should not expect to
 7    receive them.  On the other hand, any exhibits admitted into
 8    evidence during the trial will be available to you for
 9    detailed study if you wish during your deliberations.  So if
10    an exhibit is received in evidence but is not fully read or
11    shown you at the time, don't be concerned because you will
12    get to see and study it later during your deliberations.
13              Preliminary Instruction Number 4.  If you would
14    like to make notes during the trial, you may do so.  On the
15    other hand, of course, you're not required to take notes if
16    you do not want to.  That will be left up to you
17    individually.  If you do decide to take notes, do not try to
18    write everything down because you'll get too involved --
19    excuse me, you will get so involved in note-taking that you
20    might become distracted from the ongoing proceedings.  Just
21    make notes of names or dates and places, things that might
22    be difficult to remember.
23              Also, your notes should be used only as aids to
24    your memory and if your memory should later differ from your
25    notes, you should rely upon your memory and not your notes.
```

1    If you do not take notes, you should rely on your own

2    independent recollection or memory of what the testimony was

3    and what you should not be unduly -- and you should not be

4    unduly influenced by the notes of other jurors.  Notes are

5    not entitled to any greater weight than the recollection or

6    impression of each juror concerning what the testimony was.

7            Preliminary Instruction Number 5.  In deciding

8    what the facts are, you may have to decide what testimony

9    you believe and what testimony you do not believe.  You may

10   believe all of what a witness says or only part of it or

11   none of it.  In deciding what testimony to believe, consider

12   the intelligence of the witness, the opportunity the witness

13   had to see or hear things testified about, the memory of the

14   witness, any motives the witness may have for testifying a

15   certain way, the manner of the witness while testifying,

16   whether the witness says something different than at an

17   earlier time, the general reasonableness of the testimony

18   and the extent to which the testimony is consistent with the

19   other evidence that you believe.

20           Do not allow sympathy or prejudice to influence

21   you.  The law demands that you give a just verdict

22   unaffected by anything except the evidence, your common

23   sense, and the law as I give it to you.  You should not take

24   anything I say or do during the trial as indicating what I

25   think of the evidence or what I think your verdict should

```
 1   be.
 2              Preliminary Instruction Number 6.  During the
 3   trial you should keep an open mind and should avoid reaching
 4   any hasty impressions or conclusions.  Reserve your judgment
 5   until you've heard all of the testimony and evidence, the
 6   closing arguments or summations of the lawyers, and my
 7   instructions or explanations to you concerning the
 8   applicable law.
 9              You, as jurors, must decide this case based solely
10   on the evidence presented here within the four walls of this
11   courtroom.  You should avoid reading any newspaper articles
12   that might be published about the case and should also avoid
13   seeing or hearing any television or radio comments about the
14   trial.
15              During the trial, you must not conduct any
16   independent research about this case, the matters in the
17   case, and the individuals or issues involved in the case.
18   In other words, you should not consult dictionaries or
19   reference materials, such as the internet, web sites, blogs,
20   or use any other electronic tools to obtain information
21   about the case or to help you decide the case.  Please do
22   not try to find out information from any source outside the
23   confines of this courtroom.
24              Until you retire to deliberate, you may not
25   discuss this case with anyone, even your fellow jurors.
```

```
 1    After you retire to deliberate, you may begin discussing the
 2    case with your fellow jurors but you cannot discuss the case
 3    with anyone else until you've returned a verdict and the
 4    case is at an end.
 5              I hope that for all of you this case is
 6    interesting and noteworthy.  I know that many of you use
 7    cell phones, Blackberries, the internet and other tools of
 8    technology.  You also must not talk to anyone about this
 9    case or use these tools to communicate electronically with
10    anyone about the case.  This includes your family and
11    friends.  You may not communicate with anyone about the case
12    on your cell phone, through email, Blackberry, i-Phone, text
13    messaging, or on Twitter, through any blog or web site,
14    through any internet chat room, or by way of any other
15    social networking web sites, including Facebook, My Space,
16    Linked In and You-tube.
17              Preliminary Jury Instruction Number 7.  From time
18    to time during the trial, I may be called upon to make
19    rulings of law on objections or motions made by the lawyers.
20    You should not infer or conclude from my ruling or other
21    comment I may make that I have any opinion on the merits of
22    the case favoring one side or the other, and if I should
23    sustain an objection to a question that goes unanswered by
24    the witness, you should not guess or speculate what the
25    answer might have been nor should you draw any inferences or
```

1   conclusions from the question, itself.

2         During the trial, it may be necessary for me to

3   confer with the lawyers from time to time out of your

4   hearing with regard to questions of law or procedure that

5   require consideration by the Court or Judge alone.  On some

6   occasions, you may be excused from the courtroom for the

7   same reason.  I'll try to limit those interruptions as much

8   as possible but you should remember the importance of the

9   matter you're here to determine and should be patient even

10   though the case may seem to go slowly.

11         Preliminary Instruction Number 8.  If during the

12   course of the trial you need to communicate with me

13   regarding a scheduling matter or emergency situation in your

14   own personal circumstances, you may send me a note by

15   delivering the note to the bailiff during a recess.  I

16   cannot answer questions regarding the subject matter of the

17   trial and will not communicate with you about the trial in

18   any way.  However, if a personal issue arises that will make

19   it difficult for you to fulfill your obligations as a juror,

20   you may communicate that to me through a note and I will

21   address the issue and respond to you.

22         Preliminary Instruction Number 9.  This building

23   is a smoke-free facility.  If you wish to smoke during a

24   break in the trial, you must do so outside the building and

25   you must be accompanied by someone from the court to allow

```
 1   your re-entry into the building.  If you wish to smoke after

 2   the jury has started deliberations, you must be accompanied

 3   outside the building by a court security officer.  The jury

 4   must stop deliberating during the entire time any member of

 5   the jury is out of the jury deliberation room.

 6              Preliminary Instruction Number 10, final one.  The

 7   order of the trial's proceedings will be as follows.  In

 8   just a moment, the lawyers for each of the parties will be

 9   permitted to address you in turn to make what we call their

10   opening statements.  Plaintiff will then go forward with the

11   calling of witnesses and presentation of evidence during

12   what we call the plaintiff's case in chief.

13              When the plaintiff finishes by announcing rest,

14   the defendants will proceed with witnesses and evidence,

15   after which, without -- within certain limitations, the

16   plaintiff may be permitted to again call witnesses or

17   present evidence during what we call the rebuttal phase of

18   the trial.

19              Plaintiff proceeds first and may rebut at the end

20   because the law places the burden of proof or the burden of

21   persuasion on the plaintiff, as I will further explain to

22   you as a part of my final instructions.

23              When the evidence portion of the trial is

24   completed, the lawyers will then be given another

25   opportunity to address you and make their summations or
```

```
1    final arguments in the case, after which I will instruct you
2    on the applicable law and you'll then retire to deliberate
3    upon your verdict.
4            Now, we'll begin by affording the lawyers for each
5    side an opportunity to make their opening statements which
6    they may explain the issues in the case and summarize the
7    facts they expect the evidence will show.  I caution you
8    that the statements that the lawyers make now, as well as
9    the arguments they make at the -- present at the end of the
10   trial are not to be considered by you either as evidence in
11   the case or as your instructions on the law.  Nevertheless,
12   these statements and arguments are intended to help you
13   understand the issues and the evidence as it comes in, as
14   well as the positions taken by both sides.  So I ask that
15   you now give the lawyers your close attention as I recognize
16   them for the purpose of opening statement.
17           Now, I'm not going to have notes given to you now
18   because remember, what you're hearing now isn't evidence.
19   But once the opening statements are done, then the courtroom
20   deputy will give you pencils and pads, to anybody that wants
21   to take notes, although you don't have to take any notes.
22   It's up to you.
23           Counsel for plaintiff, you may proceed with
24   opening.
25           MR. CELLAR:  Before we begin, I just wanted to
```

PLAINTIFF OPENING

```
 1   take a moment to thank each of you for the sacrifice that
 2   you're going to be making over the next few days.  Each of
 3   you has your own family, your own jobs, your own
 4   obligations, your own things to attend to, but make no
 5   mistake, the sacrifice that you are making to decide the
 6   fundamental rights in this case is what makes the justice
 7   system in this country work.
 8         We talk about the concept of justice in the
 9   country.  We demand it, we fight for it, we go to war over
10   it.  But this concept of justice is just a concept and it
11   only becomes reality in courtrooms like this where people
12   give of their time and your talents to weigh and enforce
13   fundamental civil rights.  It is within these four walls
14   that juries just like you all around the country give of
15   their time and make the concept of justice more than a
16   concept.  They make it a reality.  So for that, we thank
17   you.
18         May it please the Court, counsel.  Before I start
19   talking to you a little bit about what the evidence is going
20   to show, I want to talk briefly about the framework for
21   deciding the issues in this case.  You're going to hear
22   testimony and you're going to see testimony from both sides
23   and some facts are going to be undisputed, and I'll identify
24   those for you, and then there are going to be other facts
25   which are going to deal with he said/she said/they said,
```

PLAINTIFF OPENING

```
 1    people recalling different events and different stories.
 2              So you may be asking yourself, how am I supposed
 3    to figure out what actually happened?  You weren't there,
 4    the judge wasn't there, I wasn't there, and Mr. Henry wasn't
 5    there.  So the reality of the situation is that you won't be
 6    able to do that.
 7              But there's good news, and the good news is this,
 8    is that you're not going to be asked to do the impossible.
 9    You're not going to be asked to decide for certain whether
10    events actually happened or not.  Instead, you're going to
11    be asked, as the Judge will tell you at the end of the case,
12    to apply something called the preponderance of the evidence
13    test.  So what does that mean?
14              In criminal cases, we talk about beyond a
15    reasonable doubt, okay, and beyond a reasonable doubt, if we
16    were on a scale, is this.  In civil cases, we apply what's
17    called the preponderance of the evidence, 51 percent.  Is it
18    more likely than not that the defendants interfered or
19    retaliated against Mr. Hurley in violation of his civil
20    rights?  There's a big difference as you will see between
21    this, what you have to prove in a civil [SIC] case and the
22    burden that Mr. Hurley is going to have to prove to you in
23    this case, is it more likely than not, 51 percent.
24              As I explained to you, the reason why that happens
25    in civil cases, why we apply that standard is because you
```

PLAINTIFF OPENING

```
 1   weren't there and it would be an impossible task to ask you
 2   to determine what actually happened.  The question will be,
 3   is it more likely than not that the defendants discriminated
 4   and retaliated against Mr. Hurley for exercising his medical
 5   leave.
 6            Okay, let's talk about the evidence.  This is
 7   going to be a very simple case with very simple facts under
 8   what will be a very simple law called the Family Medical
 9   Leave Act.  And the Family Medical Leave Act is a law, as
10   you will hear, that's designed to permit employees who
11   suffer from chronic, serious health conditions to take time
12   off to care for their illness.  It's the same law as you may
13   have heard that allows new moms and dads to take time off
14   when they have a child or care for a sick relative.  Under
15   this law -- and as the Judge will tell you, it is illegal
16   for an employer to interfere with, fire, or otherwise
17   retaliate against an employee for exercising their rights
18   under the law, for requesting a medical leave.
19            Pat Hurley -- and I'll refer to him during this
20   case as Pat -- worked for the defendants from June 1st,
21   2001, until he was verbally fired on May 1st, 2008, as the
22   defendant's CEO, Mr. Neuman, will admit, without any reason
23   or warning and less than 24 hours after he asked for medical
24   leave.  The defendants are a very large -- the defendants
25   are a large security company that provide residential and
```

PLAINTIFF OPENING

```
 1    commercial security services throughout Florida and other
 2    states and around the country.  And you're going to hear
 3    that the defendants' security company employed close to, if
 4    not over, a thousand employees during the time period that
 5    Mr. Hurley worked for the company.  The evidence is going to
 6    show that this is not a mom and pop corporation.
 7              Now, the type of guards that work for Kent
 8    Security, just to give you a little bit of premise, these
 9    are people you'd see at a gated community, school, or
10    shopping mall.  They provide those security guard services.
11              Mr. Neuman, as you're going to hear, is the CEO of
12    Kent Security.  He's also an owner of the company.  He's the
13    person who hired Mr. Hurley back in 2001.  He's the person
14    Mr. Hurley reported to throughout his entire employment, and
15    he's the person that fired Mr. Hurley within less than 24
16    hours of Mr. Hurley asking for a medical leave of absence.
17              Orly Alexander is Mr. Neuman's sister and she is
18    also an owner in the company.  She's the CFO of the company
19    and she's an active participant in the management and
20    day-to-day operations of Kent Security from the home office
21    in Miami.
22              Now, the evidence is going to show that in
23    Mr. Hurley's seven years of employment, he received
24    promotion after promotion, from vice-president of sales to
25    president of the Naples Division, to president of the Naples
```

PLAINTIFF OPENING

```
 1    and the Palm Beach Divisions.  You're going to see that he
 2    received raise after raise, performance bonuses which
 3    Mr. Neuman will characterize as discretionary in the months
 4    before he was fired, for good performance, a performance
 5    excellence award, which you're going to hold and see.  It
 6    was a trophy that he was given for his performance just
 7    months before he was fired.  And you're going to see emails
 8    from Mr. Neuman, the person who fired him, praising Pat for
 9    his work.  Not only directly to Pat, but to the entire
10    company, calling Pat, as you will see, one of the greatest
11    success stories in this company's 25 year history.
12              What you're not going to see with regard to Pat is
13    you're not going to see a single performance evaluation that
14    was negative.  You're not going to see a single reprimand of
15    Mr. Hurley or anything else to suggest that Pat was doing
16    anything but excellent work for the defendants and you're
17    going to hear the defendant's own witnesses come and testify
18    that the growth that Kent Security of Naples enjoyed while
19    Mr. Hurley was in office was unprecedented compared to any
20    of the other divisions that were much bigger and had existed
21    much longer.
22              You're also going to hear that when they fired
23    Pat, you're going to hear that why this is so important is
24    because at the time that Pat was fired, the defendants could
25    not provide him for a reason why he was being fired.  They
```

PLAINTIFF OPENING

1    never told him when he was fired, you're being fired for
2    insubordination, you're being fired for poor performance, or
3    being fired for any other reason.  And the reason why they
4    couldn't do that is, the evidence will show, is that in
5    firing Pat within 24 hours of requesting leave, the
6    defendants violated their own employee handbook, detailing
7    how leave and medical leave is supposed to be handled, and
8    they're also -- they also violated, as you will see, the
9    employment agreement that Pat had with the defendants when
10   he was hired, which talks about how he could be fired, such
11   as giving him 30 days notice in writing, which you will hear
12   never happened.
13           The preponderance of the evidence is going to show
14   that the only possible reason why Pat was verbally fired on
15   May 1st, 2008, and which Mr. Neuman will admit to you on the
16   stand, was that Pat sent an email to Mr. Neuman on
17   April 30th, 2008, asking for medical leave and Mr. Neuman,
18   in his own words, is going to tell you that had Pat never
19   sent that email, he never would have been fired.  Mr. Neuman
20   is going to also tell you that at the time Pat sent that
21   email, as he testified to under oath and will do again in
22   this courtroom, that at the time Pat was fired when he sent
23   that email, there were no ongoing performance issues with
24   Pat that would have justified his termination.  Let me say
25   that again.  The evidence is going to show that at the time

PLAINTIFF OPENING

```
 1   Pat was fired, Mr. Neuman will admit that there were no
 2   ongoing performance issues that would have warranted Pat's
 3   termination.
 4          When Pat first started with the defendants, he
 5   started as vice-president of sales in the Miami Division and
 6   within two years, you're going to see that he got promoted
 7   to take over the president of Naples Division.  Now, when
 8   Pat signed up to work with the defendants, he and Mr. Neuman
 9   negotiated an employment agreement which you're going to see
10   and read, okay, and this employment agreement, as I
11   mentioned, had specific provisions as to how Pat could and
12   could not be fired.  It also detailed his compensation and
13   his bonuses.  It said, for example, if he were to be fired,
14   he needed 30 days written notice, that he would be paid six
15   weeks of severance, that he would be paid continued medical
16   benefits.
17          MR. HENRY:  Your Honor, I have an objection.  I'd
18   like to be heard at sidebar.
19          THE COURT:  You may.
20          (At sidebar, Court and counsel present)
21          MR. HENRY:  The employment agreement was the
22   subject of a separate lawsuit.  The separate lawsuit was
23   filed in state court and all of the things that Mr. Cellar
24   is talking about in that employment agreement were all
25   litigated in state court.  There was a settlement of that
```

PLAINTIFF OPENING

```
 1   litigation, and before walking in the courtroom today,
 2   Mr. Cellar and I had an agreement that we were not going to
 3   talk about that litigation.  Now he's standing in front of
 4   the jury saying that all of Mr. Hurley's rights were
 5   violated under that employment agreement, but the fact of
 6   the matter is that he sued under the agreement.  He accepted
 7   a settlement.  He knows that I can't talk about the
 8   settlement, so he's saying all these things because I don't
 9   have a right to rebut it.
10             MR. CELLAR:  Your Honor, first of all, I never
11   mentioned the lawsuit and I don't intend to mention the
12   lawsuit.
13             THE COURT:  You said he was violated -- they
14   violated the employment agreement.
15             MR. CELLAR:  Here's why.  They're going to claim
16   that any bonuses Mr. Hurley would have been owed were
17   discretionary and the employment agreement says to the
18   contrary.  So the defendants are going to get up and take
19   the position that no bonuses are owed and bonuses are part
20   of the reason that he was having stress.  Mr. Neuman would
21   not pay the bonuses.  I want to show that these bonuses were
22   not at Mr. Neuman's discretion but were actually required to
23   be paid under --
24             MR. HENRY:  That is not what you said.  You said
25   he was entitled to 30 days notice, he didn't get it, and he
```

PLAINTIFF OPENING

```
 1    litigated that case and settled it.  What you're talking
 2    about, all these things he was supposedly supposed to get
 3    under the employment agreement, what you're talking about
 4    now is one bonus he claims he was owed for 2007 and I don't
 5    have a problem talking about that.  But to talk about all
 6    the bonuses that he was supposed to get historically or his
 7    vacation pay or his lack of notice, that was all the subject
 8    of a lawsuit.
 9            MR. CELLAR:  Your Honor, that's part of the case
10    in chief is that he didn't receive the appropriate notice
11    under their own internal admissions.  It's an admission by
12    the defendants that's signed by Mr. Neuman that says we will
13    give you 30 days notice of your termination.  It's
14    inconsistent for them to try to argue in the case that I
15    can't bring that up when he signed the document saying we
16    will give you 30 days written notice that they never did.
17            THE COURT:  Well, you can't seem to get the
18    benefit of being able to give the written notice in two
19    lawsuits.  This is the first I've known about a separate
20    lawsuit that was settled.
21            MR. HENRY:  Judge, there's been a couple of
22    occasions where we had gentleman's agreements coming in here
23    and my understanding as of yesterday and today was that this
24    was not going to be a topic of discussion and now I'm
25    hearing it in the opening statement.  I don't know what to
```

PLAINTIFF OPENING

```
1    say.
2            MR. CELLAR:  Your Honor, I got to tell you, Frank
3    and I know each other, we litigate.  I don't agree and I
4    don't appreciate you suggesting that I'm violating a
5    gentleman's agreement.  The evidence in the case is the
6    evidence, Your Honor.  It's been admission since Day 1.  The
7    defendants never filed a motion in limine on this and it's
8    fair game at every single deposition in this case including
9    three days of deposition when Mr. Henry interrogated
10   Mr. Hurley for in excess of ten hours.
11           THE COURT:  I imagine he interrogated him about a
12   lot of things, but you know, the defense indicated just now
13   that they don't have any objection to going into one bonus,
14   apparently, that is at issue.
15           MR. CELLAR:  It's more than that, Your Honor.
16           THE COURT:  Just a minute, I'm not done.
17           MR. CELLAR:  I apologize.
18           THE COURT:  So you can deal with that and then
19   nothing more.  Now, you've said plenty with regard to the
20   employment agreement.  I want a copy of whatever it was that
21   was the summons and complaint and settlement agreement in
22   the state court case because this is the first time I've
23   heard about it, so I've got to get grounded on that because
24   you can go on now with the rest of your opening, but I'm
25   going to have to prepare myself for evidentiary rulings in
```

PLAINTIFF OPENING

1    the case in chief.  So --

2               MR. CELLAR:  Understood.  But Your Honor, the

3    issue of notice is important to how they fired him.  It

4    goes -- it's part and --

5               THE COURT:  I told you what my ruling is, because

6    this is all news about having another lawsuit.  You've

7    already gotten the point of notice out.  You don't have to

8    beat it to death in your opening and so move on.

9               (Sidebar concluded)

10              MR. CELLAR:  As we were discussing regarding

11   Mr. Hurley's performance, you're going to see an email, and

12   I'll show it to you, in 2003, that Mr. Neuman sent to --

13   Your Honor, is there a way to have the lights dimmed?

14              That Mr. Neuman, you'll see this email, sent to

15   all the management employees of Kent Security acknowledging

16   how excited he was to have Pat lead the Naples Division on

17   behalf of the defendants and you're going to see in here

18   that Mr. Neuman modified Pat's pay structure, in writing,

19   and gave him a substantial pay increase as a result of his

20   promotion.  And you're going to hear that Mr. Hurly did such

21   a great job in this position from 2003 until 2006 that

22   Mr. Neuman then again decided that he was going to promote

23   Pat to an even higher position.

24              And what you're not going to see between 2003 or

25   2006, or any time after this email, that Pat ever received

PLAINTIFF OPENING

1  anything negative from Mr. Neuman, that he never received a

2  poor performance evaluation, and that the statements made in

3  this email were entirely true, calling Pat the most -- one

4  of the best success stories in our 25 year history.  And

5  you're going to hear that, again, Mr. Hurley, Pat, for this

6  promotion, received yet another pay increase.  You're going

7  to hear that in late 2007, according to Mr. Neuman, he gave

8  to him a 20,000-dollar performance discretionary bonus, and

9  again, you're going to see the award that he received.

10          Now, I want to take a step back.  We've spoken

11  about Pat's performance.  I want to tell you a little bit

12  about what was going on with Pat personally during this time

13  period starting in 2005 and continuing through today.  And

14  what you're going to hear in plain and simple terms is that

15  Pat Hurley was a workaholic.  You're going to hear from

16  Stacey Hurley, Pat's wife, that Pat was that guy that was

17  always tethered to his Blackberry.  His wife is going to

18  refer to it as the umbilical cord, okay, and Stacey's going

19  to tell you from the time Pat woke up in the morning until

20  after he got home from work in the evening and through

21  dinner and bedtime, Pat was either emailing his work, on a

22  conference call, or otherwise involved with some work-

23  related project.  You're going to hear that during dinner,

24  if the phone rang, dinner was over, Pat was on the phone.

25  You're going to hear that if they were in a movie and the

PLAINTIFF OPENING

