UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO. 2:10-CR-334-FTM-29SPC

---

PATRICK HURLEY,

        Plaintiff,

vs.                                      Fort Myers, Florida
                                         April 10, 2012
KENT OF NAPLES, INC., a Florida          8:30 A.M.
Corporation, KENT SECURITY OF PALM
BEACH, INC., a Florida Corporation,
and KENT SECURITY SERVICES, INC., a
Florida Corporation,

        Defendants.

---

TRANSCRIPT OF JURY TRIAL DAY 2

BEFORE THE HONORABLE LAWRENCE PIERSOL
UNITED STATES DISTRICT JUDGE


FOR THE PLAINTIFF:        Morgan & Morgan, P.A.
                          6824 Griffin Road
                          Davie, Florida  33314
                          954/243-4295
                          BY:  RICHARD CELLAR
                               ANGELI MURTHY

FOR THE DEFENDANTS:       Blue Rock Legal, P.A.
                          10800 Biscayne Boulevard, Suite 410
                          Miami, Florida  33161
                          305/981-4300
                          BY:  FRANK H. HENRY

REPORTED BY:              R. JOY STANCEL, RMR-CRR
                          Federal Official Court Reporter
                          2110 First Street
                          Fort Myers, Florida  33901
                          239/461-2064

```
1                          I N D E X

2   WITNESS                    DIRECT   CROSS   REDIRECT   RECROSS

3   Frederick Stuart                     209       213
    Stacey Hurley               228      274       311
4   Antonios Kokkinos           315      336     345/350      349
    Rosemary Cucurillo          351      418       421        423
5   Shelton Blackwell           424      462       464
    Orly Alexander              468      476
6   Gil Neuman                  477

7


8                     E X H I B I T   I N D E X

9   NUMBER                                                    PAGE

10  Plaintiff  1   Hurley Personnel File                      365
    Plaintiff  3   Hurley Email to Neuman 2/08                380
11  Plaintiff  4   Blackwell Email Forwarded to Hurley        439
    Plaintiff 10   Employment Agreement                       234
12  Plaintiff 11   Kent Employee Handbook                     397
    Plaintiff 12   Neuman Blast Email                         387
13  Plaintiff 16   Neuman Email 7/3/06                        392
    Plaintiff 21   Hurley Email to Neuman 3/26/08             382
14  Plaintiff 22   Hurley Email to Neuman & Cucurillo         376
    Plaintiff 25   Photo at Grand Canyon                      250
15  Plaintiff 30   Email & Vacation Schedule                  259
    Plaintiff 32   Oops Email  4/30/08                        404
16  Plaintiff 33   Request Denied Email 4/30/08               402
    Plaintiff 103  Achievement Award                          267
17  Plaintiff 49   Diamond Letter to Hurley & Kokkinos        325
    Plaintiff 50   Kokkinos Email to Hurley 8/28/08           328
18  Plaintiff 51   Business Card Templates                    330
    Plaintiff 52   Best Value Partners Incorporation Docs.    327
19

20  Defense J-1    Receipt 5/2/08                             287
    Defense N-1    Hurley Email to Kokkinos   1/08            337
21  Defense T-1    Hurley Email to Cucurillo                  299
    Defense U-1    Email RE 401(k) 2/12/08                    297
22  Defense X-1    Email 2/26/08                              302
    Defense Z-1    Email 3/19/08                              305
23

24

25
```

1              (Call to Order of the Court)

2              THE COURT:  Good morning.  Well, I received the

3    Complaint in the state court case pending in Collier County,

4    Florida, has the copy of the settlement agreement.  The

5    settlement agreement, in Paragraph 2.4, as counsel knows,

6    states, among other things, nothing herein shall affect the

7    two claims pending in the FMLA litigation.

8              When Dr. Paisan was testifying on cross going to

9    the fact that this form that he filled out was after the

10   oral termination of the plaintiff, so from that, there's an

11   inference that the plaintiff was cooking up, so to speak,

12   his claim by going there after his termination to have this

13   FMLA form filled out, so for that reason, I think that the

14   fact there was a 30 day notice provision in this contract is

15   something, because of that inference, that could be brought

16   into arguably counter the inference of so to speak cooking

17   up this claim.  So to that extent, the 30 day claim business

18   in the employment contract can come in.

19             Then there's also an issue that I hadn't ruled

20   upon with regard to other FMLA claims that the defendants

21   had, and plaintiff cited the Second Circuit case.  It was

22   not an FMLA, but it was another similar type of federal

23   statute and it is authority and there's other authority,

24   though, outside of that circuit, to the fact that we're not

25   going to be going into other claims because then we wind up

```
 1  with a bunch of mini trials and that's confusing to the
 2  jury, and we're just concerned about whether or not FMLA was
 3  applicable to this situation, and if so, was it properly
 4  handled by the defense.  So we're going to stay with what
 5  was done or wasn't done on this particular case.  We're not
 6  going to go into the fact that the defendant corporations
 7  may have perfectly well-handled other FMLA cases.
 8           Then I understand plaintiff has another matter
 9  they want to bring up.  The courtroom deputy told me that.
10           MR. CELLAR:  Good morning, Your Honor.
11           THE COURT:  Good morning.
12           MR. CELLAR:  This morning, as we were walking into
13  court, we walked in before the defendants and their counsel
14  and we were watching the front doors, and as the defendant,
15  Mr. Neuman, walked in, he and a juror were engaged in a
16  conversation, laughing, in the presence of counsel.  They
17  came through the doors and waited in line, where the
18  conversation continued until Ms. Murthy and I took a look
19  over, made eye contact with Mr. Henry, at which point
20  Mr. Henry realized that his client was having a conversation
21  with a juror and whispered something to him and the
22  conversation stopped.  When Mr. Henry turned his back again,
23  then Ms. Alexander started chatting with the juror while
24  waiting in line.  This was witnessed by myself, it was in
25  front of the marshals, it was in front of Ms. Murthy, and
```

```
1   it's incredibly troubling to me that after the Court's
2   admonishment yesterday not to have any conversations that
3   this is taking place not only between a defendant and a
4   juror but in the presence of the attorney.  So based on
5   this, I don't think we have any other choice but to move for
6   a mistrial, Your Honor.
7            THE COURT:  Well, you know, there's an old saying
8   that be careful what you wish for because you might get it.
9            MR. CELLAR:  And I understand that, and you know,
10  Mr. Hurley has wanted his day in court for a long time but
11  to see those types of communications between somebody
12  deciding the case and one of the parties is particularly
13  troubling in that regard.
14           THE COURT:  Was it the same juror in both
15  instances?
16           MR. CELLAR:  Yes, Your Honor.
17           THE COURT:  Which one?
18           MR. CELLAR:  Mr. Custer.
19           MR. HENRY:  Judge, can I be heard?
20           THE COURT:  John Custer, Juror Number 12.  All
21  right, what does the defense have to say?
22           MR. HENRY:  As I was standing in line, we were
23  here early for this hearing, I was taking off my belt,
24  putting my stuff on the countertop and I saw the juror come
25  in through the door and what I witnessed was maybe a five
```

```
 1    second conversation between Mr. Neuman and the juror.  I
 2    stopped what I was doing and I walked over to them and I
 3    said, "You guys are not supposed to talk to each other
 4    during the trial," and the juror said to me, "Not even to
 5    say hello?"  I said, "That's okay, but we're not supposed to
 6    talk during the trial."
 7             I turned around and I went through security and as
 8    far as I know, that's the end of it.  That's as much as I
 9    saw.  I'm happy to put Mr. Neuman on the witness stand and
10    you can ask him under oath exactly what was said, but what
11    he told me today was that the juror greeted him good morning
12    and that he said good morning back and they smiled at each
13    other.
14             THE COURT:  Well, plaintiff's counsel also said
15    that Ms. Alexander also then, after that, spoke to the
16    juror.  How about that?
17             MR. HENRY:  I didn't see anything about that and I
18    asked Ms. Alexander this morning if she saw what had
19    happened with Mr. Neuman.  She said yes, but that she had
20    not had any conversation with the juror.  And if the
21    marshals want to come up and testify -- I want to make sure
22    that there's been no inappropriate contact, too, but my
23    understanding is that this was a five second thing where
24    they greeted each other good morning and then they went
25    through security.
```

```
 1              THE COURT:  Let's put both defendants on the stand
 2    so we have it on the record.
 3              MR. HENRY:  Okay.
 4              THE COURT:  Go ahead.
 5              MR. HENRY:  Mr. Neuman?
 6              DEPUTY CLERK:  If you will, raise your right hand,
 7    please.
 8              (The Witness is Sworn)
 9                        GIL NEUMAN,
10       a witness herein, after having been duly sworn,
11       was examined and testified under oath as follows:
12                    DIRECT EXAMINATION
13    BY MR. HENRY
14    Q.    Good morning, Mr. Neuman.  Would you please state
15    your full name for the record?
16    A.    Gil Neuman.
17    Q.    Mr. Neuman, you're a defendant in the case; correct?
18    A.    That's correct.
19    Q.    Okay.  This morning when we were coming into the
20    courthouse, did you have any contact with one of the jurors
21    in the case?
22    A.    Yes.
23    Q.    Okay.  Would you describe for the Court, please,
24    exactly what you recall you said and what the juror said?
25    A.    We both came to the door together and we had this
```

1    little exchange, who hold the door for who, and I was here

2    first, you go in, and he said, no, you go in, and I said you

3    go in.  We stood there for three second, you go in, you go

4    in, and then we walked in.

5    Q.      Okay.  And while you were standing in line ready to

6    go through security, did you have any other conversation

7    with the juror?

8    A.      I think I said to him, "Please go in front of me."

9    That's it.

10   Q.      What did he say to you?

11   A.      He went in front of me.

12   Q.      Did he say something to you, though?

13   A.      No.

14   Q.      Okay.  I don't have any other questions.

15          THE COURT:  Plaintiff's counsel?

16          MR. CELLAR:  I have no cross, Your Honor.  I

17   wasn't present during the conversation.

18          THE COURT:  All right.  Thank you.  You may step

19   down.

20          (Witness excused)

21          THE COURT:  Now Ms. Alexander?

22          DEPUTY CLERK:  Raise your right hand.

23          (The Witness is Sworn)

24          DEPUTY CLERK:  Thank you.  Please state your name.

25          THE WITNESS:  Orly Alexander.

```
 1                        ORLY ALEXANDER,
 2        a witness herein, after having been duly sworn,
 3        was examined and testified under oath as follows:
 4                       DIRECT EXAMINATION
 5   BY MR. HENRY
 6   Q.     Ms. Alexander, you're a defendant in this lawsuit as
 7   well?
 8   A.     Yes.
 9   Q.     Okay.  This morning, did you have any conversation
10   with any juror on your way to the courthouse?
11   A.     No.
12   Q.     Okay.  You heard Mr. Neuman's testimony about a brief
13   exchange that he had with one of the jurors as they were
14   coming through the door.  Did you have any similar
15   conversation with that same juror?
16   A.     No.
17   Q.     Did you overhear any conversation between that juror
18   and anybody else?
19   A.     No.
20              MR. HENRY:  I have nothing else.
21              THE COURT:  Any questions?
22              MR. CELLAR:  No, Your Honor.
23              THE COURT:  So Ms. Alexander, aside from juror
24   Number 12, John Custer, you didn't have a conversation with
25   him or with any other juror; is that correct?
```

```
 1                THE WITNESS:  No.

 2                THE COURT:  You did not?  I want to make sure that

 3    we get our negatives here --

 4                THE WITNESS:  No.

 5                THE COURT:  You did not?

 6                THE WITNESS:  Did not.

 7                THE COURT:  Thank you.  You may step down.  All

 8    right, plaintiff have anything else to say?

 9                MR. CELLAR:  Not on this issue, Your Honor.  I

10    just wanted to bring to it the Court's attention.

11                THE COURT:  Defense?

12                MR. HENRY:  Nothing.

13                THE COURT:  Well, from the Court's own voir dire

14    and also from the voir dire that counsel had, Juror

15    Number 12, John Custer, is -- appears to the Court to be

16    very conscientious and also very chatty.  You know, if you

17    had to pick one juror out of the 12 that's chatty or out of

18    all of the other ones to examine, he's it, and I can see how

19    this would happen, if you're going through the door you get

20    an Alphonse and Gaston deal, so to speak, but you of course

21    know it's one of those things that happened.  I can't

22    imagine that it's going to make any difference to Mr. Custer

23    one way or the other.  And the rest of it is I'm not going

24    to bring Mr. Custer in to have his version of it because

25    that's going to focus or highlight the thing to him, and so
```

```
 1    I'm simply going to end the day today, remind them again,
 2    don't talk to each other about the case, don't talk to
 3    anybody else about the case, and tell them that I have a
 4    slightly different pattern instruction I use in the Eighth
 5    Circuit which goes into casual conversation more
 6    specifically than the ones I used here, and the ones here
 7    were based largely on the 11th Circuit instructions.
 8              But anyway, the motion for mistrial is denied.  I
 9    don't see any basis for a mistrial in the case but thank you
10    for bringing it to the Court's attention.
11              All right.  I got a note here that Michael Silow,
12    that is the juror that works for the power company, as I
13    recall, would be about ten minutes late because he had to
14    get his stitches taken out because he couldn't do it
15    yesterday; he got out of court too late.  So we'll be
16    waiting for a few minutes for that juror to get here and as
17    soon as he's here, we'll proceed.  Anything else from the
18    plaintiff?
19              MR. CELLAR:  One last thing, Your Honor, and we
20    didn't know about it until -- well, we should have known
21    about it but we saw it when we got a copy of the settlement
22    agreement last night which we thought was interesting
23    regarding the defendant's position on the EEOC charges.  If
24    you take a look at Section 1.2 of the settlement agreement,
25    it identifies the charges of discrimination filed by
```

1    Mr. Hurley, and then if you look at Section 2.1, the general

2    waiver of all claims, at the bottom of the first page

3    paragraph, it specifically waives any and all of the claims

4    regarding the charges of discrimination.  And if you flip to

5    Section 2.6 which talks about payment or consideration, it

6    says in exchange for Hurley's release and waiver of any and

7    all claims against defendants as discussed above, he

8    receives that compensation.

9         So to the extent the defendant is arguing that the

10   information regarding Mr. Hurley's severance payments have

11   been settled as part of the lawsuit, so too have his claims

12   for discrimination, and for the same reasons that the

13   information on his state court case should not come in, the

14   EEOC claims should not come in for the exact same reason

15   that defendants are championing to keep the other evidence

16   out, because he's waived those claims via a settlement

17   agreement and they're specifically articulated in here.

18        THE COURT:  My understanding is that there are

19   admissions within the EEOC documents that apply to this

20   case.  So what does this have to do with that, if there are

21   admissions?  I mean, I haven't seen them yet but that's the

22   claim.

23        MR. CELLAR:  I just think we talked yesterday,

24   Your Honor, about leaving the jury wondering about what

25   happened with those charges.  But I think the Court said it

1   was going to give a curative instruction on it.  I just

2   wanted to raise the issue on it because I think it's

3   inconsistent for the defendants to claim on the one hand the

4   employment agreement and what was breached in that can't

5   come in, but that the EEOC charges that were settled in the

6   very same agreement can come in.

7            THE COURT:  Actually the EEOC charges, of course,

8   were a part of the Complaint in the state court action, the

9   Court's now been furnished with a copy of the complaint, and

10  the EEOC recitation there is part of the boilerplate, but

11  wasn't part of the specific claims in the state court

12  lawsuit.

13           MR. CELLAR:  That's correct, they were not

14  asserted, but they were specifically waived in this

15  agreement.

16           THE COURT:  I know.  What's the defense have to

17  say about it?

18           MR. HENRY:  There's no question that the plaintiff

19  waived, as part of his general release, any claims for

20  discrimination he might not have -- he might have otherwise

21  had, but the claims are not, the EEOC charges are not coming

22  in to prove that he was discriminated against on the basis

23  of his age or his gender or anything else.  There are

24  admissions in the document that are relevant to this lawsuit

25  and there's specifically no confidentiality provision in

```
 1    this settlement agreement so that, you know, we can continue
 2    to use whatever information was relevant in that lawsuit.
 3    The age discrimination claims were not relevant, but the
 4    general release doesn't affect our ability to -- to offer
 5    any evidence in this case.  The Court, I think -- as I
 6    understand the Court's ruling, I thought you said that the
 7    notice period was coming into evidence.
 8              THE COURT:  The what?
 9              MR. HENRY:  The 30 day notice period was allowed
10    to come into evidence because it had some relevance to the
11    case and there's no distinction between that and the
12    admissions that are in the EEOC charges.
13              MR. CELLAR:  May I respond briefly, Your Honor, to
14    that?
15              THE COURT:  Sure.
16              MR. CELLAR:  My only response would be if there's
17    no confidentiality, then why would Mr. Hurley be precluded
18    from discussing that, whatever happened during that case and
19    what he was entitled to?  It can't be both ways.  If the
20    defendant's saying we can get into the case because there's
21    no confidentiality regarding this agreement, respectfully,
22    why would Mr. Hurley then be precluded from discussing what
23    the other issues were regarding this case, including his
24    benefits and his severance and -- one of the allegations,
25    candidly, is Mr. Neuman will get up and testify that he
```

```
 1    didn't pay Mr. Hurley's severance because Mr. Hurley filed a
 2    lawsuit.
 3           THE COURT:  Are you switching horses?  I'm trying
 4    to decide if you're trying now to get in something that you
 5    were trying to keep out before.  I'm not sure.
 6           MR. CELLAR:  Well, we discussed the EEOC charges
 7    and we filed a motion in limine and I know the Court had
 8    made its ruling yesterday.  It was just this morning when we
 9    actually got a copy of the agreement, we looked through it
10    and said --
11           THE COURT:  I actually got a copy.  Your law firm
12    was the one involved in it, for crying out loud.  Not you,
13    but somebody else.
14           MR. CELLAR:  Understood, and I understand that.
15    It was when I looked in detail at the agreement this morning
16    that we identified that same issue.  I just wanted to raise
17    that, that it's -- it seems at least to me somewhat
18    logically inconsistent to argue on the one hand certain
19    things that were waived under the agreement can come in but
20    other things can't.
21           THE COURT:  They can come in as admissions.  All
22    right, we'll be in recess until the last juror shows up.
23           (Recess from 9:00 a.m. to 9:07 a.m.)
24           THE COURT:  Bring in the jury, please.
25           COURT SECURITY OFFICER:  Yes, sir.
```

STUART - CROSS

```
 1              (Jury in)
 2              THE COURT:  Please be seated.  Good morning.  All
 3    right, recall the witness, please.
 4              MR. HENRY:  Defense recalls Fred Stuart.
 5                   CROSS EXAMINATION (Continued)
 6    BY MR. HENRY
 7    Q.      Good morning, Mr. Stuart.
 8    A.      Yeah, good morning, Mr. Henry.
 9    Q.      When we left off yesterday, we were discussing the
10    vacation that you had suggested Mr. Hurley take and during
11    your counseling sessions with him; do you recall that
12    testimony?
13    A.      I recall telling him that he needed to, you know, to
14    take some time off, yes.
15    Q.      Okay.  Your suggestion that he take time off from
16    work was optional; is that correct?
17    A.      At that juncture, that I -- that I initially saw him,
18    I thought it was optional because, you know, he had time
19    that he could take as, you know, accumulated time that he
20    apparently had never taken.
21    Q.      Okay.  And you had -- you testified that you saw him
22    at some point during the beginning of 2007; is that correct?
23    A.      That's correct, starting in, I believe, February.
24    Q.      Okay.  And that recommendation that he get more
25    exercise, sleep, and take time off of work, your testimony
```

STUART - CROSS

1    is that your recommendation as to those issues was optional?

2    A.    Well, I think -- I think what -- if I remember

3    correctly, I don't have access to the notes, at that point,

4    I thought that he was depressed and had symptoms of

5    depression and I think I made the qualifier that at that

6    point I thought he was functioning adequately insofar as he

7    was still able to, you know, go -- go to work and whatever.

8    However, I thought that he was under a lot of stress, that

9    he was depressed, and that he needed to take some actions in

10   order to reduce the stress level so that depression didn't

11   get worse.

12   Q.    And there was -- there was certainly no medical

13   mandate; correct?  You weren't requiring him to take off

14   time?

15   A.    At that juncture, I didn't -- I didn't require him to

16   take off time.  I strongly urged him to do it.

17   Q.    When was the next time that you saw him in your

18   office?  Was that after he was terminated?

19   A.    Yes.  You mean after -- after the initial time that I

20   saw him?  I saw him in February and then subsequently in

21   March of 2007, and then he was terminated, which I believe

22   was -- was that in April, 2008?

23   Q.    May 1st.

24   A.    May 1st, okay.  I saw him a few days after that in

25   May, 2008.

STUART - CROSS

1  Q.    Okay.  So between the time that you gave him that

2  initial recommendation to take time off work that you say is

3  optional, you never saw him again in your office until after

4  he had been terminated from --

5  A.    That is correct.

6  Q.    Okay.  When he came to see you in your office

7  immediately after his termination, did he tell you that he

8  had been to see a lawyer?

9  A.    No, at that juncture, I don't remember that he had.

10 No, I don't think he had.

11 Q.    Did he tell you that his lawyer had him fill out

12 medical leave forms so he could have some medical reasons

13 why he could have taken the leave?

14 A.    To be honest, I don't remember.  I'd have to look at

15 the -- my notes from that point.  I think at some point we

16 had discussed his -- you know, his options, but I don't

17 remember specifically.  I'd have to look at those.  Do you

18 have those notes?

19 Q.    Do you remember I took your deposition in this case;

20 correct?

21 A.    Yes, that's correct.

22 Q.    Okay.  I asked you, the lawyer advised him to have

23 his GP -- and I said, is that general practitioner, and you

24 said that's correct.  My question:  Fill out a Family and

25 Medical Leave request.  He is sending it to his employer.

STUART - CROSS

```
 1    What does that mean?  What did he tell you about that?
 2              Your answer was:  All I can -- all I can -- I can
 3    just tell you it's stated he, at that point, had been
 4    terminated.  He had -- according to Patrick, he had asked
 5    for time off.  I don't think he ever met face-to-face with
 6    his employer.  He had been terminated on the telephone.  And
 7    it says in his progress note he never even got written
 8    notice, which he was supposed to get according to his
 9    contract, and that whatever attorney he had at the time -- I
10    don't think it was Mr. Cellar at the time, it was a
11    different attorney, I can't remember who it was, somebody in
12    Fort Myers, I believe, had asked him to fill out -- he had
13    gone to his lawyer.  His lawyer said get your general
14    practitioner to fill out a Family and Medical Leave, so in
15    other words, you have some medical reasons why you could
16    have taken it, even though this was post facto to have that
17    filled out.
18              Do you remember my questions and your responses?
19    A.    Not verbatim, but I'm sure that if that's what I said
20    at the time, that's what I said.  I mean, I do recall that
21    he had consulted an attorney and it was different, now that
22    you mention it, from Mr. Cellar.  It was in -- in this area,
23    but I don't remember the actual chronology.  I mean, we're
24    talking three years ago.
25    Q.    Okay.  But you'll agree with me, though, that the
```

STUART - REDIRECT

1  medical certification form that we've seen in this trial,

2  Mr. Hurley told you that his lawyer told him to go get that

3  filled out; right?  He told you that?

4  A.    If that's what I stated.  Do you have the progress

5  notes there?

6          MR. CELLAR:  Objection, Your Honor, foundation.

7          THE COURT:  Overruled.

8  BY MR. HENRY

9  Q.    Do you recall saying that, now that I've read your

10 testimony?

11 A.    Apparently I did, yes.

12         MR. HENRY:  I don't have anything else, Judge.

13         MR. CELLAR:  Very brief, Your Honor.

14                  REDIRECT EXAMINATION

15 BY MR. CELLAR

16 Q.    Mr. Henry just asked you questions about when you

17 treated with Pat in 2008, and his question specifically

18 qualified "in your office".  Do you remember him making that

19 distinction?

20 A.    Yes, I do.

21 Q.    Okay.  Did you speak with Pat on the telephone on

22 multiple occasions before May of 2008 regarding his

23 condition?

24 A.    I spoke to him a couple of times on the telephone,

25 the specifics of which I -- I don't remember in detail.

STUART - REDIRECT

```
 1   Q.     Would you defer to Pat as to what was discussed
 2   during those conversations?
 3   A.     Certainly, yeah.  Let me -- let me just say something
 4   because at that juncture, I had changed agencies and even
 5   though I'm still affiliated with both places, but I had been
 6   working full-time when I first saw Pat as the clinical
 7   director at Catholic Charities and at that juncture I was
 8   working part-time at David Lawrence.  I ended up returning
 9   to David Lawrence full-time and I continue to now work
10   part-time as -- at Catholic Charities.  So I've always been
11   with both organizations.  So obviously, if Pat had followed
12   me from Catholic Charities to David Lawrence, we'd have had
13   to have had some interaction about the fact that he needed
14   to come back for services.
15   Q.     You were asked a question whether you spoke to Pat
16   after his firing.  Do you recall that?
17   A.     Yes.
18   Q.     Okay.  Did Pat tell you that he had been fired
19   verbally?
20   A.     I recall that, yes.
21   Q.     Okay.  Do you know whether Pat had an employment
22   agreement with the defendants that said either party may
23   terminate this agreement by providing the other party
24   with --
25              MR. HENRY:  Judge, objection.
```

STUART - REDIRECT

1            MR. CELLAR:  It calls for a yes or no.

2            THE COURT:  He didn't finish asking the question

3    yet.

4            MR. HENRY:  Reading from a document that's not in

5    evidence.

6            THE COURT:  I beg your pardon?

7            MR. HENRY:  Reading from a document that's not in

8    evidence.

9            MR. CELLAR:  There's no objection to this

10   document, Your Honor.

11           THE COURT:  Well, he hadn't finished asking the

12   question yet.  He might be reading, I don't know.  But go

13   ahead.  Overruled.

14   BY MR. CELLAR

15   Q.    Do you know whether when -- do you know whether Pat

16   had an employment agreement that said he could only be fired

17   in writing?

18   A.    That I -- my understanding is that's what I was told

19   by Pat, yes.

20   Q.    And do you know whether Pat had an employment

21   agreement that said he couldn't be fired on the spot, but

22   that he needed 30 days notice?

23   A.    The duration of -- of that, I don't recall knowing

24   specifically.

25   Q.    So --

STUART - REDIRECT

1   A.      But I do know that one of the upsets that was

2   mentioned to me was the fact that he -- it had happened over

3   the telephone and that -- that there was -- he had never

4   gotten any written notice to that effect.

5   Q.      Well, would it make any sense to you, Mr. Stuart,

6   that if Pat did not believe he was employed any longer that

7   he would still be asking for a leave form to work for a

8   company that he didn't work for anymore?  Would that make

9   sense?

10  A.      I'm sorry, could you repeat that?  I lost you.

11  Q.      Sure.  Does it make sense to you as a therapist that

12  Pat would be seeking a medical leave form from a company he

13  didn't believe he worked for any longer?

14  A.      No.  That -- that wouldn't make sense.

15  Q.      Now, you were asked questions yesterday about the

16  summary you provided during this litigation, it was that

17  letter that we referenced.  Do you remember that?

18  A.      Yes, uh-huh.

19  Q.      Okay.  Were you providing a copy of that summary

20  because the defendants were asking for you to sit for a

21  deposition?

22  A.      No, absolutely not.

23  Q.      As part of your preparation for testifying in this

24  case, did you prepare that summary?

25  A.      Yes.

STUART - REDIRECT

1    Q.      Do you have any stake in this case?

2    A.      No, absolutely not.

3    Q.      Do you have a lien, a medical lien against Mr. Hurley

4    for any outstanding moneys he may owe you for therapy?

5    A.      No.

6    Q.      If Mr. Hurley prevails in this lawsuit, do you get

7    anything from him?

8    A.      No.

9    Q.      If Pat prevails, do you get anything from

10   Morgan & Morgan?

11   A.      No.

12   Q.      Do you have any, I'll use the expression, skin in

13   this game?

14   A.      No.

15   Q.      Yesterday, Mr. Henry was referring to Pat's

16   Morgan & Morgan litigation team.  Do you remember that?

17   A.      Not specifically, but --

18   Q.      Who is the only attorney that you've ever spoken to

19   from Morgan & Morgan on this case?

20   A.      You.

21   Q.      Did I ever tell you what to put in your report?

22   A.      No.

23   Q.      Have I ever told you what you need to say in court

24   here today?

25   A.      No.

STUART - REDIRECT

1  Q.     Mr. Henry, yesterday, made a suggestion that Pat was

2  going to be working on a new business venture during his

3  proposed leave time from the defendants.  You remember him

4  asking you those questions?

5  A.     Yes.

6  Q.     Okay.  Did Pat ever mention to you that that's

7  something he intended to do while taking leave?

8  A.     No.

9  Q.     You were asked questions about when Pat was in the

10 Keys or hunting or at the Grand Canyon.  If Mr. Hurley

11 continued to work on these trips, answer phone calls, look

12 on his Blackberry, handle emergencies, was that the type of

13 leave you were telling him he needed to take?

14 A.     Ordinarily, I would not consider that to be -- the

15 idea of taking time off from work is to take time off from

16 work.  I mean, I understand that occasionally things came

17 up.  In fact, last week I was on vacation and I got a call

18 that I was having to come to court so I -- as -- and I got a

19 call from my employer, and I was like, "I'm on vacation,

20 what?"  You know, and so I thought, well okay, fine, I'll --

21 you know, I'll make the call, somewhat reluctantly.  But I

22 was on vacation, so if I had been asked last week to show up

23 and give a deposition, I would be like, "No, I'm not going

24 to do that, I'm on vacation."

25 Q.     That was an isolated incidence where you had a phone

STUART - REDIRECT

```
 1   call during your time off?
 2   A.     Yeah, and occasionally those things happen.  I
 3   understand that there are occasionally instances where I'm
 4   being asked, especially in the kind of work I'm in, where
 5   somebody calls or there's something that's a crisis or they
 6   need my information or they got a question about somebody's
 7   medication and whatever, and I'm happy to answer that
 8   question.  But honestly, when I'm off, I want to be off.
 9   Q.     And if -- if Mr. Hurley had more than an isolated
10   telephone call during his vacation but was constantly
11   working throughout the vacation, would that be the type of
12   leave you were suggesting that he take?
13   A.     I wouldn't suggest that, no.  I don't think that
14   that's an appropriate disengagement from something that you
15   consider potentially stressful.
16   Q.     Well, you're aware that he did take some family
17   vacations?
18   A.     That's correct -- well actually, at the time I know
19   that he had taken some -- some vacations in the past.  I
20   don't know -- I don't remember the specifics of where he had
21   gone.  All I do remember is the fact that he had accumulated
22   a significant amount of time and the question was why didn't
23   you take the time, that's what time is for, especially if
24   you work in a stressful business.  I mean, I know from, you
25   know, being in a stressful work environment, myself, that
```

STUART - REDIRECT

1    I've learned my lesson, which is is to space time out so

2    that I'm taking time at a more reasonable interval in order

3    to kind of keep the stress in check.

4    Q.     Well, the question I have for you is you're aware

5    that he took some family time after he had been diagnosed

6    with depression; right?  I mean, he had taken vacations such

7    as this one with his family?

8    A.     That's correct.

9    Q.     And after this vacation when he came to see you, did

10   it appear to you that this type of vacation was effective in

11   managing his depression and stress?

12   A.     I would say that would be helpful.  He looks like

13   he's enjoying himself and happy.

14   Q.     And do you know whether 30 seconds after this phone

15   call [SIC] Mr. Hurley was back on the telephone conducting

16   business matters?

17   A.     I have no way of knowing that.

18   Q.     If you found out that was the case, that he was back

19   on the phone conducting business, responding to emails, that

20   would not be the type of unplugged leave that you were

21   discussing with him; correct?

22   A.     I wouldn't think so.  I mean, if somebody was my

23   client and was involved in that sort of situation, I'm

24   talking hypothetically, I would say, well this is really a

25   boundary and assertiveness issue that you need to address

STUART - REDIRECT

1    with your employer in terms of being able to take time off,

2    being able to unplug.

3    Q.    Would you agree that at the time Pat came to see you

4    in May, 2008, whatever he had been doing to manage his

5    stress wasn't working?

6    A.    Absolutely not.  It wasn't working.

7    Q.    There was some discussion about the Wyatt Earp Days,

8    which is what that photo was about.  Do you remember hearing

9    that?

10   A.    Uh-huh.

11   Q.    Just answer verbally so the court reporter can --

12   A.    Oh, sorry.  Yes.

13   Q.    Do you know why Pat and his family were going to

14   Wyatt Earp Days?

15   A.    No.

16   Q.    Do you know the reason they were going was because

17   Pat's son was obsessed with anything western?

18   A.    I wasn't I aware of that.  His wife told me that

19   yesterday actually, just in passing conversation.

20   Q.    Do you know whether before Pat's son had requested or

21   begged the family to go to Wyatt Earp Days they had ever

22   gone, just Pat and Stacey alone?

23   A.    I'm sorry?

24   Q.    Do you know whether Pat and Stacey had ever gone to

25   Wyatt Earp Days before their son had ever asked them to do

STUART - REDIRECT

1    so?

2    A.    No, I'm not -- I'm not aware of whether they had or

3    not.

4    Q.    When Pat was talking to you about wanting to move to

5    Arizona in February of 2007 --

6    A.    Right.

7    Q.    -- was this during treatment for one of his episodes?

8    A.    Yes.

9    Q.    Did you consider Pat's talk of relocation to be sort

10   of that escape fantasy that we talked about yesterday?

11   A.    Yes, I referenced that yesterday, that I thought it

12   was the difference between something that's an escape or

13   feeling trapped, and as I indicated, sometimes when people

14   are depressed or anxious or whatever, they may make

15   decisions that or consider options in order to sort of

16   escape, so to speak, that may not be -- I'm not saying that

17   they're not viable options, but you may want to consider and

18   be a little bit prudent about acting on those thoughts,

19   especially at the time that your judgment may be a little

20   bit suspect.

21   Q.    Now at the time that Pat discussed with you that he

22   wanted to escape and go to Arizona, this was in 2007; right?

23   A.    Yes, that's correct.

24   Q.    And you understand that Pat was fired sometime in May

25   of 2008, is that --

STUART - REDIRECT

1   A.      Right, almost a year later.

2   Q.      Between that early 2007 period and May of 2008, did

3   Pat ever quit his job?

4   A.      No.

5   Q.      Did he move to Arizona?

6   A.      No.

7   Q.      Did he discuss with you looking for schools or

8   locations for his son?

9   A.      No.

10  Q.      Did he discuss that he would need to find a dojo to

11  practice karate in Arizona?

12  A.      No.

13  Q.      Would you agree that other than in early 2007 when he

14  met with you during this episode, Pat did not bring up the

15  concept of moving to Arizona again?

16  A.      Not that I -- no.

17  Q.      When you were treating with Mr. Hurley, did it appear

18  to you that he was committed to his job?

19  A.      Yes.

20  Q.      Did it appear to you that his commitment to the job

21  was part of the reasons that he was suffering from these

22  conditions?

23          MR. HENRY:  Objection, Judge, it's leading.

24          THE COURT:  I beg your pardon?

25          MR. HENRY:  Leading the witness through his

STUART - REDIRECT

```
 1   testimony.
 2               THE COURT:  Sustained.
 3   BY MR. CELLAR
 4   Q.    In your opinion, did Mr. Hurley's job or commitment
 5   to his job contribute to his depression or stress?
 6   A.    I think so, yes.
 7   Q.    Did Mr. Hurley ever quit his job at Kent Security, to
 8   your knowledge?
 9   A.    No.
10   Q.    Did he work in Fort Myers until the day he was fired
11   for the defendants, if you know?
12               MR. HENRY:  Same objection, Judge.
13               THE COURT:  Sustained.
14   BY MR. CELLAR
15   Q.    Do you know whether he continued to work for the
16   defendants in Fort Myers?
17   A.    The location, I'm not sure of.  I know that he
18   continued to work for the same employer.
19   Q.    Do you know whose decision it was to separate Pat's
20   employment?
21   A.    According to Pat, it was his employer's decision.
22               MR. CELLAR:  I've got nothing further.  Thank you,
23   sir.
24               THE WITNESS:  Okay.
25               MR. HENRY:  Brief Recross?
```

STUART - REDIRECT

```
 1   BY MR. HENRY
 2   Q.     I apologize, Mr. Stuart.
 3   A.     Oh, that's okay.  I blocked out enough time so don't
 4   worry about it.
 5   Q.     I got lost in all that.  Is it your testimony that
 6   this Wyatt Earp Days in Tombstone, Arizona, was a medical
 7   leave that you were recommending?
 8   A.     Okay, first of all, I'm not a qualified physician, so
 9   I'm not, you know, qualified to put somebody on medical
10   leave.  What I was suggesting is that somebody who's under a
11   lot of work stress who has the opportunity to take time off
12   in order to manage that stress better may want to consider
13   that option in order to reduce their stress.
14   Q.     Mr. Hurley's contending in the case that the vacation
15   that you suggested was a medical leave.  I'm asking you, is
16   this vacation that he took in Tombstone, Arizona, at Wyatt
17   Earp Days the type of vacation that's at issue in this
18   case --
19              MR. CELLAR:  Objection, Your Honor.
20              MR. HENRY:  -- that you were suggesting?
21              MR. CELLAR:  Objection, Your Honor.  Misstatement
22   of Mr. Hurley's position.
23              THE COURT:  Sustained as to form.
24   BY MR. HENRY
25   Q.     You had suggested that Mr. Hurley take vacation;
```

STUART - REDIRECT

1  right?

2  A.     I suggested that he take time off, right.

3  Q.     Is this the type of vacation that we're talking

4  about, the vacation in Tombstone?

5  A.     I could see that as being something that -- that

6  would be effective, yes, at the time that I saw him.

7  Q.     And did I hear you say that if he took a phone call

8  during that vacation that was business related, that that

9  would not be therapeutic?

10  A.     Actually, no, I don't think I said that.  What I said

11  was that I understand that occasionally the demands,

12  especially of being a professional, require you to sometimes

13  attend to business that you don't -- may not want to or when

14  you're -- when you're on vacation, but the issue at that

15  point would be, at least for me, would be to set appropriate

16  limits in terms of, you know, your interaction.  I think

17  there's a difference between being on the phone for 30

18  seconds or for two minutes or for five minutes, like I was

19  last week, even though maybe it gave me an emotional

20  hangover for an hour to be frustrated, to say, I don't want

21  to deal with this, I'm on vacation.  So it really depends on

22  the, you know, the extent, the duration, and the frequency,

23  I think, of the demands being placed upon you.

24  Q.     Okay.  But just so the jury's clear, this photograph

25  of Mr. Hurley in Tombstone, Arizona, that was the type of

STUART - REDIRECT

1    therapeutic vacation that you were suggesting?

2    A.    Actually, no, I didn't suggest any specific vacation

3    for him at all.  I didn't say, you know, dress up and --

4    like Wyatt Earp or go to Arizona, or whatever.  In fact, I

5    was not aware of the fact that, you know, that he was doing

6    that.  I think that the -- the idea of going somewhere that

7    was tranquil -- and if I seem to remember, we talked about

8    sort of wide open spaces and horses and whatever, and you

9    know, for somebody -- I could see that that would be a very

10   relaxing and serene environment for somebody to be in.

11         But you know, I think with people, what I tell

12   people, your happiness is a by-product of the choices you

13   make.  Some people are very content and happy skydiving and

14   some people are afraid to go upstairs on an escalator.  What

15   somebody might consider relaxing may not be what I would

16   necessarily consider relaxing.  I think that the issue is if

17   somebody is depressed or unhappy or stressed out, whatever

18   it is that reduces your stress, whatever it is that

19   increases your pleasure level if you're anhedonic, is

20   something that I would recommend.

21         MR. HENRY:  Okay.  Thank you very much.

22         THE COURT:  Thank you.  You're excused.

23         (Witness excused)

24         THE COURT:  Call your next witness.

25         MR. CELLAR:  The plaintiff calls Stacey Hurley,

S. HURLEY - DIRECT

```
 1   Your Honor.  I believe she's outside.  May I go get her?
 2              THE COURT:  You may.
 3              DEPUTY CLERK:  Could I have you please raise your
 4   right hand?
 5              (The Witness is Sworn)
 6              DEPUTY CLERK:  Thank you.  You may be seated in
 7   the witness booth behind you, and if you would, please state
 8   your name for the record.  State your name, please.
 9              THE WITNESS:  Stacey Hurley.
10              MR. CELLAR:  Might I have the ELMO turned on,
11   please?
12              DEPUTY CLERK:  Yes.
13                       STACEY HURLEY,
14       a witness herein, after having been duly sworn,
15       was examined and testified under oath as follows:
16                     DIRECT EXAMINATION
17   BY MR. CELLAR
18   Q.     Good morning.
19   A.     Good morning.
20   Q.     Please go ahead and introduce yourself to the jury.
21   A.     I can't hear you.
22   Q.     Please go ahead and introduce yourself to the jury.
23   A.     Hi, my name is Stacey Hurley.  I'm Patrick Hurley's
24   wife.  We've been married for about 25 years, and I have two
25   boys, one living at home who's 15.
```

S. HURLEY - DIRECT

```
 1   Q.     Okay.  And where do you live?
 2   A.     In Naples.
 3   Q.     Okay.  And who do you live with?
 4   A.     I live with my husband and my son.
 5   Q.     Okay.  Ms. Hurley, do you have any medical condition
 6   that would affect your ability to hear what I'm asking you
 7   here today?
 8   A.     Yes.  I have a hearing disability in both ears,
 9   50 percent in one ear and 70 percent in another ear.
10   Q.     Does that affect your ability to hear or see what I'm
11   asking?
12   A.     Yes, yes.  I'm not able usually to hear everything in
13   a sentence, so I may have to have you repeat it.
14   Q.     Okay.  And I'm sure Frank will agree that if you
15   don't hear one of our questions, just go ahead and ask us to
16   repeat it.
17   A.     Okay, thank you.
18   Q.     Okay, you got it.  Are you currently employed?
19   A.     I'm -- I'm employed part-time.  I'm a karate
20   instructor.
21   Q.     Okay.  And can you just give the jury a little bit of
22   background, what sort of karate you teach and a little bit
23   about your program?
24   A.     Sure.  I am a first degree black belt and I have been
25   teaching for about, hum, little over three years.  I've been
```

S. HURLEY - DIRECT

1    a black belt for about three years.  I started teaching when

2    I was a brown belt.  We teach children that have autism.  We

3    also teach adults and families all together, and I do that

4    two nights a week.

5    Q.    Okay.  In addition to your karate teaching what else

6    do you do with your time?

7    A.    I home school full-time.

8    Q.    And is there a reason why you home school?

9    A.    You know, my son does not learn well in a big group

10   setting, and so I chose to home school him, doing more one

11   on one.  He learns much better that way.  And because I

12   can't really hold down a job, a regular job, I'm using that

13   time to devote to his education.

14   Q.    Okay.  I want to shift gears and talk to you a little

15   bit about your observations of Pat during his employment

16   with Kent; okay?

17   A.    Okay.

18   Q.    Do you recall when Pat started with Kent Security?

19   A.    I believe it was in 2001.

20   Q.    Do you recall what month that was, roughly?

21   A.    June.

22   Q.    Okay.  And were you aware of the negotiations that

23   were going on between Pat and Kent at the time he came over

24   to work for the company?

25   A.    Kind of on the periphery, yes.

S. HURLEY - DIRECT

1    Q.    Okay.  Do you know whether Pat and defendants ever

2    entered into an employment agreement?

3    A.    Yes, they did.

4    Q.    Did you see or review this employment agreement at

5    the time Pat signed it and received it from the defendants?

6    A.    Yes, I have -- I have looked over it.

7    Q.    Okay.  Would you be able to identify the employment

8    agreement if I showed it to you?

9    A.    Yes, I would.

10   Q.    Okay.  I believe if you take a look at the stack in

11   front of you, I'm going to show you what's been marked as

12   Exhibit Number 10.  Do you see that?

13   A.    Yes, I do.

14   Q.    Okay.  Showing you what's marked as Exhibit

15   Number 10, can you identify that document, please?

16   A.    It's the employment agreement dated June 2001,

17   June 1st, 2001, between Kent Security and Patrick.

18   Q.    Okay.  Does this appear to be a true and correct copy

19   of the employment agreement that you saw regarding Pat's

20   employment with Kent?

21   A.    Yes.

22        MR. CELLAR:  Your Honor, at this time, I'd like to

23   move into evidence what's been marked as Plaintiff's Exhibit

24   Number 10.

25        MR. HENRY:  Judge, I have an objection to the

S. HURLEY - DIRECT

1    document, if I could be heard at sidebar?

2              THE COURT:  You may.

3              (At sidebar, Court and counsel present)

4              MR. HENRY:  Judge, this employment agreement was

5    entered into in 2001 when Mr. Hurley was hired as a

6    salesman.  He changed jobs several times after that within

7    the company.  This was the entire basis for the litigation

8    in state court.  I don't have an objection to the expert

9    witness testifying about Mr. Hurley's rate of compensation,

10   his benefits, his car, but this employment agreement, we

11   hotly disputed in the state court litigation was even in

12   effect because he'd changed jobs and he had abandoned this

13   contract.  What he's going to ask this witness now about

14   this document is whether Mr. Hurley was somehow entitled to

15   any of the benefits.

16             MR. CELLAR:  No, I'm not.  I have no intention of

17   doing that, Your Honor.  My only intention was were you

18   aware that Mr. Hurley, that Pat had certain provisions of

19   his agreement that dictated how he could be fired, which

20   goes to the notice issue.  I'm not getting into the benefits

21   and this agreement is part of the personnel file that they

22   produced.  The agreement goes to the jury.  They never

23   objected to the agreement, itself.  I'm not intending on

24   going to the benefits of the agreement with her at all.

25             MR. HENRY:  This -- if the document's admitted,

S. HURLEY - DIRECT

 1  there's got to be some curative instruction that the parties

 2  hotly dispute that the thing was even in effect because that

 3  was our only point of litigation in the state court case.

 4          THE COURT:  Of course there never was any

 5  litigation because you never went to trial, you settled.

 6          MR. HENRY:  No, we didn't.  That's correct.

 7          MR. CELLAR:  Your Honor, if I may, to that point,

 8  the agreement specifically provides that it will

 9  automatically renew for successive 12 months periods unless

10  30 days prior a party gives notice.  So they can certainly

11  argue to the jury that the agreement was not in effect.

12  We're certainly going to argue that it was regarding the

13  notice provisions of this agreement.

14          THE COURT:  There was no subsequent written

15  agreement, I take it?

16          MR. HENRY:  There wasn't.

17          THE COURT:  Well, I'm going to let the agreement

18  in and both sides can argue with regard to whether it was in

19  effect or not.

20          (Sidebar concluded)

21          MR. CELLAR:  May I proceed, Your Honor?

22          THE COURT:  You may proceed.

23          MR. CELLAR:  Thank you.  At this time, we'd like

24  to move into evidence what's been marked as Plaintiff's

25  Exhibit Number 10.

S. HURLEY - DIRECT

```
 1              THE COURT:  Exhibit 10 is received.

 2              (Plaintiff Exhibit 10 admitted)

 3  BY MR. CELLAR

 4  Q.    Now Ms. Hurley, you have a copy of the employment

 5  agreement in front of you.  Is there any way we can dim the

 6  lights, please?  Thank you.

 7              You have a copy of the employment agreement in

 8  front of you and what I wanted to ask you was, to your

 9  knowledge, was there a provision that discussed how long the

10  agreement would be in effect?

11  A.    To my knowledge, it was going to be into -- it would

12  stay in effect unless the parties changed it.

13  Q.    Okay.  And if you take a look at Paragraph 3 of the

14  agreement, was this your understanding of how the agreement

15  would renew?

16  A.    Yes.

17  Q.    Okay.  Now, in addition to how long the agreement

18  would be in effect, was it your understanding or did you

19  know whether there were provisions in the agreement that

20  discussed the manner in how Mr. Hurley, your husband, Pat,

21  could be fired?

22  A.    Yes, it did.

23  Q.    Okay.  What I'd like you to do is turn to Paragraph 7

24  of the agreement and explain to the jury, if you can, simply

25  what the notice provisions were of the agreement -- let me
```

S. HURLEY - DIRECT

1    ask it differently.
2            Did you have an understanding as to how, under the
3    terms of this agreement, Pat could be fired?
4    A.    Yes, I did.
5    Q.    What was your understanding, based on the agreement?
6    A.    My understanding was that the parties had to give
7    each other written notice, 30 days written notice for
8    separation or their intent to separate, and during that
9    time, Pat would have to work the full 30 days for Kent.
10   After that, he was supposed to receive --
11   Q.    I don't want you to talk about what he was supposed
12   to receive.
13   A.    Okay.
14   Q.    Okay.  Now, do you know the date that Pat's
15   employment -- strike that.
16           Do you know what month the defendants attempted to
17   fire Pat?
18   A.    May of 2008.
19   Q.    Okay.  And in testifying a moment ago -- I'm going to
20   mark a provision on the agreement.  Was this the provision
21   you were referring to regarding the manner in which Pat
22   could be fired by Kent?
23   A.    Yes.
24   Q.    And I'm going to fast forward for one second and then
25   we're going to fill in some detail.  Did Pat ever receive

S. HURLEY - DIRECT

1   written notice that he was going to be fired by Kent?

2   A.      No, he did not.

3   Q.      Did Pat ever receive a 30 day notice period?

4   A.      No, he didn't.

5   Q.      That he would be fired by Kent?

6   A.      No, he did not.

7   Q.      Now, I'm going to get into a little more detail about

8   Pat's employment with Kent, but I wanted you to give the

9   jury an overview of how Pat started with the company and

10  worked his way up.  Could you do that for us?

11  A.      Yes, I'd be happy to.  He was hired to perform sales.

12  I believe his title was vice-president of sales at the time

13  for the East Coast Division.  Then he was promoted to the

14  Naples Division and then from there, he was promoted to run

15  not only the Naples Division but the Broward Palm Beach

16  Division.

17  Q.      And at the time he was fired in May of 2008, do you

18  recall what his position was, what his title was?

19  A.      He was President of Kent of Naples.  President of

20  Naples Kent, yeah.

21  Q.      Okay.  Now, can you describe to the jury, and it's

22  been a source of discussion so far in the trial, about Pat's

23  work behaviors when he worked for the defendants?

24  A.      He was a workaholic, a company man.  He put the

25  company first.  He was always working.

S. HURLEY - DIRECT

1  Q.      Can you describe to the jury what you mean by always
2  working?
3  A.      Sure.  Even when he wasn't in the office, if he was
4  out giving a presentation, he'd do that after hours.  Would
5  also work from home.  Any time the phone rang, whether we
6  were having dinner, going to the movies, having a family
7  gathering, everything stopped and he took care of whatever
8  needed to be attended to.  He sometimes got called out in
9  the middle of the night.  He answered the phone all hours,
10 three o'clock in the morning.  That's what he did.
11 Q.      Did that frustrate you as his wife at times?
12 A.      Yes.
13 Q.      Why?
14 A.      Well, because I felt like the work was intruding on
15 our family time.
16 Q.      And when Pat would come home from work, would the
17 work day be over?
18 A.      No, of course not.  He was still checking his email,
19 checking his Blackberry.  First thing he did when he woke up
20 in the morning was check his Blackberry, last thing he did
21 when he went to bed was check his Blackberry.
22 Q.      Do you know the number or the type of schedule Pat
23 was working when he was --
24 A.      Yes.
25 Q.      -- at Kent of Naples?

S. HURLEY - DIRECT

1  A.    Yes.  He was in and out of the office but he was
2  generally there between nine and six.  And then like I said
3  before, he would make presentations after hours to various
4  homeowners associations, attend their annual meetings and
5  such, and then again, he was on call 24/7.
6  Q.    Did you have the opportunity to observe the effect
7  Pat's work behavior was having on his health?
8  A.    Yes.  He became more and more stressed.  He started
9  having panic attacks and he was more anxious and I noticed
10 he even was like off, like he was acting like he was
11 depressed.
12 Q.    When did this start, if you can give us a time frame,
13 a rough time frame of this?
14 A.    Around 2005.
15 Q.    Okay, okay.  Can you describe in a little bit more
16 detail to the jury the types of symptoms Pat -- you observed
17 Pat was having in 2005?
18 A.    In 2005, she -- he seemed depressed to me.  He was
19 withdrawn, more gloomy, he wasn't as communicative.  He
20 wasn't vibrant like he used to be and he was having panic
21 attacks.  He was anxious and he was really struggling, and I
22 didn't understand what was going on.
23 Q.    Did you suggest that he do anything about it in 2005?
24 A.    Yes.  I told him he needed to go to the doctor.
25 Q.    Okay.  And do you know whether he did so?

S. HURLEY - DIRECT

1    A.    Could you repeat that?

2    Q.    Do you know whether he did so?

3    A.    Yes, he went to see Dr. Dauer.

4    Q.    Did you accompany him on this doctor's visit?

5    A.    I did.

6    Q.    Okay.  During this doctor's visit with Dr. Dauer,

7    were you present during the consultation part of the

8    treatment?

9    A.    I was with -- I was there.  I was present while he

10   was talking to Pat.  I mean, he basically said my wife

11   thinks I'm depressed, that's why I'm here.

12   Q.    Okay.  Was Pat almost -- was Pat -- did Pat act

13   embarrassed about his condition?

14   A.    Absolutely.

15   Q.    Did he explain to you why?

16   A.    No.  He didn't really explain why.  He was just

17   embarrassed.  I think -- I don't know if it's a guy thing,

18   an ego thing, just he was embarrassed, I think.

19   Q.    Did Pat, to your knowledge, ever share with anybody

20   at work what was happening with him behind the scenes?

21   A.    I don't believe he did, no.

22   Q.    Why not?

23   A.    That wouldn't be something that he would -- he would

24   want to talk about.

25   Q.    Why not?

S. HURLEY - DIRECT

1   A.      He -- he didn't even talk about it to me.  But I'm

2   sure that he wouldn't do that in -- I think it would affect

3   his ability to manage and be perceived as a strong leader.

4   Q.      Now, when you went with Pat to go see Dr. Dauer in

5   2005, do you recall what Dr. Dauer told Pat he needed to do

6   to work within his symptoms?

7   A.      Yes.  He told him that he needed to take time off, he

8   needed to reduce his stress and the way to do that was

9   several things.  He needed to take time off and just kind of

10  unplug from work.  He also told him, you know, in the

11  meantime, take some medication and to try exercise.

12  Q.      Okay.  Do you know what medication Dr. Dauer

13  prescribed for Pat?

14  A.      Yes.  It was called Wellbutrin.

15  Q.      Did Dr. Dauer explain what this medication was for?

16  A.      It was an antidepressant.

17  Q.      Okay.  Now after Pat treated with Dr. Dauer in 2005

18  for his symptoms -- let me take one step back.  Did

19  Dr. Dauer ever diagnose Pat's condition for him?

20  A.      Yes.  He thought he was depressed.

21  Q.      Do you know, did Dr. Dauer also diagnose Pat with

22  having work related stress, to your knowledge?

23  A.      Well, that would be what was causing his depression.

24  Q.      After Pat treated with Dr. Dauer in 2005, did his

25  depression and stress stop?

S. HURLEY - DIRECT

1   A.      No.

2   Q.      Did Pat continue to treat with any other medical

3   providers regarding his depression and stress?  And let's

4   focus on 2007 and 2008.

5   A.      Okay.  Dr. Dauer moved out of state and Dr. Paisan

6   took over his practice.  He saw Dr. Paisan for the same

7   conditions and he also saw a mental health therapist, Fred

8   Stuart.

9   Q.      Were you ever present during any of the consultations

10  that Pat had with Dr. Paisan regarding this depression

11  issue?

12  A.      Yes.

13  Q.      And do you recall what advice Dr. Paisan gave to Pat

14  during these discussions as to how to treat his condition?

15  A.      Yes.  He virtually gave the same advice as Dr. Dauer

16  and that was he needed to reduce his stress and he needed to

17  take time off away from work to do that.

18  Q.      Did he describe the type of time off that he wanted

19  or he was suggesting Pat take?

20  A.      Could you ask me that again?

21  Q.      Sure.  Did he discuss the type of time off that he

22  wanted Pat to take?

23  A.      Yes.  He said he needed to unplug, unplug, you know,

24  just relax, don't -- don't work, basically.  Don't work.

25  Q.      Now, you mentioned that in 2005, Pat was having panic

S. HURLEY - DIRECT

1    attacks and these other symptoms.  Can you describe what you

2    observed from 2005 through his firing in 2008 regarding his

3    conditions?

4    A.    Yes.  I noticed he was becoming more and more

5    stressed.  His panic attacks became more frequent.  There

6    were days when he couldn't get out of bed and go to work.

7    There were times I found him in the bathroom curled up, and

8    I even found him under the dining room table.

9    Q.    Can you describe to the jury the instances where you

10   found him curled up in the bathroom?  What was he wearing?

11   A.    What was the last part of that question?

12   Q.    What was he wearing?

13   A.    He wasn't naked but he didn't have a lot of clothes

14   on.

15   Q.    What was he doing in the bathroom?

16   A.    He was curled up, hugging himself, hugging his knees

17   to his body, and he was just kind of, you know, shaking and

18   being uncommunicative.  He wouldn't talk to me.

19   Q.    Did he call for you to come to the bathroom?

20   A.    No.

21   Q.    How did you find him?

22   A.    I was looking for him.  I didn't know where he went

23   and I was looking around and I walked in the bathroom and

24   there he was on the floor.

25   Q.    Was he able to explain to you what was happening?

S. HURLEY - DIRECT

1  A.    No.  He wasn't able to talk.  When he was having an

2  episode, he -- he wasn't able to communicate to me.  He

3  would just not be able to talk.

4  Q.    How long did this episode that you're discussing in

5  the bathroom last, roughly?

6  A.    You know, it seems like forever, but I'm sure it was

7  maybe 30 minutes.

8  Q.    Okay.  You had also mentioned that there were

9  occasions where you found Pat under -- did you say -- you

10  said the dining room table?

11  A.    Yes.

12  Q.    Can you describe to the jury what you saw during that

13  instance?

14  A.    You know, what I remember about that incident is the

15  overwhelming sense of shock and dismay and seeing him laying

16  there, I -- I stood there and my brain could not comprehend

17  what I was seeing here.  I just -- my husband was laying

18  there and it was breaking my heart, but it was so shocking

19  to me that I was in a state of shock seeing him like that.

20  Q.    When he was under the table, were his symptoms the

21  same as when he was in the bathroom shaking?

22  A.    Yes.

23  Q.    Were you able to communicate with Pat?

24  A.    No.  I mean, I could talk to him but he didn't talk

25  to me.

S. HURLEY - DIRECT

1   Q.     Did you try to find out what was happening to him

2   when he was laying under the table?

3   A.     Yes.  I found him like that, I -- you know obviously,

4   "Are you okay, what's wrong," you know.  He wouldn't -- he

5   wouldn't respond.

6   Q.     You'd mentioned that there were times where Pat's

7   symptoms would prevent him from getting out of bed in the

8   morning.  Can you describe to the jury what you observed

9   during those instances?

10  A.     Sure.  He always left before -- left for work before

11  I woke up and you know, on those days, I would wake up and

12  he would still be in bed.  You know, naturally I'm

13  concerned, and I would think he was sick, not feeling well.

14  And he was sick, not feeling well, but he -- I would say,

15  you know, "Honey, are you sick, do you have a cold," you

16  know, "What's wrong?"  And he would say, "I just can't go to

17  work.  I just can't do it.  I just can't go to work today."

18  Q.     What would his condition be when he was laying in bed

19  next to you during those occasions?

20  A.     He was -- I don't know how to describe it.  He just

21  couldn't function.  He wasn't able to function.  He wasn't

22  able to talk.  I mean, he was just, you know -- sometimes he

23  was tearful, like he just couldn't do anything.  He couldn't

24  get out of bed.  He couldn't talk.

25  Q.     Were there occasions where Pat would go into work but

S. HURLEY - DIRECT

1  come home early because of --

2  A.    Yes, there were.

3  Q.    -- the symptoms that he was suffering?

4  A.    Could you --

5  Q.    Sure.  Can you describe to the jury what would happen

6  on those days when Pat would come home early because of what

7  was happening to him?

8  A.    Yes.  I knew if he came early that he was having an

9  episode and most of the time he would just come home, walk

10  through the door and go straight into the bedroom, close the

11  door and crawl in bed.  No -- no dinner, no "hi how are

12  you", no "how was your day".  No interaction.

13  Q.    What effect was this having on the family when these

14  things were happening?

15  A.    Well naturally, it wasn't a good environment,

16  especially with a child in the home, but it was extremely

17  stressful and I -- I felt helpless like I couldn't help him.

18  There was nothing I could do.  He wasn't communicating with

19  me what was really going on.  All I was seeing was the

20  physical manifestation of it and it was really -- there was

21  a lot of tension in the house, and you know, a lot of

22  stress, distance.

23  Q.    Was the tension and stress as a result of what was

24  happening with Pat?

25  A.    Yes, it was.  It was, you know, affecting everything

S. HURLEY - DIRECT

```
 1   at home.
 2   Q.      Now, you mentioned Pat went on something called
 3   Wellbutrin for a period of time; is that correct?
 4   A.      Yes.
 5   Q.      Was there a time when another doctor prescribed him a
 6   different medication for him to try?
 7   A.      Yes.  Dr. Paisan, who took over for Dr. Dauer,
 8   prescribed Effexor.
 9   Q.      And do you know what -- did he explain to you and Pat
10   during that session what Effexor is properly used for?
11   A.      It was my understanding it was an antidepressant.  It
12   was just a different type of antidepressant because Pat
13   didn't like the first one that was prescribed for him.
14   Q.      Now, between 2005 and 2008, did you and Pat take
15   family vacations?
16   A.      Yes, we did.
17   Q.      Okay.  Can you describe some of the locations that
18   you went?
19   A.      Sure.  We would take trips to Disney World.  We went
20   to Arizona and Las Vegas.
21   Q.      Let me ask you about Las Vegas.  When you went to Las
22   Vegas, was it just you and Pat?
23   A.      One time we went from Arizona through the Hoover Dam
24   and then up to Las Vegas with my son.  We just kind of drove
25   up there and stayed one night and then came home, but we
```

S. HURLEY - DIRECT

1   wanted to show him the Hoover Dam.  But all the other times
2   it was just Pat and I, and those were for business.  Those
3   were business trips.  Those weren't just for vacation.
4   Q.    Can you explain to the jury what you mean by business
5   trips?
6   A.    Sure.  Every year there was a security convention in
7   Las Vegas and Pat would entertain guests of the company.  In
8   other words, he would invite certain clients to come out and
9   he would take them through the convention and look at all
10  the things that were available, a lot of high-tech items,
11  and you know, talk to them about how they could integrate
12  that into the services they were providing to them.  We
13  also -- you know, he would take them out to dinner.  I would
14  accompany him, and entertain them.  We took them to the
15  Grand Canyon, took -- took one client to the Hoover Dam.  So
16  we were -- he was tasked as entertaining and subtly selling.
17  Q.    Now when you would go on these non-business trip
18  family vacations, and there's a picture over there which
19  we'll look at in a moment, would Pat's work behavior change
20  significantly?
21  A.    Not significantly but he, you know, when you're on
22  vacation, I'd try to get him to relax a little bit and
23  distract him but when the phone would ring, didn't matter
24  where we were on vacation, he would take care of it.
25  Q.    Okay, and there's been some testimony regarding

S. HURLEY - DIRECT

```
 1   having isolated phone calls while away on a trip versus
 2   constant communication with work on a business trip.  Can
 3   you describe to the jury which one of these categories Pat's
 4   behavior on these trips would fall into?
 5   A.    Could you tell me which categories again?  I didn't
 6   hear all of that.
 7   Q.    Sure.  Let's say one of the categories is taking a
 8   call for a few minutes here, once or twice, and the second
 9   category would be remaining on the phone throughout much of
10   the entire trip.
11   A.    I'd probably say it was more toward the latter.  You
12   know, he would participate in our vacation, you know, but it
13   wasn't completely a vacation.  Work was still there.  It was
14   still -- you know, if he got a call, he would walk away, be
15   gone for a little bit, you know, talking on the phone or
16   texting and taking care of things and he was also required
17   to check in with dispatch and the office.  He couldn't just
18   go on vacation and not be in contact with the office.
19   Q.    Would the calls, based on what you saw, that Pat
20   would be receiving during these trips affect his mood on the
21   trips?
22   A.    Absolutely.  If something was -- obviously, if they
23   were calling him, there was a problem and he would be -- it
24   would just rear the stress again, just cause more anxiety
25   even while he was on vacation.
```

S. HURLEY - DIRECT

1    Q.    Were these trips, these family vacations the same

2    type of trips that you understood his doctors to be

3    recommending?

4    A.    No, because -- because a vacation is when you leave

5    work, you -- vacation is getting away from all of the things

6    you do every day.  And the doctor was specific when he said

7    unplug, you need to unplug.  If you can't unplug from your

8    phone, you're not unplugged.

9    Q.    I want to show you a picture that you have in front

10   of you, and I believe it's been marked as Plaintiff's

11   Exhibit 25.  Do you see that?

12   A.    Yes, I do.

13   Q.    Okay.  What is this?

14   A.    That is the Grand Canyon.

15   Q.    Okay.  And does this appear to be a photograph that

16   you took?

17   A.    Yes, I took that picture.

18   Q.    Does this appear to be a true and correct copy of the

19   photograph that you took?

20   A.    Yes, it would.

21        MR. CELLAR:  Your Honor, at this time, we'd like

22   to move into evidence what's been marked as Exhibit 25.

23        THE COURT:  25 is received.

24        (Plaintiff Exhibit 25 admitted)

25

S. HURLEY - DIRECT

```
 1   BY MR. CELLAR

 2   Q.     Why did you take this picture, Stacey?

 3   A.     Well to me, it's a picture of irony.  This is what I

 4   saw on vacation.  Here we are, one of the great wonders of

 5   the world, and you can see in the picture this beautiful

 6   view, beautiful vista.  And what's he doing?  He's got his

 7   back turned to it and he's on his Blackberry.  This is what

 8   I saw.  It was just so frustrating.  To me, it was like this

 9   is the irony, you're going to the Grand Canyon, look at the

10   Grand Canyon, forget about work, at least for a little

11   while.

12            MR. CELLAR:  May I use this, Frank?

13            MR. HENRY:  Yeah, sure.

14   BY MR. CELLAR

15   Q.     This is the picture that the defendants have been

16   showing in this courtroom to describe the actual vacations

17   that Pat was taking.  If you had to choose which picture

18   more accurately describes Pat during these trips, which one

19   would you pick?

20   A.     It would be the Grand Canyon picture.

21   Q.     Why?

22   A.     You know, that picture there, it's a great picture,

23   and Mr. Henry, if I can have it after the trial, I'd love

24   that, but that's a posed picture.  I mean, most people when

25   they see a camera and somebody's taking their picture, they
```

S. HURLEY - DIRECT

 1    smile, okay.  But in this picture, this is the real Pat.

 2    This is Pat working at the Grand Canyon.

 3    Q.     Did you express your discontent with that Pat during

 4    vacations?

 5    A.     I was very frustrated.  I just wanted him to focus on

 6    the family when we were on vacation.

 7    Q.     Did you ever make -- and sorry I'm yelling, I don't

 8    have a microphone.  Did you ever make any comments to Pat

 9    regarding the improper relationships he was having with his

10    Blackberry?

11    A.     Yes.  I used to joke that he had an umbilical cord

12    attached to it, that he was tethered to it all the time.

13    Q.     Now, there was -- there's been some discussion about

14    trips to Arizona in this case?

15    A.     Yes.

16    Q.     And something called Wyatt Earp Days.  Have you heard

17    that before?

18    A.     Yes, I have.

19    Q.     Okay.  Was there a special event -- was that the

20    event that you would go to Arizona for?

21    A.     Yes.  We -- it originally started, I was -- my son is

22    all about cowboy stuff and he had watched the movie

23    Tombstone and was all about Wyatt Earp and I was just

24    researching for a unique vacation for him, something cowboy

25    related, and I came across that they have Wyatt Earp Days

S. HURLEY - DIRECT

 1  every Memorial Day.  So from that, I kind of created a
 2  little vacation and we attended the Wyatt Earp Days at
 3  Tombstone.
 4  Q.    Had you ever attended Wyatt Earp Days before your son
 5  got this fascination with western?
 6  A.    No.
 7  Q.    Okay.  Now, some of the photos that we're looking at
 8  here, do you know whether Pat had to submit written leave to
 9  get these vacations?  Do you know whether he ever did that?
10  A.    If he did what?
11  Q.    Submitted written leave to get approval for these
12  types of vacations that he went on?
13  A.    No, I don't think so.
14  Q.    Now, I wanted to talk about a time when Pat's
15  condition, his medical condition came to a head.  Was there
16  a time period where you became truly fearful of what would
17  happen to Pat if he continued in his ways?
18  A.    Yes.  In 2008, he was becoming unglued.  He was
19  having more panic attacks.  It seemed to me daily, but he
20  was having more difficulty getting out of bed.  I just --
21  everything crescendoed, and then on top of that, the economy
22  was going bad and -- and we were having financial problems,
23  too.
24  Q.    Did Pat share with you problems that he was having at
25  work receiving bonuses he was entitled to?

S. HURLEY - DIRECT

1   A.    Yes.  He was having difficulty getting his bonuses

2   paid.

3   Q.    And what effect did that have on his health?

4   A.    It created great stress and anxiety for him.

5   Q.    Did Pat ever discuss with you concerns that he had

6   with Mr. Neuman not wanting to come to the Naples office?

7   A.    Yes.  He was very frustrated that he'd repeatedly

8   asked Mr. Neuman to come to the Naples office to meet with

9   key clients and also to boost the morale in the Naples

10  office with the employees.

11  Q.    And did Pat affect -- or explain to you if the morale

12  in the office was affecting his condition or his stress?

13  A.    Sure.  It was -- it was definitely a factor in his

14  feeling that.

15  Q.    What was happening during this 2008 period that we're

16  discussing regarding Pat's symptoms?  Can you describe with

17  a little more specifics what was happening at this time?

18  How were his symptoms manifesting?

19  A.    Frequent panic attacks.  Not being able to get out of

20  bed.  Curled up in a ball in the bathroom and, you know,

21  under the dining table.  He was --

22  Q.    What if anything --

23  A.    He was tearful.  He couldn't even talk.  He was

24  having a hard time just talking, just regularly speaking.

25  Q.    Were these symptoms happening 24 hours a day seven

S. HURLEY - DIRECT

1    days a week?

2    A.    No.  It was periodic.  It was up and down, you know.

3    It was episodic.  It just would be bad and then it would get

4    a little better, be bad again, get a little better.

5    Q.    Did there come a time where you said something to Pat

6    regarding his need to take a medical leave?

7    A.    Yes.  It -- I was really afraid I was going to get a

8    call that he had dropped dead of a heart attack or was

9    having a nervous breakdown and had to be committed, put in a

10   rubber room, whatever.  I just -- I said, "That's it, your

11   health is critical.  You're becoming unglued.  I need you to

12   listen to me now.  It's not optional.  You must take that

13   time off the doctors have been telling you to take off.  You

14   have to do this.  It's not optional, I'm putting my foot

15   down."

16   Q.    And what was his response to that?

17   A.    I think his response was that, okay, I'll do it.  But

18   I wanted him to take a big chunk of time off.  I thought he

19   needed to just completely take a bunch of time off but he

20   wouldn't do that.

21   Q.    Why not?

22   A.    He put the company first.  He felt an obligation to

23   the company.

24   Q.    Did Pat ever tell you that he wanted to quit his job

25   at Kent?

S. HURLEY - DIRECT

```
 1   A.      No.  He loved his job, despite the stress and the
 2   anxiety, if you could just put that in a bubble and if you
 3   took his talents and his skills, they were a perfect match
 4   for his job and he was really successful.  He was very
 5   successful and he loved that.  He loved that part of his
 6   job.
 7   Q.      Did you and Pat ever discuss him quitting his job
 8   with Kent and moving to Arizona?
 9   A.      No, we didn't -- not in those terms.  We talked about
10   moving to Arizona, sure.  You know, it was more like a -- an
11   abstract daydream type thing.  We also talked about moving
12   to Chicago.  We visited Chicago; my son loved it.  We said
13   wouldn't it be cool if you had a little apartment in a corn
14   cob building downtown in the middle there and, you know,
15   that would be cool.  Also, you know, Pat wants to live in a
16   log cabin some day.  Sure, wouldn't it be cool if we had a
17   log cabin in Beech Mountain.
18   Q.      Was it ever a serious discussion for Pat to leave his
19   job at Kent and move to Arizona?
20   A.      No, we -- no.  We never made plans to move.
21   Q.      Did you ever put your house up for sale in the time
22   period of 2006 or 2007?
23   A.      Yes, we did.
24   Q.      Why?
25   A.      Well, because when we moved over here, I was a city
```

S. HURLEY - DIRECT

1  girl but I didn't realize that until I'd lived in the house

2  a little while.  We live in a very rural area and it was

3  really hard for me to make friends and it was 15 miles into

4  town, and I wanted to be closer into town where there was

5  more things to do.

6  Q.    Was there any other reason why you would have put

7  your house up for sale during that time period?

8  A.    We were having financial problems and we wanted to

9  downsize.

10 Q.    Do you know how long your house stayed on the market?

11 A.    About a year.

12 Q.    Is it still on the market, if you know?

13 A.    We put it on the market after he left Kent and we --

14 it's not for sale now because it's in foreclosure, but we

15 had it on the market for quite a while.

16 Q.    If Pat wanted to leave Kent during his employment

17 there, are you aware of any opportunity that he had to do

18 so?

19 A.    I'm sorry, you'd have to repeat the question.

20 Q.    Sure.  If Pat wanted to leave his employment with

21 Kent, are you aware of any opportunity that he had to do so?

22 A.    No.

23 Q.    Do you know whether Pat ever received an unsolicited

24 offer from a company to go work there?

25 A.    Yes.  When we first moved to Naples, he received an

S. HURLEY - DIRECT

1    offer from a company in Atlanta paying him significantly

2    more money, but he didn't want to do that.  He said he

3    wasn't interested because we had just moved to Naples and he

4    was committed to working for Kent.

5    Q.      To your knowledge, while Pat worked for Kent, did he

6    ever look for another job?

7    A.      No, he did not.

8    Q.      Did Pat ever discuss with you whether he intended to

9    retire with Kent?

10   A.      Sure.  He felt that he -- there were a lot of

11   opportunities at Kent and the company was branching out to

12   other states and he felt there was a lot of opportunity

13   there.

14   Q.      Were there ever times where you would help Pat with

15   his work obligations?

16   A.      Yes, I did.

17   Q.      Can you describe to the jury what you would do?

18   A.      Yes.  He would put together presentations, sometimes

19   they were quite thick, and I would help him.  We would have

20   the employees over, do brainstorming sessions, and then I

21   would help him type up the proposals and work on graphics to

22   make the artwork look nice.

23   Q.      Where would you perform that work?

24   A.      At home.

25   Q.      And would Pat email you any materials from his job to

S. HURLEY - DIRECT

1    your home?

2    A.    Yes, he did.

3    Q.    What sort of materials would he email to you?

4    A.    He emailed parts, you know, particular language he

5    wanted to have put into the proposal, and resumes as well.

6    Q.    Whose resumes would he email to you from work?

7    A.    His email, Mr. Blackwell's email -- I'm sorry,

8    resume, resumes, and anyone else who was going to be working

9    on the account.

10   Q.    Did Pat explain to you why he was sending you the

11   resumes?

12   A.    Yes.  The clients that were looking at the proposal

13   wanted to know what kind of qualifications the people who

14   would be managing the account had.

15   Q.    Now, flipping back to the time you said to Pat,

16   enough, did you and Pat at some point sit down to put a

17   leave schedule together?

18   A.    Yes, we did.

19   Q.    Did you assist him in preparing that document?

20   A.    Yes, I was very helpful in that regard.

21   Q.    Okay.  What I'd like you to do is take a look at

22   what's been marked as Exhibit Number 30, which should be two

23   pages?

24   A.    Okay.

25   Q.    Can you identify these documents to the jury?

S. HURLEY - DIRECT

1   A.     Yes.   It's -- the top page is an email to Mr. Neuman

2   dated April 29th, 2008.  And the subject is vacation

3   schedule.

4   Q.     And what's attached to it?

5   A.     Pardon?

6   Q.     What's on the second page?

7   A.     The second page is our vacation dates that we set

8   out, kind of a -- it's a proposal, so to speak.

9   Q.     Does this appear to be a true and correct copy of the

10  email and vacation dates that you folks submitted to the

11  defendants?

12  A.     Yes.

13         MR. CELLAR:  Okay.  Your Honor, at this time, we'd

14  like to move into evidence what's been marked as Plaintiff's

15  Exhibit Number 30.

16         MR. HENRY:  No objection.

17         THE COURT:  Exhibit 30 is received.

18         (Plaintiff Exhibit 30 admitted)

19  BY MR. CELLAR

20  Q.     Now during this case, we've looked at -- may I use

21  this again?

22         MR. HENRY:  Sure.

23  BY MR. CELLAR

24  Q.     We've looked at the schedule that was submitted to

25  Mr. Neuman.  What we haven't looked at is the email attached

S. HURLEY - DIRECT

1   to that schedule, so I'd like to go through that with you

2   for a moment.

3   A.      Sure.

4   Q.      Is this the email that Pat sent to Gil requesting

5   leave?

6   A.      Could you say that one more time?  Sorry.

7   Q.      Is this the email that Pat sent to Gil, or

8   Mr. Neuman, regarding leave?

9   A.      Yes.

10  Q.      Okay.  In this email, does Mr. -- does Pat say these

11  dates are set in stone?

12  A.      No.  He said it was a proposal.

13  Q.      Okay.  And if you take a look at the last sentence of

14  the email, what does Pat say?

15  A.      It says the dates are subject to change.

16  Q.      Now, was that your understanding at the time you sat

17  down with Pat to come up with the schedule that these were

18  flexible dates?

19  A.      Sure.

20  Q.      Did it matter to you and Pat, in particular, when Pat

21  got to take the leave off?

22  A.      Did I assist him with the dates?

23  Q.      Did it matter to you at the end of the day whether

24  Pat took off these dates or any other dates?

25  A.      I'm sorry, I don't understand the question.

S. HURLEY - DIRECT

1   Q.     Sure.  Was it your understanding that Pat's leave had

2   to be on these dates?

3   A.     Oh, no, not at all.  This was a proposal.

4   Q.     Okay.  Now, was there a method to how you and Pat

5   went about finding these dates?

6   A.     There was a -- a general method.  We got out a

7   calendar and looked at the dates that we had previously

8   taken vacations and went ahead and tried to pencil those in,

9   and I know that a lot of them fall on a holiday weekend or a

10  holiday week and you know, the office is closed during that

11  time when there's a holiday, so you know, it was easier for

12  him to take vacation and make that just -- you know, have

13  that extra day for resting.

14  Q.     Did Pat explain to you why vacations would have been

15  easier?  I know you just mentioned the office was closed.

16  In your experience, would Pat have to attend client meetings

17  during these holidays?

18  A.     Meetings?

19  Q.     Yes.

20  A.     Client meetings?  No, everything slowed down around a

21  holiday.

22  Q.     Did Pat ever share with you that in Naples, there was

23  any sort of difficulty getting people to work, meaning

24  guards, on the holidays?

25  A.     No.  In fact, they liked to work because they got

S. HURLEY - DIRECT

 1  paid time and a half.

 2  Q.     Okay.  So did Pat ever share with you that the

 3  holiday, the taking the holidays off would be more of an

 4  inconvenience to Kent than not?

 5  A.     Can you repeat?

 6  Q.     Let me ask it differently.  Was the purpose when you

 7  and Pat sat down and came up with these dates to be a

 8  benefit -- strike that.  Let me ask it differently.

 9         You had mentioned that you wanted Pat to take a

10  block of time off; is that correct?

11  A.     Correct.

12  Q.     Okay.  What was Pat's response to that?

13  A.     No, I can't do that.  I can't be gone that long from

14  the company.

15  Q.     In coming up with this leave schedule, was it your

16  intention, collectively, to come up with a schedule that

17  inconvenienced the defendants as little as possible?

18  A.     No, we tried to make it, instead of one huge block

19  which he could have asked for, he broke it out, broke it

20  down.  It averages about one week a month.

21  Q.     And do you know whether Pat actually submitted this

22  schedule to Gil --

23  A.     Yes, he did.

24  Q.     -- Mr. Neuman?  And do you know what happened after

25  that?

S. HURLEY - DIRECT

1    A.      Mr. Neuman replied request denied in an email.

2    Q.      And if you know, what did Pat do?  At the time frame

3    that Pat received an email back from Mr. Neuman denying his

4    request, can you describe the frame of mind he was to the

5    jury the frame of mind he was in?

6    A.      He was desperate, desperate.  I was desperate.  He

7    didn't know what to do.  He said, I've got to take this time

8    off.  He realized at that point I'm disintegrating, I need

9    to do something, and he was desperate.

10   Q.      Now, what did Pat do in response to Mr. Neuman's

11   email saying your leave is denied?

12   A.      He sent another email explaining to Mr. Neuman that

13   he had a medical condition -- medical condition -- condition

14   that required him to take time off to treat, and that at

15   this point, it wasn't optional and his doctors had been, you

16   know, advising him to take the time off.

17   Q.      Now, when we looked at the schedule, the first

18   holiday falls on a Memorial Day weekend.  You see that?

19   A.      Yes.

20   Q.      And Mr. Henry has suggested that that would be the

21   same weekend of Wyatt Earp Days in Arizona?

22   A.      Right.  That would be the time frame that Wyatt Earp

23   Days is going on.

24   Q.      Did you have any intention when you put this leave

25   schedule together to go to Wyatt Earp Days in May?

S. HURLEY - DIRECT

1   A.      No, we did not.

2   Q.      Can you explain to the jury why you did not?

3   A.      Yes.  In March, I hurt my back.  I have degenerative

4   back disease and I was hiking with my son, hurt my back, and

5   I couldn't even sit down.  Five minutes was a lot.  There

6   was no way I was going to be able to get on an airplane and

7   sit on an airplane for five hours, much less ride a horse.

8   Q.      At the time you proposed this leave, did you know

9   that you were not going to be able to go to Arizona?

10  A.      Yes.

11  Q.      When did you know you wouldn't be able to go to

12  Arizona?

13  A.      In March when I hurt my back.

14  Q.      Okay.  And what is the date of this email?

15  A.      The date of the email is April 29th, 2008.

16  Q.      Okay.  Did Pat tell you what Mr. Neuman's response

17  was to his email requesting medical leave and identifying --

18  strike that.

19          Did Pat tell you what Mr. Neuman's response was to

20  his email saying the leave was for medical reasons?

21  A.      He called him the next day and fired him.

22  Q.      Did Pat ever tell you why or whether Mr. Neuman had

23  given him a reason for firing him on that day?

24  A.      No, he didn't.

25  Q.      Was that consistent with your understanding and Pat's

S. HURLEY - DIRECT

1  understanding, his verbal firing, with whether that was

2  something that could be done by the company without any

3  writing or notice?

4  A.     No.  He had an agreement on the terms of separation.

5  Q.     Did Pat ever receive notice of his termination in

6  writing?

7  A.     No, he did not.

8  Q.     What did Pat do, if you know, the morning after or

9  the same day he received a call from Mr. Neuman telling him

10 he was fired?  What did he do?

11 A.     He actually was on his way into a parking lot to give

12 a presentation and after he hung up with Mr. Neuman, he

13 continued into the meeting and gave his presentation.  And

14 then later that evening, he attended a funeral for one of

15 the employees' children as a representative of Kent.

16 Q.     Did Pat -- did Pat explain to you whether he believed

17 he was fired as of May 1st, 2008, when he received a phone

18 call?

19 A.     No.  He -- he didn't believe it because they had an

20 agreement and those terms of separation were very specific.

21 Q.     Are his actions in continuing to work for the

22 defendants after this call, in your mind, consistent with

23 what his understanding was?

24 A.     Yes.

25 Q.     Does it make sense to you that if somebody believes

S. HURLEY - DIRECT

1  they'd been fired that they would continue to work for a

2  company that just fired them?

3  A.    That's correct.

4  Q.    Can you describe to the jury what happened with Pat

5  after he realized that the defendants were going to enforce,

6  or try to enforce his verbal termination?  What happened?

7  A.    He was devastated.  He -- he couldn't believe it

8  because, you know, here he had spent seven years growing the

9  company, developing the company.  His division was the most

10  successful division in the company history.  And you know,

11  sacrificed his health.  He had bonuses, promoted time and

12  time again, raises, and when he needed time and loyalty from

13  the company to help him heal, they fired him instead, and he

14  was devastated.  He had given everything for this company.

15  Q.    Prior to May 1st, 2008, were you aware that anybody

16  had told Pat he wasn't performing well?

17  A.    No.

18        MR. CELLAR:  Your Honor, may I approach?

19        THE COURT:  You may.

20  BY MR. CELLAR

21  Q.    I want to show you this award and ask if you've ever

22  seen that before?

23  A.    Yes, I have.

24  Q.    What is it?

25  A.    It's an award that was given to Pat by Mr. Neuman for

S. HURLEY - DIRECT

1   outstanding achievement and service.

2   Q.    And what's the date of that award?

3   A.    December, 2007.

4   Q.    And does that appear to be a true and correct copy of

5   the award that Pat received from Mr. Neuman?

6   A.    Yes.

7         MR. CELLAR:  Your Honor, at this time we'd like to

8   introduce into evidence the award.

9         MR. HENRY:  No objection.

10        THE COURT:  Well, it's received.  We'll have to

11  somehow make a copy of it for the record because that's not

12  a copy it's the award.

13        (Plaintiff Exhibit 103 admitted)

14        MR. CELLAR:  Your Honor, with the Court's

15  permission, I'd like to publish it to the jury so they can

16  see it.

17        THE COURT:  You may.

18        MR. CELLAR:  Thank you.

19  BY MR. CELLAR

20  Q.    After Pat was fired, did he crawl into bed and stop

21  looking for work?

22  A.    No, he proceeded to look for work immediately.

23  Q.    What did he do to look for work?

24  A.    Went online, applied on job boards, sent out lots of

25  resumes, called all of his business contacts to see if there

S. HURLEY - DIRECT

1    were any opportunities available that they knew of, looked

2    in the newspaper, continually looked for work.

3    Q.     At the time of Pat's termination, do you know how

4    much he was making, roughly?

5    A.     His base salary was 128,000 and then he had his

6    benefits and bonuses.

7    Q.     Do you know what benefits he was entitled to during

8    his employment?

9    A.     Yes.  He received four weeks paid vacation every

10   year, which accrued if he didn't take it, health insurance

11   for his family and for himself, the 401(k) contributions,

12   and a company car.

13   Q.     Okay.  And do you know whether Pat also received

14   bonuses during his employment based on his performance?

15   A.     Sorry?

16   Q.     It's okay.  Do you know whether Pat also received

17   bonuses during his employment that were based on his

18   performance?

19   A.     Yes.  They were on -- Mr. Neuman provided a schedule

20   that needed to be achieved in order for him to earn the

21   bonuses, and he did so.

22   Q.     Do you know the last time Pat received a bonus from

23   Kent before his firing?

24   A.     No.  It had been a while.

25   Q.     Do you know whether he had received a bonus in

S. HURLEY - DIRECT

1    December of 2007 for performance?

2    A.      You know, I don't think -- I don't know.

3    Q.      Okay.  If you don't know, that's fine.  Now, was

4    there a time period where Pat finally found a job after he

5    was fired?

6    A.      Yes.

7    Q.      Can you describe to the jury the job that he was able

8    to find?

9    A.      Okay.  Are you -- part-time job?

10   Q.      Well, let's talk about everything that he did.

11   A.      Okay.  He found part-time work with a private

12   investigation firm, just doing surveillance and things that

13   private investigators do.  And that position segued into a

14   full-time position at an estate taking care of a disabled

15   man.

16   Q.      Do you know what the job title was that Pat took?

17   A.      Home health aide.

18   Q.      And do you know how much he made doing that job?

19   A.      Initially he was paid $25 an hour and then it was

20   reduced to $15 an hour.

21   Q.      Okay.  And can you describe to the jury the duties

22   that Pat was doing in this job?

23   A.      Sure.  The man was not able to get out of his

24   wheelchair by himself.  Pat would take him into the bathroom

25   to help toilet him, wash him, bathe him, shave him, change

S. HURLEY - DIRECT

1   his sheets, get him dressed, take him to doctors'

2   appointments and, you know, get him haircuts, take him out,

3   entertain him, and just attend to his basic needs.

4   Q.      Are these the same types of duties he was doing as

5   president of two divisions at Kent?

6   A.      No.

7   Q.      Did Pat continue to look for work even after he had

8   retained this full-time home health aide position?

9   A.      Yes, he did, always.

10  Q.      Does he continue to look for work today?

11  A.      Yes.

12  Q.      When Pat took this home health aide position, did he

13  receive benefits?

14  A.      No, he did not.

15  Q.      Did he get a company car?

16  A.      No, he was an independent contractor.

17  Q.      Did he receive a 401(k)?

18  A.      No, he didn't.

19  Q.      Did he get four weeks of vacation, paid vacation?

20  A.      No, no vacation.

21  Q.      Was there a time period where this job ended

22  regarding this man, this disabled man Pat was caring for?

23  A.      Yes.  The disabled man passed away.

24  Q.      When was that?

25  A.      In August, August or early September of this -- of

S. HURLEY - DIRECT

1    2011.

2    Q.    And did Pat attempt to find another job after

3    September of 2011?

4    A.    Yes, he did.  He -- he found a position with Alta

5    Health, and that is a concierge medicine firm where he is a

6    patient advocate explaining the program to people who would

7    be interested in converting to concierge medicine.

8    Q.    How much does he make per week doing that?

9    A.    $500 an hour -- $500 a week.

10   Q.    Okay.  And does he receive benefits?

11   A.    No benefits.  He's an independent contractor.

12   Q.    Does he receive a company car?

13   A.    No.

14   Q.    Are the benefits -- does he receive any of the

15   benefits today that he received had he not -- that he was

16   receiving with Kent?

17   A.    No, he did not -- he does not.

18   Q.    Do you have health insurance today?

19   A.    No, we don't.

20   Q.    Does Pat still continue to treat with his health care

21   providers today, regarding his condition?

22   A.    No, he doesn't.

23   Q.    Why not?

24   A.    Well, we don't have health insurance and we're not

25   making ends meet and we just can't afford it.

S. HURLEY - DIRECT

1    Q.    Before Pat came to our firm, Morgan & Morgan, do you

2    know whether he had another lawyer?

3    A.    Yes, he hired Geralyn Noonan.

4    Q.    And did Pat -- do you know the reason why Pat had

5    hired Geralyn Noonan?

6    A.    My understanding was that he wanted her assistance in

7    filing for unemployment.

8    Q.    Okay.  Did Pat ever express to you concerns that he

9    was having with Ms. Noonan?

10   A.    Could you -- I'm sorry.

11   Q.    That's okay, not a problem.  I keep forgetting, and I

12   apologize.  Did Pat ever express to you concerns that he was

13   having with Ms. Noonan?

14   A.    Yes.  He was concerned that every time he called,

15   he'd have to leave four or five messages.  Emails would go

16   unanswered.  He'd have to call the secretary and there was

17   always a reason why she couldn't get back to him.

18   Q.    Did he ever explain to you that she was not listening

19   to what he was telling her?

20   A.    Yes.  He was frustrated with that, too.  On top of

21   her not communicating with him, when he was able to speak

22   with her, she wasn't listening to what he was talking about,

23   wasn't -- she wasn't following what he wanted her to do.

24   Q.    Was there a time where Pat terminated Ms. Noonan as

25   his lawyer?

S. HURLEY - DIRECT

1  A.    Yes.  He felt that she wasn't listening to him and
2  wasn't communicating with him.
3  Q.    In your opinion, would Pat still be working for Kent
4  today if it was up to him?
5  A.    Absolutely.
6         MR. CELLAR:  I've got nothing further.  Thank you,
7  Stacey.
8         MR. HENRY:  Judge, could I indulge the Court for a
9  personal break?
10         THE COURT:  Very well.  We'll take -- about time
11  for our mid morning break, anyway.  We'll take a 15 minute
12  recess.  Please stand for the jury.
13         (Recess from 10:35 a.m. to 10:50 a.m.)
14         THE COURT:  Bring in the jury, please.
15         COURT SECURITY OFFICER:  Yes, sir.
16         (Jury in)
17         THE COURT:  Please be seated.  Proceed.
18         MR. HENRY:  Thank you, Your Honor.  Good morning,
19  Mrs. Hurley.
20         THE WITNESS:  Good morning, Mr. Henry.
21         MR. HENRY:  Your Honor, would you mind if I use
22  the walk-around mic while I'm standing at the ELMO?
23         THE COURT:  That's fine.
24         MR. HENRY:  Testing.  I promise that I won't sing.
25

S. HURLEY - CROSS

```
 1                    CROSS EXAMINATION
 2   BY MR. HENRY
 3   Q.    Mrs. Hurley, your husband's lawyer showed you this
 4   document and you said that you took this photograph to make
 5   a point that he had turned his back on the Grand Canyon to
 6   use his Blackberry?
 7   A.    Yes.
 8   Q.    And I think I heard you say that this was his natural
 9   state during the vacations that you took between 2005 and
10   2008; is that right?
11   A.    Can you speak up?  I can't hear you.
12   Q.    I'm sorry.  I think you said that this is his normal
13   state?  More often than not, this is what he was doing on
14   your vacations; is that right?
15   A.    This -- this is what I see when he's on vacation with
16   us, you know, when we went on family vacation.
17   Q.    Okay.  And other than this photograph, do you have
18   any other photographs of your husband using a Blackberry or
19   a phone while he's on vacation?
20   A.    No, I don't.
21   Q.    I'm showing you -- we made a request for production
22   in the case and we asked for all your photographs of
23   vacations and you all produced them.  They were admitted
24   into evidence yesterday as Defendant's Exhibit R-3.  Do you
25   recognize this photograph?
```

S. HURLEY - CROSS

```
 1   A.      Yes.

 2   Q.      Okay.  Did you take it?

 3   A.      I think so, yes.

 4   Q.      And where was this photograph taken?

 5   A.      In Arizona.

 6   Q.      Okay.  Your husband is clearly not using a Blackberry

 7   or telephone in --

 8   A.      That is correct.

 9   Q.      -- this photograph.  And of course, this is the

10   photograph, though, we just showed the jury that was taken

11   by the Grand Canyon where he's using -- looks like typing an

12   email or some message; correct?

13   A.      Uh-huh.

14   Q.      You have to answer for --

15   A.      Yes.

16   Q.      This is a photograph of your husband deer hunting in

17   South Carolina.  Did you go on that trip with him?

18   A.      No, I did not.

19   Q.      Okay.  Do you have any idea whether during this

20   vacation he was continually using his Blackberry?

21   A.      I don't know.  I'm sure he did.

22   Q.      Okay.  Do you have any photographs of that?

23   A.      No, I don't.

24   Q.      And where was this photograph taken?

25   A.      In Arizona.
```

S. HURLEY - CROSS

1  Q.    And what specific event in Arizona?  Is this Wyatt

2  Earp Days?

3  A.    Well, it was at a -- yeah, Wyatt -- I can't even

4  talk -- Wyatt Earp Days event.

5  Q.    And did your son take this photograph?

6  A.    I think so.

7  Q.    That's why he's not in the photograph?

8  A.    I'm assuming, yes.  He was with us.

9  Q.    When you were at Wyatt Earp Days, is it customary to

10 dress in costume the whole time you're there?

11 A.    Yes, it is.

12 Q.    And here's another photograph.  I assume this is

13 Wyatt Earp Days?

14 A.    Yes, it is.

15 Q.    And that is your son standing on the right-hand side

16 of the picture?

17 A.    That's my son, yes.

18 Q.    Okay.  And you also produced this photograph.

19 Describe this photograph for the jury.

20 A.    I believe this was our first visit to Arizona and

21 this is at the White Stallion Ranch, which is in Tucson,

22 just north of Tucson, and the people in the picture were

23 guests there.  We just took a picture together.

24 Q.    That's Pat Hurley at the right-hand side of the

25 photograph; isn't it?

S. HURLEY - CROSS

1    A.    Yeah.

2    Q.    And is that you in the center?

3    A.    I'm in the center, yes.

4    Q.    And is that your son sitting in the front?

5    A.    Yeah, he's that little shaver in the front.

6    Q.    What was the event that you were there for?  Was it

7    something called a dude ranch?

8    A.    It is a dude ranch, yes.  You ride horses, swim, eat

9    lots of food.

10   Q.    Okay.  And during that vacation, is it your testimony

11   that your husband continually used his Blackberry and his

12   cell phone?

13   A.    I believe I testified that he did relax, he did have

14   some moments where he wasn't on his Blackberry.

15   Q.    Okay.

16   A.    So he wasn't continually --

17   Q.    How often was that?

18   A.    -- using his Blackberry.

19   Q.    Well, how often was he using his Blackberry, say for

20   example, when he was at this dude ranch?

21   A.    I wouldn't be able to give you an amount, Mr. Henry.

22   Q.    Fair enough.  This is a photograph that you also

23   included?

24   A.    Oh, that's a terrible photograph.

25   Q.    It's a very good photograph of you.  Where was this

S. HURLEY - CROSS

1  taken?

2  A.      In Arizona.

3  Q.      Okay.  At a dude ranch or Wyatt Earp Days?

4  A.      I think it was at Tombstone.

5  Q.      And how about this photograph, was this in --

6  A.      In Tombstone.

7  Q.      At Wyatt Earp Days?

8  A.      Yes.

9  Q.      And again, what about this one, was this at Wyatt

10 Earp Days?

11 A.      This is Wyatt Earp Days.  He met this little young

12 man who was a cowboy action shooter and they got together

13 and had a cap gun shootout in the middle of the main street.

14 And that's his family.

15 Q.      Okay.  And I notice that you and your husband are not

16 in costume in this photograph?

17 A.      No, we were leaving that day.

18 Q.      Okay.  You also produced this photograph.  Describe

19 this one for the jury.

20 A.      This is at the dude ranch.  They have a ride where

21 you ride out for breakfast and then they had a photographer

22 taking pictures of it, all the guests.  This was our first

23 trip.  My son is taller than both of us now.

24 Q.      Okay.  You know it's your first trip by the size --

25 your son's age at the time?

S. HURLEY - CROSS

1    A.    I'm sorry?

2    Q.    You can recognize that this is one of your first

3    trips --

4    A.    Yes.

5    Q.    -- because of the size of your son?

6    A.    Yes.

7    Q.    Okay.  And what is this photograph?

8    A.    It looks like we were at Disney.

9    Q.    Walt Disney World in Orlando?

10   A.    Yes.

11   Q.    Okay.  And at that trip -- what year would this have

12   occurred; do you recall?

13   A.    I really don't know.

14   Q.    Do you know how many times between 2005 and 2008 that

15   you went to Disney World?

16   A.    We had annual passes.

17   Q.    An annual pass means you can go as often as you want?

18   A.    You can go as often as you want, but we never went

19   like from March through the summer because it was just too

20   hot.  We went at least a couple times a year, probably more.

21   Q.    So during that period of time between 2005 and 2008,

22   you may have gone five or six times to Disney?

23   A.    Could you ask me again?  I'm sorry.

24   Q.    Yeah, I'm sorry.  During between the period of time

25   beginning 2005 and ending in 2008, you might have gone to

S. HURLEY - CROSS

1   Disney World five or six times?

2   A.    If I went twice a year for three years, yeah, sure.

3   Q.    Okay.  And describe for the jury the photograph that

4   I just put up on screen.

5   A.    This is another visit to Wyatt Earp Days and we're

6   standing in front of the OK Corral where Wyatt Earp Days had

7   the big shootout.

8   Q.    And this photograph?

9   A.    Same thing, we're just, you know, on Allen Street.

10  Q.    Okay.  And I notice that there are people in the

11  background and none of them have what would appear to be

12  costumes on.

13  A.    Well, if you look right to the right of me, there are

14  people standing there.  Those ladies have dresses, the

15  proper lady dresses on.  There were people there that were

16  just spectators and they came for the day or whatever, but

17  there are a significant amount of people dressed up.

18  Q.    So when you were at Wyatt Earp Days, you actually got

19  involved in the festivities?

20  A.    Yes.

21  Q.    And to a greater extent than other people who might

22  be what you just characterized as spectators?

23  A.    Well, they didn't -- if it was their first trip

24  there -- first time we went, we didn't have costumes.

25  Q.    Did you rent the costumes at Wyatt Earp Days?

S. HURLEY - CROSS

1    A.      I did the first year.

2    Q.      And of course this is the photograph that we've been

3    looking at throughout the trial.  This is also taken at

4    Wyatt Earp Days?

5    A.      Yes.

6    Q.      Who took this photograph, your son?

7    A.      I think so.  It looks like it's low kind of going up.

8    Q.      And describe this photograph, please, for the jury.

9    A.      This was outside a mine tour just outside of the main

10   area at Wyatt Earp Days.

11   Q.      So you took a tour of a -- some type of mine while

12   you were there?

13   A.      Right, the silver mine.

14   Q.      Do you know who took this photograph?

15   A.      It could have been either my son or me.

16   Q.      And how about this photograph, was this at the same

17   mine tour?

18   A.      That's the same mine tour, same day.

19   Q.      In Tombstone, Arizona?

20   A.      Right.  All three of us, right, went on this tour.

21   Q.      And this is the same mine tour?  I notice they both

22   have hardhats on.

23   A.      Yes.

24   Q.      Okay.  And you also produced this photograph, see if

25   I can zoom this out.  Describe this photograph for me.

S. HURLEY - CROSS

1   A.      The gentleman next to my husband is his father.  He

2   was 90 years old in this picture, and we're at the White

3   Stallion Ranch.

4   Q.      So that's Patrick Hurley's father?

5   A.      Yes.

6   Q.      And he lives at the White Stallion Ranch?

7   A.      No, but I wish we did.  No, he lives in Fort

8   Lauderdale.

9   Q.      Okay.

10  A.      He lived in Fort Lauderdale at the time.

11  Q.      Did he go with you on this vacation?

12  A.      I'm sorry?

13  Q.      Did he go with you on this vacation?

14  A.      He met us there, yeah.

15  Q.      Okay.  Was that normal for you to go on vacation with

16  other families or relatives?

17  A.      No.

18  Q.      So that just happened this one time?

19  A.      Yes.

20  Q.      Now, you just mentioned you wished you lived at the

21  White Stallion Ranch; is that true?

22  A.      Sure.  Why not?  It's a dream place to live.

23  Q.      It's a beautiful --

24  A.      Who wouldn't want to live there?

25  Q.      Okay.  Is this also at the White Stallion Ranch?

S. HURLEY - CROSS

1   A.      Yes, it is.

2   Q.      And you mentioned earlier in your testimony that you

3   knew that you weren't going to be going to Arizona for

4   Memorial Day in 2008 because you had hurt your back in March

5   that year; right?

6   A.      Yes.

7   Q.      Okay.  And the reason that you would not be able to

8   go to Arizona is because you wouldn't be able to ride a

9   horse, as you see in this picture; correct?

10  A.      Yes.

11  Q.      This photograph, describe it for the jury.

12  A.      Yes.  This is at the White Stallion Ranch and I took

13  this picture.

14  Q.      And how about this one?

15  A.      That's at the White Stallion Ranch.  I did not take

16  that picture.

17  Q.      Okay.  Who took this picture?

18  A.      One of the hired photographers that they have at the

19  ranch.

20  Q.      Do you have other photographs of the vacations that

21  you took between 2005 and 2008 that you didn't produce to

22  us?

23  A.      No.  I gave you everything that I had.

24  Q.      Okay.  And so this one photograph that you have of

25  your husband using his Blackberry in front of the Grand

S. HURLEY - CROSS

1    Canyon, can you give the jury an estimate, based upon the

2    photographic records that you have, how often he was

3    actually using his Blackberry on those vacations?

4    A.    Several times a day.  He was required to check in.

5    Q.    Okay.  So your testimony is that several times a day,

6    Mr. Hurley checked his Blackberry for email; is that

7    correct?

8    A.    Could you repeat the last part of the sentence?  You

9    turned away.  I'm sorry.

10   Q.    I'm sorry.  Several times a day while he was on

11   vacation, he checked his Blackberry; is that fair?

12   A.    Yes, but I couldn't give you a number.

13   Q.    And of all the photographs that we just looked at,

14   only one of them he's actually using his Blackberry?

15   A.    I don't think it would be something I would take a

16   picture of normally because I had enough of it, you know, in

17   person.  It was just the irony of him being at the Grand

18   Canyon with that beautiful view in the back and of him being

19   on his Blackberry.  That -- that summed up my frustration.

20   Q.    You were frustrated with it?

21   A.    Absolutely.

22   Q.    Mrs. Hurley, I believe that you testified that after

23   May 1st of 2008, your husband somehow did not believe that

24   he had been terminated from employment; is that correct?

25   A.    I think I said he was devastated.

S. HURLEY - CROSS

1    Q.     Did he understand, though, after his conversation

2    with Gil Neuman on May 1st, 2008, that his employment had

3    been terminated by Kent?

4    A.     I'm not sure that he understood -- I'm not sure what

5    he understood.  I believe that he heard that Mr. Neuman had

6    fired him from Mr. Neuman, but I really think that he felt

7    that the employment agreement was still in effect.

8    Q.     So he felt that he was not supposed to be fired;

9    correct?

10   A.     Not under the terms, the way that it was done.

11   Q.     But after -- after May 1st, you know, he -- you

12   testified that he was working that day; right?

13   A.     He worked on May 1st, yes.

14   Q.     And after May 1st, he never went back to work;

15   correct?

16   A.     Right.

17   Q.     And did he have a company car as part of his

18   employment?

19   A.     Yes, yes.  He was asked to turn all of that in.  The

20   keys to the office, to the company car, any company

21   property.

22   Q.     On May 2nd, Mr. Hurley turned in his Blackberry;

23   correct?

24   A.     As far as I know.

25   Q.     His company car and its key; correct?

S. HURLEY - CROSS

1    A.    Yes.

2    Q.    He turned in his security cards for the building;

3    correct?

4    A.    I believe so.

5    Q.    He turned in his keys to the office; correct?

6    A.    Yes.

7    Q.    And he turned in his company laptop; correct?

8    A.    Yes, yes.

9    Q.    At that point, did Mr. Hurley, after he had the

10   conversation with Mr. Neuman and after he'd turned in all

11   that material and he never went back to work again, did he

12   at some point tell you that he thought he was still employed

13   by Kent?

14   A.    No.  He didn't tell me that.

15   Q.    So what's the basis for your belief that he was

16   somehow still entitled to work there?

17   A.    Based on the -- the agreement.  He felt that, you

18   know, he needed to be working, but he was asked to turn

19   everything in, so he couldn't go back to work.

20   Q.    I'm showing you what has been marked for

21   identification as Defendant's Exhibit J-2.  Is that your

22   husband's signature at the bottom?

23   A.    Yes.

24         MR. HENRY:  I would offer J-2 into evidence, Your

25   Honor.

S. HURLEY - CROSS

1           MR. CELLAR:  No objection, Your Honor.

2           THE COURT:  J-2 is received.

3           (Defense Exhibit J-2 admitted)

4  BY MR. HENRY

5  Q.     Mrs. Hurley, this is a receipt signed by Pat Hurley

6  at the bottom.  Is that his signature there?

7  A.     Yes.

8  Q.     Said received from Pat Hurley on May 2nd, 2008, at

9  3:10 p.m. --

10  A.     Uh-huh.

11  Q.     -- Blackberry with case, BMW X3 -- that was his

12  company car?

13  A.     Yes.

14  Q.     The key for the BMW, proxy cards, keys to the Naples

15  office, and his laptop computer.  That's your understanding

16  of what happened?  This document reflects that the day after

17  Mr. Hurley had his conversation with Mr. Neuman, he went to

18  the company and turned all this stuff in; correct?

19  A.     As Mr. Neuman requested, yes.

20  Q.     I'm going to continue to use this microphone because

21  it seems like it's broadcasting my voice better and it's

22  making it easier for you to hear.

23  A.     Sure.

24  Q.     You testified about an incident, or more than one

25  incident, in which you found your husband at home in the

S. HURLEY - CROSS

```
 1   bathroom semi naked on the floor in what sounds to be the
 2   fetal position?
 3   A.    Yes.
 4   Q.    Okay.  How often or how many times did that happen?
 5   A.    I -- I really don't know.  I couldn't even begin to
 6   guess a number.
 7   Q.    Was it more than ten?
 8   A.    I don't know.  I really don't know.  I never really
 9   counted or kept track of it.
10   Q.    Was it more than once?
11   A.    Yes.
12   Q.    Was it more than three times?
13   A.    Yes.
14   Q.    And I think you also testified that you found your
15   husband underneath the dining room table in the same
16   position?
17   A.    Yes.
18   Q.    And how often did you find him in that circumstance?
19   A.    One time.
20   Q.    Okay.  So one time under the table and then other
21   times in the bathroom?
22   A.    Yes.
23   Q.    Did you find him that way in any other point in the
24   house?
25   A.    No.
```

S. HURLEY - CROSS

1   Q.      And you said, I think, that he was uncommunicative,

2   that he couldn't communicate with you at those points;

3   right?

4   A.      Yes.

5   Q.      Was there anybody else that was present to witness

6   that besides you and Mr. Hurley?

7   A.      Was there anybody else --

8   Q.      Did anybody else see that happen?

9   A.      No.

10  Q.      Okay.  So the only two people that would know

11  anything about that would be you and Mr. Hurley?

12  A.      That's correct.

13  Q.      You did you consider calling an ambulance when you

14  found your husband naked on the floor in the bathroom?

15  A.      I did ask him if he wanted me to call an ambulance

16  and he didn't say anything.  I didn't -- I didn't think he

17  was -- there was anything that they could do for him.

18  Q.      The second time that it happened, did you reconsider

19  calling an ambulance?

20  A.      I really didn't think there was anything that --

21  there was nothing that they could do for him.  If he was

22  depressed, he needed to do what the doctors told him to do

23  to get better.

24  Q.      Did you -- did you call the police or anything like

25  that?

S. HURLEY - CROSS

1   A.    Did I call who?

2   Q.    The police?

3   A.    No, I didn't.

4   Q.    Other than testifying about that incident at this

5   trial, have you -- have you ever talked to anybody else

6   about it?

7   A.    I probably have talked to my best friend, you know.

8   Q.    Who was that?

9   A.    I was going through a difficult time at that point,

10  you know.  We -- we were having a lot of problems at home.

11  Q.    Okay.

12  A.    I may have said something.  I don't recall, though.

13  Q.    I've reviewed all of Mr. Hurley's doctors' notes and

14  we've had them admitted into evidence and there's no mention

15  of that incident in those doctors' notes.  Do you know

16  whether you husband even told his social worker or his

17  doctors about that incident?

18  A.    I don't know what he told them.  I -- I don't know

19  that he even mentioned it.  But I wouldn't know for sure

20  what he told them and what he didn't.

21  Q.    You testified that you had gone to at least one of

22  Mr. Hurley's doctor visits with him; correct?

23  A.    Yes.

24  Q.    Did you consider telling the doctor at that visit

25  that this had happened?

S. HURLEY - CROSS

```
1    A.     I believe that those curling up on the floor
2    incidents had happened after he saw Dr. Paisan, but I can't
3    say for sure.  But no, the topic never came up.
4    Q.     And I think I heard you testify that Mr. Hurley never
5    told anybody at Kent Security about those incidents; right?
6    A.     As far as I know, he didn't.
7    Q.     And as far as you know, he never told anybody at Kent
8    Security about any event of depression; correct?
9    A.     As far as I know, yes.
10   Q.     And you know, we just looked at these photographs
11   from your vacations that you took between 2005 and 2008.  Do
12   you know whether your husband ever requested any kind of
13   medical certification under the Family Medical Leave Act for
14   any of those vacations?
15   A.     No, he did not.
16   Q.     The only time he did that was after he had been
17   terminated?
18   A.     No.  He requested that before he was terminated.
19   Q.     You're talking about the email that he sent Gil
20   Neuman; correct?
21   A.     Yes.  He asked for time off.
22   Q.     Okay.  And I'm talking about the Family and Medical
23   certification form that the doctor filled out.  Did
24   Mr. Hurley get one of those documents for any of the
25   vacations that you took between 2005 and 2008?
```

S. HURLEY - CROSS

1    A.      Could you repeat that?  I didn't understand that.

2              (Discussion off record between counsel)

3    BY MR. HENRY

4    Q.      This is a medical certification that your husband got

5    from his doctor on May 9th, 2008.  He was terminated from

6    employment, as you know, on May 1st, 2008.

7    A.      Yes.

8    Q.      So he got this certification from his doctor seven

9    days after he was terminated?

10   A.      Yes.

11   Q.      My question to you is, did he ever get one of these

12   certifications for any of the vacations that you took prior

13   to 2008?

14   A.      No.

15   Q.      Do you know why?

16   A.      Well, it -- the type of leave he was requesting in

17   May was different than the vacations.

18   Q.      And how is that?  How is it different?

19   A.      It's the -- it's exactly the type of leave that -- a

20   time off of work that the doctors described.  He needed to

21   completely unplug.  When we were on vacation, he was still

22   working, was still in contact with the office.  What he was

23   requesting was time away from the office, time away from

24   work, completely unplugged.

25   Q.      Do you remember two days in a row when your husband

S. HURLEY - CROSS

1    was not able to go to work because of his depression?

2    A.    I really don't recall.

3    Q.    Do you know of any time that your husband was not

4    able to work because of his depression?

5    A.    Yes.  He wasn't able to get out of bed some days.

6    Q.    Okay.  And do you know of any such time that he ever

7    got in trouble for that at work?

8    A.    In trouble?

9    Q.    Yes, disciplined in any way?

10   A.    With work?

11   Q.    Yes.

12   A.    No, he did not.

13   Q.    So the only thing that we're talking about in this

14   case, the leave that he claims he requested and didn't get

15   was the vacation schedule that you and he put together for

16   2008 and 2007; is that correct?

17   A.    As far as leave goes?

18   Q.    Yes.  This is what we're talking about?

19   A.    Yes, yes.

20   Q.    After May 1st, 2008, when your husband was terminated

21   from employment, was there anything different that he did

22   about managing his depression than when he worked at Kent?

23   A.    Anything different?

24   Q.    Yes.

25   A.    In managing his depression?

S. HURLEY - CROSS

1  Q.     Yes.

2  A.     Well, he wasn't working for Kent anymore, so that was

3  one stress relief, but it was replaced by the stress of now

4  having to find another job.

5  Q.     So in your opinion, it was better for him that he was

6  not working for Kent?

7  A.     Say that again?  I'm sorry.

8  Q.     Yeah, you said that one thing that he did differently

9  was that he didn't work for Kent anymore and that was a

10 stress relief.  My question to you is, in your opinion, he

11 was better off not working for Kent; correct?

12 A.     Now, my opinion is yes.

13 Q.     Do you believe that generally?  Are you glad that

14 your husband no longer works for Kent?

15         MR. CELLAR:  Objection, Your Honor, relevance.

16         THE COURT:  Sustained.

17 BY MR. HENRY

18 Q.     Have you spoken to your husband about the fact that

19 he no longer works for Kent?

20 A.     Probably in a general way.  I'm sure the subject has

21 come up.

22 Q.     Have you ever -- have you ever told him that you're

23 glad that he doesn't work there anymore?

24         MR. CELLAR:  Objection, Your Honor, relevance.

25         THE COURT:  Sustained.

S. HURLEY - CROSS

1   BY MR. HENRY

2   Q.      In June of 2008, after your husband was terminated,

3   did you visit the Sunshine Key RV resort in the Florida Keys

4   for five days?

5   A.      Yes, we did.

6                MR. CELLAR:  Objection Your Honor, relevance.

7                THE COURT:  Sustained.  The answer's stricken.

8                MR. HENRY:  Judge, could I be heard at sidebar?

9                THE COURT:  No, ask the next question.

10               MR. HENRY:  Okay.

11  BY MR. HENRY

12  Q.      You said on direct examination that you were having

13  financial problems in 2008.  Do you recall that testimony?

14  A.      Yes.

15  Q.      Describe those financial problems for the jury.

16  A.      Our credit cards were maxed out and we were having a

17  hard time paying our bills.

18  Q.      And as -- did you testify on direct examination that

19  in 2008 that you had your house up for sale?

20  A.      I don't believe I -- I said a particular date.  We

21  did put it on the market after he left Kent.

22  Q.      After he left Kent?

23  A.      Well, we had it on the market prior as well.

24  Q.      When did you have it on the market?

25  A.      You know, I don't know the exact dates.  I don't

S. HURLEY - CROSS

1    really remember.

2    Q.    At some point during the last two years that your

3    husband worked for Kent Security, did you have your house

4    for sale?

5    A.    That would have been around 2006?

6    Q.    2006 to 2008?

7    A.    I think so.

8         (Discussion off record between counsel)

9    BY MR. HENRY

10   Q.    Did you ask your husband shortly before he was

11   terminated to stop contributing to his 401(k) account at

12   Kent?

13   A.    Yes, I did.

14   Q.    Why did you that?

15   A.    Because he had money taken out of his check

16   automatically and contributed and because we were having

17   problems paying our bills, I asked him to have that added

18   back in instead of contributing it to the 401(k) so we'd

19   have a little extra money.

20   Q.    Okay.  So the reason that you needed that money was

21   because you were having difficulty paying your bills?

22   A.    Yes.

23   Q.    I'm showing you what's marked as Defendant's

24   Exhibit U-1 for identification.  What is that document?

25   A.    It's an email from my husband to me on -- dated

```
 1    February 12th, and the subject is 401(k).
 2               MR. HENRY:  Offer the exhibit into evidence, Your
 3    Honor.
 4               MR. CELLAR:  No objection, Your Honor.
 5               THE COURT:  Excuse me, the number was U-1?
 6               MR. HENRY:  U, as in U-boat, 1.
 7               THE COURT:  U-1 is received.
 8               (Defense Exhibit U-1 admitted)
 9    BY MR. HENRY
10    Q.    So this was February 12st, 2008, at 9:39 a.m. that
11    you wrote to your husband:  Hi, Sweetie, I'm wondering if
12    you would be able to ask Rose to not take out your 401(k)
13    contributions for a while.
14               Who is Rose?
15    A.    Yes.
16    Q.    Who is Rose?
17    A.    Rose was the lady in Miami office who was -- I think
18    she was in charge of bookkeeping.
19    Q.    And you said I think we need the extra cushion with
20    all the travel coming up and the credit card bills.  What
21    travel were you anticipating?
22    A.    We were going to be traveling to Las Vegas with
23    clients.
24    Q.    And your husband responds:  That's troubling, Sugar.
25    We've got to lower our overhead.  Need your help on selling
```

S. HURLEY - CROSS

1    the Lexus to make some progress in that direction.
2              Do you recall that?
3    A.    Yes.
4    Q.    Did you sell the Lexus?
5    A.    Yes, we did.
6    Q.    Did you sell anything else?
7    A.    I'm sorry?
8    Q.    Did you sell anything else, ATVs, anything like that?
9    A.    We sold those after he was terminated.
10   Q.    Okay.
11   A.    But that was the plan.
12   Q.    You had intended, as of this point, to start selling
13   those; right?
14   A.    Yes.
15   Q.    This is T-1.  I'm showing you what's marked as
16   Defendant's Exhibit T-1 for identification, have you ever
17   seen this before?
18             MR. CELLAR:  Your Honor, objection, foundation.
19             MR. HENRY:  I just asked her if she'd seen it.
20             THE COURT:  He's trying to establish it.  We'll
21   see if he does.  Overruled.
22   BY MR. HENRY
23   Q.    Have you ever seen the document before?
24   A.    Yes.
25   Q.    And what is it?

S. HURLEY - CROSS

1  A.      It's an email from Pat to Rose dated February 12th,

2  regarding the 401(k).

3  Q.      And the email was copied to you; correct?

4  A.      Yes, it was.

5  Q.      And you received it on 4:15 p.m; right?

6  A.      Sorry?

7  Q.      You received it on 4:15 p.m.?

8  A.      That's what it says.

9          MR. HENRY:  I offer Exhibit T-1 into evidence,

10  Your Honor.

11          MR. CELLAR:  No objection.

12          THE COURT:  T-1 is received.

13          (Defense Exhibit T-1 admitted)

14  BY MR. HENRY

15  Q.      Would you read the email, please, for the jury,

16  Mrs. Hurley, that your husband wrote at 3:39 p.m, five

17  minutes after you had written him asking him to cancel his

18  401(k) account?

19  A.      Hi, Rose.  I've decided to invest some money in gold

20  because of where the market is and where I think it will be

21  in the next 18 months.  So I want to take the money I'm

22  setting aside for my 401(k) and use that to buy gold.  It's

23  a great hedge against the dollar falling like it has been,

24  but I can't buy it through or with a 401(k).  Therefore, can

25  you suspend my 401(k) contributions until further notice?

S. HURLEY - CROSS

1    Thanks, Pat.

2    Q.    Is this email inconsistent with your prior email to

3    your husband asking him to cancel his 401(k) account?

4    A.    Yes.

5    Q.    And how so?

6    A.    He did what I -- I asked him to do and that was to

7    ask Rose to stop the contributions to the 401(k).

8    Q.    Uh-huh.  And the reason you did that is because you

9    needed the money for -- to pay your credit card bills;

10   right?

11   A.    Yes, to pay our bills.

12   Q.    And this document appears to say that Mr. Hurley's

13   intending to invest in gold --

14   A.    Uh-huh.

15   Q.    -- with that money?

16   A.    Yes.

17   Q.    Do you know the reason for that inconsistency?

18   A.    I believe he would have been embarrassed to tell her

19   the real reason, so he -- and he had talked about buying

20   gold.  So, I think he was just trying to cover his

21   embarrassment.

22   Q.    So it's your impression that your husband was

23   embarrassed about it so he didn't tell the truth about it?

24   A.    Sure.

25   Q.    How often did that happen in your experience with

S. HURLEY - CROSS

1   your husband?

2   A.      That was not something that he did often.

3   Q.      How many times, do you think, that you can remember?

4          MR. CELLAR:   Objection, Your Honor, relevance.

5          THE COURT:   Sustained.

6   BY MR. HENRY

7   Q.      Mrs. Hurley, are you -- do you know whether you're

8   going to be asking the jury for the value of your husband's

9   401(k) account as part of his damages?

10  A.      I really don't know.

11  Q.      Okay.

12  A.      I'm not involved in that part of the case.

13  Q.      You don't know, you don't have any idea what money

14  you're going to be asking the jury for?

15  A.      No.

16  Q.      You would agree with me that Mr. Hurley canceled his

17  401(k) account before he ended his employment and therefore,

18  he didn't have a 401(k) account; right?

19  A.      No, he did have a 401(k).  He stopped -- he canceled

20  the contributions.

21  Q.      He stopped participating in it?

22  A.      He stopped contributing in February.

23  Q.      Okay.  Did you ever tell your husband that Gil Neuman

24  was borrowing your money?

25  A.      Yes, I did.

S. HURLEY - CROSS

1   Q.      Can I have Exhibit X 1, please?  What did you mean by

2   that, if you can remember?

3   A.      Mr. Neuman required his executives to take clients

4   out, fronting their -- with their own money, so in the

5   instance of taking clients to Las Vegas, there were times

6   when we had to pay for the expenses up front and then be

7   reimbursed.  He didn't have a -- a company card, in other

8   words, to charge company expenses.

9   Q.      I'm showing you what's been marked for identification

10  as Defendant's Exhibit X-1.  Is that an email that you wrote

11  to your husband?

12  A.      Yes.

13  Q.      What's the date on it?

14  A.      February 26th, 2008.

15  Q.      And that's approximately a month, a little over a

16  month before his termination from employment; correct?

17  A.      Yes.

18          MR. HENRY:  I'd offer Exhibit X-1 into evidence,

19  Your Honor.

20          MR. CELLAR:  No objection, Your Honor.

21          THE COURT:  Exhibit X-1 is received.

22          (Defense Exhibit X-1 admitted)

23  BY MR. HENRY

24  Q.      In the second paragraph of this email that you wrote

25  to your husband, you said:  I would like to suggest that you

S. HURLEY - CROSS

1    ask Gil for a business credit card.  Why did you say that?

2    A.    Then we wouldn't be fronting the money to entertain

3    clients and it would be something that Mr. Neuman could just

4    take care of rather than us having to file for

5    reimbursement.

6    Q.    And you also said that he's borrowing our money and I

7    don't like it, I never have.

8    A.    Right.  I don't believe it's right for a company to

9    expect their executives to front out quite a large financial

10   sum and then -- with their own money, and then get it paid

11   back.

12   Q.    Did you ever spend any money on behalf of Kent

13   Security that Kent did not reimburse?

14   A.    I really don't know.  I don't know the answer to -- I

15   wasn't involved in that.

16   Q.    So whatever information that you would have would

17   have come from your husband; right?

18   A.    Yes.

19   Q.    So is this something that he had complained to you

20   about, that the company was borrowing money from you?

21   A.    No, that was something that I complained about.

22   Q.    But you're not aware of any time that you spent money

23   on behalf of the company in which you were not reimbursed

24   for it; right?

25   A.    I'm not aware, no.  I wasn't involved in that.

S. HURLEY - CROSS

1    Q.     Okay.  And in the last paragraph of this document,

2    you're talking about your financial problems.  It speaks in

3    terms of selling the ATVs and other things that you have,

4    transferring balances on your credit card.  That was at a

5    time when Mr. Neuman -- your husband was getting his full

6    pay at Kent Security; right?

7    A.     His salary, yes, he was being paid.

8    Q.     Was this causing -- his financial problems at home,

9    was this causing him any stress?

10   A.     Sure, absolutely.

11   Q.     And were you at any visit with the doctor when he

12   complained to the doctor that these financial issues were

13   partially the cause of his stress or his depression?

14   A.     You know, I don't recall.  I really don't recall.

15          MR. HENRY:  Okay.  Give me Z-1, please.

16   BY MR. HENRY

17   Q.     I'm showing you Exhibit Z-1 for identification.  Have

18   you ever seen it before?  Have you seen this document

19   before?

20   A.     I might have.  I don't recall.

21   Q.     This is an email that you wrote to your husband on

22   March 19th, 2008; correct?

23   A.     Yes.

24   Q.     And --

25   A.     Well, I didn't write it -- wait, let me look here.

S. HURLEY - CROSS

 1    There's a whole progression.  Okay, this was March 19th?

 2    Q.      Yes.

 3    A.      Yes.

 4              MR. HENRY:  Offer Exhibit Z-1 into evidence.

 5              MR. CELLAR:  No objection, Your Honor.

 6              THE COURT:  Exhibit Z-1 is received.

 7              (Defense Exhibit Z-1 admitted)

 8    BY MR. HENRY

 9    Q.      On March 19th, you wrote your husband an email saying

10    I would suggest you call Gil directly and get a firm

11    commitment from him when he will start paying your second

12    half bonus; do you see that?

13    A.      Yes.

14    Q.      What did you know about any bonus compensation that

15    your husband had gotten from Kent?  Everything that you know

16    about his bonus you would have heard from your husband;

17    correct?

18    A.      Yes.

19    Q.      You never had a conversation directly with Gil Neuman

20    about your husband's bonus; right?

21    A.      No, I have not.

22    Q.      Would you read for the jury the second part of that

23    paragraph?

24    A.      That way you'll know for sure if he's screwing with

25    you.  It's almost the second quarter of 2008.

S. HURLEY - CROSS

1    Q.    Did you have some reason to believe that -- that Gil

2    Neuman was screwing with your husband in 2008?

3    A.    Yes, yes.  He -- he wasn't paying the bonuses that my

4    husband had earned and he was delaying them significantly.

5    Q.    Do you know --

6    A.    He did -- he did say, I, you know, I owe it to you, I

7    just haven't gotten around to it.

8    Q.    Do you know whether bonuses for other employees were

9    canceled?

10            MR. CELLAR:  Objection, Your Honor, relevance.

11            THE COURT:  Just a moment.

12            (Pause in place)

13            THE COURT:  Sustained.

14            MR. CELLAR:  Actually, Your Honor, I'm sorry, I'll

15    withdraw my objection.  I apologize.  Counsel just made me

16    aware --

17            THE COURT:  I already sustained it.  Go ahead.

18    BY MR. HENRY

19    Q.    Are you telling the jury that your financial problems

20    that you were experiencing in March of 2008 were a result of

21    the fact that Kent was not paying your husband a bonus for

22    2007?

23    A.    I would tell the jury that it was a contributing

24    factor that we were relying on -- on those bonuses to help

25    with our finances and they weren't being paid.

S. HURLEY - CROSS

1   Q.     At the time your husband left Kent, were you sick of
2   Kent as a whole?
3              MR. CELLAR:  Objection, Your Honor, relevance.
4              THE COURT:  Sustained.
5   BY MR. HENRY
6   Q.     Did you ever tell your husband that you were sick of
7   Kent?
8              MR. CELLAR:  Same objection, Your Honor.
9              THE COURT:  Sustained.
10  BY MR. HENRY
11  Q.     You had conversations with your husband about his job
12  at Kent many times; correct?
13  A.     What do you mean?
14  Q.     You talked about his work?  He might have said
15  something to you about what happened at work and you
16  responded to him about the conversation?
17  A.     Yes.
18  Q.     And during those conversations, did your husband
19  often times complain to you about things that -- that had
20  happened to him at work?
21  A.     Did he complain about -- I'm sorry, I didn't hear the
22  last part of that.
23  Q.     Did he ever complain about something that happened at
24  work?
25  A.     Sure.

S. HURLEY - CROSS

1   Q.      Okay.   And did you ever talk to him where you -- you

2   discussed the other employees and how your husband was being

3   treated?

4   A.      Yes.

5   Q.      And you've -- ever discuss with your husband about

6   the idea that his job was unfulfilling to him?

7   A.      That his job was --

8   Q.      Did he ever tell you that his job was unfulfilling?

9   A.      That his job was -- I didn't hear you.

10  Q.      Unfulfilling?

11  A.      Unfulfilling, no.   I think it was probably just the

12  opposite.

13  Q.      Did he ever tell you that he didn't like his job at

14  all?

15  A.      He loved his job.

16  Q.      So as far as you knew, your husband loved his job

17  during the entire time that he worked at Kent?

18  A.      Yes.

19  Q.      Did you ever have a chance to meet -- I'm sorry, did

20  you ever encourage your husband to quit his job?

21  A.      You know, I think probably in anger or frustration, I

22  probably mentioned it.   But it was not something that he was

23  open to.   I mean, if he was -- wouldn't even take the time

24  off he needed to get well, he definitely wasn't going to

25  listen to me about him finding another job.

S. HURLEY - CROSS

1          MR. HENRY:  Could I have Exhibit C-1, please?

2          MR. CELLAR:  Frank, C-1?  I'm sorry.

3          MR. HENRY:  C-1.

4          MR. CELLAR:  Thank you.

5    BY MR. HENRY

6    Q.     Showing you Exhibit C-1 for identification --

7          MR. CELLAR:  Your Honor, I object to the document

8    in its entirety and even questions regarding the document.

9    Can we sidebar?

10         THE COURT:  One moment.

11         (Pause in place)

12         THE COURT:  Counsel, approach the bench.

13         (At sidebar, Court and counsel present)

14         THE COURT:  Okay, what?

15         MR. CELLAR:  Your Honor, the purpose of the email

16   is clear what he's going to try to do because he mentioned

17   it in opening because he's going to try to use the word

18   white trash to be inflammatory the way Ms. Hurley referred

19   to another employee.  It has nothing to do with the FMLA

20   claim at all.

21         MR. HENRY:  Another president of the company she

22   referred to as white trash.

23         MR. CELLAR:  Mr. Neuman was never aware of this

24   email and he'll testify to that.

25         THE COURT:  Let's move on.  I mean, we are -- I

S. HURLEY - CROSS

1    mean, the point's been made with regard to 2007, 2008.  This

2    is back in 2006, and you know, we're going to be here for

3    three weeks at the rate we're going and this is too far

4    afield.

5              MR. HENRY:  I'm going to finish with her right

6    now.

7              THE COURT:  I beg your pardon?

8              MR. HENRY:  I'm going to finish with her right

9    now.

10             THE COURT:  All right.

11             (Sidebar concluded)

12             MR. HENRY:  I-3?

13             MR. CELLAR:  I-3, Frank?

14             MR. HENRY:  I-3, yes.  Thank you.

15   BY MR. HENRY

16   Q.    Mrs. Hurley, you testified that after your husband

17   left Kent that he's been looking for employment; correct?

18   A.    After he left Kent, I didn't --

19   Q.    He's been looking for employment?

20   A.    Yes.

21   Q.    Okay.  Are you familiar with a web site called

22   workcamper.com?

23   A.    Yes.

24   Q.    What is that?

25   A.    It is a web site where people can volunteer to work

S. HURLEY - REDIRECT

1    at various jobs when -- like in an RV park.

2    Q.    I'm showing you what's been marked for identification

3    as Defendant's Exhibit I-3.  Is this a -- what is the

4    document?  Have you seen it before?

5    A.    Could you repeat the question?

6    Q.    Yeah, what is the document that I just showed you?

7    Is that your husband's resume?

8    A.    It looks like a -- some type of biography.

9    Q.    You've never seen it before?

10   A.    Honestly, no.

11          MR. HENRY:  Okay.  I have nothing further, Your

12   Honor.

13          MR. CELLAR:  I have five questions, Your Honor.

14          THE COURT:  We'll see.

15          MR. CELLAR:  I estimate five questions, Your

16   Honor.

17          THE COURT:  That's more like it.  You're not so

18   limited.  When you set a number for yourself, watch out; the

19   jury starts counting.

20          MR. CELLAR:  Fair enough.

21                    REDIRECT EXAMINATION

22   BY MR. CELLAR

23   Q.    Question one, you were asked whether Pat ever

24   disclosed his medical illness, the details of it to Kent

25   Security before; do you remember that?

S. HURLEY - REDIRECT

1   A.      Yes.

2   Q.      What happened to Pat within 24 hours of disclosing

3   his illness for the first time?

4   A.      He was terminated.

5   Q.      Did Kent Security ever ask Pat, to your knowledge,

6   for a certification justifying his leave request?

7   A.      No, they did not.

8   Q.      That was two.  Are you aware of any work obligation

9   that your husband had to discuss with Rose Cucurillo what

10  your personal financial circumstances were?

11  A.      No, there was no work obligation.

12  Q.      Now, Mr. Henry showed you what he marked as Exhibit

13  Number X-1, and what we didn't look at was the bottom of the

14  email where Pat's explaining to you what's going to happen

15  as a result of the financial circumstances that are going

16  on.  You see that?

17  A.      Yes, I do.

18  Q.      In response to your email, what did Pat say he was

19  going to need to do?

20  A.      He says he's going to double up on his Effexor and

21  it's going to cause panic attacks and it looks like he's

22  going to stop doing karate.

23  Q.      I want to focus on the first sentence.  What's the

24  date of this email?

25  A.      February 26th, 2008.

S. HURLEY - REDIRECT

```
 1   Q.      Had Pat been fired at that point?
 2   A.      No.
 3   Q.      Did Pat have any reason at that point to make up an
 4   email to you that he was having panic attacks?
 5   A.      No.
 6   Q.      Would there have been any reason at this point to lie
 7   about his illness?
 8   A.      No.
 9           MR. CELLAR:  I've got nothing further.
10           MR. HENRY:  Nothing further, Your Honor.
11           THE COURT:  Thank you.  You may step down, ma'am.
12           (Witness excused)
13           THE COURT:  Call your next witness.
14           MR. CELLAR:  Your Honor, we're going to call Adoni
15   Kokkinos from the defendants.  For purposes of planning,
16   Your Honor, is there a break time we'll be taking to see if
17   I can figure out where to go with this exam?
18           THE COURT:  Well, it's ten minutes to 12.  We
19   might as well have our recess now.  So we'll be in recess
20   from now until 1:00.
21           I'm going to tell you what I told you before but
22   I'll shorten it up.  But don't do any research, don't do any
23   looking in dictionaries.  Don't do any Blackberry.  We found
24   out a peculiar thing that sometimes people think when
25   they're looking at a Blackberry or now an i-Pad or i-Phone
```

```
 1    and looking around for information on that, some people
 2    don't consider that research.  They think only when you look
 3    in a book is research.  Well that's not true, of course,
 4    because information that you get on an i-Pad or whatever,
 5    your electronic thing you're looking at is also research.
 6    Some of it is dubious in value but still research.  So don't
 7    do that.  Don't talk to each other about the case.  Keep an
 8    open mind until you've heard all of the evidence, until
 9    you've heard my detailed instructions at the end and until
10    you've also heard the arguments of counsel at the end.
11    Those arguments aren't evidence, of course, but it might
12    help you in how you look at the evidence and how you analyze
13    the evidence and how you apply the evidence as you find it
14    to the law as I give it to you.  So don't talk to each
15    other, don't let anybody else talk to you about the case.
16    Of course, obviously, you can talk to each other about other
17    things.  In the meantime time, just go out and have a
18    pleasant lunch.  We'll see you at 1:00.  Please stand for
19    the jury.
20              (Recess from 11:52 a.m. to 1:00 p.m.)
21              (Jury in)
22              THE COURT:  Please be seated.  Call your next
23    witness.
24              MR. CELLAR:  The plaintiff calls Mr. Kokkinos,
25    Antonios Kokkinos.
```

KOKKINOS - DIRECT

```
 1              DEPUTY CLERK:  If I could have you to raise your
 2   right hand, please?
 3              (The Witness is Sworn)
 4              DEPUTY CLERK:  Thank you.  Please be seated,
 5   please state your name for the record.
 6              THE WITNESS:  Antonios Kokkinos.
 7                    ANTONIOS KOKKINOS,
 8       a witness herein, after having been duly sworn,
 9       was examined and testified under oath as follows:
10                    DIRECT EXAMINATION
11   BY MR. CELLAR
12   Q.    Good afternoon, Mr. Kokkinos.  You are the current
13   Vice-president of Sales for Kent Security of Naples;
14   correct?
15   A.    I believe my title is just Vice-president.  I don't
16   think "sales" is in it, sir.
17   Q.    Okay.  Are you currently the Vice-president of Kent
18   Security of Naples?
19   A.    Yes, sir.
20   Q.    Fair enough.  And as vice-president, you report to a
21   gentleman by the name of Shelton Blackwell?
22   A.    No, sir.  The way we are currently structured, I now
23   report directly to Mr. Neuman.
24   Q.    Okay.  Was there a time in the recent past where you
25   were reporting directly to Mr. Blackwell?
```

KOKKINOS - DIRECT

1    A.    Yes, sir.

2    Q.    When was that?

3    A.    Till about probably two or three months ago, sir.

4    Q.    So when I took your deposition previously in the

5    case, at that time, you were reporting to Mr. Blackwell

6    directly?

7    A.    Yes, sir.

8    Q.    Okay.  Is Mr. Blackwell still in the title of

9    President of Kent?

10   A.    I don't believe so, sir.  They restructured on that

11   side.

12   Q.    What's his title now?

13   A.    I'm not sure, sir.

14   Q.    Fair enough.  You don't have to call me sir if you

15   don't want to.  You have never held the position of

16   President of Kent Security Naples; correct?

17   A.    No, I've not.

18   Q.    And at the time or after Pat was fired, nobody else

19   ever took that title on; correct?

20   A.    Correct.

21   Q.    Okay.  You were never aware of what Pat's specific

22   duties were as president of Naples; correct?

23   A.    Correct.

24   Q.    Now, you were hired by Pat in 2007; right?

25   A.    Yes, sir.

KOKKINOS - DIRECT

1    Q.    And Pat hired you in what essentially was a sales
2    position; is that right?
3    A.    Yes, sir.
4    Q.    But he gave you a much better title called Business
5    Development Manager; is that right?
6    A.    Yes, sir.
7    Q.    We can agree it was a sales position, though?
8    A.    Yes, sir.
9    Q.    Now, the purpose of your job in 2007 was to go out
10   and generate new business for Kent Security?
11   A.    Yes, sir.
12   Q.    Okay.  And you admit that you struggled with that?
13   A.    Yes, sir.
14   Q.    To use your own words, you were, quote, failing
15   miserably?
16   A.    Yes, sir.
17   Q.    Now, Pat's job at the time, in addition to being
18   president, was to try and mentor you in that position;
19   right?
20   A.    Yes, sir.
21   Q.    And would you agree that as a salesperson, you worked
22   primarily out of the Kent Security of Naples offices,
23   meaning outside of the office?
24   A.    Yes, sir.
25   Q.    Okay.  And you would have no idea of how many hours

KOKKINOS - DIRECT

1    per day Pat was working?

2    A.    I could not give you an exact number, sir, no.

3    Q.    You would not know when Pat was working?

4    A.    Unless I happened to be at the office at the same

5    time.  Obviously the command structure, Mr. Hurley was above

6    me and therefore did not report to me with his hours, sir.

7    Q.    Okay.  And I believe you testified previously that

8    you would see Pat, at most, somewhere between five to seven

9    hours in total per week?

10   A.    Yes, sir.

11   Q.    Okay.  Now during your employment with Pat, you

12   always found him to be professional; isn't that right?

13   A.    Yes, sir.

14   Q.    And you always found him to be professional not only

15   with you, but with clients; right?

16   A.    Yes, sir.

17   Q.    And with his staff; correct?

18   A.    Yes, sir.

19   Q.    You felt that Pat was a good boss?

20   A.    Yes, sir.

21   Q.    You felt that Pat was an incredibly personable

22   person; isn't that true?

23   A.    Yes, sir.

24   Q.    You never saw Pat be condescending to anybody; did

25   you?

KOKKINOS - DIRECT

```
 1   A.     Certainly not intentionally, sir.  I'm sure there --
 2   I can't say that I never did.  I'm certain that we had a
 3   vendor or something that would mess up and he might be
 4   demeaning, but I can't recall any individual instance.
 5   Q.     Okay.  And with regard to Pat, you never reported to
 6   Mr. Neuman that you felt Pat was acting in any
 7   unprofessional way ever; did you?
 8   A.     No, sir.
 9   Q.     Okay.  Pat was somebody, in your words, that you
10   wanted to emulate; isn't that true?
11   A.     In his ability to empathize with individuals, his
12   ability to be just incredibly charismatic, yes, sir.
13   Q.     Pat was something you respected, not only as a boss
14   but as a business leader?
15   A.     Yes, sir.
16   Q.     Now, you heard that Pat had been fired, I'm going to
17   use the expression, after the fact; is that right?
18   A.     Yes, sir.
19   Q.     You didn't know at the time Pat was being fired that
20   he was going to be fired; right?
21   A.     Correct, sir.
22   Q.     You didn't know before Pat was going to be fired that
23   he was going to be fired?
24   A.     Yes, sir.
25   Q.     Does that make sense?
```

KOKKINOS - DIRECT

1   A.      Yes, sir.

2   Q.      It's kind of a terrible question, to be honest with

3   you.  Let me pull that one back.

4           Prior to the time you learned Pat had been fired,

5   you had no idea that was going to happen?

6   A.      Correct, sir.

7   Q.      Okay, fair enough.  Now, you learned that Pat had

8   been fired directly from Pat; isn't that true?

9   A.      Yes, sir.

10  Q.      Now, Pat called you after he had been verbally

11  terminated and told you that he was still headed to a client

12  meeting; is that right?

13  A.      I don't recall that, sir.

14  Q.      Do you recall whether after Pat told you that he had

15  been verbally terminated he continued to perform work for

16  Kent Security that day?

17  A.      I was aware that the day of Mr. Hurley's termination,

18  as I recall, Mr. Hurley and I believe it was Ms. Callahan

19  went to give a presentation on Marco Island.  I happened to

20  be in the office when Mr. Hurley returned and Mr. Hurley

21  informed us that he'd been terminated.  This was after the

22  presentation had been given.  I hadn't been given a lot of

23  reasons so I asked Brandy, Brandy Callahan, Ms. Callahan

24  about what had happened.  She said that prior to giving the

25  presentation that he had been informed that he was no longer

KOKKINOS - DIRECT

1   an employee of Kent Security.

2   Q.    Okay.  Now, because of the way you were struggling

3   with sales, would you agree that you were looking for an

4   angle to try to boost your performance with the company?

5   A.    Yes, sir.

6   Q.    Okay.  And one of the angles that you looked at was

7   creating a venture to secure contract work as a disabled

8   Veteran; is that right?

9   A.    In security, yes, sir.

10  Q.    Okay.  And your hope was that by creating this sales

11  opportunity, you would be able to create a niche for

12  yourself in Kent to refer the business to Kent; wasn't that

13  true?

14  A.    Yes, sir.  I thought it could be another tool in our

15  tool box, another asset that we could use when trying to get

16  points on bids.  Many times government bids are set aside

17  and a company that's not Service Disabled Veteran owned

18  cannot bid on it.  So what had happened in the past was we

19  were -- we had looked at partnering with another company.

20  Q.    When you say "we" were looking at partnering with

21  another company, who's "we"?

22  A.    There was a meeting at corporate with Mr. Neuman,

23  Mr. Hurley and myself, and two members -- I can't recall

24  their names -- from a Service Disabled Veteran owned small

25  business that we were looking at partnering with to bid on a

KOKKINOS - DIRECT

1  very specific opportunity, and that was kind of the genesis

2  of the idea forming.

3  Q.    So you were aware, prior to Mr. Hurley's termination,

4  that Mr. Neuman knew this was an operation you guys were

5  going to try to expand into; right?

6  A.    I never had any conversations with Mr. Neuman about

7  it, specifically.

8  Q.    But you were aware that Mr. Neuman had attended this

9  meeting to discuss expanding into this disabled veterans

10  arena?

11  A.    Yes, sir.  Not through means of Best Value Partners.

12  It was through The Ale Group was the name of the company.  I

13  believe his name was John Ale.  Might have been a different

14  first name, and he was aware we were trying to bid on it

15  through that.

16  Q.    And Pat, that was before Pat was fired?

17  A.    Yes, sir.

18  Q.    Now in your mind, there was nothing wrong with

19  attempting to create a venture that would pump business into

20  Kent; right?

21  A.    Correct, sir.

22  Q.    And that was the whole point of this entity that you

23  and Mr. Hurley created while he was still working for Kent?

24  A.    Yes, sir.

25  Q.    Okay.  Was there anything wrong with doing that?

KOKKINOS - DIRECT

1    A.      Not in my mind, no, sir.

2    Q.      Now, you and Pat ultimately created this venture

3    during his employment called Best Value Partners; right?

4    A.      Yes, sir.

5    Q.      Now, the Best Value Partners, as we discussed, was

6    not a -- a separate business that you were intending to use

7    for personal gain; right?

8    A.      Well, it would have been personal gain, as I would

9    get commissions from Kent for selling security and I would

10   be able to bid on things that otherwise we wouldn't have

11   been able to bid on.

12   Q.      You weren't intending to hide this business from

13   Mr. Neuman?

14   A.      Correct.

15   Q.      Now as you said before, you never spoke to Mr. Neuman

16   during Pat's employment regarding your involvement in this

17   business; is that right?  But you were aware that Pat had

18   discussed with you that he had disclosed that to Mr. Neuman;

19   right?

20   A.      Yes, sir.

21   Q.      Now at no time did you ever go to Mr. Neuman and say

22   to him, I need you to get me out of this venture with Pat;

23   right?

24   A.      Correct, sir.

25   Q.      Have you ever referred to Mr. Neuman as Gilly?

KOKKINOS - DIRECT

```
1   A.      Not to my knowledge, sir.

2   Q.      Is that a term you would ever use to describe

3   Mr. Neuman?

4   A.      Personally, I have not, no, sir.

5   Q.      Who incorporated Best Value Partners, if you know?

6   A.      Could you define what you mean by incorporating Best

7   Value Partners?  Like, who filed the documents or who signed

8   or who paid?

9   Q.      Let's do it a little bit differently.  If you can,

10  there's a stack of documents in front of you.  Counsel, 49.

11  What I'd like you to do first is take a look at what's been

12  marked as Plaintiff's Exhibit Number 49 and ask you to -- if

13  you can recognize and acknowledge that document for the

14  jury.

15  A.      49?

16  Q.      Yes, sir.  It should be the second exhibit.

17  A.      I believe that's 153 -- oh, here it is.

18  Q.      Yes, you're right, okay.  Showing you what's been

19  marked as Plaintiff's Exhibit Number 49, do you recognize

20  that document?

21  A.      If I've seen it, I don't remember seeing it, but

22  I'm --

23  Q.      Do you have any reason to deny that this letter was

24  sent to you?

25  A.      No, sir.
```

1          MR. CELLAR:  Okay.  Your Honor, at this time, I'd

2    like to introduce into evidence what's been marked as

3    Plaintiff's Exhibit Number 49.

4          THE COURT:  Exhibit 49 is received.

5          (Plaintiff Exhibit 49 admitted)

6    BY MR. CELLAR

7    Q.    Showing you what's been marked as Plaintiff's Exhibit

8    Number 49, who is this document addressed to?

9    A.    To myself and Mr. Hurley.

10   Q.    And where was the document sent?

11   A.    To a P.O. Box.

12   Q.    And was that a P.O. Box that you had created for the

13   company?

14   A.    Correct.

15   Q.    And that was a P.O. Box that you had paid for out of

16   your own pocket; right?

17   A.    Yes, sir.

18   Q.    Now, taking a look at this, this appears to be what's

19   referred to as a final statement from somebody named Barry

20   Diamond?

21   A.    Yes, sir.

22   Q.    Who is Barry Diamond?

23   A.    If I remember correctly, Mr. Diamond was an attorney

24   that Mr. Hurley was -- knew and was utilizing for the

25   creation of the documents that would be necessary for Best

KOKKINOS - DIRECT

1   Value Partners.

2   Q.    Okay.  And what this document appears to be, correct

3   me if I'm wrong, is essentially an invoice for the work he

4   had performed on your behalf and Pat's behalf to incorporate

5   Best Value Partners; is that true?

6   A.    Yes, sir.  It's what it appears to be.

7   Q.    Okay.  Let me go ahead and ask you to now take a look

8   at Exhibit 52 and ask if you can identify that document,

9   please.

10  A.    That's not a document that I have seen.  Mr. Hurley

11  had the key to the P.O. Box shortly after, so most of the

12  stuff that went there, I wouldn't have seen.

13  Q.    Do you have any reason to deny, as you sit here

14  today, that this letter was addressed to you?

15  A.    No.  I wouldn't have known that it was or was not.

16  Q.    Okay.  Do you have any reason to believe that this

17  document was not a true and correct copy of the letter that

18  was sent to both you and Mr. Hurley regarding incorporation

19  of Best Value Partners, LLC?

20  A.    No.

21        MR. CELLAR:  Your Honor, at this time, I'd like to

22  move into evidence what's been marked as Plaintiff's

23  Exhibit 52.

24        MR. HENRY:  No objection.

25        THE COURT:  Exhibit 52 is received.

```
 1              (Plaintiff Exhibit 52 admitted)

 2   BY MR. CELLAR

 3   Q.    Just very briefly, Mr. Kokkinos, you would agree this

 4   letter is addressed to you?

 5   A.    Yes, sir.

 6   Q.    And it was sent to the address, the P.O. Box that you

 7   incorporated -- or that you paid for and set up?

 8   A.    Yes, sir.

 9   Q.    Okay.  And it discusses the purpose of it is to

10   enclose documents regarding your incorporation of Best Value

11   Partners with Mr. Hurley; right?

12   A.    Yes, sir.

13   Q.    Now, you were the majority owner of Best Value

14   Partners; right?

15   A.    Yes, sir.

16   Q.    You shared in the expenses of the company with

17   Mr. Hurley?

18   A.    I think I just paid for a P.O. Box.

19   Q.    Okay.

20   A.    And I paid for an E fax for a few months, I think.

21   Q.    You were also actively involved in creating business

22   cards for the company; right?

23   A.    I don't know if we ever actually had business cards

24   printed.  I know we talked about the design of them.  I

25   don't remember if we ever sent them to be created.  I don't
```

KOKKINOS - DIRECT

1    know if it got that far.

2    Q.    Okay.  Let me show you what's been marked as 50,

3    which should be in the stack of documents you have in front

4    of you, and ask if you can identify for the jury what's been

5    marked as Plaintiff's Exhibit Number 50?

6    A.    Yes, this is an email apparently that I sent to

7    Mr. Hurley when we were talking about the design of them.

8    I --

9    Q.    Is this -- go ahead.  I didn't mean to interrupt you.

10    A.    No, I just had a friend that worked at a print shop

11    and he said that he could -- it would be a discount if we

12    could set it up ourselves and then pay them to print it

13    instead of paying them to do the design.

14    Q.    Is this a true and correct copy of the email you sent

15    to Pat on April 28th, 2008?

16    A.    Yes, sir.

17           MR. CELLAR:  Your Honor, at this time, we'd like

18    to move into evidence what's been marked as Plaintiff's

19    Exhibit 50.

20           MR. HENRY:  No objection.

21           THE COURT:  Exhibit 50 is received.

22           (Plaintiff Exhibit 50 admitted)

23           MR. CELLAR:  Thank you, Your Honor.

24    BY MR. CELLAR

25    Q.    And there is the email that you sent to Pat; right?

KOKKINOS - DIRECT

1   A.      Yes, sir.

2   Q.      Who initiated this email?

3   A.      By initiated, do you mean who sent it?

4   Q.      Correct.

5   A.      I sent it.

6   Q.      Okay.  And in this email, you're sending Pat what you

7   refer to as a mockup of the business cards for Best Value

8   Partners; right?

9   A.      Yes, sir.

10  Q.      And what you're saying to Pat is take a look at it

11  and if you like it, let me know, we'll send them out for

12  print.  Was that the intent?

13  A.      Yes, sir.

14  Q.      Take a look next at Exhibit 51.  Showing you what's

15  been marked as Exhibit 51, was this the attachment to this

16  email that we're looking at here?

17  A.      I believe so, sir.

18  Q.      You do or you don't?

19  A.      Yes, sir.

20  Q.      Okay.  Sorry about that.  What is Exhibit 51?

21  A.      It appears to be 10 business card templates.

22  Q.      Okay, for which company?

23  A.      Best Value Partners.

24  Q.      And does this appear to be a true and correct copy of

25  the attachment that you sent to Mr. Hurley on April 28th,

1    2008?

2    A.      Yes, sir.

3             MR. CELLAR:  Your Honor, at this time, we'd like

4    to move into evidence what's been marked as Exhibit 51.

5             MR. HENRY:  No objection.

6             THE COURT:  Exhibit 51 is received.

7             (Plaintiff Exhibit 51 admitted)

8    BY MR. CELLAR

9    Q.      These are the business card mockup that you sent to

10   Mr. Hurley; right?  Correct?

11   A.      Yes, sir.

12   Q.      Mr. Hurley did not do the mockup of the cards; it was

13   you that did it?

14   A.      Correct.  Mr. Hurley has a better eye for ideas than

15   I did and he provided a lot of input, like the idea of

16   putting the three stars, the idea of the name coming up for

17   Best Value Partners.  He's far better at marketing than I

18   was so he gave me kind of a sketch of what he would like and

19   I put it together using some Microsoft software, I believe,

20   and sent it back over to him.

21   Q.      Okay.  Now what we've seen in this case is only the

22   card.  This is -- would have been your business card;

23   correct?

24   A.      Yes, sir.

25   Q.      And you would have been considered the CEO of the

KOKKINOS - DIRECT

1    company or president?

2    A.    Yes, sir.

3    Q.    Do you know whether a similar card was ever created

4    for Mr. Hurley?

5    A.    I can't say if it was or was not.

6    Q.    Fair enough.  You don't know one way or the other?

7    A.    Correct.

8    Q.    Now, this all took place before Pat was fired; right?

9    A.    Yes, sir.

10            MR. CELLAR:  Give me one moment, I apologize.

11            (Pause in place)

12   BY MR. CELLAR

13   Q.    You were never disciplined for your involvement in

14   Best Value Partners by Mr. Neuman; were you?

15   A.    No, sir.

16   Q.    Did Mr. Neuman ever tell you at any point that he

17   believed your involvement with Best Value Partners was in

18   any way wrong?

19   A.    No, sir.

20   Q.    Okay.  And you've never requested a Family Medical

21   Leave Act from the defendants; correct?

22   A.    No, sir, I have not.

23   Q.    In fact, after this email, after your involvement

24   with Best Value Partners, you got promoted; right?

25   A.    Correct, sir.

KOKKINOS - DIRECT

1  Q.    You've never been told that your participation in
2  Best Value Partners was something you shouldn't have done by
3  Mr. Neuman; right?
4  A.    No, sir.
5  Q.    Or by Mr. Blackwell?
6  A.    I don't believe so, sir.
7  Q.    Or by anybody else at Kent?
8  A.    Not that I can recall, sir.
9  Q.    Did Mr. Neuman ever tell you that he believed Pat's
10 involvement in Best Value Partners was improper?
11 A.    Not that I can recall, sir.
12 Q.    Now, after Pat's termination, you stopped being
13 involved with Best Value Partners; right?
14 A.    Correct, sir.
15 Q.    And the reason for that was simple.  You didn't know
16 why Mr. Hurley had been terminated; right?
17 A.    I think that there were several things that were
18 going on at the time inside of me.  That would have been one
19 of them.
20 Q.    But nobody had told you why Pat was fired; right?
21 A.    That is correct.
22 Q.    Nobody ever told you during this time period that Pat
23 had been fired for insubordination; right?
24 A.    Correct.
25 Q.    Nobody had ever told you that Pat had been fired for

KOKKINOS - DIRECT

1    poor performance; right?

2    A.      Correct.

3    Q.      Nobody had ever told you that Pat had been fired

4    because he was involved with you in Best Value Partners;

5    right?

6    A.      Sir, no one ever told me why Mr. Hurley was fired.

7    Q.      Fair enough.  And the reason why you stopped being

8    involved was because you assumed that the reason why Pat was

9    fired was for something bad; right?

10   A.      Yes, sir.  Most people aren't fired if they do

11   something good.

12   Q.      Right.  And that was the only reason or the main

13   reason why you no longer wanted to be involved with Best

14   Value Partners was because you simply didn't know why he was

15   fired?

16   A.      That was a primary reason, yes, sir.

17   Q.      Okay.  You were fearful that if you continued in any

18   venture with Pat after he had been fired, that could affect

19   your spot with Kent Security; right?

20   A.      I don't know if it would be that, sir.  But at the

21   time, I -- I obviously have a lot of respect for Mr. Neuman

22   and I figured that he wouldn't be making a decision without

23   having a good reason for it.  I didn't know what had

24   happened.  I was worried there was something that maybe

25   happened with Mr. Hurley that I was not aware of.  I was

KOKKINOS - DIRECT

1    concerned that an association -- I live in Naples.  Naples

2    is a very small town.  I was worried that an association

3    with him if something was to come out would be poor and that

4    was where my fear was.  It wasn't necessarily towards Kent.

5    I just didn't know what was going on and I considered

6    Mr. Hurley a friend and I didn't understand what was

7    happening.

8    Q.    So would it be fair to say that these feelings that

9    you were having of not wanting to be affiliated were

10   essentially based on your own assumptions?

11   A.    Yes, sir.  I had no fact.

12   Q.    Okay.  Now, you also weren't sure whether there would

13   be a conflict of interest, since Pat had now been fired and

14   you didn't know why, if you continue with Best Value

15   Partners; right?

16   A.    There was some concern about that.

17   Q.    Okay, fair enough.  Now, you never took any formal

18   action to disassociate yourself with Best Value Partners;

19   right?

20   A.    Correct.

21   Q.    You never filed anything with the government to have

22   your name removed?

23   A.    That is correct, sir.

24   Q.    And you never contacted your lawyer, Mr. Diamond, to

25   get that removed, to get you removed from the company;

KOKKINOS - DIRECT

1    right?

2    A.    No, sir.  I never thought of Mr. Diamond as my

3    attorney.

4    Q.    Let's say as the company's attorney, Best Value

5    Partners.

6    A.    As I said, I never really thought about it that way.

7    I was just kind of floating.  I didn't know what to do.  As

8    I said, Mr. Hurley has been a friend and a mentor and I

9    wasn't quite sure where to go.

10   Q.    Okay, fair enough.  You never told Mr. Neuman that

11   Pat was not working during the week; did you?

12   A.    No, sir, not that I can recall.

13   Q.    And you're certain of that; right?

14   A.    I wouldn't know if Mr. Hurley was working during the

15   week or not working, so I don't know why I would tell

16   Mr. Neuman.

17   Q.    So is the answer that you never told him that?

18   A.    I don't recall ever telling him that.  I don't recall

19   him ever asking me that or any reason why I would even have

20   that discussion.

21   Q.    Okay.  You also never told Mr. Neuman that Pat wasn't

22   working on Mondays or Fridays; right?

23   A.    No, sir.

24   Q.    Meaning that's correct, you never told him that?

25   A.    I don't ever recall telling Mr. Neuman anything like

KOKKINOS - CROSS

```
 1   that.  As a matter of fact, I vaguely remember there were
 2   meetings on Mondays.
 3   Q.     So if Mr. Neuman testified that you told him that,
 4   that would be incorrect?
 5   A.     If -- I do not recall telling him that.  So --
 6          MR. CELLAR:  I've got nothing further.  Thank you,
 7   Mr. Kokkinos.
 8                        CROSS EXAMINATION
 9   BY MR. HENRY
10   Q.     Good afternoon, Mr. Kokkinos.
11   A.     Good afternoon, sir.
12   Q.     I'm going to be recalling you later, but I wanted to
13   ask you a couple questions about something that you said on
14   Mr. Cellar's direct examination.  He asked you some
15   questions about Mr. Hurley, Mr. Hurley's professionalism,
16   and I think you testified that he was professional, in your
17   opinion; is that right?
18   A.     Yes, sir, generally speaking.  I think everyone, you
19   know, from moment to moment may make an offhand comment that
20   probably shouldn't make.  I'm sure I've done it.  But
21   generally speaking, I would say he's a professional man, or
22   he was in my presence.
23   Q.     Between the time of, say, January of 2008, April of
24   2008, do you recall Mr. Hurley using profanity with you or
25   with other employees in the workplace?
```

KOKKINOS - CROSS

1    A.      I would guess he may have in a joking manner.

2    Q.      Do you recall that, though?

3    A.      Specific instances?

4    Q.      Yes.

5    A.      I can't recall any specific instances, but if you ask

6    me if he did or did not and I had to place a bet, I would

7    say that he did, on that bet.

8    Q.      Did you have any conflicts with him during that

9    period of time that you can recall?

10   A.      No personal conflicts that I can remember, sir.

11   Q.      Okay.  This is N-1.  Mr. Kokkinos, look at Exhibit --

12   Defendant's Exhibit N-1 that I just handed to you.  This is

13   an email that Mr. Hurley wrote to you in January of 2008.

14   Have you ever seen this before?

15   A.      Yes, sir.

16   Q.      Is this a copy of an email that Mr. Hurley wrote to

17   you on that date?

18   A.      Yes, sir.  Well, he carbon copied me.  I don't think

19   that I was necessarily the primary intended recipient.

20          MR. HENRY:  I'd offer Exhibit N-1 into evidence,

21   Your Honor.

22          THE COURT:  Exhibit N-1 is received.

23          (Defense Exhibit N-1 admitted)

24   BY MR. HENRY

25   Q.      Mr. Kokkinos, looking at Exhibit N-1 that's just been

KOKKINOS - CROSS

```
 1    received into evidence, can you tell the jury, what was the
 2    background for this email?
 3    A.    From what I remember, this was a -- it was a hotel
 4    that was being built and we were -- we were the security
 5    company for it.  I don't know exactly which stage it was.  I
 6    just remember that that's what Mr. Carroll was with, Naples
 7    Bay Resort.  We had been experiencing problems over and over
 8    and over again at the same property and I believe Mr. Hurley
 9    was becoming very agitated and he was unsure exactly what to
10    do as regards to how to solve this problem, because he had
11    already -- and I don't remember the specific meeting, but
12    obviously because of this email we had had a meeting prior
13    to this around New Year's and it hadn't had a good effect.
14    Q.    Okay.  I just highlighted a portion of this email and
15    I'm not going to ask you to read it --
16    A.    Thank you, sir.
17    Q.    -- but is this the type of communication that
18    Mr. Hurley typically exhibited with you?
19    A.    No, sir, I would not say that was typical.  I would
20    say that that was Mr. Hurley very frustrated.
21    Q.    Are there other occasions -- you testified on direct
22    examination that he was always professional.  Are there
23    other -- would you consider this to be unprofessional?
24    A.    Can I change always to generally?  Like I said, I'm
25    sure that everyone has a momentary lapse.
```

KOKKINOS - CROSS

1   Q.     Absolutely can.

2   A.     But generally, he was professional.  Generally, he

3   would not be saying something like, "Our follow-through

4   F'ing sucks," or that --

5   Q.     I'm not going to ask you to read that portion either,

6   but are these words that you'd ever, before this email,

7   heard Mr. Hurley say or seen him use in an email?

8   A.     I certainly had not seen them used in an email.  He

9   may have used them verbally when he was extremely frustrated

10  or in a joke or something like that.  But generally, no.

11  Q.     Would you say, did you notice in working with

12  Mr. Hurley, that his level of stress or his level of

13  frustration was any different from January of 2008 until May

14  of 2008 than it was at any other time that you worked with

15  him?

16         MR. CELLAR:  Objection, Your Honor, foundation.

17         THE COURT:  Well, he can state what he observed.

18  Overruled.

19  A.     I think that I hadn't had a lot of time in the

20  office, so I don't know what Kent was doing exactly then,

21  but from an economic standpoint, the security business was

22  becoming far more difficult.  I think environmental factors

23  made things more stressful on everyone.  I would say that I

24  think everyone in the office was probably a little more

25  stressed at that time than they'd been prior.  Building was

KOKKINOS - CROSS

1    reducing.  We do a lot of construction, a lot of new homes
2    and we were at the end of that big boom of every contractor
3    had a gate house with security.  So getting new security
4    was -- getting new contracts was difficult, which means
5    there's more of a focus on retention.  Bill rates are being
6    pushed down, so you're paying officers less, so retaining
7    officers becomes more difficult.  In general, I think it
8    becomes more stressful.
9    Q.    When did that start, in your memory?
10   A.    I don't think that I was really with Kent in the
11   heyday.  I just know what I was being told when I came to
12   start working with Kent Security, and I mean, obviously,
13   everyone was becoming more and more stressed probably for
14   the -- I don't know, about the past -- well, I'd say January
15   of 2008 it was pretty stressful.  The end of 2007 to the
16   beginning of 2008, we were seeing turn-overs in assistant --
17   at the time we had a director of operations and assistant
18   director of operations and we were seeing turn-over in that
19   position which was also creating stress.  That
20   stonewall1@aol.com I believe was James Calamari who was also
21   the operations manager.  So we had gone from Tori to James,
22   and later to Kristie.  So there was a lot of turn-over in
23   that.  So probably the increase was happening December,
24   January.
25   Q.    When did you get hired by Kent?

KOKKINOS - CROSS

1    A.      I would have to check my HR file, sir.  I do not

2    remember.

3    Q.      How long was it, if you can recall, before this

4    email, Defendant's Exhibit N-1 was written?

5    A.      I guess I was hired about three months prior.

6    Q.      So you got this email roughly three months after you

7    were hired and you testified that your initial period of

8    time at Kent was strained in your ability to sell; is that

9    right?

10   A.       Yes, sir.  When I first started with Kent, my very

11   first month there, Mr. Hurley suggested that I work on post

12   to try to understand exactly what was going on at Kent, and

13   so that created some stress.  I then was assigned a large

14   project, University of South Florida's bid and worked on

15   that, which had some stress.  And then following that, a lot

16   of times I was -- and just, you know, it didn't really

17   affect everything, but I was being asked to help out with

18   certain operations things.  I think that there was some

19   operational management skills that may have been lacking and

20   so they were trying to pull in additional people to try to

21   salvage problems.

22   Q.      Okay.  Let's shift gears for a little bit and talk

23   about Best Value Partners.  Best Value Partners was not

24   something that Kent Security was going to be involved in; is

25   that right?

KOKKINOS - CROSS

1    A.      Correct, sir -- well, define involved.  They were

2    going to be the person who would be the security provider.

3    Q.      How did Mr. Hurley describe Best Value Partners to

4    you?

5    A.      Initially, we decided that after our experience with

6    The Ale Group and them wanting a very large sum of money in

7    order to partner with us and really not doing that much, my

8    understanding of what Mr. Hurley was telling me is that we

9    could, you know, Best Value Partners would work on the, you

10   know, putting together the bids and all that kind of stuff,

11   because you have to have -- you have to do something.  You

12   can't just have a company that doesn't do anything and then

13   the Government awards the contract.  So Best Value Partners

14   would put together the RFP response, the Request For

15   Proposal and response to the RFP, and then Kent Security

16   would be the provider of the service and that would be

17   Kent's involvement.  Kent would be paid through -- I don't

18   know if it has to go through Best Value Partners or Kent

19   would be paid directly.  That I don't know the details on

20   that.

21   Q.      When Mr. Hurley left Kent, I think you said you had

22   no further involvement in Best Value Partners?

23   A.      Correct.  We had a couple of meetings before -- I do

24   remember that we had a meeting while Mr. Hurley was working

25   for Kent where we were discussing starting another company

KOKKINOS - CROSS

1    and Mr. Hurley brought up that he wasn't aware that

2    Mr. Neuman had offered to pay to do this and I was, I guess,

3    kind of taken back by that because I would think that if it

4    was going to benefit Mr. Neuman's business that he would be

5    willing to, you know, put the capital up for that.  I'm not

6    looking for anything in addition to whatever commission I

7    would make.  I was just looking for another tool so

8    Mr. Hurley suggested that we go into business together and

9    that way, if, you know, a contract came up where the

10   Government would want cars, we could bid on that, and I

11   remember but it was supposed to be primarily security.  And

12   I think we agreed it would be primarily security, and that

13   was what we were going for.

14   Q.    But you never actually had any conversations directly

15   with Gil Neuman about Best Value Partners; correct?

16   A.    No, sir.

17   Q.    Everything that you knew about Kent's status with

18   Best Value Partners you learned from Mr. Hurley?

19   A.    Yes, sir.

20   Q.    And Mr. Hurley told you that this was something that

21   was going to be partnered with Kent Security?

22   A.    Mr. Hurley and I discussed it and came to that

23   agreement.

24   Q.    Okay.  And after Mr. Hurley left Kent, what happened

25   to Best Value Partners?

KOKKINOS - CROSS

1    A.      Mr. Hurley and I had a couple of meetings after he

2    had left Kent -- or one that I remember.  I think maybe two.

3    We met at a coffee shop once and he asked -- because I was

4    supposed to help pay for half of it and he said that I

5    wouldn't have to pay for the other half if I would give them

6    the stock certificate and he would have the whole company,

7    and I said that's not a problem and I could never find the

8    stock certificate.  So I don't believe I ever got him the

9    stock certificate, that I can recall.

10   Q.      Did Mr. Hurley ever tell you that Best Value Partners

11   was going to be an alternative to Kent?

12   A.      Maybe very briefly one or two sentences in a big

13   discussion where if Best Value Partners was to take off and,

14   you know, be a supplier of a lot of different things that it

15   could be, you know, something bigger than Kent for us.

16   Q.      Was that while he was still employed by Kent?

17   A.      Yes, sir.  I believe that was at that lunch meeting

18   at the barbecue place.

19   Q.      And have you ever, being a majority owner of Best

20   Value Partners, have you, yourself, ever gotten any income

21   from Best Value Partners?

22   A.      No, sir.

23          MR. HENRY:  Okay, I don't have any other

24   questions, Your Honor.

25          THE COURT:  Very well.  Anything further?

1          MR. CELLAR:  Yes, Your Honor, very briefly.  I'm

2    not going to promise how many questions I'm going to ask.

3    I've learned my lesson from that.

4                    REDIRECT EXAMINATION

5    BY MR. CELLAR

6    Q.    Mr. Kokkinos, if we looked at all of your emails over

7    the last seven years, we'd find something in there that had

8    a curse word; right?

9    A.    Very likely, sir, yes.

10   Q.    Okay.  You were asked a question whether you could

11   observe whether Mr. Hurley's stress level was higher at

12   certain points when you were with him than others; right?

13   A.    Yes, sir.

14   Q.    Okay.  Are you -- let me ask generally, you're

15   certainly not a medical doctor; right?

16   A.    No, sir.

17   Q.    Okay.  Now the email that we looked at -- can I

18   borrow that?

19          MR. HENRY:  I just put it on the exhibit table.

20          MR. CELLAR:  May I approach, Your Honor?

21          THE COURT:  You may.

22   BY MR. CELLAR

23   Q.    Did you ever bring this email to Mr. Neuman's

24   attention?

25   A.    No, sir.

KOKKINOS - REDIRECT

1   Q.      Did you ever bring this email to Rose Cucurillo in

2   human resources attention?

3   A.      No, sir.

4   Q.      Did you ever make a complaint to anybody that you

5   were offended by this email?

6   A.      I believe that the three people that this email went

7   to, Ms. Callahan, Mr. Calamari and myself, I remember a

8   discussion the next day.  This was sent late at night and I

9   remember coming into the office the next day and they were

10  both, you know, they were madder than a wet hen about

11  getting that email.  And so they -- well I mean, you know,

12  we kind of had a little gripe session, but that would be the

13  extent of it, sir.

14  Q.      As president, would you agree that if there's a

15  problem with a client of this nature, Mr. Hurley had an

16  obligation to get to the bottom of it?

17  A.      Most certainly, sir.

18  Q.      Okay.  And I think we can all agree that the wording

19  in the email is not -- not even sure how to really describe

20  it.  It's not great, but Mr. Hurley made his point moving

21  forward with this client; isn't that correct?

22  A.      What do you believe Mr. Hurley's point was, sir?

23  Q.      I think his point was that the attention -- let me

24  ask you this, did the attention to detail to this job change

25  after this email?

KOKKINOS - REDIRECT

```
 1  A.      I don't remember, sir.  I think that this email
 2  certainly expressed Mr. Hurley was very agitated and very
 3  angry about the service being provided to the client.  I'm
 4  not sure what the direction was that he was trying to
 5  motivate us into.
 6  Q.      Do you know what the personal circumstances of
 7  Mr. Hurley's health was around the time he sent this email?
 8  A.      No, sir, I do not.
 9  Q.      Do you know whether he was treating around the time
10  he sent this email with a doctor named Carlos Paisan?
11  A.      No, sir.
12  Q.      Now, you had mentioned that things started to turn
13  downwards shortly after you got to the company, meaning with
14  the economy; right?
15  A.      Correct, sir.
16  Q.      That was company-wide; right?
17  A.      Yes, sir.
18  Q.      It wasn't Mr. Hurley's fault that the economy was
19  starting to fail; right?
20  A.      No, sir.  I believe it was industry-wide situation.
21  You could see our bill rates declining across the board.
22  Every company did; not just us.
23  Q.      Now you said something to the effect toward the end
24  of your testimony that Mr. Hurley told you that this Best
25  Value Partners could be something extra to Kent; right?
```

KOKKINOS - REDIRECT

1    A.    Yes, sir.

2    Q.    Did you mean that it would be something in lieu of --

3    in lieu of Kent?  Is that what he was suggesting to you?

4    A.    I don't know exactly what his meaning was, sir.  At

5    the time I remember if they want to buy 20 Fords, then we

6    could sell them 20 Fords.  And my only reason was I wasn't a

7    very big fan of that idea.  I felt taken advantage of by

8    this Ale Group company that had come in and they wanted -- I

9    don't remember the numbers but it was a very large sum of

10   money like a million dollars for them to allow us to use

11   their name and they weren't doing anything, and I thought

12   that wasn't in the spirit behind the government, of the idea

13   of the Service Veteran Disabled program and somebody come

14   up, I'll pay you a million dollars to use our name.  I

15   didn't want us to go down that path.  I didn't know if that

16   was his intention or not.

17   Q.    I see.  So if you felt there was anything

18   inappropriate about remaining in Best Value Partners based

19   on something Pat told you, you would have gotten out of it

20   right there on the spot; right?

21   A.    Correct, sir.

22   Q.    And you didn't do that?

23   A.    Correct, sir.

24   Q.    And even though you were involved with Best Value

25   Partners just like Mr. Hurley, you've never been disciplined

KOKKINOS - REDIRECT

1   at all for being involved; right?

2   A.    No, I have not.

3   Q.    You've received promotions; right since this time?

4   A.    I think we should define -- the promotions happened

5   because Mr. Hurley left.  I don't believe they were entirely

6   performance warranted.

7   Q.    Did you receive a pay increase as a result of your

8   promotion?

9   A.    Yes, at some point.

10  Q.    So that's a promotion; isn't it?

11  A.    Yes, sir.

12         MR. CELLAR:  Okay, nothing further.  Thank you.

13                    RECROSS EXAMINATION

14  BY MR. HENRY

15  Q.    You worked with Mr. Hurley for only about six months;

16  right?

17  A.    I guess so, sir.

18  Q.    Did -- any time during those six months, did he ever

19  tell you that he was depressed?

20  A.    Not that I can recall, sir.

21         MR. HENRY:  Thank you.  I don't have anything

22  further, Your Honor.

23         MR. CELLAR:  Your Honor, may I ask one last

24  question?

25         THE COURT:  Hold on.  You may.

KOKKINOS - RECROSS

```
 1              MR. CELLAR:  Thank you, Your Honor.
 2                   FURTHER DIRECT EXAMINATION
 3   BY MR. CELLAR
 4   Q.    Without getting into any details, Mr. Kokkinos,
 5   you're considered to be a disabled Veteran; right?
 6   A.    Yes, sir.
 7   Q.    You have a personal medical condition; right?
 8   A.    Yes, sir.
 9   Q.    That's not something you're going to share with
10   anybody that would ask you about it; right?
11   A.    No, sir.
12   Q.    That's something you'd want to keep personal and
13   confidential?
14   A.    Yes, sir.
15              MR. CELLAR:  I've got nothing further.  Thank you,
16   Your Honor.
17              MR. HENRY:  Nothing further, Your Honor.
18              THE COURT:  Thank you.  You're excused.
19              THE WITNESS:  Thank you, Your Honor.
20              (Witness excused)
21              THE COURT:  Call your next witness.
22              MR. CELLAR:  The plaintiff calls Rosemary
23   Cucurillo.  Your Honor, would the Court be inclined to allow
24   me a personal three minute bathroom break?
25              THE COURT:  Sure.
```

KOKKINOS - FURTHER DIRECT

1              MR. CELLAR:  Is it okay if Mr. Hurley goes, too?

2              THE COURT:  We'll take a ten minute recess.

3              MR. CELLAR:  Sorry.

4              THE COURT:  The jury can get up and move around,

5    so on, too.

6              (Recess from 1:46 p.m. to 1:56 p.m.)

7              THE COURT:  Get the jury please.

8              COURT SECURITY OFFICER:  Yes, sir.

9              THE COURT:  Please be seated.  Call your next

10   witness.

11             MR. CELLAR:  Thank you, Your Honor.  The plaintiff

12   calls Rose Cucurillo, or Rosemary Cucurillo.

13             DEPUTY CLERK:  Will you please raise your right

14   hand?

15             (The Witness is Sworn)

16             DEPUTY CLERK:  Thank you.  You may be seated.

17   Please state your name for the record.

18             THE WITNESS:  Rosemary Cucurillo.

19                      ROSEMARY CUCURILLO,

20        a witness herein, after having been duly sworn,

21        was examined and testified under oath as follows:

22                      DIRECT EXAMINATION

23   BY MR. CELLAR

24   Q.    Good afternoon.

25   A.    Hi.

1  Q.    Ms. Cucurillo, you've been working for the defendant
2  since 1999; right?
3  A.    That's correct.
4  Q.    And you're currently the Director of Human Resources?
5  A.    Currently, yes.
6  Q.    And you've been in that capacity since approximately
7  2009?
8  A.    That's correct.
9  Q.    And you started, I think you said, in 1999, and
10  you've worked your way up with the company; right?
11  A.    I did.
12  Q.    What different positions have you held during your
13  time with the company?
14  A.    I started as an entry level kind of an HR rep.  Not
15  really HR, more like a hiring person at our remote office.
16  Q.    From when to when?
17  A.    From probably 1999 till maybe 2001.
18  Q.    What was your next job from there?
19  A.    Administrative and payroll clerk in the Broward
20  Division, Kendall Palm Beach.
21  Q.    And when till when?
22  A.    Until about 2004.
23  Q.    And what was your next promotion from there?
24  A.    Payroll manager from 2004 till about 2007 and then --
25  well, I still had that position, but had added

CUCURILLO - DIRECT

1    responsibilities after that of office manager until about

2    2009.

3    Q.    Okay.

4    A.    And now I still have office manager and HR functions

5    as well.

6    Q.    Between the period of -- let's go 2005 through 2008,

7    let's focus on those time periods.  You were responsible

8    for, among other things, assisting the different offices

9    with payroll issues; right?

10   A.    Yes.

11   Q.    So if there was an issue, for example, in

12   Mr. Hurley's office in Naples with payroll, he would call

13   you or somebody from his office would call you to resolve

14   it; right?

15   A.    In some cases, yes.

16   Q.    And payroll, you worked out of the Miami office

17   during this time; right?

18   A.    I did.

19   Q.    You did not work with Mr. Hurley in Naples?

20   A.    No.

21   Q.    Okay.  And during this time period, all of Kent's

22   payroll for each of its divisions was being handled out of

23   the Miami office; right?

24   A.    Well, each division handled their own timekeeping and

25   most of the data entry, but the -- it was funneled through

1    the Miami office, yes.

2    Q.    And where were --

3    A.    Checks were processed in the Miami office.

4    Q.    Okay.  And in approximately 2000 -- were you familiar

5    with approximately how many employees worked at Kent overall

6    in different years?

7    A.    I couldn't be certain, sitting here today, of year by

8    year how many people.  I can tell you approximately right

9    now there are about 1200.

10   Q.    Okay.  And in 2008, for example, would there have

11   been close to or more than a thousand employees?

12   A.    Probably close to a thousand, maybe a little bit

13   less, but probably a thousand.

14   Q.    And because there's so many employees at the company,

15   it's hard to remember the circumstances of each employee's

16   employment; right?

17   A.    Of course.

18   Q.    And you would agree that with a company that size,

19   documentation of issues going on with an employee would be

20   critical; right?

21   A.    Important, yes.

22   Q.    Okay.  Now since 2006, all management personnel files

23   have been kept in your office; right?

24   A.    That's correct.

25   Q.    And since that time, you've been responsible for

CUCURILLO - DIRECT

| 1 | reviewing and updating those files when asked; right? |
|---|---|
| 2 | A.     Reviewing, no.  Adding to, possibly, if someone -- |
| 3 | you talking about at that time in 2006? |
| 4 | Q.     Sure. |
| 5 | A.     Yeah.  If someone gave me a document to add to a |
| 6 | file, I added it.  I didn't review the files. |
| 7 | Q.     Fair enough, and that's a fair distinction.  So if |
| 8 | somebody told you to add something to Mr. Hurley's personnel |
| 9 | file between 2005 and 2008, you would have been the person |
| 10 | adding the document? |
| 11 | A.     Yes. |
| 12 | Q.     Now, you were promoted along the line by both |
| 13 | Mr. Neuman and Ms. Alexander; right? |
| 14 | A.     Mr. Neuman -- well, they're partners in the business, |
| 15 | but my direct boss has always been Mr. Neuman. |
| 16 | Q.     And because of how long you've been with the company |
| 17 | and the way you've worked your way up the company, you would |
| 18 | consider yourself to be a very loyal employee of the |
| 19 | company; right? |
| 20 | A.     I'm a loyal employee, yeah, no matter who I work for. |
| 21 | I worked for GE for 20 years. |
| 22 | Q.     And you would also be loyal -- you're also very loyal |
| 23 | to Mr. Neuman for what he's done for you? |
| 24 | A.     What he's done for me? |
| 25 | Q.     As far as promote you up the chain? |

CUCURILLO - DIRECT

1    A.    I worked my way all the way up.

2    Q.    I'm not suggesting otherwise, Rose.  But I'm saying

3    the fact that he was the one that recognized your efforts

4    and promoted you?

5    A.    Him and my previous supervisor, yes.

6    Q.    And who was that?

7    A.    Mr. DiMaria (phonetic).

8    Q.    And would you agree that you're also appreciative of

9    Orly Alexander for -- as a co-partner recognizing your

10   accomplishments with Kent?

11   A.    Fair statement.

12   Q.    Okay.  You would agree with me that you wouldn't want

13   something negative to happen to Kent; right?

14   A.    Okay, I agree with that.

15   Q.    It's where you work?

16   A.    Right.

17   Q.    It's where you rely on for your livelihood; right?

18   A.    Correct.

19   Q.    Okay.  Now, since -- let's talk about during the time

20   period here.  Let's focus on 2005 forward, all right?

21   You've always worked out of the Miami office during that

22   time period?

23   A.    From 2005, yes, I believe so.

24   Q.    Okay.  You've never worked in the Naples office?

25   A.    No.  I may have visited a couple of times, maybe to

CUCURILLO - DIRECT

1    train someone, but no, my -- my place was always Miami.

2    Q.    Okay.

3    A.    From that time.

4    Q.    And you have no idea, based on your own personal

5    knowledge, whether Pat Hurley was performing well in Naples;

6    right?

7    A.    It wouldn't have been my job to manage him or to

8    review him, no.

9    Q.    Okay.  You have no idea of how many hours he was

10   working on a weekly basis?

11   A.    I would only have access to his absences if he

12   reported them through the normal payroll process.

13   Q.    Understood, but for example, you wouldn't know what

14   time he would come in on a Monday?

15   A.    No, no.

16   Q.    What time he would go to lunch?

17   A.    No.

18   Q.    He wasn't punching the clock?

19   A.    Not with me, anyway, no.

20   Q.    And likewise, Kent maintained no records of the

21   actual hours Pat was working on a year by year basis; right?

22   A.    That's probably accurate.  There's no definite

23   records unless, as I said, whatever he reported to us.

24   Q.    Okay.  You cannot dispute that in 2006 or 2007 or

25   2008 Mr. Hurley worked 1,250 hours or more; right?

CUCURILLO - DIRECT

1    A.      I cannot confirm or dispute.

2    Q.      Right.  You have no way of disputing; that was my

3    question.

4    A.      Right.

5    Q.      Right.  And you understand as a human resources

6    representative that 1,250 hour number qualifies somebody

7    under the Family Medical Leave Act; right?

8    A.      Correct.

9    Q.      Now, if Pat came in late on a particular morning

10   because he was having an anxiety attack, would you know that

11   during the time we're discussing?

12   A.      Not unless he called and told us.

13   Q.      Was he obligated to call you and tell you?

14   A.      To tell me, no.

15   Q.      Anybody else, to your knowledge?

16   A.      I assume he would have to tell the supervisor if he

17   was going to be late.

18   Q.      What if he was going to be late on a particular date,

19   do you know if Mr. Hurley had to call Mr. Neuman?

20   A.      I don't know.

21   Q.      What if he had to go home early because he wasn't

22   feeling well, would you have any knowledge of that?

23   A.      I probably wouldn't have knowledge of it, no.

24   Q.      You would agree that you had very little interaction

25   with Pat on a daily basis?

1    A.     On a daily basis, yes.

2    Q.     The only times you really saw Pat in person was when

3    he came down to Miami for meetings; right?

4    A.     Or to pick up payroll, yes.

5    Q.     Okay.

6    A.     When he visited Miami, yes.

7    Q.     Now, Pat would come down to Miami and have meetings

8    with Mr. Neuman; right?

9    A.     Yes.

10   Q.     And he would also have meetings with Mrs. Alexander?

11   A.     I don't know of any meetings with Mrs. Alexander.

12   Q.     Is it your testimony that Pat would not come to the

13   office two to three times a month to meet with

14   Mrs. Alexander?

15   A.     If he did, I wasn't aware of it.  I know he came to

16   the Miami office a couple of times a month.

17   Q.     Okay.  And you have no idea who he was meeting with;

18   is that a fair statement?

19   A.     Well, what's fair is I've never seen him in a meeting

20   with Mrs. Alexander.

21   Q.     Okay.  You were not present, like you just said,

22   during any meetings between Pat and Mrs. Alexander; right?

23   A.     That's correct.

24   Q.     So you have no idea, if they had meetings, what was

25   discussed?

CUCURILLO - DIRECT

1   A.      I have no idea if they had meetings.  I --

2   Q.      And when Pat would meet with Mr. Neuman, you were not

3   present in those meetings generally; correct?

4   A.      That's correct.

5   Q.      So again, you would have no idea what would be

6   discussed during those meetings either?

7   A.      Correct.

8   Q.      Okay.  You would agree that as in his role as

9   president of Naples, Pat reported directly to Mr. Neuman?

10  A.      Yes.

11  Q.      And during that time, Mrs. Alexander was the CFO of

12  the company; right?

13  A.      Correct.

14  Q.      And if Mrs. Alexander had issues or concerns, that

15  Pat would report directly to her on those concerns as well;

16  right?

17  A.      The way it's set up is that Gil Neuman runs the

18  operations, and Pat at the time worked for the operations

19  end.  If there were concerns, he would bring them to

20  Mr. Neuman, not to Mrs. Alexander.  That's my knowledge.

21  Q.      And when Mr. Neuman would travel to the Middle East

22  during the year, Mrs. Alexander would stay behind sometimes;

23  right?

24  A.      Sometimes, yes.

25  Q.      And Mrs. Alexander would be responsible for running

CUCURILLO - DIRECT

1    the company in Mr. Neuman's absence; right?

2    A.    Yes, but with close contact with Mr. Neuman.

3    Q.    And were you present during that close contact with

4    Mr. Neuman?

5    A.    No.

6    Q.    So you have no idea what sort of close contact or any

7    contact she had with Mr. Neuman when he was out in the

8    Middle East?

9    A.    No, but if I can -- can I give you an example?

10    Q.    Sure.

11    A.    If a decision had to be made on an operations level,

12    even now, if Mr. Neuman is not in the building,

13    Mrs. Alexander will call him and make sure they're on the

14    same page or make sure whatever he wants done is done.

15    Q.    But if --

16    A.    You understand?

17    Q.    I'm sorry, were you finished with your answer?

18    A.    I said, do you understand what I'm trying to say?

19    Q.    I do, but let's say, for example, Mr. Neuman was in

20    another country and unavailable and a decision needed to be

21    made; who made the decision?

22    A.    Mrs. Alexander is perfectly capable, I'm sure, of

23    making the decision.  I don't know that she ever did without

24    Mr. Neuman's confirmation, let's say.

25    Q.    Well, Mrs. Alexander is more than capable?

CUCURILLO - DIRECT

1    A.    Of course.

2    Q.    She's an owner of the company; right?

3    A.    Of course.

4    Q.    And she's the acting chief financial officer; right?

5    A.    Yes.

6    Q.    And she comes to the office on a regular schedule;

7    right?

8    A.    Yes.

9    Q.    And she has the ability to hire the employees that

10   she wants to hire; right?

11   A.    Yes.

12   Q.    And she has the ability to fire the employees that

13   she wants to work with; right?

14   A.    Yes.

15   Q.    And she has the ability to determine how much she

16   wants to pay employees; right?

17   A.    Yes.

18   Q.    And she also has the ability to determine when she

19   wants those employees to work; right?

20   A.    Yes.  But she doesn't have the operations background

21   that Mr. Neuman has so she doesn't really get too involved

22   with the operations end of the business.

23   Q.    Understood.

24   A.    I'm not trying to be argumentative.  I'm just trying

25   to --

CUCURILLO - DIRECT

1  Q.      And I'm not suggesting that you are.

2  A.      Okay.

3  Q.      Now, we talked about your responsibility about adding

4  things into management personnel files during the time

5  period; right?

6  A.      Yes.

7  Q.      At no time during Pat's employment did anybody ever

8  ask you to place a reprimand in his personnel file; right?

9  A.      I don't ever recall a reprimand, no.

10  Q.      So the answer's no?

11  A.      Correct.

12  Q.      And at no time did anybody ever ask you to place a

13  demotion notice in his personnel file; right?

14  A.      That's correct.

15  Q.      And at no time did anybody ever ask you to place any

16  negative performance issues, such as emails, in his

17  personnel file; right?

18  A.      I'm not a hundred percent sure on the email end.  I

19  know, for example, on the last -- right before he was fired,

20  there was a -- an email that we probably copied and I placed

21  in the file.

22  Q.      And that was the email where Pat said that his leave

23  was medically necessary; right?

24  A.      The email where he said if you want more information,

25  come to Naples, or something.

CUCURILLO - DIRECT

1   Q.    My question to you was the email --

2   A.    Same email.

3   Q.    The email where he said, I need medical leave; right?

4        MR. HENRY:  Objection, mischaracterizes the

5   document.  It's not in evidence.

6        THE COURT:  Just a moment.

7        (Pause in place)

8        THE COURT:  The email speaks for itself.

9   Sustained.

10  BY MR. CELLAR

11  Q.    What I'd like you to do is take a look at what we've

12  marked up there as Plaintiff's Exhibit Number 1 which I will

13  represent to you is the personnel file of Mr. Hurley that

14  was produced to us in this matter, and ask you if you can

15  take a brief look at that, please.  Let me know when you're

16  finished, please.

17  A.    I'm not sure if I mixed anything up but I see the

18  next exhibit is Number 4.  I don't see 2 or 3 or --

19  Q.    Yes, ma'am, the next exhibit would be 4.

20  A.    Okay, then I'm ready.

21  Q.    This is the personnel file that was produced to the

22  defendants -- by the defendants to us in the case as

23  Mr. Hurley's complete personnel file.  Do you have any

24  reason to dispute that?

25  A.    I do not.

CUCURILLO - DIRECT

1  Q.    Does this appear to be a true and correct copy of Pat

2  Hurley's personnel file with the defendants?

3  A.    It does.

4        MR. CELLAR:  Your Honor, at this time, we'd like

5  to move into evidence what has been marked as Plaintiff's

6  Exhibit Number 1.

7        THE COURT:  Exhibit 1 is received.

8        MR. HENRY:  No objection.

9        (Plaintiff Exhibit 1 admitted)

10 BY MR. CELLAR

11 Q.    What I'd like to do briefly, Ms. Cucurillo, is go

12 through the documents contained in his entire personnel

13 file.  Okay?  The first document is a Kent Security

14 application for employment.  Do you see that?

15 A.    Yes.

16 Q.    Now at the top of the application, you're going to

17 see that there's some language crossed out.  You see that?

18 A.    Yes.

19 Q.    And I know it's hard for the jury to read and I'll

20 try to zoom in, and you folks will get a copy of this back

21 in the jury room, but what I wanted to ask you was, you

22 would agree that the language that's crossed out is language

23 that says Kent can fire Pat Hurley at will for any reason.

24 You see that?

25 A.    Let me -- give me a minute.

CUCURILLO - DIRECT

```
 1    Q.      Sure, take your time.

 2    A.      Yes, I see that.

 3    Q.      Okay.  So it says here specifically -- let me ask it

 4    differently.

 5            This would have been the general application for

 6    employment at the time Pat applied; right?

 7    A.      Yes.

 8    Q.      Okay.  And the form application said specifically in

 9    the paragraphs that are crossed out that my employment is at

10    will, I can be fired for any reason; do you see that?

11    A.      Yes.

12    Q.      Now, Pat Hurley specifically crossed those provisions

13    out; do you see that?

14    A.      Yes.

15    Q.      And was it your understanding that the reason why he

16    did that was because he had an employment agreement with the

17    defendants that didn't allow him to be fired for any reason?

18            MR. HENRY:  Objection, Your Honor.

19    A.      I have no knowledge of this application at the time

20    it was filled out.

21            THE COURT:  Just a moment, we have an objection.

22            MR. HENRY:  Could I be heard at sidebar?  This is

23    an issue that we discussed earlier.

24            THE COURT:  You may.

25            (At sidebar, Court and counsel present)
```

1          MR. HENRY:  This is exactly what we talked about.

2     He's talking about a restriction in the employment agreement

3     that restricts his ability to be terminated.  That was the

4     basis for the state court lawsuit and now he's going to get

5     into it with this witness that somehow Kent Security's right

6     to terminate him was restricted under his employment

7     agreement.  That's what we litigated and settled.  That was

8     the basis for his complaint.

9          MR. CELLAR:  Your Honor, I'm moving on after this

10    question, first of all.  And second of all, the reason why

11    he could be fired was not litigated during the state court

12    case.  What was litigated was that they breached the

13    contract by not paying benefits, which I told you I'm not

14    getting into.  How or why he could be fired goes directly

15    toward the pretext that they were aware that they just

16    couldn't fire him at will.  So I can tell you, I don't even

17    mind withdrawing the question because the jury's going to

18    see it, but I'm moving on.

19          THE COURT:  Okay, let's move on, then.

20          MR. CELLAR:  Okay, thank you.

21          (Sidebar concluded)

22          THE COURT:  In case you wondered what that white

23    noise is, that's just what it is.  It's supposed to cover up

24    our voices when we're talking over here at the sidebar.

25    That's what that aggravating noise is.  Go ahead.

CUCURILLO - DIRECT

```
 1   BY MR. CELLAR
 2   Q.     If you take a look at Page 2, Ms. Cucurillo, there's
 3   further language in the Notice to All Applicants section
 4   that's likewise crossed out.  Do you see that?
 5   A.     I do.
 6   Q.     Do you know why that was crossed out?
 7   A.     No.
 8   Q.     Were you aware that Mr. Hurley had an employment
 9   agreement with Kent?
10   A.     I'm aware of it now.  Does that make sense?  At the
11   time he was hired, I wasn't I aware.  It wouldn't have been
12   my --
13   Q.     Let me ask it differently.  Were you aware of it at
14   the time he was employed there?
15   A.     At the time he was employed there, yes.
16   Q.     Fair enough.  Do you know when you became aware of
17   it?
18   A.     Probably when he got fired.
19   Q.     And then finally, if you take a look at Page 3, which
20   is the acknowledgment of receipt of employee handbook, and
21   we're going to talk in detail about this in a moment, again,
22   it's crossed out or the section is crossed out that says
23   Kent has the right to terminate Pat's employment at any
24   time; do you see that?
25   A.     Yes.
```

CUCURILLO - DIRECT

1   Q.    Okay.  The next page of his employment or personnel

2   file is his U.S. Department of Justice form; right?

3   A.    Yes.

4   Q.    Then there's a non-disclosure non-competition and

5   non-solicitation agreement.  You see that?

6   A.    Yes.

7   Q.    If you take a look on the next page, Paragraph 6,

8   again there's a provision saying that Mr. Hurley was an at

9   will employee.  You see that?

10  A.    I do.

11  Q.    And that's crossed out as well; right?

12  A.    Correct.

13  Q.    Continuing onto the next page, it says that employee

14  or employer may terminate the parties' employment

15  relationship at any time.  You see that?

16  A.    I do.

17  Q.    And that's crossed out as well; isn't it?

18  A.    Correct.

19  Q.    Next page is the signature.  Then we get to

20  Mr. Hurley's employment agreement, which is part of his

21  personnel file; right?

22  A.    Yes.

23  Q.    Okay.  Did anybody ever tell you to remove this from

24  his personnel file?

25  A.    No.

CUCURILLO - DIRECT

1    Q.    Did anybody ever tell you that his employment
2    agreement was not in place during his employment?
3    A.    No.
4    Q.    Did anybody ever suggest to you that the employment
5    agreement didn't need to be honored with regard to the
6    termination provisions?
7    A.    At some point in time, and I don't know exactly
8    when --
9    Q.    That would have been after Mr. Hurley was fired;
10   right?
11   A.    Well, what I was going to say is that at some point
12   in time, I became aware that the agreement was for his being
13   hired as a sales, VP of sales I think was the title.  But
14   later he became -- he was promoted to president.  So I'm
15   not -- I don't know if this agreement would bear on that
16   job.
17   Q.    Well, let's take a look at Paragraph -- bear with me
18   for one moment, please -- 3 of the agreement and it says
19   here in the middle, this agreement will automatically renew
20   for successive 12 month periods unless 30 days prior to the
21   end of the term one party provides written notice to the
22   other of their intention not to renew this agreement.  You
23   see that?
24   A.    Yes, I do.
25   Q.    Now, we're going to review Pat's personnel file.

CUCURILLO - DIRECT

```
 1    We're going to go through the rest of it.  Let's get to the
 2    end of the story here.  We're not going to see any document
 3    in here withdrawing the renewed periods; right?
 4    A.    I don't believe so.
 5    Q.    Nothing's in here that says this agreement is no
 6    longer in effect?
 7    A.    No.
 8    Q.    And there's nothing in here that says this agreement
 9    is no longer in effect because Pat has been promoted; right?
10    A.    Correct.
11    Q.    The next page of his personnel file contains an
12    employee master file check history.  Do you see that?
13    A.    Yes.
14    Q.    And these are all the payments, I imagine -- well, it
15    looks like these are payments that were made to Pat between
16    May of 2007 and April of 2008; right?
17    A.    Yes, from Kent of Palm Beach.
18    Q.    Why was Pat being paid from Kent of Palm Beach?
19    A.    Just a matter of allocation of expenses, I believe.
20    Q.    Okay.  Let's take a look at this next document, which
21    is in Pat's personnel file.  And this is a writing, you see
22    at the top of it where it says gilronit?  Whose email
23    address is that?
24    A.    Gil Neuman.
25    Q.    And who's the email from?
```

CUCURILLO - DIRECT

1    A.      From Gil Neuman.

2    Q.      To who?

3    A.      To Pat Hurley.

4    Q.      And if you can see in here, this is memorializing a

5    pay increase that Pat is receiving; isn't that right?

6    A.      Yes.

7    Q.      And the bottom of the email, it's also discussing a

8    bonus structure that Pat would be entitled to if he hit

9    certain goals; right?

10   A.      Correct.

11   Q.      The next email we see is the email, the leave email

12   that we've been discussing.  You see that?

13   A.      Yes.

14   Q.      And here's the second page and the first request, and

15   the schedule attached; right?

16   A.      Yes.

17   Q.      And then there's an email or a letter from Mr. Neuman

18   to Pat Hurley after Mr. Neuman received Pat's Medical Leave

19   Act form.  Do you see that?

20   A.      I do.

21   Q.      And in this letter, Mr. Neuman -- it's dated May 16,

22   2008 -- says to Pat, I was unaware that you had any medical

23   issues necessitating leave.  Do you see that?

24   A.      I do.

25   Q.      That's not true; is it?

CUCURILLO - DIRECT

1   A.      I don't know how to answer that.  I'm going to say
2   it's not true in light of what you were pointing out in
3   these emails.  But if you're telling me that this email --
4   the first email where he's requesting vacation time and that
5   request was denied, then generated the second email where
6   the vacation request referred now to medical.
7   Q.      Right.  And that email, the second one which we're
8   going to discuss, was dated April 30th, 2008; right?
9   A.      Correct.
10  Q.      And in that email, Pat specifically tells Mr. Neuman,
11  please know that I have been advised by medical health
12  professionals that my need to avail myself of the vacation
13  time that I have earned is no longer optional.  Do you see
14  that?
15  A.      I do.
16  Q.      And that was before Mr. Neuman's letter dated
17  May 16th, 2008, where Mr. Neuman denies that he was aware of
18  any medical issues necessitating leave.  You see that?
19  A.      Yes.
20  Q.      So that's not true; is it?
21          MR. HENRY:  Objection, Your Honor, she can't speak
22  to Mr. Neuman's state of mind.
23          THE COURT:  She's not reflecting upon his state of
24  mind.  It's reflecting upon what Mr. Neuman is stating.
25  Overruled.

CUCURILLO - DIRECT

```
1    BY MR. CELLAR
2    Q.      Then we can go to the next document, which it's out
3    of order?  This is the letter that Mr. Hurley sent to
4    Mr. Neuman saying that pursuant to my email, emails with
5    you, and the phone conversation I had with you on the
6    morning of May 1st, I have been ill and continue to be ill.
7    Do you see that?
8    A.      I do.
9    Q.      And what's the date of that letter?
10   A.      May 12th.
11   Q.      And that would have been before Mr. Neuman's letter
12   saying I'm unaware that you had any medical issues; right?
13   A.      Yes.
14   Q.      So again, his -- I'll strike that.
15           Then the next page would be the Family Medical
16   Leave Act form that's in his personnel file; right?
17   A.      Yes.
18   Q.      And that's the end of his personnel file; isn't it?
19   A.      Yes.
20   Q.      There's not a single document in here that says that
21   Mr. Hurley was fired for insubordination; right?
22   A.      Correct.
23   Q.      There's not a single document in his personnel file
24   that says that Mr. Hurley was not performing properly;
25   right?
```

CUCURILLO - DIRECT

1   A.      Correct.

2   Q.      And you testified earlier when I had you on the stand

3   that it's important for a company of this size to document

4   employee issues; right?

5   A.      Correct.

6   Q.      But you didn't do that with one of the highest

7   persons in command in the company; isn't that true?

8   A.      I didn't do it?

9   Q.      The company didn't do it?

10  A.      Right.

11  Q.      That's true; right?

12  A.      Yes.

13  Q.      Now, as an office manager in 2007 and 2008, you were

14  familiar with pay concerns that were being raised not only

15  in Pat's division, but with others, with employees in other

16  divisions that they weren't getting paid their bonuses;

17  right?

18  A.      Bonus, no.  I was only aware of -- well, I don't

19  recall being aware of anything other than -- anyone other

20  than Pat's issue with the bonus.

21  Q.      Okay.  Let's go ahead and if you can, take a look at

22  Exhibit Number 22, please.

23  A.      I have it.

24  Q.      Showing you what's been marked as Exhibit Number 22,

25  you're copied on that email; correct?

CUCURILLO - DIRECT

1    A.      Yes.

2    Q.      Okay.  And what is this document?

3    A.      This is an email from Pat Hurley to Gil Neuman and

4    copy to me regarding a pay rate for one of Pat's employees.

5    Q.      And does this appear to be a true and correct copy of

6    the email when you received it?

7    A.      Yes, it does.

8           MR. CELLAR:  Your Honor, at this time, we'd like

9    to move into evidence what's been marked as Plaintiff's

10   Exhibit 22.

11          THE COURT:  Number 22 is received.

12          (Plaintiff Exhibit 22 admitted)

13   BY MR. CELLAR

14   Q.      Showing you what's been marked as Exhibit Number 22,

15   this is an email or an incident where Pat is notifying you

16   and Mr. Neuman that there's a problem with another

17   employee's pay.  You see that?

18   A.      Yes.  He's notifying Mr. Neuman and copying me and

19   Brandy.

20   Q.      And what he's complaining about in this email is that

21   there was a female employee who wasn't receiving the same

22   raise that a male employee had received; isn't that true?

23   A.      Yes.

24   Q.      So Pat was not the only one that was being affected

25   by not getting proper compensation; right?

CUCURILLO - DIRECT

1    A.    Well, you asked me about bonus prior.

2    Q.    Let's go ahead and take a look at Exhibit Number 4.

3    Showing you what's been marked as Exhibit Number 4, have you

4    ever seen this document?

5    A.    I don't recall seeing this, no.

6    Q.    Do you recall ever having a conversation with

7    somebody named William Denio and reviewing bonus numbers for

8    the Palm Beach office in March of 2008?

9    A.    I know that Bill Denio worked in the Palm Beach

10   office and if he says he sat with me and reviewed it, then

11   yeah, but I don't recall it at this time.  I don't recall

12   the meeting.

13   Q.    Do you have any reason to dispute that you sat with

14   Mr. Denio to go over bonus numbers with the Palm Beach

15   employees?

16   A.    No, I don't.

17   Q.    You would agree that Mr. Denio was complaining that

18   the employees in Palm Beach were so desperate for their

19   bonus checks that they were willing to even take less than

20   what was owed to them; isn't that right?

21   A.    That's what this says, yes.

22   Q.    You were aware, contrary to what you just said, that

23   employees in other offices were having problems getting

24   their bonuses, too; right?

25   A.    What I said was I didn't recall.  Yes.

CUCURILLO - DIRECT

1   Q.    Now that you've seen this document, do you recall
2   that?
3   A.    Not specifically, no.
4   Q.    Would you agree that now that you've seen it that
5   Mr. Hurley was not the only one having problems getting his
6   bonuses?
7         MR. HENRY:  Objection, it's been asked and
8   answered.
9         THE COURT:  Overruled.
10  BY MR. CELLAR
11  Q.    You can answer, ma'am.
12  A.    Yes.
13  Q.    There was no knowledge not to -- there was no reason
14  to withhold these bonuses to these employees; was there,
15  Ms. Cucurillo?
16  A.    I'm not privy to why they were held, if they were
17  held, what the reasons were.  That wouldn't have been my
18  area.
19  Q.    You were aware that Pat Hurley had been emailing
20  Mr. Neuman to receive his performance bonuses; right?
21  A.    Yes.
22  Q.    Okay.  And you would agree that there was nothing
23  insubordinate about Pat asking for money he felt he was owed
24  by Mr. Neuman; right?
25  A.    I would agree.

CUCURILLO - DIRECT

1  Q.     And you were aware -- you had no idea what

2  Mr. Hurley's bonus structure was with the defendants; right?

3  A.     Right.

4  Q.     Anything you would have known about what to pay

5  Mr. Hurley in bonuses would have been told to you by

6  Mr. Neuman?

7  A.     Correct.

8  Q.     Okay.  You were aware that in late 2007, Mr. Neuman

9  gave Pat a 20,000-dollar bonus; right?

10  A.     Yes.  Not in lump sum, but yes.

11  Q.     And that bonus, according to you, was a discretionary

12  bonus; isn't that true?

13  A.     I think all bonuses are, but that's my opinion.

14  Q.     So if this bonus, according to you -- or let me go

15  back.  If it was a discretionary bonus, that means it was up

16  to Mr. Neuman whether to pay Pat for it or not; correct?

17  A.     Correct.

18  Q.     You would agree you wouldn't write a 20,000-dollar

19  bonus to an employee who's performing poorly; would you?

20  A.     I wouldn't, no.

21  Q.     But Mr. Neuman did; didn't he?

22  A.     (No response)

23  Q.     And in addition to the bonus that he received at the

24  end of 2007, this discretionary bonus for $20,000,

25  Mr. Hurley was also emailing Mr. Neuman because he was owed

CUCURILLO - DIRECT

1  an additional bonus for the following six months; right?

2  A.      That's what the email says, yes.

3  Q.      Okay.  And you were aware that Pat was frustrated

4  that he was not receiving those bonuses from Mr. Neuman;

5  right?

6  A.      Through the emails, yes.

7  Q.      Okay.  And I want to show you these emails and ask

8  you if you've seen them.  If you can, take a look at

9  Exhibits 3 and 21, which are in front of you, and I just ask

10  if you've ever seen these documents before.

11  A.      Yes.

12  Q.      Okay.  And does Exhibit 3 appear to be a true and

13  correct copy of one of the emails that Mr. Hurley sent to

14  Mr. Neuman?

15  A.      Yes.

16          MR. CELLAR:  Okay, I'd like to move into evidence

17  what's been marked as Exhibit 3, Your Honor, please.

18          MR. HENRY:  No objection.

19          THE COURT:  Exhibit 3 is received.

20          (Plaintiff Exhibit 3 admitted)

21  BY MR. CELLAR

22  Q.      I'm going to show you what's been marked as

23  Exhibit 3.  This is an email dated February of 2008;

24  correct?

25  A.      Yes.

CUCURILLO - DIRECT

1   Q.    And in this email, Mr. Hurley is asking Mr. Neuman

2   for his next bonus, which is due; right?

3   A.    Yes.

4   Q.    And Mr. Neuman never responded to this email; did he?

5   A.    I don't know that.

6   Q.    Do you know whether he just ignored it?

7   A.    I don't.  I don't know if he ignored it, if he

8   responded, or what their private conversations were.

9   Q.    Did he ever tell you that he wasn't going to pay it?

10  A.    I don't think he said he wasn't going to pay it,

11  specifically.  I think at one point all bonuses were

12  suspended.

13  Q.    And bonuses were supposed to be suspended in 2008;

14  right?

15  A.    I'm not sure of the time line.

16  Q.    You're aware that Shelton bonus -- Shelton Blackwell

17  received a bonus in 2008; right?

18  A.    I really have no recollection.  I don't specifically

19  remember that, no.

20  Q.    Well, you were in charge of payroll at the time?

21  A.    Yes.

22  Q.    So if Mr. Blackwell received a bonus, it would have

23  gone through you?

24  A.    Yes.

25  Q.    Fair enough.  Let's take a look at Exhibit 21, and I

CUCURILLO - DIRECT

 1  ask if you've seen this document?

 2  A.    Yes.

 3  Q.    Okay.  And can you identify it for the jury, please?

 4  A.    An email from Pat Hurley to Gil Neuman on March 26th,

 5  2008.

 6  Q.    And does this appear to be a true and correct copy of

 7  the email that Mr. Hurley sent to Mr. Neuman on that date?

 8  A.    Yes.

 9        MR. CELLAR:  Your Honor, at this time, I'd like to

10  introduce into evidence what's been marked as

11  Plaintiff's 21.

12        MR. HENRY:  No objection.

13        THE COURT:  Exhibit 21 is received.

14        (Plaintiff Exhibit 21 admitted)

15  BY MR. CELLAR

16  Q.    Showing you what's been marked as Exhibit Number 21,

17  which is highlighted, this is yet another email from

18  Mr. Hurley asking Mr. Neuman for his bonus; right?

19  A.    Correct.

20  Q.    And the date of this is March 26th, 2008?

21  A.    Correct.

22  Q.    Just months before Mr. Hurley was fired?

23  A.    Yes.

24  Q.    Okay.  And he's saying in there that I need you to

25  calculate the last six months of 2007 and insert that in

CUCURILLO - DIRECT

```
 1  payroll ASAP.  Do you see that?
 2  A.      I do.
 3  Q.      Do you believe that this email is insubordinate?
 4  A.      Do I believe it's insubordinate?  No.
 5  Q.      There's nothing wrong with him asking for money that
 6  he's owed; right?
 7  A.      Correct.
 8  Q.      Now at no time prior to May 1st, 2008, did Mr. Neuman
 9  ever tell you that he was going to fire Pat; right?
10  A.      Correct.
11  Q.      At no time prior to May 1st, 2008, did Orly Alexander
12  tell you that she wanted Pat fired or kicked out?
13  A.      Correct.
14  Q.      You never heard Pat was not performing well; right?
15  A.      No, that's not exactly right.  I know that there was
16  some issue with opening an office on the west coast.  I
17  don't know if it was Tampa or Jacksonville, and I did hear
18  that there was some slow-down there, that enough aggressive
19  action wasn't being taken on Pat's part.
20  Q.      Do you recall giving a deposition under oath in this
21  case, Ms. Cucurillo?
22  A.      I do.
23  Q.      Do you remember that I took your deposition on
24  January 28th, 2011?
25  A.      Right.
```

CUCURILLO - DIRECT

1   Q.    And it was in front of a court reporter?

2   A.    Yes.

3   Q.    And you raised your hand?

4   A.    Yes.

5   Q.    And you said -- you agreed to tell the truth?

6   A.    I did.

7   Q.    The whole truth?

8   A.    Yes.

9   Q.    Nothing but the truth?

10  A.    Correct.

11  Q.    Just like you're sitting here in court in front of

12  this jury today?

13  A.    Correct.

14  Q.    And do you recall me asking you this question --

15  counsel, Page 21, Line 24.

16        MR. HENRY:  Thank you.

17  BY MR. CELLAR

18  Q.    Did you ever hear, prior to May 1st, 2008, that

19  Mr. Hurley was not performing well in his job other than

20  what we've discussed.

21        Answer, no.

22        Did you testify to that?

23  A.    Prior to May -- yes, prior to May 1st was in that

24  question?  Okay.

25  Q.    Yes.  And your answer was no.  Does that refresh your

CUCURILLO - DIRECT

1   recollection as to what you testified to under oath?

2   A.      Yes.

3   Q.      Now, this issue that you raised with the Tampa

4   office --

5   A.      I believe that was raised in the deposition also, but

6   I -- I don't have the copies.

7   Q.      Do you know when that -- when these concerns were

8   raised?

9   A.      I don't.

10  Q.      Were you ever asked to put anything in Mr. Hurley's

11  personnel file --

12  A.      No, no.

13  Q.      If you could just let me finish -- saying that

14  Mr. Neuman had a concern that Pat wasn't doing what he was

15  supposed to be doing regarding a Tampa office?

16  A.      I was not.

17  Q.      Pat actually opened up a Tampa office on Hines in

18  Tampa; right?

19  A.      There was an office in Tampa, yes.

20  Q.      And Mr. Hurley opened that office?

21  A.      I don't know.  He may have.  I don't know.

22  Q.      And do you know whether he was permitted to staff it

23  before he was fired?

24  A.      I don't know.

25  Q.      From what you observed, you believe Pat was a very

CUCURILLO - DIRECT

```
 1   competent division president; isn't that true?
 2   A.     I believe he was extremely competent in sales.  I
 3   believe he was competent in operations to a degree.  I think
 4   he had a very good team.
 5   Q.     You've heard the expression, a leader is only as good
 6   as his team; right?
 7   A.     Exactly.
 8   Q.     You were aware that during the time period Pat was
 9   running the Naples Division it remained profitable; right?
10   A.     I wouldn't be privy to the -- well, I wouldn't be
11   privy to the exact financials, but I would have to assume it
12   remained profitable.
13   Q.     Okay.  And you were aware of that because you were
14   getting numbers for the company; right?
15   A.     No, that wouldn't be my ...
16   Q.     Now you were aware that during your tenure at the
17   company that Mr. Hurley had been promoted twice; right?
18   A.     I believe he was promoted to President of Kent's Palm
19   Beach at one point and then Kent of Naples.  I don't know if
20   it was -- which was first or if it was simultaneous.
21   Q.     What I'd like you to do is, Ms. Cucurillo, take a
22   look at Exhibit Number 12, which should be in front of you,
23   and ask if you've ever seen this document.
24   A.     Yes.
25   Q.     Okay.  What is this document?
```

CUCURILLO - DIRECT

1    A.    This is a blast email from Gil Neuman announcing the

2    promotion of Pat Hurley.

3    Q.    And does this appear to be a true and correct copy of

4    the email when you received it?

5    A.    Yes.

6         MR. CELLAR:  Your Honor, at this time, we'd like

7    to move in evidence what's been marked as Exhibit Number 21.

8         MR. HENRY:  No objection.

9         THE COURT:  Exhibit 21's already been received.

10   Do you mean 12?

11        MR. CELLAR:  I apologize, Your Honor.  Let me just

12   double check.  Yes, Your Honor, 12.  I apologize.

13   Number 12.

14        THE COURT:  12 is received.

15        (Plaintiff Exhibit 12 admitted)

16   BY MR. CELLAR

17   Q.    Now this email is from Mr. Neuman to a number of

18   people.  Do you see that?

19   A.    Yes.

20   Q.    Who are the people, if you can -- are these generally

21   management people of Kent Security at the time?

22   A.    Looks like middle management, yes.

23   Q.    Okay.  And also higher management?  Ms. Alexander is

24   copied?

25   A.    Yes.

CUCURILLO - DIRECT

1   Q.      And you're also copied on here as well.  Do you see
2   that?
3   A.      Yes.
4   Q.      Now, what was the purpose, as you said, for this
5   email?
6   A.      This email was actually drafted and written by Pat
7   when he was promoted and sent to Gil to blast out to
8   everybody to make the announcement.
9   Q.      Did you have any reason to dispute when you received
10  this email any of the statements being made by Mr. Neuman to
11  the company regarding Mr. Hurley?
12  A.      Honestly, I did not really read it in full when I got
13  it because I knew about the promotion ahead of time -- not
14  ahead of time.  I knew about the promotion when it took
15  place, so I wasn't actually waiting for this announcement to
16  come through.
17  Q.      My question is, do you -- do you have any reason to
18  dispute anything contained within this email from
19  Mr. Neuman?  Is it untrue?
20  A.      Not that I'm aware, no.
21  Q.      Now, you just testified that Mr. Neuman's strength
22  was sales?
23  A.      Mr. Hurley.
24  Q.      Mr. Hurley, I apologize.  There's been a lot of
25  Hurley and Neuman in this trial.  But that he lacked

CUCURILLO - DIRECT

```
 1    operational insight; right?
 2    A.      Correct.
 3    Q.      Let's take a look at the bottom of this email from
 4    Mr. Neuman and I want to focus you on certain words in this
 5    paragraph, and I'm going to underline them for you.
 6    Mr. Neuman's not saying in this email that Pat's not good at
 7    operations; is he?
 8    A.      I don't know if you missed the first part, but
 9    Mr. Neuman didn't write this.  He blasted it out but Pat
10    Hurley wrote this.
11    Q.      Where does it say on here that Pat Hurley wrote this?
12    A.      It doesn't say.
13    Q.      Is it your testimony that Mr. Neuman allows employees
14    to put emails out under his name?
15    A.      I -- it is my testimony that Pat Hurley wrote this
16    email in an effort to announce to the general population
17    that this was a wonderful thing and it was, it was a good
18    promotion, and Pat is very good at self promotion.  He's an
19    excellent salesman.  He could probably sell ice to the
20    Eskimos.  So if it's Mr. Neuman's practice, did you say to
21    have employees make their own emails?  I wasn't -- I'm not
22    sure of the question.
23    Q.      Who does the email say it's from?
24    A.      It says it's from Pat -- I'm sorry, Gil Neuman.
25    Q.      And it's your testimony here today that it was
```

CUCURILLO - DIRECT

 1    actually Mr. Hurley that wrote this?

 2    A.     It is.  I'm telling you Mr. Hurley drafted the

 3    wording.  The wording is all Mr. Hurley.

 4    Q.     Were you present when he drafted this?

 5    A.     No, I didn't have to be.  If you know Mr. Hurley --

 6    well, I'm testifying this was written, drafted, composed by

 7    Pat Hurley.

 8    Q.     And you have no basis for saying that other than your

 9    own speculation; isn't that true?

10    A.     Yes.  That's true.

11    Q.     Okay.  So on the face of the document, it says it's

12    from Mr. Neuman but it's your testimony to the jury that

13    it's not from Mr. Neuman?

14    A.     You're missing what I'm saying.  I'm saying Pat

15    Hurley crafted the words.  Pat Hurley wrote the prose, if

16    you will, forwarded it to Mr. Neuman.  Mr. Neuman blasted it

17    as a wonderful thing, an announcement.

18    Q.     Did Mr. Neuman -- do you assume Mr. Neuman read the

19    email before it went out?

20    A.     I'm sure he did.

21    Q.     Do you believe that if he disagreed with something in

22    there he would have made edits to it?

23    A.     Well, if you're pumping someone up and you're pumping

24    a company up and you're making this wonderful announcement,

25    and you have a sentence that you underlined by saying --

CUCURILLO - DIRECT

1   where was it again?

2   Q.      Here it is.

3   A.      Well, that's the second email.  This email that

4   you're showing me now, Exhibit 12 --

5   Q.      Who wrote this one, Exhibit 12?

6   A.      This is the one I'm talking about that Pat Hurley

7   drafted.

8   Q.      In November of 2003, were you still in a payroll

9   clerk position?

10  A.      2003?  I believe I was, but for the Palm Beach

11  Division.

12  Q.      Okay.  So you wouldn't have been privy to any

13  management discussions between Mr. Neuman and Mr. Hurley, as

14  a payroll clerk at the time; right?

15  A.      That's correct.

16  Q.      Okay.  So other than your own speculation or

17  assumption, you have no basis to conclude that Mr. Hurley

18  was the actual author of this email; right?

19  A.      Correct.

20  Q.      And if Mr. Hurley had put in here not only am I

21  getting a raise but -- not only am I getting a promotion,

22  but Mr. Neuman's going to agree to pay me $10 million a

23  year, we can both agree Mr. Neuman would have edited that;

24  right?

25  A.      I'm sure he would, yes.

CUCURILLO - DIRECT

1    Q.     At least we can agree on that.  What I'd like you to

2    do is now take a look at Exhibit 16 and ask you if you've

3    ever seen this document.

4    A.     Yes.

5    Q.     Okay.  What is this document?

6    A.     This is an email again a blast email, memo announcing

7    the promotion of Pat Hurley to president of Naples.

8    Q.     And did you receive a copy of this email on or before

9    July 3rd of 2006?

10   A.     I did.

11   Q.     Does this appear to be a true and correct copy of the

12   email you received at that time?

13   A.     Yes.

14          MR. CELLAR:  Okay.  Your Honor, at this time, we'd

15   like to move into evidence what's been marked as Plaintiff's

16   Exhibit 16.

17          MR. HENRY:  No objection.

18          THE COURT:  Exhibit 16 is received.

19          (Plaintiff Exhibit 16 admitted)

20   BY MR. CELLAR

21   Q.     Who wrote this email, Ms. Cucurillo?

22   A.     On the basis that I don't 100 -- I wasn't in the room

23   when he wrote it, but I'll tell you Pat Hurley wrote this

24   one, too.

25   Q.     Would he have emailed it to Mr. Neuman?

CUCURILLO - DIRECT

1    A.    Yes.

2    Q.    Now during this case, you've had the opportunity to

3    go back and look for Mr. Hurley's emails; right?

4    A.    I didn't do that personally, no.

5    Q.    Well, we marked one in this case earlier today that

6    had the F word in it.  Have you ever seen that email where

7    he used the F word in speaking with his staff?

8    A.    I think I saw it during deposition.

9    Q.    Okay.  You were able to find that email but there's

10   no email that anybody found from Mr. Hurley to Mr. Neuman

11   saying, put this in a promotion blast; right?

12   A.    I don't -- I didn't look for the emails.  I don't

13   know.  I can't answer that.

14   Q.    What was the purpose of this email, what's been

15   introduced as Exhibit 16?

16   A.    An announcement that Pat was promoted to president of

17   Naples.

18   Q.    What I'd like you to do is focus on this third

19   paragraph, which says when I asked Pat to take command of

20   Naples three years ago, it was a failing division and on

21   life support.  Is that a true statement?

22   A.    Yes.

23   Q.    Now, you had worked -- was there a time where you

24   ever worked in Naples?

25   A.    No.

CUCURILLO - DIRECT

1  Q.      Fair enough.  Now it also says he along with Shelton
2  and his other team members turned it completely around.  Is
3  that true?
4  A.      Yes.
5  Q.      He also says in there that it has a far healthier
6  profit and loss.  You see that?
7  A.      I do.
8  Q.      Is that true?
9  A.      Yes.
10 Q.      It then says, would you believe that they have lost a
11 total of just one client in the past three years to
12 dissatisfaction; was that true?
13 A.      Yes.
14 Q.      It remains one of the best success stories in our 25
15 year history and I am proud of their efforts.  Was that
16 true?
17 A.      Yes.
18 Q.      In your opinion, Ms. Cucurillo, does this memo, this
19 blast appear to be describing a poorly performing employee?
20 A.      It does not.
21 Q.      Is there any mention in here that Pat was not doing
22 what he was supposed to be doing in his job?
23 A.      No.
24 Q.      Any mention here that Pat was not opening up a Tampa
25 office?

CUCURILLO - DIRECT

1    A.      In 2006 -- or 2003?  No.

2    Q.      Any mention in any of these emails that Pat had ever

3    been insubordinate?

4    A.      No.

5    Q.      To Mr. Neuman before?

6    A.      No.

7    Q.      And again, nothing in his personnel file either?

8    A.      Correct.

9    Q.      Now as an office manager, you're aware that Kent had

10   an employee handbook?

11   A.      Yes.

12   Q.      And when an employee starts at Kent, they are given a

13   copy of the handbook?

14   A.      Correct.

15   Q.      And they're required to sign an acknowledgment form;

16   right?

17   A.      That's right.

18   Q.      Now, if we look in Pat's personnel file, which is

19   Exhibit 1, the handbook application form or the receipt that

20   he got is dated June 1st, 2001; right?

21   A.      Yes.

22   Q.      And that is the only employee handbook acknowledgment

23   form that is contained in his personnel file?

24   A.      Yes.

25   Q.      So would you agree with me that the acknowledgment

CUCURILLO - DIRECT

```
 1   form that this pertains to would have to have been a
 2   handbook that was in place on or before June 1st of 2001?
 3   A.      Agreed.
 4   Q.      Now, what I'd like to do is show you, and it should
 5   be up there, what's been marked as Exhibit Number 11, and
 6   I'd ask that you identify the document, please.
 7   A.      Yes, this is the Kent Security handbook that was in
 8   place -- well revised in October of '99.
 9   Q.      And would you agree that this would have been the
10   handbook that Pat Hurley received and acknowledged in his
11   personnel file?
12   A.      Yes.
13   Q.      Okay.  Now, does this appear to be a true and correct
14   copy of the employee handbook at that time?
15   A.      Yes.
16            MR. CELLAR:  Your Honor, at this time, we would
17   like to move into evidence what's been marked as Exhibit
18   Number 11.
19            MR. HENRY:  No objection.
20            THE COURT:  11 is received.
21            (Plaintiff Exhibit 11 admitted)
22   BY MR. CELLAR
23   Q.      Now, this is the same handbook for all of the Kent
24   companies; right?
25   A.      Yes, it is.
```

CUCURILLO - DIRECT

1    Q.      Okay.   And this handbook provides for a medical

2    leave; right?

3    A.      Yes.

4    Q.      And what I'd like to do is turn your attention to

5    Page 4 of the book, and if you see here, it describes Kent's

6    family leave.   You see that?

7    A.      I do.

8    Q.      And it says here that you must work for at least one

9    year and have worked at least 1600 hours --

10   A.      Uh-huh.

11   Q.      -- in the preceding 12 months; do you see that?

12   A.      Yes.

13   Q.      Now, I asked you before about 1,250.   Can you dispute

14   that Mr. Hurley worked 1600 hours in 2007 or 2008?

15   A.      I can't tell you if he worked a thousand or 2,000.

16   Q.      Let's go to the next page where it describes what

17   family leave is available for, and it says here that you're

18   entitled to Family Medical Leave for your own serious health

19   condition; correct?

20   A.      Yes, sir.

21   Q.      And it says here on the next paragraph that if you're

22   required to give us reasonable notice -- you are required to

23   give us reasonable notice if you are planning to take family

24   leave; right?

25   A.      Yeah, 30 day notice unless it is an emergency.

CUCURILLO - DIRECT

1    Q.    Okay.  So under the terms of this provision in Kent's

2    handbook, Mr. Hurley had to give at least 30 days future

3    leave -- or notice to take future leave for a medical

4    condition; right?

5    A.    Correct.

6    Q.    Now it says here, we may require certification from

7    your health care provider that you are unable to perform

8    your job duties and that you are not able to perform other

9    work we have available before the leave is granted.  Do you

10   see that provision?

11   A.    I do.

12   Q.    And then below that, it says that even if we don't

13   believe your first certification, we reserve the right, at

14   our option, to have you get a second or third opinion, but

15   at your expense; right?

16   A.    I see it, uh-huh.

17   Q.    So this gives Kent three opportunities to say to an

18   employee who requested for leave, give us medical backup;

19   right?

20   A.    Correct.

21   Q.    This prevents -- the purpose of this is to protect

22   Kent; isn't it?

23   A.    Yes.

24   Q.    And the purpose of it is to prevent employees from

25   simply making up medical conditions?

CUCURILLO - DIRECT

1  A.      Yes.

2  Q.      The purpose of this is to allow Kent to ask for

3  certification to make sure that employees are just not

4  saying, I need medical leave, and going to Wyatt Earp Days;

5  right?

6  A.      Yes.

7  Q.      The purpose of this is to allow Kent to determine

8  whether an employee has a serious medical condition, to

9  learn about the condition, so they could make a legal

10 decision on whether leave is appropriate; right?

11 A.      Correct.

12 Q.      The purpose of this is to make sure that Kent does

13 not make a rash decision in approving or denying an

14 employee's leave before consulting with either a doctor or

15 the law?

16 A.      Correct.

17 Q.      The purpose of this provision is to make sure that

18 the Medical Leave Act is complied with; right?

19 A.      Yes.

20 Q.      Now, I want to focus on the time that Pat was fired.

21 Up until that point, as we discussed, you were unaware of

22 any discipline or warning Pat had ever received; right?

23 A.      Correct.

24 Q.      He'd worked there for seven years up until that

25 point?

CUCURILLO - DIRECT

1  A.      Correct.

2  Q.      He'd received these two promotions that we looked at,

3  Exhibits 12 and 16.  Right?

4  A.      Yes.

5  Q.      He had received pay increases?

6  A.      Correct.

7  Q.      He'd been given increased responsibility?

8  A.      Yes.

9  Q.      He received a discretionary bonus from Mr. Neuman in

10  2007; right?

11  A.      Yes.

12  Q.      He received a trophy at the management retreat in

13  2007?

14  A.      Yes.

15  Q.      For his performance; right?

16  A.      Correct.

17  Q.      Now on April 30th of 2008, you were copied on an

18  email discussion between Mr. Neuman and Pat; right?

19  A.      Yes.

20  Q.      Now, you were copied not by Mr. Hurley but by

21  Mr. Neuman; right?

22  A.      No.  I was copied by Mr. Hurley.

23  Q.      Okay.  Let me show you what's been marked as

24  Plaintiff's Exhibit Number 33.  Do you have that in front of

25  you?

CUCURILLO - DIRECT

1   A.      I do not.

2            MR. CELLAR:  Give me two seconds -- Your Honor,

3   would this be a good breaking point for a moment or do you

4   want me to proceed?

5            THE COURT:  You can find it.

6            MR. CELLAR:  I'm sorry?

7            THE COURT:  Do you want to find it?

8            MR. CELLAR:  I'm sorry.

9            THE COURT:  Proceed.

10           MR. CELLAR:  May I approach?

11           THE COURT:  You may.

12           THE WITNESS:  Thank you.

13           MR. CELLAR:  You're welcome.

14  BY MR. CELLAR

15  Q.      Showing you what's been pre-marked as Exhibit

16  Number 33, I'd ask you to identify that, please?

17  A.      This is from Gil Neuman to Pat Hurley -- well, yeah,

18  from Gil Neuman to Pat Hurley.  Your request has been

19  denied.  Please schedule a meeting with me to discuss this

20  further.

21  Q.      Okay.  Now does that appear to be a true and correct

22  copy of the email that you were copied on on or about

23  April 30th, 2008?

24  A.      Yes.

25           MR. CELLAR:  Your Honor, at this time, we'd like

CUCURILLO - DIRECT

```
 1   to move into evidence Plaintiff's 33.
 2               MR. HENRY:  No objection.
 3               THE COURT:  Exhibit 33 is received.
 4               (Plaintiff Exhibit 33 admitted)
 5   BY MR. CELLAR
 6   Q.    Now, if you take a look at the bottom of 33, the
 7   first page, there's an email from Pat Hurley to Gil Neuman;
 8   you see that?
 9   A.    Yes.
10   Q.    You're not copied on that email; correct?
11   A.    Correct.
12   Q.    The response, Mr. Neuman's denial, that you were
13   copied on; right?
14   A.    Yes.
15   Q.    So does that change your testimony that it was
16   Mr. Neuman, not Mr. Hurley, that copied you on the email?
17   A.    Yes.  When you referred to the email of April 30th, I
18   thought it was the, "Oops, I left you off the email."
19   Q.    Fair enough.
20   A.    Sorry.
21   Q.    That's okay.  Now in the first string of emails that
22   you're looking at, Pat had asked for a leave contained in
23   the email and attached a schedule right?
24   A.    Yes.
25   Q.    Gil responded to that, as you can see, less than one
```

CUCURILLO - DIRECT

1    hour later?

2    A.    Yes.

3    Q.    And he said the request was denied?

4    A.    Right.

5    Q.    Then if we look at Exhibit 34 -- I'm going to bring

6    it over to you, ma'am.

7    A.    Sure.

8              (Discussion off record between counsel)

9              MR. CELLAR:  Give me one second.  It might be 35.

10   It was the "oops" email.  You have that one.

11             MR. HENRY:  You're looking for 32.

12             MR. CELLAR:  32?

13             MR. HENRY:  32.

14             MR. CELLAR:  32.

15             (Discussion off record)

16   BY MR. CELLAR

17   Q.    Showing you what's been marked as Exhibit Number 32,

18   ask if you recognize that document?

19   A.    Yes.

20   Q.    And is that the -- the true and correct copy of the

21   email that you received on or about April 30th, 2008, at

22   11:05 p.m.?

23   A.    Yes.

24             MR. CELLAR:  Okay.  Your Honor, at this time, we'd

25   like to move into evidence what's been marked as Exhibit 32.

CUCURILLO - DIRECT

 1                 MR. HENRY:  No objection.

 2                 THE COURT:  Exhibit 32 is received.

 3                 (Plaintiff Exhibit 32 admitted)

 4    BY MR. CELLAR

 5    Q.    And this is the email that we've been discussing

 6    where Pat said his leave is for medical reasons.  You see

 7    that?

 8    A.    Yes.

 9    Q.    Now, you're currently the HR -- the HR manager for

10    Kent; right?

11    A.    Correct.

12    Q.    And you're aware that as an HR manager, if an

13    employee makes a request for medical leave, the employer has

14    certain obligations to inquire further about that leave?

15    A.    Correct.

16    Q.    Okay.  And you're also aware that if an employee

17    requested medical leave, the employer does not -- or the

18    employee does not have to specifically use the words "I want

19    FMLA leave"?

20    A.    Correct.

21    Q.    The employee doesn't have to say FMLA at all; right?

22    A.    That's right.

23    Q.    Okay.  You would agree that the burden, once the

24    employee says they need medical leave, is now on the

25    employer to ask for more information, such as a

CUCURILLO - DIRECT

1    certification, if they need it; right?

2    A.      Correct.

3    Q.      And you're well aware that nobody from Kent ever did

4    that after Pat sent this email?

5    A.      Correct.

6    Q.      You're aware that Kent did no investigation to

7    determine what their obligations were upon receiving this

8    email; right?

9    A.      Correct.

10   Q.      You're aware that they asked for no information from

11   the Department of Labor; right?

12   A.      Right.

13   Q.      You're aware that --

14   A.      That he was --

15   Q.      -- they did not consult with an attorney to determine

16   what if any obligations they had under the law as a result

17   of this email?

18   A.      I'm not a hundred percent aware of that, but it

19   sounds right.

20   Q.      You're aware that nobody did any investigation to

21   determine whether Kent had an obligation under the law to

22   make any further inquiry about this statement?

23   A.      Correct.

24   Q.      Instead, you're aware that Mr. Neuman fired Pat 24

25   hours later after receiving this email; right?

CUCURILLO - DIRECT

1  A.      Yes.

2  Q.      You're aware that Pat had worked there for seven

3  years?

4  A.      Yes.

5  Q.      You're aware that he had been given no reason for his

6  firing when he was fired; right?

7  A.      I'm not aware of that.

8  Q.      Were you aware that Pat could only be fired in

9  writing?

10 A.      No, I was not at the time, no.

11 Q.      Were you aware that Pat was required to be given 30

12 days notice?

13 A.      I was not aware.

14 Q.      Now, you were also aware that Kent's handbook

15 contains what's called a progressive discipline policy;

16 right?

17 A.      Yes.

18 Q.      And if you take a look at --

19 A.      At that time it was, yes.

20 Q.      Right, at that time.  If you take a look at Page 12

21 of the handbook -- sorry, let's go to Page 10.  It outlines

22 certain offenses that an employee can be fired for

23 immediately at Kent Security; right?

24 A.      Yes.

25 Q.      And above that it talks about progressive discipline

CUCURILLO - DIRECT

```
 1    where there should be write-ups; is that right?
 2    A.      Yes.
 3    Q.      And there should be steps before an employee gets
 4    fired?
 5    A.      Correct.
 6    Q.      And we've already established that there was nothing
 7    in Pat's personnel file at the time he sent his request for
 8    medical leave containing any of the progressive steps of
 9    discipline; right?
10    A.      Correct.
11    Q.      Now, under Class A offenses, it says these may result
12    in immediate termination of employment without the benefit
13    of progressive discipline.  You see that?
14    A.      I do.
15    Q.      And what I'd like you to do is take a look at the
16    list of 21 factors briefly and tell me where it says
17    insubordination.
18    A.      It doesn't.
19    Q.      Okay.  Tell me where it says poor performance.
20    A.      It doesn't.  But you're talking about a high level
21    managerial position when this book is geared for security
22    guards.  It's --
23    Q.      The book -- I'm sorry, go ahead.
24    A.      We had one book.  It's true.
25    Q.      If the book is geared for security guards, then why
```

CUCURILLO - DIRECT

1   would you ask Mr. Hurley to sign off acknowledging that he

2   received it if it didn't apply to him?

3   A.    I think it's probably just part of the overall

4   package, the new-hire package at the time in 2001 when he

5   was hired.

6   Q.    Did anybody ever tell Pat, to your knowledge, that

7   the handbook did not apply to him?

8   A.    No.

9   Q.    Is there anything in his personnel file that says, we

10  know you signed an acknowledgment, but it doesn't really

11  apply to you?

12  A.    No.

13  Q.    Now, if Pat wanted to take leave, is it your

14  testimony that Mr. Neuman would have to approve it?

15  A.    Yes.

16  Q.    Okay.  And would Pat -- Pat would have to fill out a

17  form or a document and submit to it Mr. Neuman; right?

18  A.    Not necessarily a formal -- there's not necessarily a

19  form that would have to be filled out.  If he were

20  requesting a vacation, for example, like he did in this

21  email, he could send him a an email that says I need

22  vacation time for these dates.

23  Q.    Okay.  You would agree that there's not a single

24  email that has been produced in this case prior to the

25  medical leave one where Pat was emailing Mr. Neuman for

CUCURILLO - DIRECT

1   approval of a leave?

2   A.      No, just this first one.  This one on -- at 11:54 on

3   April 29th that I request these dates off for the following

4   two years.

5   Q.      And this one would be different, meaning this leave

6   request, because in this one, he's actually asking for

7   medical leave or medical leave time off, according to his

8   doctors; right?

9   A.      After the vacation request was denied.

10  Q.      Right.

11  A.      Right.

12  Q.      But there's not a single email showing that in times

13  past Pat had actually emailed Mr. Neuman to request leave;

14  is there?

15  A.      I don't know that.

16  Q.      Well, this was certainly a different type of leave

17  that he was asking for in this email; wasn't it?

18  A.      Not in the first email.  It's vacation dates.  That's

19  all it says.

20  Q.      And after Mr. Neuman responded it was denied, then

21  Pat explained what the nature of the leave was; right?

22  A.      Right.

23  Q.      And we agree that Kent did nothing to determine its

24  obligations under the Family Medical Leave Act at that

25  point?

CUCURILLO - DIRECT

1   A.      Correct.

2   Q.      And you're aware that under the Family Medical Leave

3   Act, you're entitled to up to 12 weeks of unpaid leave;

4   right?

5   A.      Yes.

6   Q.      And that doesn't matter whether you have any existing

7   leave time or not; does it?

8   A.      That's correct.

9   Q.      Now in response to Pat's request for this leave time,

10  Mr. Neuman asked you to do an audit of how much leave time

11  Pat had remaining; right?

12  A.      Yes, but that went more to the, in your words,

13  request, which Mr. Hurley then says well, this isn't a

14  request, this is a demand, or however he's put it in the

15  email.  That's where the insubordination comes in, I think.

16  Q.      Okay.  The language you're referring to saying this

17  was not a request, it was a schedule?

18  A.      Correct.

19  Q.      And you see in the first email that Mr. Hurley sent

20  to Mr. Neuman that any of these dates are subject to change?

21  A.      Right.

22  Q.      You see that?

23  A.      Attached is my vacation schedule going forwards.

24  Q.      And what does the next sentence say?

25  A.      Dates are subject to change, Pat.  Uh-huh.

CUCURILLO - DIRECT

1    Q.    You claim to have attended a meeting between

2    Mr. Neuman and Shelton Blackwell prior to Mr. Neuman firing

3    Pat; right?

4    A.    Yes.

5    Q.    Were you present for the entire meeting?

6    A.    I think I was.

7    Q.    Okay.  And is it your -- your testimony has been that

8    the purpose of this meeting was, quote, to rehash the email

9    or Pat's email requesting leave; right?

10   A.    Pretty much.  It was Gil Neuman saying, what am I

11   going to do with this guy.  He's drawing a line in the sand.

12   Q.    Do you recall giving a prior deposition under oath,

13   ma'am?

14   A.    I do.

15   Q.    And you recall as we discussed you were sworn?

16   A.    Yes, Richard.

17   Q.    And I asked you the question -- counsel, Page 34,

18   Line 14 -- tell me what was discussed during this meeting

19   between you, Mr. Neuman, and if you recall correctly,

20   Mr. Blackwell.

21         And your answer was:  I think it was just a rehash

22   of this email.  Mostly the part that I spoke to you about

23   before saying, you know, feel free to come to Naples.

24   A.    Right, feel free to come to Naples.  The

25   insubordination area of it.

CUCURILLO - DIRECT

1   Q.      Understood.

2   A.      The fact that every single date on this schedule

3   contained a holiday, two years out.

4   Q.      Is it your testimony that Shelton Blackwell was aware

5   of the email that Mr. Neuman -- that Mr. Hurley had sent

6   Mr. Neuman during the time of this meeting?

7   A.      Yes, I believe so.

8   Q.      You're certain of that; right?

9   A.      Yes.

10  Q.      As certain of that as you are the rest of your

11  testimony here today?

12  A.      Yes.

13  Q.      And it's your testimony that this meeting took place

14  before Pat was fired; right?

15  A.      Yes.

16  Q.      And again, during this meeting, nobody discussed

17  obligations under the Family Medical Leave Act?

18  A.      Correct.

19  Q.      And as an office manager, you didn't think you had an

20  obligation to raise that there might be a Medical Leave Act

21  issue here?

22  A.      I didn't.  HR was not my bailiwick at the time and to

23  be quite honest with you, I don't think this has anything to

24  do with medical leave, not after the way it was requested,

25  not after the way it was demanded, this is my schedule, this

CUCURILLO - DIRECT

```
 1   is what I need for two years out.  No, I don't think medical

 2   leave came into it at all.

 3   Q.     Were you aware of Pat's mental state at the time he

 4   sent this email?

 5   A.     His mental state?

 6   Q.     Yes, ma'am.

 7   A.     No.

 8   Q.     Now, as an HR manager today, you would agree that if

 9   an employee asked for -- that you would have asked for

10   certification if an employee was asking for medical leave;

11   right?

12   A.     If an employee was asking for medical leave, yes.

13   Q.     You would ask the employee for certification, now

14   that you're an HR manager?

15   A.     Yes.

16   Q.     Now during this meeting, you claim that Shelton

17   flat-out, to use your words, told Pat -- told Mr. Neuman,

18   fire him; right?

19   A.     Fire him, yes.

20   Q.     Without a doubt, that's what he said?

21   A.     Yes.

22   Q.     And again, you're as certain of that as you are the

23   rest of your testimony here today?

24   A.     Yes.

25   Q.     Fair enough.  Now during this meeting, Mr. Neuman
```

CUCURILLO - DIRECT

1    never said he was going to fire Pat; did he?

2    A.    I don't recall that he came out and said he was going

3    to fire him.  He said he had to take care of it that day.  I

4    know --

5    Q.    You didn't --

6    A.    -- he left the office that day.

7    Q.    But during the meeting, Mr. Neuman never definitively

8    said he was going to fire Pat; right?

9    A.    I really don't recall him saying those words, no.

10   Q.    And you didn't even think that Pat was going to be

11   fired during that meeting or after that meeting; did you?

12   You thought it would just be a slap on the wrist, blow over?

13   A.    I did.

14   Q.    Right?

15   A.    I did.

16   Q.    Business as usual, isn't that what you testified to?

17   A.    Yes.

18   Q.    And that's because Gil normally wouldn't fire

19   somebody over an issue like this?

20   A.    No, that's not the reason.  The reason is because Gil

21   is very slow to fire.

22   Q.    Right.  You would agree that Gil needs a long road of

23   issues with somebody before he's just going to go and fire

24   them; right?

25   A.    Or a line in the sand or the straw that broke, yeah.

CUCURILLO - DIRECT

1    Q.    But as we saw in the personnel file, there was no

2    long line of issues with Mr. Hurley?

3    A.    No, there was the line in the sand.

4    Q.    But you would agree that, like you said, Mr. Neuman

5    does not fire easily?

6    A.    No, he does not.

7    Q.    The next thing you heard, however, Gil had -- or

8    Mr. Neuman had fired Pat on the phone; right?

9    A.    Yes.

10   Q.    And you weren't present during the phone call between

11   the two?

12   A.    No, definitely not.

13   Q.    And Mr. Neuman never gave you a reason for why he

14   fired Pat; right?

15   A.    The reason was understood by me to be

16   insubordination.

17   Q.    My question was, did Mr. Neuman ever give you a

18   reason for why he fired Pat, yes or no?

19   A.    No.

20   Q.    Mr. Neuman never asked you to put a document in

21   Mr. Hurley's personnel file explaining the reason for why he

22   was terminated; right?

23   A.    No.  Correct.

24   Q.    And nothing was ever sent to Pat in writing or

25   otherwise saying, this is why you were terminated; correct?

CUCURILLO - DIRECT

 1   A.      I don't know if it was.  I didn't see it, no.

 2   Q.      It was after litigation began that Mr. Neuman first

 3   claimed insubordination; isn't that true?

 4   A.      No, I think it came up way before that.  Probably

 5   with the unemployment claim and in the discussion in the

 6   meeting.

 7   Q.      You claimed that you're aware that the argument

 8   during the unemployment hearing was that Mr. Hurley was

 9   insubordinate; right?

10   A.      Yes.

11   Q.      Do you recall what the finding was during that

12   unemployment hearing?

13   A.      I don't, no.

14           MR. HENRY:  Object to the question, Your Honor.

15   Could I be heard at sidebar?

16           MR. CELLAR:  I'll withdraw the question, Your

17   Honor.

18           THE COURT:  All right, we'll take a 15 minute

19   recess now.

20           MR. CELLAR:  Your Honor, I have two questions

21   left -- literally two questions left.

22           THE COURT:  All right, go ahead.

23           MR. CELLAR:  Four questions.

24   BY MR. CELLAR

25   Q.      As human resources manager for Kent, if an employee

CUCURILLO - DIRECT

1    is fired today, you would document their reason in their

2    file for why they were fired; right?

3    A.    Yes.

4    Q.    And the write-up would be signed not only by the

5    manager but by the employee?

6    A.    Correct.

7    Q.    Kent would make sure there's a documented reason in

8    the file for termination?

9    A.    Yes.

10   Q.    And this would be, it would be to make sure that a

11   reason was not made up after the firing; right?

12   A.    Correct.

13   Q.    And to have proper documentation?

14   A.    Yes.

15   Q.    But Kent never did that for Mr. Hurley; did they?

16   A.    No.

17             MR. CELLAR:  I've got nothing further.  Promise.

18             THE COURT:  Now we'll take a 15 minutes recess.

19   Don't talk to each other about the case or the witnesses,

20   and keep an open mind.  Stand for the jury.

21             (Recess from 3:15 p.m. to 3:30 p.m.)

22             THE COURT:  Bring in the jury, please.

23             COURT SECURITY OFFICER:  Yes, sir.

24             (Jury in)

25             THE COURT:  Please be seated.  You may proceed.

1          MR. HENRY:  Thank you, Your Honor.

2                    CROSS EXAMINATION

3   BY MR. HENRY

4   Q.      Good afternoon, Ms. Cucurillo.

5   A.      Good afternoon, Mr. Henry.

6   Q.      I'm going to talk very slowly.  I'm going to call you

7   in my case in chief, and so I'm only going to ask you a few

8   questions today because I'm going to ask you more questions

9   later on in the trial.  There was an issue that you talked

10  about on your direct examination by Mr. Cellar.  You said

11  something to the effect -- and I got lost, I must admit --

12  but something to the effect that Pat Hurley had been asked

13  to open a Tampa office and that Gil Neuman was critical of

14  him or upset with him or something because he hadn't done

15  that.

16  A.      Yes.  I don't know if it was Tampa or Jacksonville.

17  It was somewhere on the west coast and it was north of

18  Naples, that I know.

19  Q.      And Mr. -- Mr. Cellar, I believe, asked you with your

20  deposition transcript if you had mentioned that issue at

21  your deposition.  Do you recall that testimony?

22  A.      Yes, I think I do.  I think I said yes, and in the

23  deposition and here.

24  Q.      Yeah, he said that -- he read this testimony -- it's

25  at Page 21.

CUCURILLO - CROSS

```
1              MR. CELLAR:  Thanks.
2    BY MR. HENRY
3    Q.     Did you ever hear prior to May 1st, 2008, that
4    Mr. Hurley was not performing well in his job other than
5    what you've already discussed.
6              And I think you answered that question?
7    A.     I said no.  But other than what we've already
8    discussed, meaning the things we discussed in the
9    deposition, the things we discussed as far as this email,
10   the opening of that other office.
11   Q.     There were pages of deposition testimony that weren't
12   addressed by Mr. Cellar.  You recall testifying, Mr. Cellar
13   asked you the question:  Did Mr. Neuman ever ask you to
14   place any written reprimand's in Pat Hurley's personnel file
15   from 2006 to 2008.
16             You answered that, I don't recall any written
17   reprimand, no.
18             This is Page 15.  And he questioned you:  Do you
19   recall any verbal reprimand as you sit here today between
20   the period of 2006 and 2008 that Mr. Neuman discussed with
21   you regarding Mr. Hurley.
22             And your answer was --
23             MR. CELLAR:  Your Honor, objection.  This is
24   improper bolstering of her deposition testimony.
25             MR. HENRY:  He impeached her with this transcript
```

CUCURILLO - CROSS

 1   and I'm reading the rest of the transcript that Mr. Cellar
 2   was not kind enough to read.
 3           THE COURT:  The Rule of completeness; it's
 4   overruled.
 5   BY MR. HENRY
 6   Q.    Your response was:  I recall friction between
 7   Mr. Hurley and Mr. Neuman.  I don't recall that anything was
 8   ever placed in his file, at least not by me.
 9           And then the question was:  Do you recall any
10   specific instances of this friction you're describing.
11           And you responded:  There were several.  One that
12   I recall is that Mr. Hurley was asked to open an office, I
13   think it was -- it could have been Tampa or Jacksonville.
14   I'm not sure where, but somewhere on the west coast, and
15   Mr. Neuman felt that he might have been dragging, that
16   Mr. Hurley must have been dragging his feet on it.
17           Do you recall now that testimony?
18   A.    Yes.  And that's what I said here today that I'm not
19   sure where the office was, whether it was Tampa,
20   Jacksonville, that there was friction over that, that
21   Mr. Neuman did feel that Pat was dragging his feet on it and
22   that every time -- well, there wasn't any progress being
23   made.  No office was open during this.  And again, I
24   don't -- I'm not sure if it was Jacksonville or Tampa or
25   where.  I know it was on the west coast and I know it was

CUCURILLO - REDIRECT

```
 1    much further north of Naples.
 2              MR. HENRY:  Okay, I have more questions for you
 3    when we recall you, but I don't have any further questions
 4    on cross examination, Judge.
 5                    REDIRECT EXAMINATION
 6    BY MR. CELLAR
 7    Q.    Ms. Cucurillo, I'm not sure whether this is 12 or 16.
 8    This is March of 2008.  Do you see that?
 9    A.    Yes.
10    Q.    Can you read this sentence to the jury from
11    Mr. Hurley to Mr. Neuman?
12    A.    I know you've been out of the office all day but we
13    should try to discuss the Tampa office.
14    Q.    Is this an email from Mr. Hurley to Mr. Neuman
15    initiating discussion on the Tampa office?
16    A.    It's an email from Mr. Hurley to Mr. Neuman.  I don't
17    know where the discussion initiated.
18    Q.    Does this appear to be consistent with you of an
19    employee who's dragging his feet emailing his boss to
20    discuss it?
21    A.    Well, I think it was way before March 26th that the
22    plans were to open the office.  So I don't know how much
23    time had elapsed from the inception of the plan to this
24    email.
25    Q.    The only -- the only information --
```

CUCURILLO - REDIRECT

1    A.      In other words, I can't really answer that.  I don't

2    know.

3    Q.      The only information you have regarding this alleged

4    friction between Mr. Hurley and Mr. Neuman is what

5    Mr. Neuman told you; right?

6    A.      No, that's not exactly right.  There were -- there

7    was friction over this issue, I want to say, for a few

8    months before this email.

9    Q.      And that was what Mr. Neuman told you?

10   A.      What Mr. Neuman told me, what the regular office talk

11   was, just from general knowledge in the office.

12   Q.      Okay.  You were not present during any meetings or

13   discussions between Mr. Neuman and Mr. Hurley regarding this

14   Tampa office?

15   A.      No, I was not.

16   Q.      Okay.  And other than your own speculation combined

17   with what Mr. Neuman told you, you have no personal

18   knowledge of what the issue was, if anything, with Tampa;

19   right?

20   A.      Correct.

21   Q.      And you are aware that Mr. Hurley did open up a Tampa

22   office with Kent?

23   A.      I know there was an office opened.  I don't know if

24   this was supposed to be a second one or one further north.

25   I don't know.

CUCURILLO - RECROSS

1          MR. CELLAR:  Thank you.  I've got nothing further,

2    Your Honor.

3          MR. HENRY:  One follow-up.

4                    RECROSS EXAMINATION

5    BY MR. HENRY

6    Q.    Ms. Cucurillo, on the same issue, have you ever seen

7    a communication in writing between Mr. Hurley and Gil Neuman

8    discussing the Tampa office where Mr. Hurley did not also

9    ask for his bonus?

10   A.    Never.

11   Q.    In every occasion, the Tampa office always --

12   A.    Whenever the Tampa office was brought up, the bonus

13   was brought up.

14          MR. HENRY:  Okay, thank you.

15          MR. CELLAR:  Nothing further, Your Honor.

16          THE COURT:  Thank you.  You may step down.

17          THE WITNESS:  Thank you.

18          (Witness excused)

19          THE COURT:  Call your next witness.

20          MR. CELLAR:  The plaintiff calls Shelton

21   Blackwell.

22          THE COURT:  Come forward.

23          DEPUTY CLERK:  Stop right there and raise your

24   right hand.

25          (The Witness is Sworn)

BLACKWELL - DIRECT

1          DEPUTY CLERK:  Thank you.  You may be seated in

2     the witness booth and if you'll please state your name for

3     the record.

4          THE WITNESS:  Shelton Richard Blackwell, Jr.

5               SHELTON R. BLACKWELL, JR.,

6          a witness herein, after having been duly sworn,

7          was examined and testified under oath as follows:

8                    DIRECT EXAMINATION

9     BY MR. CELLAR

10    Q.    Good afternoon, Mr. Blackwell.

11    A.    Hello, sir.

12    Q.    Now, your current title is President of Kent; is that

13    true?

14    A.    No, sir.

15    Q.    Did that recently change?

16    A.    Yes, sir.

17    Q.    When I had taken your deposition, was it President of

18    Kent?

19    A.    Probably.

20    Q.    What's your title now?

21    A.    Director of Operation.

22    Q.    Okay, and when did that change?

23    A.    Few months back.  Maybe four or five months back.

24    I'm not sure exactly on the date.

25    Q.    Nobody's ever been hired as President of Naples since

BLACKWELL - DIRECT

1    Pat was fired; right?

2    A.      That's correct.

3    Q.      Now, you started your career with Kent in 2004;

4    right?

5    A.      Yes, sir.

6    Q.      And you were hired in Naples?

7    A.      Yes, sir.

8    Q.      I believe it was Mr. Hurley that actually hired you;

9    wasn't it?

10   A.      I had interviewed with Mr. Hurley and his manager at

11   the time, yes, sir.

12   Q.      And Pat helped promote you up through the ranks while

13   he was still there?

14   A.      Correct.

15   Q.      Okay.  He got you a position of district manager at a

16   certain point?

17   A.      Correct.

18   Q.      And then director of operations?

19   A.      It was the same position.  It was just he retitled

20   it.

21   Q.      Don't tell anybody that.  In 2006, you became

22   Vice-president of Naples under Pat; correct?

23   A.      Correct.

24   Q.      Pat was your supervisor at that time?

25   A.      Yeah.  Pat spent most of his -- predominantly most of

BLACKWELL - DIRECT

1    his time on the east coast in Kent of Palm Beach but he was

2    ultimately in charge of Kent of Naples at that time.

3    Q.    So in the chain of command, you would have still

4    reported to Pat?

5    A.    Yes, sir.

6    Q.    Fair enough.  Now, you've worked your way up in Kent

7    from security guard when you were first hired to essentially

8    now -- tell me the new position?  I apologize.

9    A.    Director of Operations.

10    Q.    Director of Operations, and you would agree that

11    you're fairly loyal to Kent at this point in your life?

12    A.    Yes, I'm loyal to Kent Security, yes.

13    Q.    And you're also loyal to Mr. Neuman, who is your now

14    direct supervisor?

15    A.    Mr. Neuman's my direct supervisor, yes, sir.

16    Q.    And you're loyal to him?

17    A.    Yes, sir.

18    Q.    And you're also loyal to Mrs. Alexander, who is one

19    of the owners of the company?

20    A.    Yes.

21    Q.    Okay.  And you actually work fairly closely with

22    Mr. Neuman on a day-to-day basis; isn't that true?

23    A.    Yes, sir.  I have daily contact with Mr. Neuman.

24    Q.    Okay.  Is Kent your only source of income?

25    A.    Yes.

BLACKWELL - DIRECT

1   Q.      Has Kent been your career for the last eight years?

2   A.      Yes.

3   Q.      And you certainly wouldn't want anything bad to

4   happen to Kent as a result of this lawsuit; right?  Can we

5   agree on that?

6   A.      We can agree on that.

7   Q.      Okay.  Now, you worked directly with Pat in Naples

8   between 2004 until late 2006; right?

9   A.      Yes, sir.

10  Q.      And during that time, as we discussed, Pat was the

11  senior manager to you?

12  A.      Yes, sir.

13  Q.      And you worked closely with Pat?

14  A.      Yes, sir.

15  Q.      And Pat was one of the managers that you were sort of

16  learning from at Kent; right?

17  A.      Yeah, correct.  Yes.

18  Q.      He'd been, in certain ways, a mentor to you?

19  A.      In some areas, absolutely.

20  Q.      And he'd been a very successful manager with Kent

21  during that time period; would you agree?

22  A.      From a business development, sales standpoint, yes.

23  The operations mostly fell on my shoulders.

24  Q.      Fair enough.  Like you, Pat had worked his way

25  through the company ranks?

BLACKWELL - DIRECT

1   A.      I believe Pat started with the company as -- as a
2   salesperson.
3   Q.      Okay.  And then he'd worked his way up all the way
4   to, at a certain point, president of two divisions?
5   A.      At one point, correct.
6   Q.      Now, during the time you worked with Pat in Naples,
7   and I want to focus on that because I know at a certain
8   point you left and went elsewhere, Pat worked a normal
9   business schedule; right?
10  A.      Traditional business hours, Monday through Friday
11  kind of a thing, yes.
12  Q.      He also -- you and he would sometime attend meetings
13  after work; right?
14  A.      Correct.
15  Q.      Okay.  And you never told Mr. Neuman specifically
16  that Pat was not working Mondays or Fridays; right?
17  A.      No, sir.
18  Q.      Meaning you never said that to Mr. Neuman?
19  A.      That's correct, sir.
20  Q.      You had no ideas what day Pat was working -- or what
21  days Pat was working once you had moved to the east coast,
22  especially; right?
23  A.      When I was in Kent of Naples, I knew what days he was
24  working, but when I moved over to the east coast, my contact
25  with Pat was limited at best.

BLACKWELL - DIRECT

```
1   Q.      And when you worked with Pat, on average, how many
2   hours a week do you think the two of you worked together?
3   A.      It would vary.  There was times when we were in the
4   office predominantly at the time and there was times that he
5   may be out of the office and I may be in the office.  So we
6   probably had anywhere between 20 to 40 hours a week in
7   between that.
8   Q.      And do you have any reason to dispute that Pat worked
9   more than 1,600 hours in any given year?
10  A.      I don't know what that equates to in a given year.
11  My math's a little slow so I can't answer.  I don't know
12  what one thousand some-odd hours makes in a year.
13  Q.      Let's make the math simple.  Let's assume it's 40
14  hours a week for 40 weeks in a year.  Do you have any reason
15  to dispute Pat worked that many hours?
16  A.      Does that include vacations or days off during the
17  year?
18  Q.      Sure.
19  A.      Yeah.  Frankly, vacation and days off, I don't have
20  any reason to dispute that.
21  Q.      Are you aware that on occasion, for example, Pat
22  would have meetings on Monday mornings and Friday mornings
23  with the team?
24  A.      That was something he kind of instituted afterwards.
25  We didn't have that rigid of a staff meeting.  We would have
```

BLACKWELL - DIRECT

1    staff meetings but nothing that rigid on Mondays and

2    Fridays.

3    Q.      Now there was a period of time where Pat, after he

4    had been promoted to president of Kent of Naples and

5    president of Palm Beach that he actually moved back to the

6    east coast for a short period of time; right?

7    A.      His -- his residence, no.  He maintained his

8    residence in Naples.

9    Q.      But that he physically was staying on the east coast

10   to help get Palm Beach back on its feet?

11   A.      Correct.  He was staying in a condominium in Fort

12   Lauderdale.

13   Q.      And in turn, he tasked you to run Naples for him

14   under his watch?

15   A.      Yeah, I -- I handled the day-to-day.  I kept him in

16   the loop on pressing matters or issues that I felt he needed

17   to be, you know, in the loop in.

18   Q.      You would agree that in your experience, during any

19   time that you and Pat were affiliated with the Naples

20   Division, that that division had strong profit margins?

21   A.      Correct.

22   Q.      And that that division, the profit margins were, in

23   fact, not even traditional with those being seen in some of

24   the other offices?

25   A.      That's true.  It was -- and it was also a very

BLACKWELL - DIRECT

 1   different economic time in that area as well.

 2   Q.     Okay.  So you would agree that between 2006 and let's

 3   say 2008, Kent of Naples continued to thrive?

 4   A.     2008?  No, we were declining in 2008 in Kent of

 5   Naples.

 6   Q.     That was because of the economy; right?

 7   A.     Economy was part of it but we started losing

 8   business, yeah.  We weren't as robust as we were in 2006,

 9   certainly, or 2005, certainly.

10   Q.     In 2008, when Pat was fired, you were working on the

11   east coast; correct?

12   A.     Correct.

13   Q.     So you were not involved any longer as of late 2006

14   with the day-to-day operations of Naples?

15   A.     Correct.

16   Q.     In essence, Pat had given you Kent of Palm Beach to

17   run on your own; is that right?

18   A.     Gil had given me Kent of Palm Beach to run on my own.

19   Q.     Pat had recommended that to Gil; right?

20   A.     Pat, after arriving at Kent of Palm Beach in June of

21   2006, started having conversations with me around the

22   November time that he felt that he had made a mistake going

23   to Kent of Palm Beach and would like to come back to Naples,

24   and felt the only way that he could do that if I was

25   interested in taking on the problems that existed in Kent of

BLACKWELL - DIRECT

1    Palm Beach.  Pat stated that he didn't feel that he had the

2    energy level to deal with Gil or deal with the problems that

3    were in Kent of Palm Beach and he felt that I was a better

4    fit.  So that started that ball rolling.  Obviously, it was

5    a promotional opportunity for me, so I embraced it.

6    Q.    Now, I want to show you what we've previously marked

7    as Exhibit Number 16, which has already been introduced into

8    evidence.  You should have a copy in front of you.

9    A.    Okay.

10   Q.    Do you recall receiving this email?

11   A.    Yes, sir.

12   Q.    Okay.  Do you disagree with anything in this email?

13   A.    No, sir.

14   Q.    This is true, everything that's in here?

15   A.    Yes, sir.

16   Q.    Okay.  So you would agree that, for example, Pat and

17   his team, meaning you and him, had turned Naples around;

18   correct?

19   A.    Yeah.  I don't know what the trials and tribulations

20   were of Naples before I got into management.  I was only a

21   rank and file employee for a very brief period of time

22   before Pat gave me an opportunity to get into management.

23   So I don't understand the whole history there, but I know

24   that from that point forward, we had some success and

25   business development and client retention as well.

BLACKWELL - DIRECT

1  Q.    Now after November of 2006, you and Pat made the

2  switch where you went to the east coast, he stayed on the

3  west coast?

4  A.    Yes, sir.

5  Q.    And from that point forward, the two of you didn't

6  really work together in person; right?

7  A.    I'm sorry, say again, please?

8  Q.    From that point forward, the two of you didn't work

9  together on a day-to-day basis?

10  A.    When I went to the east coast and he came back to

11  Naples?

12  Q.    Yes.

13  A.    That's correct.  We had some interaction.  Mild.  Our

14  relationship was a little strained at the time when that

15  switch happened, but after some time, things smoothed out

16  between us to a point we were able to work a little bit

17  closer together.

18  Q.    Well, the reason why your relationship was strained

19  was because you threatened to physically kill Pat; right?

20  A.    Well, you're leaving a lot of the part of the story

21  out, but -- of what led up to that, but yeah, I made -- I

22  made statements and threats to Pat that, that I shouldn't

23  have made.  That's correct.

24  Q.    And there are threats of violence that actually

25  resulted in a police report getting filed; right?

BLACKWELL - DIRECT

1    A.     I've never seen a police report filed on that.

2    Q.     You were not aware that there was a police report

3    filed in Collier County, Florida, Charge Number 0110000?

4    A.     I was told by Gil Neuman that he had contacted law

5    enforcement, but I had never seen a report.

6    Q.     Do you deny that you said to Pat that you were going

7    to, quote, pound his F'ing head in?

8    A.     I don't recall my exact verbiage that I used.  But

9    seeing that I was several days away from not having a place

10   to live with a one year old baby and a wife, based on a

11   residence that I thought the corporation was providing me,

12   yeah, I lost my cool and I -- I reacted poorly.

13   Q.     You also said to him, I'm going to beat your F'ing

14   A-S-S.  Do you recall saying that?

15   A.     I'm not going to dispute anything that you say that I

16   said because I don't recall exactly what I said, but I know

17   it wasn't nice and I know it wasn't pretty.

18   Q.     Well, when you said to it him, you've identified that

19   at that time, Pat was still your supervisor; right?

20   A.     Incorrect.

21   Q.     Well at this time, in November of 2006, you were

22   still considered to be the Vice-president of Naples; right?

23   That was your title?

24   A.     By that time, I was already working full-time in Palm

25   Beach.

435

BLACKWELL - DIRECT

1   Q.      Your title at the time, sir, was Vice-president of

2   Naples; right?

3   A.      At that point, I was working full-time in Palm Beach.

4   I had relinquished any duties in Naples at that point.

5   Q.      I understand what you're saying about your duties,

6   but your title remained the same; didn't it?

7   A.      It was Vice-president.  I'm not sure which

8   demographic it fell in, whether Naples or Palm Beach.

9   Q.      And as vice-president, you still were under or

10  subordinate to Pat; right?

11  A.      No.

12  Q.      And you used the F word toward Pat and threatened him

13  with violence?

14  A.      I used profanity to Pat and threatened him with

15  violence, yes, I did.

16  Q.      And you threatened to kill him?

17  A.      I don't recall those words.  But I'm not going to

18  dispute it.  What I said was very emotionally charged.

19  Q.      You don't consider that to be insubordination?

20  A.      He wasn't in my chain of command at that time.

21  Q.      You mentioned Mr. Neuman was aware of it; right?

22  A.      Mr. Neuman was made aware of it by Mr. Hurley.  He

23  was also made aware of the situation leading up to that by

24  me.

25  Q.      Mr. Neuman was the one who told him to file the

BLACKWELL - DIRECT

1   police report; isn't that true?

2   A.    That, I don't know.  I'm not privy to the

3   conversation he had with Pat about it.

4   Q.    Well, you would agree that using language like this,

5   even to a coworker, would be inappropriate; right?

6   A.    I've said it before, I'll say it again; I'm

7   embarrassed by it.  It was a wrong decision.  It was

8   emotionally charged, should never have happened.  It was a

9   learning experience for me, to say the least.

10  Q.    You were never reprimanded for using that language or

11  threats by Mr. Neuman; right?

12  A.    Considering the circumstances that I was faced in, I

13  think Mr. Neuman took a little pity on me, but I don't know

14  that for sure.  You'd have to ask him.

15  Q.    So the answer is, to your knowledge, no?

16  A.    That's correct.

17  Q.    If an employee today used that language toward you,

18  would you reprimand that employee?

19  A.    Yes.

20  Q.    But you were never reprimanded?

21  A.    I was counseled, but I was not written reprimanded,

22  no.

23  Q.    Now, you were saying that you and Pat still remained

24  in touch after the threat; right?  That's not true?

25  A.    After some time passed.

BLACKWELL - DIRECT

1  Q.    It was more than just some time.  It was nine months

2  where you and he didn't speak a word to one another?

3  A.    I don't know if that's accurate, but it was some time

4  that passed.

5  Q.    You would agree that during this time period, Pat

6  certainly wasn't confiding to you on a personal level?

7  A.    I don't know when Pat began to confide back in me.  I

8  don't remember time frames but there was a point in time

9  where there was zero contact between us.  The contact began

10 when I took it upon myself to realize there was so much

11 tension between Pat and I, we were going to have to work

12 together, I reached out to him and I expressed regret for my

13 handling of the situation and the deterioration of our

14 relationship and told him, you know, for the sake of the

15 company, we need to be able to speak to one another, work

16 together.  So after that, we started having conversations

17 and correspondence again.

18 Q.    You would agree that the relationship after this was

19 never the same?

20 A.    I would agree with that.

21 Q.    And you would agree that where you might have had a

22 nice personal relationship with Pat after this time -- or

23 before this incident, after that, it was business?

24 A.    I'd agree with that.

25 Q.    So it wasn't like Pat was coming to you and talking

BLACKWELL - DIRECT

1    to you about his personal issues in his life; right?

2    A.    We --

3    Q.    Wouldn't have made since for him to do that?

4    A.    We had discussed some Kent issues in his life.  We

5    didn't discuss personal issues as in family members or

6    things like that.

7    Q.    Now I want to show you what we previously marked as

8    Exhibit Number 4.  I have it; sorry.  I have a tendency to

9    misplace things, sorry.  I had a whole stack here.

10                Do you have Exhibit 4 in front of you,

11    Mr. Blackwell?

12    A.    I do.

13    Q.    This has already been -- has this been introduced

14    into evidence.  Show you what's been marked as Exhibit

15    Number 4.  Do you recognize this document?

16    A.    I do.

17    Q.    What is it?

18    A.    It's an email.

19    Q.    And who is the email from?

20    A.    From me to Pat.

21    Q.    Okay.  And does this appear to be a true and correct

22    copy of the email as you sent to Pat?

23    A.    Yes.

24    Q.    On that date?

25    A.    Yes.

BLACKWELL - DIRECT

1    Q.    At this time, Your Honor, we'd like to move into

2    evidence what's been marked as Plaintiff's Exhibit Number 4.

3           MR. HENRY:  No objection.

4           THE COURT:  Exhibit 4 is received.

5           (Plaintiff Exhibit 4 admitted)

6    BY MR. CELLAR

7    Q.    Showing you what's been marked as Exhibit Number 4,

8    this is an email.  Can you describe to the jury what this

9    email is?

10   A.    It's an email from -- that originated?  Is that what

11   you want me to do?

12   Q.    Sure.  What was the basis of this email?

13   A.    It was an email from -- originally from a district

14   manager to, looks like, Gil.

15   Q.    And then you forwarded it to Pat; right?

16   A.    And then from Gil to Bill Denio, from Bill Denio back

17   to Gil, Michael Lewis, and myself, and then to Pat.

18   Q.    You forwarded this to Pat?

19   A.    Uh-huh.

20   Q.    In it, it says a beaten team?

21   A.    Yeah.

22   Q.    Why would you send that to Pat?

23   A.    We were having conversations with Pat.  Pat was upset

24   about not receiving his -- his bonus for fourth quarter of

25   2007.  I was frustrated as well.  I had not received my

BLACKWELL - DIRECT

1   bonus for fourth quarter of 2007.  So I was sharing with him

2   that -- he felt that Gil was attacking him personally and

3   not paying him personally, and I was sharing with him, it's

4   not just you, it's other people, it's the rest of us.  The

5   entire bonus structure after that was completely taken

6   apart.

7   Q.     Well actually, you received your bonus in 2008 for

8   the last quarter of 2007; didn't you?

9   A.     The end of 2000 -- shortly after this email, the end

10  of the first quarter of 2008, yeah.

11  Q.     You received your bonus?

12  A.     Correct.

13  Q.     So the bonus structure didn't stop for you; right?

14  A.     It ended after the fourth quarter of 2007, correct.

15  Q.     And you would agree that --

16  A.     For the company.  Not just for me, but for the

17  company.

18  Q.     And you would agree that then Pat was not the only

19  one that Mr. Neuman was not properly paying in bonuses;

20  right?

21  A.     Well this particular case, from what Bill Denio --

22  who I didn't know at the time but I do know now, but I

23  didn't know when I forwarded this to Pat, Bill had padded

24  his overtime percentage rates that qualified him for a

25  bonus.  Gil suspected fraud in that, in his calculation in

BLACKWELL - DIRECT

1    his reporting and it was found to be true that he was

2    fraudulently producing numbers.  So in Bill's case, it was

3    more than just a case of not paying.  It was a case of Bill

4    submitting improper numbers.

5    Q.    Was he fired?

6    A.    Oh, yeah.

7    Q.    Was he fired as a result of that?

8    A.    He was fired for a host of issues.

9    Q.    When was he fired?

10   A.    I don't remember.  I don't recall.

11   Q.    Do you know whether there was any documentation in

12   his personnel file regarding this issue?

13   A.    I don't know.

14   Q.    What did you mean, though, by a beaten team?

15   A.    Well, he was upset that he wasn't getting his bonus.

16   Bill and Michael, they were upset because they weren't

17   getting their bonuses based on their overtime percentage

18   rates.  I didn't understand why they weren't getting it at

19   the time but I do know now.

20   Q.    Well, having run a division, you would agree that

21   employee morale is an important part of management; right?

22   A.    Yes.

23   Q.    And you would agree that if employee morale is down

24   because employees feel that they're not getting paid

25   properly, that could affect the way things run in business;

BLACKWELL - DIRECT

1    right?

2    A.      Yes.

3    Q.      And you would agree that if things are not running

4    well, if employee morale is low, as a president, that could

5    affect how things are with you; right?

6    A.      I'm sorry, say again, please?

7    Q.      The buck stops with the president; right?

8    A.      When it comes to paying the bonuses?  No.

9    Q.      Making sure that the division is running properly.

10   A.      When it comes to the morale of the team, I share a

11   big load on that, getting people up, yeah.

12   Q.      If the employees are not paid the bonuses they're

13   entitled to, that could have an effect on them not only

14   personally but professionally?

15   A.      As I said, in this particular case, I know now why

16   the bonus wasn't paid.  I didn't at the time.

17   Q.      Do you know why Pat's bonus wasn't paid?

18   A.      No.  I didn't get involved in Pat's issues.  That was

19   his issue to battle through.

20   Q.      You never told Mr. Neuman that Pat was not performing

21   well; isn't that right?

22   A.      Correct.

23   Q.      It's yes or no, okay.  You never heard that

24   Mr. Neuman was unhappy with Pat's work; right?

25   A.      Incorrect.

BLACKWELL - DIRECT

```
 1   Q.      Okay.  Do you recall giving a deposition in this

 2   case, Mr. Blackwell?

 3   A.      I do.

 4   Q.      Do you recall being put under oath?

 5   A.      I do.

 6   Q.      Okay.  Do you recall me asking you the following

 7   question -- counsel, Page 21, Line 1.

 8           Do you know whether Mr. Neuman ever issued Pat any

 9   sort of discipline for not performing well during his

10   employment.

11           I am not aware.

12   A.      That's not what you just asked me.  You asked me if I

13   knew if Mr. Neuman was upset and I did.  Mr. Neuman was

14   growing increasingly frustrated trying to get Pat to expand

15   our operations and our business into the Tampa market and

16   was having no progress in that.  Mr. Neuman voiced his

17   concerns and I had heard those concerns several times, and

18   that's what I was referring to.  But I have never seen any

19   write-ups or so -- so I answered your question in the

20   deposition accurately.

21   Q.      Okay.  So you were -- is it your position that

22   Mr. Neuman wanted Pat to take on more responsibility by

23   opening up a Tampa office?

24   A.      Yes.

25   Q.      And he was frustrated that Pat wasn't taking on more
```

BLACKWELL - DIRECT

1    of this responsibility?

2    A.    Yes.

3    Q.    You would agree that it wouldn't make sense for

4    Mr. Neuman to want a poorly performing employee to take on

5    more responsibility; right?

6    A.    Well, this wasn't an endeavor that lasted 30 days or

7    60 days.  This push to go to Tampa was quite a long time.

8    Q.    Understood, but if Mr. -- if Mr. Hurley was not

9    performing well in his job in Naples, it wouldn't make sense

10   that Mr. Neuman would then want him to take on more

11   responsibility by opening up another office in Tampa; would

12   it?

13   A.    Well that would be a question for Mr. Neuman, not me.

14   But I know that Mr. Neuman's desires were to go into Tampa,

15   expand that market.  He'd been talking about it for a year

16   plus, and we were no closer getting there than we were when

17   he talked about it the first time.  So I know that was a

18   source of tension for him.  He wanted to get into the Tampa

19   market.

20   Q.    That's not true either.  Mr. Hurley actually opened

21   up a Tampa office on Hines Boulevard; didn't he?

22   A.    Yeah, with no clients.  What good is an office if you

23   don't have any clients to serve out of it?  It's just an

24   overhead expense.  It's not making money.

25   Q.    Do you know why there was no clients -- let me ask it

BLACKWELL - DIRECT

1    differently.  Do you know that Mr. Hurley was fired shortly
2    after he opened the office?
3    A.    I don't have a time frame on that.
4    Q.    You don't know whether he was even given a chance to
5    bring clients in; do you?
6    A.    I know that initiative had been talked about for over
7    a year.
8    Q.    Were you ever present during a discussion between
9    Mr. Neuman and Mr. Hurley on that issue?
10   A.    On the Hines office?
11   Q.    Yes.
12   A.    No.
13   Q.    Okay.  So anything you know about what had been
14   discussed was something that Mr. Neuman told you; right?
15   A.    Yes.  His frustration, correct.
16   Q.    And as you discussed, you've never heard that
17   Mr. Neuman had ever disciplined Pat for any work related
18   reasons; right?
19   A.    He wouldn't share that with me.
20   Q.    Okay.  Now, when Pat was fired in May of 2008, you
21   went back to Naples; right?
22   A.    Yes.
23   Q.    You actually took over what Pat was doing?
24   A.    At that point, I had the east coast operations and
25   west coast operations, correct.

BLACKWELL - DIRECT

1    Q.     You actually benefited from his firing, personally?

2    A.     No.  It was a burden.  I didn't have -- it didn't

3    mean anything for me financially.  It was more work.  It

4    wasn't a benefit to me at all.

5    Q.     At no point prior -- at no point prior to the time he

6    was fired did you ever tell Mr. Neuman to fire Pat; right?

7    A.     On the day that Pat was fired, he called me in the

8    office and we had a discussion about it.

9    Q.     My question, and listen carefully, is did you ever

10   tell Mr. Neuman prior to May 1st, 2008, to fire Pat, yes or

11   no?

12   A.     No.

13   Q.     Did you ever tell Mr. Neuman on May 1st, 2008, that

14   he should fire Pat during a meeting you had with him; yes or

15   no?

16   A.     No, those weren't the questions asked.

17   Q.     Okay.  So the answer is no, you never told Mr. Neuman

18   to flat-out fire Pat; right?

19   A.     Correct.  Mr. Neuman's questions were more geared

20   towards, can you handle the additional responsibilities, can

21   you handle the client transition, will you be able to go

22   over to Naples and help us smooth out the operation.  It was

23   those questions along those lines.

24   Q.     So it --

25   A.     What's it's going to mean to us in the whole if Pat's

1    not here, that kind of discussion.

2    Q.    So if somebody testified here in court that you said,

3    flat-out, fire Pat, that would be incorrect; right?

4    A.    It was my opinion.  If you're asking me if Gil asked

5    me my opinion on whether to fire Pat, I don't recall that,

6    no.  I don't recall being --

7    Q.    You specifically testified that you never told

8    Mr. Neuman to fire Pat; didn't you?

9    A.    Yeah, I don't believe Gil ever asked me whether or

10   not he should fire Pat.  I don't believe that question ever

11   came to me.

12   Q.    And my question to you, so if somebody got up here

13   and testified that you said, during this meeting, flat-out,

14   fire Pat, that would be incorrect?

15   A.    I believe I gave Mr. Neuman my confidence and

16   reassurance that if he fired Pat that we would survive, we

17   would be fine, we would move forward.  I don't believe that

18   I discouraged him from firing Pat but I don't believe I

19   endorsed it either.

20   Q.    Mr. Blackwell, it's a yes or no question.

21        MR. HENRY:  Your Honor, I object.  It doesn't call

22   necessarily for a yes or no answer.  He explained his

23   answer.

24        THE COURT:  Overruled.

25

BLACKWELL - DIRECT

1    BY MR. CELLAR

2    Q.    It's a yes or no question.

3    A.    No, I did not.

4    Q.    My question to you is, if somebody got up here and

5    testified that you said those words during a meeting, that

6    would be untrue, yes or no?

7    A.    That's correct.  I don't know what other people

8    testified to.

9    Q.    Now, I want to talk a little bit about this meeting

10   on May 1st.  You had mentioned that the purpose of the

11   meeting was that Gil called you in to consult what the

12   damage would be if he fired Pat; right?

13   A.    What impact it would have on the company, correct.

14   Q.    Okay.  He wasn't consulting you on whether he should

15   fire Pat.  He was simply asking you what the effect would be

16   of the firing; isn't that true?

17   A.    And asked if I would -- had any issues, if I felt

18   that I could handle the additional burden of Naples.

19   Q.    Okay.  But he wasn't consulting with you, "Shelton, I

20   don't know what to do, should I fire Pat here?"

21   A.    No.

22   Q.    And if somebody testified that the purpose of the

23   meeting with Mr. Neuman was to rehash an email that Pat had

24   sent to Mr. Neuman, that would be incorrect; right?

25   A.    By the time I came into the office, the meeting was

BLACKWELL - DIRECT

1    already started.  When I got there, the tone was that this

2    was moving forward.

3    Q.    Okay.  My question to you was, you were not even

4    aware that Pat had sent Mr. Neuman an email during that

5    meeting; isn't that correct?

6    A.    No, because I had a conversation with Pat prior who

7    told me that he was sending an email to Gil and what it was

8    going to contain.

9    Q.    My question to you is --

10   A.    I shared with him he shouldn't do that, he should go

11   see Gil and speak to him personally.

12   Q.    My question to you was, were you even aware that

13   Mr. Hurley had sent an email to Mr. Neuman during that

14   meeting, yes or --

15   A.    No -- well, yeah, Pat told me he was sending the

16   email the night before.

17   Q.    Do you recall testifying under oath --

18   A.    Yes.

19         MR. CELLAR:  Counsel, Page 28.

20   BY MR. CELLAR

21   Q.    Question, at the time of this meeting in person, were

22   you aware of an email exchange between Mr. Hurley and

23   Mr. Neuman from the days prior regarding Mr. Hurley's

24   request for leave.

25         Answer, I did not know of an exchange.

BLACKWELL - DIRECT

1   A.    You're asking me if I knew of an exchange and then

2   you asked me if I knew about an email.

3         MR. HENRY:  Your Honor, he needs to read the rest

4   of the paragraph.

5         THE COURT:  One moment.  You'll have an

6   opportunity under the rule of completeness to read whatever

7   else you want.

8   BY MR. CELLAR

9   Q.    Then on Page 29, counsel, at Line 14, you

10  specifically said:  I did not know there was any type of

11  volley or exchange or anything back and forth.

12        But then you say:  But I knew what Pat's

13  intentions were via email.

14        So at the time of this meeting, you were not aware

15  whether the email had actually been sent; isn't that

16  correct?

17  A.    Just as you read, as I said, I was not aware of

18  exchanges or volleys going back and forth but I knew an

19  email was coming from Pat because he shared with me that the

20  night before during a telephone conversation.

21  Q.    Did Gil mention the email during the meeting?

22  A.    I believe he did.

23        MR. CELLAR:  Counsel, Page 32, Line 16.

24  BY MR. CELLAR

25  Q.    Question, do you know whether Pat actually sent the

BLACKWELL - DIRECT

1    email to Gil at the time you were having the meeting with

2    Gil.

3           Your answer:  I do -- I do not believe that I had

4    knowledge of the email.

5           MR. HENRY:  Where are you reading from?

6           MR. CELLAR:  I had not seen it.

7           MR. HENRY:  Where are you reading from?

8           MR. CELLAR:  Sorry, Page 32, Line 16.

9           MR. HENRY:  Oh, let me read the first part.

10          MR. CELLAR:  Let me read it again.

11   BY MR. CELLAR

12   Q.    Question, do you know whether Pat actually sent the

13   email to Gil at the time you were having the meeting with

14   Gil.

15          Your answer was:  I do not believe that I had

16   knowledge of the email.  I had not seen it at that point.

17   A.    I had not seen it at that point.  You asked me if Gil

18   had mentioned the email.  You didn't ask me if I saw the

19   email.  I did not see the email.

20   Q.    Mr. Blackwell, your testimony was that you did not

21   believe you had knowledge of the email.  That's what you

22   testified to.

23   A.    I had not seen the email, that's correct.

24   Q.    You keep saying seen the email.

25   A.    Well, you just read my deposition and that was the

BLACKWELL - DIRECT

1    words from my deposition and you're trying to hold me to

2    that standard and so now I want to answer to that standard.

3    Q.    Mr. Neuman never told you during this meeting why he

4    was asking you about the ramifications of firing Pat; did

5    he?

6    A.    I don't think I understand the question.

7    Q.    Mr. Neuman did not share with you why he would even

8    be asking you what would happen if he fired Pat; right?

9    A.    What would happen if he fired Pat?

10   Q.    No, why he was even asking you about firing Pat?

11   A.    He shared with me that he was considering firing Pat

12   because the relationship had gone completely sour and it was

13   a burden and it was -- it was a bad situation.

14          MR. CELLAR:   Okay.   Counsel, Page 30 Line 10.

15   BY MR. CELLAR

16   Q.    Okay, let's go back now to the meeting with Gil.   So

17   did Gil mention to you during the meeting that he felt -- or

18   why he was asking about Pat's potential termination?   Do you

19   understand the question?   What prompted all of this?

20          Answer, he did not share with me the background,

21   if that's what you are asking.

22          Question, he did not present you with any

23   documents from Pat to Gil during that initial meeting;

24   correct.

25          Answer, correct.

BLACKWELL - DIRECT

1          Was that your testimony?

2   A.    Yeah.

3          MR. HENRY:  Your Honor, I'm not sure how that's

4   inconsistent with what he just said.

5          THE COURT:  Well, the jury can make their

6   conclusion as to that.  Overruled.

7   BY MR. CELLAR

8   Q.    Now, you learned later in the day that Pat had

9   actually gone to fire Gil -- Gil had actually gone to fire

10  Pat; right?

11  A.    Yes.

12  Q.    Okay.  And you're aware that even after Gil called

13  Pat on the telephone to fire him, Pat went to a presentation

14  later in the day?

15  A.    I had heard that.

16  Q.    Okay.  Who did you hear that from?

17  A.    May have been Pat during the telephone conversation I

18  had with him later that evening, the day of his firing.  I

19  believe, if I recall correctly, he attended a hurricane

20  preparedness meeting at the Dunes, if I recall correct.

21  Q.    Does it make sense to you if somebody were fired they

22  would go and continue to work for the company?

23  A.    You'd have to ask that question to Pat, but no.

24  Q.    Would you have continued to work for the company if

25  you thought you were fired?

BLACKWELL - DIRECT

1    A.      If I was trying to reverse the boss' decision, maybe.

2    Q.      Didn't you actually tell Pat after you learned that

3    he was fired that you would go and talk to Mr. Neuman for

4    him?

5    A.      Sure, I did.

6    Q.      But you didn't ever?

7    A.      No.

8    Q.      That's because you wanted his job; isn't it?

9    A.      I wanted his responsibility?  More responsibility?

10   No, I had enough responsibility as it was.

11   Q.      Well, you were upset when you had to move back from

12   Naples to the east coast; right?  That's what prompted --

13   A.      I was upset?

14   Q.      That's what prompted this threat?

15   A.      I was upset because Pat was trying to get $5,000 out

16   of me for a security deposit on a condominium that he

17   represented to me was a corporate perk and part of my

18   accepting of the job of Kent of Palm Beach, and I would be

19   able to stay there for six months and it was going to be

20   totally paid for by Gil Neuman and was going to cost me

21   nothing.  Several days before I go to move into this thing

22   and I have my furniture and all my life in storage, he tells

23   me in fact that it's leased in his name, he pays for the

24   rent, Gil reimburses him and he's going to need $5,000 from

25   me before I can move in, and I planned on leaving

BLACKWELL - DIRECT

1    December 24th, right before Christmas.  So yeah, that was --

2    it was a bad time, Richard, bad time.

3    Q.    The reason why Pat didn't want you moving into the

4    apartment he was leasing was because your wife had been

5    shooting firearms in your prior residence; isn't that true?

6    A.    That's absolutely not true.  You're saying my wife

7    discharged a firearm inside my residence?

8    Q.    That's the truth; isn't it, sir?

9    A.    That's a lie.

10         MR. HENRY:  Judge, can I be heard at sidebar,

11   please?  I have an objection to the whole line of

12   questioning.

13         THE COURT:  You may approach.

14         (At sidebar, Court and counsel present)

15         MR. HENRY:  I was about to read an email with

16   Stacey Hurley earlier in the day where she talked about him

17   being a monster and describing what a terrible person he was

18   in an email that she wrote to her husband, Mr. Hurley.  And

19   the Court heard argument on that and denied the

20   admissibility of it.

21         What Mr. Cellar is now doing is he's taking

22   advantage of that ruling and he's going to bring out all of

23   this trash between Mr. Hurley and this witness, knowing that

24   I can't rebut it with the documents that I have in my file

25   related to that.  This has nothing to do with the case.

BLACKWELL - DIRECT

1          MR. CELLAR:  Your Honor, the only reason why it

2    was brought up was because he tried to create a reason that

3    Pat was being fraudulent for not giving him the apartment.

4    I'm just using it to impeach him.  I have no further

5    questions on it.  He denies it.  Whether we know that to be

6    true is a different story.  However, he opened the door when

7    he started disparaging and saying Pat was trying to pull one

8    over on him.  That's the only reason why I brought it up,

9    and I don't intend going any further on it.

10          THE COURT:  What's this about bringing up the

11   business on wife shooting firearms?

12          MR. CELLAR:  That's why Pat would not want to

13   lease him the apartment, as you're going to hear if he asks

14   him about it because apparently his wife was shooting

15   handguns and they were going to lose their security deposit

16   if they allowed him to come in.

17          MR. HENRY:  No --

18          MR. CELLAR:  We can agree to disagree on the

19   facts, but that's what Mr. Hurley's position would be.  I

20   don't intend on going any further on it but I felt it was

21   appropriate for me to at least attempt to impeach the

22   witness because in he admitted to it.

23          THE COURT:  Do you have reasonable basis with

24   regard to asking the questions with regard to the handgun

25   business?

BLACKWELL - DIRECT

1          MR. CELLAR:  Absolutely, Your Honor.

2          THE COURT:  What?

3          MR. HENRY:  Judge, I have a document that was

4    written by Stacey Hurley to her husband, the same documents

5    that you looked at today, and that document says, we should

6    not lease that property to him because he's such a monster.

7    It doesn't say anything about a handgun.  It says he's not

8    to be trusted, you don't deserve his trust.  It's on the

9    exact same issue that he's about to go into.

10          MR. CELLAR:  I'm not going any further.  So while

11    I appreciate Frank suggesting I'm going to -- that was my

12    one question on it.  I would have been done by now.  I'm not

13    asking anything further.  We clearly have a good faith basis

14    to ask because that's the reason why.

15          THE COURT:  Is that the document that you're

16    relying upon for the handgun business?

17          MR. CELLAR:  No.  There is no document.  There's

18    testimony from Mr. Hurley and his wife if we get to that

19    point regarding why exactly.

20          THE COURT:  Well, we won't get to that point.

21    That's a collateral thing.  I don't want to go into it.

22    Move onto something else.

23          MR. CELLAR:  Thank you, Your Honor.

24          MR. HENRY:  Thank you, Your Honor.

25          (Sidebar concluded)

BLACKWELL - DIRECT

1    BY MR. CELLAR

2    Q.    Now, Mr. Blackwell, it's your testimony that the day

3    before Pat sent his leave request to Mr. Neuman, he called

4    you up to confide about it; right?

5    A.    Leave request?

6    Q.    Yes.

7    A.    I don't know any -- you talking about the email that

8    he sent?

9    Q.    The email that, according to you he told you he was

10   going to send to Mr. Neuman?

11   A.    I can't recall at this second whether it was a call

12   from me or a call from him but we had discussed it.  The

13   tensions between him and Gil were brewing.  You could feel

14   it.  He had shared with me what his intentions were on the

15   sending the email to him.  I had asked -- I had told him

16   that I felt it was too confron -- I thought it was suicide,

17   quite frankly and I said the best thing that he could do was

18   go down to corporate, get behind closed doors with Gil and

19   have a conversation with him.  He shared with me he wasn't

20   coming to corporate.

21   Q.    So it's your testimony that Pat Hurley, after the

22   incident that we discussed, called you up to discuss a

23   personal matter with you at this point?

24   A.    I didn't say that he called -- I told you I could

25   not -- I can't remember at this second whether I called him

BLACKWELL - DIRECT

1   or he called me, but we had a conversation.

2   Q.    Well, you had testified earlier, under oath, that

3   your business after this incident had become only

4   professional; right?

5   A.    Yes.

6   Q.    So is it your testimony that now Pat was calling you

7   with a personal issue regarding his personal leave?

8   A.    The conversation did not just encompass his intended

9   leave.  It was bonus checks, it was frustrations, it was

10  several topics.  It wasn't just a -- a -- you keep using the

11  word leave.  I call it vacation schedule.  He never used the

12  word leave to me.  He used the word vacation schedule.  He

13  said he was entitled to this vacation, it was in his

14  employment contract, and he was going to afford himself to

15  every piece of vacation he had coming to him.  So I don't

16  know if leave is the correct verbiage there.

17  Q.    Now, you believe that Pat was somebody who was

18  normally diplomatic at the company; right?  Yes or no?

19  A.    Not at that point in his employment he wasn't

20  diplomatic.  He was confrontational.  But at one point,

21  yeah, he was extremely diplomatic.

22  Q.    Do you recall testifying under oath, sir, in a prior

23  deposition?

24  A.    I sure do.

25          MR. CELLAR:  Okay.  Counsel, Page 60, Line 8.

BLACKWELL - DIRECT

1    BY MR. CELLAR

2    Q.      Question, did that seem normal, regarding his

3    temperament and your interactions with him, the way he was

4    speaking and acting during this call?

5            Your answer:  It's a difficult question to answer

6    because I had never seen Pat at such conflict with Gil.  I

7    had never seen Pat square off with Gil.  So it is difficult

8    to say normal.  I will tell you that there were times when

9    Pat picked his fights with Gil and he pressed and there were

10   times when he knew he couldn't pick his fights with Gil and

11   left it alone.  This was the first time I ever seen Pat say,

12   you know, I am picking this, I am pushing this issue.

13   Historically, Pat is very diplomatic.  He relies on his

14   communication skills.  As you know he's a wordsman.  He's a

15   great communicator.  So the term normal or regular, I never

16   seen Pat position himself against Gil like that.  So it was

17   not traditional, from what I've seen there.

18   A.      As I said, towards the end of his employment, he was

19   confrontational, but you're right, everything I said there

20   is correct, yes.

21   Q.      Okay.  You agree that you'd never seen Pat act like

22   this before; right?

23   A.      When you go back through my statement on disposition,

24   you know, with any employer, you pick and choose your

25   battles but of this one, he was -- he was going to battle

BLACKWELL - DIRECT

1    Gil on and there was no talking him out of it.  I told him

2    that I didn't think it was going to turn out well and -- but

3    he chose to take that path anyhow.

4    Q.    You thought it was crazy what he was doing; right?

5    A.    I don't know about crazy, but I thought it was -- I

6    thought it was certainly confrontational and I'm just of the

7    school that you don't -- there's only so far you can push

8    your boss, I mean, you know.  I just thought it was the

9    wrong approach.

10   Q.    Would you agree that this was not something that you

11   had ever seen from Pat to this extent before?

12   A.    This was extreme.

13   Q.    Do you know what was going on with him that evening,

14   mentally?

15   A.    Other than that phone call conversation, no, I

16   didn't -- I wasn't around him.  I was on the east coast.

17   Q.    Do you know what was happening to him physically that

18   evening when he wrote that email or when he spoke to you?

19   A.    To my knowledge, physically nothing was happening to

20   him, to my knowledge.

21   Q.    You don't know one way or the other; right?

22   A.    No, sir.

23          MR. CELLAR:  I've got nothing further.  Thank you.

24

25

1                    CROSS EXAMINATION

2    BY MR. HENRY

3    Q.      Hello, Mr. Blackwell.

4    A.      Hello, Mr. Henry.  How are you, sir?

5    Q.      I'm fine.  I'm going to call you as a witness later

6    in the trial.

7    A.      Outstanding.

8    Q.      But I heard a question that was asked of you about

9    whether or not you knew that Pat Hurley had written the

10   email that ultimately was attached to the vacation schedule

11   that we've been looking at throughout this trial?

12   A.      Yes, sir.

13   Q.      And I heard you say that you had not seen the email

14   as of April the 30th, but you had spoken to Pat Hurley about

15   it the night before he sent the email; is that correct?

16   A.      Correct.

17   Q.      And then I heard Mr. Cellar read you a section of

18   testimony from your deposition to impeach you, and I want to

19   read the rest of that --

20   A.      Sure.

21   Q.      -- to you.  Page 28, Richard.

22           MR. CELLAR:  What page?  I'm sorry.

23           MR. HENRY:  Page 28.

24   BY MR. HENRY

25   Q.      You were asked the question at your deposition:  At

BLACKWELL - CROSS

1    the time of this meeting in person, were you aware of an

2    email exchange between Mr. Hurley and Mr. Neuman from the

3    days prior regarding Mr. Hurley's request for leave.

4            Answer -- the part that Mr. Cellar read to you.

5    Answer, I did not know of an exchange.

6            The rest of your testimony was:  I knew from Pat

7    Hurley from talking to him the night before, Pat had planned

8    on sending Mr. Hurley -- sending Mr. Hurley -- or Mr. Hurley

9    planned on sending Gil -- I had a conversation with Pat who

10   shared with me that he was boiling over with more

11   frustrations with Gil.  He shared with me that up until that

12   point in his employment, he had not afforded himself of all

13   of his vacation that he was entitled to per his employment

14   contract, and that he was going to avail himself of that

15   vacation time moving forward.  He shared with me what his

16   intentions were, to send Gil and email outlining his

17   vacation schedule, and I advised him not to.  I told him

18   that I felt it was too confrontational.

19           I also shared with Pat that I felt that he needed

20   to come down to corporate to have a closed door with Gil

21   before it escalated.  Pat's response was, he was not coming

22   to corporate office because he was upset about the comment

23   that Gil made about a suggestion of a corporate retreat that

24   Pat had mentioned.  So I'm not aware of anything Gil sent

25   back to him at the time of the meeting.  I did not know that

BLACKWELL - REDIRECT

1    there was any type of volley or exchange or anything back

2    and forth, but I knew what Pat's intentions were via email.

3              That was your testimony at your deposition?

4    A.    Yes, sir.

5    Q.    And that's consistent with what you said today;

6    right?

7    A.    I'm trying to say, yes, sir.  I hope I said.

8              MR. HENRY:  I don't have anymore questions for the

9    witness, Judge.

10             MR. CELLAR:  One brief redirect, Your Honor.

11                      REDIRECT EXAMINATION

12   BY MR. CELLAR

13   Q.    Just so I understand, Mr. Blackwell, at no point

14   during this meeting did Mr. Neuman ever tell you that he had

15   received an email from Pat; right?

16   A.    No.  I believe he said he received an email from Pat,

17   but I was -- I did not have firsthand knowledge of the

18   contents.

19   Q.    Well again, on Page 28, Line 12, I asked you,

20   question, during the meeting, did Mr. Neuman share any

21   emails with you between Mr. Hurley and Mr. Neuman.

22             And your answer was:  In that meeting, no.

23   A.    You just asked me if he shared it with me and I just

24   said no, he did not share it with me.  He told me that there

25   was an email but he did not share the email with me.  I've

BLACKWELL - REDIRECT

1   said it now several times.

2   Q.      You didn't mention in your deposition that Mr. Neuman

3   had ever shared an email with you; did you?

4   A.      Perhaps you didn't ask the question.

5   Q.      You didn't feel that that was a necessary fact to

6   volunteer?

7   A.      It's your deposition, man.  I just ask the questions

8   you answer me [SIC].  You know, that's it.

9   Q.      You understand the point is to get to the truth in

10  this matter; right?

11  A.      Sure do.  It's your job to ask the questions; my job

12  to answer them.

13  Q.      So then it's your position that you only have to

14  answer -- strike that.

15          MR. HENRY:  Argumentative.

16          MR. CELLAR:  I didn't finish the question, Your

17  Honor, and I withdrew it.

18  BY MR. CELLAR

19  Q.      Did you ever ask Mr. Neuman during the meeting that

20  you -- you never asked Mr. Neuman during the meeting why he

21  was thinking of firing Pat; right?

22  A.      No.

23          MR. CELLAR:  Just give me one second, sir.

24          (Pause in place)

25

BLACKWELL - REDIRECT

```
 1    BY MR. CELLAR
 2    Q.      Was Rose present during the entire meeting with
 3    Mr. Neuman?
 4    A.      I believe she was.  If not the entire, definitely a
 5    majority of it.
 6    Q.      Do you recall testifying that Rose actually only came
 7    in the meeting once or twice?
 8    A.      She was there when I got there.  Like I said, if she
 9    wasn't there for the entire thing, she was there for the
10    majority of it.
11    Q.      Well during your deposition, do you recall saying
12    that she only came in once or twice during the meeting?
13    A.      No, I don't recall that.
14            THE COURT:  Isn't that beyond the scope of Direct
15    and Redirect?
16            MR. CELLAR:  I guess, Your Honor, to the extent
17    we're talking about the meeting.
18            THE COURT:  Yes, you are.
19            MR. CELLAR:  Would the Court prefer that I move
20    on?
21            THE COURT:  I beg your pardon?
22            MR. CELLAR:  Would the Court prefer that I move
23    on?
24            THE COURT:  I prefer you keep it restricted to the
25    Cross that's gone on.
```

BLACKWELL - REDIRECT

```
 1              MR. CELLAR:  Okay.
 2    BY MR. CELLAR
 3    Q.     You're aware, sir, that Ms. -- this will be my last
 4    question, Your Honor, that Ms. Cucurillo was not present
 5    during the entire meeting; isn't that true?
 6    A.     It's possible that she was out, yeah, during the
 7    whole -- during the entire course of the meeting, it's
 8    possible she stepped out, yeah.
 9              MR. CELLAR:  I've got nothing further.  Thank you,
10    Your Honor.
11              MR. HENRY:  I don't have any other questions.
12    Reserve the right to call.
13              THE COURT:  All right.
14              (Witness excused)
15              THE COURT:  Call your next witness.
16              MR. CELLAR:  Our next witness, Your Honor, is
17    going to be Ms. Alexander, who I anticipate will be fairly
18    brief and then after that, my intention was to call
19    Mr. Neuman, which will be fairly lengthy.  So would the
20    Court -- is there something you want to take up outside the
21    presence of the jury, Your Honor, or may I ask?
22              THE COURT:  I beg your pardon?
23              MR. CELLAR:  With the Court's permission, what I'd
24    like to do, just to make it easier, is to finish
25    Ms. Alexander today and be able to start Mr. Neuman in the
```

ALEXANDER - DIRECT

```
 1   morning, if that's possible.

 2            THE COURT:  Well, yes, if you finish with her

 3   quickly, then we'll start with Mr. Neuman now.  We're going

 4   to go until 5:00 for whatever we can get done.

 5            MR. CELLAR:  Plaintiff would call Ms. Alexander.

 6            DEPUTY CLERK:  Raise your right hand, please.

 7            (The Witness is Sworn)

 8            DEPUTY CLERK:  Please state your name for the

 9   record.

10            THE WITNESS:  Orly Alexander.  I need my glasses.

11                     ORLY ALEXANDER,

12       a defendant herein, after having been duly sworn,

13       was examined and testified under oath as follows:

14                    DIRECT EXAMINATION

15   BY MR. CELLAR

16   Q.    Good afternoon.

17   A.    Good afternoon.

18   Q.    Mrs. Alexander, you're the owner or one of the owners

19   of Kent Security; correct?

20   A.    Yes.

21   Q.    Okay.  And you are also the CFO of the corporation?

22   A.    Yes.

23   Q.    And can you -- a CFO, your primary oversight deals

24   with legal issues; right?

25   A.    Financials, legals.
```

ALEXANDER - DIRECT

1    Q.      Banking relations?

2    A.      Banking, yes.

3    Q.      You're also responsible for overseeing the accounts

4    receivable of each of the offices?

5    A.      Yes.

6    Q.      Okay.  And that would require your interaction, for

7    example, with the division presidents at each of the Kent

8    facilities; right?

9    A.      I do it together with my brother.  So sometimes I do

10   it; sometimes he does it.

11   Q.      Okay.  And you're also responsible, for example, for

12   insurance?

13   A.      Yes.

14   Q.      And also to a certain extent, managing the

15   unemployment proceedings?

16   A.      Yes.

17   Q.      Okay.  Now, during Pat's employment -- if you need

18   water, let me know.

19           During Pat's employment, you maintained an office

20   at Kent headquarters in Miami; right?

21   A.      Yes.

22   Q.      And you worked a full-time schedule for Kent?

23   A.      Yes.

24   Q.      Okay.  And you had your own staff that reported to

25   you?

ALEXANDER - DIRECT

1   A.      Yes.

2   Q.      And you could hire your own staff?

3   A.      Yes.

4   Q.      And likewise fire your own staff?

5   A.      Yes.

6   Q.      Okay.  And you would determine the schedule for your

7   staff to work?

8   A.      I have a controller under me and then the controller

9   has all the financial people that reports to her.  So she

10  reports to me.

11  Q.      Okay.  And you hired the controller?

12  A.      Yes.

13  Q.      And you've fired employees in the past; right?

14  A.      Employees that work direct for me.

15  Q.      Fair enough.  And you understand that you can be

16  personally responsible for a violation of your company as a

17  CFO; isn't that correct?

18  A.      For what?

19  Q.      Under the law, you understand that you could be

20  personally responsible for a violation of the law?

21  A.      I don't know.  I have to ask my lawyer.

22          MR. HENRY:  Objection, calls for a legal

23  conclusion.

24          THE COURT:  Sustained.

25

ALEXANDER - DIRECT

1   BY MR. CELLAR

2   Q.      Now, your brother is Mr. Neuman?

3   A.      Correct.

4   Q.      And he's the CEO?

5   A.      Correct.

6   Q.      And your husband is -- I don't want to butcher that.

7   How do you pronounce his first name?

8   A.      Shlomy Alexander.

9   Q.      Shlomy Alexander?

10  A.      Yes.

11  Q.      And he's one of the owners of the company as well?

12  A.      Yes.

13  Q.      Both you and your brother travel to the Middle East

14  during a particular year; isn't that right?

15  A.      Sometimes.  Not every year.

16  Q.      Okay.  And when your brother is gone, you become the

17  person in charge of the corporation; right?

18  A.      Correct.

19  Q.      And likewise, when you're gone, any issues that he

20  needs to resolve, he could handle?

21  A.      Correct.

22  Q.      Now, when Mr. Neuman is gone, for example, you have

23  the authority to sign checks on behalf of the company?

24  A.      Yes.

25  Q.      And you can also, for example, enter into contracts

ALEXANDER - DIRECT

1   on behalf of the company?

2   A.    Yes, but usually together with him on the phone, I

3   consult, what business we take, what the rate.  I don't take

4   it on my own.

5   Q.    Okay.  So would it be a fair statement to say you two

6   work in conjunction with one another?

7   A.    Absolutely.

8   Q.    So if Gil's making a decision, you would support that

9   decision?

10  A.    Yes.

11  Q.    And vice-versa?

12  A.    Yes.

13  Q.    And do you stand by the decisions that Mr. Neuman

14  makes on behalf of the company?

15  A.    Yes.

16  Q.    Because you trust that as the CEO, he speaks for the

17  company?

18  A.    Yes.

19  Q.    Now you required -- or Mr. Hurley, during his

20  employment, came to the Miami office a couple times a month;

21  isn't that right?

22  A.    I didn't count, but I used to see him at the office.

23  Q.    Well you would more than -- you would have meetings

24  with him?

25  A.    Never.

ALEXANDER - DIRECT

1    Q.    It's your testimony that you never had meetings with

2    him when --

3    A.    Maybe hello, how are you, how's your family, like on

4    a personal note, but not business meetings.

5    Q.    So it's your testimony that you would never meet with

6    Mr. Hurley regarding accounts receivable in the Naples

7    office?

8    A.    Maybe if I had a question, I would ask him, yeah, but

9    not on a regular basis meeting.

10   Q.    When the need would arise if Mr. Hurley was in Miami,

11   you would have meetings with him.

12   A.    Yeah, but not very often.

13   Q.    Well, before you said never.

14   A.    Okay.

15   Q.    So is it never or not very often?

16   A.    Not very often.

17   Q.    Fair enough.  If there were specific insurance

18   requirements on a contract that was being awarded in Naples,

19   you would have to communicate that with Pat; right?

20   A.    Yes, or through my legal assistant.  I also have a

21   legal assistant.

22   Q.    Okay.  But your legal assistant would be explaining

23   to Pat what was needed at your direction; right?

24   A.    Yes, but it's usually the other way around.  No,

25   because the contract will have requirements for insurance

ALEXANDER - DIRECT

1    and then they will call us to see if we have those

2    requirements.

3    Q.    Now, during holiday times, you would be the person at

4    Kent responsible for coordinating the gifts to be sent to

5    clients; right?

6    A.    I coordinated, yes.

7    Q.    And you would direct Pat which gifts needed to be

8    sent to which clients in Naples?

9    A.    Yes, we have a list and it goes out.

10   Q.    And you were the one dictating what type of gift Pat

11   was going to be giving to which type of client?

12   A.    I implemented it.  I didn't come up with the list.

13   It's usually the managers and together with Gil who decides

14   which manager gets what.

15   Q.    Well, when you say you implemented it, what does that

16   mean?

17   A.    I get the gifts, I pack them, I make sure that it

18   goes to the right person.

19   Q.    Okay.  And then you would, in turn, communicate to

20   Pat?

21   A.    And I make sure it gets picked up at the office and

22   gets to Naples.

23   Q.    Okay.  Now, you were aware that Pat had a prior

24   career in media before coming to Kent; right?

25   A.    Yes.

ALEXANDER - DIRECT

1    Q.    Okay.   And were there occasions where you would ask
2    Pat personally to attend media related events on Kent's
3    behalf?
4    A.    Only thing that I would ask him would be at
5    Thanksgiving when we have a company lunch, he always greeted
6    everyone and said a prayer.
7    Q.    Do you recall working closely with Pat on Kent's
8    25 -- 25th anniversary planning meetings?
9    A.    Maybe he sat on the meeting.   I don't remember.
10   Q.    And you would also ask Pat to consult with you
11   regarding advertising needs of the company; isn't that true?
12   A.    We very rarely advertise.
13   Q.    When you did, you would ask Pat?
14   A.    I don't remember.
15   Q.    Fair enough.   Do you recall having safety or
16   terrorism presentations during Pat's employment?
17   A.    Yes, we had a few.
18   Q.    And you would direct Pat to coordinate the media
19   coverage of these events?
20   A.    No, I had a PR person.
21   Q.    So is it your testimony that you would not direct Pat
22   to be involved?
23   A.    Maybe he presented the guest speaker.   I don't
24   remember.   It was a while ago.
25   Q.    You would ask him to do that?

ALEXANDER - CROSS

1    A.      To present the guest speaker, maybe.

2    Q.      You were also responsible, for example, for

3    coordinating the company picnics and events; right?

4    A.      I was, yes.

5    Q.      And you would, in conjunction with Pat, ask him to

6    assist; right?

7    A.      He was responsible for the Naples area so we always

8    have to make sure that they all can come and that they all

9    can be there because we try to have all our companies

10   together.

11   Q.      You had the authority, Ms. Alexander, to fire Pat if

12   you wanted to?

13   A.      Not really because I didn't hire him and he didn't

14   report to me.

15           MR. CELLAR:  Okay, I've got nothing further.

16   Thank you.

17                     CROSS EXAMINATION

18   BY MR. HENRY

19   Q.      Hello, Ms. Alexander.

20   A.      Hi.

21   Q.      Did you supervise Pat Hurley in his day-to-day job

22   duties?

23   A.      Not at all.

24   Q.      Did you play any role whatsoever in the decision to

25   terminate him?

NEUMAN - DIRECT

1   A.      Not at all.

2   Q.      You've been listening to testimony here in this trial

3   for now two days.  Did you have anything to do with anything

4   relevant to this case?

5   A.      Not at all.  A lot of it was new for me.

6               MR. HENRY:  Okay.  I don't have anything else.

7               THE COURT:  All right.  Anything further?

8               MR. CELLAR:  No, Your Honor.

9               THE COURT:  All right, thank you.  You may step

10  down, ma'am.

11              (Witness excused)

12              THE COURT:  Call your next witness.

13              MR. CELLAR:  Our next witness would be Mr. Neuman,

14  Your Honor.

15              (The Witness is Sworn)

16              DEPUTY CLERK:  Thank you.  You may be seated.

17  State your name for the record, please.

18              THE WITNESS:  My name is Gil Neuman.

19              DEPUTY CLERK:  Thank you.

20                        GIL NEUMAN,

21      a defendant herein, after having been duly sworn,

22      was examined and testified under oath as follows:

23                    DIRECT EXAMINATION

24  BY MR. CELLAR

25  Q.      Good afternoon, Mr. Neuman.

NEUMAN - DIRECT

```
 1   A.      Good afternoon.
 2   Q.      We've got about 20 minutes so I'm going to begin with
 3   some preliminary or background information and hopefully
 4   tomorrow morning we'll pick up and get into the substance of
 5   your testimony.  You were the CEO of Kent Security; right?
 6   A.      My title is CEO, but I tend to always joke that I'm
 7   the chief bottle washer.  The buck stop with me.  I'm the
 8   one who get the blame and I rarely ever get the credit.
 9   Q.      Okay.  And Kent Security has a number of corporations
10   or entities under one big umbrella; is that right?
11   A.      Yes, sir.
12   Q.      So for example, there's Kent Security of Palm Beach?
13   A.      Yes, sir.
14   Q.      And there's Kent Security of Broward?
15   A.      No, there's no Kent Security Broward.
16   Q.      Was there over a Kent Security of Broward?
17   A.      20 years ago plus.
18   Q.      Okay.  There's Kent Security of Naples?
19   A.      Yes, sir.
20   Q.      Kent Security also has divisions in Texas?
21   A.      That's correct.
22   Q.      What other states does Kent Security operate in?
23   A.      New York.
24   Q.      And can you describe to the jury, because I'm sure
25   I've butchered it, what is it that Kent Security does?
```

NEUMAN - DIRECT

1  A.    We provide security guard service and security
2  equipment and security consulting to a large array of
3  customers.  We have built our business traditionally by
4  providing homeowner association and condominium association,
5  but in the last ten years or five years, we have branched
6  out to do a lot of municipalities, a lot of cities, a lot of
7  counties, and we have some state work.  So we really have a
8  very large array of different kind of customers we service.
9  Q.    Now, during 2007 and 2008, you would agree that Kent
10 had more than 50 employees; right?
11 A.    Yes, I would agree.
12 Q.    Okay.  And the reason why I'm asking you that, as
13 you'll see, is that you understand that's part of qualifying
14 for Family Medical Leave Act.  You understand that to be the
15 case, that you need to have 50 or more employees?
16 A.    I have no reason to question you, so...
17 Q.    Fair enough.  I know it sounds like a silly question.
18 In fact, in 2007 and 2008, Kent had close to if not over a
19 thousand employees?
20 A.    I think less.
21 Q.    What would you estimate during that time period?
22 A.    I'm afraid to say a word because you're going to find
23 a sentence that I said the wrong thing but I would assume in
24 the neighborhood of 800.
25 Q.    Okay, fair enough.  Do you recall giving a prior --

NEUMAN - DIRECT

```
 1   I'm just kidding.
 2              As CEO, you make the decisions to hire and fire
 3   managerial employees of the defendants; right?
 4   A.     As CEO, if you like it or not, the buck stop with
 5   you.  So I make the decisions, and yes, they come to me.
 6   Q.     And when it comes to managerial employees, you're the
 7   one that makes those decisions?
 8   A.     Yes, sir.
 9   Q.     Now as CEO, as we discussed, you're also involved in
10   the management of each of the Kent entities that fall under
11   the umbrella?
12   A.     When you say the word involve, how deeply involved do
13   you mean?
14   Q.     You would oversee the operations, meaning having the
15   presidents of each one report to you?
16   A.     In that way, yes.
17   Q.     Okay.  Is that a fair statement?
18   A.     Yes.
19   Q.     And with regard to the presidents of each of these
20   divisions, you would make the hiring and firing decisions
21   for each of these entities; right?
22   A.     For the presidents, yes.
23   Q.     And you would also determine the rates of pay that
24   they're going to receive?
25   A.     Yes.
```

NEUMAN - DIRECT

1   Q.     Okay.  And you would -- you did that actually when
2   Mr. Hurley came on board?
3   A.     Mr. Hurley came on board as a salesperson, so he did
4   not come aboard as management.
5   Q.     He had a -- what was his title when he came on board?
6   A.     A VP of sales.  It sounds good but he was a salesman.
7   Q.     Okay.  So his job when he came on board was to
8   generate sales on behalf of Kent entities?
9   A.     Specifically on behalf of Kent Security of Palm
10  Beach, but he also generated sales for Kent Security of
11  Miami.  He covered the entire east coast.
12  Q.     And Naples as well; right?
13  A.     Not at -- not when he started.
14  Q.     Okay.  Was there a time period shortly after he
15  started where he began pushing the sales out of the Naples
16  Division as well?
17  A.     Forgive me, we talking over ten years ago.  I don't
18  remember.
19  Q.     Well, the reason why I'm asking you is the 2003
20  promotion email, which we've looked at a number of times,
21  you make reference that Pat has helped build the Naples
22  Division and that was in 2003?
23  A.     2003 email that Pat Hurley wrote.
24  Q.     Okay.  We're going to discuss that as well.  But in
25  that email, you make reference to the fact that Pat has

NEUMAN - DIRECT

1    helped grow the Naples business?

2    A.      Forgive me.  We talking ten years ago.  I don't

3    remember exactly what sales did Pat do in Naples in 2002 --

4    I'm sorry, yeah, in 2002.  That's ten years ago.

5    Q.      At the time Mr. Hurley came to work for you, you and

6    he negotiated and signed an employment agreement?

7    A.      There was an employment agreement when he came to

8    work but it was not really a negotiation.  We as a company

9    do not have employment agreements.  None of our employees

10   have employment agreements.  At the time when I hired Pat, I

11   pursued him.  And I -- I recruited him to come to work for

12   Kent and he asked and I said to him, put something in

13   writing and I'll take a look at this, and that's exactly

14   what took place.

15   Q.      Okay.  So the employment agreement which we're going

16   to talk about in a moment, Mr. Hurley sent this to you;

17   right?

18   A.      Yes, sir.

19   Q.      And you had the opportunity to make any edits that

20   you wanted to make?

21   A.      Yes, sir.

22   Q.      And then ultimately, you and he agreed upon the terms

23   of the email; right?

24   A.      Yes, sir.

25   Q.      Okay.  And if I can show you the email, which we're

NEUMAN - DIRECT

1   going to mark -- or the employment agreement as Exhibit 10,

2   if you take a look at the last page, is that your signature

3   on the agreement?

4   A.    Yes, sir.  Yes, sir, on the last page, it's my

5   signature.

6   Q.    Okay.  And you understood that at the time you were

7   signing off on this employment agreement, you were doing so

8   on behalf of the defendants, Kent Security?

9   A.    You're asking me what I was thinking 11 or 12 years

10  ago?

11  Q.    Well, let me ask it differently.  You wouldn't have

12  signed an employment agreement at any time in your life if

13  you weren't doing so in the capacity as CEO of Kent

14  Security?

15  A.    Yes.

16  Q.    Okay.  Now this was the only employment agreement

17  that Mr. Hurley ever signed during his tenure with Kent

18  Security; right?

19  A.    I don't know about signatures but in the tenure while

20  Pat worked, there were many emails back and forth with

21  changes, new ones, because remember, this agreement in 2001,

22  this was the position of a vice-president of sales or a

23  sales development, and it's basically for a salesman.  Pat

24  made a lot more money than this agreement says.

25  Q.    Right.

NEUMAN - DIRECT

1  A.     Pat made a lot more money than this agreement says.

2  Q.     And there were times where, for example, Mr. Hurley

3  was promoted that you and he negotiated a modification to

4  his pay structure in this agreement; right?

5  A.      In the seven year time that Pat worked for Kent, Pat

6  got a lot of increases, yes.

7  Q.     Now, under the terms of this agreement, it says

8  initially that the agreement will be effective for a term of

9  48 months.  You see that?

10 A.     Yes, sir.

11 Q.     And then the next sentence says this agreement will

12 automatically renew for successive 12 month periods -- I

13 made a mess of that -- unless 30 days prior to the end of

14 the term one party provides written notice to the other

15 party of their intention not to renew this agreement.  Is

16 that true?

17 A.     You are reading a hundred percent.

18 Q.     Okay.  At no time during Pat's employment did you

19 ever tell him that this agreement was not being renewed --

20 or let me ask it differently.

21        At no time during his employment did you tell him

22 this agreement was no longer in effect; is that correct?

23 A.     Many discussion I had with Pat.  I said to Pat, your

24 old agreement was a salesman agreement and we have increased

25 it tenfold.  You are an executive now.  Pat is not another

NEUMAN - DIRECT

1    employee.  Pat was the number two person in the company.

2    Q.     But my question, Mr. Neuman, was whether you ever

3    gave Mr. Hurley any notice in writing that you did not

4    intend to renew his employment agreement, yes or no?

5    A.     I did not write anything to Pat saying I will not

6    renew your employment agreement, no.

7    Q.     Okay.  Did you ever email Mr. Hurley and say, your

8    employment agreement is no longer in effect?

9    A.     Part of my personality is I don't write as good as I

10   want to write.  So I'm not a writer like other people.  I'm

11   much more of a verbal person.  I speak to people.  So if you

12   look at all of our team members, their file is not full of

13   paperwork.

14   Q.     Well, I've never seen other team members' personnel

15   files, but in looking at Pat's, you would agree that there

16   was never anything in writing in his personnel file saying

17   that this employment agreement was no longer in effect;

18   right?

19   A.     I sit here and I'm reading it and absolutely, I did

20   not send him an email saying your employment contract is not

21   in effect, obviously.

22   Q.     Well, when we asked Kent Security to provide a copy

23   of Pat's employment agreement, or of Pat's personnel file,

24   you saw when we went through it with Rose that a copy of

25   this employment agreement remained in his file; right?

NEUMAN - DIRECT

1  A.      Yes, sir.

2  Q.      But what we didn't see was anything, an addendum or a

3  note saying the agreement is no longer in effect; can we

4  agree on that?

5  A.      Yes, sir.

6  Q.      Now, the employment agreement initially laid out how

7  Pat was supposed to be paid by the company; correct?

8  A.      Yes, as a salesman.

9  Q.      And the agreement stated that any modifications

10 needed to be in writing; is that right?

11 A.      Yes, but we didn't follow our own words.  I mean, as

12 we increased his pay, we have never put it into the file.

13 Q.      But it certainly was done in writing by email; wasn't

14 it?

15 A.      No.

16 Q.      So we're not going to see any emails, Mr. Neuman,

17 where you and Pat updated the terms of his agreement

18 regarding compensation; is that your testimony?

19 A.      My testimony is that Pat got so many increases, I

20 don't think that all of them were documented.

21 Q.      He got so many increases because he was a excellent

22 employee?

23 A.      I'll answer again, he got so many increases, I don't

24 think all of them were documented.

25 Q.      Okay.  But you wouldn't give an increase to somebody

NEUMAN - DIRECT

1   that wasn't performing well; would you?

2   A.      I absolutely think it's my responsibility not to.

3   It's my responsibility to give increase to people that

4   should get them.

5   Q.      Okay.  So you would agree that whenever you gave Pat

6   a pay increase, he deserved it?

7   A.      At the time I thought, yes.

8   Q.      Okay.  And you would agree that when you paid Pat a

9   discretionary bonus at the end of 2007, just months before

10  his termination, that he deserved it?

11  A.      At the time I signed it, obviously, yes.

12  Q.      Okay.  So you would agree that at least at the time

13  you gave him his performance bonus, you believed that he

14  deserved it because it was payable at your discretion;

15  right?

16  A.      Yes, sir.

17  Q.      And you wouldn't have given Pat this award if you

18  didn't believe he deserved it?

19  A.      I remember giving this award in a company meeting and

20  I remember asking Rose to make it, and she looked at me and

21  she said to me, what?  And I said to her, if I'm not going

22  to give him, he'll be all upset and then it's going to be

23  another drama.  Let's just give it to him.

24  Q.      So is it your testimony that this award was nothing

25  more than a pity party for Mr. Hurley?

NEUMAN - DIRECT

1    A.    It was not a pity party, but it was make sure that
2    we're not going to create another drama.
3    Q.    Was there an annual awards ceremony every year where
4    employees would get awards?
5    A.    No.
6    Q.    So then why in December of 2007 did you believe that
7    Pat needed to get a trophy when there had not been one
8    before?
9    A.    We did an award that time and a lot of people got
10   them, and if I would give to it other people and I wouldn't
11   give to it him, I will get a big drama.
12   Q.    Have you ever provided a copy or an example or even a
13   picture of an award that anybody else got at the company
14   that was anything similar to this?
15   A.    We give a lot of awards all the time.
16   Q.    Who chose the wording in this -- on this trophy?
17   A.    Not me.
18   Q.    Okay.  Do you agree with the wording on it?
19   A.    I have no idea what it says.
20   Q.    It says, "The roots of true achievement lie in the
21   will to become the best you can become."
22   A.    I have no idea who wrote it.
23   Q.    Okay.  Now, under the terms of Pat's employment
24   agreement, he was also entitled to receive certain benefits
25   during his employment; right?

NEUMAN - DIRECT

1   A.      Like a car, you mean?

2   Q.      Like a company car; right?

3   A.      Yes.

4   Q.      Now you're taking the position that this agreement

5   didn't apply to Pat once he moved on to other positions.

6   You never took his company car away; right?

7   A.      I like to see the agreement.  Hold on.  I don't even

8   know what it says about a car.  I don't see anything about a

9   car.

10  Q.      Can you look under Section 5.A which references

11  company car?

12  A.      Yes, I see it.

13  Q.      So you would agree that under the terms of this

14  employment agreement, Mr. Hurley was supposed to receive a

15  company car?

16  A.      Yes, sir.

17  Q.      Okay.  And he had that throughout his employment;

18  right?

19  A.      He had many cars.

20  Q.      Okay.  And you didn't take those away when he moved

21  to a different position?

22  A.      I rewarded him with nicer, nicer cars.

23  Q.      Okay.  And you also paid for gas under the terms of

24  his agreement?

25  A.      All of our company cars I pay for gas and I pay for

1    insurance.  It's normal for everybody.

2    Q.    And maintenance as well?

3    A.    For everybody.

4    Q.    Okay.  And that was one of the benefits he received

5    throughout his entire employment with Kent?

6    A.    Our entire management team receive the same benefit.

7    Q.    Okay.  And Section B, Pat was also permitted to

8    receive continuous enrollment for his wife and children and

9    himself in a medical and dental plan; right?

10   A.    Yes, as the rest of our upper management team, our

11   executives.

12   Q.    And the next one is Pat would be entitled to four

13   weeks paid vacation per year.  Do you see that?

14   A.    Yes, sir.

15   Q.    Okay.  Did the entire management team also get four

16   weeks per year?

17   A.    No.

18   Q.    Okay.  But Pat continued to receive or be eligible to

19   receive four weeks of paid vacation per year; right?

20   A.    Pat took a lot more than four weeks vacation a year

21   and I chose not to go to battle over.

22   Q.    There would be emails or documents to support your

23   conclusion that Mr. Hurley took more than four weeks per

24   year; right?

25   A.    He tooks lots and lots of vacation, that's correct.

NEUMAN - DIRECT

1  Q.    My question to you is, there should be some sort of
2  email or form that Pat filled out that we'll see here in
3  court that would confirm what you're saying; right?
4  A.    I don't know what forms you're talking about, but I
5  know that when Pat raised the issue about vacation accrued,
6  I asked our payroll department to do an audit and our
7  payroll department showed that he received all of his
8  vacations through the years.
9        MR. CELLAR:  Okay.  And we're going to talk about
10 that in a moment.
11       Your Honor, can I ask if this would be a good
12 breaking point?
13       THE COURT:  I'll give you a five minute break.
14 All right, remember what I told you last night, and that is
15 that don't talk to each other about the case.  Don't do any
16 research one way or the other about the case.  Don't let
17 anybody else talk to you about the case.  And we'll commence
18 again 9:00 tomorrow morning.  Thank you.  Please stand for
19 the jury.  Counsel stay.
20       (Jury out)
21       THE COURT:  You may sit down.  Please be seated.
22 All right, Mr. Cellar, when do you think that the plaintiff
23 is going to complete their case?
24       MR. CELLAR:  May I be seated, Your Honor?
25       THE COURT:  Oh, sure.

1           MR. CELLAR:  Okay.  I believe I will finish with

2   Mr. Neuman, his direct, by no later than 10:30 tomorrow

3   morning.  I don't know how long Mr. -- or Frank, Mr. Henry

4   intends on crossing him.  After that, I planned on calling

5   Mr. Hurley, which I imagine will be a direct of about an

6   hour to an hour and a half, and then I planned on finishing

7   with the economist, who will be very brief because it's just

8   on back pay.  So that's the remainder of my case.  I don't

9   intend to call rebuttal witnesses unless something unusual

10  comes up, but I've never done it in the past, to be honest.

11          THE COURT:  All right.  Then how long does the

12  defense think their case would take?

13          MR. HENRY:  Well, I'm going to be participating in

14  cross examining these witnesses tomorrow and I would expect

15  Mr. Hurley is going to be an extensive cross examination,

16  but after Mr. -- I don't intend necessarily to cross

17  Mr. Neuman because I'm going to call him in my case in

18  chief.  I'll expect to call Rose Cucurillo, and Shelton

19  Blackwell and Geralyn Noonan.  So my case in chief is going

20  to be a day and a half.

21          THE COURT:  That's means that if essentially the

22  estimates of counsel are reasonably accurate that evidence

23  won't get in till Friday noon.  That's a problem because I

24  told the jury five days when we picked the jury and I don't

25  want to go over till Monday.  We're not going to try it on

```
 1   Saturday, not going to try it on Sunday.  So you're gong to
 2   have very short arguments.  I'm going to talk about it now.
 3   Normally I don't talk about arguments until the day before
 4   argument.  How much time does the plaintiff want for
 5   argument?
 6           MR. CELLAR:  Having learned from my opening
 7   experience, Your Honor, I would ask for an hour for closing.
 8           THE COURT:  And the defense?
 9           MR. HENRY:  Half hour.
10           MR. CELLAR:  He always does that to me.
11           THE COURT:  I beg your pardon?
12           MR. CELLAR:  He always does that to me.
13           THE COURT:  Uh-huh.  Well, I'll tell you, before I
14   talk more about that, settling the instructions is going to
15   be quick.  You know, the things that you've proposed are
16   given substantially.  That's one thing.  And anything that
17   you propose that isn't substantially given, you have an
18   automatic exception to my instruction thereto, to your
19   instruction not being given if it's not given substantially.
20   But I'm not going to go through each one of your
21   instructions and say well, I gave this part and I didn't
22   give this part.  Not going to do it because if we do that,
23   it's going to take way too much time.  And what I'll try to
24   do is I'll try to give you, at least the night before, and
25   that's Thursday night, I'll try to give you a draft of the
```

```
 1   instructions to go over yet Thursday so that if you have
 2   response on problems, I can work on Thursday night.  I'll do
 3   that so that I can give you the instructions that I propose
 4   to give Friday morning.
 5          And you might have noticed in my preliminary
 6   instructions, you argue first, I instruct after you argue,
 7   just so you know.  But you know, we have proceeded, I would
 8   say deliberately, leaving no stone unturned and I don't want
 9   anything to bog down any further than it is because the jury
10   isn't going to be happy about getting brought back on
11   Monday, so just keep that in mind.
12          Anything from the plaintiff I should think about
13   before tomorrow morning?
14          MR. CELLAR:  No, Your Honor.  Will you allow us to
15   argue the instructions in closing?
16          THE COURT:  Oh, yes, because you'll have the
17   instructions.  I'll give you two different sets.  I'll give
18   you a set with the authorities that the Court's relying upon
19   and another set without so you can put them up on ELMO, you
20   can say we've been advised that the Court's going to
21   instruct you thus and so.  You can argue, point to the
22   instruction and talk about your favorite instructions and so
23   on.
24          MR. CELLAR:  Your Honor, the one thing I would ask
25   is there were some findings made on summary judgment by
```

```
 1   Judge Steele regarding, for example, that all of the Kent
 2   entities are considered to be a joint employer, that
 3   Mr. Neuman is individually liable.  I would just ask, and I
 4   believe -- I don't know if they're in the proposed jury
 5   instructions, but I would just ask the Court in framing its
 6   instructions to provide the jury with an explanation of
 7   that.  There's been a lot of testimony about Kent of Naples
 8   and Palm Beach.  I don't want the jury to think that they're
 9   not all included as one entity and the Court's already made
10   a finding on that as a matter of law.
11           THE COURT:  Well, if there's a finding, you're
12   going to have to put it in evidence.  I'm not going to go
13   pick through the findings in orders to say, you know, this
14   has been found or that's been found.
15           MR. CELLAR:  It was a specific order, Your Honor.
16   It was a motion for clarification.
17           THE COURT:  I read it.  But I don't go through and
18   pick through that.  That's your responsibility if you want
19   that as proof.
20           Any other questions?
21           MR. CELLAR:  No.  The last point I'd make, Your
22   Honor, is I think the only rub that the parties really had
23   on the jury instructions was the theory under which
24   plaintiff is proceeding.
25           THE COURT:  Minor matter.
```

1          MR. CELLAR:  Well, it's our position, without

2     arguing, was that he's proceeding under a chronic serious

3     health condition under the FMLA and the concern was that the

4     jury instructions did not account for that, that branch of

5     the Family Medical Leave Act that he's proceeding under.

6          The other issue, Your Honor, is that the

7     regulations were modified subsequent to his termination.  We

8     brought a copy of the old regulations, which is what we're

9     relying on, which we believe are instructive.  If the Court

10    doesn't have them, we're more than happy to provide our book

11    in the interim.

12         THE COURT:  Just a moment.  I haven't subjected

13    myself to the CFRs yet, but do we have the old ones?

14         MS. ALLEN:  I can go back in Westlaw and go to

15    previous law and I've been doing that to get 2008.  It would

16    be easier to work from the code, if I could do that.

17         MR. CELLAR:  I don't mind sharing our book, Your

18    Honor.

19         THE COURT:  If you have the old code because it's

20    easier to work from --

21         MR. CELLAR:  Agreed.

22         THE COURT:  -- that would be helpful.

23         MR. CELLAR:  May I approach?

24         THE COURT:  Please.

25         MR. CELLAR:  Your Honor, the one issue is it is

```
 1    marked up.  Is that okay?
 2              THE COURT:  That's fine.
 3              MR. CELLAR:  Okay.
 4              (Code provided to the Court)
 5              MR. HENRY:  Judge, another issue that I want to
 6    talk about in scheduling time, it's on my mind, we're going
 7    to be moving for a directed verdict as to Ms. Alexander and
 8    as to the complaint in its entirety in two motions.  We're
 9    going to need to budget some time at the close of the
10    plaintiff's case in chief to hear that motion.
11              THE COURT:  I'm aware of that but it isn't going
12    to take long.
13              MR. HENRY:  Okay.
14              THE COURT:  So I'm sure you'll have your argument
15    bottom line so it won't take long.
16              MR. CELLAR:  Nothing else from our side, Your
17    Honor.
18              THE COURT:  I beg your pardon?
19              MR. CELLAR:  Nothing else from our side.
20              THE COURT:  All right.  I don't know what the
21    practice is here, but I have juries deliberate at night but
22    I don't know about the logistics of it here.  What can you
23    tell me about the logistics as the jury deliberating at
24    night.
25              DEPUTY CLERK:  We go as long as you want us to go.
```

1          THE COURT:  Good.  We'll go as long as we want to

2    go is what I was just told.  So that's what we're going to

3    be doing.  I can see we'll be deliberating Friday night.

4          All right, thank you.  See you in the morning,

5    9:00.  We're in recess.

6          (Proceedings recessed at 5:10 p.m.)

7

8                          CERTIFICATE

9    I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND

10   ACCURATE TRANSCRIPT FROM THE ORIGINAL STENOGRAPHIC RECORD IN

11   THE ABOVE-ENTITLED MATTER.

12

13       Dated this 26th day of February, 2013.

14

15                    /s/ R. Joy Stancel
                     _____
16                       R. JOY STANCEL, RMR-CRR
                     FEDERAL OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25