UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CASE NO. 2:10-CR-334-FTM-29SPC

---

PATRICK HURLEY,

        Plaintiff,

vs.                                              Fort Myers, Florida
                                                 April 11, 2012
KENT OF NAPLES, INC., a Florida                  9:00 A.M.
Corporation, KENT SECURITY OF PALM
BEACH, INC., a Florida Corporation,
and KENT SECURITY SERVICES, INC., a
Florida Corporation,

        Defendants.

---

TRANSCRIPT OF JURY TRIAL DAY 3

BEFORE THE HONORABLE LAWRENCE PIERSOL
UNITED STATES DISTRICT JUDGE


FOR THE PLAINTIFF:        Morgan & Morgan, P.A.
                          6824 Griffin Road
                          Davie, Florida  33314
                          954/243-4295
                          BY:  RICHARD CELLAR
                               ANGELI MURTHY

FOR THE DEFENDANTS:       Blue Rock Legal, P.A.
                          10800 Biscayne Boulevard, Suite 410
                          Miami, Florida  33161
                          305/981-4300
                          BY:  FRANK H. HENRY

REPORTED BY:              R. JOY STANCEL, RMR-CRR
                          Federal Official Court Reporter
                          2110 First Street
                          Fort Myers, Florida  33901
                          239/461-2064

```
 1                      I N D E X

 2   WITNESS                  DIRECT   CROSS   REDIRECT   RECROSS

 3   Gil Neuman                 502

 4   Patrick Hurley             606     717

 5   Bernard Pettingill         678     691      712       714

 6

 7                E X H I B I T   I N D E X

 8   NUMBER                                              PAGE

 9   Plaintiff  2    Neuman Email to Hurley 8/9/05        534
     Plaintiff  7    Hurley Email to Neuman 6/28/06       538
10   Plaintiff 17    Hurley Email RE Launched Flawlessly  552
     Plaintiff 23    Hurley Email to Neuman 4/7/08        573
11   Plaintiff 36    Certification and Cover Letter       595
     Plaintiff 37    Neuman Response to Hurley            601
12   Plaintiff 69-75, 78, 84, 93, 94, 95, 97 98, 100, 101 672
                     Job Application Information
13   Plaintiff 102   Pettingill's Report                  682

14

15   Defense B-1     Neuman Email to Hurley  10/20/05     730
     Defense F-1     Hurley Email to Callahan 10/8/07     739
16   Defense H-1     Hurley Email to Callahan 11/26/07    741
     Defense J-1     Hurley Email to Callahan 12/13/07    744
17   Defense V-1     Hurley Email to Neuman 2/12/08       751

18

19

20

21

22

23

24

25
```

```
 1              (Call to Order of the Court)
 2              THE COURT:  Last night, the issue was brought by
 3   the plaintiff about, you know, the findings by Judge Steele
 4   in the summary judgment motion with regard to the corporate
 5   defendants, and I said, well, the plaintiff has to address
 6   that in some way.  The way it should be addressed, it seems
 7   to me, is that the Court could take judicial notice of those
 8   findings by Judge Steele, but that has to be on the record
 9   here and not something working back in the stack of
10   documents that are the pleadings.  So that's how that should
11   be done.  Are you ready to proceed?
12              MR. HENRY:  Judge, does that imply that we're
13   going to somehow instruct the jury that several of the
14   defendants have already been found to be some element of the
15   claim, like joint employers?  Is that going to be said to
16   the jury in the case?
17              THE COURT:  Well, the jury's going to be told
18   that, at least.  Whether I put it in the instructions, I
19   haven't decided, but the jury will be told that the Court
20   takes judicial notice of X.  Whether I put it in the
21   instructions, I haven't decided on that.
22              MR. CELLAR:  We're ready, Your Honor.
23              THE COURT:  Very well.  Bring in the jury, please.
24              COURT SECURITY OFFICER:  Yes, Your Honor.
25              (Jury in)
```

NEUMAN - DIRECT

1    THE COURT:  Please be seated.  Good morning.

2  Plaintiff may proceed.

3    MR. CELLAR:  We would recall Mr. Neuman.

4    THE COURT:  You're still under oath from last

5  time.

6    DIRECT EXAMINATION (Continued)

7  BY MR. CELLAR

8  Q.    Good morning.  Okay, Mr. Neuman, I wanted to -- first

9  of all, good morning.

10 A.    Good morning.

11 Q.    I want to pick up where we started -- or where we

12 left off yesterday talking about Mr. Hurley's employment

13 agreement and I've given you copies of that document in

14 front of you.  Now, I understand your position is that the

15 employment agreement was not in place at the time Pat was

16 fired.  Is that right?

17 A.    That's correct.

18 Q.    Okay.  Understanding that's your position, I'd still

19 like you to answer my question and the question is, when you

20 fired Pat or attempted to fire him over the telephone on

21 May 1st, 2008, you did not give him a 30 day notice of that

22 firing; right?

23 A.    When I fired Pat over the phone, I had pretty lengthy

24 conversation with Pat and Pat asked me on the phone about

25 the 30 days and I told Pat that I'm planning to pay for the

NEUMAN - DIRECT

1   30 days.

2   Q.    But you didn't pay him for the 30 days?

3   A.    I did.

4   Q.    You didn't?

5   A.    Yes.

6   Q.    My question to you was, you never gave him the 30

7   days notice in writing that he was going to be fired as the

8   contract required; right?

9   A.    In technical terms, as far as sending him a letter

10  and saying to him in 30 days I'm going to do something, I

11  didn't.  But when we have this discussion on the phone, I

12  told him I'm planning to pay him instead of working.

13  Q.    Okay.  But because you didn't actually pay him, what

14  you had said to him didn't really have any effect?

15  A.    I paid him few paychecks until he refused to sign the

16  release.  And then we realized that we're heading the wrong

17  road.

18  Q.    That's not what you testified to under oath during

19  the unemployment compensation hearing, Mr. Neuman; is it?

20  A.    I have no idea what I testified under oath on the

21  employment hearing.

22          MR. CELLAR:  Okay.  Give me a moment, please.

23  Counsel, Page 20, Line 19 of the transcript.

24          MR. HENRY:  Transcript?

25          MR. CELLAR:  Of the unemployment hearing.

NEUMAN - DIRECT

1          MR. HENRY:  I don't have a copy of the transcript

2    of the unemployment hearing.

3          MR. CELLAR:  I know we produced it during

4    discovery.  I can get you another copy.

5          MR. HENRY:  You have a tape recording of it.

6          MR. CELLAR:  We also have a transcript of it.

7          MR. HENRY:  I don't have it.

8          MR. CELLAR:  Is it okay if I proceed or do you

9    want to wait?

10          MR. HENRY:  No, I'd like a copy of it.

11          MR. CELLAR:  Sure, okay.

12          (Pause in place)

13          MR. CELLAR:  Tell you what, is it okay if I share

14    my copy with you while I examine the witness so we can move

15    forward?

16          MR. HENRY:  Where are you reading from?

17          MR. CELLAR:  I'm going to read from here, and

18    we'll get you a copy.

19    BY MR. CELLAR

20    Q.    Mr. Neuman, on Page 20 --

21    A.    I don't have Page 20.

22    Q.    I understand.  I'm going to read to you what you

23    said.  The question was -- this is from Ms. Noonan,

24    Mr. Hurley's former counsel.  The question was, did the

25    contract address how the parties were supposed to behave in

NEUMAN - DIRECT

1    the event that Mr. Employee -- Mr. Hurley's employment was

2    terminated.

3            Mr. Neuman, yes, I see Paragraph Number 7.  It

4    says that we will give him 30 days --

5            I'm not going to read the rest of that, okay?

6            MR. HENRY:  That's up to you.  We'll read the rest

7    to the jury if you don't.

8            MR. CELLAR:  That's fine.  I just didn't want to

9    raise an issue.

10           And we will give him his six weeks severance and

11   that's it.  Now when I called him.  I told him on the phone

12   I will pay him 30 days rather than keep him working.

13           Ms. Noonan said:  Okay, and did you do that.

14           Your answer was:  What.

15           Ms. Noonan then said:  And Mr. Neuman, did you in

16   fact do that.

17           Your answer was:  I did it until I guess he

18   retained your services and he started suing me from every

19   side possible.

20           Was that your testimony under oath?

21   A.   Obviously.  I don't have any reason to question it.

22   I start paying him and when we realized that we're not going

23   to be able to resolve it amicably, him signing a release, I

24   realized that this is not going to end nice.

25   Q.   Your testimony was the reason why you didn't pay him

NEUMAN - DIRECT

1  his severance was because he pursued legal action to enforce

2  his rights; isn't that what you testified to under oath?

3  A.    He refused to sign a release.

4  Q.    Can you show me where in his employment agreement it

5  says that he is required to sign a release to get the

6  contractual benefits that you and he agreed on?

7  A.    I did not write this employment agreement, so I

8  cannot tell you where it will say anything.

9  Q.    Well, if you take a moment and look at it, it doesn't

10 say in there that Mr. Hurley had to sign a release to get

11 the money you said you would pay him?

12        MR. HENRY:  Judge, I have an objection to this

13 line of questioning.  This is something that we've addressed

14 a couple of times.  Can I be heard at sidebar?

15        THE COURT:  Very well.

16        (At sidebar, Court and counsel present)

17        MR. HENRY:  Mr. Cellar's question was where does

18 it say in his employment contract that he has to sign a

19 release and where in order to get the benefits that are

20 available to him under the employment agreement.  That's

21 four corners of the issue that we -- that they sued in state

22 court on and it was settled.  Now he's talking about it

23 again.  Where does it say in the contract that he had to

24 sign a release to get these benefits.  This something that

25 you already said that they couldn't go into.  It's another

NEUMAN - DIRECT

```
 1   thing to say the 30 day notice period applied or at least he
 2   thought it did, but to say the benefits that are available
 3   under the contract are only available -- or the contract
 4   does not require that he sign a release.  He's going back
 5   into the stuff that we defended in state court.
 6             MR. CELLAR:  He certainly opened the door, Your
 7   Honor, when he started saying he did something he didn't do.
 8   I'm not offering it for the truth of the matter but solely
 9   for impeachment.
10             THE COURT:  I think it's impeachment because
11   frankly, this is different than he testified to and it is --
12   he opened the door when he said -- when the witness said
13   what he said in response to a question.  So I think it is
14   proper impeachment.
15             MR. HENRY:  Okay.  Thank you, Judge.
16             (Sidebar concluded)
17             MR. CELLAR:  Is there a way to read back my last
18   question?
19             (The question referred to was read by the reporter
20   as previously recorded)
21   BY MR. CELLAR
22   Q.    Isn't that true?
23   A.    From the brief time I look at this again, I don't see
24   anything about what he has to do, but obviously when
25   somebody say good-bye to you and you separated, you want to
```

NEUMAN - DIRECT

1   make sure that all the money you give him, you get some

2   release.

3   Q.     But when you negotiated this with Mr. Hurley, you

4   never told him that it was conditioned, meaning what you

5   would pay him, would be conditioned upon him giving you some

6   sort of release; you owed it to him under the agreement.

7   A.     But you keep on forgetting that I told you at the

8   beginning that I don't view this as still in enforcement.

9   Q.     Okay.  So under your interpretation of the

10  agreement -- let me ask it differently.

11         Why would you agree to pay him 30 days or why

12  would you even have a discussion about paying him 30 days if

13  the contract wasn't -- if you didn't believe the contract

14  was in effect?

15  A.     Because Pat has been a team member for seven years.

16  I wanted Pat to leave with dignity.  I wanted it to be done

17  nice and amicably and move on with our life.

18  Q.     Do you pay everybody in your company who leaves 30

19  days notice?

20  A.     No.

21  Q.     So the 30 days had to come from somewhere?

22  A.     Pat asked me this on the phone and I said Pat, I will

23  pay you whatever I owe you, I'm not looking to fight with

24  you, I'm not looking for a war with you, I just want to move

25  on with my life and I want you to do the same.

NEUMAN - DIRECT

1   Q.    Well, you also made a mention in your prior testimony

2   about the six weeks of severance, as you testified to;

3   right?

4   A.    I said -- he asked me all those questions over the

5   phone, are you going to pay me this, are you going to pay me

6   this, are you going to pay me this.  I said, Pat, I'll tell

7   you again, I'm not interested in fighting.  I will pay you

8   whatever I owe you and I want us to move on.

9   Q.    Well, you would agree that the phrase six weeks of

10  severance is not something that would be pulled from thin

11  air; right?  It would come from somewhere?

12  A.    Pat always refer back to this contract throughout his

13  seven years.

14  Q.    And where would we find any sort of response from you

15  in writing, Mr. Neuman, saying Pat, what contract, or Pat,

16  your contract is not in effect?  We won't see that; right?

17  A.    You will not find a lot of things from me in writing.

18  As I said to you yesterday, I'm not very good in writing,

19  I'm much more of a verbal person.

20  Q.    I don't want to talk about other things we're going

21  to see.  I want to talk about your response to the question

22  I just asked, is we will not see anything in writing from

23  you ever denying that this contract continued to be in

24  effect, yes or no?

25  A.    I do not view this contract in effect because I do

NEUMAN - DIRECT

1    not view Pat to be the vice-president of sales.

2    Q.     Okay.  And even though you believe this contract

3    wasn't in effect when it came time to terminate, you

4    discussed paying him the 30 days notice pay; right?  That

5    was in the contract?

6    A.     I did not discuss in specific.  He asked me for

7    things and I said to him, Pat, I want you to know I'm going

8    to pay you everything that I owe you.  I don't want to fight

9    with you.

10   Q.     But you didn't pay him everything that you wanted --

11   that he wanted; right?

12   A.     I paid him, I think, for two, three weeks afterwards

13   until we realized that we're not going to settle it nicely

14   and he's not going to sign a release.

15   Q.     Even though the employment agreement never required

16   any sort of release, can we agree on that?

17   A.     It doesn't look like it says anything about a

18   release, but obviously when you depart and you give money,

19   you want some sort of a release.

20   Q.     Would you require Mr. Hurley to give you a release

21   every time you gave him a paycheck?

22   A.     Absolutely not.

23   Q.     Now, in addition to you being the CEO and I'll save

24   some time on this, you heard your sister, Ms. Alexander,

25   testify yesterday; right?

NEUMAN - DIRECT

1  A.     What's the question?

2  Q.     You heard your sister testify in court here

3  yesterday?

4  A.     Yes, sir, I was here.

5  Q.     And just so we can skip some time, did you agree with

6  her testimony regarding her job duties and responsibilities

7  at Kent?

8  A.     As a little brother, I'm always very critical of her,

9  but yes, I would agree.

10 Q.     So you would agree very briefly that she did all the

11 hiring and firing that she discussed regarding her staff?

12 A.     Her staff is very limited, but yes, I make it my

13 business to stay out of her business.

14 Q.     Okay.  But we can agree that what she testified to

15 under oath was an accurate description of her job duties and

16 responsibilities?

17 A.     I didn't see anything major that require us going

18 back to it.

19 Q.     Okay.  And did you agree with her testimony that when

20 you would travel oversees, Ms. Alexander would be in charge

21 of the company on your behalf?

22 A.     I'm happy that you say overseas today because I took

23 offense for the last few days you been calling it, you said

24 we going to the Middle East.  I was born and raised in

25 Israel and once in a while I go back.

NEUMAN - DIRECT

1   Q.     Israel's in the Middle East; right?

2   A.     I guess how you look at it.

3   Q.     Okay, fair enough.  I'll start referring to it as

4   Israel if you prefer.

5   A.     Thank you.

6   Q.     Now, when you initially hired Pat in June of 2001,

7   you hired him as vice-president of sales and marketing;

8   right?

9   A.     As we said yesterday, it says -- it's a fancy word

10  for salesman, yes.

11  Q.     And he remained in that position through roughly

12  December of 2003?

13  A.     He remained for some time.  I don't know exactly

14  when, but he remained for some time in that position, yes.

15  Q.     Can we agree that he did excellent work for the

16  company during that time period?

17  A.     I think that he did excellent work as a salesman,

18  yes.

19  Q.     And his work was so good that it warranted a

20  promotion from you; right?

21  A.     I think he did good work and we promoted him, that's

22  correct.

23  Q.     Let's take a look at Exhibit 12 which has already

24  been introduced in evidence.  Okay, now we've discussed this

25  email a few times and I understand your position is that Pat

NEUMAN - DIRECT

1   wrote this email for you?

2   A.      You're a hundred percent correct.

3   Q.      Okay.  Now, you would agree your name is on it?

4   A.      My name is on it.

5   Q.      You would agree that you had the opportunity to edit

6   this before it went out?

7   A.      I agree.

8   Q.      And you would agree that it's being sent to

9   management folks in the company as being a memo from you;

10  right?

11  A.      Yes, I agree.

12  Q.      And you would also agree that if somebody were to

13  receive this in the company, they could assume that these

14  were your words; right?

15  A.      Anybody who know me will tell you that I would love

16  to have this kind of word crafting, but I don't have it.

17  Q.      Fair enough.  But I guess my question is this, is

18  there anything in this email that you disagree with?

19  A.      Let's read.  Looking at this, obviously I cannot be

20  writing this.

21  Q.      I understand that's your position, Mr. Neuman.  My

22  question is, is there anything in here that you disagree

23  with?

24  A.      Yes.

25  Q.      Okay.

NEUMAN - DIRECT

1   A.    I'm reading it now slowly and it says that it's

2   almost eight years of highly successful security experience.

3   This is after he working for two years.

4   Q.    You were aware that Pat had prior security experience

5   coming to work for your company; right?

6   A.    Yes, but I learned afterwards that he was fired.

7   Q.    You heard afterwards that Pat was fired?

8   A.    Yes.

9   Q.    Did you ever raise that issue with him during his

10  employment?

11  A.    I've learned afterwards.

12  Q.    Okay.  From whom?

13  A.    Through the litigation.

14  Q.    Who told you that?

15        MR. HENRY:  Well, I'm going to object on the

16  attorney-client privilege.  We can be heard at sidebar on

17  the issue.

18        MR. CELLAR:  Your Honor, I would move to strike

19  based on hearsay.

20        THE COURT:  Well approach the bench, please.

21        (At sidebar, Court and counsel present)

22        MR. HENRY:  Mr. Hurley testified to that at his

23  deposition.

24        THE COURT:  I beg your pardon?

25        MR. HENRY:  That he was terminated from a security

NEUMAN - DIRECT

1   company before he came to work for Kent.  He testified to it

2   at his deposition.

3           THE COURT:  So what's the attorney-client

4   privilege?

5           MR. HENRY:  It's what he was about to say that I

6   told him that.  The true -- well, the truth is that he read

7   the transcript.  He's aware of the deposition and I did talk

8   to him about that.

9           MR. CELLAR:  It's hearsay, Your Honor.  I mean,

10  he's testifying to an out of court statement for the truth

11  of the matter asserted.

12          MR. HENRY:  That your client testified to.

13          MR. CELLAR:  It's still double hearsay because it

14  may be an admission but you're still reading it from an

15  exterior source.  He has no firsthand knowledge of it.

16          THE COURT:  Doesn't have to.

17          MR. HENRY:  His transcript of his deposition is a

18  party admission.  He's aware of it through Mr. Hurley's

19  deposition.

20          MR. CELLAR:  I don't know that he testified to it.

21  I'm sure Frank knows Pat's deposition better than I do at

22  this point.

23          THE COURT:  Assuming he did, I think we should

24  just move on.

25          MR. CELLAR:  Okay, that's fair enough.

NEUMAN - DIRECT

```
 1              (Sidebar concluded)

 2   BY MR. CELLAR

 3   Q.     Is there anything else in this memo that you disagree

 4   with, Mr. Neuman?

 5   A.     Outside of this one lie, yes, I agree.

 6   Q.     Okay.  So other than that one line, you're in

 7   agreement with --

 8   A.     I didn't say line, I said lie.

 9   Q.     Lie?

10   A.     Yes.

11   Q.     Okay.  You make a reference here and you heard

12   Mr. Henry argue that Pat was not doing what he needed to do

13   as in operations.  Now, you didn't mention that you believed

14   the operations know-how was an issue for Pat in this email;

15   right?

16   A.     He didn't do any operation prior to that.

17   Q.     Well, you're plauding [SIC] his operational know-how;

18   right?

19   A.     No, he's plauding it.  He's writing it.

20   Q.     He's writing it in an email under your name?

21   A.     Yes, and I blasted it out.  Let me explain to you why

22   I blasted out.  I always think it's healthy in a company to

23   promote from within, and I think it's healthy to send a

24   message to the rest of the team that we encourage it and we

25   think it's good stuff.  However, since my writing skills are
```

NEUMAN - DIRECT

1    not great, I never get around to do this stuff, which I

2    think is important.  It's important to tell everybody, to

3    build morale, that we're promoting from within.

4              So Pat said to me, Gilly, I think it's really

5    important to do team building.  I said fine, I agree with

6    you, send me the email, I'll put it on my stuff and I'll

7    send it out.  I don't have a problem with it.  I think it's

8    good to build a team morale.

9    Q.    You just said Pat referred to you as Gilly?

10   A.    Gil, Gilly, some people called me Mr. Neuman,

11   something else.

12   Q.    Did Adoni Kokkinos refer to you as Gilly?

13   A.    Very well could be.  I don't know how people refer me

14   and I'm sure behind my back they refer to me bad stuff.

15   Q.    Do you recall testifying under oath that he referred

16   to you as Gilly?

17   A.    Very well could be.

18   Q.    You also heard Mr. Kokkinos tell you or testify that

19   he never told you that he wanted to get out of Best Value

20   Partners.  You testified under oath that he did come to you.

21   Do you remember that?

22   A.    I remember a conversation with Adoni that he

23   consulted with me and he asked me how to get out because

24   it's his name on the line and he's not feeling comfortable,

25   yes, I remember this.

NEUMAN - DIRECT

1  Q.     Okay, but he denied that yesterday in court; right?

2  A.     I don't remember everything he said, no.

3  Q.     Okay.  But it's your testimony that he did come to

4  you; right?

5  A.     Yes.

6  Q.     And Mr. Kokkinos' testimony is that he never came to

7  you?

8  A.     I don't know that.

9  Q.     You weren't sitting here when he testified?

10 A.     I was sitting here for the last three days, hearing a

11 lot of things.  I don't remember every sentence that every

12 person said.

13 Q.     Now, you would not have promoted Pat if he didn't

14 deserve it; right?

15 A.     I would have not promoted Pat if I wouldn't think at

16 the time that he deserved it, absolutely.

17 Q.     Okay.  So at the time when you promoted him in

18 November of 2003, you had a belief that he was worthy of the

19 promotion; right?

20 A.     I think Pat is a very smart and capable man.  I

21 always said that.

22 Q.     Okay, so the answer is yes?

23 A.     Yes.

24 Q.     Okay.  Now, being president of Kent of Naples is, to

25 use your words, a very tough position with a lot of

NEUMAN - DIRECT

1  responsibility; right?

2  A.    Extremely tough position, extreme responsibility,

3  absolutely.

4  Q.    Now, when Pat went over to Kent of Naples, in your

5  words, he became the face of the company?

6  A.    I think that every person who head a division is the

7  face.  Nobody know Gil Neuman.  Everybody know the person

8  who is heading that division.

9  Q.    And you've described Pat during these proceedings as

10  the face of Kent of Naples; right?

11  A.    I don't know if I describing in this proceeding but I

12  would agree that the person who run the office is the face

13  of Kent, just like I think the guards are the face of Kent,

14  not my face.

15  Q.    Okay.  Now, your position has been that if Pat was

16  away from his job for a period of time, significant period

17  of time, that would negatively affect Kent of Naples; right?

18  A.    I think any company, if it's in security business, if

19  it's in the construction business, when the head guy is away

20  for a long time, obviously it will affect the company.

21  Q.    So you had an interest in making sure that Pat was

22  not away from the company or Kent of Naples regularly?

23  A.    I have an interest to make sure that -- I always said

24  my job is to take care of my customers and to take care of

25  my good employees.  Without happy customers and happy

NEUMAN - DIRECT

1    employees, I have no business.

2    Q.    Would keeping an employee happy, would paying an

3    employee their bonuses when they're due in your opinion keep

4    an employee happy?

5    A.    A hundred percent.

6    Q.    Would -- would withholding wages from an employee in

7    your opinion, keep them happy?

8    A.    Withholding wages is illegal.  You go to jail.

9    Q.    So we can agree on that?

10   A.    I think when you don't pay a salary, you going to

11   jail.

12   Q.    What about when you don't pay somebody a bonus that

13   you told them you'd pay?

14   A.    Let's talk about the bonus.  I think it's a great

15   topic.

16   Q.    I think we're going to get there but I'd like you to

17   answer my question.

18   A.    But you asked me now so let me answer you.

19   Q.    Sure, go ahead, Mr. Neuman.

20   A.    Around 2005, I try to come up with a way to put the

21   company interest in line with the employee interest.  In

22   other words, to build a formula that as the company do well,

23   the employees will benefit directly.  So I came up with a

24   three tier program.  I came up with new revenue, retention

25   of customers, and low overtime.  And each one of those three

NEUMAN - DIRECT

```
 1    pieces had three or four measures underneath.  And
 2    relatively quickly, I realized that it turned to be a
 3    disaster because people got confused, people did not
 4    understand how to calculate it and the first thing the
 5    people said, hey, I earn it, give me the money.  So I'm the
 6    bad guy for not giving money.  People will have math
 7    mistakes, people will add it wrong, but I'm the bad guy
 8    because I don't pay bonus.  So within a year or two, I did
 9    away with this bonus program because it turn out to be a
10    disaster.
11    Q.    You just referred to yourself as being the bad guy?
12    A.    Yes.  As the person on the top, people always said
13    give us more money, give us more bonuses, and you have the
14    responsibility to running a company.  So many time you have
15    to say no, so automatically you become the bad guy.
16    Q.    Does it make you the bad guy if you make an agreement
17    with somebody and don't follow it?
18           MR. HENRY:  Objection, calls for hypothetical.
19           THE COURT:  Overruled.
20    A.    I think a person is only as good as his word.  If you
21    don't keep your word, you're not a good person.  Simple as
22    that.  You treat people the way you want to be treated.
23    BY MR. CELLAR
24    Q.    The golden rule?
25    A.    If you call it -- I say you treat people as you want
```

NEUMAN - DIRECT

1    to be treated.

2    Q.     If you work for a company for seven years, would you

3    want to be fired on the phone?

4    A.     With all due respect, there was a lot in the seven

5    years.  You cannot just take the one last day and keep on

6    characterizing the whole seven years.  This was a very, very

7    long relationship.  Not a good relationship, a long

8    relationship, that at the end, had to come to an end.

9    Q.     And I appreciate that, but my question was, because

10   you had testified you treat others the way you want to be

11   treated?

12   A.     Yes, sir.

13   Q.     If you worked somewhere for seven years and were one

14   of the top ranking managers of the company, would you

15   believe that it was respectful to be terminated over a

16   telephone call?

17   A.     Obviously when you work for somewhere for seven

18   years, you don't want to be terminated, period, not over the

19   phone, not in person, not in anywhere.  That's minor.  You

20   want to have relationship that you can be proud of for years

21   to come.  Nobody want to be terminated.  But in business,

22   sometime relationship end.

23   Q.     And there's a right way to end a relationship, isn't

24   there, Mr. Neuman?

25   A.     I called Pat and I said to him, Pat, we have been

NEUMAN - DIRECT

1   together for seven years.  You are smart man.  You're

2   brilliant person.  We had a good run together.  I think it's

3   time to separate way.  I want to leave it amicably.  I want

4   to leave it with respect.

5   Q.     And you didn't mention insubordination during that

6   call; right?

7   A.     Why going into a painful part?  Let's leave on high

8   note in a respectable way.  Let's give a man dignity as

9   well.

10  Q.     My question, Mr. Neuman, is you did not mention

11  insubordination to Pat during that telephone call; did you?

12  A.     I did not tell him because you move two steps to the

13  left or because you jump too high.  I just called in a very

14  respectable way and I said, Pat, we have worked together for

15  seven years, you're a smart guy, you will do well wherever

16  you go.  Let's end this road amicably, let's go our separate

17  way.

18  Q.     Is the answer no, Mr. Neuman?  Is the answer to my

19  question no, you did not mention?

20  A.     Please repeat the question.

21  Q.     You did not mention insubordination, yes or --

22  A.     No, I did not go into any detail why I did it.  I

23  wanted to do it nice.

24  Q.     You did not mention poor performance?

25  A.     I didn't give him any specific.  I said to him, we

NEUMAN - DIRECT

```
 1   came to tend of the road.  Let's part way in an amicable
 2   way.
 3   Q.     You didn't mention the Tampa office?
 4   A.     You going to ask me ten more questions?  I told you I
 5   didn't mention any details of why.  I said let's end it
 6   amicably.
 7   Q.     You didn't ask Rose Cucurillo to put anything in
 8   Mr. Hurley's personnel file indicating he'd been fired for
 9   insubordination either; right?  Yes or no?
10   A.     I try to remember if I asked Rose to put something in
11   his file.  I guess not.
12   Q.     Well, you heard her testify yesterday that you
13   didn't; right?
14   A.     I'm sorry, but I don't remember exactly what she said
15   on each question.
16   Q.     You also heard Ms. Cucurillo testify that you didn't
17   tell her to put anything in Pat's file regarding poor
18   performance; right?
19   A.     I never treated Pat as an employee.  I treated Pat as
20   an equal.  I treated Pat as an executive.  I don't write up
21   an executive.  This is not a respectful way to deal with
22   executive.  Maybe I'm wrong.  But I treated Pat as an
23   executive.
24   Q.     And you think it's okay to pick up the phone and call
25   an executive and fire them after seven years instead of
```

NEUMAN - DIRECT

1   calling them to your office and having a conversation?

2   A.    I tried to call Pat to my office but he refused to

3   come.

4   Q.    Now, part of Pat's job duties and responsibilities in

5   these matters, you've described three major components;

6   right?  One of them is getting clients?

7   A.    New business.

8   Q.    Keeping -- okay, new business.  Two, keeping clients

9   happy?

10  A.    Retaining business.

11  Q.    And three, keeping staff happy?

12  A.    No.  The three things that I build the bonus program

13  that didn't work out was retaining new business, getting new

14  business, retaining existing business, and cutting overtime.

15  Q.    Do you recall testifying under oath, Mr. Neuman in

16  these proceedings?

17  A.    You mean when you deposed me?

18  Q.    Yes, sir.

19  A.    Yes, sir.

20  Q.    Counsel, Page 49 Line 8.  Let me ask it differently.

21  Would you agree that managing the employees of the

22  corporation, of the company would be an essential function

23  of the job.

24        Your answer, yes.

25        Was that your testimony?

NEUMAN - DIRECT

1   A.    Absolutely.  You will never get -- I been doing this

2   now for, gee, over 20 years.  You will never get to low

3   overtime without doing a great job managing employees.

4   Q.    Now, to do these functions, Pat needed to be

5   functioning properly; right?

6   A.    What do you mean functioning properly?

7   Q.    He needed to be able to, for example, have clear

8   decision-making?

9   A.    Absolutely.  It's a tough job.

10  Q.    Have clear and rational thinking?

11  A.    Yes.

12  Q.    Now, to have the ability not to panic during

13  stressful situations?

14  A.    I don't know.  What does that mean not to panic under

15  stressful --

16  Q.    That if there was something going on that -- that was

17  causing Pat to panic, that could affect his decision-making;

18  right?

19  A.    I think us as people always should keep cool head and

20  respectful manner.  I don't think panicking helpful in any

21  situation.

22  Q.    And he needed to communicate calmly with clients?

23  A.    I would hope so.

24  Q.    And he needed to be able to focus; right?

25  A.    I would hope so.

NEUMAN - DIRECT

1   Q.     You would agree that for Pat to do the essential

2   functions of his job, he needed to be in good health to do

3   so?

4   A.     I know Pat for seven years.  Pat was always in good

5   health.  Pat has never shared with me one sentence that he's

6   not well.

7   Q.     Well, you needed a strong leader in Naples; right?

8   A.     I need a strong leader in every office.

9   Q.     And you understand why Pat did not discuss his

10  depression with you until it was time to do so; don't you?

11  A.     Pat has never discussed his depression with me,

12  never, ever, ever, ever, ever, ever.  Did I say enough

13  evers?

14  Q.     And you're certain of that?

15  A.     Pat has never discussed his depression with me ever,

16  ever, ever, ever.

17  Q.     You told Pat that he needed to be strong and

18  resilient to run the Naples office; right?

19  A.     All of our managers have to be strong and resilient.

20  Q.     Now, Pat stayed in his role with Kent until

21  approximately July 5th of 2006; right?

22  A.     I have no reason to question this.

23  Q.     Now, you remember at the time you promoted Pat he was

24  living over on the east coast where you folks are; right?

25  A.     The east coast where you folks are, what does that

NEUMAN - DIRECT

 1   mean?

 2   Q.      Fort Lauderdale.

 3   A.      He was living Fort Lauderdale when I hired him, yes.

 4   Q.      Okay, when --

 5   A.      And he lived in Fort Lauderdale when?

 6   Q.      And then when you promoted him, there was a time

 7   period he eventually had to move out here to the west coast

 8   in Naples, slash, Fort Myers; right?

 9   A.      Yes.

10   Q.      And you know that he relocated his family?

11   A.      Yes.

12   Q.      Had to say good-bye to his friends?

13   A.      I don't know if he said good-bye to his friends.

14   Q.      Sell his house?

15   A.      I don't know what he did with his house.

16   Q.      Now, you were aware that although Pat had now moved

17   to the west coast, he still continued to have regular

18   meetings with you back in the Miami office?

19   A.      No.  You keep on referring to meetings as something

20   very official.  Pat would come to the office to pick up

21   payroll once in a while.  Pat would come to the office if he

22   had to.  Rarely we had official meetings.

23   Q.      I'd like to --

24   A.      We're not an official company.  We are kind of

25   casual.

NEUMAN - DIRECT

1   Q.      Casual with close to or over a thousand employees, is

2   that your testimony?

3   A.      A hundred percent.  My door is always open.  We're a

4   very casual company.

5   Q.      Casual documenting employees' performance issues as

6   well?

7   A.      Casual that I call every employee every morning on

8   his birthday and sing them happy birthday, absolutely.  Our

9   documentation, forgive me for this word, suck.  We are not

10  very good companies in documentation, I'll be the first one

11  to say.  Every company have strength and have weaknesses.

12  Documentation is not our strength.

13  Q.      You understand that under the law documentation in

14  certain circumstances is necessary; right?

15          MR. HENRY:  Objection to the question, Your Honor.

16  It's characterizing a legal requirement that doesn't exist.

17          THE COURT:  I sustain.

18  BY MR. CELLAR

19  Q.      You understand the importance of documenting employee

20  issues in today's work force; right?

21  A.      Every day I'm learning more.

22  Q.      I'd like you to take a look at, there's a stack of

23  exhibits there, what's been marked as Exhibit Number 5?

24  A.      Yes, sir.

25  Q.      And ask you to identify this document, please.

NEUMAN - DIRECT

1   A.    It look like a white piece of paper with an email

2   from me -- not an email, I'm sorry.  It says from Gil Neuman

3   to Pat Hurley.  And then there is a base salary of a hundred

4   thousand dollar, and three areas where I focused the plan on

5   three critical area I feel need to keep on our eyes, growth,

6   revenue growth, sales to payroll ratios, that's another good

7   one, and retention of clients.

8   Q.    Does this appear to be a true and correct copy of the

9   memo that you wrote from Mr. Neuman to Pat Hurley?

10  A.    I have no way to tell you that yes or no.

11  Q.    Do you have any reason to deny that this is something

12  you said to Pat Hurley?

13  A.    I have no idea if it's taken out of context.  I

14  really don't know what it is.

15        MR. CELLAR:  Your Honor, at this time, we'd like

16  to move into evidence what's been marked as Plaintiff's

17  Exhibit Number 5.

18        THE COURT:  Number 5 is received.

19        MR. HENRY:  No objection.

20  BY MR. CELLAR

21  Q.    Who wrote this email -- who wrote this memo,

22  Mr. Neuman?

23  A.    I don't know.

24  Q.    Is it your testimony that Mr. Hurley wrote this one

25  as well?

NEUMAN - DIRECT

1   A.    No.  I don't know, I said.

2   Q.    Okay.  Now, this would have been subsequent to Pat

3   starting at Kent; right?  This agreement would have happened

4   after he was hired?

5   A.    Are you saying this was when he was hired to Kent?

6   Q.    No, after he was hired.

7   A.    Again, as I look at this, it look more like my

8   writing because there are misspells and everything's in

9   capital.  It look like something that I would do.

10  Q.    How much was Pat supposed to be paid when he was

11  hired at Kent Security, his first job, base salary?

12  A.    According to Exhibit 10 that you gave me --

13  Q.    Take a look at the employment agreement?

14  A.    That's what I'm holding.  That's Exhibit 10.  It says

15  here that his base salary of 2,000-dollar per week.  That's

16  a 104,000.

17  Q.    What was his net salary -- says his base salary is

18  $1,394.  Do you see that?

19  A.    Right above it I got the line where it says

20  2,000-dollar per week.

21  Q.    Right, and that was for the first 16 weeks?

22  A.    Yes.

23  Q.    And then after that, he was receiving $1,394.23;

24  right, per week?

25  A.    Yes.  I don't know exactly.  What's 1394 time 52.

NEUMAN - DIRECT

1    Q.    Doing simple math, would you agree that's less than a

2    hundred thousand dollars a year?

3    A.    I would say it's somewhere in the neighborhood of 75?

4    Q.    Okay.  And the point I'm trying to make is if he was

5    making $75,000 when he started, plus bonuses, that's a bonus

6    structure on the bottom; right?

7    A.    That's what a salesperson would get, yes.

8    Q.    Okay.  This subsequent memo between you and

9    Mr. Hurley was a pay increase that he was supposed to

10   receive; right?

11   A.    But you see, this one is very telling.  Why would

12   people get confused, because there are three areas here,

13   revenue growth, sales to payroll ratio, and retention of

14   clients.  But how do you calculate it?  It says five

15   percent, one percent.  I mean, how do you do the math?

16   Where's the formula?  And that's where people obviously

17   assume that, quote/unquote, I owe them money and that's

18   where I am wrong.

19   Q.    Mr. Neuman, my question was this was a pay increase

20   for Pat; isn't that right?

21   A.    I don't know when it was.  There's no date on this

22   document.

23   Q.    Okay.

24   A.    And this is --

25   Q.    I'm sorry, were you finished with your answer?

NEUMAN - DIRECT

1    A.    I don't know when is this document was produced.

2    Q.    It's got your name on it; right?

3    A.    It has my name on it, yes.

4    Q.    Okay.  And you don't disagree that at a certain

5    point, Pat received this pay increase discussed here in this

6    memo; do you?

7    A.    Pat made a lot more than a hundred thousand at the

8    end of the employment.  So obviously sometime between the

9    beginning of his employment to the end of the employment

10   that's one of his bumps.

11   Q.    And you wouldn't have given him -- as you discussed

12   yesterday, you wouldn't have given somebody a pay increase

13   if they weren't worthy of it or deserving; right?

14   A.    As I answer you before, when I made the decision to

15   give, I obviously thought they with were worthy of it.

16   Q.    Okay.  Let's take a look at what's been marked as

17   Exhibit Number 2, which is in front of you.

18   A.    Yes, sir.

19   Q.    Okay.  Showing you what's been marked as Exhibit 2,

20   have you ever seen this document before?