```
 1   phone rang or an email came in, the movie was over.  And
 2   you're going to hear that even during family vacations where
 3   Pat's supposed to be taking time off and spending time with
 4   his family, he remained attached to his umbilical cord, and
 5   you're going to hear and see a picture, which I'm going to
 6   show you right now, that his wife took because she wanted to
 7   remember him the way he always was, especially on vacation,
 8   at the Grand Canyon with his back turned to one of the
 9   wonders of the world, emailing on his Blackberry.
10             And you're going to hear that this caused issues
11   with Pat's balance in life and more importantly, with his
12   health.  In early 2005 and after four years of what Stacey
13   will describe as Pat working 24/7, Pat began suffering from
14   chronic depression, anxiety, and stress as a result of his
15   work environment and you're going to see that this wasn't
16   the type of day-to-day stress that the Judge joked about
17   with the Miami Heat losing or having an argument with a
18   friend, but this was real, medically diagnosed, clinically
19   diagnosed depression, stress, and anxiety.  And you're going
20   to hear that this was the type of depression, stress, and
21   anxiety that caused Pat to have panic attacks, to have
22   crying spells, that prevented him from thinking clearly or
23   rationally at times, that made him miss work on certain days
24   because he was so sick he couldn't even get out of bed.
25   You're going to hear from Stacey, his wife, where she had
```

PLAINTIFF OPENING

1   the pleasure of coming home on certain occasions to find Pat
2   curled up half-naked in the bathroom in a ball next to the
3   toilet, laying on the floor.  And you're going to hear
4   Stacey discuss the occasion where she had the privilege of
5   coming home to find her husband curled up in a ball under
6   the dining room table, hiding, crying, shaking, unable to
7   communicate because of what was happening with his
8   depression and stress.  You're going to hear that there were
9   days when it was so bad that Pat could not even communicate
10  with his wife to tell her what was going on with him so that
11  she could help him.
12          Now up front, Pat's medical condition is not the
13  type of depression or stress where it's 24 hours a day seven
14  days a week.  You're going to hear that this type of
15  depression and stress has what's referred to as episodic,
16  excuse me, periods of incapacity.  Okay, you're going to
17  hear that it ebbs and flows, some days are good and some
18  days are bad.  But you're going to see that Pat was never
19  committed to an inpatient institute or was required to miss
20  significant consecutive days of work as a result of what was
21  going on.  That's not what the testimony is and that's not
22  what he's claiming.
23          You're going to see that as a result of his
24  medical condition, Stacey made Pat start treating with a
25  medical doctor in 2005.  His name was Dr. Andrew Dauer and

PLAINTIFF OPENING

```
 1   Dr. Dauer, while meeting with Pat and Stacey, prescribed
 2   Wellbutrin.  And you're going to hear that his first
 3   diagnosis to Pat in 2005, you need to take time off from
 4   work if that is what is causing you the stress, and that
 5   will be undisputed.
 6           The evidence is going to show that Pat, being the
 7   ever present workaholic, did not listen to Dr. Dauer
 8   initially because of his put-work-first-and-put-everything-
 9   else-second attitude.  And Pat's condition, as you will
10   hear, continued to get worse and worse and you're going to
11   hear that it reached a critical stage in 2007, early 2008.
12   And you're going to hear after Dr. Dauer had been telling
13   him to take time off -- and Dr. Dauer left his practice.
14   Dr. Paisan, who will be your first witness, inherited Pat,
15   and you're going to hear that Dr. Paisan treated him for
16   depression and prescribed him with now Effexor, another
17   antidepression drug to try to help with the symptoms.
18           You're also going to hear in 2007 and 2008, Pat
19   treated with Fred Stuart, a mental health practitioner
20   specializing in these disorders.  And it's going to be
21   undisputed each of these health care providers, time and
22   again, recommended to Pat that he needed to take time off
23   from work, time he needed to completely unplug, not the time
24   where he's away from the office but still working, but
25   completely unplug from work.
```

PLAINTIFF OPENING

```
 1              And the evidence is going to show that by late
 2   2007 through 2008, Pat's panic attacks and symptoms were
 3   becoming even more severe, more regular, more recurring,
 4   that he was beginning to become unglued, becoming unable to
 5   function at home and at times during work, during these
 6   increasing episodes.  And the evidence is going to show that
 7   Pat was headed toward what his doctors told him what would
 8   happen if he didn't take time off, a breakdown, a major
 9   episode.
10              You're also going to hear it was around the time
11   that Pat and his wife began having financial problems to add
12   insult to injury on top of everything else.  You're also
13   going to hear that part of the stress that Pat was having as
14   a result of work was that starting in 2007, 2008, Mr. Neuman
15   refused to start paying employees bonuses, not only in Pat's
16   office but in other offices.  And you're going to hear that
17   that had an effect on morale and it certainly had an effect
18   on Pat regarding his financial condition and the stress.
19   You're going to hear he was relying on these bonuses.
20   You're going to see emails where he's going to say, pay my
21   bonus, please.  You're not going to hear a response from
22   Mr. Neuman, never denying he owed the bonuses or that he
23   wasn't going to pay the bonuses.  He just simply didn't pay
24   them.
25              Despite all this and despite up to the last day
```

PLAINTIFF OPENING

```
 1    Pat was working for the defendants he continued to go to the
 2    job with single focus.  His wife is going to call him a
 3    company man to the end.  And that's why you will see that
 4    after Mr. Neuman promoted Pat president to Palm Beach in
 5    Naples in 2006, the evidence will show Pat continued to
 6    excel in the job, the divisions continued to grow, they
 7    remained profitable, and Pat never received any performance
 8    warnings, indicators, anything that he was doing a job other
 9    than an excellent job for the defendants.
10              In March or early April of 2008, you're going to
11    hear from Fred Stuart that he and Pat spoke on the phone.
12    Fred Stuart was his therapist, and during this call, you're
13    going to hear the therapist reinforce Pat's need to take
14    time away.  This is going to be approximately two months
15    before Pat's fired.  And you're going to hear that
16    Dr. Stuart's recommendation was not this type of vacation
17    time but vacation time away and unplugged from what was
18    causing him the stress.
19              And you're going to hear that by this point, Pat
20    had accrued substantial leave time and that you're going to
21    hear that he had weeks and weeks of leave to use, over 21
22    weeks, over -- and there will be some dispute about how many
23    weeks we say and how many weeks they say.
24              You will hear that during this time after he spoke
25    with Fred Stuart, his therapist, in March of 2008, early
```

PLAINTIFF OPENING

1    April, that the condition continued to worsen because Pat
2    continued to work the same way and continued to have the
3    same symptoms.  And you're going to hear Stacey Hurley
4    testify that by mid April, she had enough.  She had enough
5    and she said, "Enough.  It's time to take a leave.  You
6    can't continue to do this to yourself.  You have a family."
7    And you're going to hear that for the first time since 2005,
8    Pat finally listened to the medical advice that he was being
9    given.  And you're going to see that Pat sat down with his
10    wife, took out a calendar, and proposed a leave schedule to
11    Mr. Neuman.  Not a leave schedule to go specifically treat
12    with doctors or to be away at a specific location, but a
13    leave schedule to simply unplug from work.  Plain and
14    simple, that was the therapy, as you will hear, that he was
15    being suggested to take and that is exactly what he intended
16    to do.
17            So you're going to see this email that Pat sent to
18    Mr. Neuman saying attached is a vacation schedule, these
19    dates are subject to change.  And you're going to see the
20    attachment -- let me zoom out a little bit here -- with the
21    proposed vacation dates for the next two years.  Rather than
22    taking a block of time off, as Pat's wife was telling him to
23    do, and as the law, as you will hear, permitted him to do,
24    up to 12 weeks, Pat again, putting the company before
25    himself, decided that it would be too disruptive to the

PLAINTIFF OPENING

```
 1    company and instead he would take weeks or days off at a
 2    time, over holidays, where the testimony will show that in
 3    Naples, would be the best time for him to take leave because
 4    the office is closed, there's no client meetings, and
 5    security guards here on the west coast wanted to work those
 6    extra hours because they got extra pay.
 7             The evidence is going to show that despite being
 8    able to take this large block of time under the law, Pat did
 9    it in pieces, and the expression that no good deed goes
10    unpunished came to fruition.  Now, within less than an hour
11    of sending this email to Mr. Neuman, you're going to see
12    that Pat got a response, "Your request is denied."
13             What you're then going to see is Pat then turned
14    around and sent an email back to Mr. Neuman explaining why
15    he needed this leave so badly.  And the email, as you're
16    going to see, specifically said, please be -- please know
17    that I have been advised by health professionals that my
18    need to avail myself of this time is no longer optional.
19    The medical advice that he had been given by his doctors,
20    take time off from work.
21             And what is the evidence going to show happened?
22    After receiving this email, you're going to hear that
23    Mr. Neuman didn't contact his human resources department.
24    He didn't look at the employee handbook which details what
25    the defendants have to do in this situation when employees
```

PLAINTIFF OPENING

```
 1   request medical leave.  He didn't consult with a legal team
 2   to determine what obligations he had under the law, and he
 3   did not consult with the Department of Labor to determine
 4   what if anything he needed to do under the Fair Labor
 5   Standards Act -- under the Family Medical Leave Act, I
 6   apologize.
 7            You're going to see the employee handbook which
 8   says even if you believe an employee is faking it or not
 9   entitled to leave, you have the right, defendants, Kent
10   Security, to say to the employee, "I need medical
11   certification to make sure that the medical leave you're
12   asking for is truly medical leave."
13            But you're going to hear that Mr. Neuman didn't do
14   that.  He didn't ask Mr. Hurley to get a doctor's note
15   saying that this was truly medical leave.  You're also going
16   to see the handbook that says that they could ask Mr. Hurley
17   at his expense to go get two medical certifications, up to
18   two more certifications than the first one defendants could
19   have asked for.  They did none of that.  They never asked
20   him for a certification.
21            You're going to hear that 24 hours after receiving
22   this email, less than 24 hours, Mr. Neuman calls Pat on the
23   phone -- the president of your company who had worked for
24   you for seven years -- calls him on the phone and says,
25   "Pat, you're a good man.  You're a smart man.  You're a
```

PLAINTIFF OPENING

```
 1   capable man.  It's time to part ways."
 2              And you're going to hear Mr. Neuman never said,
 3   "You've been insubordinate to me, you've been performing
 4   poorly," or there's any reason for us firing you within 24
 5   hours of you requesting leave, medical leave.
 6              You're going to hear that during this phone call
 7   Pat went into even more detail with Mr. Neuman regarding his
 8   condition, that he specifically explained what was happening
 9   to him, that he was suffering from panic and depression and
10   his email was so frantic because of these reasons and you're
11   going to hear what Mr. Neuman did was mutter something in
12   Hebrew and tell Pat, again, he was a good man, a smart man,
13   a capable man, but it's time to part ways.
14              Mr. Neuman is going to admit to you that at no
15   point during this conversation did he ever give Pat a reason
16   for the firing.  And you're going to hear that the first
17   time Mr. Neuman ever gave anybody a reason for the firing
18   was when Mr. Hurley pursued a claim for unemployment
19   benefits.  That's going to be the first time Mr. Neuman
20   makes a claim and says insubordination.
21              Now, what's going to be interesting is you're
22   going to see in this case Mr. Neuman changes his reason.  He
23   never said poor performance as you will hear during the
24   unemployment proceedings, but now once Pat files a lawsuit
25   under the Family Medical Leave Act, now Mr. Neuman is going
```

PLAINTIFF OPENING

```
 1    to claim poor performance, a reason he never gave to the
 2    unemployment agency.  And then he's going to switch back
 3    again and say it was a combination of insubordination and
 4    poor performance.  But you're going to hear from the other
 5    witnesses that the defendants can't even get their story
 6    straight among each other, and they're all going to
 7    contradict each other when they get up here and testify
 8    about what the real reason was.
 9              THE COURT:  Two minutes, counsel.
10              MR. CELLAR:  You're going to see that Pat, after
11    being fired, went to his doctor and secured a leave form
12    that he was never asked to secure before, before he was
13    fired, and this form is filled out by Dr. Paisan.  You're
14    going to hear that after seven years, Pat was making
15    $128,000, benefits, leave, and in a phone call, that was
16    ended.
17              But Pat's not going to ask you to feel sorry for
18    him.  He's not going to ask you to award him emotional
19    distress damages or to feel pity for him.  The only thing
20    Pat is going to ask you for in this lawsuit, the only thing
21    that he's going to ask you for in this lawsuit is to
22    reimburse him for the wages that he lost had he not been
23    illegally fired in the first place.  It's called back wages,
24    had he been in the same position through today.  That's all
25    he's going to ask you to reward him.  He's not going to ask
```

DEFENSE OPENING

1   you for punitive damages or emotional, none of that.  Just

2   his wages.

3          I told you it is going to be a very simple case

4   with very simple facts and very simple law.  This is the

5   story about a corporation and a CEO who refused to play by

6   the rules and when they got caught, you're going to see that

7   they lied about it and made up stories to cover their

8   actions.

9          We learned a lot of things in law school.  One of

10  them is a Latin expression called res ipsa loquitur and what

11  it means is it speaks for itself.  And at the end of the

12  evidence, you will see very clearly that the evidence in

13  this case speaks for itself.  Pat was fired for no other

14  reason than he filed a claim or requested medical leave and

15  was fired less than 24 hours later.  That's the evidence and

16  that's what this case is about.  Thank you.

17         THE COURT:  Counsel?

18         MR. HENRY:  Thank you, Judge.  I'm going to

19  rearrange the furniture a little bit before I start if

20  that's okay with you, Judge.

21         THE COURT:  Certainly.

22         MR. HENRY:  Ladies and gentlemen, good afternoon.

23  Something the Judge said at the beginning in your

24  instructions is very important.  There's two sides to every

25  story, and nothing that was just said was evidence.  I

DEFENSE OPENING

```
 1   didn't learn in law school, they don't teach you in law
 2   school the importance of the jury system.  I learned that
 3   when I actually served as a juror several years ago.  I got
 4   picked on a small civil case.  I begged to be on the jury
 5   because I'd never heard what jurors talked about.  And the
 6   judge gave us an instruction at the beginning of the case
 7   and he said that this system that we have of civil justice
 8   allows us a way to redress our differences without running
 9   home to get our guns and shoot it out in the street.  And
10   that's what this is all about.
11              There's a dispute between Mr. Hurley and
12   Mr. Neuman, Ms. Alexander, and the company that he used to
13   work for.  Nobody has anything personal against Mr. Hurley.
14   This is the way we resolve it and you're integral to that,
15   so I appreciate your service and I hope you can pay
16   attention carefully over the next few days and sift through
17   all this, and I know you're going to make the right
18   decision.
19              Kent Security, by some standards, a big company;
20   by others, it's a small company.  It's a security company
21   that provides guards at your local condominium association.
22   When you go through the shack and there's somebody that's
23   sitting in the shack, that could be a Kent Security guard.
24   When you go into your condominium and there's somebody at
25   the front desk, that could be a Kent Security guard.  There
```

DEFENSE OPENING

```
 1    are places in the government where they're guarding parking
 2    lots, they're guarding swimming pools, they're at commercial
 3    buildings.  They're the security guards that make sure
 4    everything runs properly.
 5            Gil Neuman is the CEO of the company.  That's a
 6    big title.  Gil Neuman personally reviews and signs every
 7    paycheck every pay period for that company.  He was
 8    Mr. Hurley's supervisor.  He talked to him every day.  He
 9    keeps track of every part of the company, and he was
10    Mr. Hurley's boss and that's going to be important later
11    when we start talking about the reasons why Mr. Hurley was
12    terminated.
13            Orly Alexander is also sitting at my table and
14    she's being sued individually as a defendant.  Orly is Gil's
15    sister and she's also one of the owners of the company.  But
16    as far as any of us can tell, and you heard Mr. Cellar say
17    this in his opening, she didn't have anything to do with
18    anything that happened in this case.  She manages the
19    fitness of the company.  She didn't supervise Mr. Hurley;
20    she didn't interact with him on a day-to-day basis.
21    Mr. Hurley was in Naples; she's in Miami.  She certainly
22    didn't play any part in the decision to terminate his
23    employment and yet she's still being sued in this lawsuit.
24            Why is that?  Mr. Hurley's going to answer that
25    question when he reaches the witness stand.  But the fact of
```

DEFENSE OPENING

```
 1   the matter is that it's undisputed between the parties that
 2   she had nothing to do with anything that you're about to
 3   hear in this case.
 4          Mr. Hurley was what Kent Security describes as a
 5   divisional president.  He held a number of different job
 6   titles while he was employed by Kent.  The last job title
 7   that he held was a Divisional President for the Naples
 8   Division.
 9          The Naples Division is a growth area and whatever
10   else is said about Patrick Hurley over the next couple of
11   days, the man could sell wool to a sheep.  He's a terrific
12   salesman.  What he -- what he has in his salesmanship, he
13   lacks in his operational abilities.  What he has in
14   salesmanship, he lacks in his ability to interact with
15   others.  And when I say to you that none of this -- none of
16   what we're saying is evidence, we're going to show you
17   specific examples of awful emails that Mr. Hurley sent to
18   both his subordinate employees and ultimately to his boss.
19   The one that you just had on screen, the night that
20   Mr. Hurley sent his vacation schedule to Mr. Neuman, the
21   highlighted portions of that email were not the heart of it.
22   I'm going to talk about this in more detail, but
23   essentially, he told Mr. Neuman the night before he was
24   terminated, I'm taking 11 weeks of vacation.  I'm taking off
25   11 weeks, every holiday weekend for the next two years.
```

DEFENSE OPENING

1          This is Mr. Hurley's medical leave.  This is

2    Memorial Day.  This is Independence Day, Labor Day, Columbus

3    Day, Thanksgiving.  All the talk that you're going to hear

4    about the medical condition that Mr. Hurley has, I'm not

5    going to dispute it.  I don't live in his house and I

6    couldn't tell you whether Mr. Hurley was curled up in a ball

7    on the floor.  I wasn't there, and neither were you.

8          What I can tell you is that during the entire term

9    of his employment with Kent Security, he never, ever, ever,

10   told anyone that he was so much as depressed.  Not that he

11   was treated for depression, but he didn't even tell anybody

12   he was depressed.

13         Mr. Hurley was what some will describe an arrogant

14   man.  He was a good salesman.  He was perceived in the

15   company as a high roller, that he had it all together and

16   that he managed his finances well.

17         But ultimately, his relationship with his

18   subordinate employees and his relationship with his boss

19   deteriorated to the point that it was intolerable.  And this

20   is going to be undisputed as well.  This was a bad

21   relationship that had to end.  Mr. Hurley went to -- we, you

22   know, sometimes we discover these things after the

23   litigation has been filed.  So one of the things that we do

24   in litigation is take discovery.  So after this lawsuit was

25   filed -- this lawsuit was filed two years after Mr. Hurley

DEFENSE OPENING

1    was terminated -- we took the deposition of somebody that

2    Mr. Hurley told us had knowledge regarding his -- his

3    depression and that gentleman's going to testify today or

4    tomorrow -- possibly today.  His name is Fred Stuart.

5            Mr. Hurley visited Mr. Stuart three days a year

6    before he was terminated, and what did he tell Mr. Stuart?

7    He told Mr. Stuart that his job at Kent Security was

8    unfulfilling.  He told Mr. Stuart that he didn't like his

9    boss.  He told Mr. Stuart that what he really wanted to do,

10   and this is in 2007, what he really wanted to do was sell

11   his house and move to Arizona.

12           Mr. Hurley vacationed in Arizona several times a

13   year, and during those vacations, he would go to the Grand

14   Canyon.  He did -- visited dude ranches and one of the

15   things that he did was go to something called Wyatt Earp

16   Days, and it sounds like a lot of fun.  Wyatt Earp Days

17   occurs on Memorial Day in Tombstone, Arizona, and part of

18   Wyatt Earp Days, people dress up like people in the old

19   west.  They carry sidearms in some cases; they wear cowboy

20   hats.  And Mr. Hurley, for Memorial Day in 2005 and 2006 and

21   2007, went to Wyatt Earp Days at Tombstone, Arizona.  This

22   is a photograph that Mr. Hurley produced to us in discovery.

23   We asked him how he spent his vacation in 2005, 2006, and

24   2007.

25           Why is that important?  It's because you're going

DEFENSE OPENING

```
 1    to hear throughout this trial that Mr. Hurley's doctors were
 2    recommending that he take time off from work to manage his
 3    stress.  What really happened was he told his doctors he
 4    didn't like his job, he was having problems with his wife,
 5    he had financial problems, and the doctors said here's what
 6    you need to do, you need to get more sleep at night, you
 7    need to eat better, you need to exercise and take vacation.
 8    And in particular, Mr. Hurley was telling Mr. Stuart, "I
 9    want to leave my job, I want to sell my house, I want to
10    move to Arizona."  So Mr. Stuart told him, "Why don't you do
11    this, why don't you take some vacation from work, go to
12    Arizona and see if you like it there, and then you can
13    decide if you're going to quit."
14            The claim in this case is that because the doctors
15    were recommending vacation to treat his depression, that
16    those vacations that he took were automatically Family and
17    Medical Leave.  Mr. Hurley is telling us that because my
18    doctor told me I ought to take some time off work for
19    vacation, which is good for everybody, that because I have
20    depression, that it was a Family and Medical Leave.
21            Ladies and gentlemen, we're going to show you a
22    number of these photographs, but Mr. Hurley is going to
23    testify before you that this was not a Family Medical Leave.
24    He's going to tell you that my doctor did not tell me a
25    single thing that I had to do on leave.  He didn't tell me I
```

DEFENSE OPENING

1    had any scheduled treatments.  He didn't tell me I had

2    anything that I was going to do.  I wasn't supposed to be

3    doing yoga, I wasn't going to any kind of event, and I

4    certainly was not predicting that in any of these dates I

5    was going to be incapacitated.

6            Instead, Mr. Hurley is going to tell you that I

7    wanted that time off work because I needed to unwind, and

8    that's not Family and Medical Leave.  He'll also tell you

9    that the trips that he made -- remember, he was diagnosed

10   with depression in 2005.  That year and the following year

11   and the year after for Memorial Day he went to Wyatt Earp

12   Days in Tombstone, and as you can see, his first vacation

13   that he asked for in 2008 was Memorial Day.  So we're going

14   ask Mr. Hurley in his testimony, we've already done that in

15   his deposition, what is it that makes that a medical leave

16   but that -- but that's not a medical leave.  And he doesn't

17   have an answer.

18           Why?  Mr. Hurley went to see his -- Mr. Hurley was

19   terminated from employment the evening of April 28th, 2008.

20   That day, the same day he was terminated, he did two things.

21   First, he finished some business cards that he had been

22   working on for a new company that he was working on on the

23   side.  He created his own company, and on April 28th, he

24   finished his business cards and he circulated them to his

25   coworker.  The business was going to be a company that sells

DEFENSE OPENING

```
 1    ammunition to the federal government.

 2              Kent Security is a security company.  They don't

 3    do that.  This is Mr. Hurley's own business and he convinced

 4    one of the people that worked for him to go in with him on

 5    it.  Why?  Because the company that he created could only

 6    get contracts if the owner and operator of the company was a

 7    disabled Veteran, and Mr. Hurley is not a disabled Veteran.

 8    So he found one that worked for him and made him his

 9    partner.  And on April the 28th, he finished his business

10    cards for that business.

11              That same night, and this was shortly after

12    midnight on April the 28th, so it's really April the 29th,

13    he sent Mr. Neuman an email and he attached to that email

14    this piece of paper that's been blown up and you're going to

15    look at this throughout the trial.

16              Mr. Neuman got that document about the time that

17    he sent it because apparently none of these people sleep at

18    night.  Mr. Neuman got the document after midnight and he

19    wrote back to Mr. Hurley and he said, "Your request is

20    denied."