21   A.    I think you showed it yesterday.

22         MR. CELLAR:  I'm not sure if I -- I may have.  Did

23   we introduce 2 in evidence already?

24         DEPUTY CLERK:  2 has not been admitted.

25

NEUMAN - DIRECT

```
 1   BY MR. CELLAR
 2   Q.      Is this an email from you to Pat Hurley dated
 3   August 9th, 2005?
 4   A.      It look like it, yes.
 5   Q.      Does it appear to be a true and correct copy of the
 6   document at the time you sent it?
 7   A.      Can I read it?  But it look real.
 8              (Pause in place)
 9              THE WITNESS:  Are you asking me a question, sir?
10              MR. CELLAR:  Yes.  I was giving you a moment to
11   review it.  Your Honor, at this time, we'd like to move into
12   evidence what's been marked as Plaintiff's Exhibit Number 2.
13              MR. HENRY:  No objection.
14              THE COURT:  I beg your pardon?
15              MR. HENRY:  I have no objection.
16              THE COURT:  Very well.  Exhibit Number 2 is
17   received.
18              (Plaintiff Exhibit 2 admitted)
19   BY MR. CELLAR
20   Q.      Now, this is an agreement or an email between you and
21   Pat.  What's the title of it?
22   A.      It says --
23   Q.      The subject?
24   A.      New comp plan and it says sorry for the delay.
25   Q.      Okay.  And then in this email, you're agreeing to
```

NEUMAN - DIRECT

1   give Pat another pay increase based on his performance; is

2   that true?

3   A.     No.  It says this is the new plan.  Don't read more

4   into it.  That's all it says, that's the new plan.

5   Q.     That's the new plan you were telling Pat he would

6   have moving forward; right?

7   A.     Yes.

8   Q.     Okay.  And it says that his base salary is being

9   increased to $120,000 a year?

10  A.     Yes, sir.

11  Q.     And you give him an updated bonus structure toward

12  the bottom.  You see that?

13  A.     Yes, sir.

14  Q.     Does it say in here that these bonuses are

15  discretionary?

16  A.     It says here that we will meet again to review the

17  reality versus your projections.

18  Q.     You set certain goals that Pat needed to meet in

19  order to get paid these incentive bonuses; correct?

20  A.     That's correct.

21  Q.     If you look at Paragraph 4, it's telling Pat

22  specifically how his bonus is to be calculated moving

23  forward.  For example, every percent improved will increase

24  the bonus one percent equals 1,000, two percent equals 5,000

25  and so on.  Do you see that?

NEUMAN - DIRECT

1    A.      Yes, sir.

2    Q.      It doesn't say in here that even if you hit these

3    numbers, I may decide not to pay you your bonuses; does it?

4    A.      Why would I put it and not pay the bonuses, sir?

5    Q.      That's my question, Mr. Neuman.

6    A.      Every time I put it, I intend to pay it and I pay it.

7    Q.      But you heard Rose testify yesterday that any bonuses

8    paid by you were discretionary.  Did you hear her say that?

9    A.      No.  Every bonus that were paid by us were subjected

10   to the individuals.  There are never one rule of bonuses

11   throughout the company.

12   Q.      Your testimony has been that bonuses paid by you are

13   discretionary; right?

14   A.      Individuals, based on our understanding.

15   Q.      You used the term discretionary; didn't you?

16   A.      Bonus in their definition, I would think, are not

17   salary.  Salary is what you get paid for the work you do,

18   bonus is what you get the extra for the extra you do.

19   Q.      You wouldn't have continued to increase Pat's

20   compensation if he wasn't performing well; right?

21   A.      It took me years to realize that the performance is

22   declining where the -- where the salary keep getting higher.

23   Took me a bunch of years.  When I realized that, Pat's

24   salary is getting to the point of three employees, but the

25   performance are not there.

NEUMAN - DIRECT

1   Q.      Did you tell him that?

2   A.      Yes.

3   Q.      We're going to see a document that says you told him

4   that?

5   A.      I'll go back to the same thing.  I talk verbally.

6   Q.      You seem to be identifying a number of emails between

7   you and Pat.  We've seen a number in this case.  We're not

8   going to see any documents that suggest that you ever told

9   Pat he was being overpaid; will we?

10  A.      I told Pat that the overhead in the office for the

11  size of the office does not make sense.

12  Q.      And the only support you have for your claim that you

13  told that to Pat is your own testimony; right?

14  A.      I don't talk to a person and write a note.  I talk to

15  a person.

16  Q.      So it's only going to be your testimony in support of

17  your allegation that you said this to Pat; right?  Yes or

18  no?

19  A.      I don't make allegation.  I had a conversation with

20  Pat and I said the overhead of the Naples office make no

21  longer sense.  I have you as the person in charge.  I have

22  three or four assistants, I have salespeople under you.  It

23  doesn't make sense.  We're not growing.

24  Q.      Take a look at Exhibit Number 7 please.  I'm going to

25  ask you to identify what's been marked as Plaintiff's

NEUMAN - DIRECT

1    Exhibit Number 7.  You see that?

2    A.    Yes, sir.

3    Q.    And can you just generically identify the document?

4          Let me ask it differently.  This is an email

5    exchange between you and Pat Hurley regarding a new

6    compensation plan; is that right?

7    A.    It's an email from Pat to me on June 28th of 2006.

8    Q.    And then in response --

9    A.    And I response to him by saying take a look.

10   Q.    Does this appear to be a true and correct copy of

11   your email exchange on that date?

12   A.    I have no reason to question it.

13         MR. CELLAR:  Your Honor, at this time, we'd like

14   to move into evidence what's been marked as Plaintiff's

15   Exhibit Number 7.

16         THE COURT:  Exhibit 7's received.

17         (Plaintiff Exhibit 7 admitted)

18   BY MR. CELLAR

19   Q.    Now, this is a proposal that you and Pat had

20   discussed because he had been promoted to take on a second

21   division as well; right?

22   A.    At one point in 2006, I asked Pat to see if he can

23   take over the Palm Beach Division and in a normal Pat

24   fashion is, how much you going to give me now.  So I said to

25   him, put something in writing.

NEUMAN - DIRECT

1   Q.    If you take a look at Pat's first email to you, he

2   says, greetings, sir, and he says here's the synopsis of

3   what we discussed yesterday.  You did have some conversation

4   on this before, obviously; right?

5   A.    Probably.

6   Q.    Okay.  And he says if you agree with below, we can

7   alter our current agreement accordingly.  Do you see that?

8   A.    That's what it says here.

9   Q.    Now, are we going to see a response from you,

10  Mr. Neuman, saying Pat, what agreement are you talking

11  about, there's no agreement in effect?

12  A.    What agreement is he talking about?  I don't know.

13  Q.    Well, we've agreed in looking through his personnel

14  file that Pat only had one employment agreement with Kent;

15  right?

16  A.    I have no idea what agreement is he talking about.

17  Q.    Did you say to Mr. Neuman -- did you say to

18  Mr. Hurley, Mr. Neuman, what agreement are you talking

19  about, Pat?

20  A.    I said take a look.  I don't know what it mean and I

21  don't know the whole content of the conversation.

22  Q.    Well, what happened was Pat had discussed with you or

23  had confirmed in writing what you and he had discussed the

24  day before; right?

25  A.    Give me a second to read, please.

NEUMAN - DIRECT

1                (Pause in place)

2     A.      Yes, sir.

3     Q.      Okay.   And Pat then put fingers to keyboard and sent

4     you an email for how he interpreted the conversation between

5     you and him the day before regarding his new compensation

6     plan; right?

7     A.      He also talking about sabotage.

8     Q.      And if you can, just answer my question, Mr. Neuman.

9     Pat forwarded what he believed to be the proposed plan that

10    you and he agreed upon?

11    A.      I assume.

12    Q.      And then you responded to him by making your final

13    edits in parentheses.   Do you see that?   That's why you

14    wrote, take a look.

15    A.      What do you mean parentheses?   Collier and Lee

16    parentheses.

17    Q.      Right.   And if you look underneath it says max one

18    year?

19    A.      I see Collier and Lee right above it and Broward and

20    Palm Beach; is this what you mean?

21    Q.      Correct, you made --

22    A.      That I made this edit?

23    Q.      You made edits to the agreement and put them in

24    parentheses documenting the changes you wanted to make to

25    this proposal?

NEUMAN - DIRECT

1    A.       I cannot tell you that.

2    Q.       Okay.  Take a look at the last bullet point,

3    Mr. Neuman.

4    A.       Yes, sir.

5    Q.       It says all current terms, benefits, and perks

6    currently enjoyed by me will remain unchanged.  Do you see

7    that?

8    A.       That's what it says, yes, sir.

9    Q.       Did you say to Pat, what terms?

10   A.       Again, I do not know what was said, but this was the

11   email and it was written by Pat and I wrote back, take a

12   look.  I have no idea what I changed.

13   Q.       This ultimately became his compensation plan; isn't

14   that true?

15   A.       I'm sorry, but I don't know.  It could be very well

16   true.  I'm not saying yes or no.

17   Q.       You were the only --

18   A.       But I have a feeling you know.

19   Q.       You were the only person that Pat discussed his pay

20   with; right?

21   A.       Yeah, I was Pat's boss.

22   Q.       You were the only one that could decide what Pat was

23   going to be paid when he worked for Kent?

24   A.       Yes.

25   Q.       So you would be the only one from the defendants that

NEUMAN - DIRECT

1    could testify as to whether this was the deal that was

2    ultimately implemented for Pat?

3    A.    Forgive me, this an email from 2006.  We sitting here

4    2012.  I get over a thousand emails a day -- I'm sorry, a

5    thousand email a week.  I get about 200-plus per day.  I

6    don't remember each email.  I'm sorry.

7    Q.    This isn't the first time that you've seen this email

8    here in court; is it, Mr. Neuman?

9    A.    This particular one, yes.

10   Q.    This case has been pending for close to three years;

11   right?

12   A.    Two, if I remember.

13   Q.    Fair enough, two.  I took your deposition, you've

14   seen the documents that the parties have exchanged?

15   A.    I'm sorry, but I don't remember seeing this

16   particular page.

17   Q.    But we can agree that you never responded to Pat and

18   said, I don't understand what current agreement you're

19   referring to, Pat; right?

20   A.    I have no idea what current agreement he's referring

21   to.

22   Q.    But you didn't ask him?

23   A.    No.  I don't know also what it mean when I wrote to

24   him take a look.  I don't know what it meant.

25   Q.    At the bottom of it, it also says -- Pat writes you

NEUMAN - DIRECT

1   an email saying you would need to compose an announcement of

2   this change for the entire company; right?  You see that?

3   A.      I see that, sir.

4   Q.      Did you respond back and say Pat, no, you write it?

5   A.      The only thing it says the response back, it's take a

6   look.

7   Q.      Now, this position took effect on July 5th, 2006,

8   according to the email; right?

9   A.      According to the email, yes, sir.

10  Q.      And after July 6th, there was an email that went out

11  under your name which we've marked as Exhibit Number 16?

12  A.      That I composed?

13          MR. CELLAR:  We'll talk about that.  Have we

14  already introduced 16?

15          DEPUTY CLERK:  Yes.

16  BY MR. CELLAR

17  Q.      Let me show you what's been marked as Exhibit

18  Number 16, which I will identify for you has already been

19  marked.  Who wrote this email?

20  A.      Mr. Patrick Hurley.

21  Q.      And who's the email from?

22  A.      Gil Neuman.

23  Q.      To whom?

24  A.      Blast to the management team.

25  Q.      Did you make any edits to this email after Mr. Hurley

NEUMAN - DIRECT

1  sent it to you?

2  A.    Most likely not.

3  Q.    Okay.  Did you read it?

4  A.    Most likely not.

5  Q.    Okay.  So you're saying that you wouldn't have read

6  something going out to the management of your company --

7  A.    Listen, I --

8  Q.    -- under your name?

9  A.    Absolutely.  I know that Pat had the intention of

10  promoting himself, which was okay with me.  I don't have a

11  problem with it.

12  Q.    Is there anything in this email that's untrue,

13  Mr. Neuman?

14  A.    I wish I can write this well.  Obviously it's full of

15  self promotion, but it's okay.  I don't have a problem with

16  it.

17  Q.    My question to you, is there anything in here that's

18  untrue?

19  A.    Exaggeration, yes, but it's okay.

20  Q.    What's exaggerated?

21  A.    It's remain one of our best success story in 25 year

22  history.  Obviously it -- it sounds very big, which is okay.

23  Q.    Well, that would be inconsistent with your position

24  that he was performing poorly; right?

25  A.    As I said to you and I'll say to you again, Pat is a

NEUMAN - DIRECT

1    very good and smart and capable person and Pat always took

2    care of Pat first.  Pat served Kent very well.  He did well

3    to us and we paid him well.

4    Q.    Now, if you felt that Pat was not performing well,

5    you certainly would have -- would not have promoted him to

6    take on yet another division of Kent; right?

7    A.    Did you hear me saying that Pat was not performing

8    well?

9    Q.    You've made that allegation in this case, sir;

10   haven't you?

11   A.    Pat did not like me personally.  Pat did not like my

12   style of managing, which is okay.  This is not a personality

13   contest.  Pat did a good job for Kent and got paid well.

14   Q.    Is it now your position at trial that Mr. Hurley --

15   that poor performance was not a reason why you're claiming

16   he was fired?  Are you changing that?

17   A.    I think Pat was coasting for a long time.  I don't

18   think Pat gave a hundred percent.

19   Q.    Did you --

20   A.    You ask me a question but you don't listening to me.

21   Q.    I'm sure the jury's listening, Mr. Neuman.

22   A.    Oh, well, I'll look at them.  I thought Pat, through

23   the entire time, is very capable man.  But Pat did not

24   operate, as we say, on all eight cylinders.  Pat built a

25   wonderful team around him and he was able to get work done

NEUMAN - DIRECT

1    operating on 50 percent capacity.

2    Q.     Mr. Neuman, my question is, are you now claiming in

3    this lawsuit that Pat was not fired for poor performance?

4    Yes or no?

5    A.     Pat was fired for insubordination.

6    Q.     Only insubordination?

7    A.     And Pat was fired for the fact that we never liked

8    each other and he basically told me off to my face.

9    Q.     You mean in email?

10   A.     Yes.

11   Q.     Okay.  So just so we're clear, it is now -- now it's

12   defendant's position at trial that the only reason he was

13   fired was insubordination?  I just want a yes or no so I

14   understand your position.

15   A.     Pat was fired for insubordination, which ended few

16   years of bad relationship.

17   Q.     So if you gave a sworn answer in this case when we

18   asked what was the reason for Pat's termination and you said

19   poor performance, that would be incorrect; right?

20   A.     Not operating a hundred percent of capability.  I

21   don't know if you want to call it poor performance or half

22   performance.  You can play -- we can play games here with

23   words.  Pat was not operating a hundred percent.

24   Q.     Well, you chose the words poor performance?

25   A.     Okay.

NEUMAN - DIRECT

1   Q.     The other thing that you -- the other thing that you
2   didn't mention is these discussions about a Tampa office.
3   Was he fired because --
4   A.     You want to talk about the Tampa office?  Let's talk
5   about the Tampa office.
6   Q.     Is it your position that Pat was fired for not
7   opening up a Tampa office?
8   A.     Pat was not -- excuse me.  I apologize.
9   Q.     That's okay.
10  A.     Pat was not fired --
11  Q.     There's water up there, by the way.
12  A.     I'm good, I got it right here.  Pat was not fired for
13  not opening a Tampa office.  The Tampa office was just an
14  example for the -- the symptoms ongoing.  Pat, as a very
15  capable salesperson, brilliant salesman, started the company
16  on projections of increases and at one point, it continue in
17  a straight level.  It did not increase, but it did not
18  decrease, so we can say it that he's doing his job but a
19  person of his statue expected to take it to increase every
20  year, not to keep it level.  So what happened to the
21  situation here is we had, for the size of the operation as
22  time went by, we had more and more management on the same
23  size company.  So it was getting less and less profitable.
24  And I expect always to grow.
25  Q.     So Mr. Neuman, why didn't -- how long was this going

NEUMAN - DIRECT

1    on where you felt this way?

2    A.    Two, three years.

3    Q.    Okay.  So in those two, three years, you certainly

4    could have sent Pat a 30 day notice and said to him, Pat, we

5    believe you're overpaid, I'm giving you 30 days notice in

6    writing that we're going to be firing you; right?

7    A.    I'm guilty.  Part of my personality is avoid

8    confrontation at all cost.  I do not tell people sometime

9    what I should.  So in that way, I'm guilty.

10   Q.    Okay.  So but if you felt this way for two or three

11   years, you certainly had an avenue under the employment

12   agreement to terminate Pat; right?

13   A.    You keep on assuming that I keep on looking at the

14   employment agreement.  I told you before that I'm not.

15   Q.    Forget about the employment agreement.  You could

16   have fired Pat at any time if you felt that way; right?

17   A.    That's correct.

18   Q.    Yet you fired him within 24 hours of an email that he

19   sent to you saying I need medical leave?

20   A.    No, no.  I fired him because he told me in an email,

21   hey, buddy, I'm not coming to see you.  If you want to talk,

22   you come to see me.  And I'm not talking to you, I'm telling

23   you.

24   Q.    You just said that -- you heard Rose testify

25   yesterday that you're not one to fire easily; right?

NEUMAN - DIRECT

1  A.    I'm the worst guy.  People always say to me I don't
2  fire fast enough.
3  Q.    Okay.  And you agree and you've testified under oath
4  that there was nothing going on at the time Pat sent you
5  this email that would have warranted his firing; do you
6  remember testifying to that under oath?
7  A.    I don't remember, no, but it could be.  You asked me
8  what I said years ago.  I don't remember.
9  Q.    Well, I'm going to ask you what you said during your
10 deposition here in this case.
11 A.    I'm sure you will.  Read to me.
12 Q.    Just give me a moment to find it, please.  I do have
13 it, I promise.  I just have to find it.
14 A.    I'm not questioning you.
15 Q.    So I don't continue to waste time, if I find it, I'll
16 get to it, would you agree that at the time you fired Pat,
17 there was no other reason other than when he sent -- let me
18 ask it differently.
19       Had Pat not sent that email, you would not have
20 fired him at that time; right?
21 A.    It was a question of time.  It's one of those things
22 that I made analogy, the straw that broke my back.  It
23 was -- maybe would not be this thing, it would be that
24 thing.  It was coming.  If he wouldn't -- I mean, when you
25 have a bad relationship, sometime it explode over the

NEUMAN - DIRECT

```
 1  weirdest things, but it was coming.
 2  Q.     But you testified under oath previously that you
 3  would not have fired Pat at that time had he not sent the
 4  email; right?
 5  A.     Again, I don't remember every word I said two years
 6  ago, sir.
 7         MR. CELLAR:  Counsel, Page 87 -- let's start at
 8  Page 86, actually.
 9  BY MR. CELLAR
10  Q.     My question to you is, other than his last email,
11  other than these acts of insubordination as you call them,
12  are there any other reasons why Mr. Hurley was fired.
13         Your answer, no.
14         MR. HENRY:  You're reading from Page 87?
15         MR. CELLAR:  I said 86 and then I'm going to 87.
16  BY MR. CELLAR
17  Q.     Continuing on 86, did you have any issues with his
18  job performance other than insubordination.
19         Answer, I thought Pat knew the business.  Pat is
20  smart, very articulate.  Nobody is perfect.  I am not
21  perfect.  I'm not following your question.
22         Here's where we get to it, 87, Line 3 --
23  A.     You're not asking me if I'm perfect because I'm not.
24  BY MR. CELLAR
25  Q.     I'm not.  Had Pat not sent that email to you, would
```

NEUMAN - DIRECT

1    you have fired him on May 1st, 2008.

2              Answer, probably not.

3              Question, was there anything in your mind pending

4    as of May 1st, 2008, other than that email, that would have

5    given you a basis to say, I am firing Pat Hurley.

6              Answer, probably not.  Was that your testimony

7    under oath?

8    A.    I have no reason to question you, but as I said to

9    you, I cannot sit here and tell you what was on my mind on

10   May 1st four years ago.

11   Q.    Now, even after this email that we've been discussing

12   here, you continued to praise Pat in writing through email,

13   not just on the telephone; right?

14   A.    I don't understand what you saying.

15   Q.    Let me show you what's up there and what's been

16   marked as Exhibit Number 17.  Have you seen this document

17   before?

18   A.    It look like an email that Pat wrote to Allen Blaker,

19   Brandy, and myself, and he's saying that I'm happy to report

20   that we have launched flawlessly at 1500 and the customer is

21   thrilled.  Thank you, Brandy, Tori, and Kim, signed by Pat.

22   Q.    Okay.  And you responded, which we'll talk about in a

23   moment, but does this appear to be a true and correct copy

24   of the emails that you were copied on and then responded to

25   on this date?

NEUMAN - DIRECT

1    A.      It's missing the top, but yes.

2    Q.      I'll represent to you that the only thing at the top

3    was Pat forwarding it to me.

4    A.      Fine.

5            MR. CELLAR:  Your Honor, at this time, we'd like

6    to move into evidence what's been marked as Plaintiff's

7    Exhibit Number 17.

8            MR. HENRY:  No objection.

9            THE COURT:  Exhibit 17 is received.

10           (Plaintiff Exhibit 17 admitted)

11   BY MR. CELLAR

12   Q.      Now, you were copied on Pat's email to the client;

13   right?

14   A.      That's not Pat email to the client.

15   Q.      Who's Alan Blaker?  Oh, Alan Blaker worked for the

16   company?

17   A.      Yes.

18   Q.      Now, can you read to the jury, please, what your

19   response was to Pat?

20   A.      He wrote it at 7:19 at night and I replied at 8:49 at

21   night.

22   Q.      What did you say?

23   A.      And I said thanks, Pat, you trained us to expect

24   nothing but, and then there are five points and then I guess

25   I did some cutting and pasting, flawless start and thrilled

NEUMAN - DIRECT

```
 1   customer.  Keep up the great work.
 2   Q.     Did you write that email?
 3   A.     With the help of the word flaw and thrilled, so yes,
 4   I -- I did it.
 5   Q.     Now, at the beginning of your testimony, you
 6   identified in your words two major components for Pat to do
 7   his job.  One is get customers?
 8   A.     New customers.
 9   Q.     Two is?
10   A.     New customer, existing customers, and either overtime
11   or -- there was another word that I liked in the one I saw
12   before.  The ratio between payroll and billing.  But I said
13   overtime before.
14   Q.     But the second one was keep current customers happy?
15   A.     Hundred percent.
16   Q.     According to your words, Pat's doing that as of
17   August 15th, 2007; right?
18   A.     Negative.  This is not a current customer.  This is a
19   customer started this day.  This is the day we launched.  It
20   said we launched.
21   Q.     So Pat had received a new customer?
22   A.     So that's a new customer.
23   Q.     He's building the business with a new customer?
24   A.     That's a new customer, yes.
25   Q.     That would be criteria one for Pat to be doing a good
```

NEUMAN - DIRECT

1    job is bringing in a new customer?

2    A.    Absolutely.  You have to look at the whole picture.

3    This is wonderful email and this is wonderful email

4    absolutely.  We have to make sure we don't lose customers,

5    we have to make sure we get new customers every month.

6    Q.    You wouldn't say this to a poorly performing manager;

7    right?

8    A.    A poorly performing manager would not sent this to

9    me.

10   Q.    I'd like you to take a look at the employee handbook

11   which we've introduced into evidence, Mr. Neuman, as

12   Exhibit 11.

13   A.    Yes, sir.

14   Q.    This was the employee handbook that was given to Pat

15   during his employment with Kent; right?

16          THE COURT:  We're going to take our morning

17   recess.  We'll be in recess 15 minutes.  No talking about

18   the case.  Keep an open mind.  Please stand for the jury.

19          (Recess from 10:15 a.m. to 10:30 a.m.)

20          THE COURT:  Bring in the jury, please.

21          COURT SECURITY OFFICER:  Yes, sir.

22          (Jury in).

23          THE COURT:  Please be seated.  You may proceed.

24          MR. CELLAR:  May it please the Court, thank you,

25   Your Honor.

NEUMAN - DIRECT

1    BY MR. CELLAR

2    Q.    Mr. Neuman, I liked you to take a look at Page 4 of

3    the employee handbook that we've marked which talks about

4    Kent's family leave policy.  You see that?

5    A.    Hold on for a minute.

6    Q.    Absolutely.  It's up on your computer screen, if you

7    need it, too, or it should be.

8    A.    Yes, sir.

9    Q.    Kent's policy is that employees who work at the

10   company for one year and work at least 1600 hours in the

11   past 12 months qualify; right?  That's the policy?

12   A.    The policy is whenever anybody need time off, they

13   can take it.

14   Q.    Understood, but my question to you is just the

15   language, you would agree that the policy says you have to

16   work there for one year and have at least worked 1600 hours?

17   A.    That's what it says in the print.  But in reality, if

18   you need time off, you'll take it.

19   Q.    And Pat met these conditions; right?  He'd worked

20   there for at least a year?

21   A.    Pat worked for seven years.

22   Q.    Okay.  And you have no reason to dispute that he

23   worked at least 1600 hours a year?

24   A.    I have no reason to dispute that he worked any number

25   of hours.

NEUMAN - DIRECT

1    Q.      Okay.  You have no knowledge on that whatsoever?

2    A.      No.

3    Q.      Okay.  Now, if you take a look at Page 5, the second

4    paragraph says you're required to give us reasonable notice

5    if you're planning to take family leave; right?

6    A.      That's what it says here, sir.

7    Q.      Okay.  It doesn't say in here that the employee has

8    to provide a schedule of the leave that they intend to take;

9    right?

10   A.      It says here that if you're planning to take, you got

11   to give us reasonable notice.

12   Q.      Right, but the policy doesn't say, I'm giving you

13   notice and here's my schedule?

14   A.      It says give us reasonable notice.

15   Q.      Okay.  And it says that you must give us at least 30

16   days reasonable notice, or 30 days notice, I'm sorry, in

17   that same paragraph.  You see that?

18   A.      In the next paragraph you mean?

19   Q.      I apologize, you're right.

20   A.      Yes, sir.

21   Q.      And we're going to talk about Pat's leave, I'm sure,

22   but Pat gave you 30 days notice when he submitted his leave

23   schedule; didn't he?

24   A.      He never submitted a leave schedule.

25   Q.      In the email that Pat sent you that had a schedule

NEUMAN - DIRECT

1  attached, he gave you a 30 day advance notice?

2  A.     No, he send me an email saying those are the dates

3  that I'm going to take vacation.

4  Q.     Now, in the last paragraph -- the second to the last

5  paragraph on Page 5, Kent states that we may ask for

6  certification from your health provider that you are unable

7  to perform your duties; right?  You see that?

8  A.     It says, but if you tell us you're not well, we want

9  to see you well.

10  Q.     Does the policy say that, Mr. Neuman?

11  A.     That's what we practice.

12  Q.     Okay.  And it also says that you can also request a

13  second or third certification at the employee's expense?

14  A.     I'm not aware that we ever did anything like this.

15  Q.     It gave you the option in the handbook to do so;

16  right?

17  A.     It says that but we have never done that.

18  Q.     Now, the purpose of this provision is to give Kent

19  the power to investigate whether an employee is requesting a

20  valid leave; right?

21  A.     We tend to -- this is not something that people

22  usually make up.  If somebody is not well, we want to see

23  him well.

24  Q.     But the very reason why this provision is in the

25  handbook is in that situation where an employee may be

NEUMAN - DIRECT

1    making up a condition for leave, Kent has the right to

2    verify that it's a true medical condition; right?

3    A.    We've been in business for almost 30 years.  It's

4    very rare that people make up medical conditions and we

5    don't question them.

6              MR. CELLAR:  Your Honor, can you instruct the

7    witness to answer my question?

8              THE COURT:  Ask it again and we'll see if he

9    answers it.

10   BY MR. CELLAR

11   Q.    You would agree that the purpose of this provision is

12   for that instance where if you believe an employee's request

13   may not be valid, Kent has the option of seeking medical

14   certification to validate the leave?

15   A.    I did not put this book together so I cannot tell you

16   what was the purpose of this provision.

17   Q.    You are the CEO of the company?

18   A.    Yes, sir.

19   Q.    You are the president of this company?

20   A.    Okay.

21   Q.    You make employment decisions on behalf of the

22   company?

23   A.    Yes.

24   Q.    And is it your testimony that you never familiarized

25   yourself with the requirements of the company on medical

NEUMAN - DIRECT

 1    leave?

 2    A.    Honestly?  I've never read this book.  I treat people

 3    the way I want to be treated.

 4    Q.    As the CEO, you've never read your own employee

 5    handbook?

 6    A.    I never had a problem.  I treat people with respect

 7    every single day, with decency.

 8    Q.    If you've never read the handbook, how do you expect

 9    an employee to understand what their obligations are under

10    the handbook?

11    A.    I don't know what the employee's obligation.  If

12    somebody come to me and said to me I need something, I say

13    what do you need?  Sit down and let's talk about it.

14    Q.    And when Pat emailed you and said the time off he was

15    requesting was for medical reasons, you didn't have that

16    sit-down with him?

17    A.    I saw from the first second that he wrote me that

18    email that it's another one of Pat games.

19    Q.    And that's why this very provision is in the

20    agreement, because if you felt it was a game, you could have

21    asked Pat for medical certification?

22    A.    Pat asked in that email seven different things.  He

23    asked for retreat, he asked for bonus, he asked for

24    different things.  And then he said to me, by the way, I'm

25    not talking to you, I'm telling you and I'm not coming to

NEUMAN - DIRECT

1   see you.

2   Q.     You had the opportunity to say to Pat, if you have a

3   medical issue which is why you're requesting leave in this

4   email, go get a doctor's certification; is that correct?

5   A.     I sat here yesterday and listened to two professional

6   doctors who told me he does not need those verifications.

7          MR. CELLAR:  Your Honor, could we ask the witness

8   to answer the question, please?  We'll be able to go a lot

9   quicker.

10         MR. HENRY:  I think he answered the question, Your

11  Honor.

12         THE COURT:  Overruled.

13  BY MR. CELLAR

14  Q.     At the time you got this email from Pat, you had

15  never spoken to his doctors; right?  You didn't know what

16  his medical condition was?

17  A.     I know Pat for seven years.  I traveled the world

18  with him.  I been in other countries with him.  I stayed in

19  hotels with him.  I know Pat.  Pat has never indicated any

20  problem of any nature.  The only issue that I know Pat had

21  medically is one time he had a small car accident.  But Pat

22  had no other issues.

23  Q.     Well, you heard differently yesterday that, he'd been

24  treating for depression, stress, and anxiety in 2005, 2007,

25  2008.  So Pat did have a medical issue; didn't he?

NEUMAN - DIRECT

1   A.    I sat here with you yesterday and I listened to the

2   two professionals and I was amazed that with the medical

3   issue, he never went to a psychiatrist.

4   Q.    So you believe that if somebody doesn't go to a

5   psychiatrist they can't be suffering from depression, sir?

6   A.    I think that that's the kind of doctors who help you.

7   Q.    You don't believe that a mental health therapist is

8   qualified to assist Pat?

9   A.    Remember, the mental health tell us he cannot give

10  any drugs.  A psychiatrist is the person that can help.

11  Q.    And his general practitioner who also prescribed him

12  medication; isn't that true?

13  A.    He's not a specialist.

14  Q.    Have you ever suffered from depression, Mr. Neuman?

15  A.    I am the most sensitive person in the world for

16  people with depression and mental health.  My son is

17  autistic.  He's depressed.  He take medication for it.  I'm

18  the last one in the world to treat anybody bad because of

19  mental health.

20  Q.    My question to you is that if you believed this was

21  one of Pat's games, as you just described it, under your own

22  handbook, you had the opportunity to flesh him out and say,

23  Pat, let me see a certification if it's medical?

24  A.    It's just another game.

25  Q.    And you didn't do that?

NEUMAN - DIRECT

1    A.      I don't play those games.  I decided to stop playing
2    those games.
3    Q.      Now, toward the end of 2007, as we discussed
4    yesterday, you gave Pat what you refer to as a 20,000-dollar
5    discretionary bonus; right?
6    A.      Forgive me, I need a minute to compose myself.
7            (Pause in place)
8    A.      I'm sorry, can you please repeat the question?
9    Q.      Sure.  Do you need to take a break, Mr. Neuman?
10   A.      I'm okay.
11   Q.      In 2007, you gave Mr. Hurley what you described as a
12   discretionary performance bonus; correct?
13   A.      I'm not going to question it.  It's possible, yes.
14   Q.      Okay.  And the reason you gave him that was because
15   you felt that his performance warranted it; right?
16   A.      I must have; I must have.
17   Q.      Okay.  And Pat's response to you -- and Pat, as you
18   heard yesterday from Stacey, was happy to have received that
19   bonus, but he also believed that you had owed him a
20   remaining bonus for the final six months of 2007; right?
21   A.      Very possible.
22           MR. CELLAR:  Okay.  And what I'd like you to do is
23   take a look at Exhibit 21, please, and I believe we
24   introduced this yesterday with Ms. Cucurillo?
25           DEPUTY CLERK:  Yes.

NEUMAN - DIRECT

1                    MR. CELLAR:   Okay.

2    BY MR. CELLAR

3    Q.       This was an email that Pat sent you in March of 2008

4    suggesting that you discuss the Tampa office; right?

5    A.       Number 21?

6    Q.       Yes, sir.  And it's on your screen if you need to

7    look at it.

8    A.       That's the one that he's asking for his bonus.

9    Q.       Yes, sir.

10   A.       What's the question?  I'm sorry.

11   Q.       He's also raising that -- with you that you need to

12   try and discuss the Tampa office; do you see that?

13   A.       Real purpose for this, he's asking for the money.

14   Q.       Okay.  Did you respond to this email?

15   A.       I don't know.

16   Q.       Okay.  I did want to go back for a minute on this

17   email that we mentioned before --

18   A.       Yes, sir.

19   Q.       -- you said, you trained us to expect nothing but

20   flawless starts and thrilled customers.  That email suggests

21   that it wasn't just this customer that Pat was doing a great

22   job with, but prior customers?

23   A.       This is a morale building email.  We started a

24   customer at three p.m.  By seven, Pat is already reporting

25   to me that the customer is thrilled.  We were there for four

NEUMAN - DIRECT

1    hours and he's already patting himself on the back what an

2    amazing job we do.  So I can either shut it down or I can

3    say great.  I chose to say great.

4    Q.    Okay.  But you said more than just great.  You said

5    you had trained us to expect this behavior; right?

6    A.    I think my job as the person on the top to say good

7    work when there's good -- when somebody said I did something

8    good.

9    Q.    But you wouldn't have said it if you didn't mean it?

10   A.    I don't say what I don't mean.

11          MR. CELLAR:  Okay.  What I'd like to do is now

12   show you Exhibit 3, which you should have in front of you

13   and I believe we introduced that as well yesterday?

14          DEPUTY CLERK:  Yes.

15          MR. CELLAR:  Thank you.

16   BY MR. CELLAR

17   Q.    This is another email from Pat to you in February

18   asking when you were going to pay his bonus; right?

19   A.    It doesn't say to pay.  It says to calculate.

20   Q.    Okay.  And he's asking you for --

21   A.    Big different.

22   Q.    And he's asking you to calculate his bonus for the

23   final six months of 2007?

24   A.    But that's exactly what I told you earlier today.

25   The formula was so cumbersome that I ended up throwing it

NEUMAN - DIRECT

1    out because it did a disservice.  People continuously felt

2    that they deserved more, even though they weren't.  And it

3    made me the bad guy because they kept on saying, you didn't

4    calculate this, you didn't calculate this, so I was the bad

5    guy trying to cheat them out of money.

6    Q.    Did you respond to Pat in this email saying, Pat, I'm

7    going to calculate it, give me a minute?

8    A.    I don't know.

9    Q.    Well, we would see that email here in court; right?

10   A.    How would you see all my emails?

11   Q.    Well, you've had the opportunity to present your

12   evidence and produce any documents you intend to rely on in

13   this case; isn't that true?

14          MR. HENRY:  It's argumentative, Judge.

15          THE COURT:  Sustained.

16          MR. CELLAR:  I'll move on, Your Honor.

17   BY MR. CELLAR

18   Q.    You were also aware that it wasn't only Pat who was

19   asking for his compensation, it was employees in other

20   offices as we saw yesterday?

21   A.    I shared with you that this bonus program meant

22   something good but it end up going astray.

23   Q.    You made a mention about morale, how morale is

24   important in an office and you were aware that there were

25   employees in the Naples office that felt that you were not

NEUMAN - DIRECT

1   paying them properly, in addition to Pat; right?

2   A.    I'm sorry?

3   Q.    You were aware that there were employees in the

4   Naples office who felt that you weren't paying them properly

5   either?

6   A.    Please refresh my memory.

7   Q.    Sure, if I can show you --

8        MR. HENRY:  Judge, I have an objection to the line

9   of questioning on relevance.

10       THE COURT:  Sustained.  Move on.

11  BY MR. CELLAR

12  Q.    You would expect that Pat, as the president of the

13  Naples Division, needed to communicate with you on issues

14  important to the division; right?

15  A.    Obviously.

16  Q.    So if Pat was emailing you regarding concerns of

17  morale in the office, you wouldn't necessarily find that to

18  be insubordinate; would you?

19  A.    Obviously if a person once in a while saying, well, I

20  have an issue with this guy or this lady, that's normal.

21  That's normal work.  But if I would get 20 a day, I would

22  have an issue with it, yes.

23  Q.    But if it raised a legitimate business need or an

24  issue that was going on, you would expect Pat to communicate

25  that to you; right?

NEUMAN - DIRECT

1    A.    Sure.

2    Q.    Now, that wouldn't have been insubordinate by him,

3    simply communicating that?

4    A.    Why would it be insubordinate?

5    Q.    I'm asking you?

6    A.    It's his job.

7    Q.    Now, you were aware that Shelton, at a certain point,

8    had threatened Pat with violence?

9    A.    I learned out more yesterday than I knew, but I knew

10   a little bit and yesterday I learned more.

11   Q.    You were the one who told Pat to file a police

12   report?

13   A.    At one point, I got a call from Pat telling me that

14   they had an incident between the two of them and Shelton

15   lost it.  I said what happened, blah, blah, so on.  He said

16   to me, he threaten my life.  I said Pat, time out, if

17   somebody threaten your life, you call the police.  I expect

18   this from any person.  If somebody threaten your life, you

19   call the police.

20   Q.    And you were aware of this, that Shelton had done

21   this to Pat while Pat was still employed there; right?

22   A.    I heard -- both of them called me and both of them

23   shared with me.  Obviously, there was a different story from

24   each side and I'm not King Solomon and I'm not going to cut

25   the baby in half.

NEUMAN - DIRECT

1   Q.     The point is this, is that -- and you heard Shelton

2   admit yesterday that he said some things he shouldn't have

3   said?

4   A.     He -- yesterday, yes.

5   Q.     You would agree that under Kent's policies,

6   threatening an employee, the life of an employee would be a

7   terminable offense?

8   A.     I think any person should never threaten another

9   person.  End of story.  You treat people the way you want to

10  be treated.

11  Q.     But under Kent's policy which lays out progressive

12  discipline, that would have been an immediately terminable

13  offense?

14  A.     I have a funny feeling that you know the book better

15  than me.

16  Q.     Do you have any reason to disagree that threatening

17  the life of a president of Kent of Naples by another

18  employee would be an immediately terminable offense?