21              Why did he do that?  He did it because the Naples

22    Division was struggling and he didn't want the president of

23    the division to take 11 weeks off.  He did it because the

24    security business is busy during holidays.  People call in

25    sick, people have parties at their condo units, it's a busy
```

DEFENSE OPENING

1   time of the year, and it was inconceivable to Mr. Neuman

2   that the president of the division would take every single

3   holiday off during that two year period.

4           So he said no.  That was also shortly after

5   midnight on April 28th.

6           The next day, Patrick Hurley spent the better part

7   of the day writing a nasty, scathing, insubordinate email to

8   his supervisor, an email that would have gotten anyone

9   fired.  And it said, "This vacation request is not a

10  request, it was a schedule."  It said, "If you want to talk

11  to me about any of this stuff, you come down to Naples

12  because I'm not coming to Miami.  Or I'll meet you halfway

13  in between, but I am not coming to Miami."  Mr. Neuman got

14  that email and not unexpectedly, he was angry.

15          He called Mr. Hurley the next day.  Before he did

16  that, he had a meeting.  He had a meeting with a fellow

17  named Shelton Blackwell.  Shelton Blackwell is the president

18  of -- and he's going to testify for us.  Mr. Blackwell was

19  the president of the Palm Beach Division, the Miami

20  Division, all the east coast divisions of the company.  His

21  share of the company was much, much, much larger than

22  Mr. Hurley's.  And so Mr. Neuman met with Mr. Blackwell and

23  asked him, could you take over the Naples Division in the

24  short-term, and Mr. Blackwell said yes.  Mr. Blackwell will

25  tell you that he knew at that point that Mr. Hurley was

DEFENSE OPENING

```
 1    going to be terminated.
 2             He also met with the director of human resources,
 3    said, you know, what's going on, we're going to do this
 4    thing, and he made these arrangements and he stepped out of
 5    that meeting and he made a phone call and called Pat Hurley,
 6    who was at work that day.  He said, "Now it's time to part
 7    ways."  Mr. Hurley knew what he was talking about.  They
 8    just had this email exchange.
 9             Next day, he came in, turned in his company car,
10    turned in his office keys and laptop computer, and
11    everything else he owed the company, and then over the next
12    seven days, there was negotiation that went on.
13             MR. CELLAR:  Your Honor, objection.
14             THE COURT:  Sustained.
15             MR. HENRY:  Mr. Hurley and Mr. Neuman spoke over
16    the next few days about exit issues.
17             MR. CELLAR:  Your Honor, same objection.
18             THE COURT:  Overruled.
19             MR. HENRY:  About exit issues and when that
20    discussion was finished, Mr. Hurley went to see a lawyer and
21    after he saw the lawyer, he went to see his doctor, and
22    that's Dr. Carlos Paisan.
23             Now, how do I know that?  Mr. Hurley told his --
24    his therapist, his social worker, Fred Stuart, that his
25    lawyer told him to go see a doctor and get the FMLA
```

DEFENSE OPENING

1  certification form that you just saw so that he could have a
2  reason for claiming that his termination was illegal.  And
3  so even though he'd already been terminated from employment,
4  even though his employment with Kent Security was over, he
5  visited Dr. Carlos Paisan and he gave him a certification
6  form that the government prints on its web site and Paisan
7  filled it out.  It said, I understand that he's been
8  terminated from employment, but there may be instances in
9  the future when he needs time off from work, depending on
10 his circumstances.  He sent that form to Kent Security and
11 now it's an exhibit in the case.  That occurred after he had
12 already been terminated from employment, after he had
13 already talked to a lawyer.
14         Mr. Hurley also filed charges of discrimination
15 with the federal and state government.  He filed a charge
16 claiming that he was terminated because of his age.
17 Evidence is going to show that Mr. Neuman, the person that
18 terminated him, is actually older than he is.  He filed a
19 charge of discrimination claiming that the reason for his
20 termination was his gender, and as you can see, the person
21 that terminated his employment is of the same gender.  He
22 claimed retaliation, but in those charges -- and we're going
23 to go through them in this case -- he made a lot of
24 different statements.  In those charges, he said, and we
25 agree, that the relationship between him and Gil Neuman had

DEFENSE OPENING

1    been wrecked ever since 2005.  And in fact, he said that

2    Mr. Neuman had been attempting to constructively discharge

3    Mr. Hurley since 2005.  All of this occurred in 2008 and I

4    respectfully submit to you the evidence is going to show

5    that if Mr. Neuman wanted Mr. Hurley out of the company for

6    three years before this happened, his termination could not

7    have been based on any protected Family Medical Leave.

8           And here we are today.  This lawsuit was filed

9    after those charges.  The lawsuit was filed two years after

10   Mr. Hurley was terminated from employment.  You're going to

11   hear from Mr. Hurley's social worker and doctor today.  All

12   of them are going to say, we had nothing to do with this

13   schedule.  Mr. Hurley spent an evening with his wife at home

14   and they picked their holiday vacations that they wanted to

15   take in 2008 and ultimately when he got fired, now he's

16   pointing back to it and saying this was some kind of Family

17   and Medical Leave.

18          This is what he does on vacation.  Ladies and

19   gentlemen, I'm going to submit to you the evidence is going

20   to show that none of this was a Family and Medical Leave.

21   Mr. Neuman had very good reasons for terminating his

22   employment.  And as uncomfortable as that may be,

23   terminating someone's employment is always uncomfortable,

24   you're going to hear the evidence from this side of the room

25   tell you, Mr. Hurley's going to tell you that he did not

DEFENSE OPENING

1    like working with Mr. Neuman.  Mr. Hurley's wife is going to

2    testify that Mr. Hurley's co-worker, Shelton Blackwell, was

3    a monster.  She's going to say that she's glad he's no

4    longer working at Kent.  She's going to say that she was

5    sick of Kent, this was a bad relationship that had to end.

6           It's been turned into something else and it's your

7    job, ladies and gentlemen of the jury, to look at all this

8    and say, is that -- is that a vacation?  Is that vacation

9    time or is this a medical leave?  Everybody in the room is

10   going to agree that Mr. Hurley was not going to be

11   incapacitated during any of these dates.  We can't look into

12   the future and say, you know, Memorial Day, I'm going to be

13   too depressed to go to work, so instead, I'm going to go to

14   Arizona.  Or I can't sit here and say on Columbus Day, I

15   don't think I'm going to be able to work.

16           The Family Medical Leave Act doesn't work that

17   way.  The Family Medical Leave Act provides leave of absence

18   for people who are incapacitated, people that are unable to

19   work because they either have treatment scheduled or they're

20   sick and they need to stay home from work.  This is neither

21   of those things.

22           Mr. Hurley's heart was not in his job anymore.

23   The evidence is going to show that and this is an

24   uncomfortable -- you know, we're all sitting in the same

25   room together and we have to say these things about each

DEFENSE OPENING

1  other and it's an uncomfortable situation to be in, but it's
2  necessary.
3          Ladies and gentlemen, you can use your common
4  sense.  You can sift through all this and I know you're
5  going to make the right decision.  And thank you for your
6  patience in listening to me.
7          THE COURT:  All right.  We'll take a 15 minute
8  recess.
9          COURT SECURITY OFFICER:  All rise.
10         (Jury out, recess from 2:30 p.m. to 2:43 p.m.)
11         THE COURT:  Bring in the jury, please.
12         COURT SECURITY OFFICER:  Yes, sir.
13         (Jury in)
14         THE COURT:  Please be seated.  The jury can come
15  in and sit down right away because we're standing up for
16  you, out of respect for you.
17         All right, call your first witness.
18         MR. CELLAR:  Thank you, Your Honor.  The plaintiff
19  calls Dr. Carlos Paisan.
20         DEPUTY CLERK:  If I could please have you to raise
21  your right hand?
22         (The Witness is Sworn)
23         DEPUTY CLERK:  If you'll please state your name
24  for the record and spell your last name please?
25         THE WITNESS:  My name is Carlos Paisan,

PAISAN - DIRECT

1    P-A-I-S-A-N.

2              DEPUTY CLERK:  Thank you.

3                    CARLOS PAISAN,

4       a witness herein, after having been duly sworn,

5       was examined and testified under oath as follows:

6                   DIRECT EXAMINATION

7    BY MR. CELLAR

8    Q.    Good afternoon, Dr. Paisan.  Can you please introduce

9    yourself to the jury, tell us a little bit about what you

10   do?

11   A.    My name is Carlos Paisan.  I'm a doctor.  I was a

12   treating physician.  I'm a physician, board certified in

13   family practice.  I been in Naples, Florida, for over 20

14   years, been a physician for over 20 years.

15   Q.    What areas of practice in your family treatment do

16   you handle?

17   A.    Multiple.

18   Q.    Would depression, for example, be one of the things

19   that you would see from a particular patient on any given

20   day?

21   A.    Yes.

22   Q.    Fair enough.  Are you currently employed in a

23   practice?

24   A.    Yes.

25   Q.    And where do you work now?

PAISAN - DIRECT

1   A.    I work for a group called Team Health and I work out

2   of Marco Urgent Care Center.

3   Q.    And how long have you been with Team Health?

4   A.    Team Health is a new group that bought our group out

5   about two or three years ago.

6   Q.    Okay.

7   A.    Previously, we were with Emergency Physicians of

8   Naples, which was five, six years before then.  I don't know

9   the exact numbers.

10  Q.    The last time we spoke, I recall that you were

11  working as an emergency room doctor; is that still the case?

12  A.    It's an urgent care facility.

13  Q.    How long have you been in that capacity?

14  A.    Since I last spoke with you?

15  Q.    How long have you been in the urgent care?

16  A.    Off and on for 20 years.

17  Q.    Okay.  Prior to working at this urgent care facility,

18  did you run a family practice here in Naples?

19  A.    I was employed as a family physician.

20  Q.    Do you recall from when to when you were involved in

21  that practice?

22  A.    I don't.  I'm not good with dates.

23  Q.    Where was that practice located, if you recall?

24  A.    It was Creek Side.

25  Q.    Would that be in Naples?

PAISAN - DIRECT