19  A.     I think if it's done in a serious manner, absolutely.

20  If it's done in the heat of a moment, we got to listen to

21  the whole story.

22  Q.     Shelton was never fired for the threat of violence

23  against the President of Kent of Naples?

24  A.     I have never heard this threat personally.  I was not

25  there.  Shelton was never --

NEUMAN - DIRECT

1   Q.    Shelton was never reprimanded for being

2   insubordinate?

3   A.    I was not there, personally.  I have not seen.  I

4   heard two people with two different stories.

5   Q.    In fact, Shelton was promoted after he threatened to

6   kill Pat; isn't that true?

7   A.    Are you asking and answering, sir?

8   Q.    I'm sorry?

9   A.    Are you asking the questions and answering them as

10  well?  You're not listening to what I'm saying to you.

11  Q.    Shelton was promoted after this incident; correct?

12  A.    Nothing to do with this incident, no.

13  Q.    I'm just saying, he was promoted after this happened?

14  A.    Shelton, through his tenure at Kent get promoted

15  throughout.

16  Q.    Okay.  You were aware that throughout his employment,

17  Pat had repeatedly asked you to come to Naples to visit with

18  his employees and the clients; right?

19  A.    Occasionally, yes.

20  Q.    Okay.  He wanted you to meet with the staff?

21  A.    Do you know how many people work in the Naples

22  office?

23  Q.    Can you just answer my question, Mr. Neuman?

24  A.    You talk about meeting his staff.  Do you know how

25  many people work in the Naples office, sir?  One.

NEUMAN - DIRECT

1    Q.      Did Kristie Franklin work in the office?

2    A.      Under Pat, we had four people in the office.  Today

3    we have one person in the office.

4    Q.      I'm talking about when Pat was there.

5    A.      When Pat was there, either three -- three people.

6    Q.      And there were clients that Pat wanted --

7    A.      Clients never come to the office.

8    Q.      There were clients that Pat wanted you to meet from

9    Naples?

10   A.      Yes.

11   Q.      Okay.  And you didn't find Pat asking you to come to

12   Naples to be insubordinate; did you?

13   A.      Absolutely not.  I did not find it to be

14   insubordination.

15   Q.      And you told Pat I'm not going -- coming out to the

16   Naples office?

17   A.      I said to Pat in a smiling way, there is no need.

18   Everything is running well.

19   Q.      Right.  You said -- your words were you had

20   100 percent trust in Pat; right?

21   A.      I thought Pat ran the office fine.

22   Q.      But your words were 100 percent trust in Pat?

23   A.      I don't remember my exact words.

24   Q.      You also said to Pat that I'm not coming there

25   because you're doing a great job and, quote, getting it

NEUMAN - DIRECT

1    done.   Do you remember saying that?

2    A.      Not really.

3    Q.      Do you deny that you said that?

4    A.      I said I don't remember it.

5    Q.      I just want to refer you to your testimony to help

6    refresh your recollection, sir -- on Page 106, counsel,

7    Line 5, question, and there were times when you disregarded

8    his request for you to come to Naples or to Naples to see

9    the office and meet with clients; correct.

10            Answer, a hundred percent.  I had trust in him.  I

11   knew the job was getting done.

12            Those were you words under oath; is that correct?

13   A.      I have no reason to argue that.

14   Q.      Now, we talked about morale and you would agree that

15   if an employee is not getting paid what they feel they're

16   entitled to, that could cause stress to the employee; right?

17   A.      Yes.

18   Q.      If, for example, somebody's in a financial

19   stressful -- in a financially stressful situation and

20   they're not getting what they're supposed to be getting,

21   that could add further burden?

22   A.      Money could be a source of stress, I agree.

23   Q.      Now, Pat emailed you again in April of 2003, just

24   shortly before he was fired --

25   A.      You mean 2008.

NEUMAN - DIRECT

1   Q.     2008, sorry.  As well, take a look, please, if you
2   could at Exhibit 23, and I ask if you've ever seen this
3   document before?
4   A.     Hold on, I'm looking.  Forgive me, I'm slow reader.
5   Q.     That's okay.
6   A.     I've never seen the top part of the document because
7   it's an email between Pat Hurley and Stacey Hurley, so I'll
8   never see this.
9   Q.     Let's focus on the bottom part where it --
10  A.     The bottom part is an email from Pat to me.
11  Q.     Okay.  And does this appear to be a true and correct
12  copy of the email that Pat sent to you on April 7, 2008?
13  A.     Is there more than one page?
14  Q.     Yeah, there's a second page behind it.
15  A.     Forgive me, I have so many pages here.  I do not see
16  the second page.  It looked like Pat emailed to me on
17  April 7th, sir.
18  Q.     Does this appear to be a true and correct copy of the
19  email that you received from him on April 7, 2008?
20  A.     I have no reason to question it, sir.
21         MR. CELLAR:  Your Honor at this time, we'd like to
22  move into evidence what's been marked as Plaintiff's
23  Exhibit 23.
24         MR. HENRY:  No objection.
25         THE COURT:  Exhibit 23 is received.

NEUMAN - DIRECT

1              (Plaintiff Exhibit 23 admitted)

2    BY MR. CELLAR

3    Q.     Now in this email, Mr. Neuman, Pat is addressing not

4    only his bonus, but also operational issues in his office

5    regarding other employees; right?

6    A.     I don't see operational issues.  I see my bonus,

7    Brandy pay raise, Kristie pay raise, Brandy bonus.  It's

8    money, money, money.

9    Q.     Not just money for Pat but for his employees?

10   A.     Yes.

11   Q.     Okay.  And you can see in the email that Pat's

12   telling you that he has employees at the bottom that are

13   starting to question whether Kent truly cares about them.

14   Do you see that?

15   A.     I'm sure you -- which one?

16          MR. HENRY:  Judge, objection, relevance, this

17   issue came up just a short time ago.

18          THE COURT:  One moment.

19          MR. HENRY:  Talking about other employees and

20   their bonuses.

21          THE COURT:  Sustained.  Move on.

22   BY MR. CELLAR

23   Q.     Did you find this email to be insubordinate?

24   A.     Not insubordinate.  A little bit bothersome.  Pat has

25   never send me email saying to me, Gilly, let's open a new

NEUMAN - DIRECT

1    division, let's grow the business, let's come up with ways

2    to improve the company, let's do -- it's always I need

3    money, I need money, I need money, I need money, and

4    whatever I make it's not enough.  I want more money, I want

5    more money, I want more money.  Can you show me any emails

6    that we said let's come up with better ways to build the

7    company?

8    Q.    My question, Mr. Neuman, was whether you found this

9    email to be insubordinate?

10   A.    I did not think it was insubordinate.

11   Q.    Now, on April 29th, 2008, Pat emailed you a leave

12   schedule or as you call it -- let me ask it differently.

13          On April 29th, 2008, you received a request from

14   Pat to take time off?

15   A.    Which number?

16   Q.    It's going to be Exhibit 30, sir.

17   A.    30?

18          MR. HENRY:  This has been redacted.

19          THE WITNESS:  I'm sorry, but I don't have 30 here.

20   BY MR. CELLAR

21   Q.    Take a look at the screen if you will.

22   A.    I have a page but it doesn't have a number on it.

23   Q.    Do you have in on the screen in front of you?

24   A.    Yes, sir; yes, sir.

25   Q.    And just for the record, Mr. Neuman, you'll see that

NEUMAN - DIRECT

1  the top of the email is redacted?

2  A.    Yes, sir.

3  Q.    I will represent to you that it was an email that Pat

4  had forwarded to me, so I just took that portion of it off,

5  all right?

6  A.    Yes, sir.

7  Q.    Now in this email, Pat is not demanding the attached

8  vacation schedule; right?

9  A.    This email is very clear.  It says, as you know, I

10  have been earning and accruing vacation time at the rate of

11  four weeks per year for nearly eight years.  To date, I have

12  taken only a small percentage of it.  Attached is my

13  vacation schedule.

14  Q.    Okay.  And he told you in there that dates are

15  subject to change; do you see that?

16  A.    Yes.

17  Q.    Did you find this email to be insubordinate?

18  A.    I did not agree right off the start because I know

19  Pat has been taking tons of vacations all the time.  So I do

20  not know how he can think that he doesn't take vacations.

21  Q.    And when Mr. Hurley would take vacations, he would

22  email you or notify you of those vacations?

23  A.    Not to me, but I would know that he go out of town.

24  He would go out all the time.

25  Q.    Okay.  So we should see some documentation or backup

NEUMAN - DIRECT

1   regarding all of the vacations Mr. Hurley --

2   A.      Yes.

3   Q.      And we'll talk about that.

4   A.      Yes, sir.

5   Q.      Now, the leave dates that he requested, as we've

6   discussed, the majority of them do fall on holidays; right?

7   A.      Why do you call them leave dates?  He asked for

8   vacation.

9   Q.      Whatever we want to call them, Mr. Neuman --

10  A.      That's what he asked for, vacation.

11  Q.      I understand.

12  A.      Why do you call them leave dates?

13  Q.      You're aware of the next email where he explained the

14  reason why he was asking for --

15  A.      He's asking for vacation; he's telling you.

16  Q.      Now, these all fall around holiday weekends; right?

17  A.      Yes, sir.

18  Q.      Okay.  Now it's your contention that holidays are

19  busy?

20  A.      Obviously.  Anybody who would sit here in this chair

21  who will tell you that the holiday time at the security

22  business are not important or easy is either a liar or he

23  doesn't know what he's talking about.  But from a person who

24  personally been working in the security industry for the

25  last 25 years, it's the hardest time in the security

NEUMAN - DIRECT

1    industry.  Every -- not every.  A huge chunk of employees

2    call out and we're struggling.  Construction sites have

3    additional service, a lot of places that close have

4    additional service.  If you ask Shelton where did he spend

5    Easter Sunday, it will be on a construction site that copper

6    is being stolen from.  So anybody who asks for vacation time

7    on a holiday is laughing in my face.

8    Q.    Did you respond to Pat that this is an insult?

9    A.    I respond to Pat, please come in and sit down and

10   talk to me.

11   Q.    Okay.

12   A.    That's how I ask.  I asked the man, please come in,

13   sit down and talk to me.

14   Q.    Okay.  Now, you never worked out of the Naples

15   office; right?

16   A.    When you say work out of the Naples office, what do

17   you mean?

18   Q.    You didn't work out of the Naples office on a

19   day-to-day basis when Pat was there?

20   A.    On day-to-day basis, absolutely not.

21   Q.    In fact, you testified even though Pat was asking you

22   to come to Naples you just simply wouldn't go?

23   A.    I go to different offices for different times and

24   different reasons.  I don't have a set schedule of going to

25   an office, sir.

NEUMAN - DIRECT

1   Q.    So you have no personal knowledge as to how Naples
2   coverage was during holiday --
3   A.    I absolutely have a personal knowledge.  Holidays,
4   all of our offices reception hours close and everything come
5   to our main office and we handle what we call the dispatch.
6   So all the people that call out are at the main office.  So
7   when I come to the main office on many weekends, and I say
8   to Alan, hey Alan, what's going on.  Alan is our dispatcher
9   who work the weekend as well.  He tell me all the places
10  call out, this guy call out, I'm struggling to cover this
11  construction site, on and on and on, sir.
12  Q.    What you're saying, like a holiday, for example,
13  Memorial Day, would be a crazy time at the office?
14  A.    Not at the remote offices; at the main office I said.
15  Q.    Okay.  So -- but would you agree that, for example,
16  Memorial Day, taking off Memorial Day would be a difficult
17  situation for a president because it was busy?
18  A.    For anybody in management.  Anybody in management
19  should not take a holiday off.  It's -- it's a known -- it's
20  a known fact in the industry that during those holidays it's
21  not a good time to take.
22  Q.    Okay.  Well, we've heard testimony about Wyatt Earp
23  Days that take place over Memorial Day; right?
24  A.    Yes, sir.
25  Q.    And we've seen this picture?

NEUMAN - DIRECT

1    A.    Yes, sir.

2    Q.    So you would agree, then, because this was taking

3    place during Memorial Day and Pat was away, he was getting

4    calls and things were crazy back at the office; right?

5    A.    Let me explain to you.  Pat was not an operation guy.

6    Pat is a sales guy and Pat had an operation team.  They were

7    being bombarded, and absolutely, we let our management take

8    some holidays off.  There's nothing wrong with it.  But to

9    ask for every single holiday?  It's insulting.

10   Q.    Okay.  But my question was, during this vacation,

11   which took place over Memorial Day, you would agree that

12   would be a busy time for Pat?

13   A.    I would agree that the main office received a lot of

14   calls about people who did not show up to work on certain

15   posts.  The first call was to the supervisor and to Shelton

16   and the next call, if this was not handled properly, it

17   would be to Pat.  Am I speaking to loud?

18   Q.    You know what, I think the microphone might be too

19   close.

20         MR. HENRY:  Yeah, step back from the microphone a

21   little bit.

22         THE WITNESS:  I apologize.  Tell me; I want to

23   know.  I don't want to make you uncomfortable.

24   BY MR. CELLAR

25   Q.    No, that's okay.  You're aware that there's a benefit

NEUMAN - DIRECT

1   to guards for working on the -- over the holidays?  They get

2   more compensation; right?

3   A.    We'd like to pay overtime for people that work on the

4   holidays and I would say that probably 90 percent of the

5   work force who work on holidays get time and a half, yes,

6   sir.

7   Q.    Okay.  Now on this email, Mr. Hurley only sent it to

8   you; correct?  You're the only one copied?

9   A.    Yes, sir.

10  Q.    Now in response to that, less than an hour later, you

11  sent Pat an email back, if you take a look at Exhibit 33,

12  your request has been denied, please schedule a meeting with

13  me to discuss this further; right?

14  A.    Yes, sir.  I ask Mr. Hurley to come and sit down and

15  talk to me.

16  Q.    Now, you copied Rose Cucurillo on this; right?

17  A.    Yes, sir.

18  Q.    You were the one who brought her into the

19  conversation, not Pat; right?

20  A.    Yes, sir.

21  Q.    And one of the issues that you believed it was

22  insubordinate when Pat responded to this was that he had

23  copied Rosemary Cucurillo?

24  A.    You're right.

25  Q.    But you were the one who brought Rose into it to

NEUMAN - DIRECT

1   begin with?

2   A.      You're right.

3   Q.      Now, after Pat received this email, the same day, he

4   sent a response back to you; right?

5   A.      If you look at what a crazy life it is, this email

6   was sent at 12:41 a.m., quarter to one in the morning.

7   Q.      What time did Pat send it to you, meaning his initial

8   email?

9   A.      He sent it to me six minutes before midnight and I

10  sent it back to him 19 minutes before 1:00 in the morning.

11  Q.      So the two of you were working late?

12  A.      Yes.

13  Q.      Business as usual?

14  A.      Yes.

15          MR. HENRY:  What number are you looking at?

16          MR. CELLAR:  This is, I believe, 32.  It's his

17  response.

18  BY MR. CELLAR

19  Q.      Now, this is the response that you got back from Pat.

20  This is what the case is about, this email?

21  A.      Yes, sir.

22  Q.      Now in this email, what you took offense to was that

23  Pat said, I'm not coming to see you.  You either meet me

24  halfway or come see me.  That's what you found

25  insubordinate?

NEUMAN - DIRECT

1   A.      Yes, sir.

2   Q.      That's why you fired him, for that language?

3   A.      That's the straw that broke my back, yes, sir.

4   Q.      Okay.  But in the email, you're aware, we've looked

5   at this quite a bit, that he specifically says, but please

6   know that I have been advised by medical health

7   professionals that my need to avail myself is no longer

8   optional.  You see that?

9   A.      Yes, sir.

10  Q.      Now, you understand that the law allows Mr. Neuman to

11  take up to 12 weeks of unpaid leave; right?

12          MR. HENRY:  Objection, it calls for a legal

13  conclusion.

14          THE COURT:  Just a moment.

15          (Pause in place)

16          THE COURT:  Sustained.

17  BY MR. CELLAR

18  Q.      Were you familiar with the Family Medical Leave Act

19  at the time you received this email?

20  A.      I don't know the exact detail of it no.

21  Q.      Were you familiar with the requirements of the type

22  of leave an employee could take as CEO of the company?

23  A.      The exact detail, no.

24  Q.      Now, you do not dispute that you read this language

25  about medical professionals in Pat's email; right?

NEUMAN - DIRECT

1   A.      I read it, and before I even got to the next line, I
2   know it's a lie.
3   Q.      And in response, you didn't review the employee
4   handbook to determine what your obligations were to Pat?
5   A.      I know it's a lie.  Why should I go any further?
6   Q.      And you didn't discuss this with a lawyer to
7   determine what your obligations could have been with regard
8   to this email?
9   A.      Should I keep on answering the same way, sir?
10  Q.      You felt it was a lie?
11  A.      Obviously.
12  Q.      And you could have exercised Kent's policy to say,
13  Pat, we don't believe you, give us the medical
14  certification; right?
15  A.      No medical professional will tell you that next
16  July 4th, you're going to be sick.
17  Q.      It's your belief that unless an employee says I need
18  Family Medical Leave Act leave, they're not entitled to
19  leave; right?
20  A.      Anybody who's not well should take time off.
21  Q.      But Mr. Neuman, your position is that unless an
22  employee specifically says, I need Family Medical Leave Act,
23  they're not entitled to leave?
24  A.      Anybody who is not well should take time off.
25  Q.      Can you answer my question, sir?

NEUMAN - DIRECT

```
1    A.      I'm answering the question.
2    Q.      Do you recall testifying to what I just asked you
3    under oath in a prior deposition?
4    A.      I'm sure you're going to read it to me.
5    Q.      And you remember in this deposition you swore to tell
6    the truth, the whole truth?
7    A.      Yes, sir.
8    Q.      You remember that?
9    A.      Yes, sir.
10   Q.      Do you remember making a statement during that
11   deposition saying I always tell the truth?
12            MR. HENRY:  Page?
13            MR. CELLAR:  I'm going to get there?
14            THE WITNESS:  I do.
15            MR. CELLAR:  Page 76, counsel, Line 11 or starting
16   on Line 4.
17   BY MR. CELLAR
18   Q.      When you say it is not your business, this is my
19   question to you, do you know whether, as you sit here today,
20   do you know whether the employer has any obligation under
21   the law when an employee asks for leave under the Family
22   Medical Leave Act.
23            Your answer was --
24            MR. HENRY:  Objection, Judge, in the same colloquy
25   in the deposition I object based upon it calls for a legal
```

NEUMAN - DIRECT

1    conclusion, just like I did today.

2              MR. CELLAR:  It goes to the issue of liquidateds,

3    Your Honor.

4              THE COURT:  Pardon?

5              MR. CELLAR:  It goes to the issue of liquidated

6    damages.

7              THE COURT:  Just a moment.

8              (Pause in place)

9              THE COURT:  I don't see anything yet that does.

10   Approach the bench, please.

11             (At sidebar, Court and counsel present)

12             THE COURT:  Nothing that I heard or that's on the

13   transcript shows me anything about liquidated damages.

14   Explain that to me, please.

15             MR. CELLAR:  Sure.  To establish liquidated

16   damages, we have to show that the employee could have or

17   should have known his obligations under the law and/or

18   recklessly disregarded his obligations under the law.  What

19   we'll explain to you, which is why I'm asking the questions,

20   once the jury's out, assuming we prevail, is his knowledge.

21   The law says this, that you don't have to mention Family

22   Medical Leave Act by its name.  He's been saying, as he did,

23   he doesn't know what the Family Medical Leave Act requires

24   and his understanding is that unless you mention, I need

25   Family Medical Leave Act, that an employee is not entitled

NEUMAN - DIRECT

```
 1   to it.  That's reckless as an employer under the standard
 2   for liquidated damages.  So I'm not trying to get into
 3   necessarily what the law is, but his understanding of the
 4   law is directly relevant to the evidence I need to present
 5   to the Court, unless the defendants will stipulate that if
 6   he prevails he's entitled to liquidated damages, and then
 7   I'm done with this area.
 8            THE COURT:  What liquidated damages are you
 9   talking about?
10            MR. CELLAR:  Under the Family Medical Leave Act,
11   he's entitled to liquidated damages of doubling his back pay
12   award if the jury gives him one unless the defendant can
13   meet their heavy burden of showing that they took good faith
14   actions to comply with the Family Medical Leave Act,
15   educated themselves as to the Family Medical Leave Act and
16   it was just an honest mistake as opposed to just sticking
17   their head in the sand not learning what the Leave Act
18   requires.  What you're also going to hear is they didn't
19   even post the required Family Medical Leave Act posters in
20   the workplace, which further goes to the issue of how can
21   you expect Mr. Hurley to know what he has to put in the
22   request if you're not putting the posters up to advise the
23   employees of that.
24            THE COURT:  What does the defense have to say?
25            MR. HENRY:  First of all, Judge, the issue of
```

NEUMAN - DIRECT

1    liquidated damages under the Family Medical Leave Act is for

2    the Court, it's not for the jury.  Like front pay, this

3    issue is not appropriate to be argued in front of the jury.

4    I disagree with the characterization of the law and what

5    they have to prove with regard to the liquidated damages

6    award.  But the general rule is that you have to prove a

7    willful violation.  This jury is never going to hear -- it's

8    never going to decide the concepts of liquidated damages.

9    All they're going to hear is whether or not Mr. Neuman, a

10   non-lawyer, understands the Family Medical Leave Act, and it

11   doesn't have any relevance to anything that they're going to

12   determine.

13          MR. CELLAR:  If I can respond?  Your Honor, the

14   standard, as you'll see it, was in our motion for summary

15   judgment, to get a third year statute of limitations, you

16   have to show that it's willful conduct.  To secure

17   liquidated damages, you just have to show that the employer

18   never took any good faith affirmative actions to accomplish

19   what they're required.  Different standard.

20          THE COURT:  But liquidated damages aren't

21   submitted to the jury.

22          MR. CELLAR:  Correct, but I still have to present

23   the evidence for the Court to make a decision rather than a

24   separate trial.

25          THE COURT:  Not now.  I mean --

NEUMAN - DIRECT

```
 1              MR. CELLAR:  It leaves me in the position of
 2    asking whether we have to bifurcate on the issue of damages
 3    or have a second trial, assuming he prevails.  So I'm not
 4    getting much more in-depth.  I just -- he testified that --
 5              THE COURT:  You know, we're going all over the
 6    place on this thing.  I think we have to tighten the case up
 7    a bit and if you recover, then we'll deal with liquidated
 8    damages.
 9              MR. CELLAR:  Okay.
10              THE COURT:  Move on.
11              MR. CELLAR:  Fair enough.
12              (Sidebar concluded)
13    BY MR. CELLAR
14    Q.    Now, you testified earlier, and just to recap, had
15    Pat never sent this email, you wouldn't have fired him?
16    A.    I'm sorry?
17    Q.    Had Pat never sent you this email, you would not have
18    fired him?
19    A.    It would not have been that day.  Probably would have
20    been within the weeks or month, but it was -- it was not a
21    good healthy relation between us.
22    Q.    Did you respond to Pat in writing regarding this
23    email?
24    A.    The one that I -- the man send me an email asking for
25    20 weeks vacation and I said to him, please come and meet
```

NEUMAN - DIRECT

1   with me.  That's all I said, please come and meet with me.
2   He was an executive that is getting paid, I don't know,
3   hundred, two hundred thousand dollar.  I'm asking to please
4   come and meet with me.  He's sending me an email the next
5   day saying I'm not coming to meet with you; you come and
6   meet with me.
7   Q.    Did you respond in writing to this email, was the
8   question, sir?
9   A.    No, sir.  I called him and I wished him good luck for
10  the rest of his life.
11  Q.    Okay.  Did you put him on a performance plan for this
12  email?
13  A.    I'm sorry?
14  Q.    Did you go through Kent's progressive disciplinary
15  policy?
16  A.    I answer you.  You didn't hear my answer?
17  Q.    Your answer was no?
18  A.    I said I called him the next day and I said to him,
19  Pat, it's time for us to part way.
20  Q.    But you understand that Kent had a progressive
21  discipline policy in its handbook that said that there are
22  certain reasons where an offense would be immediately
23  terminable; right?
24  A.    Listen, the man asked for 20 weeks vacation at a time
25  that the company does not work this way.  I asked to come

NEUMAN - DIRECT

1   and meet with me, please, in my office.  He write me back,

2   I'm not coming to your office; you can come to me.

3   Q.    You keep saying 20 weeks of vacation.  Under the --

4   you agree that Pat was entitled to four weeks of paid

5   vacation per year; right?

6   A.    That's what he wrote in the previous page to this.

7   Q.    Okay.  Well, that's what the employment agreement

8   said?

9   A.    No, no, that's what Pat wrote in the previous page to

10  this.

11  Q.    And can we agree that the agreement speaks for

12  itself?

13  A.    Which agreement?

14  Q.    His employment agreement?

15  A.    No, we cannot agree.

16  Q.    Okay.  And you keep saying 20 weeks.  If Pat was

17  entitled to four weeks of vacation per year, let's count,

18  this would be 13, 18, 21, 26.  That would be approximately

19  five weeks of vacation; right?

20  A.    Five days is a week.

21  Q.    Okay.  And if he had four weeks per year and had

22  other vacation time that he had accrued, there was no -- he

23  wasn't asking for anything that he hadn't already accrued?

24  A.    What other vacation time did he accrued?

25  Q.    I'm sorry?

NEUMAN - DIRECT

1   A.    What other vacation time did he accrued?

2   Q.    I want to show you a document that was provided to us

3   after this lawsuit was filed which appears to be a -- some

4   sort of spread sheet prepared by Rose Cucurillo.  Let me

5   show you what's been marked as Exhibit Number 29.  Do you

6   have that up there?

7   A.    Yes, sir.

8   Q.    Okay.  Have you seen this document before?

9   A.    No.

10  Q.    Okay.  Now, you asked Rose to take a look at how much

11  vacation time Pat had; right?

12  A.    Yes, sir.

13  Q.    And the only information she was able to pull was

14  this spread sheet that only goes back to 2005; right?

15  A.    No.  I don't know what the only information she

16  pulled.  I don't know.

17  Q.    There's no record of any vacation time that

18  Mr. Hurley may or may not have taken from 2001 to 2005;

19  right?

20  A.    Not on this particular page.

21  Q.    Okay.  Well, you've made the position that Pat -- or

22  you've taken the position that Pat was out of vacation time?

23  A.    I didn't say that.  I said to you, sir, that Pat took

24  lots and lots of vacations.  And we saw yesterday Pat took a

25  lot of vacations.

NEUMAN - DIRECT

1    Q.      Now, when you -- when you called Pat on the phone,

2    Pat explained to you during that conversation what was

3    happening to him; didn't he?

4    A.      Absolutely not.

5    Q.      You deny that happened?

6    A.      Absolutely not.  Pat was shocked when I told him that

7    we are parting way and he kept on saying to me, are you

8    going to pay me my 30 days, are you going to pay me my 60

9    days, and I said, Pat, I will pay you whatever I owe you.  I

10   want to depart amicably, respectfully.

11   Q.      Okay.  So I want the jury to understand your version

12   of the phone call.  Your version of the phone call is you

13   call Pat and you say, you're a good man; right?

14   A.      Yes, sir.

15   Q.      Smart man?

16   A.      Yes, sir.

17   Q.      A capable man?

18   A.      Yes, sir.

19   Q.      But it's time to part ways?

20   A.      Yes, sir.

21   Q.      You do not mention why it's time to part ways?

22   A.      That's correct.

23   Q.      And there's no context of why you're deciding to part

24   ways, there's no discussion about that meaning, there's --

25   Pat doesn't say, why are we parting ways?

NEUMAN - DIRECT

1    A.    No, he doesn't.

2    Q.    Pat doesn't try to explain to you what's going on

3    with him?

4    A.    No, he doesn't.

5    Q.    That never happened?

6    A.    Never happened.

7    Q.    And that makes sense to you?

8    A.    It's reality.

9    Q.    Now, you -- we discussed as a boss it's important to

10   treat people with respect?

11   A.    As a human being it's important to treat people with

12   respect.

13   Q.    Right.  And it's your position that after seven

14   years, this was a respectful way to terminate a company

15   president?

16   A.    Listen, I did not -- I choose not to put salt on open

17   wound.  I choose not to -- to rehash bad reality.  It's time

18   for everybody to move on.  You know, at the end of the day,

19   many people that left jobs and got fired went on to get much

20   better jobs and went on to do much better things in their

21   life.

22   Q.    Did that happen to Pat?

23   A.    I have no idea what happened to Pat.

24   Q.    You heard about the job he got after Kent; right?

25   A.    No -- oh, yesterday it was mentioned, yes.

NEUMAN - DIRECT

1   Q.    Do you believe that having to toilet a disabled man

2   is a much better job than being a company president?

3   A.    Absolutely not.

4   Q.    Let me show you what's been --

5   A.    Let me just finish.  But I believe that Pat today is

6   still a very smart man and very capable man.

7           MR. CELLAR:  Let me show you what we've marked as

8   Exhibit 36.  Do we have this in?

9           DEPUTY CLERK:  No.

10  BY MR. CELLAR

11  Q.    Show you what's been marked as Exhibit Number 36.

12  Have you seen this document before, Mr. Neuman?

13  A.    Yes, sir.

14  Q.    And what is it?

15  A.    It's a letter registered return receipt that was sent

16  to me.  I think I got it probably within a day or two after

17  it was sent.

18  Q.    Okay.

19  A.    Basically saying to me that he would like to go on

20  Family Medical Leave and this is almost two weeks after I

21  fired him.

22  Q.    This is attaching the certification that you never

23  asked him for; right?

24  A.    I never asked him and he never talked about any

25  certification or any medical condition.

NEUMAN - DIRECT

1  Q.    Does this appear to be a true and correct copy of the

2  document that Mr. Hurley sent to you on or about May 12th,

3  2008?

4  A.    I think so, yes.

5         MR. CELLAR:  At this time, Your Honor, we'd like

6  to move this in evidence as Exhibit 36.

7         MR. HENRY:  Is the document that's coming into

8  evidence just the certification or is it the letter and --

9         MR. CELLAR:  It's the cover letter with the

10 certification attached.

11         MR. HENRY:  The certification came in yesterday.

12         THE COURT:  It did.

13         MR. HENRY:  I have no objection.

14         MR. CELLAR:  I just want to --

15         MR. HENRY:  I have no objection.

16         THE COURT:  Exhibit 36 is received.

17         (Plaintiff Exhibit 36 admitted)

18 BY MR. CELLAR

19 Q.    This is a letter you got from Pat Hurley; right?

20 A.    Yes, sir.

21 Q.    And in it, he's telling you, in my emails and the

22 phone conversation I had with you on the morning of May 1st,

23 2008, I have been ill and continue to be ill?

24 A.    That's what his registered letter, return receipt,

25 said, yes.

NEUMAN - DIRECT

1    Q.    You never denied that in your response to him; did

2    you?

3    A.    Denied what?

4    Q.    You never denied that he told you during the phone

5    conversation about his illness?

6    A.    He has never told me in a phone conversation about

7    his illness.

8    Q.    My question is, you never denied that in response,

9    saying, Pat, you never discussed any illness with me?

10   A.    He never discussed any illness with me.  You know, by

11   the way, he also didn't discuss with me what's going on in

12   Alaska.  We didn't talk about it.  Why would I deny about

13   something we didn't talk about?

14   Q.    Well in all fairness, Mr. Neuman, what was happening

15   in Alaska wasn't relevant to what was happening with Pat

16   being fired after seven years.

17   A.    But we didn't talk about it.  He is -- he was fired

18   for insubordination.  He never asked for medical leave.  He

19   asked for medical leave two weeks after he was fired.

20   Q.    Would you agree that if Pat's employment agreement

21   was in place and that you fired him on May 1st, 2008, he

22   would have up until May 30th, 2008, under the agreement?

23   A.    That's -- that's legalese talk.  I don't know.

24   That's -- you have to -- I don't know how it's view or -- I

25   don't know.

NEUMAN - DIRECT

1   Q.     Can we agree that if the employment agreement was in
2   place, you were obligated to give him 30 days notice?
3   A.     You talking legalese.  It's over my head.  I will
4   have to ask an attorney for his interpretation.  I don't
5   know.
6   Q.     I'm asking you factually, sir, if the agreement was
7   in place and it required 30 days notice, do you believe that
8   you would have had to give him 30 days written notice?
9   A.     If he had an agreement --
10         MR. HENRY:  Judge, I object, asked and answered.
11  A.     -- I have to give him 30 day notice.  If I don't give
12  him 30 day notice, if I give him money and I wish him luck,
13  it's the same thing.
14  BY MR. CELLAR
15  Q.     But you didn't do that?
16  A.     I -- I gave him a good chunk of the 30 days and when
17  I realized that we cannot agree on -- on release, I stop.
18  Q.     Now, after you saw that Pat had sent you a
19  certification, at that moment, you had an opportunity to
20  say, wait a minute, this now all makes sense, I made a
21  mistake; right?
22  A.     Listen --
23         MR. HENRY:  Judge, objection, lack of foundation.
24         THE COURT:  Overruled.
25  A.     As I said to you before, sitting here today, I am

NEUMAN - DIRECT

```
 1   still a hundred percent sure that this have nothing to do
 2   with medical leave.  This is a vacation issue.
 3   BY MR. CELLAR
 4   Q.    So is doctor -- strike that.
 5   A.    Doctor and the medical person that was sitting here
 6   said to us, they never said to him to take those vacation
 7   dates.
 8   Q.    Mr. Neuman, my question was, after you received this
 9   lever form, you now had a medical doctor telling you that
10   Pat needed medical leave.  Right or wrong?
11   A.    The doctor who wrote this told us here sitting in
12   this chair that he never knew about those dates.
13   Q.    Okay.  I know you're focusing on the dates, but my
14   question to you is, once you received this form, you were
15   aware that a doctor was saying Pat needed Family Medical
16   Leave Act; right or wrong?
17             MR. HENRY:  Judge, the document speaks for itself.
18             MR. CELLAR:  I'm asking about his awareness, Your
19   Honor.
20             THE COURT:  Just a moment.
21             MR. CELLAR:  I'm sorry.
22             THE COURT:  Overruled.
23   BY MR. CELLAR
24   Q.    Right or wrong?
25   A.    At this point, it was already after the firing two
```

NEUMAN - DIRECT

```
 1   weeks.  I passed it on to Rose and I said let's get legal
 2   help, what do we do, what is the right thing to do.
 3   Q.     And you could have, at this point under Kent's
 4   policy, if you thought Dr. Paisan was a liar, too, you could
 5   have said to Pat, go get a second certification from
 6   somebody else?
 7   A.     I -- you putting words in my mouth.  I didn't say to
 8   you Dr. Paisan is a liar.  You putting words in my mouth.
 9   Q.     Do you believe that Dr. Paisan, based on your frame
10   of mind at the time, was being truthful when he completed
11   this form?
12   A.     Dr. Paisan told us yesterday or the day before that
13   he did not ask for any specific date off, any.
14   Q.     But you're focusing, Mr. Neuman, on Mr. Paisan's
15   testimony three years after the fact.  What I'm asking you
16   is at the time you received --
17   A.     You're right.  I knew that this is all tactics and
18   when I sat here the other day, it reinforced that I was
19   right.
20   Q.     You didn't call Pat and say, Pat, I see that you
21   submitted a medical certification form, let's slow things
22   down, go get another one?
23   A.     Mr. Hurley also submitted it, I discriminate against
24   him because he was male.  He also said that I discriminated
25   him because he was my age.  He said many things.
```

NEUMAN - DIRECT

1    Q.      Mr. Neuman, at this time, Mr. Hurley had not made any

2    of those allegations nor had anybody on his behalf; correct?

3    A.      Do you know what date the sexual, the sex

4    discrimination charge came in?  I don't know what date the

5    age discrimination came in.  But Pat said a lot of things

6    about me and --

7    Q.      It certainly wasn't -- he wasn't making those claims

8    at the time he submitted a leave trying to get his

9    employment back; right?  He gave you a form suggesting --

10   A.      If somebody want to get his employment back, all he

11   had to do is call me and talk to me.

12   Q.      Okay.  And he sent you a letter?

13   A.      He sent me a registered letter, return receipt.

14   Q.      And just so we're clear, it's a yes or no, you did

15   not ask for a second or third certification because you

16   thought Pat was playing games?

17   A.      I absolutely thought that Pat was playing games.

18   Q.      So you didn't ask for the certifications.  Instead,

19   if you could take a look at Exhibit 37 -- has that been

20   introduced?  Let me show you what's been marked as 37.  Do

21   you recognize that document?

22   A.      Yes, sir.

23   Q.      What is it?

24   A.      It look like my response to Mr. Pat Hurley.

25   Q.      And does this appear to be a true and correct copy of

NEUMAN - DIRECT

1    the document you sent to Mr. Hurley?

2    A.    I don't know why but I thought that I send it also

3    registered, return receipt, but it doesn't say it here.

4    Q.    Does this appear to be a true and correct copy of the

5    content of it?

6    A.    I think, yes.

7          MR. CELLAR:  At this time, we'd like to move into

8    evidence what's been marked as Plaintiff's Exhibit 37.

9          MR. HENRY:  No objection.

10         THE COURT:  Exhibit 37 is received.

11         (Plaintiff Exhibit 37 admitted)

12   BY MR. CELLAR

13   Q.    Now, this is a response to Pat; right?

14   A.    Yes, sir.

15   Q.    Now, in your letter, you say, thank you for your

16   letter dated May 12th and in the enclosed forms.  I was

17   unaware that you had any medical issues necessitating leave.

18   Right?

19   A.    Yes, sir.

20   Q.    That's not true is it, Mr. Neuman?

21   A.    It's a hundred percent true.

22   Q.    And nowhere in this letter does it say that Pat was

23   being fired for insubordination or any other reason?

24   A.    What does that have to do with --

25   Q.    Did you write this letter, Mr. Neuman?

NEUMAN - DIRECT

1   A.    With the help of others.  I told you, I'm not a great
2   writer.
3   Q.    There's been some discussion of this Best Value
4   Partners company?
5   A.    Are we putting this aside?
6   Q.    Sure.
7   A.    Okay.  Yes, sir.
8   Q.    Is it your position that had you known about Best
9   Value Partners during Pat's employment, you would have fired
10  him for that?
11  A.    It's my position that if I would have known that an
12  executive who work for the company with me who is making a
13  hundred, two hundred thousand dollar a year, is moving on
14  his own to open a company to do business on the side, I
15  don't think I would be happy.
16  Q.    You heard Mr. Kokkinos' description of the business
17  yesterday; right?
18  A.    I heard Mr. Kokkinos, yes.
19  Q.    Now, you had said Pat never came to me with any good
20  ideas or something to build the business; right?
21  A.    That's correct.
22  Q.    This was an idea to funnel business or to push
23  business to Kent Security?
24  A.    Wow, what a concept.  So let's sit down and talk
25  about it.  But nobody ever talked about it.

NEUMAN - DIRECT

1  Q.    Well, you were aware that this was something Kent was

2  attempting to do beforehand; right?

3  A.    Never.  I had a meeting that they were sitting on

4  that somebody tried to push this on us.  We never did it

5  before; we don't do it after.  It's not what we do.

6  Q.    Now, Mr. Kokkinos still works for the company; right?

7  A.    Yes, sir.

8  Q.    And he was involved in this venture, as you heard?

9  A.    With Mr. Pat Hurley.

10  Q.    And he's never been fired or reprimanded for his

11  participation; right?