```
1    A.      Yes.
2    Q.      Was it a facility that was owned by a company called
3    EPN?
4    A.      Yes.
5    Q.      During your -- you had mentioned that you, in your
6    family practice, you currently treat patients, for example,
7    having depression; is that accurate?
8    A.      Right, yes.
9    Q.      Okay.  During the time period you worked at this
10   facility, this family practice in Naples, did you likewise
11   treat clients that were suffering from depression, anxiety,
12   or stress?
13   A.      Yes.
14   Q.      At the time you came to work for this family
15   practice, were you aware that it had been run by another
16   doctor?
17   A.      Yes.
18   Q.      Who was that doctor, if you recall?
19   A.      Dr. Dauer.
20   Q.      Do you recall his first name?
21   A.      Andrew, I believe.
22   Q.      Do you have an understanding as to where Dr. Dauer is
23   now?
24   A.      I heard he died.
25   Q.      At the time you inherited the practice, was
```

PAISAN - DIRECT

1    Mr. Hurley, Pat Hurley a patient of Dr. Dauer's?

2    A.    Yes.

3    Q.    Okay.  And did you inherit the medical files from

4    Dr. Dauer if you inherited the patient?  You understand my

5    question?

6    A.    Yes, I think I do.

7              MR. HENRY:  Objection, Judge, leading.

8              THE COURT:  Overruled.

9    BY MR. CELLAR

10   Q.    When you took over the practice, were there medical

11   files present?

12   A.    Yes.

13   Q.    Were they the files of existing patients?

14   A.    Yes.

15   Q.    Okay.  Now, whatever medical notes were in, for

16   example, Mr. Hurley's file at the time you took over for

17   Dr. Dauer, were they maintained in the regular course of

18   business?

19   A.    I believe so.

20   Q.    Do you have any reason to doubt that the files that

21   were in Pat Hurley's file at the time you took over for

22   Dr. Dauer are the true and correct copies of his medical

23   records?

24   A.    I believe so.

25             MR. CELLAR:  Your Honor, at this point, can we get

PAISAN - DIRECT

1    the ELMO working, please?

2    BY MR. CELLAR

3    Q.    What I'd like do, Doctor, and if I may approach, show

4    you what has previously been marked as Plaintiff's Exhibit

5    Number 54.  May I approach, Your Honor?

6              What I'd like you to do is take a look at what's

7    been pre-marked as Plaintiff's Exhibit Number 4 and ask you

8    if that appears to be a true and correct copy of a medical

9    record contained within Patrick Hurley's file, to your

10   knowledge?

11   A.    This is the medical records of the file?

12   Q.    Right, is this Dr. Dauer's notes?

13   A.    This looks like Dr. Dauer's medical record.

14   Q.    Do you have any reason to believe that this is not a

15   true and correct copy of the note that was in Dr. Dauer's

16   file at the time you inherited the file?

17   A.    No.

18            MR. CELLAR:  Your Honor, at this time we'd like to

19   move into evidence what's been marked as Plaintiff's

20   Exhibit Number 54.

21            THE COURT:  54 is received.

22            (Plaintiff Exhibit 54 admitted)

23            MR. CELLAR:  Thank you, Your Honor.  May I publish

24   54 to the jury, Your Honor?

25            THE COURT:  You may.

PAISAN - DIRECT

1    BY MR. CELLAR

2    Q.    Showing you what's been marked as Plaintiff's

3    Exhibit Number 54, can you describe to the jury what the

4    reason was that Mr. Hurley was coming in to treat for?  And

5    that would be right about here.

6    A.    According to the chart it says the chief complaint is

7    sleep problems, depression, and anxiety, and then later on

8    tells he's having major problems on his job.

9    Q.    Does he say in particular in that record what's going

10    on with his job?

11    A.    According to the chart, it says he's being maligned

12    and lied by his boss.

13    Q.    Does he explain in this on March 14, 2005, what

14    effect this conduct is having on him at his work?

15    A.    According to the chart, it says he's not wanting to

16    get out of bed and he's crying and he can't concentrate and

17    that his speech has been affected at times.

18    Q.    Does he mention whether he had ever suffered from

19    this type of condition in the past?

20    A.    I don't see that right now.

21    Q.    Does he mention here --

22    A.    He has never been -- says that he has never been like

23    this and is embarrassed.

24    Q.    Let me ask you a question, Dr. Paisan.  In your

25    experience in treating patients such as Mr. Hurley, is this,

PAISAN - DIRECT

1    in your experience, a common situation where a patient may

2    be embarrassed about the symptoms that they're having.

3    A.    Yeah, some patients are very embarrassed about

4    their -- they want to hide their depression or their anxiety

5    because you're always taught to, you know, buck up, get over

6    this, and sometimes it's hard to get over that.  It's hard

7    to be able to admit it.

8    Q.    I want you to take a look at the bottom of the

9    document under where it says "plan."?

10    A.    Yeah.

11    Q.    And can you describe briefly to the jury what the

12    medical record reports that Dr. Dauer is suggesting that

13    Mr. Hurley do?

14    A.    He suggests that he contact his mental health

15    referral so he can get some counseling and he's also

16    suggesting he be started on some medication to see if it can

17    help with his anxiety and his depression.

18    Q.    And does it indicate on there what type of medication

19    Dr. Dauer is prescribing?

20    A.    Yes.

21    Q.    And what is it?

22    A.    Wellbutrin and Xanax.

23    Q.    Are you familiar with those medicines?

24    A.    Yes.

25    Q.    What are they prescribed for, doctor?

PAISAN - DIRECT

1    A.    Xanax is mostly for anxiety.  Wellbutrin can be used

2    for either/or, depression or anxiety.

3    Q.    Dr. Paisan, in your experience, is depression a real

4    disease?  Do you understand my question?

5    A.    Is it a real disease?

6    Q.    Sure.

7    A.    Yes.

8    Q.    Just to be clear, we're not talking about being upset

9    that your baseball team lost.  Is it a condition that truly

10   affects people, based on your experience?

11   A.    Yes.

12   Q.    In your experience, can depression affect one's

13   ability to communicate, as Mr. Hurley was indicating here?

14   A.    Communicate in the sense of maybe not be able to

15   concentrate and say the words you want to say well.

16   Q.    Could it -- could depression or anxiety or stress

17   affect one's ability to perform their job?

18   A.    Sure.

19   Q.    Okay.  And have you seen different types of stress or

20   depression where, for example, somebody's depressed all the

21   time versus where somebody has episodes?

22   A.    Yes.  Some people have a hard time getting out of

23   depression.  Some people, it's just like any illness,

24   there's a wide variety of intensity of it.  Some people

25   could have mild hypertension.  Some people could have severe

PAISAN - DIRECT

1    hypertension.  Depression can be the same way.

2    Q.    If left untreated, based on your experience, what

3    could happen to a person suffering from depression?

4    A.    The worst?

5    Q.    Walk us through the whole range of things.  Correct.

6    A.    The worst?

7    Q.    Yes, sir.

8    A.    Somebody commits suicide.

9    Q.    Okay.  What would be the next level down from that,

10   if somebody wasn't committing suicide?

11   A.    They just lose their zest for life and they don't

12   take care of themselves, don't take care of their body,

13   maybe start drinking more, having a hard time getting

14   outside, enjoying life, losing their friends, isolating

15   themselves more.

16   Q.    Have you ever heard the expression "major episode of

17   depression"?

18   A.    Yes.

19   Q.    What does that mean?

20   A.    It's an -- it's not just a mild effect.  It's not

21   just a minor feeling blue for a day or two.  It's affecting

22   themselves where they're not being able to enjoy the typical

23   things that they would normally enjoy.

24   Q.    In the work context, what were -- what would be some

25   recommendations that you would give to one of your patients

PAISAN - DIRECT

1    who might be suffering from depression or anxiety that's

2    work related?

3    A.    What would I do?

4    Q.    Sure, what would be your recommendation to a patient

5    in that instance?

6    A.    I usually try to get them on some medications and try

7    to get them some therapy.

8    Q.    Would you ever make a recommendation to a patient

9    that they take time away from work to recover?

10   A.    If that's one of the precipitating factors that's

11   causing the depression, anxiety, yes.

12   Q.    If you made a recommendation to a patient regarding

13   depression or symptoms they were suffering from, would you

14   necessarily make a note of exactly what you told them in

15   your medical records?

16   A.    Depends how busy I was.

17   Q.    Okay.  Generally, let's assume you were part of a

18   busy practice, would you note everything that you were doing

19   or recommending for a patient?

20   A.    Not always.

21   Q.    When you would recommend or recommend to a patient

22   that they take time away from work if it's an aggravating

23   factor, do you simply mean time away from the office but

24   still working or is there another type of leave that you'd

25   recommend?

PAISAN - DIRECT

1    A.    It can vary.

2    Q.    Okay.  Would you ever recommendation to a patient

3    suffering from depression that they totally unplug from work

4    if work is causing that sort of stress or depression?

5    A.    It depends on the patient.

6    Q.    Okay.  As you sit here today, do you have any

7    independent recollection of the suggestions or

8    recommendations you would have given to Mr. Hurley when you

9    treated him?

10   A.    No.

11   Q.    Would you agree, based on your experience, that

12   there's no true way to predict when an episode or a panic

13   attack is going to come on from somebody treating from

14   depression?

15   A.    To predict anxiety?

16   Q.    Sure, sure.

17   A.    Not a hundred percent.

18   Q.    Okay.  Is depression or stress, work related stress,

19   in your experience, the type of condition that can ebb and

20   flow?

21   A.    Yes.

22   Q.    Okay.  Can panic attacks come on without notice?

23   A.    Yes.

24   Q.    And would you agree that the worse -- or the longer

25   depression continues, the worse the symptoms could get?

PAISAN - DIRECT

1    A.      Harder to treat.

2    Q.      What are some symptoms, if you could just describe

3    them generally, that a patient suffering from depression or

4    stress would suffer from?

5    A.      From just depression or stress?

6    Q.      Or both?

7    A.      Depression, lack of energy, altered appetite, lack of

8    enjoying things that they normally would enjoy, eating,

9    sleeping disturbance.

10   Q.      What about panic attacks, could a patient suffering

11   from depression suffer from panic attacks?

12   A.      They can.  Panic attacks, they feel like they're

13   losing control.

14   Q.      Are panic attacks more synonymous from somebody

15   suffering from anxiety or stress than depression?

16   A.      Yeah, can be.

17   Q.      Would another symptom during a panic attack be

18   shortness of breath?

19   A.      Yes.

20   Q.      What about crying?

21   A.      Can be.

22   Q.      What about dizziness?

23   A.      Can be.

24   Q.      Can these symptoms, when combined, cause a period of

25   incapacity?

PAISAN - DIRECT

1    A.    At times.

2            MR. CELLAR:  Let me show you the next record, if I

3    may approach, Your Honor?

4            THE COURT:  You may.

5    BY MR. CELLAR

6    Q.    Showing you what has been marked as Plaintiff's

7    Exhibit Number 55, and again, the same questions I asked

8    before, does this appear to be a true and correct copy of a

9    treatment note from Dr. Dauer that would have been contained

10   in Pat Hurley's file at the time you took over?

11   A.    It looks like it.

12           MR. CELLAR:  Your Honor, at this time, we'd like

13   to move into evidence what's been marked as Plaintiff's 55.

14           THE COURT:  Exhibit 55 is received.

15           (Plaintiff Exhibit 55 admitted)

16   BY MR. CELLAR

17   Q.    Showing you what's been marked as Plaintiff's Exhibit

18   Number 55, was this another treatment based on what you can

19   tell, between Pat and Dr. Dauer for his depression?

20   A.    Yes.

21   Q.    Okay.  And as you sit here today, do you know what

22   advice Dr. Dauer would have given Mr. Hurley during this

23   treatment session?

24   A.    According to the chart, looks like he's bumping up

25   his medication and also to seek counseling with David

PAISAN - DIRECT

1    Lawrence Center.

2    Q.    When you say David Lawrence Center, is that the

3    reference to DLC?

4    A.    Yes.

5    Q.    Can you just -- make sure we find that.

6    A.    Paragraph four -- or three, third line.

7    Q.    I'm missing it, but okay, it's not a problem.  So in

8    this report, is Dr. Dauer, to your knowledge, making a

9    recommendation that Pat seek other counseling with a mental

10   health therapist at the David Lawrence Center?

11   A.    Correct.

12   Q.    Let's go ahead and show you what's been marked as

13   Exhibit Number 56, which I'll ask you, does that appear

14   likewise to be a true and correct copy of a medical record

15   contained within Dr. Dauer's file that you inherited from

16   Dr. Dauer?

17   A.    It looks like one.

18        MR. CELLAR:  Your Honor at this time, I'd like to

19   move into evidence what's been marked as Exhibit Number 56.

20        THE COURT:  Exhibit 56 is received.

21        (Plaintiff Exhibit 56 admitted)

22   BY MR. CELLAR

23   Q.    Okay, and very briefly -- and very briefly,

24   Dr. Paisan, is this another record where Pat treated for his

25   mental health issues with Dr. Dauer in April of 2005?

PAISAN - DIRECT

1   A.    That one looks like more of a combination of a sinus
2   problem, to me.
3   Q.    And what was the assessment here that Dr. Dauer was
4   recommending?  Let me move that up for you.  Under the
5   second line, what was the assessment?
6   A.    I can't see that.  Move it to the side.  I can't see.
7   Q.    I'm sorry.
8   A.    Use Xanax sparingly, continue Wellbutrin, follow up
9   in two months.
10  Q.    What I'd like to do now is jump to when you started
11  treating with Pat Hurley, and I'd like to show you what's
12  been marked as Plaintiff's Exhibit Number 58.  Can you
13  identify for the record, please, what's been marked as
14  Exhibit Number 58?
15  A.    What do you mean?
16  Q.    What is it?
17  A.    It's a chart on the patient.
18  Q.    Okay.  What is the date on the chart?
19  A.    12/21/07.
20  Q.    And does this appear to be a true and correct copy of
21  the chart that your office would have created in treating
22  Mr. Hurley on that date?
23  A.    Yes, it does.
24        MR. CELLAR:  Your Honor, at this time, we'd like
25  to move into evidence what's been marked as Exhibit

PAISAN - DIRECT

1    Number 58.

2              THE COURT:  Exhibit 58 is received.

3              (Plaintiff Exhibit 58 admitted)

4    BY MR. CELLAR

5    Q.      Now, according to Exhibit 58, Mr. Hurley was coming

6    to see you because of a flare-up with his depression and

7    anxiety; is that correct?

8    A.      Combination of that and also prescription refill.

9    Q.      Okay.  Would you agree that patients come in and

10   bring up a variety of issues when they come in to treat with

11   you?

12   A.      Yes.

13   Q.      Okay.  And as I asked you earlier, because of that,

14   would you agree that you cannot always note specifically

15   everything you're recommending to the patient when you see

16   them?

17   A.      I said that earlier.

18   Q.      Okay.  Now, it says here under history of present

19   illness that Pat is coming in because of a flare-up of his

20   anxiety and depression; is that right?

21   A.      Yes.

22   Q.      What else is he telling you during this treatment

23   regarding what's happening to him?

24   A.      According to this, he's saying he's under a lot of

25   stress.  That's probably when the economy was going down so

PAISAN - DIRECT

1    things were slow and apparently, he had been -- sometimes

2    him and his wife would come and -- or his wife was one of my

3    patients then.  He had been agitated, stressed out.  That's

4    noted before.  Poorly motivated, tired, et cetera.

5    Q.    Under the medical assessment portion of what you did

6    for him on that date, what did you do?

7    A.    Cursory exam.

8    Q.    Okay.  And what did you -- what was the medical

9    assessment that you made of him on that particular day?

10   A.    Number one, depression and anxiety secondary to job

11   situation.  Tried a different medication.  And also, number

12   two, nasal steroid for his chronic allergies.

13   Q.    Now it says here that you prescribed Effexor or you

14   told him to continue using Effexor on that date; is that

15   correct?

16   A.    Yes, because I believe on the front part it says he

17   wasn't -- the Wellbutrin was not -- it was not working well

18   with him.

19   Q.    Okay.  Is 37.5 milligrams the lowest dose?

20   A.    Starting dose.

21   Q.    Okay, fair enough.  Would you have prescribed Effexor

22   to a patient if you did not believe it was necessary?

23   A.    No.

24   Q.    In that note, you also mentioned to Pat that he

25   should come back in in a month for follow-up.  Do you see

PAISAN - DIRECT

1    that?

2    A.    Yes.

3    Q.    What I'd like to do is show you what's been marked as

4    Exhibit Number 62.  Showing you what's been marked as

5    Plaintiff's Exhibit Number 62, can you identify that

6    document, sir?

7    A.    It appears to be a Family Practice note.

8    Q.    Okay.  Does that appear to be a true and correct copy

9    of the treatment that you gave to Mr. Hurley on that date?

10    A.    Yes, it does.

11         MR. CELLAR:  Okay Your Honor at this time we'd

12    like to move Plaintiff's 62 into evidence.

13         THE COURT:  Exhibit 62 is received.

14         (Plaintiff Exhibit 62 admitted)

15    BY MR. CELLAR

16    Q.    The date of this treatment is January 21st, 2008; is

17    that correct.

18    A.    Yes.

19    Q.    Okay.  And the purpose of this was for Pat to come in

20    to treat for a follow-up on his depression; is that correct?

21    A.    Yes, that and the sinus problems.

22    Q.    Okay.  And at the bottom under medical assessment,

23    you make a note that you believe his depression is

24    improving.  Do you see that?

25    A.    Yes, according to the first part of the note, it

PAISAN - DIRECT

1    states that he was feeling better, less up and down.

2    Q.    And is that common with patients who are suffering

3    from depression, to have bouts where they're feeling better

4    as opposed to other dates?

5    A.    Well, I think the key on this is that these

6    medications take a while to take effect.  So that's why he

7    was coming back, just to see if -- you don't know how

8    anybody's going to react to the medication.  Everybody has

9    different -- different meds for different people.  So he

10   came back a month later to see if the new medication was

11   going to have a positive effect on the patient.

12   Q.    Okay.  And --

13   A.    So that's why he came back.

14   Q.    Do you recall whether you were aware at the time Pat

15   came to see you for these symptoms in late 2007 and 2008

16   that he was having difficulty getting out of bed?

17   A.    According to the notes, it says, yes, I believe.

18   Q.    Okay.  Let me go ahead and show you, the next time

19   you treated with Mr. Hurley after this time in January of

20   2008 was three and a half months later in May of 2008.  Do

21   you recall that?

22   A.    No.

23   Q.    Okay, let me show you what's been marked as Exhibit

24   Number 64.  And I apologize, Doctor --

25   A.    Oh, before I forget, can I ask you a quick question.

PAISAN - DIRECT

1    Am I violating HIPAA regulation by talking about this?

2              THE COURT:  No.

3              THE WITNESS:  Thank you.

4    BY MR. CELLAR

5    Q.    Let me show you what we'd go ahead and mark as

6    Exhibit Number 64.  Showing you what's been marked as

7    Exhibit Number 64, do you recognize that document?

8    A.    Yes, looks like one of the Family Practice notes.

9    Q.    Okay.  And does that appear to be a true and correct

10   copy of the treating notes that you had with Mr. Hurley on

11   that date?

12   A.    Yes.

13   Q.    And what's the date on that, sir?

14   A.    5/9/08.

15   Q.    And does that --

16             MR. CELLAR:  Your Honor, at this time, we'd like

17   to move into evidence what's been marked as Plaintiff's 64.

18             THE COURT:  Exhibit 64 is received.

19             (Plaintiff Exhibit 64 admitted)

20   BY MR. CELLAR

21   Q.    Now on this date, Dr. Paisan, what was the purpose of

22   treating with Mr. Hurley?

23   A.    Follow-up, depression and anxiety, and request for

24   certification for FMLA.

25   Q.    You make -- you make a note in here that patient had

PAISAN - DIRECT

1    a long history of depression and anxiety.  Was that your

2    understanding of Pat's condition at the time you were

3    treating him?

4    A.    That's according to the charts.

5    Q.    And did he explain to you why he was having

6    depression and anxiety, according to this note?

7    A.    Yes, and also according to the charts.

8    Q.    What does it say?

9    A.    Patient has had problems with depression and anxiety

10   secondary to harassment at work and at his job.  Apparently,

11   one of his bosses had spread false rumors that he was having

12   a homosexual relationship with a coworker.  Wow.

13   Q.    You indicate in here that the patient has been under

14   the care of mental health counselors at David Lawrence

15   Center, Fred Stuart.  Was that consistent with your prior

16   recommendation that he do so?

17   A.    I don't recall.

18   Q.    Okay, fair enough.  It says here patient's stress,

19   anxiety, and insomnia all got to the point where he needed

20   to take some time off.

21         At the time you saw Mr. Hurley on this date, can

22   you describe to the jury what his condition was?

23   A.    Vague recollection, cloudy at best.  Anxious and

24   depressed.

25   Q.    Do you recall whether he was crying?

PAISAN - DIRECT

1    A.    I don't recall.

2    Q.    Okay.

3    A.    For a hundred percent.

4    Q.    Fair enough.

5    A.    But anxious, very anxious.  That I do remember

6    distinctly, extremely anxious.

7    Q.    Did Pat explain to you what had happened to him

8    regarding work during this treatment date?

9    A.    According to the chart, just a lot of stress at work

10   and problems with his boss and some false rumors.

11   Q.    Toward the bottom, did Pat explain to you what had

12   happened when he asked for leave time off?

13   A.    Let's see, apparently he asked for time off and was

14   denied.

15   Q.    Okay.  And in addition to a denial, did Pat mention

16   to you what further action the employer took, if any?

17   A.    He was fired on the spot.

18   Q.    Now, one of the reasons Pat came to see you on this

19   date was that he also wanted you to fill out a Family

20   Medical Leave Act form; is that correct?

21   A.    That's correct.

22   Q.    At the time you saw Pat on this date, did you believe

23   that he was faking his illness?

24   A.    No.

25   Q.    Did you ever come to the impression or belief that

PAISAN - DIRECT

1   during your treatment with Mr. Hurley he was faking the

2   depression and stress or anxiety he was suffering from?

3   A.     I'm a doctor and we're not trained in faking

4   diagnoses.  We're treating diagnoses and when a patient

5   tells me something, I don't believe there's a reason for him

6   to be faking it, so no, I don't believe he was faking it.

7   Q.     Do you have any reason to believe that he wasn't

8   really suffering from the conditions he was claiming on this

9   date?

10  A.     No.

11  Q.     Let me show you what we've marked as Exhibit

12  Number 65 which I believe will be the last exhibit I'll be

13  marking with you, and ask you if you can identify that

14  document for us, please.

15  A.     Yes, it looks like the FMLA certification that

16  Mr. Hurley asked me to fill out for him.

17  Q.     Does that appear to be a true and correct copy of the

18  Family Medical Leave Act form that you filled out?

19  A.     Yes.

20         MR. CELLAR:  Okay.  Your Honor, at this time, we'd

21  like to move into evidence what's been marked as Exhibit

22  Number 65.

23         THE COURT:  Exhibit 65 is received.

24         (Plaintiff Exhibit 65 admitted)

25

PAISAN - DIRECT

1    BY MR. CELLAR

2    Q.    Dr. Paisan, do you recognize the handwriting on this

3    document?

4    A.    That's mine.

5    Q.    Okay.  Now, on this form, you're not stating that Pat

6    cannot work at all; are you?

7    A.    No.

8    Q.    Are you stating that Pat needed to take time off to

9    care for his condition on this form?

10   A.    I'm saying he will need continuing care and

11   counseling and be able to take time off from work to get

12   appropriate care.

13   Q.    Okay.  And on this form, were you suggesting that he

14   could work, but just simply on a reduced schedule?

15   A.    I'm just saying what the chart's saying.  He could

16   probably work -- where is it?

17   Q.    In here under Section 7(B).

18   A.    There, yes.

19   Q.    Do you state that Pat needs to reduce his workload?

20   A.    Yes.

21   Q.    Do you also state that he needs to be able to have

22   days off, depending on the severity of his symptoms or

23   conditions?

24   A.    Correct.

25   Q.    Now at this point, you cannot state for certainty

PAISAN - DIRECT

1   when Pat would have an anxiety attack or panic attack; could

2   you?

3   A.      No.

4   Q.      The purpose of this leave was for Pat to take time

5   away from the stressors of work; is that correct?

6   A.      Yes, so he could do his work.

7   Q.      Okay.  Now, you're aware that, based on the note,

8   that after Pat had asked for leave, he had been fired;

9   correct?

10  A.      Yes.

11  Q.      Did you have an understanding as to why he would

12  still be asking you for a Family Medical Leave Act form

13  after he'd been told he'd been fired?

14  A.      No.

15  Q.      Do you recall what the discussion was?

16  A.      No.

17  Q.      Okay.  Was the purpose of this form to notify Pat's

18  employer, yes, his medical condition was legitimate?

19  A.      The purpose of this form is so he could get some time

20  off so he could do his job, from what I understand.  So if

21  he needed to show his work, he could do so.

22  Q.      Okay.  Now, under the section of the form -- or the

23  first page, it gives you the ability to check the types of

24  conditions that Pat would qualify for under the Family

25  Medical Leave Act.  Do you see that?

PAISAN - DIRECT

1    A.      Yes.

2    Q.      You checked 2 and you checked 4.  Do you see that?

3    A.      Yes.

4    Q.      Now on the last page of the leave -- of the form,

5    there is a definition section which identifies what 2 is and

6    what 4 is, and for purposes of today, I want to focus on

7    Section 4 which talks about a chronic condition requiring

8    treatment.  You see that?

9    A.      Yeah.

10   Q.      Okay.  Now, under Section 1 it says to qualify, you

11   need to require -- or have periodic visits for treatment by

12   a health care provider.  You see that?

13   A.      Yes.

14   Q.      Was it your understanding that in the past year, Pat

15   had treated with you on a number of occasions for his

16   depression, stress, or anxiety?

17   A.      Yes.

18   Q.      Okay.  And the second requirement is that the

19   condition continues over an extended period of time.  Do you

20   see that?

21   A.      Uh-huh.

22   Q.      It was your understanding that Pat was suffering from

23   stress and depression from 2005 forward; is that correct?

24   A.      Yes.

25   Q.      So would that, in your mind, qualify for that second

PAISAN - DIRECT

1   factor of continuing over an extended period of time?

2   A.    Yes.

3   Q.    And third, it says may cause episodic rather than a

4   continuing period of incapacity.  You see that?  And it

5   gives examples?

6   A.    Yes.

7   Q.    Based upon your prior testimony, would you agree that

8   if one is having these anxiety attacks or panic attacks

9   during the work day, that could cause episodic periods that

10  would qualify under Number 3?

11  A.    Yes.

12  Q.    Would you have completed this form for Mr. Hurley if

13  you believed that it was inaccurate?

14  A.    No.

15        MR. CELLAR:  I've got nothing further.  Thank you,

16  Dr. Paisan.

17        THE COURT:  You may examine.

18        MR. HENRY:  Good afternoon, Dr. Paisan.

19        THE WITNESS:  Good afternoon.

20                  CROSS EXAMINATION

21  BY MR. HENRY

22  Q.    Mr. Hurley, according to this Plaintiff's Exhibit 64,

23  told you that he had problems with depression that were

24  caused by harassment at work and harassment at his job.  Do

25  you see that, in the first paragraph there?

PAISAN - CROSS

1    A.      Yes.

2    Q.      Did he explain to you what that was?

3    A.      What do you mean?

4    Q.      Did he tell you what the harassment was?

5    A.      Exactly?  Well, one of them is apparently the false

6    rumors.

7    Q.      What did he tell you about the false rumors?

8    A.      It's what the chart says.

9    Q.      So you -- he didn't tell you anything other than what

10   you wrote here?  It looks like it says apparently one of his

11   bosses had spread false rumors that he was having a

12   homosexual relationship with a coworker.  That's all you

13   recall from that conversation?

14   A.      That's one of the things I remember distinctly.

15   Q.      When you see a patient, it's not like a lawyer where

16   we would dig into that and ask a hundred questions about it

17   to try to get to the bottom of it.  If he told you something

18   like that, that's as far as you'd go; right?

19   A.      Not necessarily.

20   Q.      Okay.  What else do you recall asking him about that?

21   A.      From what I can recall is that he was having problems

22   with stress and work and job, boss difficulties.

23   Q.      And this particular visit, you're aware, was after

24   Mr. Hurley had already been terminated from employment;

25   correct?

PAISAN - CROSS

1    A.      I don't recall.

2    Q.      Okay.  Mr. Hurley was terminated from employment,

3    I'll represent to you, on May 1st of 2008.  This document is

4    dated May 9th, 2008; correct?

5    A.      Yes.

6    Q.      Okay.  And so Mr. Hurley had actually been terminated

7    eight days before he came to visit you on this date;

8    correct?

9    A.      According to what you're telling me.

10   Q.      Did he talk to you about any stress related issues

11   related to his termination?

12   A.      I think he talked about, you see at the bottom, that

13   he was fired on the spot and he was very stressed out about

14   that.

15   Q.      Did he ask you at this particular visit for the FMLA

16   certification form?

17   A.      I believe so, but I'm not a hundred percent sure.

18   Q.      Okay.  And you knew, didn't you, that he'd been --

19   already been terminated from his job, he was no longer

20   employed; right?

21   A.      I think.  I'm not -- I don't remember.  To be honest

22   with you, I don't remember.

23   Q.      It says in the -- in the notes that he'd been

24   terminated and he was stressed out; right?

25   A.      According to the notes.

PAISAN - CROSS

1   Q.    Okay.  So you were aware that he'd already been

2   terminated from employment; right?

3   A.    Like I said, I don't remember.

4   Q.    Okay.  Is there any reason you would have written in

5   your notes that he had been terminated from employment if

6   Mr. Hurley hadn't told you that at the --

7   A.    No, it would have been straight from the patient's

8   mouth.

9   Q.    Okay.  So it's fair for us to assume that Mr. Hurley

10  told you at that visit that he'd already been terminated?

11  A.    I believe that's a fair statement.

12  Q.    Why in the world would you have filled out an FMLA

13  certification form for somebody that had already been

14  terminated?

15          MR. CELLAR:  Objection, Your Honor, argumentative.

16          THE COURT:  Overruled.

17  BY MR. HENRY

18  Q.    Dr. Paisan?

19  A.    Ask the question again?

20  Q.    Yeah.  Why in the world would you have filled out an

21  FMLA certification form for somebody who's just told you

22  that they've already been terminated?

23  A.    I didn't realize -- I'm not sure if I remembered then

24  he was terminated or not.  I'm just telling you.

25  Q.    There would be no reason for you to do that if he was

PAISAN - CROSS

1    no longer working there?  He would not be eligible for leave

2    of absence or anything else; right?

3    A.     I don't know.  I'm not a lawyer.

4    Q.     Well, you -- if you're certifying that he needs leave

5    of absence from work and he does not have work, why would

6    you be filling out the form?

7    A.     I don't know that answer.

8    Q.     Did Mr. Hurley tell you the things that he wanted you

9    to put on that FMLA certification form?

10   A.     No.

11   Q.     How is it that you can recall that but you don't

12   recall whether he told you he was terminated?

13   A.     I don't let a patient tell me what to write on a

14   chart.

15   Q.     Okay.  Would you look at the certification form that

16   you filled out and tell me where on this form it says that

17   Mr. Hurley should take vacation?

18   A.     Should take vacation?

19   Q.     Yes.

20   A.     Doesn't say anything about vacation.

21   Q.     Okay.  I'm going to hand you the exhibit and I want

22   you review it very carefully.  Take your time and read all

23   of it.

24   A.     Okay.

25   Q.     Did you read the second page as well?

PAISAN - CROSS

```
 1            (Pause)
 2   Q.    And the third, please?
 3   A.    Oh, okay.
 4            (Pause)
 5   Q.    And let me know when you're finished.
 6   A.    I'll let you know.
 7            (Pause)
 8   Q.    The printed portion you don't need to read.
 9   A.    Okay.
10   Q.    Thank you.
11   A.    Uh-huh.
12   Q.    Dr. Paisan, now that you've had a chance to read the
13   entire FMLA certification form that you wrote, tell me where
14   if anywhere on the form you recommended to Mr. Hurley that
15   he take vacation.
16   A.    It doesn't say anything about vacation, that I can
17   see.
18   Q.    Okay.  And do you recall in any session that you've
19   ever had with Mr. Hurley that you ever suggested that he
20   take vacation?
21   A.    No.  Time off.
22   Q.    Okay.
23   A.    Not vacation.
24   Q.    And in this FMLA certification form, you suggested he
25   take time off depending on the severity of the symptoms;
```

PAISAN - CROSS

1    correct?

2    A.      Yes.

3    Q.      Okay.  What does that mean?

4    A.      Well, if he can't get out of bed and his depression

5    is out of control, he may need some more time off than if

6    the depression is very mild.

7    Q.      So what you were recommending to Mr. Hurley is that

8    when he had symptoms of depression that prevented him from

9    going to work, that he should take time off; correct?

10   A.      Say it again?

11   Q.      You were recommending to Mr. Hurley that when he

12   became symptomatic in his depression, that he needed to take

13   time off of work; correct?

14   A.      I think that's if it -- if it interferes with his

15   work.

16   Q.      You were not suggesting that, for example, he take

17   off Memorial Day weekends, Labor Day, Columbus Day,

18   Thanksgiving; correct?

19   A.      No, right.

20   Q.      Did you give him any specific date that he should

21   take off from work?

22   A.      No not to my knowledge.

23   Q.      Did you give him any guidance on how much time he

24   should take off?

25   A.      Not to my knowledge.

PAISAN - CROSS

1  Q.      Did you give him any guidance on what he should do
2  while he's off of work?
3  A.      What do you mean?
4  Q.      Did you tell him he needed to do yoga, did you tell
5  him that he needed to get therapy?
6  A.      I might have, but I might not have documented.
7  Q.      Do you recall giving him any directions like that?
8  A.      I always tell patients to exercise, eat right, sleep
9  well.
10 Q.      That's really the protocol for treating depression,
11 exercising, eating right, and sleeping well; correct?
12 A.      Amongst other things.
13 Q.      Okay.  And you would have given that advice to
14 Mr. Hurley; right?
15 A.      Yes.
16 Q.      Sitting here today, Mr. Hurley -- well strike that
17 question.
18         Mr. Hurley came to see you after he'd already been
19 terminated.  Did he tell you the dates that he had requested
20 off?
21 A.      No.
22 Q.      No?  The one thing he could have done was show you
23 the vacation dates that he had submitted to his employer.
24 Did he do that?
25         MR. CELLAR:  Objection, speculation, Your Honor.

PAISAN - CROSS

```
 1              THE COURT:  Overruled.
 2   A.     I can't -- I don't remember.  It doesn't ring a bell.
 3   BY MR. HENRY
 4   Q.     That certainly -- that vacation schedule that
 5   Mr. Hurley submitted to his employer was not in your medical
 6   file; right?
 7   A.     I've never seen that before.
 8   Q.     Okay.  And anything that a patient gives you related
 9   to his or her treatment would go in your medical file;
10   correct?
11   A.     Maybe.
12   Q.     Maybe not?
13   A.     Maybe not.
14   Q.     Dr. Paisan, is it, Mr. Hurley had come to you and
15   said, you know, I feel fine today, but I'd like to take the
16   day off, would you have given him an FMLA certification form
17   allowing him to stay home from work?
18   A.     No.
19   Q.     And by the -- in the same nature, if he had come to
20   you and said, you know, I have no reason to believe that on
21   Independence Day I'm not going to be able to work, but I'd
22   like you to fill out a certification form saying that I need
23   to stay home from work that weekend, would you have done
24   that?
25   A.     No.
```

PAISAN - REDIRECT

1    Q.    So you would not certify somebody as eligible for

2    Family and Medical Leave at some point in the future without

3    knowing that they were not going to be able to work that

4    day; right?

5    A.    I don't believe so.

6    Q.    Just because a patient comes to you and says, you

7    know, I'd like to take Memorial Day, Columbus Day, Labor

8    Day, Thanksgiving and the 4th of July off, you wouldn't fill

9    out a FMLA certification form them to do that; right?

10   A.    I don't think so.

11   Q.    And you certainly didn't do that with Mr. Hurley;

12   correct?

13   A.    Not to my knowledge.

14          MR. HENRY:  I don't have any other questions, Your

15   Honor.

16          THE COURT:  Redirect?

17          MR. CELLAR:  Thank you, Your Honor.

18                  REDIRECT EXAMINATION

19   BY MR. CELLAR

20   Q.    Dr. Paisan, you were asked some questions whether you

21   knew whether Pat had been fired before he came after you --

22   before he came to you or after.  Do you recall that a few

23   moments ago?

24   A.    Yes.

25   Q.    Okay.  Do you know whether Pat was still considering

PAISAN - REDIRECT

1    himself to be employed under his agreement with the

2    defendants at the time he came to you?

3    A.    From what I believe, he was still employed, from what

4    my understanding at the situation.

5    Q.    Now, I --

6    A.    But I'm not, you know, I'm not an expert in -- in

7    this type of thing, but from my recollection, it was my -- I

8    was assuming that he was employed.

9    Q.    And my question is, do you know as you sit here today

10   one way or the other whether Pat explained to you that under

11   the terms of his employment agreement, he was still

12   considered to be an employee of the company regardless of

13   whether he was verbally fired?

14           MR. HENRY:  Objection, Your Honor.

15           THE COURT:  Sustained.

16           MR. CELLAR:  Your Honor, may I sidebar on this for

17   a moment, please?

18           THE COURT:  No, form.  Ask your next question.

19   It's leading.

20   BY MR. CELLAR

21   Q.    Doctor, do you know one way or another whether Pat

22   was legally -- or Pat was considered to be an employee of

23   Kent Security at the day he -- on the day he came to see

24   you?

25   A.    I don't know for a hundred percent but my presumption

PAISAN - REDIRECT