12  A.    As I shared with you at the beginning, we going back

13  now, Mr. Kokkinos came to me after and said to me, how do I

14  get out of it.

15  Q.    Okay.  And you, to be specific, what you said was

16  Mr. Kokkinos came to you and said, Gilly, I don't know how

17  to get out, I don't want to do it, I don't know how to get

18  out, help me.  I said what.

19        That's -- that's what you testified to previously;

20  right?

21  A.    Yes.

22  Q.    Okay.  And you heard yesterday Mr. Kokkinos said he

23  never referred to you as Gilly; right?

24  A.    If it's Gil or Gilly, it's not an issue.

25  Q.    And you also heard him say that he never approached

NEUMAN - DIRECT

1    you to ask you for help to get out of this?

2    A.    I don't remember that.

3    Q.    You would agree that an employer of your size,

4    meaning Kent, has certain obligations to familiarize

5    themselves --

6    A.    What do you mean?

7    Q.    -- under the law?

8    A.    Tell me -- I don't understand the question.

9    Q.    You would agree that as an employer, Kent has certain

10   obligations to its employees; right?

11   A.    Such as?

12   Q.    Complying with the law?

13   A.    We must.  Every single person has to comply with the

14   law.

15   Q.    And you would agree that if Kent violated the law,

16   they should be punished for it; right?

17   A.    I don't understand the question.

18        MR. HENRY:  Objection, argumentative, Judge.

19        THE COURT:  Sustained.

20   BY MR. CELLAR

21   Q.    Had you wanted to hire Mr. Hurley back after you

22   received that form, you could have; right?

23   A.    Has Mr. Hurley ever wanted to come back, he would

24   have called me.

25   Q.    Would you hire him back today?

NEUMAN - DIRECT

1   A.      Maybe, yes.

2   Q.      Even with all his poor performance issues?

3   A.      Let's put it this way, I think every experience that

4   we as people go through make us stronger, make us better, if

5   we learning from them.  I assume that Pat had a very tough

6   four years and I assume that he's a better person today.

7           MR. CELLAR:  I've got nothing further.  Thank you,

8   Mr. Neuman.

9           THE WITNESS:  Thank you.

10          MR. HENRY:  I don't have any questions, Your

11  Honor.

12          THE COURT:  Very well.  You may step down,

13  Mr. Neuman.

14          (Witness excused)

15          THE WITNESS:  Thank you.  Should I clean this

16  mess?

17          THE COURT:  No, you leave it.  Let me worry about

18  that.  Call your next witness.

19          MR. CELLAR:  Your Honor, we're going to call

20  Mr. Hurley, just one administrative issue.  We have

21  Dr. Pettingill coming this afternoon.  So what I'd ask the

22  Court, because of Dr. Pettingill's trial schedule is to

23  allow us to interrupt Mr. Hurley's testimony, put

24  Dr. Pettingill on, get him out of here.

25          THE COURT:  Yes, that's fine.

P. HURLEY - DIRECT

```
 1              MR. CELLAR:  We'd call Pat Hurley, Your Honor.
 2              (The Witness is Sworn)
 3              DEPUTY CLERK:  Thank you.  If you'll please be
 4    seated and state your name for the record.
 5              THE WITNESS:  My name is Patrick Hurley.  My
 6    friends and family call me Pat.
 7              MR. CELLAR:  I'm not going through all of this, I
 8    promise.
 9                   PATRICK HURLEY,
10        the plaintiff herein, after having been duly sworn,
11        was examined and testified under oath as follows:
12                   DIRECT EXAMINATION
13    BY MR. CELLAR
14    Q.    Good morning, Pat.
15    A.    Good morning.
16    Q.    Please go ahead and introduce yourself to the jury.
17    A.    My name is Pat Hurley.  I'm 46 years old.  I'm the
18    youngest of eight children.  I was born in Fort Lauderdale,
19    Florida.  I am a martial arts instructor part-time.  I teach
20    a lot of autistic children martial arts, and that's --
21    that's it.
22    Q.    Are you currently employed?
23    A.    Yes.
24    Q.    Who do you work for?
25    A.    I'm an independent contractor for a company called
```

P. HURLEY - DIRECT

1    Alta Private Health.

2    Q.    And what do you do for them?

3    A.    I'm a patient advocate.

4    Q.    Can you explain briefly to the jury what that is?

5    A.    Alta Private Health is a company that takes

6    traditional medical practices and transitions them into a

7    new concept called concierge medicine, and my job is to

8    educate the patients of that practice and to show them the

9    benefits continuing on once the practice becomes a concierge

10   practice.

11   Q.    When did you start there?

12   A.    I believe it was September of last year.

13   Q.    And how much do you make working for them?

14   A.    $500 per week.

15   Q.    And do you get any benefits?

16   A.    No.

17   Q.    Prior to that, where did you work, Mr. Hurley?

18   A.    Prior to that, I worked for a company called Bright

19   Star Home Health Care.

20   Q.    Okay.  And what did you do for them?

21   A.    I was a home health aide.

22   Q.    Were you an employee?

23   A.    Yes, I was an employee.

24   Q.    And what were your job duties?

25   A.    I took care of a severely handicapped man who had a

P. HURLEY - DIRECT

 1  long-term brain injury and my job was to just take care of
 2  every need he had.  I clothed him, I bathed him, I toileted
 3  him, I changed his linens, washed his clothes, took him to
 4  doctors' appointments, took him to get haircuts.
 5  Q.    And how much were you paid to perform these services?
 6  A.    $15 per hour.
 7  Q.    Was there a time period where you were paid more to
 8  perform these services?
 9  A.    Yes.  I at -- for a period of months, I worked
10  directly for the estate of this man and I was making -- when
11  I worked directly for the estate, I was making $25 per hour.
12  Q.    Okay.  During the time you worked as a home health
13  care aide, did you receive any benefits?
14  A.    No.
15  Q.    Approximately how many hours a week were you working?
16  A.    40.
17  Q.    Okay.  So at the time you were making $15 an hour,
18  what was your gross income per week, roughly?
19  A.    Oh, I guess it was around $600 or so.
20  Q.    Okay.
21  A.    Per week.
22  Q.    And why did that job end?
23  A.    The patient died.
24  Q.    Can you explain to the jury your educational
25  background?

P. HURLEY - DIRECT

```
 1   A.      A high school graduate and I have approximately two
 2   years of college.
 3   Q.      Okay.  Where did you go to college?
 4   A.      Valdosta State in Georgia and Broward Community
 5   College in Fort Lauderdale.
 6   Q.      Now, prior to coming to work for Kent, did you have
 7   any experience in the media?
 8   A.      Yes, I did.  I was a newscaster in Miami and I was a
 9   radio talk show host in Fort Lauderdale and I also did
10   infomercials, too.
11   Q.      Did you have any experience in security before coming
12   to work for Kent?
13   A.      Yes, I did.
14   Q.      Okay.  And what was that?
15   A.      I worked for Navarro Security in Fort Lauderdale and
16   I also worked for a company called Elite Protection Services
17   in Palm Beach County.
18   Q.      In what capacity did you work?
19   A.      Director of sales and marketing.
20   Q.      Now, are you familiar with what your compensation was
21   at the time you were fired from Kent?
22   A.      Yes.
23   Q.      And what was it?
24   A.      I made $128,500 per year and I had many benefits,
25   company car with gas and maintenance, I had four weeks of
```

P. HURLEY - DIRECT

1    paid vacation that accrued if I -- if I didn't use it, I had

2    a 401(k) program, and also I was a part, as was my wife and

3    my son, the company paid for all of our health insurance as

4    well.

5    Q.     Were you also entitled to any bonuses in addition to

6    your 128,000-dollar base?

7    A.     Yes, I was.

8    Q.     What were those performances or those bonuses based

9    on?

10   A.     They were based on a few categories, client

11   retention, ratios of overtime, and -- and profitability.

12   Q.     Was it your understanding at any point during your

13   employment that the bonuses you were to be paid were

14   discretionary?

15   A.     No.

16   Q.     Did Mr. Neuman ever tell you that your bonuses were

17   discretionary?

18   A.     No.

19   Q.     Did you and Mr. Neuman have a written agreement

20   during your employment that spelled out how your bonuses

21   were to be paid at different times?

22   A.     Yes, we had an employment agreement.

23   Q.     I want to talk briefly about your medical condition

24   and ask you sort of a general question.  In the last seven

25   years, have you been diagnosed with any medical conditions

P. HURLEY - DIRECT

1    regarding your mental health?

2    A.      Yes, I have.

3    Q.      Okay.  And what have you been diagnosed with?

4    A.      I was diagnosed with clinical depression, anxiety,

5    panic attacks.

6    Q.      Okay.  Do you know when you were first diagnosed with

7    this condition?

8    A.      It was early 2005.

9    Q.      And who diagnosed you?

10   A.      Dr. Dauer.

11   Q.      What was it that prompted you to go see a doctor for

12   your condition?

13   A.      I was experiencing feelings and such that were scary.

14   I'd never felt that way before.  I felt very, very gloomy,

15   very down.  I was just very out of sorts and I never felt

16   that way before and I -- I went to see my doctor.

17   Q.      Did anybody attend any of those sessions with you?

18   A.      Yes.  My wife did.

19   Q.      Okay.  And did Dr. Dauer at a certain point prescribe

20   any medication for you?

21   A.      Yes, he did.

22   Q.      What did he prescribe?

23   A.      He transcribed a medicine called Wellbutrin and also

24   a medicine called Xanax.

25   Q.      Did he make any recommendations to you regarding how

P. HURLEY - DIRECT

```
 1   to deal with your diagnosed depression, anxiety, or stress?
 2   A.      Well first of all, he explained that it was a -- it
 3   was a terrible illness and it was something that I couldn't
 4   ignore.  And he said that we needed to get me on medications
 5   right away, which turned out to be Wellbutrin and Xanax.  He
 6   said that I needed to unplug, to get away from the work
 7   related stresses that were causing or bringing on or
 8   aggravating my conditions.  And he -- he also suggested that
 9   I start adding an exercise regimen because he said that
10   exercise improved brain chemistry, that it released
11   something called endorphins.
12   Q.    Did Dr. Dauer ever suggest to you that you go see a
13   mental health care practitioner?
14   A.    Yes, he did.
15   Q.    And do you know -- did you ever go do that?
16   A.    Not right away, but I did eventually seek out help.
17   Q.    Who did you go see?
18   A.    I saw Fred Stuart, the gentleman that was here the
19   other day.
20   Q.    Now, did you take Dr. Dauer's advice to take time off
21   from work initially?
22   A.    No, I did not.
23   Q.    Why not?
24   A.    I had so much to do.  I was a company man, very, very
25   dedicated at a difficult job.  I had a lot of people
```

P. HURLEY - DIRECT

1    depending on me.  I had a lot of irons in the fire.  I

2    just -- I just didn't -- didn't see how it was going to be

3    possible to take the time off with all the things that I had

4    to -- had to accomplish.

5    Q.    Did Dr. Dauer ever explain to you what could happen

6    if you didn't unplug or take time away from work?

7    A.    Yes, he did.  He said that if I did not unplug from

8    work, if I did not reduce my stress and manage my

9    conditions, that -- that this was likely to get worse and

10   indeed far worse if I didn't take care of it and address it

11   and unplug.

12   Q.    Other than Dr. Dauer, did you ever see any other

13   health care professionals regarding your mental health?

14   A.    Yeah, I saw -- I saw Fred Stuart and -- and I also

15   saw Dr. Carlos Paisan, who was also here the other day.

16   Q.    Do you recall the dates that you saw, that you

17   specifically saw these doctors?

18   A.    I don't think I could recall specific dates.

19   Q.    Is there anything that would help refresh your

20   recollection as to the dates you saw these -- we'll refer to

21   as your mental health team?

22   A.    Well, if you've got some kind of record, maybe that

23   would help me recall.

24             MR. CELLAR:  May I approach, Your Honor?

25             THE COURT:  You may.

P. HURLEY - DIRECT

```
 1              (Discussion off record between counsel)
 2              MR. HENRY:  Judge, I'm going to object to him
 3  using the document to refresh recollection unless he
 4  provides me a copy of it.
 5              MR. CELLAR:  Oh, I'm not suggesting that I'm not
 6  providing you -- you asked for a copy?
 7              MR. HENRY:  Yes.
 8              MR. CELLAR:  I'm sorry, I thought you wanted it
 9  introduced in evidence.  Sorry, sorry about that.  I
10  misunderstood.
11              THE WITNESS:  Thank you.
12              MR. CELLAR:  Sure.
13  BY MR. CELLAR
14  Q.    Does that help refresh your recollection, Mr. Hurley?
15  A.    Yes.
16  Q.    Can you identify for the jury each of the dates that
17  you treated with a doctor or health care practitioner up
18  until you were fired in May of 2008?
19  A.    Yes.  The first one is March the 14th, 2005, with
20  Dr. Dauer, March 21st, 2005, with Dr. Dauer, April 11th,
21  2005, with Dr. Dauer, February 28th of 2007 with Fred
22  Stuart, March the 7th, 2007, with Fred Stuart, March the
23  14th, 2007, with Fred Stuart.  There was another Fred Stuart
24  entry there; it doesn't have a date with it.
25  Q.    You can go to the next one.
```

P. HURLEY - DIRECT

1    A.      There's December the 21st, 2007, with Dr. Paisan.

2    January the 21st, 2008, with Dr. Paisan.  I had spoken a

3    couple of times on the telephone with Fred Stuart in the

4    early parts of 2008.  May 5th, 2008, with Fred Stuart, and

5    May 9th, 2008, with Dr. Paisan.  And I think that's it.

6    Q.      We heard some testimony yesterday from Stacey

7    regarding some of the conditions that you were suffering

8    from.  Can you describe to the jury, in your words, what was

9    happening to you?

10   A.      I was very depressed.  I had a great deal of anxiety.

11   I had panic attacks.  I couldn't sleep.  I -- my mind was

12   racing a million miles an hour, it felt like.  I couldn't --

13   there were times I couldn't speak well.  I couldn't speak,

14   couldn't form a lot of sentences, and it was -- I would

15   break out in sweats.  My heart would palpitate.

16   Q.      How did this affect you on a day-to-day basis?

17   A.      It was just very hard to keep it altogether.  It was

18   very hard to do what I do -- what I did as president when

19   you're feeling these feelings.  Very tough.

20   Q.      The longer you continued to work for the defendants

21   did your symptoms improve?

22   A.      There were times that I felt better along the way but

23   looking at the overall period of 2005 to 2008, there was

24   more of a progression of getting worse over that period of

25   time.

P. HURLEY - DIRECT

```
1   Q.     Were the symptoms constant during this time period?
2   A.     No.
3   Q.     Can you explain to the jury how they would come on?
4   A.     There was no rhyme or reason, it seemed, why they
5   would come, why they would go.  But it seemed that they had
6   kind of an ebb and kind of a flow to them.  They'd come,
7   they'd come hard, they'd stay, they'd lessen, they'd go
8   away, and they'd come back again.
9   Q.     Could you predict with any certainty when an episode
10  would come on?
11  A.     No.
12  Q.     Were there days in 2007 and 2008 where you didn't go
13  to work because of what was happening?
14  A.     Yes.
15  Q.     Can you describe to the jury what would happen on
16  those days?
17  A.     I wasn't sleeping well and I was having panic attacks
18  and -- and depression, and my heart was palpitating and
19  there were mornings that I -- I just couldn't get -- I
20  couldn't get out of bed.
21  Q.     Did this affect your ability to perform your job with
22  the defendants?
23  A.     Yes, it did.
24         MR. CELLAR:  Your Honor, may I approach for a
25  moment?
```

P. HURLEY - DIRECT

```
1              THE COURT:  You may.
2    BY MR. CELLAR
3    Q.      As you sit here today, can you specifically identify
4    the dates that you would have been out in 2007 to 2008?
5    A.      No.
6    Q.      Did you have to, on particular days if you were going
7    to be absent from work, would you have to report those to
8    Mr. Neuman?
9    A.      I'm sorry, can you say that again, please?
10   Q.      Would you have to report -- if you were having a day
11   where you weren't feeling well, would you to call Mr. Neuman
12   and tell him that?
13   A.      I would let my staff know that I was not able to come
14   in.
15   Q.      Okay.  And were there days where you also came home
16   early from work because of what was happening?
17   A.      Yes, I did.
18   Q.      Can you describe what would happen on those days?
19   A.      I -- I -- there were days I'd have a panic attack and
20   I didn't feel like I was going to be able to hold it
21   together and I would -- I would come home early.
22   Q.      During the treatment of your health condition with
23   your medical staff, was there a time when your symptoms had
24   improved during your employment?
25   A.      As I said, it had an ebb and a flow to it.  There
```

P. HURLEY - DIRECT

```
 1   were times where I did feel somewhat better and -- and there
 2   were certainly days that I felt even good.
 3   Q.    Now, we didn't see -- in 2006, it doesn't appear that
 4   you treated with anybody for your condition.  Was 2006 a
 5   better year for your condition?
 6   A.    I don't know about better for my condition.  It was a
 7   very busy year, as I recall, and I know I was taking some
 8   St. John's Wort at the time.  I was still struggling.  I was
 9   still struggling mightily with my condition.
10   Q.    Did you -- in addition to Dr. Dauer, did you receive
11   any recommendations from anybody else on your mental health
12   care team?
13   A.    Well, I received it from -- from Fred Stuart and
14   eventually Dr. Paisan.
15   Q.    Can you describe to the jury what Fred Stuart was
16   telling you to do or what recommendations he was making to
17   you regarding your condition?
18   A.    Fred Stuart was saying substantially the same things
19   that Dr. Dauer had told me, and that was that I had got -- I
20   had to unplug.  I had got -- I had to take time away from
21   the things that were causing my symptoms, and -- and
22   business was what was aggravating and causing my stress and
23   my panic attacks and my depression.  He wanted me to get
24   away.  And he also agreed that I needed to be on a -- some
25   kind of antidepressant and he agreed with what I was doing.
```

P. HURLEY - DIRECT

1    And at that time, I had taken up martial arts, karate.  I'd
2    been away from it for many years, and he agreed that it was
3    a good thing that I exercise because he, too, said it was
4    a -- it was helpful for brain chemistry.
5    Q.    Did Dr. Stuart -- did Mr. Stuart ever explain to you
6    the consequences of what could happen if you did not listen
7    to what he was telling you?
8    A.    He, too, thought that -- that this was a very serious
9    illness and that if you don't really address it, that it's
10   very likely to get worse and maybe far, far worse and you
11   could eventually end up into a collapse.
12   Q.    We've talked about Dr. Dauer and we've talked about
13   Fred Stuart.  Can you describe what advice, if any,
14   Dr. Paisan was giving you when you started treating for this
15   in December of '07 with him?
16   A.    All three of my medical people and Fred Stuart
17   included in that, all of them had -- had essentially agreed
18   with each other about what was best.  The consistent thing,
19   the most urgent thing they kept saying to me was, unplug,
20   get away from all of the things that are causing and
21   aggravating your stress, unplug, continue with
22   antidepressants.
23   Q.    Did you listen to them initially?
24   A.    No.
25   Q.    Why not?

P. HURLEY - DIRECT

1   A.      As I said earlier, I had -- I was a company man.   I

2   had a big responsibility.   I had families, low income

3   families who were depending on me to run a good company so

4   that they could continue to be employed, and I felt I just

5   had too many obligations, too many things to do, and I just

6   didn't see -- I didn't have the luxury -- I didn't feel like

7   I had the luxury of taking this kind of time away from Kent.

8   Q.      Now, there's been discussion about vacations, family

9   vacations that you took during your tenure with Kent?

10  A.      Yes.

11          MR. CELLAR:  And we were shown a bunch of photos.

12  May I approach to grab these, Your Honor?

13          THE COURT:  I think we'll take our recess now.

14  We'll be in recess until 1:00.  Don't talk to each other

15  about the case, keep an open mind.  Please stand for the

16  jury.

17          (Recess from 12:00 m. to 1:00 p.m.)

18          THE COURT:  Bring in the jury, please.

19          COURT SECURITY OFFICER:  Yes, sir.

20          THE COURT:  On Exhibit 103, do the parties agree

21  we can use this picture rather than the award, itself?

22          MR. CELLAR:  That's fine, Your Honor.

23          MR. HENRY:  I haven't seen the picture.  I'll take

24  a look at it but I don't have a principle objection.

25          MR. CELLAR:  Your Honor, is there any objection to

P. HURLEY - DIRECT

```
 1    allowing the jury to actually take the award back with them?
 2              THE COURT:  No, that's fine.  But for the record,
 3    we'll substitute this because obviously just in the off
 4    chance that somebody would appeal, we'd want that in.
 5              MR. HENRY:  I don't have an objection.
 6              THE COURT:  All right.
 7              (Jury in)
 8              THE COURT:  Please be seated.  Proceed, please.
 9    BY MR. CELLAR
10    Q.    Mr. Hurley, when we left off, I started asking you
11    about some of the photographs that the defendants had
12    brought up in this case while you were on some of these
13    family vacations.  Do you remember seeing those?
14    A.    Yes, I do.
15    Q.    Just so we're clear, are you taking the position in
16    this case that you never smiled between 2006 to 2008?
17    A.    No, of course not.
18    Q.    Are you taking the position that you never enjoyed
19    yourself during any time on your family trips?
20    A.    No, I -- I did enjoy myself on family trips.  In
21    fact, that -- there's -- there's a moment there that I was
22    enjoying myself.
23    Q.    Do you ever smile at work?
24    A.    Sure, I smiled at work.  I smiled at work a lot.  I
25    enjoyed what I did.
```

P. HURLEY - DIRECT

1   Q.    Now were these vacations that the defendants have

2   shown pictures of, in your mind, the types of vacations that

3   your medical team was telling you to take, the type of leave

4   your team was telling you to take?

5   A.    No.

6   Q.    What was the difference, if you can explain to the

7   jury, please?

8   A.    The difference was what I was being told to do by my

9   medical team, was to get totally unplugged from Kent

10  Security, to get away from the things that were stressing

11  me, that were affecting me.  And that just isn't how family

12  vacations, unfortunately, had to be handled.  I may have not

13  physically been in the office, but I was still conducting a

14  lot of work on vacation.  I've -- during these family

15  vacations, I'd take -- have to respond to emails, I'd have

16  to respond to calls, issues, problems at all hours.  So

17  that's -- that's not getting -- that's not being unplugged

18  from the things that were causing and aggravating my

19  conditions.

20  Q.    Now, are you taking the position in this case that

21  your doctors or your medical team ever specifically said you

22  need to take these particular days off?

23  A.    No.

24  Q.    Are you taking a position that they said you have to

25  take a particular week off?

P. HURLEY - DIRECT

1   A.      No.

2   Q.      What was their advice regarding how you were to take

3   this time off?

4   A.      Well, it -- it was told to me that I should take a

5   block of time off, again, to unplug, to get away, to not be

6   affected by the things that were aggravating my condition.

7   Q.      Did you ever understand their advice to be or their

8   recommendations to be optional for you?

9   A.      No, it never came across as optional.  It always was

10  this something that you have to do.

11  Q.      And you had mentioned before that your medical team

12  said if you didn't do what they were recommending, it might

13  get to a certain point?

14  A.      They said it could -- it would get -- it very well

15  could get worse, it could get much worse.

16  Q.      And did it ever reach that point?

17  A.      Yes, it did.

18  Q.      And approximately when?

19  A.      2008.

20  Q.      And who were you working for at the time?

21  A.      Kent Security of Naples.

22  Q.      And when were you fired, just for the record?

23  A.      May the 1st, 2008.

24  Q.      Is that when you learned that you had been fired over

25  the telephone?

P. HURLEY - DIRECT

1    A.    I got a call from Mr. Neuman who fired me on the

2    telephone.

3    Q.    We've spoken a lot and I'm going to do a lot of

4    summarizing here with your testimony regarding the way you

5    moved up and down through the company.

6    A.    Okay.

7    Q.    I do want to ask some specific questions, however,

8    regarding some of the documents that we looked at earlier in

9    the case.  How did you learn of the job at Kent Security?

10   A.    Mr. Neuman recruited me.  We had a mutual friend in

11   the security industry who helped him to get in contact with

12   me.

13   Q.    He reached out to you?

14   A.    Yes.

15   Q.    And who did you interview with when you came to the

16   company?

17   A.    Mr. Neuman.

18   Q.    And as we heard, what was his role at the time?

19   A.    Chief executive officer.

20   Q.    I want to show you what we have represented as

21   Exhibit 1 or the personnel file from the defendants, or a

22   piece of the personnel file actually.  This is just the

23   application.  Now on this application, neither Mr. Neuman or

24   Ms. Cucurillo could speak to why there are cross-outs.

25   Could you explain to the jury why there were cross-outs on

P. HURLEY - DIRECT

```
 1    your application?
 2    A.      These things were crossed out on my application
 3    because we had negotiated an employment agreement that set
 4    out very specific terms of my employment and the things on
 5    this boilerplate, things here on the application were
 6    contrary to the things that we had negotiated.  This talked
 7    about essentially an at will employee.  I had an employment
 8    agreement that -- that was the guiding -- guiding document
 9    in our relationship.
10    Q.      And I want to show you a copy of the employment
11    agreement and ask if this is the agreement you're referring
12    to?
13    A.      Yes.
14    Q.      How did this document come into being?
15    A.      Mr. Neuman and I negotiated the terms of it.
16    Q.      Okay.  And if you take a look at Paragraph 3 that
17    we've been discussing, it talks about the term of the
18    agreement?
19    A.      Yes.
20    Q.      And I want to focus on the second sentence which --
21    which talks about automatically renewing the agreement.  You
22    see that?
23    A.      Yes, I do.
24    Q.      Was that your understanding throughout your entire
25    employment of the term of your agreement?
```

P. HURLEY - DIRECT

1    A.      Yes.

2    Q.      Okay.  At any time during your employment did you

3    ever receive a 30 day notice or a 30 day written notice of

4    defendant's intention not to renew this agreement?

5    A.      No, never.

6    Q.      Okay.  Now, Paragraph 4 deals with how you're to be

7    compensated.  You see that?

8    A.      Yes.

9    Q.      Okay.  Now, was it your understanding and were there

10   any provisions in the agreement as to how, if any way, this

11   agreement could be modified?

12   A.      It had to be in writing and between the two of us.

13   Q.      Okay.  And were there times during your employment

14   where the agreement was, in fact, modified?

15   A.      Yes.  Several times.

16   Q.      And was it in writing?

17   A.      Yes.

18   Q.      And I want to show you what we marked as Exhibit 2

19   and ask if you remember this email?

20   A.      Yes, I do.

21   Q.      Okay.  And what is this email?

22   A.      This is an email from August of 2005 and this

23   adjusted my compensation package.

24   Q.      Now, was this an example of one of the writings that

25   modified your employment agreement?

P. HURLEY - DIRECT

1    A.      Yes.

2    Q.      Now in addition to your salary, which we looked at in

3    Paragraph 4 of the agreement, you were also entitled to

4    certain benefits under the employee agreement?

5    A.      Yes, I was.

6    Q.      Okay.  And these are articulated -- are these

7    articulated in Paragraph 5?

8    A.      Yes, they are.

9    Q.      Okay.  And is that a true and correct statement of

10   what the benefits you were supposed to receive throughout

11   your employment with Kent?

12   A.      Yes, that's correct.

13   Q.      Was that ever modified?

14   A.      No.

15   Q.      If you look at Paragraph 7 of the employment

16   agreement, and we've talked about this, and we'll be brief,

17   there's a termination provision?

18   A.      Yes, I see it.

19   Q.      Did Mr. Neuman at any point ever tell you that that

20   portion of the agreement was no longer in effect?

21   A.      No, never.

22   Q.      Did Mr. Neuman ever tell you that any portion of the

23   agreement was no longer in effect?

24   A.      Never.

25   Q.      Did Mr. Neuman ever act inconsistently with the terms

P. HURLEY - DIRECT

1    of this agreement?

2    A.      Never.

3    Q.      Now, the termination clause requires 30 days written

4    notice.  Do you see that?

5    A.      Yes, I do.

6    Q.      And we've heard to the point of nausea, would you

7    agree that -- sorry, Frank -- that that was not ever done?

8    A.      No, it was never done.

9    Q.      What was the date that you received verbal notice?

10   A.      May 1st, 2008.

11   Q.      Okay.  Now, I want to show you another piece of your

12   personnel file, which has already been introduced in

13   evidence and this is called a non-disclosure and

14   non-competition agreement.  Do you see that?

15   A.      Yes, I do.

16   Q.      Now again, there's some language crossed out.  Can

17   you explain to the jury what the point of the language is?

18   And by the way, you have a copy of that in front of you as

19   well?

20   A.      Well, that's okay.  I can see it here.  The reason

21   this was crossed out is for the same reasons that the

22   writing on the application was crossed out, that in here was

23   language that would be contradictory to the employment

24   agreement that the two of us had negotiated.  So the things

25   on here that would contradict it were crossed out.

P. HURLEY - DIRECT

1    Q.    Now, do you remember when you signed this during your
2    employment?
3    A.    I actually don't.  I had for gotten, frankly, that I
4    had signed this but it was brought to my attention that I
5    did and I -- I remembered.
6    Q.    According to the terms of this agreement, in
7    Paragraph 2 --
8    A.    Yes.
9    Q.    -- the defendants restricted your ability to work
10   for -- was it your understanding or is it your understanding
11   that the defendants were restricting your ability to go work
12   for another security company?
13   A.    Yes, that's what it says.
14   Q.    Okay.  And how long, according to this agreement,
15   were you prevented -- in the event you were fired -- from
16   going to work for another company?
17   A.    Says 24 consecutive months after the date of
18   termination of employment with employer.
19   Q.    When you and Mr. Kokkinos created Best Value
20   Partners, was that considered a security company?
21   A.    No, no.
22   Q.    We've talked about the employee handbook, as well.
23   Just one more point.  Do you see the signature here at the
24   end of the noncompete agreement?
25   A.    Yes.

P. HURLEY - DIRECT

1    Q.      Is that your signature?

2    A.      Yes, it is.

3    Q.      And do you recognize the signature below yours?

4    A.      To be honest with you, I -- I don't recognize it.

5    Q.      Fair enough.  We've talked about the employee

6    handbook and we've also looked at the acknowledgment form.

7    Consistent with your prior testimony, have you already

8    explained why you crossed out this language on the

9    application as well?

10   A.      I don't -- I don't know if I explained it on this

11   particular form, but any time any of these documents have

12   something crossed out, it was because it was contrary to

13   something that we had negotiated and had put in writing in

14   our employment agreement.

15   Q.      Okay.  If you look at the next page, which we've,

16   again, looked at at length, is this the employee handbook

17   that you signed as having received?

18   A.      Yes.

19   Q.      Now, when you became president of Kent of Naples, did

20   the defendants require you to go and undergo human resource

21   training?

22   A.      No.  The only thing that I ever did was I got a

23   little training on unemployment issues, how unemployment

24   issues are handled.  That's all.

25   Q.      And who provided that training to you?

P. HURLEY - DIRECT

1    A.      Mrs. Neuman -- pardon me, Mrs. Alexander.

2    Q.      During your tenure with Kent Security, did you ever

3    see posters in the Naples workplace that identified your

4    rights under the Family Medical Leave Act?

5    A.      No.

6    Q.      As president, were you ever asked to purchase any of

7    those posters to put up in the break room?

8    A.      No.

9    Q.      Is it a fair statement to say that between 2004, when

10   you ultimately moved to Naples, until the time you were

11   fired, there was never any Family Medical Leave Act poster

12   explaining your rights in the break room?

13   A.      Well, we didn't have a break room.  It would have

14   been out in the lobby and no, there was no such poster.

15   Q.      As president of the division, would you have been

16   aware had these been posted?

17   A.      Yes, of course I would have.

18   Q.      Now, looking at Pages 4 and 5 of the employee

19   handbook regarding family leave, was this your understanding

20   after having received the handbook that this was Kent

21   Security's policy on employee -- on Family Medical Leave?

22   A.      Yes, it was.

23   Q.      Did anybody ever tell you that this was not the

24   policy of Kent Security?

25   A.      No.

P. HURLEY - DIRECT

 1  Q.    It says here that in order to qualify for Leave Act
 2  under Kent's policy, you had to work there for at least a
 3  year.  Do you see that?
 4  A.    Yes.
 5  Q.    Can we agree that you worked there for at least a
 6  year?
 7  A.    Yes, I --
 8  Q.    And you also had to work at least 1600 hours in the
 9  preceding 12 months.  Do you see that?
10  A.    Yes, yes, I do.
11  Q.    What was your general schedule when you worked for
12  Kent in Naples?
13  A.    Usual business hours were from nine a.m. to six p.m.,
14  but there were many times that I'd have an early morning
15  meeting or I'd have a late night meeting or there'd be
16  issues overnight that I'd have to deal with.  So it could be
17  irregular.
18  Q.    Did you work more than 1600 hours in 2007?
19  A.    I have no doubt that I did.
20  Q.    What about in 2008?
21  A.    Well, I was fired first of May, 2008.  I don't know.
22  I'd have to do a calculation, but --
23  Q.    Do you have any doubt that you worked at least 1600
24  hours between May 1st of 2007 and May 1st of 2008?
25  A.    No, I have no doubt.

P. HURLEY - DIRECT

1    Q.      Now, under this policy, were you -- under the Family

2    Leave policy, did you have an understanding as to how much

3    notice you had to give the defendants if you were going to

4    take leave?

5    A.      Yes.  It was 30 days was the -- was the target.

6    Q.      Were you aware of any procedure of where if the

7    defendants did not believe your request for leave, they had

8    a remedy for it?

9    A.      Yes, I knew that.

10   Q.      What was the remedy?

11   A.      Remedy was they could ask you for confirmation of it.

12   They could ask you to submit paperwork verifying it.  And

13   they also could ask you for two more to back the first one

14   up.  So that was part of their process.

15   Q.      To your knowledge, were you ever given a different

16   policy regarding family leave during your employment with

17   defendants?

18   A.      No.

19   Q.      If you would have received another policy, would you

20   have been obligated to sign an acknowledgment form that you

21   received it?

22   A.      Yes.

23   Q.      Now on Page 10 of the employee handbook, it talks

24   about defendant's disciplinary procedures?

25   A.      Yes.

P. HURLEY - DIRECT

1    Q.      As president of Kent of Naples, were you familiar

2    with these procedures with regard to your employees?

3    A.      Yes.

4    Q.      Okay.  Did you actually read the handbook when you

5    came on board?

6    A.      Yes, I did.

7    Q.      Did anybody from Kent ever tell you that these

8    policies don't apply to you?

9    A.      No, never.

10   Q.      And if you take a look, there's a list of immediately

11   terminable offenses, do you see that?

12   A.      Yes, I see them.

13   Q.      And then there's a list of Class B offenses which

14   would result in progressive discipline.  Do you see that?

15   A.      Yes, I do.

16   Q.      Did anybody at Kent ever tell you that you had

17   violated any provision of the immediately terminable

18   offenses?

19   A.      No.

20   Q.      Did anybody ever tell you that you had violated any

21   of the progressive discipline offenses?

22   A.      No, never.

23   Q.      Did you ever have an occasion while you worked as

24   president of Kent of Naples where a security guard

25   threatened another employee with physical violence?

P. HURLEY - DIRECT

1    A.      A security officer on security officer?

2    Q.      Sure.

3    A.      I'd have to give that some thought.  That's --

4    that's -- it doesn't ring a bell.

5    Q.      Had that happened under the terms of the agreement,

6    what would you have done?

7    A.      I would have followed the procedures that were laid

8    out in the handbook, which was company policy.

9    Q.      It's been discussed that there's no performance or

10   poor performance evaluations in your personnel file or

11   reprimands.  Have you heard that testimony?

12   A.      Yes, I have.

13   Q.      How long did you work for the defendants?

14   A.      Seven years.

15   Q.      And when were you fired?

16   A.      May 1st, 2008.

17   Q.      And how long was it after you submitted a leave or

18   request asking for medical leave?

19   A.      I was fired 24 hours after requesting medical leave.

20   Q.      And what was the reason you were given at that time?

21   A.      I was never given a reason then or ever.

22   Q.      We've looked at a number of emails regarding

23   promotions, and there's been some testimony as to who

24   drafted the emails.  Can you explain to the jury how, for

25   example, these documents came into creation?

P. HURLEY - DIRECT

1    A.    Well, I can't say specifically about this particular
2    one, but there were times that Mr. Neuman wanted an email
3    created or a letter created that he intended to send out to
4    the entire company that he would ask others to help him
5    compose.  So on occasion when he would ask me, I'd usually,
6    on the phone, sometimes in person, I'd take out a pad of
7    paper and a pen and he would tell me what he wants to say,
8    what he wanted to communicate, and I would take notes and
9    then I would try to compose that email or that letter and
10   then I would send it to him and he would edit it, change it,
11   or you know, send it out as-is.  It was up to him.
12   Q.    Once you would send him a copy of what he had
13   proposed to you, would you see it again?
14   A.    You mean a draft?
15   Q.    Once you would send him a draft, would you be further
16   involved in sending or editing the email?
17   A.    No.
18   Q.    Now, if we take a look at Exhibit 5, which has
19   already been introduced, I'd asked Mr. Neuman some questions
20   about this.  Can you explain to the jury what this document
21   was?
22   A.    As I recall, this document was kind of a -- it was
23   kind of a working document.  Mr. Neuman and I were
24   negotiating a change to my employment agreement and change
25   to my compensation and this was kind of a working document

P. HURLEY - DIRECT

1   where we were sort of putting thoughts on paper and working

2   from there.  That's what I recall.

3   Q.    If you see at the bottom, there's a bonus structure,

4   proposed bonus structure; do you see that?

5   A.    Yes, I do.

6   Q.    Were you ever under the impression that if you hit

7   the goals in this bonus structure Mr. Neuman could elect to

8   pay you at his discretion?

9   A.    Absolutely not.

10  Q.    Now, was there a time where -- after you'd been

11  promoted to president of Naples, did you immediately move to

12  Naples?

13  A.    No, I didn't.

14  Q.    What did you do?

15  A.    I commuted.  We were living in Fort Lauderdale at the

16  time and I commuted every day to -- to Naples.  So it was an

17  hour and 45 minutes one way, and so I would leave early in

18  the morning, very early in the morning and then I would come

19  back at night, so it was about three and a half hour round

20  trip every day I was in the car.

21  Q.    Was there a period of time when that stopped, meaning

22  when you moved to Naples?

23  A.    Yes.  When I moved to Naples, I no longer had to

24  commute.

25  Q.    Was there a reason that ultimately you moved to

P. HURLEY - DIRECT

```
 1    Naples instead of commuting?
 2    A.      Yeah, there was.  I was in a automobile accident back
 3    in 2003, if I'm recalling correctly.  I was in a company car
 4    and my car was rear-ended and it caused me to have to go to
 5    the hospital and have -- have follow-up care with an
 6    orthopedic doctor.  My neck and my back were -- were injured
 7    in the accident.
 8    Q.      Once you moved to Naples, were you done coming to
 9    Miami --
10    A.      No.
11    Q.      -- for Kent business?
12    A.      No.  I went to Kent of Miami, the Miami office
13    frequently.
14    Q.      You've heard both Mr. Neuman and Ms. Alexander deny
15    having regular meetings with you.  Do you recall hearing
16    that?
17    A.      I heard that.
18    Q.      Is that your -- do you agree with that statement?
19    A.      I absolutely do not agree with that statement.
20    Q.      Can you explain to the jury how often you were coming
21    to Miami to meet with these individuals?
22    A.      Well, I had to be there at minimum two times per
23    month to pick up payroll and bring it back to the -- to the
24    Naples Division so that it could be distributed.  That's the
25    minimum amount of times.  I was often there at -- usually
```

P. HURLEY - DIRECT

1    about four times per month.  I'd pick up mail, of course,

2    but I also, while there, had meetings with either Mr. Neuman

3    or Mrs. Alexander, or one or the other, but very often, I

4    would meet with them both.  Sometimes it would be long

5    meetings; sometimes they'd be brief meetings, but I never

6    came to Miami without interfacing with both of them on a --

7    on an official level.