```
 1   was that he was.
 2   Q.     Do you know whether -- what the terms of his
 3   employment agreement, if any, were when he came to see you?
 4   A.     No.
 5   Q.     Now, you were asked some questions by Mr. Henry
 6   regarding whether you would tell an employee to take time
 7   off for Columbus Day or 4th of July and some of those other
 8   holidays.  Do you remember that?
 9   A.     Yes.
10   Q.     If an employee came to you and was having work
11   related stress, would one of your recommendations be to take
12   time off away from work?
13   A.     If it's affecting their job, yes.
14          MR. CELLAR:  Okay, I've got nothing further.
15   Thank you, Doctor.
16          THE COURT:  Anything further?
17          MR. HENRY:  Nothing further, Your Honor.
18          THE COURT:  Thank you.  Doctor, you're excused.
19          (Witness excused)
20          THE COURT:  Call your next witness.
21          MR. CELLAR:  The plaintiff calls Fred Stuart, who
22   is outside.  May we go get him, Your Honor?
23          THE COURT:  You may.
24          DEPUTY CLERK:  If I could have you raise your
25   right hand, please.
```

PAISAN - REDIRECT

```
 1              (The Witness is Sworn)
 2              DEPUTY CLERK:  Thank you.  You may be seated, and
 3     if you would, state your name for the record, please.
 4              THE WITNESS:  Frederick Stuart.
 5                       FREDERICK STUART,
 6        a witness herein, after having been duly sworn,
 7        was examined and testified under oath as follows:
 8                       DIRECT EXAMINATION
 9     BY MR. CELLAR
10     Q.     Good afternoon, Mr. Stuart.
11     A.     Yeah, good afternoon.
12     Q.     Please go ahead and introduce yourself to the jury.
13     Tell them a little bit about who you are, what you do.
14     A.     Yeah, I'm a licensed clinical social worker.  That's
15     a psychotherapist.  And I currently work at the David
16     Lawrence Center here in Naples, Florida.  And I've been -- I
17     also at this point do some consulting work at Catholic
18     Charities of Collier County.  And I've been with both of
19     those organizations since 1998.
20     Q.     And what is your educational background?
21     A.      In this field, I have an MSW from the University of
22     Central Florida and I have a licensed -- I'm a licensed
23     clinical social worker in the state of Florida, and in a
24     previous life, I also have an MBA.
25     Q.     Can you describe to the jury the types of areas that
```

STUART - DIRECT

1    you practice in, what you do?

2    A.     Yeah.  Well first of all, in the Community Mental

3    Health Center where I've worked for a long time, we see a

4    broad range of problems, but I would say that the most

5    standard problems we see would be effective disorders which

6    would be anxiety and mood disorders, some general

7    situational stresses that people have, some crisis support.

8    Obviously, we deal with more severe mental illness as well.

9    Q.     Can you describe briefly to the jury the type of

10   therapy that you provide to patients?

11   A.     Well, yeah.  A lot of -- first of all, let me qualify

12   that.  A lot of psychotherapy is really based on diagnosis

13   and depending on the diagnosis that you have, if somebody

14   comes in and they're having marital problems, there's no

15   rush to send them to a psychiatrist and put them on

16   medication.  If somebody comes in and they're suffering from

17   clinical depression, let's say, you're more likely to be

18   looking at possibly a referral for medication and therapy.

19   The type of therapy that you would do, let's say in the case

20   of depression, is more cognitive behavioral, usually

21   depending on -- for example, in anxiety disorders, often

22   again, you would use cognitive behavioral therapy but

23   depends on the type of anxiety disorder because there may be

24   graded exposure or other techniques you would use.

25   Q.     Now, when you first treat with a patient, do you do

STUART - DIRECT

1    something called a clinical assessment?

2    A.    Yes, that is correct.

3    Q.    What is a clinical assessment and what does it

4    entail?

5    A.    A clinical assessment, you're spending about an hour

6    and a half or two hours with a client, depending on --

7    sometimes -- sometimes the agency that you're working at may

8    have certain paperwork requirements that may be somewhat

9    more arduous and require, you know, some extra paperwork to

10   be filled out.  But usually, let's say it would be an hour

11   and a half or two hours, and what that is is really an

12   opportunity to take an in-depth look at the patient's

13   history.  You're looking at their history of the presenting

14   concerns, medical issues, any psychosocial stresses that

15   they may have, what their family environment is like, and

16   I'm going all the way back to their childhood.  Sometimes

17   that's more salient than other times.

18        The reason that we do that, even with adults, is

19   you can have somebody, for example, who let's say had

20   undiagnosed attention deficit issues as a child which can

21   affect your concentration or focusing and that you need to

22   know that because you don't want to misdiagnose this as an

23   adult problem.

24   Q.    Is the goal of the therapy that you provide to come

25   up with some sort of treatment plan for the patient to get

STUART - DIRECT

1    better?

2    A.      Yes, that is correct.

3    Q.      Okay.  Now, during your career, let's just go back

4    let's say the last eight years or so, roughly how many

5    patients do you think you've seen?

6    A.      Wow, last eight years?  Wow, I'm trying to -- I'm

7    trying to, like, give it a round number here.

8    Q.      Let me ask you differently.  Would it be more than a

9    thousand?

10   A.      Oh, I would -- I would doubt that.

11   Q.      Okay.  More than 500?

12   A.      I would say that, yes.

13   Q.      Fair enough.  And on average in your practice, how

14   many patients would you estimate you treat per week?

15   A.      Usually I -- I average probably about 25 or 30

16   sessions a week.  That's with individual patients, so

17   probably 25 -- well would be 25 or 30 different people.

18   Q.      Okay.  And do you try and record notes for what

19   you're discussing during each patient session?

20   A.      Yes, I do.

21   Q.      Okay.  And do you recall or do you record all of your

22   notes or suggestions that you may make to a particular

23   patient during each session?

24   A.      Not -- not verbatim.

25   Q.      Okay.  Are there standard types of recommendations in

STUART - DIRECT

1    your experience that you would make to patients suffering

2    from certain conditions?

3    A.    Yes, there are.

4    Q.    Like for example, is there something you've heard of

5    called a generally accepted practice?

6    A.    Yes, that is correct.

7    Q.    Okay.  So for example, if somebody's suffering from

8    depression or anxiety or stress, would you have common

9    recommendations that you would make to these sorts of

10   patients?

11   A.    Yes, you would.

12   Q.    For example, with regard to depression or stress and

13   anxiety, is it part of your normal practice or

14   recommendation to tell the employee to take time away from

15   work?

16          MR. HENRY:  Judge, this is beyond leading.

17          THE COURT:  Sustained.

18   BY MR. CELLAR

19   Q.    If a client was suffering from depression, would you

20   tell the client to take time off from work?

21   A.    Well, obviously it would depend on whether they were

22   working or not.  That would be one, you know, one issue.

23   You know, a lot of this -- understand something about

24   diagnosis.  I want to make a clarification here, okay?

25   And -- and from a psychiatric standpoint, the -- the

STUART - DIRECT

1    Diagnostic and Statistical Manual that psychiatrists and
2    licensed therapists use is -- is based on a multi axial
3    diagnosis, and as part of that, it looks at the person and
4    the environment.  So depending on a person's environment and
5    the issues in their environment, has a bearing on not only
6    the diagnosis, because those factors, a failing marriage,
7    work related or occupational stresses or difficulties can
8    have a bearing on the ax -- what's called the Axis I
9    diagnosis, your mental health diagnosis.
10              So therefore, in answer, you know, long-winded
11   answer to your question is, you know, depending on what
12   factors somebody has that are -- may impinge or impact the
13   Axis I diagnosis, you could make certainly recommendations
14   on those issues.
15   Q.    In your experience, if a patient was suffering from
16   stress related to work, would it be part of your best
17   general practices to recommend to the patient to take time
18   away from work?
19   A.    Yes, it would.
20   Q.    Okay.  Have you ever heard the expression, major
21   episode of depression?
22   A.    Yes, I have.
23   Q.    What does that mean?
24   A.    Major episode of depression is a type of depression
25   where somebody has a cluster of symptoms and there are nine

STUART - DIRECT

1    symptoms of major depression.  You'd have to have five of

2    those nine symptoms in order for it to qualify as an episode

3    of major depression.

4    Q.    What would those symptoms be?

5    A.    Do you want me to name all nine of them?  Depressed

6    mood, loss of interest, inertia which is loss of energy,

7    anhedonia which is -- well, that's loss of pleasure in

8    things, sleep disturbance, appetite disturbance, an

9    inability to focus or concentrate or make decisions,

10   worthlessness, and inappropriate guilt, psychomotor

11   agitation or retardation or passive or active suicidal

12   ideation.

13   Q.    Sounds like you've repeated that a couple times in

14   your life?

15   A.    Yeah, I know them pretty much now.

16   Q.    Could these major symptoms or could these symptoms of

17   a major episode also affect one's ability to communicate?

18   A.    At times, yes, it could.

19   Q.    What about could it also affect one's ability to have

20   rational thinking?

21   A.    In more severe episodes -- let me make a distinction

22   here.  First of all, with major depression, there's a

23   distinction as to whether or not the depression is recurrent

24   or whether it's a single episode, and there's also

25   distinctions in terms of the severity level, whether it's

STUART - DIRECT