8    Q.    Was it -- I guess my question is, when you would go

9    to Miami, would these be impromptu meetings or was it

10   expected that you would go and meet with them while you were

11   there?

12   A.    Sometimes they were impromptu meetings.  Most of the

13   times they were set meetings.  Give you an example,

14   Mrs. Alexander was in charge of accounts receivable, the

15   moneys that were owed to our company, and she kept her thumb

16   very tightly on that subject.  So if we had a client in

17   Naples or on the west coast, Fort Myers, let's say, that was

18   slow paying, we would have meetings, she would have a

19   meeting with me in her office and we would go over the

20   accounts receivable report and she would tell me what I

21   needed to do about it, whether that was make a phone call,

22   whether that was to make a visit, whether there was some

23   other kind of follow-up she was directing me to do, and of

24   course I would do it.

25   Q.    Now, at some time in August of 2005, do you recall

P. HURLEY - DIRECT

1    receiving another pay increase from Mr. Neuman?

2    A.      In 2005, yes.

3    Q.      Do you have Exhibit 2 in front of you, actually?

4    A.      Yes, I do.

5    Q.      Fair enough.  And I know I showed it to you earlier.

6    Was this the pay increase that you received from Mr. Neuman

7    in August of 2005?

8    A.      Yes, I believe it is.

9    Q.      And was it your understanding that this was a

10   modification to the pay provisions of your agreement?

11   A.      Yes, it was.

12   Q.      Did Mr. Neuman ever tell you or say to you, "What

13   agreement, Pat?"

14   A.      No, of course not.

15   Q.      Let's take a look at Exhibit 7, which I went over in

16   detail with Mr. Neuman and I do want to spend a little bit

17   of time on this one.  You heard Mr. Neuman say that he

18   couldn't remember the context of this email.  Can you

19   describe to the jury what was happening here in June of

20   2006?

21   A.      In June of 2006, Mr. Neuman was promoting me to the

22   president not just of Kent of Naples, but also president of

23   Kent of Palm Beach, which incorporated Broward County and

24   Palm Beach.  And this -- this -- this email was laying down

25   all of the new terms, all of the things that were modifying

P. HURLEY - DIRECT

1    my employment agreement.

2    Q.     It says here in the first sentence, here's the

3    synopsis of what we discussed yesterday.  Do you see that?

4    A.     Yes, I do.

5    Q.     Do you recall having a conversation with Mr. Neuman

6    the day before you sent this email, as referenced?

7    A.     Yes.

8    Q.     Do you recall whether that was in person or over the

9    telephone?

10   A.     I believe this was over -- over the telephone.

11   Q.     Okay.  Now, did you prepare the initial draft of this

12   agreement or of this modification, rather?

13   A.     The first draft, yes, I -- I prepared the first

14   draft.

15   Q.     And then what did you do?

16   A.     I sent it to Mr. Neuman.

17   Q.     And did Mr. Neuman make any edits?

18   A.     Yes, he did.

19   Q.     Can you identify for the jury where his edits are on

20   this document?

21   A.     Yes.  The edits are pretty much everything you see

22   that's in -- pretty much everything you see that's in

23   parentheses here.

24   Q.     Take a look at the screen.  Was that one of his

25   edits?

P. HURLEY - DIRECT

1   A.    Yes, yes.

2   Q.    Was this another one?

3   A.    Yes.

4   Q.    How about that one?

5   A.    Yes.

6   Q.    What about this one?

7   A.    Yes.

8   Q.    Now, this is discussing a bonus program for you;

9   correct?

10  A.    Yes, it is.

11  Q.    Okay.  Mr. Neuman made modifications.  Did Mr. Neuman

12  make these modifications to what you were proposing?

13  A.    Yes, I think so.

14  Q.    Did this email ultimately go into effect regarding

15  your compensation?

16  A.    Yes, it did.

17  Q.    Now in this email, you do make a mention, as we've

18  discussed, about a current agreement?

19  A.    Yes, that's in the first paragraph.

20  Q.    Can you explain why the A in agreement is

21  capitalized?

22  A.    Well, because we weren't speaking generally about

23  agreeing on things.  We were speaking here about the

24  agreement, so that letter is capitalized to speak to the

25  specific employment agreement that the two of us had.

P. HURLEY - DIRECT

1    Q.      Did Mr. Neuman at any point during your

2    discussions -- let me go back.

3              Did you actually discuss your employment agreement

4    with Mr. Neuman the day before?

5    A.      Yes.  I -- I shared that all of the things that we

6    were proposing here were going to be modifying what we had

7    in writing.

8    Q.      Did Mr. Neuman tell you that the employment

9    agreement, did he ever respond, the employment agreement was

10   no longer in effect?

11   A.      Never.

12   Q.      Did he respond back saying, "Pat, I have no idea what

13   employment agreement you're referring to"?

14   A.      No.

15   Q.      And the last bullet point, which we already discussed

16   with the jury, you say here, all current terms and benefits,

17   et cetera, remain unchanged.  You see that?

18   A.      Yes, I do.

19   Q.      What were you referring to when you said terms,

20   benefits, et cetera?

21   A.      We were referring there to the employment agreement

22   and all of the provisions that were in the employment

23   agreement currently in place.

24   Q.      At the bottom, you say have I left out anything;

25   right?

P. HURLEY - DIRECT

1   A.     Yes.

2   Q.     Were you giving Mr. Neuman the opportunity to include

3   or make any further edits that he wanted to to this proposal

4   that you understood?

5   A.     That was my purpose.

6   Q.     Now, you're also saying to him you need to compose

7   announcements of this change to the entire company?

8   A.     Yes.

9   Q.     Is this consistent with your understanding as to how

10  that process would work regarding announcements?

11  A.     Yes.   What I'm saying there is Mr. Neuman needed to

12  put something together so that the -- and send it out, some

13  communication, so that the whole company would know what

14  these changes were, and I assumed that like in previous

15  times, he would either ask another employee or he would come

16  back and ask me to help assemble it.

17  Q.     You've heard Mr. Neuman describe your relationship

18  with him in negative terms.   Did you hear that?

19  A.     Yes.

20  Q.     Was that your understanding of your relationship with

21  Mr. Neuman?

22  A.     No, no.   I don't -- I don't think his description was

23  accurate.   Mr. Neuman and I fought and we hugged.   We

24  laughed and we cried.   There was always respect and we were

25  always able to speak very frankly with each other and when

P. HURLEY - DIRECT

```
 1   we talked or wrote, we often didn't pull punches with each
 2   other.  We would just be straightforward and honest.
 3   Q.     Did he ever tell you or did he ever threaten to fire
 4   you during your employment?
 5   A.     No.
 6   Q.     Would he let others know that he was satisfied with
 7   your job performance?
 8   A.     Quite often, yes.
 9   Q.     Would he call you and tell you he was satisfied with
10   your job performance?
11   A.     Yes.
12   Q.     Let me show you 16, which we're again not going to go
13   into detail.  Is this an email that you drafted for
14   Mr. Neuman?
15   A.     I think -- I'm sorry.  I think this was -- I believe
16   this was something that Mr. Neuman had me put together the
17   draft of that, I sent to him for edits and I don't know --
18   in here, I don't know what edits he made to it.
19   Q.     Okay.  After you'd proposed a draft to Mr. Neuman,
20   did you see the proposal again?
21   A.     No, no.  He didn't -- he would make whatever changes.
22   He had told me what he wanted to say, like always.  I would
23   try to put what he wanted to communicate down into words,
24   send it to him, and then he would edit it or he wouldn't
25   edit it and then he would send it out but he wouldn't send
```

P. HURLEY - DIRECT

```
 1   it back to me before he sent it out.
 2   Q.      Is there anything in this email that's untrue?
 3   A.      No.  Everything is very true.
 4   Q.      Let's skip forward now to 2007.  Can you describe to
 5   the jury your health condition at this time, now going to,
 6   let's say, early 2007?
 7   A.      Getting -- getting worse.  I was having more bouts of
 8   depression.  I was having more anxiety, more panic attacks.
 9   I was certainly not getting better.
10   Q.      Another document that we've talked about and looked
11   at at length, did Stacey explain to you why she took this?
12   A.      Yes, she did.
13   Q.      Why?
14   A.      She said because this is how she saw me on our family
15   vacations.  This is what she constantly saw and it was -- it
16   was upsetting to her.
17   Q.      Would you agree that this is pretty ridiculous?
18   A.      Yeah, I would.
19   Q.      Did Stacey ever express her frustration towards you
20   for what you were doing, not only here at the Grand Canyon,
21   but back at home when you were working?
22   A.      Very often.
23   Q.      What was she telling you?
24   A.      She was telling me that I'm marching toward collapse,
25   that I can't keep doing this, and specifically where this
```

P. HURLEY - DIRECT

1   kind of thing is concerned, that it was interfering with our

2   family life.

3   Q.    In addition to what was going on at work during this

4   time, did anything start happening with your finances?

5   A.    Yes.

6   Q.    What happened?

7   A.    We were -- we had -- we had overspent.  We were in

8   some financial difficulty.

9   Q.    How did that affect your mental health?

10  A.    I think it added a lot of pressure to my mental

11  health.

12  Q.    Now, there's been testimony or suggestions in this

13  case that the vacation schedule or the leave schedule,

14  depending whose version you look at, that you submitted was

15  intended for you to go back to the Grand Canyon.  Did you

16  hear that?

17  A.    I heard that.

18  Q.    Or the Florida Keys, or hunting?

19  A.    I heard that.

20  Q.    Did you have the money in 2008 to go on vacations,

21  Mr. Hurley?

22  A.    No, I did not.  We were -- we were in -- we were in

23  some pretty good financial difficulty.  We couldn't have.

24  We couldn't have taken that kind of vacation.

25  Q.    We looked yesterday at one of defendant's exhibits

P. HURLEY - DIRECT

```
 1   where you're having conversations in February of 2008 with
 2   Stacey.  Do you remember these conversations?
 3   A.    Yes.
 4   Q.    And you're discussing, for example, even cutting out
 5   the exercise that you had started to do that was
 6   recommended; is that true?
 7   A.    Yes, it's true.
 8   Q.    Was your mind, in February of 2008, on taking
 9   vacations, Mr. Hurley?
10         MR. HENRY:  Judge, Mr. Cellar is leading
11   Mr. Hurley through the entire testimony.
12         MR. CELLAR:  Calls for a yes or no yes question,
13   Your Honor -- or answer.
14         THE COURT:  Just a moment.  I didn't ask for any
15   comment back.
16         MR. CELLAR:  Sorry.
17         THE COURT:  Overruled.
18         THE WITNESS:  Could you repeat the question,
19   please?
20   BY MR. CELLAR
21   Q.    Was your mind on taking vacations or paying for
22   vacations in February of 2008?
23   A.    No.
24   Q.    What were you focusing on financially?
25   A.    Focusing on lowering our -- lowering our expenses,
```

P. HURLEY - DIRECT

```
 1   selling some of our assets, downsizing.
 2   Q.      Now, the reason I want to talk to you about this
 3   email is that -- first of all, when is this email taking
 4   place?
 5   A.      February, 2008.
 6   Q.      Had you been fired in February, 2008?
 7   A.      No.
 8   Q.      Did you know that you were going to be fired in May
 9   of 2008 at this time?
10   A.      No.
11   Q.      Was there a litigation in sight at this point?
12   A.      No.
13   Q.      Who was this email between?
14   A.      That was between my wife, Stacey, and myself.
15   Q.      At the time you wrote this email, did you ever expect
16   that anybody else in the world would see it?
17   A.      No.
18   Q.      In this email, do you mention to Stacey what effect
19   these finance issues are having on you?
20   A.      Yes.
21   Q.      What are you telling her?
22   A.      I'm telling her that I think this is going to cause
23   me panic attacks and that I'm probably going to have to
24   double up on my Effexor medicine.
25   Q.      What sort of symptoms were you suffering in February
```

P. HURLEY - DIRECT

1  of 2008, Mr. Hurley?

2  A.     Depression, panic attacks, my mind racing a million

3  miles an hour, lot of anxiety, couldn't sleep right.

4  Q.     You heard Mr. Neuman refer to your leave request as a

5  game.  Did you hear that?

6  A.     Say again?

7  Q.     Did you hear Mr. Neuman refer to your leave request

8  as a game?

9  A.     Yes, I heard that.

10  Q.     Do you have any reason to play games, Mr. Hurley, in

11  February of 2008?

12  A.     Absolutely not.

13  Q.     Now, I want to look at what's been marked as

14  Exhibit 3, and again, go through these briefly.  Were you

15  having concerns during this time period that Mr. Neuman was

16  not living up to the terms of your employment agreement with

17  him?

18  A.     Yes, I was.

19  Q.     What, if anything, did you do?

20  A.     I spoke to him about it, emailed him about it.

21  Q.     What would be his response?

22  A.     Most often silence, no response.  There was an

23  occasion where I brought it up to him and he said I haven't

24  gotten around to it.

25  Q.     During his testimony, did you hear Mr. Neuman say

P. HURLEY - DIRECT

1  everything with you was about money, money, money?

2  A.    Yes, I heard that.

3  Q.    Were you asking for anything in these emails that you

4  weren't entitled to, Mr. Hurley?

5  A.    No, no, just the opposite.  All I was asking for was

6  the moneys that were owed to me that I had earned.

7  Q.    And what was the source of what you believed you were

8  owed in these emails?  What was it?

9  A.    It -- it was a bonus, performance bonus.

10 Q.    Now, Ms. Cucurillo got up -- did you hear

11 Ms. Cucurillo testify yesterday that the bonus program had

12 stopped --

13 A.    Yes, I heard that.

14 Q.    -- in 2008?  Did you hear whether Mr. Blackwell

15 received his bonus in 2008?

16 A.    I heard that he did receive his bonus in 2008.

17 Q.    Now at the end of 2007, you heard -- did you hear

18 Mr. Neuman admit that he paid you a discretionary bonus?

19 A.    That's what I heard him say.

20 Q.    How much was that bonus?

21 A.    $20,000.

22 Q.    Did he explain to you what that bonus was for?

23 A.    That bonus was for the first half of 2007.

24 Q.    Did you hear Mr. Neuman say that he would constantly

25 tell you that he was having problems with you?

P. HURLEY - DIRECT

1   A.      I heard him say that.

2   Q.      Was that true?

3   A.      No, it was not true at all.

4   Q.      We looked at Exhibit 17.  Was this consistent with

5   the type of comments you were receiving from Mr. Neuman

6   throughout your employment?

7   A.      Yes, it was.

8   Q.      How was the Naples office performing in 2007 and

9   2008?

10  A.      The economy had hit this region pretty hard.  The

11  economy was going downhill.  2007, we really started to feel

12  the effects of the economy slipping.  By the time we got to

13  2008, it was -- we were in -- the economy was really in the

14  tank and it was getting worse.

15  Q.      Did you reach out to Mr. -- was that having an effect

16  on employee morale?

17  A.      Well, sure.  We were not as -- sure, it had an

18  effect.  You know, it was -- it became a very tough

19  environment, marketplace to work in when the economy was --

20  was doing so poorly.

21  Q.      Did you reach out to Mr. Neuman for some help on

22  morale?

23  A.      Yes, I did.

24  Q.      How often would you so?

25  A.      Well, I don't know if I could put a number to it.

P. HURLEY - DIRECT

1    But I -- I can't tell you how many times.  I could not even

2    come close to putting a number -- how many times I asked

3    Mr. Neuman to please come visit the Naples office, please

4    come be with the staff in the Naples office to give them

5    some kind of an uplift, to give them some kind of a pat on

6    the back, and also to visit, visit a lot of the clients that

7    were making all of our paychecks possible.

8    Q.    Would he respond?

9    A.    He -- he would respond, but he wouldn't come.

10   Q.    What did he tell you?

11   A.    He would say in so many words, I'm not coming and he

12   would say that's because you're doing a great job, you've

13   got things in control and I have confidence in you.

14   Q.    Were Mr. Neuman's comments to you on that issue

15   consistent with what he'd been telling you all along?

16   A.    Yes.  It's very much like what this email says.

17   Q.    Do you remember yesterday Mr. Neuman mentioned that

18   he gave you this award in 2007 because you would have

19   complained if you didn't get it?  Did you hear that?

20   A.    Yes, I heard that.

21   Q.    Did you ever ask Mr. Neuman to give you an award?

22   A.    I never did and I never would ask anyone to give me

23   an award.

24   Q.    In the past, had Mr. Neuman given out awards at

25   management treats like this one?

P. HURLEY - DIRECT

1    A.       No.

2    Q.       Now, I wanted to focus, and I'll move quickly and get

3    this finished, through the end of your employment with Kent.

4    From early 2008 until May 2008, describe for the jury what

5    was happening with your symptoms.

6    A.       My symptoms had been getting progressively worse

7    since 2005, but in 2008, it was like everything was on fast

8    forward.  I was really coming apart.  Couldn't sleep.  My

9    panic attacks were becoming more frequent.  My depression

10   more deep.  My anxiety greater.  The heart palpitations,

11   breaking out in sweat.  It was -- my thoughts -- my thoughts

12   would race a million miles an hour and I couldn't slow my

13   brain down to think.

14   Q.       Were you starting to miss work as a result of that?

15   A.       Yes.

16   Q.       At that point in time, why didn't you just take

17   leave, Mr. Hurley?

18   A.       As I've said to you before, I was so dedicated to the

19   job I was doing and felt so much obligation on my shoulders

20   for the people who worked for me, for the families that were

21   being fed, for the customers that we served, I just -- I

22   just never felt that I could do it.  I never felt that I had

23   the luxury of just stepping away.  I felt a lot of people

24   were counting on me and I didn't want to let them down.

25   Q.       Was there a point in time, let's say around March or

P. HURLEY - DIRECT

1    April of 2008, where the issue came to a head with Stacey?

2    A.    Yes.

3    Q.    Can you describe to the jury what happened?

4    A.    In April of 2008, I was literally -- literally

5    becoming unglued.  I was losing it.  And I was just falling

6    apart.  And my wife came to me and she said, she said that's

7    enough.  She said, you've got to listen to your -- you've

8    got to listen to your doctors and you've got to take their

9    advice, and you've got to -- you've got to unplug.

10   Q.    What was your response at that point?

11   A.    I finally said okay, and I -- I sat down with my

12   wife.  She wanted me to take a big block of time off and

13   I -- I resisted her but I said -- I told her I would take

14   time off, I would unplug, but I didn't want to take a big

15   block of time off.

16   Q.    Why?

17   A.    Because I didn't want to negatively affect the

18   company and I didn't want to negatively affect my employees

19   and my customers.

20   Q.    What did you do next?

21   A.    We got out a calendar and we went through the --

22   through the next 12, 24 months and we just looked at the

23   calendar and tried to determine what were the best times of

24   the year to take off.  I tried to -- we tried to spread it

25   out as evenly as we could over that period of time so that

P. HURLEY - DIRECT

```
1    it would have the least impact on the people that were
2    counting on me.
3    Q.    Now, we discussed that you had taken time off in the
4    past?
5    A.    Yes.
6    Q.    Wyatt Earp Days.  Had you emailed Mr. Neuman in the
7    past when you needed to take time off?
8    A.    No.
9    Q.    Then why were you doing it -- why were you emailing
10   him this time?
11   A.    Because this was -- this was different time off.
12   This was medical leave and I wanted to give the company, I
13   wanted to give Mr. Neuman, I wanted to give Mrs. Alexander,
14   I wanted to give the ownership of the company as much notice
15   as I could that I would need to be away.  I would need to be
16   unplugged in from the company during these periods of time
17   off and I wanted to make them aware of it.
18   Q.    Was this the email that you sent to Mr. Neuman?
19   A.    Yes.
20   Q.    And was this the attached schedule?
21   A.    Yes, it is.
22   Q.    At the time you sent this email, did you care what
23   dates you were actually going to get to take off?
24   A.    I'm sorry, I don't understand.
25   Q.    Did you really care about the actual dates to take
```

P. HURLEY - DIRECT

1    off?

2    A.      Not really.  They weren't that important.  I -- I

3    even -- I even put in here that the dates are subject to be

4    changed.

5    Q.      And what time of night did you send out this email?

6    A.      11:54 p.m.

7    Q.      And what was your state of mind as you were sending

8    it?

9    A.      I was in a panic.  I was in a panic.

10   Q.      And how much -- how long after you sent this email

11   did you get a response?

12   A.      I guess it was less than an hour.

13   Q.      I don't want to get into detail about this, but

14   yesterday, were you present when Mr. Blackwell testified?

15   A.      Yes.

16   Q.      Did you hear Mr. Blackwell say that you had called

17   him before you sent this email to tell him what your

18   intentions were?

19   A.      I heard that.

20   Q.      Is that true?

21   A.      That is not true.

22   Q.      Did you -- you heard about the incident between you

23   and Mr. Blackwell.  Did you hear about the incident between

24   you and Mr. Blackwell and the effect it had on your

25   relationship?

P. HURLEY - DIRECT

1    A.    Yes, yes.

2    Q.    In March of 2008, did you have a personal

3    relationship with Mr. Blackwell where you would have

4    discussed your personal health with him?

5    A.    Absolutely not.

6    Q.    Did you have a relationship at this time with

7    Mr. Blackwell where you would tell him things regarding your

8    personal intentions for leave or vacation?

9    A.    Absolutely not.

10   Q.    What happened when you received Mr. Neuman's response

11   to your email saying your request has been denied, please

12   schedule a meeting with me to discuss this further?

13   A.    I was crushed.

14   Q.    Pat, the question's going to come up, why in this

15   first email that you sent did you not say, I need to take a

16   medical leave of absence?

17   A.    I was embarrassed about my conditions.  I was

18   terribly embarrassed.

19   Q.    Did you have a fear about what could happen if you

20   disclosed this weakness to Mr. Neuman?

21   A.    I thought that I would look -- I would be embarrassed

22   and I would look tremendously weak and I wouldn't look like

23   a strong leader, capable.

24   Q.    And when you actually disclosed the illness to

25   Mr. Neuman, what happened to you?

P. HURLEY - DIRECT

1   A.      I was fired.

2   Q.      Now in your response email, you say to Mr. Neuman,

3   please know that I have been advised by medical health

4   professionals that my need to avail myself of this leave is

5   no longer optional.  Do you see that?

6   A.      Yes.

7   Q.      Had you treated with any mental health care

8   practitioner in the days right before you sent this email?

9   A.      No.  I had talked to Fred Stuart on the phone back in

10  March, April a couple of times but not just before this.

11  Q.      Why did you put in this email that it was no longer

12  optional?

13  A.      Because it was no longer optional.  I was absolutely

14  completely falling apart.  I had ignored, brushed off the

15  recommendations and insistence of my medical professionals

16  to take unplugged time off from Kent Security and I hadn't

17  done it, and the cumulative effect was at this point in time

18  in April, 2008, that I was at the point of collapse.

19  Q.      Was the purpose of your leave request to say to the

20  defendants, I might need a day off here or there if I'm

21  having a panic attack?

22  A.      No.

23  Q.      Were you asking for this type of intermittent leave?

24  A.      No, this was not intermittent leave.

25  Q.      What were you asking for?

P. HURLEY - DIRECT

1    A.      I was asking for a block of time off when I could be

2    totally disengaged from Kent Security, but I would take that

3    block of time and break it into smaller parts.

4    Q.      Did you have a plan, Pat, at the time you had

5    requested this leave for what you were going to do with your

6    time off?

7    A.      I never had the opportunity to discuss that with my

8    health professionals because 24 hours after I asked for

9    medical leave, I was fired.

10   Q.      You make a comment in here that the schedule is --

11   you put in caps, far less aggressive than I have been

12   advised to take.  Do you see that?

13   A.      No.

14   Q.      Sorry.  Right here?

15   A.      Oh, I see it now, yes.

16   Q.      What did you mean by that?

17   A.      Well, what I meant by that was I had been passive, I

18   had been brushing off my medical team's recommendations to

19   me and their insistence that I take this time off.  I'd been

20   very passive about it.  I'd brushed it off and instead of

21   taking those blocks of time off that I had been told to do

22   for three years, I had been very passive about it.

23   Q.      Can you briefly describe to the jury your frame of

24   mind when you wrote this email?

25   A.      I was desperate, just absolutely desperate.  All I

P. HURLEY - DIRECT

1   wanted to do was heal.  All I wanted to do was get better

2   and I'd finally come to the point where I knew I couldn't go

3   on anymore this way.  And I was desperate, desperate to

4   heal.

5   Q.     And we're now in 2012.  Looking back at this email

6   that you wrote at the time, do you agree that it could have

7   been worded a little bit differently?

8   A.     Yes, I do.  I -- I acknowledge that, looking back on

9   what I wrote here, I was -- I was -- try to find the right

10  word.  I was snippy.  I was snippy and I -- I wish I could

11  have been in a better frame of mind when I -- when I wrote

12  this, but -- but I admit, it is snippy.  But the next

13  morning, I was on the phone with Mr. Neuman, putting --

14  putting this email in context, sharing with him my

15  situation, so -- so that he understood.

16  Q.     You were -- were you present during Mr. Neuman's

17  testimony this morning?

18  A.     Yes, I was.

19  Q.     And did you hear that he denied that you discussed

20  your medical condition with him?

21  A.     Yes, I did.

22  Q.     Is that true?

23  A.     I absolutely discussed my medical condition with him

24  on the phone that morning.

25  Q.     You also heard Mr. Neuman tell you that he didn't

P. HURLEY - DIRECT

1    discuss why he was firing you during this phone call?

2    A.     That's correct.

3    Q.     Did you ask Mr. Neuman, why, using his words, it was

4    time to part ways?

5    A.     It was very obvious why he was firing me.

6    Q.     Why did you believe that?

7    A.     I had told him that I needed medical time off and

8    then I shared with him on the phone the details of what I'd

9    been suffering with and immediately after I shared the

10   details of my illness, he mumbled something in Hebrew and

11   then proceeded to fire me.

12   Q.     Did Mr. Neuman ever respond to the email you had sent

13   him in writing?

14   A.     No.

15   Q.     Did he ever tell you at any time during the phone

16   call or before that phone call that you had been

17   insubordinate?

18   A.     Never.

19   Q.     Did he ever tell you until litigation began that he

20   fired you for insubordination?

21   A.     Never.

22   Q.     Did he ever tell you before litigation began that you

23   were fired for poor performance?

24   A.     No, he did not.

25   Q.     Did Mr. Neuman, during either this phone call or at

P. HURLEY - DIRECT

 1    any time before that, ever ask you, what do you mean by

 2    medical health professionals and the need to avail yourself

 3    of this leave?

 4    A.    He never, ever mentioned it.

 5    Q.    Did he ever ask you for medical certification?

 6    A.    No, he didn't.

 7    Q.    Did he ever tell you that you were playing a game?

 8    A.    Never said anything like that.

 9    Q.    Did he ever accuse you of lying?

10    A.    No.

11    Q.    Did Mr. Neuman ever say, take less leave?

12    A.    No.

13    Q.    Did he ever say, "The dates you've proposed are

14    inappropriate, Pat"?

15    A.    No, he never said that.

16    Q.    During the telephone call, did you mention your

17    employment agreement to Mr. Neuman?

18    A.    Yes, I did.

19    Q.    What did you tell him?

20    A.    Well, I -- I shared with him, toward the end of the

21    phone call, I reminded him that we had an employment

22    agreement and that it called for him to give me 30 days

23    written notice and that I was, per my employment agreement,

24    supposed to work during those 30 days after I had received

25    written notice and -- and he said to me he wasn't sure if he

P. HURLEY - DIRECT

```
 1    still had a copy or not, and would I please fax him a copy
 2    and I did.
 3    Q.    Did Mr. Neuman ever deny, before litigation, that
 4    there was an employment agreement?
 5    A.    No.
 6    Q.    Between May 1st of 2008 and May 16th of 2008, did you
 7    ever receive anything in writing confirming your
 8    termination?
 9    A.    I'm sorry, one more time, please?
10    Q.    Between May 1st, 2008, and May 16th, 2008, did you
11    ever receive anything in writing saying that you were
12    terminated?
13    A.    No.
14    Q.    Did you believe you were appropriately fired on
15    May 1st, 2008?
16    A.    No, I did not.
17    Q.    What did you do after this phone call with
18    Mr. Neuman?
19    A.    I went in -- when I got the phone call, I had just
20    pulled in to one of my important clients' properties and
21    after that phone call had completed, I went in to my client
22    and I made my annual hurricane presentation to the board of
23    directors.
24    Q.    Did you do anything after this phone call with
25    Mr. Neuman to try to further explain to him what was going
```

P. HURLEY - DIRECT

```
 1   on with your health?
 2   A.     I'm sorry, I'm not sure I understand.
 3   Q.     At a certain point, did you provide more evidence of
 4   your illness to Mr. Neuman?
 5   A.     Yes.
 6   Q.     After this phone call?
 7   A.     Yes, I did.
 8   Q.     What did you do?
 9   A.     I submitted to him the Family Medical Leave Act
10   forms.  I mailed those to him.
11   Q.     Why did you do that?
12   A.     Well, because I had looked into the -- the employee
13   handbook that talks about family leave, medical leave and it
14   said that certification is important or required, but I -- I
15   really wasn't clear about what that certification entailed,
16   so I sought out an attorney to help me understand those
17   things, what kind of paperwork, what needed to be filled
18   out, such.  And so that's what I did.
19   Q.     Okay.  And who was that attorney?
20   A.     Geralyn Noonan.
21   Q.     Without getting into the details of your discussions
22   with her, did she direct you what to do to get a form
23   completed?
24   A.     Yes, she instructed me on how to get the form
25   completed.
```

P. HURLEY - DIRECT

1    Q.      Okay.  And was that the -- did you ultimately go

2    somewhere to get that form completed?

3    A.      Yes, I did.

4    Q.      Who did you meet with?

5    A.      Dr. Carlos Paisan.

6    Q.      And did Dr. Paisan evaluate you when you came in to

7    ask him to fill out this form?

8    A.      Yes, he did.

9    Q.      Did you tell him what to put in the form?

10   A.      No, absolutely not.

11   Q.      Why did you not give defendants a certification at

12   the time you asked for leave?

13   A.      I was fired within 24 hours of asking for medical

14   leave.

15   Q.      Did the defendants' handbook state that you were

16   required to provide certification?

17   A.      Yes, it talked about certification.

18   Q.      Do you know whose job was it or who had the burden of

19   asking for certification, if they needed it?

20   A.      The employer, Kent Security, had the burden of asking

21   for the certifications.

22   Q.      Now, after you submitted this form, as we discussed,

23   you got a letter back from Mr. Neuman saying -- and we're

24   almost done here, Pat -- I was unaware that you had any

25   medical issues necessitating leave.  Do you see that?

P. HURLEY - DIRECT

1    A.    Yes.

2    Q.    Is that true?

3    A.    I --

4         THE COURT:  What exhibit, counsel?

5         MR. CELLAR:  I'm sorry, Your Honor.  It's

6    Exhibit -- it's already been introduced in evidence, Your

7    Honor.  I believe it is 37.

8    BY MR. CELLAR

9    Q.    Was that true?

10   A.    I'm sorry, can you restate the question, please?

11   Q.    Sure.  Mr. Neuman states in the letter that he was

12   unaware that you had any medical issues necessitating leave?

13   A.    That's absolutely untrue.

14   Q.    He also says here, we have provided you with 30 days

15   pay in lieu of notice as set forth in that agreement.  Do

16   you see that?

17   A.    Yes.

18   Q.    Is that true?

19   A.    He didn't pay me 30 days.

20   Q.    And if you see here, Mr. Neuman -- does Mr. Neuman

21   actually acknowledge the agreement?

22   A.    Yes, he does.

23   Q.    Did Mr. Neuman at any point during these discussions

24   ever say to you, "What agreement?"

25   A.    Never.

P. HURLEY - DIRECT

```
 1   Q.    Last topic I want to cover with you, Pat, is what has
 2   happened to you and your finances as a result of your
 3   termination.  What effect has this had on you?
 4   A.    We've been financially devastated.
 5              MR. HENRY:  I'm going to object.  Judge, could I
 6   be heard at sidebar, please?
 7              THE COURT:  Yes, you may.
 8              (At sidebar, Court and counsel present)
 9              MR. HENRY:  Judge, there's no consequential
10   damages under the FMLA.
11              MR. CELLAR:  I apologize.
12              MR. HENRY:  He's been foreclosed on and I don't
13   want him to talk about --
14              THE COURT:  No doubt about it.
15              MR. CELLAR:  You're right, Your Honor.  I
16   apologize for asking.  It was just in my outline.  I'm
17   sorry.  By the way almost done, Your Honor.  Few more.
18              (Sidebar concluded)
19              THE COURT:  Sustained, proceed.
20   BY MR. CELLAR
21   Q.    Since being fired from Kent, have you tried to find
22   another job?
23   A.    Yes.
24   Q.    What efforts have you made, Mr. Hurley?
25   A.    I've made extraordinary efforts.  I've applied, I've
```

P. HURLEY - DIRECT

1    sent resumes out, I've applied on line, I have talked to

2    every friend, every person, every professional whom I've

3    ever met, it feels like, trying to get a lead, trying to get

4    a recommendation, trying to find an opening that maybe isn't

5    broadcast in the newspaper or something.  I've read

6    newspapers, the job section.  I've done everything I know to

7    do.

8    Q.    Have you kept records of your attempt to find a job?

9    A.    Yes, I have.

10   Q.    And what I'd like to do is show you a composite

11   exhibit and we're not going to go through these, but I just

12   want to mark them, what's going to be marked as

13   defendant's -- or Plaintiff's 69, 70 through 75, 78, 84, 93

14   through 95, 97 through 98, and 100 through 101, and I'm

15   going to give you a stack of all these and just simply ask

16   if you can identify what these documents are.

17   A.    Okay.

18          MR. CELLAR:  You know what, rather than taking

19   them out, I'm just going to give you my binder.  Is that

20   okay, Frank?

21          MR. HENRY:  Fine with me.

22          (Documents provided to the witness)

23   BY MR. CELLAR

24   Q.    Showing you the exhibits that I just referenced, can

25   you identify those documents, please?

P. HURLEY - DIRECT

1   A.     Cover letters, cover letters that go along with

2   resumes that I've sent out.  This is acknowledgment of a --

3   an applicant -- application that I've filled out or resume

4   I've sent out.

5   Q.     And Pat, I don't want you to go through every single

6   document.

7   A.     Yeah.

8   Q.     What I'm asking for is can you categorically describe

9   these documents?

10  A.     I guess -- I guess I would just say these are all of

11  the acknowledgments of all of the emails, all of the resumes

12  that I have sent out over the past four years.

13  Q.     And do these appear to be true and correct copies of

14  the resumes and cover letters and efforts that you've made

15  to secure employment since your firing from Kent?

16  A.     Yes, it appears to be.

17         MR. CELLAR:  Your Honor, at this time, we'd like

18  to move into evidence those exhibits.

19         MR. HENRY:  We object on the grounds of hearsay,

20  lack of foundation and authenticity, Judge.

21         THE COURT:  Just a moment.

22         (Pause in place)

23         THE COURT:  Mr. Hurley, in some instances, I

24  gather, you've deleted your initial communication sometimes

25  for reasons of privacy of who you're applying to, but

P. HURLEY - DIRECT

1    generally speaking, these exhibits contain the responses you

2    got back; is that right?

3              THE WITNESS:  Yes, sir.

4              THE COURT:  And these range all the way from

5    applying to be a house cleaner for somebody's house and

6    security jobs, and variety of other things; is that correct?

7              THE WITNESS:  Yes, sir, that's correct.

8              THE COURT:  And these are copies of the emails

9    that you got back?

10             THE WITNESS:  That would be correct, sir.

11             MR. CELLAR:  Pat, speak into the mic, please.

12             THE WITNESS:  I'm sorry.  That's correct, Your

13   Honor.

14             THE COURT:  Sometimes the Court receives evidence

15   for a limited purpose.  This is one of those times.

16   There's, among other things, objection that this is hearsay

17   that it lacks foundation and authenticity.  The foundation

18   and authenticity objection are overruled.  With regard to

19   hearsay, what somebody might have said, as reported in here

20   may be hearsay but these exhibits are received for the

21   limited purpose of showing that application was made by

22   Mr. Hurley for a variety of jobs and responses that came

23   back.  Shows that he made the application, shows he got a

24   response.  Whether the response is actually an accurate

25   response or not isn't at issue.  It's the question that he

P. HURLEY - DIRECT

 1    was making the efforts.  And so it is hearsay, but it isn't
 2    offered for the truth of the matter stated.  In other words,
 3    for instance, he was applying to do domestic work in a four
 4    bedroom house for a family.  Well, whether or not that's so
 5    isn't the point.  The point is that he made application.  So
 6    with that limitation, then -- and I'm not going to go
 7    through each one of these exhibits, but with that
 8    limitation, then, Exhibits 69, 70, 71, 72, 73, 74, 75, 78,
 9    84, 93, 94, 95, 97, 98, 100, 101 are received and this is
10    also with regard to something called mitigation of damages.
11                (Plaintiff Exhibits 69, 70, 71, 72, 73, 74, 75,
12    78, 84, 93, 94, 95, 97, 98, 100, and 101 admitted)
13                MR. CELLAR:  May I proceed, Your Honor?
14                THE COURT:  You may proceed.
15                MR. CELLAR:  May I publish these to the jury?
16                THE COURT:  No, I don't want them going through
17    all that now.  It would be distracting.
18                MR. CELLAR:  Fair enough.  Fair point.
19    BY MR. CELLAR
20    Q.    Mr. Hurley, these are my last points.  Are you asking
21    the jury to award you emotional distress damages?
22    A.    No, I'm not.
23    Q.    Are you asking the jury to award you for your pain
24    and suffering?
25    A.    No, sir, I'm not.

P. HURLEY - DIRECT

1  Q.    What are you asking from this jury?

2  A.    All I'm asking is that I be paid from May 1st, 2008,

3  to today, or tomorrow, or Friday what I would have made with

4  Kent Security if I would not have been illegally fired, less

5  anything I've made in the meantime.  That's all.

6  Q.    As you sit here today, do you know what that number

7  is?

8  A.    No, I don't.

9          MR. CELLAR:  I've got nothing further, Your Honor.

10         THE COURT:  All right, I think this is a time to

11 take an afternoon recess.  We'll be in recess for 15

12 minutes.  Counsel should stay.  Please stand for the jury.

13         (Jury out)

14         THE COURT:  Please be seated.  The reason I'm

15 keeping you here, once I find it, I wrote a limiting

16 instruction with regard to some evidence and I wanted you to

17 be aware of what it is before I give it to the jury.