```
 1   mild, moderate, severe, or severe with psychotic features.
 2   So the answer to your question, obviously if somebody has
 3   psychotic features, they have some reality impairment.
 4   However, I've seen cases where people are not necessarily
 5   psychotic but their depression is severe enough that it's
 6   impacting their ability to make good decisions.
 7   Q.    If somebody's suffering from what I'll refer to as
 8   work related depression or stress, is taking time away from
 9   work a therapy that you would recommend as a matter of
10   course?
11   A.    I would recommend any -- any -- whatever that cause
12   of that -- of that -- again I hate to do this, but I'm going
13   to make a qualification here.  A lot of mental health
14   problems are what are called stress activated.  So what I
15   mean by that is unlike a medical condition, if I go to my
16   doctor and my hand is broken and the doctor asks me, why is
17   your hand broken and I say, well, because I fell down a
18   flight of stairs or because I got mad and punched a door,
19   the doctor may say, well, that was a dumb thing to do but
20   I'm going to take an x-ray and it doesn't really matter why
21   those factors, the reality is my hand's broken.
22              I'm saying with mental health problems, it has a
23   bearing, the factors that contribute to that, on why you may
24   be feeling that way.  So what I'm saying is if -- if
25   somebody is having trouble with -- with a particularly
```

STUART - DIRECT

1    stressful work environment, then reducing the stress in the

2    work environment by either taking time off or somehow

3    reducing the stressors in the work environment, whether it's

4    to confront problems with co-workers or whatever, would be a

5    suggestion I would make.

6    Q.    Okay.  And when you -- when you would recommend to

7    somebody the take time off from work in the scenario you

8    just described, what do you intend for the patient to do

9    during that time period?

10   A.    Well, I would certainly recommend that they would

11   engage in some things that were, one, would have some --

12   well again, if somebody is clinically depressed, it's

13   probably affecting their ability to sleep and to eat and

14   their pleasure.  So it would be to keep things simple, to

15   take better care of themselves, to make sure that they're

16   eating, make sure that they're exercising, to keep stress

17   at -- to try to reduce stress in their life and to keep

18   things very, very simple at that point.

19   Q.    Okay.  If you were recommending to somebody that they

20   take time off from work, would part of that recommendation

21   be to unplug from work?

22   A.    That -- that's, again, a possibility.  Depends on

23   the -- you know, if you're talking in -- in the case of Pat

24   or in the case of general, you know.  If you're talking

25   generalities, again it would depend on the severity of the

STUART - DIRECT

1    depression.  If -- the more depressed somebody is, the more

2    likely it is that somebody would need to take some -- you

3    know, consider unplugging and taking time off.

4    Q.    Okay.  And I know we've been speaking here in

5    generalities and I want to get a little bit more specific

6    about Pat's treatment in a moment.  Let me ask you just a

7    few more general questions.  Because of the nature of

8    depressive episodes, can you as a therapist predict with any

9    certainty when an episode is going to come on?

10   A.    With any certainty, I cannot.

11   Q.    Based on your experience in treating somebody

12   suffering from depression or stress, are the symptoms

13   ongoing, meaning 24 hours a day, seven days a week?

14   A.    Well again, it depends on are you talking about the

15   overall course of the illness or are you talking about --

16   you see, depressive disorder is with an exception, the

17   exception would be something called dysthymia, which is a

18   low grade chronic depression.  Most episodes are episodic.

19   That's why you talk about a single or recurrent episode of

20   depression, which means it's an episode.  When they're in

21   that particular episode, the symptoms may wax and wane

22   somewhat but the reality is the symptoms sufficiently

23   appear, sufficiently pronounced in order to be continuous.

24   When people are not in that episode, they may have some of

25   those symptoms in attenuated form but they're not sufficient

STUART - DIRECT

1    in order to meet the qualification for being in an episode.

2    Q.    Do you recall treating a patient by the name of Pat

3    Hurley?

4    A.    Yes, I do.

5    Q.    Do you recall when you first start treating with Pat

6    Hurley?

7    A.    Yes, February of 2007.

8    Q.    What I'd like you to do, if you could take a look in

9    front of you, we've marked what's going to be referred to as

10   Plaintiff's Exhibit Number 57.  Do you see that?

11   A.    Yes, I do.

12   Q.    What I'd do is ask you to take a look and if you can,

13   identify what Exhibit Number 57 is.

14   A.    Exhibit Number 57 is the first page of progress notes

15   for this episode of care.

16   Q.    Okay, and I'll represent to you that there's two more

17   pages of Exhibit 57.  Do you see that?

18   A.    Yes, I do.

19   Q.    Okay.  And do these appear to be true and correct --

20   a true and correct copy of your treatment notes for

21   Mr. Hurley?

22   A.    Yes, they are.

23   Q.    On the dates indicated?

24   A.    Yes.

25           MR. CELLAR:  Your Honor, at this time, I'd like to

STUART - DIRECT

1    introduce into evidence what's been marked as Exhibit Number

2    Plaintiff's 57.

3              THE COURT:  Exhibit 57 is received.

4              (Plaintiff Exhibit 57 admitted)

5    BY MR. CELLAR

6    Q.    What I'm going to do, you've got a copy of the

7    document in front of you, but I'm also going to put it up on

8    the screen here.

9    A.    Okay.

10   Q.    And if you can take a look, first a general question,

11   what was the purpose of Mr. Hurley coming to treat with you

12   when he first started there in February of 2007?

13   A.    The -- why did he initially come?

14   Q.    Sure.

15   A.    Yeah, he was kind of complaining of being burnt out

16   and of being unhappy.

17   Q.    Okay.  And did he explain to you what the cause is or

18   the cause was of him feeling burnt out or unhappy?

19   A.    Well, I remember that -- that work stress was a major

20   concern of his.

21   Q.    And there's a word that you use here in the first

22   sentence.  You see that right there?

23   A.    Yeah, anhedonia.

24   Q.    Can you explain to the jury what that is?

25   A.    Yeah, anhedonia is a loss of interest in things.

STUART - DIRECT

1    Q.      And did Mr. Hurley explain to you what was happening

2    to him at this time in February of 2007, meaning the

3    symptoms?

4    A.      The actual symptoms that he was having?

5    Q.      Yes, sir.

6    A.      Yes, he did.

7    Q.      Can you describe to the jury the types of symptoms

8    that Mr. Hurley was suffering from in February of 2007, if

9    you recall?

10   A.      Can I take a look at this, please?

11   Q.      You sure can.

12   A.      Okay.  He was talking about low energy, and I put in

13   parentheses burnout.  Burnout, I just want to qualify, is

14   not necessarily a clinical term, but it's related to stress

15   overload and when somebody has stress overload, they can go

16   through periods of time and gradually, if they don't deal

17   with their stress, they can become increasingly burnt out

18   and that can turn into clinical depression.  Emptiness.  He

19   was having concentration problems and low energy.

20   Q.      Okay.  Do you make a note about the fourth line or

21   fifth line down where you say Axis I depression or is

22   that --

23   A.      Depressed -- sorry.

24   Q.      That's okay.  Go ahead.

25   A.      Depressive disorder not otherwise specified.

STUART - DIRECT

1    Q.    Okay.  Did you do a clinical assessment of Pat at the
2    time he came to see you in February 28th of 2007?
3    A.    Yes, I did.
4    Q.    Did he appear at that time to be faking or
5    malingering to you?
6    A.    Absolutely not.
7    Q.    At any time during your treatment with Mr. Hurley
8    over the last few years, did you ever believe that his
9    condition was not real?
10   A.    No.
11   Q.    Did you ever believe that he was using his condition
12   to milk his employer out of vacation time?
13   A.    Absolutely not.
14   Q.    Do you recall what you initially diagnosed Mr. Hurley
15   with?  Is that the --
16   A.    Yeah, 3/11, which is depressive disorder not
17   otherwise specified.
18   Q.    Do you recall where you first met with Mr. Hurley, I
19   mean treated with him?
20   A.    Do you mean the specific of the first session or the
21   time I first met with him, those number of sessions?
22   Q.    Meaning the location or who you were working for?
23   A.    Oh, yes, sure.  I was working at Catholic Charities
24   of Collier County.
25   Q.    What is Catholic Charities of Collier County?

STUART - DIRECT

1    A.     It's a non-profit agency that's affiliated with the

2    Diocese of Venice in Naples -- in Venice, Florida.  But

3    we're a non-denominational counseling center.  We also

4    provide other services here in Collier County, food banks,

5    refugee resettlement, but this, where I was working as the

6    clinical director at the time was our family counseling

7    center on Santa Barbara Boulevard.

8    Q.     What I'd like you to do is take a look at what has

9    been pre-marked as Plaintiff's Exhibit Number 59.  It should

10   be in front of you.

11   A.     Okay, got it.

12   Q.     Okay.  And what I'd like you to do is, if you can,

13   identify the document that we've marked as Plaintiff's

14   Exhibit Number 59.

15   A.     It says Clinical Social History.

16   Q.     And does that appear to be a true and correct copy of

17   a clinical social history?

18   A.     Yes, it is.

19   Q.     Okay.  At the time Pat came in to see you on this

20   date, what was his chief complaint -- oh, I'm sorry.

21          MR. CELLAR:  At this time, Your Honor, we'd like

22   to move into evidence what's been marked as Exhibit

23   Number 59.

24          THE COURT:  59 is received.

25          (Plaintiff Exhibit 59 admitted)

STUART - DIRECT

1    BY MR. CELLAR

2    Q.      And you can hang onto that, Mr. Stuart.  What I'm

3    going to want to do is discuss some of the details of this

4    clinical assessment with you.  Now, under the Chief

5    Complaint section of your clinical assessment, Mr. Hurley,

6    you see here you note he has become more fatalistic; you see

7    that?

8    A.      Yes.

9    Q.      What does that mean?

10   A.      Somebody who's fatalistic just doesn't see much of a

11   future for themselves.

12   Q.      Okay.  And your next note says pessimistic, wants to

13   be left alone.  Were these things that you observed from Pat

14   or things that he told you?

15   A.      They would be things that would be based on things

16   that somebody would tell me.

17   Q.      Okay.

18   A.      Because it's under Chief Complaint.

19   Q.      Okay.  And I can see here that you also noted has

20   lost passion, feels empty, pangs of depression; see that?

21   A.      Yes.

22   Q.      Are these symptoms, in your experience, consistent

23   with someone who's actually suffering from a medical version

24   of depression?

25   A.      It can be, yes.

STUART - DIRECT

1   Q.     Under History of Present Complaint, it says here --
2   and it's hard to read, with all due respect to your
3   handwriting.
4   A.     It says client describes signs -- SS, S/S is signs
5   and symptoms.  Okay, I say client describes signs and
6   symptoms have been chronic for a number of years.
7   Q.     Now, under Previous Illness, which I'm going to move
8   down, you make a reference here to 2005 Pat having taken
9   Wellbutrin from his GP.  Do you see that?
10  A.     Yes, I do.
11  Q.     Okay.  Was that your understanding of the medicines
12  that Pat was taking, at least as of 2005?
13  A.     Yes, that's correct.
14  Q.     Okay.  Skip to this next page.  Under Occupational
15  History, what I'd like you to do is describe to the jury, if
16  you could, some of the things that Pat was discussing with
17  you regarding his current job when he was treating with you?
18  A.     Well, I remember him telling me that he had been with
19  a security company for a number of years, but had prior been
20  in the security business longer than that and had currently
21  been the president of -- was the president of the security
22  company.
23  Q.     And then at the end, your clinical impression was
24  that word again which I always mispronounce?
25  A.     Anhedonia.

STUART - DIRECT

1  Q.    Okay.  Which is?

2  A.    That's one of the symptoms of depression one of the

3  nine symptoms, refers to loss of interest in things.

4  Q.    You make a comment here, can you first read to it the

5  jury what it says, and explain what it means?

6  A.    Yeah.  I said that signs -- signs and symptoms have

7  increased in recent months and I said, um, functions

8  adequately, and I think that's one of the reasons that at

9  that time I did not, um, necessarily have given him a major

10  depressive episode.  At least, you know, my -- my

11  professional opinion is to always give somebody a less

12  restrictive diagnosis unless you're absolutely sure of what

13  that diagnosis is.  But I will make a qualification here.

14  If -- if somebody is just suffering from some situational

15  upset, I'm not going to give them a depressive diagnosis.

16  I'm going to give them what may be called an adjustment

17  disorder with depressed mood.  They're just having some

18  situational upsets.  The fact that I gave somebody a

19  depressive diagnosis indicates I thought it was more severe

20  than that.

21  Q.    Okay.  Now, this assessment took place in February,

22  28th of 2007; is that correct?

23  A.    That's correct.

24  Q.    When was the next time, if you take a look at

25  Exhibit 57, your notes, that you treated with Pat for his

STUART - DIRECT

1    depression again?

2    A.    That was about ten days later -- well actually, I'm

3    sorry, February -- a week later.  March 7th.

4    Q.    Okay.  Now, if we can take a look at your notes on

5    March 7th, you indicate on here that Pat was still stressed

6    at work; is that correct?

7    A.    Yes, that's correct.

8    Q.    Okay.  Did Pat make any indication to you as to what

9    he wanted with regard to this therapy and what he was hoping

10   for during this treatment?

11   A.    At that juncture, I think he -- he wanted to -- I

12   think he just wanted to feel better.  I think he wanted to

13   feel less stressed out.  I think he wanted to feel happier.

14   Q.    Did Pat tell you, if you recall, whether he was

15   looking to reduce his stress and/or get some peace and

16   quiet?

17   A.    Absolutely.

18   Q.    Just -- I want to mark that for you.  Is that one of

19   the statements that he made to you?

20   A.    Yes.  He said that he wants -- he said, you know,

21   that he wanted to decrease the stress and increase the peace

22   and quiet in his life.

23   Q.    Now above that, there's a comment that Pat finds his

24   job unfulfilling.  Do you see that?

25   A.    Yes.

STUART - DIRECT

1   Q.     In your experience in treating this sort of
2   condition, is that a common symptom of somebody suffering
3   from depression?
4   A.     I -- I would say -- I would say yes.  I think that
5   people, because there's -- part of anhedonia is finding
6   nothing of interest.  And so it's possible that somebody
7   could feel unfulfilled and say I find my job -- I don't like
8   my job anymore because they're -- not just because they
9   don't like their job but because they're unhappy in general.
10  Q.     And did Pat at any point during this therapy session
11  on March 7, 2007, tell you that he was feeling trapped by
12  his circumstances?
13  A.     Without looking at the note I can't tell you
14  precisely whether or not he said the word trapped.  I
15  certainly know that he had expressed an interest in, you
16  know, escaping and of -- of -- of moving.  And actually, I
17  see it there, okay.  I was qualifying that.  Yeah, I said
18  decrease client's feeling of being trapped by circumstance.
19  Q.     You said -- you mentioned a moment ago that Pat was
20  feeling that he wanted to escape.  Is that -- is that true?
21  A.     That's correct.
22  Q.     Okay.  And again, is that a common symptom of
23  somebody suffering from depression?
24  A.     That's also -- yes, it's a symptom of somebody
25  suffering from depression, but it's also a symptom of

STUART - DIRECT

1    somebody struggling with anxiety and stress.

2    Q.    Now, during this -- during these first two sessions,

3    is Pat -- did Pat convey to you that the stress he was

4    suffering was as a result of his work conditions?

5    A.    He had indicated that his work conditions were

6    stressful, yes.

7    Q.    Okay.  And at this point in treatment, do you recall

8    whether you recommended to Pat that he take time away from

9    work to treat for his conditions?

10   A.    I recommended -- I certainly -- we had talked about

11   his -- one of his things that he had talked about was the

12   possibility of -- of moving.  And I actually, if you go to

13   the second page, I said he periodically fantasizes about

14   being in -- about being in Arizona.  So one of the things

15   that I think that that was, in my judgment, was referred to

16   somebody feeling trapped and thinking of how it could be

17   better by taking off and going somewhere else.  And at that

18   point, my job was to say, you know, when you're depressed,

19   you may want to consider not making any major decisions, and

20   you may want to consider, can you take some time off, can

21   you consider doing something less drastic than I'm just

22   going to uproot and take off and make a wholesale decision

23   just because at that time, I'm feeling, you know, an intense

24   emotion.

25   Q.    Was the purpose of requesting or suggesting that he

STUART - DIRECT

1    take leave off to also allow him to unplug from work?

2    A.    Certainly, sure.

3    Q.    Okay.  And was that the only time, to your knowledge,

4    that you suggested to Pat that he take time off from work?

5    A.    As far as I know.  I know that we had some incidental

6    phone contact in between the time of -- that I stopped

7    seeing him at Catholic Charities and he started seeing me at

8    David Lawrence that following, I want to say -- I can't

9    remember.  Was it May of 2008?

10   Q.    Okay.  Now, as -- as part of trying to reduce stress,

11   would you agree that everybody can benefit from taking time

12   off?

13   A.    Absolutely.  That's why we get time off.

14   Q.    Would you agree --

15   A.    I just took a time off.  I just took a week off last

16   week because I was burnt out, so I understand.

17   Q.    Good for you; I am jealous.  Would you agree that

18   somebody that is suffering from stress that is work related

19   may benefit more than, let's say, the rest of us who aren't

20   suffering from that stress by taking time off?

21   A.    Sure.  In terms of reducing their stress level, sure.

22   Q.    Why would that be?

23   A.    Well, because I think that when one is depressed or

24   when one is suffering from severe anxiety, it's debilitating

25   and it makes it harder to function.  One of the -- one of

STUART - DIRECT

1   the things that -- the sign posts that you use when giving

2   people diagnosis is the degree of functional impairment that

3   somebody has.  So it doesn't mean that somebody can't be

4   clinically depressed and still working, but they're going

5   to -- it's going to require -- because again, remember,

6   their energy level is down.  They may not be sleeping and

7   eating correctly, and therefore, it's going to be harder for

8   them to function because there's less oil in the car, so to

9   speak.

10  Q.    If we take a look at Exhibit 57, when was the next

11  time you treated with Pat regarding his depression and/or

12  stress?

13  A.    It was the week after that, which was 3/14/07.

14  Q.    Okay.  And during each of these sessions, you would

15  have recommended -- would you have recommended to Pat that

16  he take tame off from work?

17  A.    I don't remember specifically doing that at that --

18  at that session.

19  Q.    Is there anything that would help refresh your

20  recollection as to whether you did actually say that to Pat

21  during your treatment with him?

22  A.    On the -- hold on one second.  Well, what I can

23  suggest is that it may well have come up in the context of

24  being in Arizona, wanting to go to Arizona, again, and --

25  because I had qualified that by saying this is not triggered

STUART - DIRECT

1   by intense feelings of being trapped, which I think I
2   chalked up to maybe having made some sense to him in that
3   previous session about possibly not making a wholesale
4   decision.
5   Q.      Do you recall giving a prior deposition in this
6   matter?  Do you recall being asked --
7   A.      Yes.
8   Q.      Okay.  And do you recall the day of that deposition?
9   A.      Not offhand, no.
10  Q.      Do you recall whether it was March 8th, 2011?
11  A.      That sounds familiar.
12  Q.      Okay.  Do you recall being asked the following
13  question -- counsel, Page 46, Line 5.
14          MR. HENRY:  Thank you.
15  BY MR. CELLAR
16  Q.      Did you recommend to Patrick Hurley that he take time
17  off from work at any of the three sessions that we've talked
18  about in February or March of 2007.
19          And your answer was:  To the best of my
20  recollection, I did.
21          Do you recall that?
22  A.      I don't recall saying that but I probably did at the
23  time.
24  Q.      Okay.  Does that refresh your recollection as to
25  whether you did tell Mr. Hurley to take time off?

STUART - DIRECT

1    A.    Well, it's a -- yes.  And as I said, I just qualified

2    it by looking -- what I -- what I did was I made the error

3    of reading, starting to read the note on 3/7 when we were

4    talking about Arizona and thinking that was the only

5    reference to it, but I see that we also talked about it in

6    the following 3/14 session where we did discuss the same

7    thing.

8    Q.    Okay.

9    A.    So it's very likely that we described it at that

10   time, yes.

11   Q.    Okay.  Now, were you aware at the time you were

12   treating Pat that he had accrued a significant amount of

13   leave time to take off?

14   A.    Yes.

15   Q.    Okay.  And do you recall whether when you told him to

16   take time off you suggested whether he could take it in

17   whole block increments or in shorter pieces?  Do you recall

18   one way or the other?

19   A.    No, I did not.

20   Q.    Is there anything that would help refresh your

21   recollection?

22   A.    No.  I just know that he had had a significant amount

23   of time accrued and that one of the issues that he had

24   talked about was that because of the work pressures, it was

25   difficult for him to get time off.

STUART - DIRECT

1    Q.    Do you recall ever telling Pat, people take time off

2    or people need to take time off and that's why you have time

3    off?

4    A.    Something to that effect, sure.

5    Q.    Fair enough.  Now in August of 2007, you prepared a

6    discharge summary for Pat.  Do you recall doing that?

7    A.    Yes, I do.

8    Q.    I'd like you to take or turn your attention to

9    Exhibit Number 60.  Does this appear to be a true and

10   correct copy of the discharge summary that you prepared for

11   Pat?

12   A.    Yes, it is.

13        MR. CELLAR:  Okay, and Your Honor, at this time,

14   we'd like to submit into evidence what's been pre-marked as

15   Plaintiff's Exhibit Number 60.

16        THE COURT:  Exhibit 60 is received.

17        (Plaintiff Exhibit 60 admitted)

18   BY MR. CELLAR

19   Q.    Okay.  Now, at the time you prepared this discharge

20   summary regarding your treatment with Pat, it says that he

21   attended some sessions and then withdrew.  Do you know why

22   he withdrew?

23   A.    No, I don't.

24   Q.    Okay.  And at the bottom of this discharge summary,

25   you make some assessments or recommendations to Pat.  Do you

STUART - DIRECT

1    see that?

2    A.    Yes.

3    Q.    What are they?

4    A.    I said he needs to better manage stress level to

5    maintain mild improvement in depressive signs and symptoms.

6    He has a history of depression and being on medicine, not on

7    any currently.  He can return to therapy prn, as needed, and

8    for follow-up, and for follow-up with his primary care

9    physician or other M.D. regarding med needs if depression

10   worsens and -- and worsens without therapy and adequate

11   stress management.

12   Q.    At the time you created this discharge summary in

13   August of 2007, had Pat been cured of his depression, to

14   your knowledge?

15   A.    No.

16   Q.    Okay.  Would you have made these recommendations to

17   him, such as managing or reducing his stress, if -- if they

18   were no longer necessary?

19   A.    No.  I -- I would have -- if I had seen him, I would

20   have told him the same thing.

21   Q.    Let me show you what we're going to mark as Exhibit

22   Number 66, which you should have in front of you.  Do you

23   have that in front of you?

24   A.    Yes, I see it.

25   Q.    Can you identify what's been marked as Number 66?

STUART - DIRECT

1   A.      This is a letter that was written by me summarizing

2   my treatment for Mr. Hurley both at Catholic Charities and

3   later at David Lawrence.

4              MR. CELLAR:   Your Honor, at this time, we'd like

5   to move into evidence what's been marked as Plaintiff's

6   Exhibit Number 66.

7              THE COURT:   Exhibit 66 is received.

8              (Plaintiff Exhibit 66 admitted)

9   BY MR. CELLAR

10  Q.      Now, what was the purpose of this document, if you

11  recall?

12  A.      Well, it was because there was a -- the purpose was

13  to try to summarize, given that I had seen Mr. Hurley in two

14  different locations, the course of his treatment with me,

15  since there was two separate episodes, one with one agency,

16  the other with another.

17  Q.      And who selected the words to be included in the

18  summary?

19  A.      I did.

20  Q.      Did anybody tell you what to include in the summary?

21  A.      Absolutely not.

22  Q.      Did anybody dictate to you that you had to put

23  certain catch phrases or provisions in there?

24  A.      No.   I would never allow that.

25  Q.      What I'd like to do is focus a little bit on some of

STUART - DIRECT

1    the content of this, and you have a copy in front of you so

2    I'm going to zoom in.  Starting at the bottom of paragraph

3    one where you're talking about your treatment with Pat, you

4    say during the course of this treatment, you and Mr. Hurley

5    discussed the importance of reducing his overall stress

6    level, including the possibility of taking time off from his

7    work.  You see that?

8    A.    Yes.

9    Q.    Is that a true statement?

10   A.    Yes, that's a true statement.

11   Q.    You also say Mr. Hurley told me he had accrued a lot

12   of vacation time but never had the opportunity to take much

13   of it.  Do you see that?

14   A.    Yes, that is correct.

15   Q.    And was that something that Mr. Hurley told you

16   during his treatment with you?

17   A.    Yes.  That's something that he had told me while at

18   Catholic Charities.

19   Q.    Okay.  One more question on this, before you signed

20   this document -- and I'll show you your signature on Page 2,

21   did you ever send this to Mr. Hurley or me for approval or

22   editing?

23   A.    No.

24   Q.    In paragraph two, it says here that you told

25   Mr. Hurley that his depression could worsen if he did not

STUART - DIRECT

1    take actions to reduce his elevated stress level.  You see

2    that?

3    A.    Yes.

4    Q.    Well, in paragraph two?

5    A.    Yes, yes, I see it.

6    Q.    What were the actions that you were recommending to

7    Mr. Hurley that he take?

8    A.    Well, one of the things we had discussed was, you

9    know, the possibility of resuming medications, which he had

10   had some experience with in the past, but he had -- it

11   hadn't been effective so there was some resistance there,

12   and we'd also talked about the possibility of using his time

13   off.

14   Q.    Okay.  Now, it says here in the next paragraph that

15   you saw Mr. Hurley again at the David Lawrence Center in

16   2008.  You see that?

17   A.    That's correct.

18   Q.    Now, you say between the time period you treated with

19   him in 2007 and 2008, he was unable to significantly reduce

20   his elevated stress level.  Do you see that?

21   A.    Yes.

22   Q.    On what observation are you basing that?

23   A.    Well, one of the -- one of the observations I -- I

24   base that on was the fact that he had ended up going back on

25   medication, which was something that he was not necessarily

STUART - DIRECT

1    a big fan of doing.

2    Q.    Did you ever tell Pat what would happen or what could

3    happen to him if he did not take your recommendations?

4    A.    Well, I -- I think what I said -- I don't

5    specifically remember a date when I said that, but certainly

6    I would certainly tell somebody that if you don't treat your

7    depression or you don't manage your stress, these conditions

8    are -- these symptoms are not going to get any better,

9    they're, in fact, going to get worse.

10   Q.    Did you ever, to your knowledge, warn Pat that if he

11   didn't take care of his condition in the way you were

12   recommending to him that he could suffer this major episode

13   that we were discussing?

14   A.    I don't remember using those words specifically.

15   Q.    Okay.  Was that something that, in your mind, was a

16   possibility if Mr. Hurley didn't care for his condition?

17   A.    Absolutely, yeah.

18   Q.    Now, here on the second page of your summary, you

19   report that you and Mr. Hurley had a discussion where he

20   actually approached his employer to take leave time off; do

21   you see that?

22   A.    Yes, that's correct.

23   Q.    And it was -- what happened as a result, to your

24   knowledge?

25   A.    Well, this was something that he had told me that he

STUART - DIRECT

1    had gone to his employer and -- and had asked for time off

2    to reduce his stress level and that at that point, that he

3    had been terminated.

4    Q.    Okay.  At the time you met with Mr. Hurley in 2008,

5    as reflected in this note, did he discuss with you what the

6    terms of his employment agreement were?

7    A.    At that time, no.

8    Q.    Did you know whether he considered himself to be

9    fired by his employer at the time he came to see you under

10   the terms of his agreement?

11   A.    Under the terms of the agreement, if -- if I had been

12   aware of it, whether there was agreement or not, I think he

13   considered himself to have been -- to have been fired.

14   Q.    Okay.  And did he, in turn, explain to you what

15   effect that was having on him?

16   A.    Absolutely.  I think he was devastated.

17   Q.    Okay.  And is that -- is that something that you

18   noted here in your -- in your summary?

19   A.    Well, I -- what I will tell you is -- do you have

20   copies of my notes at David Lawrence?

21   Q.    We're going to mark those next.

22   A.    Okay.  I'm sorry, could you repeat the question for

23   me, please?

24   Q.    Sure.  Did you note the effect that what his employer

25   had done to him was having on him as a result?

STUART - DIRECT

1    A.    Oh, absolutely.

2    Q.    And what was it?

3    A.    I think his depression -- I think his depression got

4    worse.

5    Q.    Now, by the time you had already met with Mr. Hurley

6    in 2008, do you recall whether his general practitioner,

7    Dr. Paisan, had already put him on a new medication?

8    A.    That's what I was -- that's what I had been told,

9    yes.

10   Q.    Now at the time Mr. Hurley came to meet with you in

11   2007, do you recall whether he was on medication at that

12   time?

13   A.    When he saw me initially?

14   Q.    Yes.

15   A.    As far as I know, he was not.

16   Q.    Okay.  But when he came to see you in 2008?

17   A.    He had resumed medication, correct.

18   Q.    That was before you and he had even met?

19   A.    That is correct.  That was in between the time I saw

20   him at Catholic Charities and when I saw him at David

21   Lawrence.

22   Q.    Now, do you recall having some telephone

23   conversations with Mr. Hurley between the time you saw him

24   in 2007 and prior to the time he was fired in 2008?

25   A.    Yes, I do.

STUART - DIRECT

1    Q.     Okay.  And do you recall actually speaking with

2    Mr. Hurley in late March or early April of 2008 regarding

3    his condition?

4    A.     I don't remember the specific date or time.  I do

5    remember having talked to him.  I would have had to have at

6    least talked to him for him to be coming back to resuming

7    services with me.

8    Q.     Okay.  And would that have taken place, that

9    conversation, would that have taken place before May of 2008

10   when he came to see you?

11   A.     Yes.

12   Q.     Okay.  Would that have taken place sometime in 2008

13   before May?

14   A.     Yes.

15   Q.     Now, during your history with Mr. Hurley, did you

16   find him to be a particularly willing client to take time

17   off from work?

18   A.     Was he willing to take time off from work?

19   Q.     Did you find him to be a -- a willing patient in that

20   regard?

21   A.     I -- well, I found him to be very dedicated to his

22   work to the -- somewhat to the -- to his own disadvantage.

23   Q.     Let's go ahead and mark Plaintiff's Exhibit Number

24   61.  Do you have that up there?

25   A.     61.

STUART - DIRECT

1    Q.      You're just going to have the number, got PLA 175 on

2    the bottom?

3    A.      Yeah, I got it.

4    Q.      Okay.  Can you identify this document, please?

5    A.      Yeah, these are progress notes from the David

6    Lawrence Center.

7    Q.      Okay.  And do these appear to be true and correct

8    copies of your progress notes from that date?

9    A.      Yes, they are.

10         MR. CELLAR:  Okay.  At this time, Your Honor, we'd

11   like to move into evidence what's been marked as Exhibit 61.

12         THE COURT:  Exhibit 's received.

13         (Plaintiff Exhibit 61 admitted)

14   BY MR. CELLAR

15   Q.      And would this have been the date that you treated

16   with Mr. Hurley for the first time in May of 2008?

17   A.      Yes, that's correct.

18   Q.      Okay.  At the time you saw Mr. Hurley in 2008 in May,

19   could you describe to the jury the comparison between how he

20   appeared and acted in 2007?

21         MR. HENRY:  Judge, I'm going to object to the

22   questioning.  Can I be heard at sidebar?

23         THE COURT:  Just a moment.

24         (Pause in place)

25         THE COURT:  You may.

STUART - DIRECT

```
 1            (At sidebar, Court and counsel present)
 2            MR. HENRY:  The date of that visit is May 5th,
 3    2008.  Mr. Hurley was terminated May 1st, 2008.  Mr. Cellar
 4    is now asking the difference between his condition after he
 5    was terminated as opposed to before.  He doesn't have a
 6    claim for compensatory damages or emotional injury.  There's
 7    no relevance to this whatsoever.  It's inflammatory to the
 8    jury.
 9            MR. CELLAR:  Your Honor, the defendant -- and this
10    is where we go back to the employment agreement.  The
11    defendant has taken the position it's May 1st, 2008, firing.
12    Mr. Hurley is saying as of the date he was still treating,
13    he never received the proper notice and was still considered
14    to be an employee of the company.  It's completely relevant
15    to his claim to show that he was suffering from these
16    conditions at that time and under the interpretation of the
17    agreement, which has nothing to do with the lawsuit.  He was
18    still an employee of the company during this visit.
19            MR. HENRY:  The pretrial stipulation says his
20    termination date was May 1st, 2008.  This keeps coming up
21    over and over, but we've all agreed it was May 1st.
22            MR. CELLAR:  No, we have not, Your Honor.  It's
23    been our position in summary judgment proceedings where we
24    said he was not -- we've always said he was verbally
25    terminated on May 1st, 2008, but we have always taken the
```

STUART - DIRECT

```
 1   position that that was not a proper termination under the
 2   law.
 3              MR. HENRY:  We litigated that in state court.
 4              MR. CELLAR:  No, we did not.
 5              THE COURT:  Well, I asked for the -- a copy of the
 6   state court summons an complaint and settlement and I want
 7   to see it because, you know, I didn't know anything about
 8   that until it came up at a sidebar here.  And so as far as
 9   I'm concerned, until I'm shown something otherwise, we're
10   going to go with the oral termination rather than litigating
11   the question of whether under an employment agreement that's
12   already been litigated whether he was terminated then.
13              MR. CELLAR:  Your Honor, may I be heard just for
14   purposes of the record?  This ruling essentially eviscerates
15   Mr. Hurley's argument regarding when he was properly
16   terminated.  The defendants never moved in limine, and
17   respectfully, Your Honor is taking defendant's
18   interpretation without seeing any documents to suggest that
19   there's no discussion of the employment agreement.  There
20   was never any litigation about the date of his termination
21   in that agreement.  It dealt with the benefits that he was
22   entitled to under the agreement.  By not allowing Mr. Hurley
23   to argue what's going to be his entire position in this
24   case, he's going to be precluded from --
25              THE COURT:  Oh, come on, his entire position?
```

STUART - DIRECT

1          MR. CELLAR:  Your Honor, the defendant's position

2    is they properly terminated him on May 1st, 2008.

3    Mr. Hurley's going to tell you he knew he couldn't have been

4    properly terminated on that date because he had an

5    employment agreement.

6          THE COURT:  I thought this was all about whether

7    he was terminated because of the violation of the FMLA.

8          MR. CELLAR:  It is, Your Honor, but there's still

9    factual evidence that needs to be heard by the jury on this

10   issue regarding defendant's violation of their own

11   procedures.

12         THE COURT:  What is it really about?  Don't over

13   blow what this is about and what it is.  If it's an FMLA

14   case, which is what I understand, that's it.

15         MR. CELLAR:  But Your Honor, if the defendant is

16   getting up and arguing May 1st, May 1st, May 1st, and my

17   hands are tied from arguing what my client's position is on

18   the case, he's not going to get a fair day in court because

19   he's not articulating his position to the jury.  He has a

20   right to present his factual position to the jury whether

21   they want to believe it or understand it.  I'm not

22   mentioning a prior lawsuit.

23         MR. HENRY:  Count 1 of the state court complaint

24   was for not giving him 30 days notice.

25         THE COURT:  I want to see the state court

STUART - DIRECT