18         This is a limiting instruction.  Sometimes I will

19 give you what is called a limiting instruction.  That's an

20 instruction telling you that you are to only use certain

21 evidence for a limited purpose.  You've heard testimony

22 regarding the plaintiff's employment agreement with the

23 defendants but this isn't a breach of contract action.  This

24 evidence regarding the employment agreement is to be

25 considered by you only for two purposes.  First, for

P. HURLEY - DIRECT

1    considering plaintiff's timing in providing a freedom -- a

2    Family Medical Leave Act certification, and second, in

3    determining whether the reasons offered by the defendants

4    for terminating plaintiff's employment are instead a pretext

5    for violating the Family Medical Leave Act.

6            The law applicable on this case requires on this

7    issue that plaintiff prove by a preponderance that an

8    employer caused an employee to suffer an adverse employment

9    action because of an employee requesting leave.  So far as

10   you're concerned in this case, an employer may discharge or

11   otherwise adversely affect an employee for any reason other

12   than a violation of the Family Medical Leave Act.  So, so

13   long as the adverse action is not a violation of the Family

14   Medical Leave Act, the reason for an adverse action or

15   discharge may be good or bad, fair or unfair, and you must

16   not second guess that decision or permit any sympathy for

17   the employee to lead you to substitute your own feeling for

18   that of the defendant, even though the defendants -- even

19   though you personally may not approve of the action taken

20   and would have acted differently under the circumstances.

21   Then the latter part, pretty much is from the law applicable

22   with a little tailoring to this case, is 11th Circuit

23   pattern instruction.

24           Does the plaintiff have any objection to that

25   limiting instruction?

1    MR. CELLAR:  Yes, Your Honor, the only thing -- is

2    it okay if I'm seated, Your Honor?

3           THE COURT:  I beg your pardon?

4           MR. CELLAR:  May I be seated?

5           THE COURT:  Sure.

6           MR. CELLAR:  The only issue is that there's

7    another portion of the law on that issue which says that if

8    the Family Medical Leave Act played any part under the mixed

9    motive instruction, then the jury can consider that it

10   contributed to the termination decision.  And that was in a

11   proposal that we had suggested.  To simply tell the jury

12   that they -- that they shouldn't second guess would be an

13   incomplete instruction without the other language that says

14   if it played any part in the decision to terminate, then

15   it's an illegal termination.  And we have provided that

16   language under the 11th Circuit case law to support that

17   position.

18          THE COURT:  All right.  Defense have any

19   objection?

20          MR. HENRY:  I heard you use the word leave.

21          THE COURT:  I did.

22          MR. HENRY:  Not in connection with the term

23   medical, and my objection would be that the term leave

24   without saying a medical leave could be confusing to the

25   jury such that if he was terminated from employment for

P. HURLEY - DIRECT

```
 1   requesting vacation leave, that that would somehow be
 2   illegal.  So I would object to the instruction just to the
 3   extent that the term leave should be accompanied by the word
 4   medical.
 5            THE COURT:  All right.  Well, what I'm going to
 6   do, then, both of you have objected to some portion of that
 7   with the law applicable, so I'm not going to give that part.
 8   All I'm going to give, then, is the first part which will
 9   read -- I'll read it again.
10            Sometimes I will give you what is called a
11   limiting instruction.  This is an instruction telling you
12   you are to only use certain evidence for a limited purpose.
13   You've heard testimony regarding the plaintiff's employment
14   agreement with the defendants, but this is not a breach of
15   contract action.  This evidence is to be considered by you
16   only for two purposes.  First, for considering plaintiff's
17   timing in providing a Family Medical Leave Act
18   certification, and second, in determining whether the
19   reasons offered by the defendants for terminating
20   plaintiff's employment are, instead, a pretext for violating
21   the Family Medical Leave Act, period.  That's it.
22            MR. HENRY:  No objection from the defense.
23            MR. CELLAR:  No objection either, Your Honor.
24            THE COURT:  All right.  We're in recess.
25            (Recess from 2:32 p.m. to 2:45 p.m.)
```

P. HURLEY - DIRECT

```
1              THE COURT:  Bring in the jury, please.

2              COURT SECURITY OFFICER:  Yes, sir.

3              (Jury in)

4              THE COURT:  Please be seated.  Plaintiff, I

5    believe, is going to call a witness out of order; is that

6    correct?

7              MR. CELLAR:  Yes, Your Honor.  With my apologies

8    and the Court's permission, Dr. Pettingill has a trial

9    tomorrow; he's outside.

10             THE COURT:  Very well.  You can step down for now

11   and we'll resume your testimony after the next witness.

12             (Witness Patrick Hurley excused)

13             DEPUTY CLERK:  Raise your right hand, please.

14             (The Witness is Sworn)

15             DEPUTY CLERK:  You may be seated in the witness

16   booth.  And if you would, please state your name for the

17   record.

18             THE WITNESS:  My name is Bernard Pettingill, Jr.,

19   spelled P-E-T-T-I-N-G-I-L-L.

20             DEPUTY CLERK:  Thank you.

21             THE WITNESS:  You're welcome.

22                  BERNARD PETTINGILL, JR.,

23      a witness herein, after having been duly sworn,

24      was examined and testified under oath as follows:

25
```

PETTINGILL - DIRECT

1                   DIRECT EXAMINATION

2    BY MR. CELLAR

3    Q.     Good afternoon, Dr. Pettingill.

4    A.     Goods afternoon, counsel.

5    Q.     Would you introduce yourself to the jury, please?

6    A.     Sure.  Again, my name is Bernard Francis Pettingill,

7    Jr.  I'm an economist.  I've taught for 27 years at either a

8    private or a public college, and now I'm just doing

9    consulting.

10   Q.     And are you currently employed?

11   A.     Yes, sir.  I'm self-employed.  I'm -- I still lecture

12   from time to time, but for the most part, I'm self-employed.

13   Q.     And I understand you had some parking difficulties

14   this afternoon?

15   A.     My GPS gave me the wrong date and place for the

16   courthouse so I parked four blocks away thinking it was the

17   courthouse.  I had to run four blocks; I'm sorry.

18   Q.     Dr. Pettingill, are you a member of any professional

19   societies?

20   A.     Yes, sir.

21   Q.     Can you name several of them?

22   A.     Sure.  There's nothing special about societies.  You

23   just have to pay your dues.  I paid in January this year, so

24   I know I still belong to the American Economic Association,

25   Southern Economic Association, National Association of

PETTINGILL - DIRECT

```
 1   Business Economists, and many other ones, but those are the
 2   big ones.  Those are the important ones.
 3   Q.     And you mentioned before that you taught economics
 4   at -- or economics, depending how you pronounce it, at
 5   various public and private institutions?
 6   A.     Correct.
 7   Q.     Can you describe those to the jury?
 8   A.     Sure.  I was -- I was born in New Orleans so I spent
 9   most of my -- my years there.  I went to a Jesuit school, a
10   prep school called Jesuit High School and I went straight to
11   Loyola and got a undergraduate degree in economics, and I
12   stayed two years and got a masters in economics, and I
13   transferred to Tulane next door and got a second masters
14   degree, masters in public health.  And then was fortunate to
15   get a scholarship to study in England, so I moved to
16   Manchester, England, and spent four years in Manchester and
17   defended my dissertation at the London School of Economics.
18   And I came back to the U.S. in 1977 and taught for 27 years.
19   Q.     Have you ever published in the area of economics?
20   A.     I have, yes, sir.
21   Q.     Can you identify for the jury, approximately how many
22   times have you published articles on matters of economics?
23   A.     I think the last one was 47 or 48 articles.  Again,
24   there's nothing special about articles.  If you want to get
25   promoted at the university, you have to publish, so I wrote
```

PETTINGILL - DIRECT

1   48 articles over the course of my career.

2   Q.     Would you be willing to bore us with just a few of

3   the titles?

4   A.     I think the most important ones, because I don't have

5   a resume, but the ones that deal with the issues we're about

6   to discuss today, I wrote an article on how an economist

7   sets a value on human life, and that was published about

8   five years ago.  And I recently published an article in

9   Forbes Magazine on forecasting nursing care costs.

10  Q.     Have you been consulted, as my office consulted with

11  you in this case, to perform certain duties on this matter?

12  A.     Yes, sir.

13  Q.     What have you been contacted or asked to consult on?

14  A.     Very simple.  This case, from my perspective, is very

15  simple in that I was asked to provide you with the net loss

16  of income and some benefits that Mr. Hurley was accustomed

17  to receiving.  There are no future damages.  The past

18  damages include what he was earning minus what he received

19  in income since the termination, minus taxes, plus some

20  benefits.  That's -- that's all I was asked to do in this

21  case.

22  Q.     Okay.  And we're actually going to go ahead and talk

23  a little bit in detail.  By means of a little bit more

24  background, is this something that you are regularly hired

25  to do?

PETTINGILL - DIRECT

1    A.    Yes, sir.  About twice a month I get a subpoena for

2    trial somewhere.

3    Q.    And do you have a particular side that you testify

4    for?

5    A.    No, it's still about 60/40, 60 plaintiff, 40 defense.

6    Pretty much -- pretty much down the middle.  Some months

7    more defense oriented than plaintiff.

8    Q.    Okay.  Have you been recognized in federal court

9    before as an expert in the field of economics?

10   A.    Yes, many times.  In fact, since I grew up in New

11   Orleans, most of the courts there are federal courts, most

12   of the cases are in federal court.

13   Q.    And have you been recognized in the past in federal

14   court as an expert specifically on the issue of calculating

15   back pay for a plaintiff in a discrimination or FMLA case?

16   A.    Yes, sir.

17            MR. CELLAR:  Your Honor, at this time, plaintiff

18   would ask the Court to recognize Dr. Pettingill as an expert

19   in the area of economics.

20            THE COURT:  He may proceed to testify.

21   BY MR. CELLAR

22   Q.    Now, were you asked to prepare a report in this

23   matter?

24   A.    Yes, sir.

25   Q.    Okay.  And did you do so?

PETTINGILL - DIRECT

```
1    A.    I did.  I prepared several because this case had been
2    moved back a couple of times.  So my last report, the most
3    current report, is April 4, 2012.
4    Q.    And do you have a copy of that in front of you?
5    A.    I do, yes, sir.
6    Q.    Okay.  Showing you what's been marked as your report,
7    April 4th, 2012, which is identified as Exhibit 102, does
8    this appear to be a true and correct copy of the analysis
9    that you've done in this matter regarding Mr. Hurley's back
10   pay?
11   A.    It is, yes, sir.
12         MR. CELLAR:  Your Honor, at this time, we'd like
13   to move into evidence what's been marked as Exhibit 102.
14         THE COURT:  Exhibit 102 is received.
15         (Plaintiff Exhibit 102 admitted)
16         MR. CELLAR:  Now, in preparing this report -- do
17   you need a copy, counsel?
18         MR. HENRY:  No, I have one.
19   BY MR. CELLAR
20   Q.    In preparing this report, what did you do?  Can you
21   walk us through the process?
22   A.    Sure.  Well first, I had several conferences and I
23   met Mr. Hurley.  We talked about the issues and I analyzed
24   the history of his earnings based on the tax returns I had
25   for many years, 2007, '8, '9 '10.  I also had W-2s and 1099s
```

PETTINGILL - DIRECT

1    for 2011.  So I know all the income he's been generating for

2    those years and I got a benchmark figure of what he was

3    earning before the discharge, and a figure broken out by

4    year in a footnote.  If you look at the footnote to Page 1

5    at the bottom, those are the credits for the money he's been

6    paid or money he's received since the termination date.  So

7    each and every year, I broke out what moneys he received.

8            For example, in 2009, he received 19,662 from

9    earned income.  2010, 2011 and I estimated through 2012,

10   based on his most recent job change last year in

11   September 2011, and brought that forward to exactly the date

12   of trial -- or the date of my report, that is.

13   Q.    And if we take a look at Page 2 of the report, it

14   identifies certain documents and things that you looked

15   at --

16   A.    Correct.

17   Q.    -- in preparing your report.  Can you identify those

18   for the jury?

19   A.    Sure.  Of course, I was given his birth date because

20   at one point in time, I was asked to consider front pay but

21   not now, so that's -- the birth date only tells me that he's

22   not going to die, according to life tables.  His life

23   expectancy is far out in the future, 32 years.  So if -- if

24   there was a medical reason why Mr. Hurley was going to pass

25   away in the interim, naturally I would have to know that.

PETTINGILL - DIRECT

1  So the date of birth is there.

2          The date of termination was given.  I know that

3  he's married to Stacey; I met her.  They have a son.  The

4  interviews are listed here.  I had a copy of the Complaint.

5  I had the updated disclosures, the employment agreement

6  dated June 1, 2001, and tax returns with amended returns for

7  many years because of a carry-forward he had, wage

8  statements 2010, 2011, some payroll stubs.  And then I had

9  some information from Kent Securities and I read the

10  deposition, Volume 1, 2, 3 from Mr. Hurley.  I think the

11  last one was February 11, 2011, and the trial date I have is

12  April 11.  So the numbers run through April 11.

13  Q.    In addition to these documents, did you also review

14  documents showing Mr. Hurley's efforts to mitigate his

15  damages?

16  A.    I was just going to mention that and I didn't have a

17  chance to list that, because there were numerous jobs that

18  he attempted to get, different categories of applications,

19  sales, security, all kinds of applications.  Yes, I did.

20  Q.    Okay.  Now, can you walk us through, Doctor, the

21  calculation that you did for Mr. Hurley?

22  A.    Yes, sir.

23  Q.    And the numbers that you arrived at?

24  A.    Yes, sir.  I'd like to give the jury the numbers

25  first.  It's on Page 3, if you don't mind.  Page 3 is a

PETTINGILL - DIRECT

 1    breakdown of the losses.  And again, I'm not a -- I'm not a
 2    vocationalist.  I've taken Mr. Hurley where I found him,
 3    making a certain amount of money, and then taking away from
 4    that stream of money what he has earned so far in his job as
 5    a home health aide.  So it's -- I'm left with the
 6    128,500-dollar starting figure, which is what his base was.
 7    I brought that forward to the date of trial, which now is
 8    3.94 years.  It looks like a long time and it is a long
 9    time, almost four years.  And then I backed out all the
10    money he's earned and which left a taxed -- because we all
11    pay taxes, and when I add the years up, we get a figure of
12    $350,597.  And that is the number, by the way, in my
13    opinion, which represents the difference between what he
14    should have earned or could have earned if he kept his
15    position, and what he has demonstrated, adjusted for taxes.
16    350,597.
17    Q.    And what tax bracket did you use in determining what
18    taxes to take out regarding the loss that Mr. Hurley has
19    suffered?
20    A.    I used a tax rate, counselor, of 21 percent.  Let me
21    put that in perspective.  The highest percentage Mr. Hurley
22    paid in the best year of taxes was seven and a half percent.
23    I didn't carry forward anymore losses that he was able to
24    use in '07.  Instead, I used what he would pay if he was
25    earning 128,000, and that was 21 percent.  So my tax bite is

PETTINGILL - DIRECT

1    almost three times higher than what he ever paid in the

2    past.  So that takes care of the back pay, to answer your

3    initial question, counselor.

4    Q.    Okay.  Now, there's a second calculation on here

5    which talks about loss of fringe benefits and you put in

6    there automobile; do you see that?

7    A.    I did.

8    Q.    How did -- how did you arrive at that number and what

9    did you consider?

10    A.    Sure.  The number is based on $650 a month, and I'll

11    put that in perspective.  There are two sources for fleet

12    vehicles that you can examine when you look at someone's

13    value for a car.  One is called Runzheimer,

14    R-U-N-Z-H-E-I-M-E-R, International, and the other one is

15    Hertz, which rents fleet vehicles.  Those are studies that

16    I've seen for years.

17          Mr. Hurley knows that he paid nothing for his car,

18    insurance, gas, replacement, oil, tires that wore out.  So I

19    used $650 a month.  It's very conservative.  Plus, I believe

20    he drove a BMW.  I believe that was the company car.  So to

21    go out and lease a BMW with all the expenses attached to it,

22    we're probably closer to a thousand.  I used 650 a month.

23    Q.    And I want to pause for a minute, are you aware in

24    speaking with Mr. Hurley and/or reviewing documents whether

25    he has an automobile allowance at his current job?

PETTINGILL - DIRECT

1    A.    Absolutely not.  He doesn't have any benefits right

2    now, zero.  He's 1099 right now, which means he has to pay

3    his own taxes into the government and he's not getting any

4    benefits, zero.

5    Q.    Okay.  Now, under the final number, which is past

6    loss of pension benefits, you see where it says company

7    match?

8    A.    Correct.

9    Q.    What is that based on?

10   A.    That's based on what the company was giving him.

11   Once he put up a certain amount of money out of his

12   paycheck, they would match that.  So that's a bonus.  It's

13   usually around six percent, and that's what it was, six.  I

14   know in 2008 he stopped that for a little while for a brief

15   period when he had that adjustment in his tax return.  But

16   technically, the six percent is the match part from his

17   former employer.  So I used six percent and did the math and

18   it came out to around 30,412.  If, in fact, he never went

19   back onto the 401(k) and the company never matched, then

20   that number would be zero.  But I know people tentatively

21   kick off from a 401 and get back in for medical or other

22   reasons, financial reasons, so I assumed that the company

23   would have continued to match, and therefore, the number is

24   30,412.

25   Q.    Okay.

PETTINGILL - DIRECT

1   A.      And when everything is added together, we get a total

2   past back pay damage number of 410,978.

3   Q.      Okay.  Now as you mentioned, you deducted from this

4   number taxes; is that correct?

5   A.      Yes, sir, I did.

6   Q.      And you also deducted, if I understand, the value of

7   the money that Mr. Hurley has earned to date?

8   A.      Every single penny, correct.

9   Q.      Okay.

10  A.      Including, you know, when he was -- when he was

11  attempting to get jobs and he was collecting some UM.

12  Q.      What is UM?

13  A.      Unemployment comp.  Those are all deducted from my

14  bottom line figure.

15  Q.      How did you go about calculating those figures?

16  Meaning, how do you know what he was making after he left

17  versus through today?

18  A.      1099s and W-2s.  I have a stack of them.  In fact,

19  most of the records here that I have in front of me are his.

20  I could pick up any document -- here's a 1099.  Here's a

21  stack of 1099s.  So I had every single record he produced

22  regarding his earnings since termination.

23  Q.      And I know you mentioned you had done a number of

24  reports in this case?

25  A.      Yes, sir.

PETTINGILL - DIRECT

1    Q.    Each time that you would do a new report, would you

2    go back and evaluate whether the circumstances had changed?

3    A.    Exactly.  And in fact, as we talked about last year

4    sometime, you didn't want to use the 2011 report because he

5    found a job right after his patient died and he went right

6    back to work.  He wasn't making $15.00 an hour.  He was

7    making 500 a week versus around 600 a week, but he was still

8    making money.  There wasn't a big gap there between the time

9    his patient, his original patient in '11 died and he went

10   back to work, I believe for a company called Alta.

11   Q.    Is it common in your experience that over the life of

12   the report the reports may change based on new information?

13   A.    Yes, sir, that's very standard.  This could maybe not

14   go to trial for another year and we'd still be amassing the

15   information, correct.

16   Q.    If the trial were to have been bumped another three

17   months, let's say, would your number have been different in

18   this April 4th report?

19   A.    Absolutely.

20   Q.    What would have been different?

21   A.    The moneys he's earned between now and three months

22   from now.  Likewise, if this case would have gone to trial

23   the day after his termination, we wouldn't have any number

24   to back out.  We wouldn't have anything to subtract out.  So

25   I took everything that was reported and backed it out.  Is

PETTINGILL - DIRECT

1    that clear?  I want to make sure that's clear.  I don't have

2    any -- any -- anything that's not reported as income

3    subtracted from what he would have earned.

4    Q.    Were you provided with all of the information that

5    you needed to give the jury your opinion regarding losses in

6    this case?

7    A.    Yes, sir, I was.

8    Q.    Okay.  And I know at the last page of your report,

9    there is a chart of sorts; is that correct?

10   A.    That's the summary number, correct.

11   Q.    Can you explain what these charts are so that when

12   the jury sees them they can understand them?

13   A.    Sure.  The numbers you were showing a few minutes ago

14   are the summary from these numbers.  This is simply a

15   break-out of each individual category which shows the gross

16   income, the benefits, the pension, the tax deduction, the

17   net money, and then the bottom line figure, 410,978.  The

18   bigger chart, the bigger chart a couple pages before that is

19   a much easier one to read.

20   Q.    And what is this chart here on the back page?

21   A.    Just a break-out year by year, year over year of what

22   he would have earned minus the taxes plus the fringes.  The

23   same exact numbers on this page were transferred to the

24   bigger -- slightly bigger chart, spread sheet, and then the

25   much bigger numbers are on my last page, Page 4 of my

1    report.

2    Q.    Are the numbers reflected on your report, to your

3    knowledge, true and accurate based upon your expertise in

4    the field of economics?

5    A.    This is the best I can do, yes, sir.

6          MR. CELLAR:  I've got nothing further.  Thank you,

7    Doctor.

8          THE WITNESS:  You're welcome, counsel.

9                    CROSS EXAMINATION

10   BY MR. HENRY

11   Q.    Good afternoon, Dr. Pettingill.

12   A.    Good afternoon, counsel.

13   Q.    Nice to see you again.

14   A.    Good to see you.

15   Q.    How many reports have you generated in this case?

16   A.    Multiple.  I think four, all the way back to about

17   January, first report last year.

18   Q.    Tell the jury a little bit about your practice.  What

19   portion of your practice would you say is devoted to

20   testifying in court or preparing reports in litigation

21   proceedings?

22   A.    50.  50 percent.

23   Q.    And is this the first time you've ever been hired by

24   Morgan & Morgan?

25   A.    I think the second time.

PETTINGILL - CROSS

1    Q.    Okay.  Of all the cases that you've been hired for,
2    has any one law firm -- does any one law firm represent more
3    than ten percent of your practice?
4    A.    No.
5    Q.    Tell the jury what your fee arrangement is with
6    Morgan & Morgan.
7    A.    Yes, same as -- same as every, every -- every one.  I
8    don't have differential pricing.  I bill 425 per hour and
9    I've been paid to date a retainer.  I think my total bills
10   to date are around $2,550.
11   Q.    That includes the four reports that you --
12   A.    Exactly.  The reports were just tweaks; they weren't
13   major revisions, as you know.  They were just tweaks.
14   Q.    Fair enough.
15   A.    It wasn't four separate reports.  It's one report and
16   I kept tweaking them.
17   Q.    I think you testified a little while ago that one of
18   the reasons you might generate a new report is because the
19   date of the trial is extended out, and therefore, the back
20   pay number may get larger?
21   A.    That's correct, and the front pay number would
22   shrink, if there was front pay; correct.
23   Q.    But isn't it true in this case your report changed in
24   material ways based on different information Mr. Hurley gave
25   you; right?

PETTINGILL - CROSS

1    A.    I don't know the exact details but on balance, the
2    numbers were pretty much the same for back pay.  You can go
3    through each report and they're not much different, but I
4    did get more information as Mr. Hurley went back to work and
5    I assume that he was going to make more money when I did the
6    second to the last report because he was making 600 a week,
7    then I had to change that to 500 a week.  So it's an ongoing
8    process, but I understand your point.
9    Q.    Well, that isn't really my point.  Mr. Hurley told
10   you in later reports about income that he didn't tell you
11   about when you prepared your first report; isn't that
12   correct?
13   A.    I don't remember, but possibly.  That's a
14   possibility, sure.
15   Q.    You don't know?
16   A.    I don't remember, counsel.  It's been years.  I don't
17   remember.  I'm sorry.
18   Q.    This report that you just presented, it has on Page 2
19   under Number 9, it says that you considered amended tax
20   returns for 2009 and 2010?
21   A.    Correct.
22   Q.    When you prepared your first report in this case, do
23   you know whether you were given tax returns for 2009 and
24   2010?
25   A.    No, I don't think I was.

PETTINGILL - CROSS

1    Q.    Okay.

2    A.    I don't think I had the amended ones, anyway -- or

3    the original ones.

4    Q.    If you didn't have Mr. Hurley's tax returns for

5    2000 -- for your first report, how did you go about

6    calculating his back pay?

7    A.    Talking to him, and I did take out some money.  As

8    you know, 2009 was atrocious.  There was so little money

9    earned in '09, whether you look at the amended return or the

10    original.  Most of his money came from withdrawals from

11    pensions.

12    Q.    Was the date of your -- what was the date of your

13    first report, if you know?

14    A.    I don't have it, and I don't remember, counsel.  I'm

15    sorry.  I didn't prepare any preparation for the old reports

16    because this was an evolving process.  It wasn't something I

17    could go back and look at.  So if you're going to ask me

18    questions, I wish you could just hand me a copy of it.  I'd

19    be glad to answer any question.

20        MR. HENRY:  Yeah, and I'm going to do that, but I

21    want to clarify this one piece.  Looking at the July 8th,

22    2009, report -- may I approach, Your Honor?

23        THE COURT:  You may.

24        MR. HENRY:  I need a microphone, please.

25

PETTINGILL - CROSS

```
 1   BY MR. HENRY
 2   Q.      Dr. Pettingill, this is a report that you appear to
 3   have prepared July of 2008, and just go back for a second
 4   and let me direct your attention to something.  It has the
 5   same list of -- of documents, information that you
 6   considered, and under Paragraph 8, it says you considered
 7   income tax returns for 2007 through 2010; correct?
 8   A.      Correct.
 9   Q.      Okay.  And then on the report that you're offering
10   today, you're saying that you considered amended returns for
11   2009 and 2010?
12   A.      Correct, that's correct.
13   Q.      Okay.  Do you know what information was different on
14   those amended returns that was not on the original returns
15   that Mr. Hurley gave you?
16   A.      I don't know.  But the numbers I used are on Page 1
17   of my report.  So if you go back to Page 1, the deductions
18   were 19,662, and for '10, 29,030.  So those are the numbers
19   I deducted.  I don't know what they were before I deducted,
20   19,000 and 29,000.
21   Q.      My point is, do you know whether Mr. Hurley failed to
22   tell you about all of his income when you prepared the first
23   few reports in this case?
24   A.      I don't remember, counselor.  I don't remember and I
25   had several conferences with him, and I just don't remember.
```

PETTINGILL - CROSS

1    But I know that up till now, every penny he's earned or

2    received has been accounted for in that footnote.  No

3    question about it.

4    Q.    The report that you gave us today, look at the first

5    page of it.

6    A.    Sure.

7    Q.    There's a boldfaced paragraph that's labeled 1.2?

8    A.    Correct.

9    Q.    And halfway through the paragraph it says -- you're

10   referring to Mr. Hurley here I think -- he returned to work

11   earning $15 per hour, 40 hours per week?

12   A.    That's in September 2011, correct.

13   Q.    Do you know whether Mr. Hurley ever worked in the

14   same job for $25 an hour?

15   A.    He started at 25.  Yes, he sure did.

16   Q.    Where is that in your report?

17   A.    Absolutely.  It's not but it didn't stay at 25.  It's

18   a good question.  It didn't stay there.  It bumped down to

19   15.

20   Q.    Okay.  And I notice that you also said in your report

21   that Mr. Hurley was getting a 401(k) --

22   A.    Correct.

23   Q.    -- match.  And I think I heard you say that if he had

24   canceled that 401(k) account, that that would not be

25   something that you would consider as part of his damages?

PETTINGILL - CROSS

1   A.      Correct, and that's why I said in direct, if the jury
2   thinks that he would have never re-upped the 401 and joined
3   it again, it would be zero.  Fair, that's exactly what I
4   told the jury.  Correct.
5   Q.      So if Mr. Hurley testifies to the jury in this case
6   that for any reason he canceled that 401(k) account, this
7   $30,000 that you've attributed to that, that element of
8   damages is gone; right?
9   A.      Absolutely.  That's exactly what I said on direct.
10  That's exactly why I told the jury that if he never got back
11  into the plan, it would be zero.  Correct.
12  Q.      You're not a certified public accountant; are you?
13  A.      No, no, sir.  I'm just a meager economist.
14  Q.      You have an impressive resume.  Your area of
15  expertise is in quantifying the present value of front pay
16  awards; right?
17  A.      Correct; that's it.
18  Q.      And that is most certainly not what you're doing now;
19  right?
20  A.      No, my job here is more simplistic, I think.
21  Q.      Do you have any expertise in what you're doing today?
22  A.      I'm not sure I understand the question.  Back pay is
23  usually part of a calculation that I've done many, many,
24  many times.  It's just part of a calculation.  So that's why
25  I said on direct, this is a very limited scope for me.

PETTINGILL - CROSS

1   Q.      You recall I took your deposition in this case?

2   A.      Sure.  I read it last night.

3   Q.      Okay, good.

4   A.      Always a gentleman.

5   Q.      Do you recall testifying at your deposition --

6           MR. CELLAR:  What Page, Frank?  I'm sorry.

7           MR. HENRY:  I'm looking at Page 25, Lines 11

8   through 14.

9           MR. CELLAR:  Thank you.

10          THE WITNESS:  Okay.

11          MR. HENRY:  I'm sorry, I got the wrong page.  It's

12  Page 51, Lines 15 through 23.

13          THE WITNESS:  Page 51; is that correct?

14          MR. HENRY:  Yes.

15          THE WITNESS:  Okay.

16  BY MR. HENRY

17  Q.     I asked you:  Without trying to put too fine a point

18  on this, then, Dr. Pettingill, why does the jury need you to

19  testify as an expert in this case?

20          And you answered:  Because by law, the numbers in

21  the future have to be reduced to present value and if that

22  didn't -- if that wasn't the case, they could just multiply

23  the number out, then I believe anybody could do it who had a

24  calculator.

25  A.      That's correct.  That's my same answer.

PETTINGILL - CROSS

1    Q.     Okay.  So your expertise would be to predict the
2    present value of future benefits, but what you're doing
3    today is estimating what Mr. Hurley lost, in your opinion?
4    A.     Correct.
5    Q.     And my question to you again is, do you have some
6    expertise in that?
7    A.     Well, I've done this so many times.  But the main
8    thing is, I can look up tables, tax tables, for example,
9    rather than looking up Mr. Hurley's tax returns.  I can look
10   at what secondary data says about the value of his car.  I
11   can look at what he was earning and I can subtract out what
12   he was paid.  I think someone -- my son used to run numbers
13   for me.  He's got a masters degree.  By virtue of having a
14   masters degree in finance, he certainly could run this.  But
15   I don't know that he would go to the same secondary data
16   sources to confirm the numbers.  That's all I was saying.
17   Q.     Doctor, the number that you used in the report, you
18   were assuming, was based -- was Mr. Hurley's salary at the
19   time that he left?
20   A.     Correct.
21   Q.     Have you ever --
22   A.     Correct.
23   Q.     His highest earning year in the tax returns that you
24   reviewed was 2007.  It was the year before he was
25   terminated; right?

PETTINGILL - CROSS

1    A.      Correct, and the number was 123 that year but he was

2    on track to make more than that when he was terminated

3    because that's -- that termination, that incident

4    occurred -- well, let me just put it this way, he was on

5    track to make more than 122 in 2008.

6    Q.      Have you ever seen a tax return that Mr. Hurley gave

7    you that showed the income numbers that you assumed in

8    preparing your report?

9    A.      No, he never got a chance to demonstrate it.

10   Q.      Okay.  So the 2007 year, even at his highest year,

11   the number you used in your report is even higher than that;

12   right?

13   A.      Of course because he was on track for '08 to make

14   more.  Now, one other correction, though, I didn't use seven

15   and a half percent taxes.  I want to make that crystal

16   clear.  Huge difference between 21 and 7 and a half.

17   Q.      Your report somehow assumes a tax deduction for

18   something?

19   A.      Of course.  We're in federal court.

20   Q.      Do you know what the gross loss to Mr. Hurley was,

21   without considering taxes or 401(k) accounts?

22   A.      Sure it's in my spread sheet.  $443,793.  It's in the

23   spread sheet.

24   Q.      Isn't it true, Dr. Pettingill, that everything in

25   this report is an estimate?

PETTINGILL - CROSS

```
 1   A.      No.  I don't think that's fair, because all the
 2   backup numbers are listed in my report.  How much money he
 3   made, how much money he deducted because he was given 1099s
 4   and W-2s.  The tax numbers are based on a table that can be
 5   looked up.  The only estimate, only estimate is the car.
 6   And I took the low out -- low range on that.  We talked
 7   about the 401(k), which is calculated based on his income.
 8   So this is not an estimate.  The only estimate would be the
 9   use of a BMW, which I know would be leased at more than 650
10   a month.  So I took the low road on that.  I didn't assume
11   he would have a BMW every year.
12   Q.      Did you assume a insurance benefit he has?
13   A.      No.
14   Q.      You didn't?
15   A.      No, sir.
16   Q.      Did you assume a insurance benefit he gets in one of
17   your first reports?
18   A.      I may have, but again, this is the report I'm
19   testifying from.
20   Q.      So this particular report does not include any value
21   for the loss of health insurance by Mr. Hurley?
22   A.      Absolutely zero.  Conservative.
23   Q.      Again, back to your deposition.
24   A.      Sure.
25   Q.      Page 24?
```

PETTINGILL - CROSS

1   A.    I wish we could turn the lights up a little bit

2   because I have mine printed 16 to a page and I can't read

3   it.

4   Q.    That's fine with me.  It will affect the visibility

5   of the screen but it doesn't bother me if you turn the

6   lights up.

7   A.    If you just tell me where you are and read it to me.

8           MR. HENRY:  Page 24.

9           MR. CELLAR:  Frank, I have a larger copy and I can

10  give it to him.

11          MR. HENRY:  Doesn't matter to me.

12          THE WITNESS:  Sure, because I have 16 to a page.

13  I can't read it.

14          MR. HENRY:  You need to get that Lasik surgery.  I

15  can read it from here.

16          THE WITNESS:  I can't afford it.

17          MR. CELLAR:  May I approach, Your Honor?

18          THE COURT:  Yes.

19          THE WITNESS:  Thanks very much.  24; right?

20          MR. HENRY:  24.

21          THE WITNESS:  Okay.

22  BY MR. HENRY

23  Q.    I asked you the question:  It's important to you as

24  an expert witness to make sure that this report is as

25  accurate as it can be -- as it can possibly be; correct?

PETTINGILL - CROSS

1   A.      Well, sure.

2   Q.      And you answered:  I'd like to point you to Page 4,

3   counselor.

4           And I said:  Question, okay, just answer the

5   question first.

6           Answer, I wanted you to look at Page 4 and then

7   I'll answer it, if you don't mind.

8           Question, as an expert witness, is it important

9   for you to make sure that this report is as accurate as it

10  can possibly be.

11          Your answer was:  Of course, but Page 4 does not

12  say loss of back pay adjusted by earned income estimated.

13  Estimated means I don't have the exact amount so I put that

14  in deliberately because I expected a trial to have better

15  information documented.  Hopefully the benefit manager will

16  be taken, hopefully somebody can vouch for the matching

17  401(k) and all the other questions that you're going to ask

18  me which I don't have the information right now.

19  A.      Absolutely true.

20  Q.      Did anybody give you any information from a benefit

21  manager from Mr. Hurley's prior employment?

22  A.      No, no, no.  But we did talk about the 401(k).  We

23  did talk about the earnings in 2011.  My deposition was

24  taken first part of -- part of the year.  So there was no

25  way I would have the information that I have today back in

PETTINGILL - CROSS

1   the time that -- back in January -- back in March when I

2   gave my depo.

3   Q.      You had four conversations with Mr. Hurley about this

4   case; right?

5   A.      Three or four, yes, sir.

6   Q.      This report says four; right?

7   A.      Yes, that's right.

8   Q.      And you've also spoken with Mr. Cellar?

9   A.      No.  Mr. Cellar, no, just to get the testimony set

10  up.

11  Q.      Okay.  But you have spoken to him but not of any

12  substance?

13  A.      No substance, correct.

14  Q.      Okay.  In any of the times that you talked to

15  Mr. Hurley, did he tell you he canceled his 401(k) account?

16  A.      No.

17  Q.      Did Mr. Hurley tell you --

18  A.      It wasn't in his depo.  That's what I was looking

19  for.  It was discussed in his depo but it wasn't mentioned

20  directly in his depo.

21  Q.      Mr. Hurley didn't tell you that, though?

22  A.      No.

23  Q.      And that's specifically in your testimony, you said

24  someone can vouch for the matching 401(k) and all the other

25  questions.

PETTINGILL - CROSS

1  A.    Right.

2  Q.    Did you ask Mr. Hurley if he canceled his 401(k)

3  account?

4  A.    Of course not.

5  Q.    Isn't that something that you would want to know and

6  make this as accurate as possible?

7  A.    Well you know, I told the jury that it could stay or

8  go accordingly, but my experience with 401(k)s, most people,

9  if they pull money out, they try to get back in because it

10  is tax deferred and it's a great plan that companies

11  provide.  But I didn't say, categorically, the 401(k) would

12  be considered up to the date of trial.  If the jury doesn't

13  want to consider it, it should be deducted.

14  Q.    And the numbers in your report, then, tell the jury,

15  may or may not be accurate; is that right?

16  A.    No, I didn't say that.  You want to keep referring to

17  the fact that my numbers are not accurate.  I've done the

18  best I can.  That's what I told the jury on direct.

19  Q.    And I took your deposition, again, at Page 25, and it

20  says:  So these numbers which you've identified in your

21  report, your damages calculation is an estimate.  It may or

22  may not be accurate; correct?

23        Your answer was:  The past number is an estimate,

24  correct.  That's the number that we're talking about today,

25  the past number is an estimate; correct?

PETTINGILL - CROSS

1    A.    The past numbers when I did my --

2    Q.    And it may not be accurate to the penny.  That's

3    correct?  That was your testimony?

4    A.    That was my testimony then and my testimony now is

5    the numbers are accurate because I've got more information

6    to review and I know more about Mr. Hurley's current work

7    history than I knew back in March of '11, that's correct.

8    Q.    You had -- when you prepared your original report,

9    estimated a 10,000-dollar benefit per year for something

10   called a risk management program.  Do you recall that?

11   A.    Absolutely.

12   Q.    Is that not in your current report?

13   A.    Absolutely not.  Nothing --

14   Q.    Why did you take it out?

15   A.    Why?  Because initially Mr. Hurley was offered some

16   risk management moneys from his former employer.  Not the

17   one he's with now.  That's simply by virtue of working for a

18   big company, he would be blended into some risk management.

19   He's working for an individual now.  He has no insurance,

20   but I didn't put it back in the report.

21   Q.    Your understanding is that he's working for an

22   individual now?

23   A.    He's working for a company now, but he's 1099.  He's

24   an independent operator.

25   Q.    And the reason you took out the risk management,

PETTINGILL - CROSS

1    benefit is because it's your understanding that he had that

2    benefit available to him now?

3    A.      No, he doesn't have it now.  He had it in his prior

4    job.

5    Q.      At Kent?

6    A.      Correct.

7    Q.      Okay.  And that was in your original report?

8    A.      Correct, but I took it out.

9    Q.      And why did you take it out?

10   A.      Well.  Counsel wanted me to be ultra conservative, he

11   said, and I took it out.  I chose to take it out.

12   Q.      At the time you prepared your original report,

13   Mr. Hurley hadn't given you any payroll information other

14   than his tax returns, which have now been amended; right?

15   A.      Correct.

16   Q.      Okay.  So that original report was based upon tax

17   returns that have changed since then?

18   A.      Correct.

19   Q.      And I recall that even though -- even though you had

20   asked Mr. Hurley for his earnings information that he hadn't

21   given it to you; right?

22   A.      It may have gone to the attorney but I hadn't

23   received it, that's correct.

24   Q.      And you had testified at your deposition that you

25   repeatedly asked him for that information and he hadn't

PETTINGILL - CROSS

1   produced it?