```
 1    complaint.
 2              MR. HENRY:  The pay for the difference.
 3              THE COURT:  Wait a minute, you're not going to
 4    talk back and forth to each other.  You're talking to the
 5    Court.  You understand that?
 6              MR. CELLAR:  Yes, Your Honor.  The issue is not
 7    whether he was paid for the 30 days.  That's not what we're
 8    saying.  The issue is whether he received proper notice to
 9    effectuate his termination.
10              THE COURT:  You're slicing differences on
11    something where I don't know what it's about.  I want to see
12    the complaint.  I want to see the settlement.  Do either one
13    of you have it here now?
14              MR. CELLAR:  I didn't bring it.
15              MR. HENRY:  If I have a wi-fi access I can pull it
16    off my home -- my office computer.  I didn't bring the state
17    court litigation file with me.
18              MR. CELLAR:  Your Honor, this case has been
19    pending for a long time and this case was settled, the state
20    court case, long ago.  So for the defendants now to raise it
21    in the middle of trial without filing a motion in limine so
22    that it could be addressed beforehand is incredibly
23    prejudicial to my client's position.  We've prepared our
24    case a certain way for trial.  This was not an issue that
25    was ever raised by the defendant and I've had to eviscerate
```

STUART - DIRECT

1    or dissect my opening argument where I didn't get to argue a

2    big portion of our position.

3           THE COURT:  It's not argument.  It's an opening

4    statement.  Remember that?

5           MR. CELLAR:  Yes, Your Honor, I'm well aware of

6    that.  However, in presenting the evidence, this is a

7    portion of the claim, how we intended to present our case to

8    the jury, and being told on the day of trial that we, after

9    we've been preparing, respectfully, three times on this case

10   to go to trial, and it's never been raised.  Now I'm being

11   told I can't present the case the way we intended to present

12   it all along.

13          THE COURT:  What was the settlement?

14          MR. HENRY:  Settlement was for all claims in the

15   complaint and we paid $15,000 to Mr. Cellar and we paid

16   another 15 to Mr. Hurley and it washed out all claims in the

17   complaint, including the failure to give 30 days notice.

18   Now, the reason I came over here, Judge, is because the

19   questioning that he's asking this witness deals with

20   compensatory damages.  The fact that this -- this treatment

21   occurred after the date that he agrees Mr. Hurley was

22   terminated means that what he's really doing was talking

23   about something that's not relevant to any of the claims of

24   the complaint.  It's inflammatory.  So I'm trying to get

25   past this idea that somehow this May 1st deadline is going

STUART - DIRECT

```
 1    to jam us up here.  This line of questioning with Mr. Stuart
 2    isn't relevant because Mr. -- Mr. Hurley's mental condition
 3    after his termination is not an issue in the case.
 4              THE COURT:  Just a moment.  I want to get
 5    something in my notes.
 6              MR. HENRY:  Thank you.
 7              (Pause in place)
 8              THE COURT:  You don't have the complaint?
 9              MR. CELLAR:  You never raised it so I --
10              THE COURT:  I take particular note of this in your
11    opening statement, counsel, that is that he's asking for
12    back wages, what he lost had he not been illegally fired, no
13    punitive damages, so on.  So tell me again why this question
14    about his reaction afterwards should come into this lawsuit
15    considering that's your damage claim?
16              MR. CELLAR:  It has nothing to do -- I'm not
17    asking for emotional distress.  What I'm just trying to have
18    the jury understand is that his symptoms were escalating
19    from 2000 until the time he reached the crisis point in late
20    April, early May of 2008 and the treatment date that we're
21    looking at is May 4th, 2008, where we're going to disagree,
22    but it's within three days of this verbal termination, which
23    he's going to say he didn't believe was effective.  So it's
24    right within the period of time that the doctor would say
25    yes, during this time he was having one of these episodic
```

STUART - DIRECT

```
 1    meltdowns, which goes to the very reasoning of the tone of
 2    his email and why he was emailing Mr. Neuman saying you come
 3    see me.  The testimony on that is going to be, from his wife
 4    and from him, that he was losing his mind.  So the state of
 5    mind that he's in on or around this time is relevant to his
 6    contention that he was having a meltdown and in need for
 7    this immediate leave.
 8              MR. HENRY:  The email that got him fired was a
 9    week earlier.
10              THE COURT:  I beg your pardon?
11              MR. HENRY:  The email that got him fired was a
12    week earlier.
13              THE COURT:  That's the thing -- I have a problem
14    on that.  If the email, which was intemperate, shall we say,
15    would have been after what you're trying to put in right
16    now, I could see the argument.  But it wasn't.
17              MR. CELLAR:  Your Honor, I understand your point.
18    I just think, respectfully, there's not much of a difference
19    in somebody's mental state that's been suffering for three
20    years whether it's four days after he sent the email or ten
21    days.  And the only point I'm trying to raise is that this
22    was the frame of mind that he was in on or around that time
23    period.
24              THE COURT:  The frame of mind when he sent the
25    email is fair game, that will come in, but after he sent the
```

STUART - DIRECT

1    email doesn't have anything to do, as far as I can tell,

2    with your client.

3            MR. CELLAR:  One last point, Your Honor, is

4    they're focusing on conduct after the email.  You went to go

5    treat with your doctor after the email.  So if they're

6    getting into it --

7            THE COURT:  If they're going to go into that, then

8    they'll open the door.

9            MR. CELLAR:  They have.

10           THE COURT:  How?

11           MR. HENRY:  The certification form that Dr. Paisan

12   testified to was two weeks after he was terminated.  That

13   occurred afterward, the certification form, and we moved to

14   exclude it and the Judge denied it because he said that

15   there was some issue of fact as to whether that

16   certification form reflected his mental state at the time of

17   his termination.  That's why I didn't object to the

18   admissibility of that certification form.

19           MR. CELLAR:  I don't really have much more on this

20   issue, to be honest, Your Honor.  We've wasted a fair amount

21   of the Court's time.  I'll move on, for purposes of

22   efficiency.

23           THE COURT:  Why didn't you bring up the -- I

24   forgot about the fact that the certification form was after

25   the time that counsel's trying to put in what was the state

STUART - DIRECT

```
 1    of mind when he went.
 2              MR. HENRY:  When I came over with the objection,
 3    my objection isn't necessarily the fact that he visited his
 4    doctor.  My objection is that Mr. Stuart is going to testify
 5    that his mental state is deteriorated as a result of his
 6    termination.  And that is not relevant to the case because
 7    there's no claim for compensatory damages.  The -- we moved
 8    to exclude the certification form and I'll respect that as
 9    the law of the case, but I believe it should have been
10    excluded.  They're the same reason.  He was already fired at
11    that point.
12              MR. CELLAR:  And Your Honor, I'm not trying to
13    argue his mental state.  So I think if I ask the question
14    differently, we're not trying to get, you know, what was he
15    like after the firing.  It was just his state of mind.  I
16    can find a different way to ask the question without getting
17    into that.
18              THE COURT:  Okay.
19              MR. HENRY:  The exhibit that was just admitted
20    into evidence, the exhibit that he's working from, the
21    May 5th doctor's notes you just admitted into evidence, we
22    would --
23              THE COURT:  You didn't object.
24              MR. HENRY:  Well, I think --
25              THE COURT:  I think it's in.  You're going to go
```

STUART - DIRECT

1   on with something else?

2            MR. CELLAR:  Yes, I'm --

3            THE COURT:  Okay.

4            MR. HENRY:  Thank you, Judge.

5            (Sidebar concluded)

6            THE COURT:  We'll take a ten minute recess.  Ten

7   minute recess.

8            COURT SECURITY OFFICER:  All rise.

9            (Recess from 4:33 p.m. to 4:45 p.m.)

10           (Jury in)

11           THE COURT:  Please be seated.

12  BY MR. CELLAR

13  Q.    I have very few questions left.

14  A.    Okay.

15  Q.    Did you ever give Pat any sort of medical mandate

16  that said you must take these specific dates and times off?

17  A.    No, I did not.

18  Q.    Okay.  When you did advise him that he needed to take

19  time off for his condition, did you believe that that was

20  something that was necessary for his health to improve?

21  A.    Yes.

22  Q.    Are you being compensated by Mr. Hurley to testify

23  here today?

24  A.    No, I'm not.

25           MR. CELLAR:  I've got nothing further, Your Honor.

STUART - DIRECT

```
1              THE COURT:  Defense?
2              MR. HENRY:  Okay, got a lot of stuff to carry.
3                     CROSS EXAMINATION
4   BY MR. HENRY
5   Q.    Hello, Mr. Stuart.  Nice to see you again.
6   A.    Yeah, nice to see you, Mr. Henry.
7   Q.    Showing you what's been admitted into evidence as
8   Plaintiff's Exhibit 66, this is a letter that you wrote to
9   Morgan & Morgan relating to this case; right?
10  A.    That is correct.
11  Q.    Okay.  Morgan & Morgan is the law firm that
12  represents Mr. Hurley?
13  A.    That is correct.
14  Q.    Who asked you to write this document?
15  A.    Um, Mr. Hurley had requested a summary of treatment.
16  Q.    He asked you for that specifically to you, directly
17  to you?
18  A.    Yes.
19  Q.    Okay.  What did he say?  Did he tell you why he
20  needed it?
21  A.    Not that I could recollect.
22  Q.    This document is dated January 14th, 2011.  It was
23  last year; right?
24  A.    That is last year, yes.
25  Q.    And that would have been almost three years after he
```

STUART - CROSS

1   was terminated from employment; right?

2   A.      That is correct.

3   Q.      So your comments in this document don't necessarily

4   reflect Mr. Hurley's state of mind at the time of his

5   termination; right?  That would be more accurately reflected

6   in your clinical notes?

7   A.      I would -- I would beg to differ with that.

8   Q.      Okay.  How so?

9   A.      Okay?  The -- Mr. Hurley, I saw at -- at -- at two

10  different locations at two different times.  Okay, I saw him

11  initially at Catholic Charities in the beginning of 2007 and

12  then I saw him for a protracted episode of care which I

13  think was probably -- I would have to count however many

14  notes, maybe 20 times in 2008.  So we were dealing with the

15  time that I saw him prior to his termination to the time

16  that I saw him after his termination and for a period of

17  time, and what I was trying to do was to come up with a

18  document that would tie those two pieces together in terms

19  of seeing one person for two different episodes of care.

20  Q.      So part of your intention in drafting this document

21  was to tell Morgan & Morgan, Mr. Hurley's litigation

22  attorneys, about Mr. Hurley's state of mind as a result of

23  his termination?

24  A.      No, it was not just about the state of his state of

25  mind as a result of his termination.  It was a question

STUART - CROSS

1    of -- of saying why did Mr. Hurley come for treatment
2    initially, what had happened from the time I initially saw
3    him to the time that I had finished seeing him.  What the
4    document states is -- is -- correct me without having to
5    reread the whole thing, is that I saw Mr. Hurley initially
6    suffering from clinical depression.  We had talked about
7    ways that he could reduce his stress.  He then subsequently
8    came to see me at David Lawrence and I had told him in the
9    interim that I suggested that his condition could worsen if,
10   in fact, he didn't take any actions to address it.
11           I then saw him at the David Lawrence Center in
12   2008, at which time his depression had actually gotten
13   worse, which is documented in my notes in the David Lawrence
14   Center, and that at that time, that he then became my client
15   there and I thought that he had -- he had told me at least
16   his position was that his -- I -- not only something he had
17   told me, it's written in my notes, that his occupational
18   stress was a major contributing to his mood dysphoria.
19   Q.    That's my question.  That reference that I've just
20   highlighted to the visit in 2008, was that before or after
21   Mr. Hurley's termination from employment, or you don't know?
22   A.    I'm sorry, could you repeat the question?
23   Q.    Yeah.  This reference in your letter to Mr. Hurley's
24   litigation lawyers --
25   A.    Right.

STUART - CROSS

1    Q.        -- you refer to a visit that you had in 2008?

2    A.        That was after his termination; that is correct.

3    Q.        So this would not reflect Mr. Hurley's state of mind

4    in, say, April of 2008, before he had terminated; correct?

5    A.        Well, let me -- okay.  I'm going to be careful about

6    how I respond to this.  If I see somebody in, let's say,

7    today and they present with depression, obviously what has

8    gone on in their lives in the past two or three months has

9    some bearing on the reasons that they're depressed.  It's

10   not as though they fell down an elevator shaft and broke

11   their leg four hours before they came to see me.  Because

12   depression is episodic, things that have happened prior to

13   somebody coming to see me has a bearing on what has

14   transpired with them.

15   Q.        Okay.  You never prescribed any medication for

16   Mr. Hurley; right?

17   A.        No, that's -- that's correct.  I'm not licensed to do

18   that.

19   Q.        Your recommendations to him, as I understood it from

20   your testimony with Mr. Cellar, is that -- was that he

21   reduce his stress, exercise, eat and sleep regularly, and

22   take time off from work; right?

23   A.        I had also indicated the possibility of going back on

24   medication.

25   Q.        Okay.  But that's not something that you could

STUART - CROSS

```
 1   prescribe.  He'd have to go to a doctor --
 2   A.      That is correct, or a general practitioner.
 3   Q.      Okay.  And did you also recommend to him that he
 4   improve his sex life?
 5   A.      I did not recommend that he improve his sex life.  I
 6   looked at the fact -- back to Catholic Charities, my second
 7   note there, the fact that his sex life was deteriorating is
 8   not uncommon in people suffering from depression because
 9   that's also a source of pleasure.  So our discussion about
10   his sex life was really not about his sex life.  It was
11   about how his depression was affecting his -- his life.
12   Q.      Okay.  Did Mr. Hurley complain to you about having
13   had periods of erectile dysfunction?
14            MR. CELLAR:  Objection, Your Honor, relevance.
15            THE COURT:  Overruled.
16   A.      Without looking at my note and seeing whether it was
17   in there or not, I don't remember.
18   BY MR. HENRY
19   Q.      You don't remember specific --
20   A.      I don't remember specifically.
21   Q.      Your recommendation about stress, exercise, eating,
22   and sleeping, those are recommendations that we would all
23   benefit from, those are good, healthy practices; right?
24   A.      I would say so, yes.
25   Q.      And your recommendation to Mr. Hurley that he do
```

STUART - CROSS

1    those same things, that didn't give him some kind of

2    prescriptive nature?  It's not as though you have to be a

3    doctor to recommend something like that; right?

4    A.    You don't have to be a doctor to recommend it, but I

5    would certainly suggest that if sleep and appetite

6    disturbances are -- are symptomatic of major depression,

7    then your major depression is not going to alleviate unless

8    you address your sleep and appetite disturbance.

9    Q.    Did you ever tell Mr. Hurley that taking vacation was

10   not an option, that he had to do it?

11   A.    Not that I recollect.  No.

12   Q.    Okay.  And you never told him any specific days that

13   he needed to take off; correct?

14   A.    No.

15   Q.    Did you give him any guidance or advice on what he

16   needed to do during the time off from work that you were

17   recommending?

18   A.    Not -- not in any specific -- I don't remember any

19   specific recommendations, except that if you're going to

20   take time off in order to reduce your stress level, then,

21   you know, take good care of yourself, and that's why people

22   take time off.

23   Q.    But as far as you were concerned, as long as he was

24   taking time off of work, he could do whatever he wanted, as

25   long as it wasn't something that would add to his stress;

STUART - CROSS

1    right?

2    A.      I would say that would be correct.

3    Q.      Okay.  And if Mr. Hurley had started his own business

4    and he chose during his time off from work to work on that

5    new business, that would have been in line with your

6    recommendation; correct?

7    A.      I would -- it would depend on the nature of the

8    business and whether or not the -- you know, the apple's in

9    the eye of the beholder, and whether or not that's

10   considered something that's stressful or not.

11   Q.      Since you didn't give him any directions on what he

12   could or couldn't do, you know, if he had chosen to work on

13   his own business that he'd started, that would have been

14   consistent with what you believed he needed to be doing?

15   A.      I'm not sure that -- I'm not sure that would be

16   consistent or inconsistent.  I mean, it would depend on

17   the -- again, the nature of the business.  I'm not sure what

18   you're referring to.  So if somebody has, you know, an

19   interest in some birds and wants to go into a -- do

20   something, you know, that's the love of their life or

21   whatever, would that necessarily be considered stressful

22   because it was for fiduciary gain?  I would not say so.  But

23   ordinarily, one takes time off from work in order to

24   decompress.

25   Q.      Okay.  And Mr. Hurley had gone to the Florida Keys in

STUART - CROSS

1    a prior year.  If he chose to take your advice and use his

2    vacation to go to the Florida Keys, that would have been

3    consistent with what you felt he should be doing; right?

4    A.    I would consider that a good use of recreational

5    time, yeah.

6    Q.    Okay.  And similarly, Mr. Hurley made it a practice

7    of going to Arizona to Tombstone for something called Wyatt

8    Earp Days.  That would have also been consistent with what

9    you were telling him to do; correct?

10   A.    I would consider that if he considered it enjoyable

11   and relaxing, yes.

12   Q.    Okay.  And Mr. Hurley had also gone hunting in one of

13   his vacations in South Carolina during -- after you had

14   given him this recommendation that he take time off from

15   work.  That would have also been consistent with what you

16   were telling him to do?

17   A.    I would say so, yes.

18   Q.    And finally, there was -- there were trips to Orlando

19   to Disney World.  Those trips to Disney World were

20   consistent with also what you were telling him to do;

21   correct?

22   A.    I would say so, yes.  Unless you go on a day when

23   there are a lots of people there, in which case it could be

24   very stressful.  No, but I'm being facetious.

25   Q.    Well you got that right, you got that right.

STUART - CROSS

```
 1              (Discussion off record)
 2              MR. HENRY:  Judge, I'm offering Defendant's
 3    Exhibit R-3 as a stipulated exhibit.
 4              THE COURT:  It being a stipulated exhibit, it's
 5    received.
 6              (Defense Exhibit R-3 admitted)
 7    BY MR. HENRY
 8    Q.    Mr. Stuart, when you were seeing Mr. Hurley and you
 9    suggested to him that he take vacation, take time off of
10    work --
11    A.    Uh-huh.
12    Q.    -- you'd said earlier that you didn't give him any
13    instructions as to what he would -- he would use that time
14    for other than -- than to decompress; right?
15    A.    The only thing that I can think of that we may have
16    talked about, but I -- is that in the context of talking
17    about moving to Arizona or considering that wholesale move,
18    I was saying that if you liked Arizona, then you may want to
19    consider, you can always take time in Arizona, but you're
20    not going to necessarily -- I would not necessarily suggest
21    you get up and move to Arizona.
22    Q.    We're going to talk about that in just a minute.  I
23    certainly do want to talk about that.  I'm showing you an
24    exhibit that's just been admitted into evidence as
25    Exhibit R-3.  These are photographs that Mr. Hurley produced
```

STUART - CROSS

1    to us of vacations that he took between 2005 and 2008, when
2    he was terminated from employment.  And this is one that
3    Mr. Hurley's attorney showed the jury earlier today.  I'll
4    represent to you that this was deer hunting in South
5    Carolina.  I don't know where this was, but I suppose it was
6    Wyatt Earp Days.  Is this the type of get-away that you were
7    suggesting to him in order to treat his depression?
8    A.    Those look like enjoyable things.
9    Q.    So is it your -- is it your testimony, Mr. Stuart,
10   that this trip to Tombstone, Arizona, was a medical leave?
11            MR. CELLAR:  Objection, Your Honor, foundation.
12            THE COURT:  Overruled.
13   A.    At the time -- when did this trip occur?
14   BY MR. HENRY
15   Q.    After you had given Mr. Hurley the advice to take
16   time off of work.
17   A.    I would not have considered it medical leave at that
18   point.
19   Q.    So this is not a medical leave?  Mr. Stuart, is this
20   the type of medical leave that you were suggesting?
21   A.    Well, it depends on how you -- you use the term
22   medical leave.  There's a difference between taking time off
23   and medical leave.
24   Q.    Okay.  So I understand this, though, you didn't give
25   Mr. Hurley any instructions on what he could do with that

STUART - CROSS

1  time?

2  A.      I didn't specifically give him any recommendations as

3  to what he could use that time, except that he take time and

4  that he -- and that during that time, he do something that

5  was enjoyable and would reduce his stress level.

6  Q.      Okay.  And for Memorial Day for two or three years in

7  a row, Mr. Hurley went with his family to Tombstone,

8  Arizona, for Wyatt Earp Days, as you can see in this

9  picture, okay?

10 A.      Uh-huh.

11 Q.      Is that consistent with what you were telling him to

12 do, in your opinion?

13 A.      I would say yes, it would be.

14 Q.      Okay.  And my next question is, is that, in your

15 opinion, a medical leave of absence?

16 A.      I would not consider that a medical leave of absence.

17 Q.      Okay.  Mr. -- Mr. Hurley also submitted a request,

18 and this is what this case is about, a request for leave of

19 absence for 2008 and 2009, 11 weeks of vacation.  If

20 Mr. Hurley had used those vacations to go to Tombstone,

21 Arizona, and dress up like a cowboy for Wyatt Earp Days,

22 would that, in your opinion, have been a medical leave?

23          MR. CELLAR:  Objection, Your Honor, foundation,

24 improper.

25          THE COURT:  Sustained.

STUART - CROSS

```
 1   BY MR. HENRY
 2   Q.     What would Mr. Hurley need to do, in your opinion, to
 3   qualify his leave of absence that is the subject of this
 4   lawsuit as a medical leave?
 5           MR. CELLAR:  Objection, Your Honor, foundation.
 6           THE COURT:  Just a moment.
 7           (Pause in place)
 8           THE COURT:  The objection's overruled.  Not only
 9   is the witness a professional, but not a medical doctor, but
10   he could testify as to leave for such a condition.  So he
11   may answer.
12           THE WITNESS:  Okay, I'm sorry, could you repeat
13   the question for me, please?
14   BY MR. HENRY
15   Q.     Yeah, what would Mr. Hurley need to have done with
16   his leave in order for you to qualify it as a medical leave?
17   A.     Maybe I'm not following, but I think what the -- I'm
18   not a medical doctor, so I'm not going to put somebody on
19   medical leave.
20   Q.     Okay.  So you never suggested any medical leave for
21   Mr. Hurley; correct?
22   A.     Medical leave, no.
23   Q.     Okay.  The time that you took off -- you suggested
24   that he take off from work, in your opinion, that was not a
25   medical leave; correct?
```

STUART - CROSS