2   A.      I have it now.

3   Q.      I'm sorry?

4   A.      I have it now.

5   Q.      Yeah, but I mean, at the time that I took your

6   deposition, you'd repeatedly asked him for it and he hadn't

7   produced it; right?

8   A.      I didn't have it then.  I have the information now.

9   I even have the last year's 1099 and income information

10  about his current job, which is something I definitely would

11  not have had in March of 2011.

12  Q.      You testified about some work that Mr. Hurley did as

13  a private detective?

14  A.      Correct.  Schedule C was filed in one of the years.

15  Q.      And in your original report, you had aggregated that

16  money into a lump sum and I asked you about it and you said

17  that -- that the money for the private detective may or may

18  not be even reflected in the report because you couldn't

19  unbundle what you relied on in calculating his damages.

20  A.      I used the Schedule C and that's -- Schedule C

21  reports gross and then all the deductions.  So when you take

22  out all the deductions, he wasn't netting out any money.  He

23  wasn't earning any money.  He was using the money he earned

24  to pay his expenses.  That's all.  There was no net income.

25  I can show it to you on the Schedule C if you like.

PETTINGILL - CROSS

1   Q.      If there's any source of income that Mr. Hurley
2   didn't tell you about, his back pay calculation the way
3   you've calculated it would be lower; right?
4   A.      Sure.
5   Q.      And back pay the way everybody calculates it is the
6   difference between the money that you're making today and
7   the money that you used to make?
8   A.      Yes, correct.
9   Q.      And the period of time that's in between; right?
10  A.      Absolutely.
11  Q.      So theoretically, and I think you said you could do
12  this when I took your deposition, you could calculate
13  Mr. Hurley's damages at six months at eight months at ten
14  months and all I would need to do is tell you what he was
15  making then and what he's making now; right?
16  A.      It's a lot more complicated than that.  What he makes
17  now, the tax base is much lower than he made then.  That's
18  one difference right there.
19  Q.      Right, but what I'm saying is that, for example
20  hypothetically, if Mr. Hurley got terminated from employment
21  and then the next week got a job at the same rate of pay or
22  a higher rate of pay or made the same amount of money, in
23  your expert opinion, what would his damages be?
24  A.      Zero but I wouldn't credit him if he made more money.
25  I wouldn't say that the fact that he got terminated was

PETTINGILL - CROSS

1    better for him so he's making 200,000 now, let me give him a

2    credit against -- he was making one twenty-eight five.

3    Q.    He would then owe Kent money; is that right?

4    A.    Sure.  Is that a real -- is it a real question?

5    Q.    It isn't a question.  It's attempt at a joke and the

6    reason I went to law school is because I couldn't be a

7    comedienne.

8    A.    I got the joke.

9    Q.    If Mr. Hurley today and throughout his period after

10   he was terminated by Kent is making a similar amount of

11   money to what he made when he was at Kent, in your expert

12   opinion, what are his damages?

13   A.    Zero.

14   Q.    And the only way that we'll know what Mr. Hurley is

15   really making is if we get records and accurate testimony

16   to -- to reflect that income; isn't that true?

17   A.    Correct.

18   Q.    Okay.  Did Mr. Hurley tell you about a company called

19   Best Value Partners?

20   A.    Possibly, yeah.  I recognize that name.

21   Q.    Is the income from that company reflected in this

22   report?

23   A.    I don't see any W-2s from that or 1099.

24   Q.    Or 1099s or any other record?

25   A.    No.

PETTINGILL - CROSS

1   Q.      What about Best Value Ammo, you see that?

2   A.      I don't recognize the name.

3   Q.      Redux Group, R-E-D-U-X, Group?

4   A.      I don't see the record.  Believe me, every single W-2

5   or 1099, I got copies of.

6   Q.      Did you do any independent research on work that

7   Mr. Hurley might have been doing other than what Mr. Hurley

8   gave you?

9   A.      No.  I'm not a vocational person.  I can't, you know,

10  go out and try to find it.  I did some research, general

11  research on unemployment rates in the county, and you know,

12  some general research just to make sure that Lee County

13  wasn't an exception, Fort Myers wasn't an exception to the

14  rule of Florida where we were leading the country in that

15  unemployment for a while.

16  Q.      There was a line item in here, I think, where you had

17  talked about all of the -- yeah, on Page 2 of your current

18  report, you've got Number 12 says income information from

19  Executive Health Care, Alta Private Health, and Ortino

20  Enterprises?

21  A.      Correct.

22  Q.      Are those the only sources of income Mr. Hurley told

23  you about?

24  A.      No, no, I had some others.

25  Q.      What are the others?

PETTINGILL - REDIRECT

```
 1   A.      I don't remember.
 2   Q.      Do you have it with you?
 3   A.      I could go through each one and try to find it.
 4   Q.      Yeah, it's important for us to know if you have it
 5   with you.
 6   A.      Sure.  I don't want to report anything that's not
 7   deducted, so those are some of the ones I listed.  There may
 8   have been a couple others.  As you know, he got paid from
 9   some agencies when he was doing private investigative work
10   but he didn't net anything out of that.  That would not have
11   shown up in 1099s and W-2s.
12   Q.      Do you have those other sources?
13   A.      You want me to look for all of them?
14   Q.      Well, if you can.  If you can't, let us know.
15   A.      I can't.
16           MR. HENRY:  Okay.  I don't have any other
17   questions, Your Honor.
18                   REDIRECT EXAMINATION
19   BY MR. CELLAR
20   Q.      Dr. Pettingill, Mr. Henry asked you to assume certain
21   things during his portion of examination.
22   A.      Right.
23   Q.      Has your opinion changed in any way?
24   A.      None whatsoever.  I was trying to make it clear on
25   direct that the one number that, in my opinion, could go
```

PETTINGILL - REDIRECT

1    either way is the 401(k).  But from my experience dealing

2    with doctors and dentists and many other various

3    professionals, people pull money out of 401(k) for certain

4    reasons, they fund a kid's education, they fund a 529 plan,

5    they pay off a mortgage, they buy a car, and then they start

6    up again.  I'm not assuming Mr. Hurley would have started up

7    again if that's the case.  If his company would have kept

8    matching, the number is 30,000.  That's my opinion.

9    Q.    And there was a suggestion made to you that if

10   Mr. Hurley made the same amount of money after Kent that he

11   was making at Kent, that would affect your analysis; right?

12   A.    Absolutely.

13   Q.    During the roughly two years you've been involved in

14   this case, have you seen any documents or any information to

15   suggest that Mr. Hurley made anything close to what he was

16   making at Kent?

17   A.    No, sir.

18   Q.    To your knowledge, what's the most he's made since

19   he's been -- since he was fired?

20   A.    25 an hour for a few months and then it bumped down

21   to 15 an hour, and that does not equate to $128,000 a year,

22   not even close.

23   Q.    Now you were asked a question regarding Ortino

24   Investigations?

25   A.    Right.

PETTINGILL - RECROSS

1   Q.     And I believe it was your testimony that that was not
2   included as income because the expenses essentially netted
3   it out?
4   A.     He had more -- more below the line deductions than he
5   had income generated so it was a negative.
6   Q.     Do you know whether you were asked questions about
7   Best Value Partners or Best Value Ammunitions, whether his
8   expenses on those ventures likewise exceeded any income he
9   may have received?
10  A.     Possibly, yes, sir.
11         MR. CELLAR:  Okay, I've got nothing further.
12  Thank you.
13         THE WITNESS:  You're welcome.
14                    RECROSS EXAMINATION
15  BY MR. HENRY
16  Q.     So that -- that income from Best Value Partners, do
17  you have any idea what it was?
18  A.     No.
19         MR. HENRY:  No further questions.
20         THE COURT:  All right, thank you.  You may step
21  down.
22         THE WITNESS:  Thank you, Your Honor.  I don't want
23  to take any exhibits.  I think these are exhibits.  I'm
24  going to leave these here.
25         THE COURT:  They are.

PETTINGILL - RECROSS

1          THE WITNESS:  Very good.  Thank you, Your Honor.
2     I appreciate you getting me in today.
3          THE COURT:  Certainly.
4          THE WITNESS:  I do have a chart I brought in.  I
5     don't know where that chart went, the big chart with the
6     numbers on it.
7          MR. CELLAR:  May have left it outside.
8          (Pause in place)
9          THE WITNESS:  Might be in the bathroom.  Took a
10    lot of work, Your Honor.
11         MR. CELLAR:  I think it's in the report.
12         THE WITNESS:  It is.  It's a lot easier to read
13    that than the overhead.
14         MR. CELLAR:  May I leave this, Your Honor?
15         THE COURT:  I beg your pardon?
16         MR. CELLAR:  May I leave this?  It's, I guess, a
17    copy of what's contained within his report.
18         THE COURT:  Yes.  What about it?
19         MR. CELLAR:  I'm sorry?
20         THE COURT:  What about it?
21         MR. CELLAR:  Is it okay to give this to the jury
22    as an excerpt of his report?
23         THE COURT:  Well, what's on the back of it?
24         MR. CELLAR:  One of the charts that's referenced
25    inside the report as well.

PETTINGILL - RECROSS

```
 1                THE COURT:  All right.  That is your report?
 2                THE WITNESS:  Yes, sir, Your Honor.  I'm sorry I
 3     didn't bring it in.  I left it in the bathroom.
 4                THE COURT:  All right you may.  You may use it.
 5                JUROR CUSTER:  Thanks for the effort.
 6                (Witness excused)
 7                THE COURT:  All right.  Now, before we proceed
 8     again, I'm going to give you another limiting instruction.
 9     I gave you one earlier.  As I told you, sometimes I will
10     give you these limiting instructions.  Those are
11     instructions that tell you that you can only use certain
12     evidence for limited purposes in some instances.  This is
13     one of those instances.
14                You've heard testimony, not from this last witness
15     but from previous witnesses, you've heard testimony
16     regarding the plaintiff's employment agreement with the
17     defendants, but as you know, this is not breach of contract
18     lawsuit.  This evidence about the plaintiff's employment
19     agreement is to be considered by you only for two purposes.
20     First, for considering plaintiff's timing in providing a
21     Family Medical Leave Act certification; and second, in
22     determining whether the reasons offered by the defendants
23     for terminating plaintiff's employment are instead a pretext
24     for violating the Family Medical Leave Act.  So the use of
25     that evidence is limited to those two purposes.
```

HURLEY - CROSS

1          You may proceed.

2          MR. HENRY:  I'm going to recall Patrick Hurley for

3     cross examination.

4          THE COURT:  Yes.

5          MR. HENRY:  Richard, where's the document you're

6     calling personnel file?

7          MR. CELLAR:  It's Exhibit 1.  It's up on the

8     table, I believe.

9          MR. HENRY:  I can't find it.

10          (Discussion off record)

11                        CROSS EXAMINATION

12     BY MR. HENRY

13     Q.    Mr. Hurley, did I hear you testify on your direct

14     examination that you had a 24 month noncompete with Kent

15     Security?

16     A.    I believe that's what it said.

17     Q.    What is the significance of that noncompete, in your

18     mind?

19     A.    I'm not sure I understand what you mean by

20     significance of the --

21     Q.    Does it have any relevance to this lawsuit?

22          MR. CELLAR:  Objection, Your Honor, calls for a

23     legal conclusion.

24          THE COURT:  Sustained.

25

HURLEY - CROSS

```
 1   BY MR. HENRY
 2   Q.      Do you know if -- were you somehow prevented from
 3   getting a job because of your noncompete?
 4   A.      Well, according to the noncompete, it said that --
 5   from the portions that I just read, that I'm not allowed,
 6   for 24 months, to compete with Kent Security.
 7   Q.      And how did that impact you?  Did you not look for a
 8   job in the security field for 24 months or something like
 9   that?
10   A.      No, I -- I did seek out employment in the security
11   field all across the country.
12   Q.      Okay.  So you weren't in any way limited in your job
13   search by any noncompete that you might have had; right?
14   A.      Well, no.  What I'm saying is I did not recall having
15   signed a noncompete back in 2001.  I was reminded of it
16   along the way, and in -- in due course, I did apply for a
17   lot of security jobs across Florida, across the country.
18   Q.      I took your deposition three times in this case;
19   right?
20   A.      Yes.
21   Q.      Okay.  And one of the times that I took your
22   deposition was on December 22nd, 2010.  That was actually
23   the first time.  Do you recall that?
24   A.      Yes.
25   Q.      And that date is more than two years after your
```

HURLEY - CROSS

1    termination from employment; right?

2    A.      What was the date we first got together?

3    Q.      December of 2010.  You were terminated in May of

4    2008.  I took your deposition two and a half years later?

5    A.      Okay.

6    Q.      Correct?

7    A.      That sounds right.

8    Q.      And at your deposition at Page 51, Lines 5 through

9    13, I asked you:  Did you have a noncompete agreement with

10   Kent that became effective after you left.

11            And your answer was no.

12            And I asked you:  There was no noncompete?

13            And your answer was no.

14            And I asked you:  As far as you know, there was no

15   restriction on your ability to compete with Kent Securities;

16   correct.

17            And your answer was:  I'm not aware of anything

18   that forbid me to compete with Kent Security.

19            Do you recall that testimony?

20   A.      Absolutely, I do.

21   Q.      Okay.  So is it your testimony today that you were in

22   any way impaired in your ability to look for jobs as a

23   result of the noncompete that you just showed the jury?

24   A.      At the time that you took my deposition, I was not

25   aware that the restriction was in place.  I have since come

HURLEY - CROSS

1    to understand that, in fact, I did have a noncompete in

2    place.

3    Q.      And you became aware of that after the noncompete had

4    already expired; right?

5    A.      If those dates are correct, and I think they are,

6    that would be true.

7    Q.      Okay.  So that -- that certainly couldn't have

8    impacted your job search because at the time the noncompete

9    would have been in effect, you didn't even know about it;

10   right?

11   A.      That -- that's accurate.  I did not know it at the

12   time that you took my deposition, correct.

13   Q.      That's what I wanted to clear up.  And you testified,

14   I think, on direct examination that you were involved in an

15   automobile accident while you worked at Kent?

16   A.      Yes.

17   Q.      And that you suffered an injury as a result of it.

18   A.      That's correct.

19   Q.      Do you recall that testimony?

20   A.      Yes, I do.

21   Q.      Do you recall what year that was?

22   A.      I believe it was 2003.

23   Q.      And did you take any leave of absence from work as a

24   result of that injury?

25   A.      I don't recall taking any leave of absence, no.

HURLEY - CROSS

1   Q.    I mean, what I mean by leave of absence, were you
2   absent from work relating to the injuries that you've just
3   described to the jury?
4   A.    I don't -- I don't recall.  I know I went to the
5   hospital and I was in a neck brace for a little bit but I
6   don't know that I -- I'm not sure that I missed any work.  I
7   don't recall.
8   Q.    Okay.  Well, let's start there.  When you were at the
9   hospital, was that during working hours?
10  A.    No, that would have been after working hours.
11  Q.    After working hours?
12  A.    Uh-huh.
13  Q.    I'm going to show you an exhibit.
14  A.    Thank you.
15          MR. CELLAR:  Your Honor, I want to object to this
16  exhibit.  It's regarding an issue that we've discussed at
17  sidebar before.
18          THE COURT:  Let's have a sidebar then and talk
19  about it.
20          (At sidebar, Court and counsel present)
21          MR. HENRY:  This is the exhibit, Judge.
22          THE COURT:  Just a minute.
23          MR. HENRY:  Oh, I'm sorry.
24          MR. CELLAR:  Your Honor, the objection to this is
25  this is an email that was during settlement negotiations

HURLEY - CROSS

1   where Mr. Neuman testified about a release.  This goes

2   directly to the issues that they've tried to keep out the

3   entire trial with regard to reimbursements for what he's

4   owed, his severance payment.  This is the only reason that

5   this would be entered is to show discussions regarding

6   settlement agreements, which they've tried to keep out.

7   This is a settlement discussion regarding release.

8           MR. HENRY:  The significance of this, he had a car

9   accident and while he was out of work, he got charged with

10  vacation time during that FMLA leave of absence and in this

11  document, he's objecting, saying I should not have been

12  charged with vacation time because this was a medical leave

13  of absence.  It's directly opposite of his position today in

14  the courtroom where he's saying, my vacation was a medical

15  leave of absence.  I don't mind redacting the entire

16  document except for this point, but this is very powerful

17  admission on his part that his claims in this case are

18  directly opposite of what he's done in the past.

19          MR. CELLAR:  Your Honor, it's made in the course

20  and scope of settlement discussions.

21          MR. HENRY:  This is not a settlement.  They had no

22  claim between them.

23          MR. CELLAR:  Mr. Neuman testified they were

24  negotiating a release.

25          MR. HENRY:  That's different than a claim.

HURLEY - CROSS

1           MR. CELLAR:  Your Honor, this is exactly what they

2    moved to keep out is these communications.

3           THE COURT:  Just a minute.  Let me look at it.

4           (Pause in place)

5           THE COURT:  We're going to get into Rose's

6    recordkeeping.  He's contesting what it says here even.

7           MR. HENRY:  He's saying she shouldn't have charged

8    him vacation days.

9           THE COURT:  I don't want to get into all that.

10           MR. HENRY:  Can I at least ask him about it

11    without the document?

12           THE COURT:  No, because we're getting too close

13    into settlement discussions.  They're going back and forth.

14    May be some posturing.  We're going to stay away from it.

15           MR. HENRY:  Okay, thank you.

16           (Sidebar concluded)

17    BY MR. HENRY

18    Q.    Mr. Hurley --

19    A.    Yes.

20    Q.    -- you worked at Kent Security from 2001 until 2008;

21    right?

22    A.    Yes.

23    Q.    And during that entire period of time, you -- the

24    person that you reported to directly was Gil Neuman;

25    correct?

HURLEY - CROSS

```
 1   A.      Gil Neuman and Orly Alexander.
 2   Q.      Okay.  But during your entire period of employment,
 3   you reported to Gil Neuman and possibly somebody else?
 4   A.      Well, predominantly Gil Neuman, but also Orly
 5   Alexander.
 6   Q.      Let me say it another way.  There was never a period
 7   of time when you were not reporting to Mr. Neuman; correct?
 8   A.      He remained the CEO the entire time I was with Kent
 9   Security.
10   Q.      When you were hired with Kent Security, did you have
11   a good relationship with Mr. Neuman?
12   A.      When I -- the day I was hired, is that what you're
13   asking?
14   Q.      Yeah, when you were initially hired, the first few
15   years of your employment.
16   A.      The first -- the first few years or the first year?
17   I want to hear your question correctly.
18   Q.      Yeah, the first few years of your employment, how was
19   your relationship with Mr. Neuman?
20   A.      I think it was pretty good.
21   Q.      And did that change over time?  Did it ever turn not
22   good?
23   A.      I think there -- there were some rough spots that
24   happened in 2004, 2005 --
25   Q.      Describe --
```

HURLEY - CROSS

```
 1   A.      2000 -- well actually, 2003 was when I was promoted
 2   to the presidency of Kent Security and I was to be moved
 3   from Fort Lauderdale to Naples by way of professional movers
 4   and it didn't end up that my home was moved by professional
 5   movers.  He enlisted some of our security guards to pack my
 6   Fort Lauderdale house up and rented like a U-Haul and moved
 7   the things over and some of the things that had been moved
 8   were irreparably damaged and so that was -- that was a bit
 9   of a source of angst.
10   Q.      Did that somehow change your relationship with
11   Mr. Neuman?
12   A.      Well, no.  It was just that it was a rough spot.  It
13   was a rough spot in our relationship; that's all.
14   Q.      Are there any other rough spots in your relationship
15   that you could describe for the jury?
16   A.      I would say another rough spot that we had was in, I
17   believe almost 2004, or 2005 -- yeah, 2004, 2005.  One of
18   the other executives in our company who ran the Broward Palm
19   Beach Division at the time that I was president of Naples
20   had spread a rumor at the corporate office that I was having
21   a homosexual relationship with the controller of the company
22   and that caused -- that caused quite a bit of angst.
23   Q.      And what was the substance of that complaint that --
24   in what nature did somebody claim you had a homosexual
25   relationship?  If you could, describe it for the jury,
```

HURLEY - CROSS

1   please.

2   A.      I'm really not sure I understand your question.

3   Q.      What did the person say about you?

4   A.      Well, only one time was it said in front of me.  It

5   was since I was in Naples, I never got to hear what was

6   verbatim said.  I only know that it was reported back to me

7   by staff members at the Miami office that the other

8   president, whose name was Bill DiMaria, he had started a

9   rumor with the corporate staff in the Miami office that I

10  was having a homosexual affair with the controller.

11  Q.      My specific question is, what did he say, though?

12  Isn't it true that --

13  A.      I wasn't there.

14  Q.      -- he referred to you and another employee as butt

15  buddies?

16  A.      He did not say that in my presence.  I thought that's

17  what you were trying to refer to.  He had -- Mr. DiMaria had

18  come over to the Naples office while I was getting some

19  nasal surgery and during the two days that I was getting

20  nasal surgery, he came over to our division and really gave

21  my office staff, my management team a real going over.  He

22  talked me down to my employees, belittled me, and then he

23  had stated to two of my management staff -- it was reported

24  to me that he had told two of my management staff that the

25  controller and I were butt buddies.

HURLEY - CROSS

1   Q.      And how did that chain of events impact your

2   relationship with Mr. Neuman?

3   A.      Well, it was obviously -- at that moment, it didn't

4   affect our relationship, but I did report to Mr. Neuman what

5   had been done and what had been said.  In fact, one of my

6   management staff created a -- I guess a memo at that point

7   bringing me up to speed on what had happened while I was

8   having nasal surgery, and I shared that with Mr. Neuman and

9   he seemed dismissive and unconcerned about it.

10  Q.      Before we move on, on that same note, were you given

11  time off for that nasal surgery that you just described?

12  A.      I was -- I was not in the office for, I believe it

13  was two days.

14  Q.      Okay.  And were you penalized in any way as a result

15  of having taken those two days off?

16  A.      I don't understand.  What does penalized mean?

17  Q.      Did you get in trouble at work for taking those two

18  days off?

19  A.      I didn't get in trouble for having nasal surgery,

20  sir, no.

21  Q.      Okay.  Now, other than what you've described with

22  Mr. Neuman, tell me about any other incidents that you can

23  recall that adversely impacted your relationship.

24  A.      Well, I guess we'd still be on the same subject.  We

25  had a management meeting in Miami at night.  It was -- I

HURLEY - CROSS

1    guess it was somewhere in the early parts of 2005, I

2    believe, and I was at that corporate office meeting, along

3    with Mr. DiMaria, who had spread these rumors.  Couple of

4    others executives with the company were there.  Mr. Neuman

5    was there, and Mr. Neuman's brother-in-law was there.  And

6    during the meeting, I asked Mr. Neuman in front of all the

7    executive staff to please address this situation and put an

8    end to it.

9           And from that point, Mr. DiMaria went on a tirade,

10   very animated, angry tirade and he -- he pointed over his

11   shoulder to the controller's office, which was behind him at

12   that point in the board room.  He pointed behind him and he

13   said to me, very angrily, why don't you and your girlfriend

14   go have some more sex.

15          And I asked Mr. Neuman repeatedly in that meeting

16   to put a stop to that.  And Mr. DiMaria continued and I

17   asked Gil again and again, Gil, please put a stop to this

18   now.  And he wouldn't do a thing.  So that caused a little

19   bit of a rough spot in our relationship.

20   Q.    Other than the incident involving the damage to your

21   furniture and the incident involving what you just

22   described, are there any other instances that you believe

23   adversely impacted your relationship with Mr. Neuman?

24   A.    Again, as I said earlier today, Mr. Henry, Mr. Neuman

25   and I had a relationship I guess like any relationship.  It

HURLEY - CROSS

```
 1   has -- it had ups and it had downs but we were always very
 2   frank with each other.  There were times where we fought,
 3   there were times where we hugged, times we laughed, times we
 4   cried.  So yeah, there were -- you know, along the path of
 5   that relationship, yeah, there were -- there were some other
 6   rough spots, but more -- more than not, just sort of garden
 7   variety.
 8   Q.    Isn't it -- didn't you feel since 2005 that
 9   Mr. Neuman wanted you to leave the company?
10   A.    No, that's not true.
11   Q.    Did Mr. Neuman ever suggest that you leave the
12   company, other than the day that you were terminated?
13   A.    Did he suggest I leave the company, like leave the
14   company?
15   Q.    Yeah.
16   A.    No, he never said for me to leave the company.
17         MR. HENRY:  Can I have Exhibit B-1, please?
18   BY MR. HENRY
19   Q.    Showing you Exhibit B-1 for identification, this is
20   an email that Gil Neuman wrote to you on October 20th, 2005;
21   correct?
22   A.    Yes.
23   Q.    And this is a true copy of the email that you
24   received from him?
25   A.    It seems to be, yes.
```

HURLEY - CROSS

1              MR. HENRY:  Your Honor, offer Defendant's

2    Exhibit B-1 into evidence.

3              MR. CELLAR:  No objection, Your Honor.

4              THE COURT:  Exhibit B-1 is received.

5              (Defense Exhibit B-1 admitted)

6    BY MR. HENRY

7    Q.    Would you read to the jury, Mr. Hurley --

8              MR. CELLAR:  What do you need?

9              MR. HENRY:  Have you got a highlighter?

10             MR. CELLAR:  Yes.

11             MR. HENRY:  Did you steal my highlighter?

12             MR. CELLAR:  That's a very serious accusation.

13   BY MR. HENRY

14   Q.    Read this sentence to the jury, please.

15   A.    It says:  If you do not like our culture, you might

16   choose to leave.

17   Q.    Okay, and then also this section?

18   A.    If you can't find -- find a way to deal with your

19   supervisor in a professional way, you might choose to leave.

20   Q.    And by supervisor, Mr. Neuman was referring to

21   himself; correct?

22   A.    I believe that's correct, yes.

23   Q.    And the next section, please?

24   A.    You are not the CEO and you do not get to tell the

25   CEO how to do his job.

HURLEY - CROSS

1    Q.      And then the final section of this email?

2    A.      The door open.  No one is holding you.  If you feel

3    you can do better elsewhere, good luck.

4    Q.      I'll ask you again, did Mr. Neuman ever suggest that

5    you leave the company other than on the day that you were

6    terminated?

7    A.      No.

8    Q.      So you -- you don't interpret this to be a suggestion

9    that you leave?

10   A.      No, I think it's very clear.  This was something in

11   the phraseology, I think is very, very clear that

12   Mr. Neuman -- we had had a little bit of a dust-up here,

13   that Mr. Neuman was saying to me that I might choose to

14   leave if I cared to.

15   Q.      Did it matter to you that the entire email is written

16   in all capital letters?

17   A.      He very often wrote his emails in all capitals.

18   Q.      Okay.  But you did not interpret this as a negative

19   thing toward you in any way; correct?

20   A.      I -- when you say negative, I -- do you consider a

21   dust-up negative?

22   Q.      Well, did you feel that this was negative criticism

23   of you?

24   A.      I feel -- I felt it was a dust-up and I felt that

25   Gil was hot under the collar because of something he and I

HURLEY - CROSS

 1    shared.

 2    Q.     Isn't it true, Mr. Hurley, that at least during the

 3    last few years of your employment with Kent Security, you

 4    did not like working with Mr. Neuman?

 5    A.     I -- I -- the last few years of working with

 6    Mr. Neuman had probably more rough patches than the earlier

 7    parts of my employment and there were certainly a lot of

 8    times that I -- I found that it wasn't fun to work with him

 9    or for him.  That's true.

10    Q.     And even beyond that, you thought Mr. Neuman was not

11    an ethical man; correct?

12    A.     That's -- that's correct.

13    Q.     And you thought he was not a moral man; correct?

14    A.     That's correct.

15    Q.     In fact, you once said that he operated his business

16    with a Middle Eastern mentality which doesn't translate into

17    the American workplace?

18    A.     That's correct.

19    Q.     Why would you say something like that?

20    A.     Well, because many of the issues that I would bring

21    up to Gil, Mr. Neuman, along the way that I thought were

22    unethical or immoral, his come-back often to me was, hey,

23    that's how we do things back home in Israel.  So what's one

24    to conclude?

25    Q.     Have you ever been to Israel?

HURLEY - CROSS

```
1   A.      No, sir.  I do hope to go one day, though.

2   Q.      Have you ever been to the Middle East?

3   A.      I have never been to that part of the world.

4   Q.      What basis do you have for believing that Mr. Neuman

5   was not ethical in the period of time between 2005 and 2008?

6   A.      I would -- I would share with you that as an example,

7   we had security officers who were very, very low-paid people

8   who worked for us and there were times where really great

9   people, for whatever reason, had to move on.  They couldn't

10  work for us anymore.  Maybe they got a better job somewhere

11  else or something happened, they had to move.  If they did

12  not turn in their uniforms, which we had hundred and

13  40-dollar deposit, a uniform that cost us $20, we were

14  holding $140 of deposit from them and if they came to pick

15  up their final paycheck but they had not turned in their

16  uniforms as yet, their final paycheck was held by Mr. Neuman

17  and that put some very low-income people, who were on the

18  knife's edge, living day-to-day, in a very, very bad

19  position.  And I thought that was wrong.  I thought it was

20  illegal.  I thought it was immoral, and I told him so.

21  Q.      And you had conflicts with Mr. Neuman about what you

22  just described; correct?

23  A.      Only to the degree that I would share these things

24  with him, reminding him that this is no way to treat

25  employees, this is not in accordance with the law and his --
```

HURLEY - CROSS

1    his come-back was, essentially, I'm the CEO.  This is none
2    of your concern.
3    Q.    And in fact, isn't it true that you believe that
4    those complaints about what you just described were the
5    reasons for your termination?
6    A.    No.  The reason for my termination was I asked for
7    medical leave and then I was terminated because of it.
8    Q.    Have you ever told the federal government that the
9    uniform issues that you just described were the basis for
10   your termination from employment?
11   A.    No.  I believe that the -- when you say the
12   government, can you be more specific, please?
13   Q.    The Equal Employment Opportunity Commission.
14   A.    Well, that's a whole different ball of wax, Mr. --
15   Mr. Henry, because the EEOC forms as you're talking about
16   were not signed by me nor were they prepared by me.
17   Q.    You're familiar with the form that I'm talking about;
18   correct?
19   A.    Vaguely.
20   Q.    Okay.  And the form that we're talking about was
21   signed by your lawyer; correct?
22   A.    Signed by my former lawyer.
23   Q.    Yeah.
24   A.    Whom I fired.
25   Q.    At the time that she signed those forms, she was your

HURLEY - CROSS

1   lawyer; correct?

2   A.    At the time that -- that she -- she signed those EEOC

3   forms, she was my lawyer, yes.

4   Q.    Okay.  And those forms that she signed and filed with

5   the government you had an opportunity to review; correct?

6   A.    No, I don't believe that's correct at all.

7   Q.    I'm sorry, didn't I show you those documents at your

8   deposition?

9   A.    No.  You said -- maybe I misunderstood your question.

10  Did you say that I had an opportunity to review them before

11  Mr. -- Mrs. Noonan sent them out?

12  Q.    Have you seen them?

13  A.    I believe you showed them to me at my deposition.

14  Q.    Okay.  Tell the jury whether those documents that

15  were filed with the federal government include an allegation

16  that your termination was a result of what you just

17  described, that uniform allowance issue?

18  A.    I'm not familiar enough with the forms to tell you

19  exactly what is or what is not in them because I didn't

20  prepare them, nor did I approve of them, nor did I sign

21  them.

22  Q.    Your lawyer prepared them, approved them, and signed

23  them; correct?

24  A.    I don't know what she did other than to sign them.  I

25  assume she created them.

HURLEY - CROSS

1   Q.      How long was Ms. Noonan your lawyer?

2   A.      About, I guess it was about nine months to perhaps a

3   year.

4   Q.      And during that nine months to a year, you're aware

5   that she filed charges of discrimination with the Equal

6   Employment Opportunity Commission; correct?

7   A.      Yes.  I am aware of that now, yes.

8   Q.      And you're aware that she filed documents on your

9   behalf with the Florida Unemployment Appeals Commission;

10  correct?

11  A.      I knew about those, yes.

12  Q.      Okay.  And there were several copies of charges that

13  were filed with the EEOC, the Equal Employment Opportunity

14  Commission and the Florida State Discrimination Agency?  Are

15  you aware of that?

16  A.      I'm not aware of that.  Anything that had to do with

17  the EEOC things, I'm -- I, frankly, wasn't aware of.

18  Q.      Are you aware that the charges that were filed with

19  the federal and state government allege that the reason for

20  your termination was your age?

21  A.      As I said to you before, Mr. Henry, since I didn't

22  review those documents, I didn't prepare those documents, I

23  didn't sign those documents, I can't be sure what is or what

24  is not in them.

25  Q.      You read them when I showed them to you at your

HURLEY - CROSS

1    deposition; right?

2    A.     That was quite some time ago.  I don't remember the

3    content.

4    Q.     Okay.  And you're not aware, then, that those

5    documents also allege that you were terminated because of

6    your gender; right?

7    A.     Again Mr. Henry, I am aware because you made me aware

8    of some of these matters, but as I sit here today, I don't

9    recall verbatim what was in those charges because I didn't

10   create them, didn't approve them, didn't sign them.

11   Q.     Let me just ask this one final question, then,

12   because Ms. Noonan is going to testify tomorrow.  Are you

13   aware that in those charges, you alleged, Ms. Noonan on your

14   behalf, that Gil Neuman was trying to force you out of the

15   company for three years before you were actually terminated?

16   A.     I'm aware of that because I believe you made me aware

17   of that.

18   Q.     Okay.  Did you -- did you tell Ms. Noonan that

19   Mr. Neuman was forcing you out of the company for three

20   years?

21            MR. CELLAR:  Your Honor, I'm going to object based

22   on the preservation of a privilege between an attorney and

23   his client.

24            THE COURT:  Just a moment.

25            MR. HENRY:  It's intended to go in the document.

HURLEY - CROSS

1              THE COURT:  Sustained.

2    BY MR. HENRY

3    Q.    Isn't it true that you believe that Mr. Neuman was

4    trying to force you out of the company up to five years

5    before you were actually terminated?

6    A.    I believed at the time that, you know, my -- my

7    furniture was destroyed, a lot of it in the move to Naples,

8    and also the situation with Bill DiMaria and being

9    bullied -- that's what I felt like it was.  I was being

10   bullied at work.  During that period of time, I certainly

11   had the feeling that he was wanting me out of the company.

12   I didn't think anybody you would want would be treated like

13   that.

14   Q.    And how long was that before you were actually

15   terminated?

16   A.    I guess it was -- it was five, four or five years,

17   sounds like, before.

18   Q.    And is it fair to say, then, that if you believe

19   Mr. Neuman was an immoral, unethical man and that he had a

20   Middle Eastern way of doing business and that you had these

21   conflicts with him that you just described and that he was

22   trying to force you out of the company, you believed, isn't

23   it fair to say that your relationship with him was bad

24   during at least the last three years of your employment,

25   Mr. Hurley?

HURLEY - CROSS

```
 1                 MR. CELLAR:  Objection, Your Honor, form.

 2                 MR. HENRY:  Summary.

 3                 THE COURT:  Overruled.

 4   A.    As I shared with you before, this is a question that

 5   you had similarly asked me a few minutes ago.  I said our

 6   relationship had highs and lows.  Whose relationships don't?

 7   I would say that the latter part of my employment with Kent

 8   Security we had more issues.  We had more rough spots than

 9   perhaps the early part.  And like I shared the story about

10   security officers leaving the company not getting their

11   final paychecks, these were things that I would bring up

12   along the way that he was not embracing and not interested

13   in hearing about.

14   BY MR. HENRY

15   Q.    Mr. Hurley, I'm showing you what I've just marked for

16   identification as Defendant's Exhibit F-1.  Is this a email

17   that you wrote to Brandy Callahan on October 8th of 2007?

18   A.    Yes.

19                 MR. HENRY:  Your Honor, I'd offer Exhibit F-1 in

20   evidence.

21                 MR. CELLAR:  No objection.

22                 THE COURT:  Exhibit F-1 is received.

23                 (Defense Exhibit F-1 admitted)

24   BY MR. HENRY

25   Q.    Zoom it.  Mr. Hurley, would you read the first
```

HURLEY - CROSS

1   paragraph of that email to the jury?

2   A.     Well, if you thought you could wish this thing away,

3   you were wrong.  If you thought that me reminding you was

4   just idle chitchat, you were wrong.  Now you have to deal

5   with it.

6   Q.     What's -- who is Brandy Callahan.

7   A.     Brandy was my director of operations in Naples.

8   Q.     Second paragraph says, "Now Gil is breathing down our

9   necks for it."  What did you mean by that?

10  A.     Well, I guess in context of the second paragraph,

11  combined with me telling you to make several face-to-face

12  quality contacts, now Gil is breathing down our necks for

13  it -- to be honest, I don't quite know, frankly, the -- the

14  context of this, the background of it.  So I'm -- I'm a

15  little foggy, but it appears that Gil is wanting us to do

16  something with -- with urgency.

17  Q.     This is October of 2007.  Do you recall how your

18  relationship was with Mr. Neuman at the time this email was

19  written?

20  A.     About the same as it always was.

21  Q.     Good or bad?

22  A.     Oh, about the same as it always was.  Again, I shared

23  with you earlier, my relationship with Mr. Neuman was not

24  unlike relationship with anybody.  It had ups, it had downs,

25  it had great days and had down days.

HURLEY - CROSS

1           MR. HENRY:  H-1.

2    BY MR. HENRY

3    Q.     Showing you what's been marked as Defendant's

4    Exhibit H-1 for identification and I'll ask you if you

5    recognize that email as well?

6    A.     Yes, I -- I do.  I would just point out that from a

7    format standpoint, this looks very odd.  It doesn't appear

8    to be the format that our emails came in.

9    Q.     Is this an email from you to Brandy Callahan?

10   A.     Sure appears to be, yes.

11   Q.     November 26th, 2007?

12   A.     Yes.

13           MR. HENRY:  I'll offer Defendant's Exhibit H-1

14   into evidence, Your Honor.

15           MR. CELLAR:  No objection.

16           THE COURT:  Exhibit H-1 is received.

17           (Defense Exhibit H-1 admitted)

18   BY MR. HENRY

19   Q.     Mr. Hurley, please read for the jury this email.

20   A.     From this day forward, every directive that Gil gives

21   you or me or the office in general, we will reiterate it in

22   an email and send it back to him first.  There are no

23   exceptions to this rule ever.  Not ever.

24   Q.     Who is Brandy Callahan?  She's your direct report?

25   A.     Director of operations.

HURLEY - CROSS

1   Q.      What was the purpose of this email?

2   A.      Again, context is always difficult when you have a

3   email in isolation.  However, what it seems like to me is

4   I'm asking my staff when -- when Mr. Neuman gives us a

5   directive to make sure that we don't forget about it or we

6   under -- we have understood what we're being asked to do

7   properly, to put it into an email, to shoot it back to

8   Mr. Neuman so that we know that we're all on the same page.

9   That's what it seems like.

10  Q.      So are you saying that this email was written as a

11  convenience for Mr. Neuman?

12  A.      No, no.  I -- again, context being everything, and

13  I'm not sure, what it feels like is I'm telling my staff, so

14  that we know that we have understood Mr. Neuman properly, to

15  shoot -- to put down what we think is being asked of us and

16  to shoot it to him and to make sure that we know what we're

17  doing and we're doing it right on the first time.