```
1    A.    As I said, I'm not qualified to give somebody medical
2    leave.
3    Q.    Okay.  I want to direct your attention back to your
4    notes.  Did you leave that up here, Richard?
5         MR. CELLAR:  I believe so.  If not, I've got an
6    extra copy if you want to use mine.  This is not marked as
7    exhibit -- here's an extra one.
8         MR. HENRY:  Is that the one you've admitted?
9         MR. CELLAR:  I don't think it's one we admitted
10   but it's an extra copy.  Feel free to use it.
11   BY MR. HENRY
12   Q.    I'm showing you what was marked as Plaintiff's
13   Exhibit Number 57.  These are your notes in your treatment
14   of Mr. Hurley.  Could you read the highlighted portion of
15   that document?
16   A.    Sex life with spouse is unsatisfactory, describes
17   overall diminished libido.
18   Q.    Were you treating Mr. Hurley for stress related
19   issues other than issues that he was experiencing at work?
20   A.    Yes.  I was treating him for depression, not for --
21   Q.    You were treating him for stress as well; correct?
22   A.    Yes.
23   Q.    What other stressors do you recall Mr. Hurley telling
24   you about that he was managing in his life?
25   A.    Well, I seem to remember there were some financial
```

STUART - CROSS

1   stresses at the time.

2   Q.    What kind of financial stresses?

3   A.    I don't recall any specific detail.

4   Q.    Would you -- these are your notes.  It looks like

5   from -- is that August 7th of 2007?

6   A.    No, I think that's March, 3, 3/7/07.

7   Q.    Okay.  March 7th of 2007, so it's roughly a year

8   before Mr. Hurley was terminated from employment; correct?

9   A.    That's correct.

10  Q.    All right.  Can you read your notes, starting here,

11  please?

12  A.    Right here?

13  Q.    Yes.

14  A.    Therapist asked client what he got out of his job.

15  His response was, one, proof he could succeed in a different

16  field versus broadcasting.  He'd obtained that proof.  And

17  two, a nice big fat -- nice big fat paycheck.  He finds the

18  job, however, unfulfilling.  He wants more adventure and

19  passion in his life coupled with decreased stress and

20  increased peace of mind.  He describes a barrier as a sense

21  of duties being to obligations to his family and worries --

22  worries -- you got to move it up.

23  Q.    Oh, sorry.

24  A.    And worries about uprooting his son, especially in

25  view of spouse's questioning whether relocation would,

STUART - CROSS

1   quote, make him happy.

2   Q.     So you were talking with Mr. Hurley about relocating

3   to Arizona?

4   A.     He had raised the possibility of relocating to

5   Arizona, yes.

6   Q.     Okay.  And he told you that the reason he was still

7   working for Kent Security was because of the big fat

8   paycheck?

9   A.     And some professional sense of competency, the fact

10  that he felt that he could succeed.

11  Q.     He said that he found the job unfulfilling; correct?

12  A.     That's correct.

13  Q.     What else do you recall talking to him about that

14  part of the job, of the treatment?

15  A.     I don't recall specifically.

16  Q.     What do you recall talking to him about a barrier

17  being his sense of duty, being responsible to his

18  obligations to his family?

19  A.     Well, I always took -- I always thought that Pat had

20  very high standards and put pressure on, you know, had --

21  had pressure on himself for doing the right thing.  And I

22  also believe that, if I remember correctly -- so I'm going

23  out on a whim here because it's not in my notes -- but I

24  think his wife also had some impairments and that that --

25  that caused some -- some concern as well.

STUART - CROSS

1  Q.     Let me just ask you pointblank, did Pat Hurley ever

2  tell you that he wanted to quit his job and move to Arizona

3  but he couldn't do it because of his financial

4  circumstances?

5  A.     No, not pointblank.  He didn't say, "I want to quit

6  my job and move to Arizona."  I think it was an option that

7  he had considered that he would like to, as I said, indicate

8  to -- to change things, to reduce his stress, to make a

9  change in his life, and one option was to try to --

10  obviously, if somebody's considering relocating, they're

11  going to consider, you know, what do I do with my house, is

12  that a possibility, could I sell it, what could I get for

13  it, how much do I owe on it, is this feasible.

14  Q.     Do you recall whether he had his house up for sale?

15  A.     I don't recall specifically.  I know that he had

16  considered selling it.  I don't remember whether or not he

17  had it up for sale or whether or not at the time it was --

18  that it was something he had considered but he didn't think

19  he would get what it was worth.  So I remember talking about

20  it but I don't remember specifically him telling me that he

21  was going to --

22  Q.     But he talked specifically to you about leaving his

23  job and relocating to Arizona; correct?

24          MR. CELLAR:  Objection, Your Honor, asked and

25  answered.

STUART - CROSS

```
 1            THE COURT:  Sustained.
 2    BY MR. HENRY
 3    Q.     Did you give him any advice on that issue?
 4    A.     Yes, I did give him advice on that issue.  And --
 5    Q.     What did you tell him?
 6    A.     What I said is is that -- that if you read the last
 7    three lines here, I differentiated between escape and
 8    leisure and opportunity, slash, new life choices, and what I
 9    said was, I used the should, can't, choose model to decrease
10    his feelings of being trapped by circumstance.  What I mean
11    by that is sometimes people feel like I have to, I can't,
12    and when that builds, they think one of the ways they do it
13    is to say, I'm going to run.  So what I was saying is, is
14    that when we choose to do things, a lot of times when we
15    feel obligation, a lot of times when we feel a sense of
16    obligation.  We all have emotional conflicts and when we
17    have that, without getting into too much detail, I put it in
18    terms of four quadrants.  We have what we should do, our
19    expectations, and the expectations our family has or
20    expectation that employers or anybody else has.  Then we
21    have a part of us that says, I shouldn't do this, which is
22    our guilt, our sense of, again, out of our sense of
23    obligation, that would be the wrong thing to do, to uproot
24    my family or take my kid, you know, to Arizona.  Then we
25    have our can't do this, I can't do this because I'm not able
```

STUART - CROSS

1    to, I don't have the resources, or whatever.  And then we
2    have, you know, I won't do this, which is our defiance, and
3    that creates ambivalence for people.  And what I tell people
4    is especially when your emotions are somewhat volatile or
5    vulnerable is why don't you consider, you know, being in
6    process and considering your options, consider the
7    possibility that you could do this or that and -- and -- and
8    explore options rather than try to make major decisions,
9    especially at a time -- if I can come back, when somebody is
10   depressed, one of the symptoms of major depression is
11   inability to focus, concentrate, or make decisions.  So if
12   somebody -- I consider somebody depressed, I try to
13   encourage them not to make major life decisions at a time
14   when they're depressed.
15   Q.     Did you specifically tell Mr. Hurley, thought, that
16   he should take time off from work, go vacation in Arizona to
17   see if he liked it there before he quit his job with Kent?
18   A.     Did I tell him specifically to go to Arizona and to
19   consider that as an option before?
20   Q.     Yes.
21   A.     Before he would quit?  I don't remember specifically
22   saying, specifically, you need to go to Arizona.  What I
23   would say is if that's something that you're considering
24   doing, then I would say explore doing that and gather
25   information to decide whether or not that's something that's

STUART - CROSS

1  feasible and something you really want to do.  I think

2  there's a difference between going to Disneyland and

3  enjoying Disneyland, which I do, and going to live in

4  Disneyland.

5  Q.    Okay.  You remember I took your deposition on

6  March 8th of 2011?

7  A.    Yes, I do.

8  Q.    Okay.  I asked you the question --

9         MR. CELLAR:  Counsel, I'm sorry, which page and

10  line, please?

11         MR. HENRY:  Page 29, Line 4.

12  BY MR. HENRY

13  Q.    I asked you the question:  What other recommendations

14  did you make to him at that meeting, referring to this March

15  meeting?

16  A.    Uh-huh.

17  Q.    And your response was:  Well, I think that we talked

18  about -- at that meeting we would talk about the fact

19  that -- to be able to say, look, you're stressed out on your

20  job.  What do you do to reduce your stress?  Can you take

21  time off?  You know, do you have vacation time?  Can you go

22  to Arizona instead of leaving your job and relocating to

23  Arizona and selling your house?  Even if you were

24  considering going to Arizona, right, a reasonable way to do

25  that would be to say, let's go to Arizona and see if I like

STUART - CROSS

 1   Arizona.  At that point, as part of the discussion of him

 2   saying maybe I'll leave the job forever, at that point, we

 3   would have talked about him having time off that he could

 4   take for his work, having time off.  Do you recall that

 5   testimony?

 6              MR. CELLAR:  Your Honor, can I ask Mr. Henry to

 7   read the remainder of his answer, please?

 8              THE COURT:  You can do completeness on redirect.

 9   BY MR. HENRY

10   Q.    Do you recall that testimony?

11   A.    I recall it.  Not verbatim, but I recall giving that

12   testimony, yes.

13   Q.    Okay.  Now do you recall Mr. Hurley telling you that

14   he wanted to leave his job at Kent forever in March of 2007?

15   A.    I recall him -- again, I don't remember him saying,

16   coming in and saying I'm -- I'm -- I'm quitting this job, I

17   can't stand it, I'm leaving tomorrow.  I think there's a

18   difference between somebody saying I'm stressed out, I'm not

19   happy, I think I'd be happier somewhere else, you know,

20   maybe I think about moving out to Arizona and leaving what

21   I'm doing, and rather than I think what you're saying is my

22   recommending it.  I'd say probably the opposite.  I would

23   recommend that you not do that.  I'd recommend that you be

24   in process.

25              THE COURT:  Counsel, are you going to be much

STUART - CROSS

```
 1   longer?  Because if you are, it will be in the morning.
 2              MR. HENRY:  15 minutes.
 3              THE COURT:  I beg your pardon?
 4              MR. HENRY:  15 minutes.
 5              THE COURT:  Well, we'll come back in the morning,
 6   then because counsel for plaintiff has the right of course
 7   to redirect then, too.  So --
 8              MR. HENRY:  Okay.  Thank you, Your Honor.
 9              MR. CELLAR:  Your Honor, I would say my redirect
10   is going to be very brief and my only concern is I know
11   Mr. Stuart has meetings or appointments in the morning that
12   he needs to attend to in his practice.
13              THE COURT:  Well, sometimes lawyers say 15
14   minutes, though, and they're not legally bound to it and it
15   goes on.  So we'll be in recess and we'll reconvene at 9:00
16   in the morning.
17              MR. HENRY:  Thank you, Your Honor.
18              THE COURT:  Please stand for the jury.  Counsel
19   stay.
20              Excuse me I have to give the jury admonition.
21   You've heard testimony today.  You know something about what
22   the case is about and you're going to go home and people are
23   going to say to you, well, were you picked for the jury and
24   you're going to say yes.  Next thing they're going to say is
25   what's it about.  They're going to want to talk about it
```

```
1    because people are curious.  Tell them that the Judge told
2    me I can't talk to you.  I don't care if it's your spouse,
3    your significant other, I don't care who it is.  You can't
4    talk to them because what's going to happen is, even though
5    they don't know anything about the case, they might have
6    some views, good or bad, and even though well-intentioned, I
7    don't want you getting their views about anything about
8    depression, about jobs, about being terminated from jobs,
9    any of that.  So you can't talk to anybody about it.  And
10   the rest of it is, don't go on the internet and start
11   looking around to find out about anything that has to do
12   with the lawsuit.  All right?  Thank you.  See you at 9:00
13   in the morning.
14              JUROR CASTER:  Your Honor, we cannot talk to each
15   other; right?
16              THE COURT:  That's right, not about the case.
17   You're excused for the night.
18              (Jury out)
19              THE COURT:  Counsel, please be seated.  Now, I'm
20   not trolling for issues or problems, but if there are any
21   lurking that will come up tomorrow, I want to know about
22   them now because that gives me tonight to think about it as
23   opposed to somebody coming up with a bright idea at five
24   minutes to nine tomorrow morning before we bring in the
25   jury.  So like I say, I'm not trolling for problems but if
```

```
 1   there are any lurking there, I want to know.  Any from the
 2   plaintiff?
 3           MR. CELLAR:  No, Your Honor, other than the one
 4   point that's going to be -- I think we're going to have a
 5   number of sidebars on is this issue about what we can and
 6   can't talk about in the employment agreement and I just
 7   wanted to proffer to the Court exactly what I intend to go
 8   into and what I don't intend to go into.
 9           The facts of what happened -- is this okay, with
10   the Court's permission?
11           THE COURT:  Sure.
12           MR. CELLAR:  The facts of the employment agreement
13   and the creation, regardless of whether there was a lawsuit
14   or not, it's our position that they're relevant and can be
15   disclosed to the jury very much in the same way that if
16   they're going to attempt to bring up the EEOC charges, the
17   facts of those EEOC charges they're going to use to argue,
18   but the end result of them, would not come in.  We're not
19   asking to bring in any discussion regarding the actual
20   outcome of the litigation or the fact that a litigation
21   existed.  The only thing we intend to argue to the jury
22   specifically is that there was an employment agreement, that
23   employment agreement provided certain notice provisions to
24   fire Mr. Hurley.  That agreement also provided the
25   compensation he was supposed to be paid.  That agreement
```

```
 1   also provided the bonus structure under which he was
 2   supposed to be paid, and it also provided certain things
 3   that he's going to need to explain to the jury, such as he
 4   received a company car, he received certain 401(k) benefits.
 5           All of those facts go not only toward his damages,
 6   but the facts of them are relevant to describe his
 7   employment circumstances and some of the disputes he was
 8   having with Mr. Neuman during his employment that they may
 9   get up here and claim are insubordinate, such as not getting
10   paid his bonuses, such as why he didn't believe he could
11   properly be fired.
12           I will represent to the Court that there will be
13   absolutely no inference or suggestion that there was a
14   lawsuit on -- or that there was a resolution of the lawsuit.
15   If we're simply permitted to discuss the facts of the
16   employment agreement and the defendant will have the
17   opportunity to respond and say, we don't believe the
18   employment agreement was in existence or you shouldn't
19   listen to the employment agreement for this reason, but
20   we're not bringing it in for a side show.  It's germane to
21   not only some of the facts that are at issue here regarding
22   bonuses and compensation and how they could be modified but
23   also with regard to the parties' mutual understanding as to
24   how their relationship would be governed.
25           So that would be the limited purpose for why we're
```

1    bringing it up.  And if the defendants feel that for some
2    reason that suggests that there was litigation as a result,
3    we would again be amenable to a limiting instruction, but we
4    just want to be able to discuss the facts of the agreement
5    and its existence, itself.
6          THE COURT:  Well, there's two different things.
7    One, is the things you mention with regard to compensation,
8    bonus structure, and company car.  That -- those are damage
9    issues.  You don't have any -- the Court doesn't have any
10   problem with any of that.  But with regard to notice, what's
11   that got to do with anything with regard to damages or any
12   other issues?
13         MR. CELLAR:  It goes to the issue of this is a
14   company that refuses to even follow its own policies and
15   procedures, when we get into the discussion of how they
16   violated their own employee handbook governing Family
17   Medical Leave.
18         THE COURT:  The handbook is separate from the
19   contract.
20         MR. CELLAR:  I understand.  It goes to, again, the
21   pattern of this company that they say one thing and agree to
22   do one thing and then they do another.  The testimony is
23   going to be that Mr. Neuman was aware.
24         THE COURT:  What does pattern and practice have to
25   do with this?

 1           MR. CELLAR:  Your Honor, very much the same reason

 2    why he would have filed an EEOC charge.  They're using it to

 3    show that he's litigious or that he wanted to file other

 4    claims.  It has nothing to do with --

 5           THE COURT:  That's not my understanding.  My

 6    understanding is he made admissions in the EEOC filing,

 7    that's why it's coming in, not that he's litigious.

 8           MR. CELLAR:  As the defendants has made

 9    admissions, Mr. Neuman has --

10           THE COURT:  No, that the plaintiff made admissions

11    in the EEOC filings.  That's my understanding as to why the

12    EEOC filings are going to come in, not that he's litigious.

13           MR. CELLAR:  Understood, but then for the same

14    reason that there are admissions in the employment agreement

15    that is a signed document, it's an admission by a party as

16    to what the terms covering the relationship of the parties

17    is.  It's analogous.  For the exact same reason that there's

18    an admission, although we dispute that in the EEOC charges,

19    because he never signed them -- we've gone down that road --

20    it's the very same reason if it's some unsigned agreement

21    that Mr. Neuman denies ever existed.  This is a signed

22    document by him explaining to plaintiff that this is how

23    your employment is going to be governed with this company.

24           THE COURT:  I understand that, but I separated it

25    out.  It's not a question of whether there's a contract of

```
 1   employment, but you're beating this notice issue, which is
 2   completely separate from damages.
 3           MR. CELLAR:  Would you like me to focus just on
 4   the notice issue and why we believe it's relevant?
 5           THE COURT:  Yeah, because you're okay with regard
 6   to damages but you're not with regard to notice.
 7           MR. CELLAR:  Because under the terms of the
 8   agreement, Mr. Hurley could not be fired unless he was given
 9   30 days notice.  That required the defendants to undergo an
10   entire process within the 30 day period to say, if as they
11   claim he was performing poorly, they certainly could have
12   spent 30 days giving him notice, which is the reason why
13   they say they're going to fire him is because he had poor
14   performance, and they never did that.  So if that's going to
15   be their reason and that he was performing poorly all along,
16   then in the jury's mind, if he has this provision in his
17   agreement that says you got to give him 30 days, it goes to
18   that very issue to say why wouldn't the defendants give him
19   the 30 days notice as opposed to him being fired less than
20   24 hours after he says I need medical leave.  So it allows
21   us to explain the defendant's true motive where they had a
22   procedure in place to specifically say, "We're unhappy.
23   Pat, you're not performing well, here's 30 days."
24           Now, if they're going to claim performance, they
25   never did that.  So it goes -- it's in direct conflict as to
```

1    what they're arguing as to why they fired him and how they

2    fired him.

3              THE COURT:  Isn't the notice thing something that

4    you might be able to get in on rebuttal but you're not going

5    to be able to get in on direct?  You know, depending upon --

6    because you're surmising something now, it sounds like, as

7    to what they're going to say with regard -- in their defense

8    case with regard to the termination.

9              MR. CELLAR:  But I'm going to bring that up during

10   the case in chief, Your Honor.

11             THE COURT:  I might not let you.  That's what I'm

12   saying.  You might be able to get it in in rebuttal, sounds

13   like, because you're speculating as to what some of the

14   things they're going to testify to in their case.

15             MR. CELLAR:  Well I guess, Your Honor, I would

16   bring it in -- I guess my question is if I ask Mr. Neuman on

17   his exam, are you claiming that you fired Mr. Hurley for

18   poor performance and his answer is yes, and his sworn

19   interrogatory answers do say that, at that point, am I now

20   free to move forward and say, "If his performance was an

21   issue, why didn't you give him the 30 days notice that you

22   agreed to under his agreement?"  That's where it's going to

23   come in.

24             THE COURT:  What did you get $30,000 for in the

25   state court settlement?

1          MR. CELLAR:  For the damages that he was owed

2    under the notice -- not under the notice, under the damage

3    provisions.  For example, he was entitled to be paid six

4    weeks of severance which they never paid him.  He was

5    entitled to be paid medical benefits.  I'm not going to get

6    into that, what they didn't pay him under the agreement.  I

7    would agree that would be precluded.  But I do want to get

8    into the form and substance of the agreement, meaning the

9    underlying 30 day period.

10          THE COURT:  Wait a minute.  You just said earlier

11   that the contract, among other things was necessary to show

12   compensation, show bonus structure, show the company car he

13   was entitled to, and we're really going to be slicing the

14   damages, it looks like, between what you actually settled in

15   the state court action and what you didn't.

16          MR. CELLAR:  Not at all, respectfully, Your Honor.

17   We're not suing in this matter for his six weeks of

18   severance because those are not appropriate damages under

19   the Family Medical Leave Act.  That's a contractual claim.

20   We're not suing in this matter for reimbursement of his

21   medical benefits; that's not covered by the Family Medical

22   Leave Act.  The damages we're seeking in this case are his

23   past wages and his benefits that he received during his

24   employment.  Not his post-employment agreement damages that

25   he's supposed to recover.  So we're going to ask for the

```
 1    reimbursement for the company car, for the 401(k), and for
 2    those benefits that he was entitled to during his
 3    employment.
 4           And Your Honor, respectfully, I'm aware of the
 5    court's resistance on this issue and if it wasn't an
 6    important part of Mr. Hurley's case I wouldn't argue just to
 7    argue it.  But it truly goes to the issue and the motive
 8    behind defendant's termination, which if I'm going to try to
 9    establish pretext under the FMLA retaliation claim, I need
10    to show that there's a reason why their ever-changing
11    discussions of why they terminated Mr. Hurley keep changing.
12    And one of the reasons why, we're going to argue, is they
13    can't justify poor performance because had they been able to
14    do so, they would have told him about it 30 days and fired
15    him the right way, and they never did that.
16           THE COURT:  You know, I got good lawyers in front
17    of me, both sides, and I'm just amazed I got another lawsuit
18    settled as a subpart of it, and you don't have the pleadings
19    here, much less telling me about it because that's part of
20    what we're talking about.  And you know, I haven't seen a
21    pleading and neither one of you have it with you.  I want to
22    see the pleadings at 8:30 tomorrow morning in that lawsuit,
23    in the state court lawsuit, because otherwise, we're just
24    whistling in the dark because I haven't seen anything.
25    Okay?
```

1          MR. CELLAR:  Understood, Your Honor.  However, I

2    will say in that action we did not seek a declaratory action

3    that the defendant -- and we'll get you the pleadings.

4          THE COURT:  I don't know what you did.  I haven't

5    seen anything.

6          MR. CELLAR:  My only attempt to split things here,

7    Your Honor, is the facts are facts.  We're not arguing the

8    legal ramifications of the agreement.  But the fact that

9    they entered into agreement -- into the agreement and what

10   the agreement says is part and parcel to what governed his

11   employment arrangement with the defendants.

12         THE COURT:  We might wind up with the whole state

13   court lawsuit getting told to the jury, settled it, paid X

14   dollars, paid attorneys fees.  I don't know.  But I've got

15   to see the agreement and if it's inextricably intertwined,

16   then we're going to have the whole thing out.  So let me

17   hear from the defense for a minute.

18         MR. HENRY:  I don't have too much to add until we

19   get the pleadings, Judge.  You know, we viewed the state

20   court litigation as separate from this because there was not

21   parallel or duplicative damages.  The car that he's talking

22   about, he's claiming as damages in this case, they were not

23   at issue in the state court litigation.  I would

24   respectfully say that we took the position in that

25   litigation that that contract was not in effect.  It expired

```
 1    a long time ago.  We settled it for -- to avoid litigation,
 2    the expense of litigation and I'm -- I'm pleased to share
 3    the agreement with you and I'm pleased to share the
 4    complaint, but the idea that somehow the 30 day notice
 5    period was not the basis for our -- the money that we paid
 6    in settlement is just not true.  That stuff was all bundled
 7    together.  It was A, B, C, and D.
 8              THE COURT:  I want to see the document.
 9              MR. HENRY:  I'll bring it with me tomorrow.
10              THE COURT:  8:30.
11              MR. HENRY:  Thank you, Judge.
12              THE COURT:  Okay.  Anything else from the defense?
13              MR. HENRY:  We have nothing.
14              THE COURT:  How we doing?  I mean, we're only
15    on -- we have a number of other witnesses.  I would suspect
16    some of the fact witnesses will go more quickly, but --
17              MR. CELLAR:  This was the choppy part of the case,
18    getting the medical testimony out of the way.  From our
19    perspective, the case is going to flow a lot quicker and
20    will be certainly more interesting to the jury moving
21    forward.
22              THE COURT:  I think this has been interesting to
23    most of the jurors.
24              MR. CELLAR:  One of them was sleeping in the
25    corner, Your Honor.
```

```
1              THE COURT:  Well, meditating.  All right, we'll be
2    in recess until 9:00, but counsel, I want the documents at
3    8:30.
4              MR. HENRY:  They let us in at 8:30 downstairs.
5              THE COURT:  Well, yes, they will.  We're in
6    recess.  Thank you.
7              (Proceedings recessed at 5:35 p.m.)
8
9
10                        CERTIFICATE
11   I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND
12   ACCURATE TRANSCRIPT FROM AN EXCERPT OF THE ORIGINAL
13   STENOGRAPHIC RECORD IN THE ABOVE-ENTITLED MATTER.
14
15        Dated this 26th day of February, 2013.
16
17                   /s/ R. Joy Stancel
                     _____
18                      R. JOY STANCEL, RMR-CRR
                     FEDERAL OFFICIAL COURT REPORTER
19
20
21
22
23
24
25
```