18  Q.      So when you wrote this email, you weren't angry or

19  frustrated with Mr. Neuman in any way?

20  A.      I -- I don't -- I certainly don't get that from this.

21  Q.      Is that something that you typically do with other

22  employees at Kent Security or you did with other employees?

23  When they tell you they need something or do something, you

24  follow it up with a writing?

25  A.      Well, I suppose the answer to that is it depends, but

HURLEY - CROSS

```
 1    I took Mr. Neuman's directives very seriously and I wanted
 2    to make sure that my staff took his directives very
 3    seriously and I didn't want us to make -- it looks like I
 4    didn't want us to make any mistakes.  So I think we may
 5    have, from the sound of this, it looks like we may have
 6    misunderstood something he said or we didn't follow through
 7    on something he said and I didn't want that to happen again,
 8    so I thought one of the best ways to remind us and to make
 9    sure we were on top of his directives was to put down what
10    we thought he wanted us to do and to -- and to email it to
11    him to make sure we understood.  And we -- as a good
12    reminder, too.
13    Q.    And your testimony is that as of November 26th, this
14    is around about Thanksgiving of 2007, your relationship with
15    Mr. Neuman was -- was still good?
16    A.    It was, again, about the same as it always was.
17    Q.    Were you suffering any kind of -- withdraw the
18    question.
19          Were you experiencing, around this same period of
20    time, problems with clients at Kent Security, November,
21    December, January?
22    A.    We always had some issue with clients.  That's sort
23    of the nature of business.  I'm sure we did.
24    Q.    Showing you what's been marked as Defendant's
25    Exhibit J-1 for identification, is this an email that you
```

HURLEY - CROSS

1    wrote to Brandy Callahan on December 13th, 2007?

2    A.    Yes, also to Matt Hodges and James Calamari.

3         MR. HENRY:  Offer Defendant's Exhibit J-1 into

4    evidence, Your Honor.

5         MR. CELLAR:  No objection, Your Honor.

6         THE COURT:  Exhibit J-1 is received.

7         (Defense Exhibit J-1 admitted)

8    BY MR. HENRY

9    Q.    Mr. Hurley, this was written by you on December 13th,

10   2007; correct?

11   A.    Yes.

12   Q.    Describe for the jury who is Ernie Ferency?

13   A.    Ernie Ferency was and may still be the general

14   manager of BMW of Fort Myers.

15   Q.    Is that a big -- was that a big client of Kent

16   Security?

17   A.    It wasn't a big client, but I considered all of our

18   clients important.

19   Q.    Okay.  So it was an important client of Kent

20   Security?

21   A.    All our clients were, I thought.

22   Q.    How many guards were assigned to this particular

23   client; do you know?

24   A.    Oh, let me think.  Well, it was certainly just one at

25   a time and I believe it was just overnights.  So the

HURLEY - CROSS

1    dealerships would have closed at about four and would have

2    reopened at about seven a.m.  So that would have taken

3    approximately three personnel to accomplish.

4    Q.    And your direct contact with that client was Ernie

5    Ferency?

6    A.    Ernie Ferency.

7    Q.    Ferency, is that how you pronounce it?

8    A.    Ferency, yes.

9         MR. CELLAR:  Your Honor, objection, relevance to

10   this entire line.

11        THE COURT:  Sustained.

12   BY MR. HENRY

13   Q.    Were you getting complaints from clients in December

14   and January of 2000 -- December of 2007, January of 2008?

15   A.    We -- we had client issues, client complaints, client

16   problems.  You could probably throw a dart at a calendar and

17   you'd hit a day that we had some kind of issue with one of

18   our clients.  It's the nature of the security industry.

19   Q.    Were the conflicts that you were having with clients

20   a source of stress for you in the workplace?

21   A.    Well, of course.  You want to have every one of your

22   clients just happy as a clam, but you know, that's not

23   always the case and when you have a client who's not happy

24   with the service you're providing, yeah, you want to do

25   better and that creates stress, urgency, so forth.

HURLEY - CROSS

1    Q.      Around the same period of time, in the first few

2    months of 2008, I think you testified on direct examination

3    that you were also having financial problems at home; is

4    that correct?

5    A.      Yes.  2008, yes.

6    Q.      And you described your financial problems at home as

7    you overextended yourself, I think; is that correct?

8    A.      That's correct.

9    Q.      And you were here when your expert witness testified

10   that one of the items of damages that's being argued to the

11   jury is the value of your 401(k) account; correct?  Is that

12   right?

13   A.      I heard talk of the 401(k) between the two of you,

14   yes.

15   Q.      Would you tell the jury, before you were terminated

16   from employment, did you ask Kent Security to cancel your

17   401(k) contribution?

18   A.      Yes, I did.  My wife had, you know, shared with me

19   the unhappy news of our finances and she had emailed to me a

20   request that we, for a period of time, stop contributing to

21   the 401(k) so that we would have more money take home in

22   order to pay some of our obligations.

23   Q.      So in view of the fact that you canceled that

24   account, it certainly wouldn't be appropriate to ask the

25   jury to award the value of that account to you in this case;

HURLEY - CROSS

1    correct?

2    A.    You just said closed the account.  That would not be

3    correct.  I simply suspended my 401(k) contributions to my

4    account.

5    Q.    And do you know whether the value that your expert

6    included for the jury is based upon the company's matching

7    contribution to that account?

8         MR. CELLAR:  Objection, Your Honor, foundation.

9         THE COURT:  Sustained.

10   BY MR. HENRY

11   Q.    Do you know how the expert's damages with respect to

12   your 401(k) account were calculated?

13   A.    Well, only to the extent that we heard his testimony

14   here.  I'm certainly no economist from New Orleans.  So no,

15   I don't know how -- how he calculated it.

16   Q.    Was one of the benefits that you received with your

17   employment at Kent Security a company match for your 401(k)

18   account?

19   A.    Yes.

20   Q.    So if you put money into that account, the company

21   would match, to a certain degree, the amount of money that

22   you put in; right?

23   A.    Yes, that's correct.

24   Q.    And if you stopped contributing to that account, of

25   course the company's match would also stop as well?

HURLEY - CROSS

1    A.      Yes, that's correct as well.

2    Q.      Okay.  So if the match that the company was giving

3    you when you stopped the account also stopped, that would

4    have no value as damages; right?

5    A.      I'm sorry?

6    Q.      Let me rephrase it.  That was a terrible question.

7    When you canceled your contribution into your 401(k)

8    account, the company's match also stopped; is that right?

9    A.      That's right.

10   Q.      Okay.  And did you tell the company that the reason

11   that you wanted to cancel that contribution was because you

12   wanted to invest in gold?

13   A.       I told Rose Cucurillo in an email, because she was

14   the one who would control those kinds of things, I told her

15   that we wanted to stop contributing to our 401(k) and that I

16   wanted to invest in gold.  You can't do that through the

17   401(k) that we had, but I wanted to.  I knew I couldn't

18   right then, but I wanted to invest it in gold and I

19   certainly hoped that at some point when we -- things got

20   better with our finances that I would be able to invest it

21   in gold because I thought that was a good investment.

22              MR. HENRY:  Is T-1 already in evidence?

23              DEPUTY CLERK:  Yes.

24   BY MR. HENRY

25   Q.      Showing you Exhibit T-1 that's already been admitted

HURLEY - CROSS

1    into evidence, and this is the email that you wrote to Rose

2    Cucurillo telling her that you were going to invest in gold

3    and to cancel your 401(k); correct?

4    A.    You keep saying cancel my 401(k) account.  I just

5    want to make sure you have it right, Mr. Henry.  I didn't

6    cancel my 401(k) account.  I just suspended contributions to

7    my 401(k).

8    Q.    I didn't mean to imply you were going to take a

9    distribution on the account.  What I meant was you canceled

10   the contribution to your account; is that right?

11   A.    I think the way I phrased it was the most accurate.

12   I had suspended my contributions to my 401(k).

13           MR. CELLAR:  Frank, it's already in.

14           MR. HENRY:  V-1 is in, too?

15           MR. CELLAR:  Yes.

16           MR. HENRY:  Oh, this is so much easier.

17           MR. CELLAR:  You're welcome.

18           MR. HENRY:  You're such a sweetheart.

19   BY MR. HENRY

20   Q.    I'm showing you Plaintiff's Exhibit V-1.  It's

21   already admitted in evidence, I'm told, and ask you if this

22   is the email exchange with your wife where she's asked you

23   to suspend your contribution into your 401(k) account?

24   A.    Yes, it is.

25   Q.    And this particular email that was sent by your wife

HURLEY - CROSS

```
 1    to you was at 9:39 a.m; correct?
 2    A.      Yes, that's what it appears to be.
 3    Q.      And then you wrote back to her at 3:34 p.m; right?
 4    A.      That's -- that looks correct, yes.
 5    Q.      And your testimony is the reason you're -- she's
 6    asking you to cancel this account is because you were having
 7    financial issues at home; right?
 8    A.      Yes.  She wanted us to suspend contributions to our
 9    401(k) so that we would have more money in my take-home pay
10    so that we could address some of our expenses.
11    Q.      Okay.  And that was at 3:34 p.m. and then five
12    minutes later, you're writing to Rose Cucurillo telling her
13    that you want to suspend the account so you can invest in
14    gold?
15    A.      I didn't ask anyone to suspend an account, Mr. Henry.
16    I asked them to suspend contributions to my 401(k).
17    Q.      Okay.  Is that at least misleading, the fact that
18    your wife wrote you five minutes ago saying suspend the
19    contribution to the account because we don't have the money
20    to pay our credit cards, and then five minutes later you're
21    writing to Rose Cucurillo saying, suspend the account
22    because I want to invest in gold?
23              MR. CELLAR:  Objection, Your Honor, relevance.
24              THE COURT:  Overruled.
25    A.      You've said again to suspend my account.  I -- I was
```

HURLEY - CROSS

1    never going to suspend my account, only to suspend my

2    contributions.

3            But as far as what your question is concerned, I

4    didn't think it was appropriate to reveal to Rose Cucurillo

5    our financial issues, our challenges.  So I -- I sincerely

6    hoped and I sincerely wanted to -- as soon as the storm

7    clouds passed with our finances at home, I had every

8    intention of investing in gold.

9            (Discussion off record between counsel)

10   BY MR. HENRY

11   Q.     Showing you Exhibit V-1 for identification, this is

12   an email you wrote to Gil Neuman on February 12th, 2008.

13   Correct?

14   A.     Yes.

15           MR. HENRY:  Offer Defendant's Exhibit V-1 into

16   evidence, Judge.

17           THE COURT:  V, as in victor, 1 is received into

18   evidence.

19           MR. CELLAR:  No objection.

20           (Defense Exhibit V-1 admitted)

21   BY MR. HENRY

22   Q.     Mr. Hurley, T-1 where you're telling Rose Cucurillo

23   where you're going to invest in gold at 3:39 p.m. was the

24   same date as what I've just offered into evidence that you

25   wrote this email to Gil Neuman where you're asking him for a

HURLEY - CROSS

1    bonus; correct?

2    A.      I'm asking him for the bonus that was overdue, yes.

3    Q.      And in fact, the bonus letter that you -- the bonus

4    email that you wrote to Mr. Neuman was approximately seven

5    minutes after the email that you wrote to Rose Cucurillo

6    where you told her I want to invest in gold; right?

7    A.      That appears to be correct.

8    Q.      And that financial issue that you were experiencing

9    at home, it's a terrible thing to go through, but you

10   described it as -- that you had overextended yourself;

11   right?

12   A.      That's accurate.

13   Q.      Okay.  Was your stress from that overextension making

14   its way into the workplace, in your opinion?

15   A.      I don't know if it made its way into the workplace,

16   but I know it certainly was -- it was something that was

17   weighing on me.

18   Q.      That financial pressure at home caused you to tell

19   Ms. Cucurillo that you were investing in gold and you wrote

20   an email to your boss asking him for a bonus?

21   A.      No, no, I didn't ask him for a bonus, like can I have

22   a bonus, please.  I was asking him if he would please

23   calculate the bonus that was owed to me and was overdue by

24   over a month at that point.

25   Q.      There's been a lot of talk about bonuses in this

HURLEY - CROSS

1    litigation.  You're not asking the jury to award you any

2    bonus compensation for 2007 or 2008; correct?

3    A.    No.

4    Q.    Okay.  So when we're talking about this bonus

5    compensation, it's not as though the jury should infer that

6    that's something that you're entitled to and you haven't

7    gotten and you're asking them for it; right?

8    A.    That's not something I'm asking for, no.

9    Q.    Okay.  In March of 2007, you were seeing Fred Stuart,

10   who's a social worker; correct?

11   A.    I had a conversation with Mr. Stuart a couple of

12   times.  I think it was in the February/March, March/April,

13   2008 range.

14   Q.    At the time you were visiting Mr. Stuart, did you

15   have your house up for sale?

16   A.    I don't know if they overlapped.  I don't know.

17   Q.    When have you -- prior to May 1st, 2008, when have

18   you had your house up for sale?

19   A.    We had -- we had it up for sale twice.  Once, I guess

20   it was back in -- I don't even remember the year, to be

21   honest with you.  Feels like it was 2006 or 2007 we had it

22   up for sale.  My wife -- we bought a house when we moved

23   over here not knowing the area and we purchased a home way,

24   way, way east in Collier County and it's about 20 miles one

25   way to a grocery store, and my wife -- it just kind of made

HURLEY - CROSS

1  her crazy.

2  Q.    Okay.  So when did you have the house for sale?  I'm

3  sorry.

4  A.    I don't recall specifically, but I seem to feel like

5  it was 2006 or 2007.

6  Q.    Okay.  And you remember that you were meeting with

7  Fred Stuart sometime in 2007; right?

8  A.    I believe I -- I believe that's right, yes.

9  Q.    Did you ever tell Fred Stuart that you wished you

10  lived in Arizona?

11  A.    I think I didn't just tell Fred Stuart.  I think I

12  probably told my wife and such that, daydreaming allowed,

13  really, that, you know, there are days where I just felt so

14  down, I just felt like I wanted to escape, wanted to run.  I

15  felt so bad that, yeah, I daydreamed aloud.  I said, boy,

16  wouldn't it be -- wouldn't it be great to be in Arizona,

17  wouldn't it be great to be in Chicago, wouldn't it be great

18  to be in a log cabin.  These were coping mechanisms, I

19  think.

20  Q.    You'd vacationed in Arizona for several years as of

21  2007; right?

22  A.    As of 2007?

23  Q.    As of the time you met with Mr. Stuart, you'd been

24  there several times; right?

25  A.    I believe I had been there once or twice.

HURLEY - CROSS

1    Q.      Okay.  And did you also tell Mr. Stuart that you
2    found your job at Kent Security unfulfilling?
3    A.      Yeah, I think on -- on an occasion, yeah, I think I
4    did say to him that it felt unfulfilling.  And you know, I
5    think -- I think that is an outgrowth of my condition.
6    There were -- there were days that I just felt rotten and
7    awful about everything.  But bottom line, I loved my job and
8    I did it well.
9    Q.      Did you ever tell Mr. Stuart that the reason you
10   stayed at Kent because you needed the big fat paycheck?
11   A.      I don't think I ever phrased it just that way, no.  I
12   think what I said was I had, you know, obviously family
13   obligations and I had a family to take care of and I had
14   expenses and I was happy that I was able to make enough
15   money to support my family and my overhead.
16   Q.      You were here in the courtroom when Mr. Stuart
17   testified on Monday; right?
18   A.      Yes.
19   Q.      Okay.  We went through his notes and he had the term
20   "big fat paycheck" in his notes in quotes, do you remember
21   that?
22   A.      Yeah, I saw that.
23   Q.      So do you recall whether that was -- that was a term
24   that you actually used with him?
25   A.      No, I don't recall.  But that -- that doesn't sound

HURLEY - CROSS

1   like something I would say.  But if -- if Fred says I said

2   that, I would defer to him.

3   Q.    Were you considering moving to Arizona at the time

4   you saw Mr. Stuart and told him that your job was

5   unfulfilling?

6   A.    Again, I probably daydreamed aloud to him several

7   times about wanting to escape, wanting to run.  I had those

8   feelings quite a bit when I was in the throes of an episode

9   or I was really feeling down.  I may have daydreamed aloud

10  and said, you know, it would be great to be here, great to

11  be there.  Just feelings of escapism.

12  Q.    And do you remember if Mr. Stuart told you, well,

13  before you move to Arizona you ought to vacation there?  Do

14  you recall that?

15  A.    I think his -- I think his counsel to me at the time

16  was, you know, no matter what you daydream aloud, whether it

17  ultimately comes to pass or not, you shouldn't do anything

18  hasty and you shouldn't do anything reflexively.  You should

19  really think it through and have a clear mind when you --

20  when you do it.

21  Q.    And you don't specifically recall Mr. Stuart telling

22  you to go to Arizona to see if you like it before you moved

23  there?

24  A.    He -- he -- he may have said that, but I believe his

25  statement was far more general than that, because I think I

HURLEY - CROSS

1    daydreamed aloud with him a lot about running away and
2    escaping and trying to feel better.  So I think his -- I
3    think his counsel to me was more general than that, that
4    whether it's Arizona or whether it's Chicago or whether it's
5    living in a log cabin, you know, ultimately, if it -- if it
6    becomes something more than a -- a daydream aloud, then try
7    it, test it out, look into it, research.  Don't make any,
8    you know, kind of reflexive decisions.
9    Q.    So you were -- you had told Mr. Stuart you found the
10   job unfulfilling and that you needed, because of your
11   obligations, a paycheck, but you were considering moving to
12   Arizona and at some point around this time you had your
13   house up for sale.  Tell the jury, were you considering
14   quitting your job at Kent Security?
15   A.    No.
16   Q.    How could you move to Arizona and not quit your job?
17   A.    Well, that assumes that I was going to move to
18   Arizona and what I just shared with you is that when I was
19   with Fred Stuart, on probably more than one occasion, I
20   definitely daydreamed aloud about not just Arizona, about a
21   lot of things and a lot of places.
22   Q.    Did you vacation in Arizona during 2007 after you met
23   with Mr. Stuart?
24   A.    I think we were in Arizona either 2005 and 2006 or
25   2006 and 2007.  I -- I don't remember.  Or maybe all three.

HURLEY - CROSS

1    I don't remember.

2    Q.    This picture that we've been throwing around the

3    courtroom for the last few days, that's of you and your wife

4    at Tombstone, Arizona, at some point, Wyatt Earp Days;

5    correct?

6    A.    Yes, that's correct.

7    Q.    And do you recall whether you had gone to Wyatt Earp

8    Days the Memorial Day weekend after you met with Mr. Stuart?

9    A.    Is that 2007?

10   Q.    2007.

11   A.    I think we -- I think 2007 was one of the years that

12   we went to Arizona.

13   Q.    Okay.  And I heard you testify on direct examination

14   that Mr. Stuart and also Dr. Paisan, Dr. Dauer, all three

15   told you that what you needed to do to treat your depression

16   was to get more sleep at night; right?

17   A.    Well, that was easier said than done since I was an

18   insomniac.

19   Q.    But I'm just running through the list of their advice

20   to you.  Get more sleep at night, eat right; yeah?

21   A.    Eat right, okay.

22   Q.    Exercise, and take some vacation.  That's your

23   testimony?

24   A.    No.

25   Q.    Okay.

1    A.    The last part, take vacation, I think it's important
2    to distinguish that what they were referring to was not a
3    family vacation where I still had my Blackberry and I was
4    still conducting Kent business I just wasn't physically in
5    the office but I was still running the company, taking
6    complaints and issues and problems and what have you.  That
7    trip to -- to Arizona, that was a family vacation and
8    there's a distinction between being totally unplugged and
9    away from the stresses of work and taking a family vacation
10   where you have your Blackberry and you're conducting
11   business while you're away.
12   Q.    So you're not claiming on contending in this lawsuit
13   that that trip to -- or any of those trips to Wyatt Earp
14   Days was a medical leave; right?
15   A.    No, that -- that's a family vacation.
16   Q.    Not a medical leave?
17   A.    That's not a medical leave, no.
18   Q.    And in 2007 and 2006, you also went deer hunting in
19   South Carolina; right?
20   A.    I took my son to South Carolina deer hunting.  Yes, I
21   did.
22   Q.    And you're not contending before the jury that that
23   was a medical leave; correct?
24   A.    No, that was not a medical leave.  That was a family
25   vacation, just minus my wife.

HURLEY - CROSS

1   Q.     And you also took trips with your family to the
2   Florida Keys; right?
3   A.     Yes, family vacations, yes, we went to the Florida
4   Keys.
5   Q.     And those you're not claiming or contending were
6   medical leaves; right?
7   A.     Those were not medical leaves.
8   Q.     And then during that same period of time after you'd
9   gotten this advice to take time off work, you also went to
10  Disney World and you're not claiming or contending that that
11  was a medical leave; right?
12  A.     No.  Those, too, were family vacations where I was
13  conducting the business of Kent, I had my Blackberry on me,
14  I was taking phone calls, dealing with issues.  That was a
15  typical family vacation.
16  Q.     This is a blow-up of the email, the attachment to the
17  email that you sent to Gil Neuman on April 29th, 2008, where
18  you told him that you were attaching your vacation schedule,
19  the dates are subject to change.  Right?
20  A.     Yes.
21  Q.     Okay.  Tell the jury, if you would -- I'm sorry,
22  strike that.
23         The first date on this list is -- is Memorial Day;
24  right?  Memorial Day weekend?
25  A.     That's -- well, it appears to be.  I'd have to take

HURLEY - CROSS

```
 1   your word for it.
 2   Q.    Okay.  I'll represent to you that it is Memorial Day.
 3   A.    Okay.
 4   Q.    And in the two prior years before this, you'd gone to
 5   Wyatt Earp Days for Memorial Day; right?
 6   A.    I -- I believe so.  Again, I'm not sure if I went in
 7   2006 or not.
 8   Q.    Okay.  What reason would Mr. Neuman have to believe
 9   that you would use that Memorial Day weekend for anything
10   other than going to Wyatt Earp Days as you had the previous
11   two years?
12             MR. CELLAR:  Objection, Your Honor, speculation as
13   to what another witness would say.
14             THE COURT:  Sustained.
15   BY MR. HENRY
16   Q.    What's different about any of these, what the -- you
17   called vacation dates on this document, what's different
18   about them as opposed to any of the vacations that you took
19   in 2003 -- I'm sorry, 2005 to 2008?
20   A.    Well, the difference is what I was going to do with
21   this time off.  This was medical time off.  I was going to
22   totally unplug from Kent Security.  I was not going to have
23   my Blackberry.  I was not going to be running the office,
24   just not in the office.  I was going to consult with my
25   medical team and put a plan together on how to heal, what
```

HURLEY - CROSS

1   things I could do during these times that would help me get
2   better, because I was desperate to get better.
3   Q.     And at the time that you sent this list of vacation
4   dates to Mr. Neuman, you hadn't gotten any advice from any
5   of your health care practitioners on what you were supposed
6   to do on these leaves; right?
7   A.     No.  We had not gotten to that point because again,
8   24 hours after I had requested medical leave, I was fired.
9   Q.     Well, your testimony is that Dr. Dauer first
10  recommended that you take leave back in 2005; right?
11  A.     That's right.
12  Q.     And then Dr. Paisan recommended that you take leave
13  sometime after that; right?
14  A.     That's true.
15  Q.     And then you got the same advice from Fred Stuart who
16  said you need to eat, sleep, exercise and take leave of
17  absence in March of -- of 2007; right?
18  A.     Are you speaking of my phone calls with Fred?
19  Q.     No, I'm talking generally.  You got advice from all
20  of your health care practitioners beginning in 2005,
21  according to you, up until the date of your termination that
22  you needed to take this time off of work; right?
23  A.     Yes.  I had been told for three years by three
24  different medical health professionals that I needed to
25  unplug from the things that were causing me all the stress,

1    all the anxiety, and all the depression and the panic

2    attacks I was suffering.

3    Q.    But none of them told you what you were supposed to

4    do during these medical leaves of absence?

5    A.    We never got a chance to get that specific.  That was

6    my intention, was to get their feedback, to get their

7    counsel so that when I took these -- these -- these dates

8    off for medical leave, that they would be times of healing,

9    times of getting better, and times of -- of strengthening

10    myself.

11    Q.    And then so you didn't have a chance in the three

12    year period beginning 2005 until three years later in 2008

13    to talk to any of your health care practitioners on what you

14    were supposed to do.  Is that your testimony?

15    A.    No.  My testimony is what it has been since I've been

16    sitting here, and that is that every time one of my medical

17    practitioners would suggest to me that I had to take medical

18    time off, I had to unplug, I had to get away from it all --

19    Q.    Yes.

20    A.    -- that I would brush off their recommendations and I

21    would tell them, I just can't do it, I don't -- I've got too

22    many irons in the fire and too many responsibilities.

23    Q.    Insofar as you had no direction as to what you were

24    supposed to do with this leave of absence, right, insofar as

25    you had no direction, your trip to Tombstone was actually

HURLEY - CROSS

1  consistent with what the doctor was telling you to do;

2  wasn't it?

3  A.    To a degree, it was consistent.  But to a large

4  degree, it was not consistent because that trip, you're --

5  you're showing a picture of, the Tombstone, Arizona, or the

6  photo that you saw earlier that my wife took of me at the

7  edge of the Grand Canyon, all of these family vacations were

8  me working for Kent Security just not in the office.  24

9  hours a day, seven days a week I had to call in to the

10  office.  I'd have to take customer calls at all hours, staff

11  problems, whatever it was.  That's not getting away from it

12  all.  That's not unplugging.

13  Q.    Okay.  Now I'm going to show you some photographs

14  that were already admitted into evidence as Defendant's

15  Exhibit R-3.  This is a photograph that was taken after you

16  had gotten advice to take time off work; correct?

17  A.    Yes, I think so.

18  Q.    And this is one of those vacations that you're saying

19  was not consistent with what the doctor intended you to do?

20  A.    No.  I suggested to you that it, to a degree, is

21  consistent because even during my family vacations, there

22  were plenty of times where I had a really good time and I

23  was really happy and I felt refreshed, but you never -- I

24  never knew when that next issue was going to happen, when I

25  was going to have to deal with an upset client or a problem

HURLEY - CROSS

1    back at the office, and then I'm on the phone for half an

2    hour, 45 minutes dealing with it and then my mood -- I'm all

3    in a knot for another two or three hours.  That's not

4    unplugging.  That's not getting away from it all.  That's

5    not therapeutic, and that's not what was being recommended

6    to me.

7    Q.    So let me just ask you a different question, get to

8    the bottom of this.  If you'd left your Blackberry home on

9    this vacation, would that have transformed this vacation

10   into a medical leave?

11   A.    I would probably answer that by saying unless I was

12   able to structure a leave that absolutely guaranteed that I

13   would be unplugged, that nobody would be able to track me

14   down, nobody would be able to call me at a hotel, nobody

15   would be able to send me a fax, I can't say with certainty.

16   Q.    So this picture in front of the Grand Canyon, you've

17   got your Blackberry with you.  If that -- had you left your

18   Blackberry at home on this trip to the Grand Canyon, in your

19   view, would that have been a medical leave consistent with

20   what your doctors were telling you to do?

21   A.    Again, I can't say with certainty because I -- you're

22   bringing up a hypothetical.  When I was at that Grand Canyon

23   trip, would my office be trying to reach me through the

24   hotel phone?  Would I be getting faxes on the hotel fax

25   machine?  Would I be dealing with company issues just by

HURLEY - CROSS

```
 1   other means?  I don't know.
 2   Q.      What about the deer hunting trip, did you have your
 3   Blackberry with you on this one?
 4   A.      I'm sure I did.
 5   Q.      And if you'd left it home, is it -- in your opinion,
 6   is that vacation transformed into the type of medical
 7   leave --
 8   A.      I think it's the same answer that I just gave you
 9   with the hypothetical Grand Canyon trip.
10   Q.      If you're not able to answer any of these questions
11   about these vacations that you've already taken, whether
12   they're medical leave, tell me what reason would Gil Neuman
13   have had to believe that any of these dates that you asked
14   for vacation were medical leave?
15               MR. CELLAR:  Objection, Your Honor.  Speculation.
16               THE COURT:  Just a moment.
17               (Pause in place)
18               THE COURT:  Sustained.
19   BY MR. HENRY
20   Q.      Did you tell Mr. Neuman that you were going to take
21   your Blackberry on any of these trips, on any of these
22   dates?
23   A.      Such a suggestion was never had because, again, 24
24   hours after this was submitted to him, my request for
25   medical leave, I was fired.
```

HURLEY - CROSS

1   Q.    You and your -- you said you and your wife picked

2   these dates for -- these vacation dates; right?

3   A.    Yes, we together picked them out, but they were

4   subject to change.  They weren't etched in stone.

5   Q.    And just for clarity, no doctor or health care

6   practitioner had anything to do with picking those dates?

7   A.    No.  My wife and I selected those dates together.

8   Q.    Is it a coincidence that the dates in 2008 are all on

9   holiday weekends?

10  A.    I don't think it's a coincidence.  What I think is

11  it -- I don't think the holiday part of it was the driving

12  force.  I think that we looked at the calendar and we looked

13  for periods of time where I thought it was best to be away

14  from the company.  There's some of these dates I had -- I

15  had been away in the past.

16         Also, on these holiday weekends, the office --

17  most of these holiday weekends, the office is closed.  There

18  is no office staff.  There's no going into the office.  So

19  that also factored in.  Is it nice that I could add a day to

20  my -- to my time off?  Sure.

21  Q.    When we're talking about the Family Medical Leave

22  Act, these vacation dates you sent to Mr. Neuman on April

23  the 29th are the only dates that we're talking about; right?

24  A.    I'm not sure what we're talking about.

25  Q.    You're not claiming or contending that you were

HURLEY - CROSS

```
 1   terminated for taking any FMLA leave of absence other than
 2   what you claim these vacation dates are; correct?
 3   A.    I'm claiming that I submitted this, these medical
 4   leave dates to Mr. Neuman and in a phone call with him,
 5   shared with him the extent of my illness, and having done
 6   so, was fired.
 7   Q.    But I just want to clarify for the jury that this is
 8   the only request that you're claiming was an FMLA request;
 9   right?
10   A.    This had to do with medical leave, this schedule
11   right there, but again, it was subject to change.
12   Q.    Okay.  Did you have, on April 29th, 2008, did you
13   have any reason to believe that you would be depressed or
14   otherwise unable to work on any of the dates that you sent
15   to Mr. Neuman?
16   A.    This -- this request, medical request for medical
17   leave was not intended to predict the future, because as I
18   shared earlier, I just never knew when I was going to have
19   an episode or when the panic attacks would come.  This
20   wasn't designed to be a predictor of the future.  It was
21   designed to set times specifically for getting well and
22   healing.
23   Q.    Did you have any doctors' appointments on any of
24   these dates?
25   A.    I don't recall having made doctors' appointments for
```

HURLEY - CROSS

```
 1   those periods of time, no.
 2   Q.      You said in your email to Mr. Neuman on April the
 3   29th -- I'm sorry, was it May 1st?  The longer email you
 4   wrote, I believe it was May 1st?
 5           MR. CELLAR:  April 30th.
 6   BY MR. HENRY
 7   Q.      On April 30th, you said that your health care
 8   practitioners had advised you that your use of leave was no
 9   longer optional.  Do you recall that?
10   A.      Yes.
11   Q.      Did I hear you say earlier that nobody actually told
12   you that it was no longer optional?
13   A.      I don't recall talking about that earlier, but I'm
14   happy to talk about it now.
15   Q.      Okay.  Did any health care practitioner ever tell you
16   that your use of leave as of April 30th, 2008, was no longer
17   optional?
18   A.      Yeah, I think you're reading that wrong.  The
19   intention of what I wrote there was to say that for three
20   years, I had been told by my medical doctors and Fred Stuart
21   that if I did not take time off, if I did not aggressively
22   address my health problems, my depression, my panic attacks,
23   my anxiety, that it could get worse and indeed it could get
24   much worse.  It had gotten much worse.  It had gotten so bad
25   I was becoming totally unglued and I knew at that point that
```

1    it was no longer optional.

2            THE COURT:  How much longer?

3            MR. HENRY:  Oh, I've got couple hours -- another

4    hour, at least.

5            THE COURT:  We're not going to do that tonight.

6    All right, same instruction.  Don't do any research, don't

7    talk with each other about the case, keep on open mind about

8    the case until you've heard all the evidence, until you've

9    heard my final instructions.  You can leave your notes back

10   in the jury room.  Nobody's going to look at them tonight.

11   And I'll see you at 9:00 tomorrow morning.  Please stand for

12   the jury.  Counsel will stay.

13           (Jury out)

14           THE COURT:  Please be seated.  Well, one thing,

15   with regard to the issues that were brought up yesterday at

16   the end of the trial for yesterday was the findings in the

17   opinion of Judge Steele, the judge resident here that had

18   this case before Judge Magnuson, before me, in Document 56,

19   which is filed, actually in response to a plaintiff's motion

20   for clarification of opinion and order, was filed on

21   June 7th, and the clarification of the opinion which I

22   thought was pretty gracious of Judge Steele, he said on

23   Page 6 that Gil Neuman -- A, Gil Neuman is an employer

24   within the meaning of FMLA; B, Kent Security Naples, Inc.,

25   Kent Security Palm Beach, Inc., and Kent Security Services,

```
 1   Inc., are joint employers within the meaning of the FMLA;
 2   and C, key employee defense is inapplicable to this case.
 3             Those are the three specific findings and ruling,
 4   aside from denying the motion for summary judgment, which of
 5   course I'm not going to tell the jury about.  Those are
 6   findings that were made by Judge Steele that when the case
 7   was assigned to him, those are the three things that the
 8   Court will take judicial notice of and advise the jury of.
 9   Okay, that's one thing.
10             We're proceeding at a glacial pace and it's
11   obvious to the Court unless things speed up we're not going
12   to get done this week and I do want to know if the lawyer
13   that the defense has subpoenaed will be here tomorrow or
14   not.
15             MR. HENRY:  She told me last night that she'll be
16   here tomorrow morning at 9:00.
17             THE COURT:  Well, that's not going to work very
18   well.  You said you've got two more hours of cross
19   examination of the plaintiff.
20             MR. HENRY:  I'm going to work through him as fast
21   as I can.  I need -- I have to go through his medication
22   efforts after we're done.  It's going to take an hour to do
23   that.
24             THE COURT:  Well, you know, I wanted to talk a
25   little bit about the attorney-client privilege, which of
```

```
1   course is the client's privilege not the lawyer's, and it's

2   been raised you know by the plaintiff under, I think the

3   question was asked by the defense and it appears to me that,

4   you know, when she's called, she can obviously testify to

5   what she filed because, you know, absent -- I'm not talking

6   about any evidentiary objections there might be to that but

7   in terms of the attorney-client privilege, she can testify

8   to what she filed because that's public record.  But with

9   regard to what the plaintiff, in this case, told her, that

10  is attorney-client privilege and it's been objected to.  So,

11  you know what are we going to gain from her testimony?

12          MR. HENRY:  Well, I had not intended to call her

13  at all, but an issue was raised in Mr. Hurley's deposition

14  about the authenticity of these charges -- and there's a

15  history behind this issue that's flowed throughout the

16  discovery process and now is coming up again today.  We had

17  set Ms. Noonan for deposition and I intended to get her to

18  authenticate the charges at her deposition.  Mr. Cellar

19  stipulated that he would not oppose the admission of those

20  documents.  After the discovery period closed, Mr. Cellar

21  moved in limine to exclude the charges and so we filed a

22  motion with the Court asking that the charges -- that

23  Ms. Noonan be set for deposition again outside the discovery

24  period and that's -- that deposition, that was granted by

25  Judge Magnuson, I believe.  And there was a delay in taking
```

```
 1    Ms. Noonan's deposition because --
 2              THE COURT:  Long delay.
 3              MR. HENRY:  Long delay.  I set that thing as soon
 4    as I got a date from everybody else and Magistrate Judge
 5    here in Fort Myers canceled the deposition for reasons I
 6    don't disagree with, but I don't understand.  And so
 7    Ms. Noonan is going to testify in Court that she recognizes
 8    her signature, she prepared the charges and that she filed
 9    them with the government.  If Mr. Cellar would stipulate
10    that the charges are -- to that part, that they're
11    admissible, he'll waive authenticity, I'm happy to cancel
12    her testimony.  But that's why she's coming here tomorrow.
13              MR. CELLAR:  Your Honor, I've always taken that
14    position.  I think where, respectfully, Frank and I have had
15    the disconnect is I've never had a problem with telling the
16    jury, these were filed with the EEOC.  The only issue that
17    we've ever disputed is that he signed them, which he clearly
18    didn't.  It's not his signature.  So I -- the past is the
19    past, but we will -- I've always offered to stipulate that
20    the charges could come in and they could say that these were
21    filed on his behalf.  I just don't think we need to get into
22    the testimony of what he discussed with Ms. Noonan.  That is
23    what we stated was privileged.
24              MR. HENRY:  With that stipulation, Ms. Noonan does
25    not need to be here.
```

```
1            THE COURT:  I sensed we were ships passing in the
2   night and appears we've gotten together at this point.  So
3   that should take care of it, seems to me.
4            MR. HENRY:  Yes.  So we'll offer those -- those
5   charges into evidence tomorrow and I'll call Ms. Noonan
6   tonight and tell her that she does not need to be here.
7            THE COURT:  All right, fine.  Good.  We're making
8   progress.  And I have -- I told you what I was going to try
9   to do and I have been working with my lawyer, who's tried
10  more lawsuits by the way than most of us have, but anyway,
11  working with her getting the Court's proposed jury
12  instructions together.  Here they are, and I want to have
13  tomorrow sometime, not a settlement but simply if you go
14  through and see a structural problem, not because you didn't
15  get everything that you wanted but rather an instructional
16  problem, I want to know about it so that I can consider it
17  tomorrow and do more tinkering if I have to.  If I get done
18  with that, then we'll have the actual set.  But that allows
19  me to do the best job I can on instructions.  Any questions
20  about that?
21            MR. HENRY:  Yeah, you had -- I believe you had
22  said yesterday that we have an ongoing exception.  Just
23  because we're going to tinker with these instructions
24  doesn't mean we waive the instructions that we proposed
25  before for appeal purposes?
```

```
 1              THE COURT:  That's right, you do not waive a
 2    thing.
 3              MR. HENRY:  Okay.
 4              THE COURT:  The instructions you timely prepared
 5    and filed, then those, if they're not given all or in
 6    substance, you have an automatic objection and the fact that
 7    you come back to me on this and we tinker with them, that's
 8    not waiving anything.  It's helping me to get the best
 9    instructions that I can give.
10              MR. HENRY:  That should go exceptionally smooth.
11              THE COURT:  I beg your pardon?
12              MR. HENRY:  That should go exceptionally smoothly.
13              THE COURT:  Well, thank you.  We're in recess.
14              (Proceedings recessed at 5:10 p.m.)
15
16
17                            CERTIFICATE
18    I CERTIFY THAT THE FOREGOING TRANSCRIPT IS A TRUE AND
19    ACCURATE TRANSCRIPT FROM THE ORIGINAL STENOGRAPHIC RECORD IN
20    THE ABOVE-ENTITLED MATTER.
21
22        Dated this 26th day of February, 2013.
23
                            /s/ R. Joy Stancel
24                          _____
                              R. JOY STANCEL, RMR-CRR
25                          FEDERAL OFFICIAL COURT REPORTER
```